1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  DENNIS J. HERMAN (220163)
   MONIQUE C. WINKLER (213031)
3  100 Pine Street, Suite 2600
   San Francisco, CA  94111
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  dennish@csgrr.com
   moniquew@csgrr.com
6
   Liaison Counsel
7
                                          SCHATZ NOBEL IZARD, P.C.
   BERGER & MONTAGUE, P.C.                 ANDREW M. SCHATZ
8  SHERRIE R. SAVETT                       JEFFREY S. NOBEL
   CAROLE A. BRODERICK                     NANCY A. KULESA
9  BARBARA A. PODELL                       One Corporate Center
   PHYLLIS M. PARKER                       20 Church Street, Suite 1700
10 JOSHUA C. SCHUMACHER                    Hartford, CT  06103
   1622 Locust Street                      Telephone:  860/493-6292
11 Philadelphia, PA  19103                 860/493-6290 (fax)
   Telephone:  215/875-3000                aschatz@snilaw.com
12 215/875-4604 (fax)                      jnobel@snilaw.com
   ssavett@bm.net                          nkulesa@snilaw.com
13 bpodell@bm.net
   pparker@bm.net
14
   Co-Lead Counsel for Plaintiffs
15
                    UNITED STATES DISTRICT COURT
16
                    NORTHERN DISTRICT OF CALIFORNIA
17

18 In re NUVELO, INC. SECURITIES          )   Master File No. 3:07-cv-04056-MMJ
   LITIGATION                             )
19 ─────────────────────────────────     )   CLASS ACTION
                                          )
20 This Document Relates To:              )   CONSOLIDATED COMPLAINT FOR
                                          )   VIOLATIONS OF THE FEDERAL
21      ALL ACTIONS.                      )   SECURITIES LAWS
                                          )
22 ─────────────────────────────────     )

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
**Page**

3  I.     INTRODUCTION ...................................................................................1

4  II.    JURISDICTION AND VENUE ............................................................5

5  III.   PARTIES ...............................................................................................5

6  IV.    CONFIDENTIAL WITNESSES .........................................................7

7  V.     BACKGROUND TO THE CLASS PERIOD .....................................8

8         A.     Nuvelo Bets Its Future on the Commercialization of Alfimeprase.........9

9         B.     Amgen Refuses to Fund Further Efforts to Commercialize Alfimeprase.............10

10 VI.    CLINICAL TRIALS OF ALFIMEPRASE .........................................12

11               1.     PAO Clinical Program ............................................14

12                      a.     Phase 2 Study ..........................................15

13                      b.     Phase 3 Studies ......................................16

14               2.     CO Clinical Program...........................................17

15                      a.     Phase 2 Study ..........................................17

16                      b.     Phase 3 Studies ......................................18

17               3.     Nuvelo Announces Failure of *Both* PAO and CO Phase 3 Trials.............19

18 VII.   DEFENDANTS' SCHEME TO DEFRAUD.........................................23

19        A.     Defendants Falsely Represented the Significance and Reliability of the
                 Phase 2 Alfimeprase Trial Data, and Conceal Material Risks to FDA
20               Approval and Commercial Marketability for PAO and CO. .................23

21        B.     Defendants' Scheme Unravels.................................................29

22 VIII.  FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD..........31

23        A.     Defendants' January 5, 2006 False and Misleading Statements...........................31

24               1.     Reasons Why Defendants' January 5, 2006 Statements Were False
25                      and Misleading..........................................................................32

                 2.     Scienter ......................................................................34
26
         B.     Defendants' February 27, 2006 False and Misleading Statements.......................36
27
                 1.     Reasons Why Defendants' February 27, 2006 Statements Were
28                      False and Misleading ...................................................38

1               2.     Scienter ...............................................................................39

2     C.    Misleading Statements in Nuvelo's FY05 Report on Form 10-K .......................41

3            1.     Reasons Why the Statements in the FY05 Report on Form 10-K Were Materially False and Misleading to Investors. ...........................42

4            2.     Scienter ...............................................................................44

5

6     D.    Defendants' False and Misleading Statements in April 10, 2006 Press Release .................................................................................................................46

7            1.     Reasons Why Defendants' April 10, 2006 Statement Was False and Misleading ....................................................................................46

8            2.     Scienter ...............................................................................47

9

10    E.    Defendants' May 5, 2006 False and Misleading Statements ................................49

11           1.     Reasons Why Defendants' May 5, 2006 Statements Were False and Misleading ....................................................................................49

12           2.     Scienter ...............................................................................50

13    F.    Defendants' August 3, 2006 False and Misleading Statements...........................52

14           1.     Reasons Why Statements Made on the August 3, 2006 Conference Call Were False and Misleading. ...........................................53

15           2.     Scienter ...............................................................................54

16

IX.    MISLEADING RISK WARNINGS PROVIDE NO SAFE HARBOR ......................57

17

X.     ADDITIONAL SCIENTER ALLEGATIONS .................................................................61

18    A.    Individual Defendants' Compensation Was Tied to Financial Performance.........61

19

20    B.    Defendants Were Motivated to Commit Fraud to Gain Access to Capital through the Follow-On Offering...........................................................................62

21  XI.   PRESUMPTION OF RELIANCE AND PROXIMATE LOSS CAUSATION/ECONOMIC LOSS ........................................................................................64

22

23    A.    Applicability of Presumption of Reliance: Fraud on the Market Doctrine............65

24    B.    Defendants' False and Misleading Statements Proximately Caused Economic Loss to Nuvelo's Investors .................................................................66

25  XII.  GROUP PLEADING ALLEGATIONS ..........................................................................67

26  XIII. CLASS ACTION ALLEGATIONS ................................................................................69

27

28

# I.     INTRODUCTION

1.     This is a securities fraud class action against Nuvelo, Inc. ("Nuvelo" or the "Company") and certain of the Company's senior officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This action is brought on behalf of all purchasers of the publicly traded securities of Nuvelo between January 5, 2006 and December 8, 2006, inclusive (the "Class Period"), including purchasers in Nuvelo's January 31, 2006 $119 million follow-on offering ("Follow-On Offering").

2.     Nuvelo is a biopharmaceutical company engaged in the development and commercialization of acute cardiovascular and cancer therapies.  During the Class Period, the Company's drug development pipeline included three acute cardiovascular drugs under development: alfimeprase, recombinant nematode anticoagulant protein c2 ("rNAPc2") and a thrombin inhibiting aptamer.  However, the Company's lead cardiovascular development program – to which the market attributed 80% of the Company's value and which the Company touted as its path to profitably – was alfimeprase, a direct-acting thrombolytic agent, or blood clot dissolver.

3.     Nuvelo obtained the rights to alfimeprase from Amgen, Inc. ("Amgen"), a pharmaceutical company whose co-founder, George Rathmann ("Rathmann"), sat on Nuvelo's board.  Amgen had previously tried unsuccessfully to develop alfimeprase.  Nevertheless, Nuvelo, which had never successfully brought a drug to market, sought to capitalize on alfimeprase's purported commercial potential, using it as a lever to raise money to keep the Company afloat, as well as to line defendants' pockets.

4.     At the time Nuvelo obtained the rights to alfimeprase in 2002, it was running out of cash and in danger of becoming insolvent.  After obtaining the rights to alfimeprase, Nuvelo merged with Variagenics, Inc. ("Variagenics") – another drug company that, like Nuvelo, had no products with any near term revenue potential in the pipeline but, unlike Nuvelo, had $55.9 million in the bank.  Following the merger, Nuvelo jumped into clinical trials of alfimeprase, repeatedly boasting of the purported results of the trials and the potential commercial success of drug.  Before and during the Class Period, the Company repeatedly used the alleged success of the alfimeprase trials to access

1    the market and obtain much needed cash to continue in operation, test its drug candidates and highly

2    compensate its executives, raising over $291 million in four public and private offerings, while

3    paying over $4.7 million in salary and cash bonuses to its top officers and directors, the defendants

4    here.

5         5.      During the Class Period, Nuvelo conducted Phase 3 clinical trials for the use of

6    alfimeprase for the treatment of acute peripheral arterial occlusion ("PAO") and catheter occlusion

7    ("CO").  Success of the Phase 3 trials was required to secure U.S. Food and Drug Administration

8    ("FDA") approval and tap the commercial potential of the drug.  Despite the fact they simply did not

9    have the clinical data to back up their statements, defendants repeatedly stated that alfimeprase had

10   already proved effective for the use for which it was being tested in clinical trials for the treatment of

11   PAO.  Defendants further concealed a "target product profile" necessary to commercialize the drug

12   for treatment of CO, as well as the fact that the FDA had imposed an extraordinary regulatory

13   standard, forty times more stringent than normal, for approval based on the Phase 3 CO trial.

14        6.      Defendants' statements were based on the results of Phase 2 trials completed prior to

15   the Class Period, which they claimed demonstrated the efficacy of the drug for the purposes for

16   which it was being tested in the Phase 3 trials.  During the Class Period, defendants repeatedly touted

17   the Phase 2 results when discussing the likely success of the Phase 3 trials.  Defendants claimed, for

18   example, that the Phase 2 trials had demonstrated that alfimeprase restored blood flow and allowed

19   patients to avoid open surgery when, in fact, defendants knew that the results of the Phase 2 trial in

20   PAO could have been the result of the catheter used to inject the drug being pushed through the clot,

21   and there was no way to reliably determine how much, if any, of the positive results were due to

22   alfimeprase.  Incredibly, despite their knowledge of these adverse facts, defendants told investors

23   that the Phase 3 trials represented a "low risk" path to regulatory approval that would be "rapid to

24   market."

25        7.      In making these statements, defendants misrepresented the significance of the Phase 2

26   results, and failed to accurately or fully disclose the risks associated with the ongoing clinical trials.

27   Nuvelo's periodic filings with the Securities and Exchange Commission ("SEC") prior to and during

28   the Class Period similarly misrepresented the risks associated with the Phase 3 trials.  The risk

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                      - 2 -

1  warnings included in those filings included standard boilerplate suggesting that success of the Phase

2  3 trials was not guaranteed.  However, those warnings failed to specifically disclose known risks that

3  undermined the purported Phase 2 results.  Taken together, these statements misled the investing

4  public about the significance of the Phase 2 trial results and the risks then presented in the Phase 3

5  trials.

6         8.     In particular, Nuvelo and its officers failed to adequately warn investors that: (i) the

7  purportedly positive Phase 2 results could be the result of blood clots in certain patients with PAO

8  simply being broken up by the insertion of the catheter into the artery, rather than dissolved by the

9  action of the drug, a matter which had been discussed internally at Nuvelo even before the Phase 2

10  trials were completed; (ii) in the Phase 3 CO trial, the FDA had imposed a much more stringent p-

11  value requirement on Nuvelo to demonstrate success at a statistical significance level that was *forty*

12  *times more stringent* than what the market believed; (iii) the market opportunity for the drug for

13  PAO was much smaller than represented to analysts and the market because of competition from off-

14  label use of other drugs and mechanical clot-busting techniques, the potential impact of which was

15  not timely or accurately disclosed to investors; and (iv) Nuvelo had an undisclosed "target product

16  profile" which would be necessary to meet in order for the Company to market alfimeprase for CO,

17  such that the Company would not proceed to market alfimeprase for that indication if the trial results

18  did not meet that profile, *even if the drug was otherwise qualified for FDA approval*.

19         9.     As a result of these false and misleading statements, Nuvelo's securities traded at

20  dramatically inflated prices during the Class Period.  At the outset of the Class Period, Nuvelo

21  announced that it had secured a commitment from pharmaceutical giant Bayer Healthcare A.G.

22  ("Bayer") to fund the Phase 3 trials of alfimeprase, which securities analysts and investors

23  reasonably understood as an endorsement of defendants' statements regarding the reliability of the

24  Phase 2 results, the ease with which efficacy would be demonstrated in the Phase 3 trials and the

25  market size for the drug.  Nuvelo immediately took advantage of these inflated prices by selling over

26  7.5 million shares of common stock in the Follow-On Offering, realizing proceeds of $119 million.

27        10.    On December 11, 2006, Nuvelo stunned investors by announcing that both of the

28  Phase 3 trials of alfimeprase had failed.  The Company also revealed that the purportedly positive

1    results in the Phase 2 PAO trial had simply been the result of the catheter used to deliver alfimeprase

2    being pushed through a blood clot and breaking up the clot, rather than any action of the drug itself.

3    In fact, *this explanation for the positive Phase 2 results had been discussed repeatedly in*

4    *Company-wide meetings* prior to the Class Period, creating internal concern among professional

5    employees at Nuvelo who disputed the potential of alfimeprase to deliver on the promises being

6    made by the Company.  The Company further revealed that the Phase 3 CO trial had failed, both

7    because the FDA had imposed a much more stringent test of statistical significance than typically

8    required and because – even at standard levels of statistical significance – the drug had failed to meet

9    the Company's undisclosed product performance standards based on market size and competition,

10   thereby rendering it unmarketable.  In fact, the Company said that although the CO trial had

11   produced statistically significant results when measured by traditional standards, and the Company

12   could probably obtain approval by doing another trial, the Company had no interest in doing so.

13   These internally known, but undisclosed, risks which had come to fruition were publicly revealed for

14   the first time when the reasons for the failure of the Phase 3 trials were announced, causing Nuvelo's

15   stock and options prices to instantly collapse, the stock falling from $19.55 to $4.05 per share and

16   the options becoming worthless.  This one day loss of nearly 80% of Nuvelo's value injured

17   thousands of investors who had purchased Nuvelo's inflated stock and options in reliance on

18   defendants' misrepresentations about the Phase 2 results, the Phase 3 trials, and the efficacy and

19   marketability of alfimeprase.

20            11.    Following the Class Period, further details emerged regarding the extent to which

21   defendants had deliberately hidden and misrepresented the risks associated with the Phase 3 trials.

22   On June 26, 2007, defendants revealed that the FDA-imposed standard for statistical significance in

23   the CO trial required alfimeprase to establish a false positive rate of only 1 in 1,250 cases – a level

24   virtually unheard of in the industry and far more stringent than the typical rate applied by the FDA of

25   5 in 100.  Plaintiffs have been unable to identify *any other trial* where the FDA had imposed such a

26   stringent standard.  Defendants further revealed that alfimeprase had failed to meet the Company's

27   previously undisclosed internal marketing guidelines for the drug.  These disclosures, along with the

28   news that Bayer had pulled out of any further efforts to develop the drug, caused an additional 20%

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                       - 4 -

1  drop in Nuvelo's share price, causing additional injury to Class members who continued to hold their

2  shares through the date of these announcements.

3  **II.     JURISDICTION AND VENUE**

4        12.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and

5  Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by §27 of the Exchange Act.  Venue is

6  proper pursuant to §27 of the Exchange Act as defendant Nuvelo/or the individual defendants

7  conducted business in and the wrongful conduct took place in this District.

8  **III.    PARTIES**

9
10        13.     Plaintiff Juan Pablo Cabrera purchased Nuvelo securities during the Class Period as

11  described in the Certification attached hereto as Exhibit A and was damaged as a result of

12  defendants' false and misleading statements.

13        14.     Plaintiffs Frank C. Petronis and Patricia A. Petronis purchased Nuvelo securities

14  during the Class Period as described in the Certification attached hereto as Exhibit B and were

15  damaged as a result of defendants' false and misleading statements.

16
17        15.     Plaintiffs Todd A. Stephens and Amy A. Stephens purchased Nuvelo securities as

18  described in the Certification attached hereto as Exhibit C and were damaged as a result of

19  defendants' false and misleading statements.

20        16.     Defendant Nuvelo is a biopharmaceutical company focused on the discovery,

21  development and commercialization of drugs for acute cardiovascular and cancer therapy.  The

22  Company was founded in 1992 as Hyseq, Inc. and renamed Hyseq Pharmaceuticals, Inc. ("Hyseq")

23  in 2001.  Upon the completion of a merger between Hyseq and Variagenics in February 2003, the

24  Company was renamed Nuvelo.[1]   Nuvelo is a Delaware corporation with its principal place of

25

26  _____

27  [1]     For ease of reference, the Company is referred to herein as "Nuvelo," regardless of the name
   it was operating under at the time the matters alleged took place.

28

business at 201 Industrial Road, Suite 310, San Carlos, CA 94070-6211.  The Company's common stock trades on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol NUVO and its options trade on five options exchanges, the American Stock Exchange ("AMEX"), Chicago Board of Options Exchange ("CBOE"), Philadelphia Stock Exchange ("PHLX"), International Stock Exchange ("ISE") and Pacific Stock Exchange ("PSE"). In its Report on Form 10-K for the year ending December 31, 2005, Nuvelo stated that "[a]s of December 31, 2005, we had 103 full-time equivalent employees."  Each of the individual defendants was heavily involved in the day-to-day details of managing the Company.  As a result of defendants' false statements, Nuvelo's stock traded at inflated levels during the Class Period, trading as high as $20.71 per share in August 2006, and the Company was able to sell $119 million worth of Nuvelo securities in the Follow-On Offering.

17.    Defendant Ted W. Love ("Love") is, and at all relevant times has been, Chief Executive Officer ("CEO") and Chairman of the Board of Nuvelo.  Love joined the Company in January 2001 and was appointed CEO in March 2001.  According to CW1 (*infra*, ¶22), "everything went through Ted" at Nuvelo, and as a result, Love was constantly kept apprised of information concerning Nuvelo's drug candidates, including its main candidate, alfimeprase.  Love has also served as the Company's Chief Operating Officer.  Love has served as a director of the Company since February 2001 and became Chairman of the Board in September 2005.  Love previously worked at Theravance, Inc., where he served as Senior Vice President ("VP") of Development from February 1998 to January 2001.  Love was employed for six years at Genentech Inc. ("Genentech"), where he oversaw drugs in development including TNKase (Tenecteplase), a single-bolus thrombolytic agent, used off-label as a treatment for PAO.  Love signed Nuvelo's filings with the SEC during the Class Period, including the Form 10-K for the fiscal year ending December 31, 2005 and the Forms 10-Q for the first three quarters of 2006.

18.    Defendant Gary S. Titus ("Titus") was, at relevant times, VP of Finance, Chief Accounting Officer ("CAO") and Chief Financial Officer ("CFO") of Nuvelo.  Titus joined Nuvelo

in January 2003 as Senior Director of Finance.  In July 2004 he was promoted to VP of Finance and CAO.  From November 2005 to July 24, 2006 he served as acting CFO.  Titus' employment with the Company was terminated on September 1, 2006.  Titus signed Nuvelo's filings with the SEC during the Class Period, including the Form 10-K for the fiscal year ending December 31, 2005 and the Form 10-Q for the first quarter of 2006.

19.    Defendant Michael D. Levy ("Levy") was at all relevant times, Nuvelo's Senior VP, Research and Development.  Levy oversaw all of Nuvelo's clinical programs, including for alfimeprase, and regularly provided investors with information regarding those trials, including on regular conference calls with analysts.  Levy joined Nuvelo in November 2004.

20.    Defendants Love, Titus, and Levy are collectively referred to herein as the "Individual Defendants."  According to Nuvelo's Proxy Statement, filed with the SEC on April 14, 2006, the Company only had four executive officers as of March 31, 2006, including Individual Defendants Love, Levy and Titus.

## IV.    CONFIDENTIAL WITNESSES

21.    The allegations of defendants' improper conduct alleged in this Consolidated Complaint for Violations of Federal Securities Law ("Complaint") are made upon information and belief, based upon investigation of counsel, including a review of SEC filings issued by Nuvelo, news articles, securities analyst reports, advisories about the Company, press releases and other public statements issued by the Company or its representatives, media reports about the Company, and the first-hand accounts of four confidential witnesses, including the following:

22.    Confidential Witness No. 1 ("CW1") was a director of research with Nuvelo during the Phase 2 clinical trials of alfimeprase.  Although CW1 did not work directly on the alfimeprase trials, he had regular contact with other employees who did.  CW1 left Nuvelo in 2005, around the time the Phase 2 clinical trials were being completed, because s/he was convinced that neither alfimeprase nor the drug candidates s/he was working on had potential for commercial success.

1   CW1 said that, during his/her tenure, other Nuvelo employees had expressed similar doubts to

2   him/her about alfimeprase's potential, including VP of Research Walter Funk, who reported directly

3   to, and had frequent communications with, Love about alfimeprase and Nuvelo's other drug

4   candidates.

5
6          23.    CW2 was a principal investigator for one of the Phase 3 clinical trials for PAO (*i.e.*,

7   NAPA – *see* ¶46-49).  As such, CW2 has direct personal knowledge of the protocols for and conduct

8   of those trials.

9          24.    CW3 was employed by Nuvelo in clinical operations during the Phase 2 trials of

10  alfimeprase.  CW3 worked on the Phase 2 clinical trials for CO and PAO.  CW3 left Nuvelo before

11  the Phase 2 trials were completed.  CW3 worked at Nuvelo while the Company was drafting the

12  protocols for the Phase 3 trials.

13
14         25.    CW4 was a director of clinical operations with Nuvelo during the Phase 2 trials of

15  alfimeprase and reported to Steven R. Deitcher ("Deitcher"), VP of Medical Affairs, who reported to

16  Love.

17  **V.      BACKGROUND TO THE CLASS PERIOD**

18         26.    Alfimeprase is a potential clot-dissolving thrombolytic agent which defendants

19  claimed degrades or dissolves clot-forming fibrin, a protein that provides the scaffolding for blood

20  clots.  Alfimeprase is a derivative of an enzyme found in the venom of the southern copperhead

21  snake.   Unlike other thrombolytics, alfimeprase is not a plasminogen activator.   Instead, it

22  purportedly acts to degrade fibrin directly in order to dissolve the clot.

23         27.    During and prior to the Class Period, Nuvelo claimed that alfimeprase can be bound

24  and neutralized by serum alpha(2)-macroglobulin, a naturally occurring protein in the blood, which

25  "traps" alfimeprase to prevent its release into the systemic circulation.  Nuvelo promoted alfimeprase

26  as having a lower risk of bleeding due to its rapid degradation in the bloodstream, thereby limiting

27  its activity to the area where it is administered.

28

**A.    Nuvelo Bets Its Future on the Commercialization of Alfimeprase**

28.    At the time Love joined Nuvelo in January 2001, the Company had only $2.7 million in cash.  Around the same time, Amgen co-founder Rathmann, who had been named Chairman of Nuvelo's Board in February 2000 and had served as President and CEO from May 2000 until Love joined the Company, provided a $20 million line of credit to the Company.  A $21 million private placement in August 2001 kept the Company going.  Still, by the end of 2001 Nuvelo's prospects were growing dim; the Company was running low on cash again and had no drugs ready to move into clinical trials.  Desperate for cash and needing a way to reel in investors, Love sought to capitalize on the Company's newfound relationship with Amgen, via Rathmann, by taking over the development and commercialization of alfimeprase.

29.    In January 2002 Love caused Nuvelo to enter into a collaboration agreement with Amgen to co-develop and commercialize alfimeprase.  Under the terms of the collaboration agreement, Nuvelo would lead all clinical development activities and Amgen would be responsible for all manufacturing activities.  Amgen neither promised nor delivered any up-front payments – Nuvelo was required to match Amgen's spending to date, and to share all development costs thereafter equally.  Under the terms of the collaboration agreement, after Nuvelo's investment reached the same level as Amgen's, Amgen could then continue to jointly develop alfimeprase with Nuvelo or it could simply license alfimeprase to Nuvelo, requiring Nuvelo – a small company with no revenue-producing products and nothing in its pipeline – to assume full financial responsibility for the commercialization of a drug which for years had already proven commercially non-viable.

30.    With alfimeprase in hand to build a pipeline around and his newfound relationship with Amgen to lend credibility, Love turned his attention to raising money.  Instead of turning to the capital markets, Nuvelo acquired Variagenics, a pharmacogenomics company in Cambridge, Massachusetts, which had $55.9 million in the bank.  The merger, completed in February 2003, served primarily as a financing vehicle for Nuvelo.

31.    Flush with cash, Nuvelo began conducting clinical trials of alfimeprase as a treatment for dissolving blood clots in the legs (PAO) and around catheters in patients undergoing treatment (CO).  Nuvelo used the buildup it had created around alfimeprase as a tool for raising much needed

1   cash to continue its business and fund the exorbitant pay packages provided to insiders.  Nuvelo

2   began a pattern of announcing positive news about the drug shortly before selling securities to raise

3   additional operating cash.  For example:

4           •       In a September 25, 2003 press release, Nuvelo positively reported the successful
                    completion of its interim analysis of data from its Phase 2 trial with alfimeprase for
5                   the treatment of PAO.  Just a week later, Nuvelo announced the sale of 10 million
                    shares of its common stock placed directly with institutional investors, receiving net
6                   proceeds of $24.5 million.  The Company paid Love a salary of $583,583 in 2003,
                    more than double the amount the Company paid its President and CEO in 1999.[2]
7                   The Company also awarded Love 133,332 options in 2003.

8           •       In a February 5, 2004 press release, Nuvelo announced that it anticipated completing
                    enrollment of the Phase 2 alfimeprase trials for both PAO and CO by April 2004, and
9                   that it expected to initiate the Phase 3 alfimeprase trial in PAO in the second half of
                    2004.  Two weeks later, on February 19, 2004, Nuvelo announced plans to offer 4
10                  million shares of its common stock in an underwritten public offering; it ultimately
                    sold 5.75 million shares, netting proceeds of $74.8 million.  Nuvelo paid Love a
11                  salary of $596,000 in 2004 and awarded him 500,000 options.  Levy, who joined the
                    Company in November 2004, was awarded 175,000 options.
12
            •       On September 30, 2004, Nuvelo announced that Phase 2 trial results showed the
13                  potential of alfimeprase to treat PAO.  On December 6, 2004, Nuvelo announced
                    data from its Phase 2 clinical trial in CO that it claimed showed the potential of
14                  alfimeprase to be approved as a fast-acting drug to clear blocked catheters.  Little
                    more than a month later, on January 24, 2005, the Company commenced a public
15                  offering which was completed on February 7, 2005, when the Company received
                    proceeds of approximately $73 million in exchange for 9.775 million shares of
16                  newly-issued common stock.  The Company paid Love $800,000 in combined salary
                    and bonus in 2005 and awarded him 750,000 options.  The Company paid Levy a
17                  salary of $381,250 and awarded him 200,000 options.  The Company paid Titus a
                    salary of $226,667, a bonus of $65,000 and awarded him 175,000 options.
18
    **B.      Amgen Refuses to Fund Further Efforts to Commercialize
19            Alfimeprase**

20          32.     By November 2004, the level of Nuvelo's financial investment in the development of

21  alfimeprase had reached that of Amgen.  Amgen then had an option to either pay 50% of the drug's

22  development costs going forward or to license alfimeprase to Nuvelo.  Amgen pulled the plug on the

23  project, telling Nuvelo it would not further fund any efforts to commercialize alfimeprase.

24          33.     Amgen's decision left Nuvelo with an incredible cash burn rate and no big-pharma

25  investment partner.  Moreover, under the terms of the agreement terminating the contract between

26  _____

27  [2]      Between May 2000 and January 2001, Rathmann, served as CEO and drew no salary.

28

1  Nuvelo and Amgen for the joint development and commercialization of alfimeprase, in order to

2  obtain licensing rights to alfimeprase from Amgen, Nuvelo had to pay Amgen $8.5 million by

3  November 5, 2004.  Heading toward the end of its fiscal year 2004 with less than $17 million in cash

4  on its books, Nuvelo again primed the capital markets with positive news about alfimeprase.

5          34.    On December 6, 2004, Nuvelo announced that data from a Phase 2 clinical trial in CO

6  showed that alfimeprase had the potential to restore function in patients with blocked catheters and

7  to be a well tolerated therapy for use in catheter occlusion.  "We are encouraged by these results and

8  will work rapidly to initiate a Phase 3 clinical development program in this second potential

9  indication," the Company stated in the December 6, 2004 press release.  "Alfimeprase is the

10 cornerstone of a growing cardiovascular franchise at Nuvelo.  The catheter occlusion data . . .

11 reflects the expanded potential opportunity we have with this versatile and unique agent."  Shortly

12 thereafter, on January 24, 2005, the Company announced a proposed public offering of 7 million

13 shares of common stock, and on February 7, 2005, it announced the completion of its sale of 9.775

14 million shares, receiving proceeds of approximately $73 million.

15         35.    By the end of fiscal year 2005, the Company's prospects again were bleak.  Nuvelo

16 had less than $38 million in cash, and again turned to alfimeprase to bail it out of potential

17 insolvency.  On December 14, 2005, the Company announced it had received a Special Protocol

18 Assessment ("SPA") agreement from the FDA for its second Phase 3 trial of alfimeprase for the

19 treatment of acute PAO.  Defendants claimed that having the FDA SPA agreement in place

20 "solidifie[d] the regulatory pathway to approval for alfimeprase."

21         36.    Throughout 2005, Nuvelo continued to report on the progress towards  Phase 3

22 alfimeprase trials in CO and PAO, each time making material misrepresentations about the results of

23 the Phase 2 trials.  On February 15, 2005, the Company again touted the results of the Phase 2

24 clinical trials in connection with the release of its FY04 results, with Love claiming that Nuvelo had

25 become "a late-stage product company with multiple development opportunities focused on acute,

26 hospital based cardiovascular care."  On April 18, 2005, the Company announced that it had begun

27 patient enrollment in the Phase 3 alfimeprase trial in PAO, representing that "alfimeprase can restore

28 arterial blood flow within four hours of initiation of dosing [and] demonstrated a favorable safety

1  profile."  On May 26, 2005, Nuvelo announced that it had finalized the design of the Phase 3

2  program for alfimeprase in CO, again misrepresenting that "[p]reviously announced results from a

3  Phase 2 multi-center, randomized, double-blind study in 55 patients with occluded central venous

4  catheters, demonstrated the ability of alfimeprase to restore function to occluded catheters in as early

5  as five minutes."  On December 14, 2005, when Nuvelo announced that it had received the SPA

6  agreement from FDA for the Phase 3 trial of alfimeprase in PAO, the Company once again

7  misrepresented that the Phase 2 trial of alfimeprase in PAO "demonstrated" that alfimeprase can

8  restore arterial blood flow.

9       37.     However, even where blood flow was increased through a clotted blood vessel, the

10  Phase 2 PAO trial was unable to reliably determine how much of that result was due to the action of

11  alfimeprase versus simply the effect of the catheter breaking up the clot as the drug was administered

12  through the catheter.  In fact, this precise risk had been discussed by CW1 prior to the Class Period

13  with high ranking officers of Nuvelo, including Love, the Company's VP of Medical Development

14  Luis Pena ("Pena") and Deitcher.  CW1 said that, in 2004 or 2005, s/he discussed the potential for

15  the drug delivery system to disrupt the clot during quarterly company-wide meetings regularly held

16  after each Board of Directors meeting.  As Love admitted in a December 11, 2006 conference call in

17  response to a question about the catheters breaking down clots in the placebo group, "it's always

18  been known that mechanical devices can work."

19  **VI.     CLINICAL TRIALS OF ALFIMEPRASE**

20       38.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301-97, new

21  pharmaceutical products cannot be marketed or sold in the United States unless the sponsor of the

22  drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its

23  intended uses. 21 U.S.C. §§355(a)&(d).  The steps required before a drug may be marketed in the

24  U.S. include: (i) preclinical laboratory and animal tests; (ii) submission to the FDA of an application

25  for an Investigational New Drug ("IND") exemption, which must become effective before human

26  clinical trials commence; (iii) human clinical trials to establish the safety and efficacy of the drug,

27  typically proceeding in three phases; (iv) submission of a detailed New Drug Application ("NDA")

28  or Product or Biologics License Application ("BLA") to the FDA; and (v) FDA approval of the

1    NDA/BLA.  The FDA does not approve a drug for treatment of a disease in general.  Instead, a drug

2    is approved for treatment of a specific condition, or "indication," for which the drug has been tested

3    in patients.  For each approved indication, the FDA will specify particular dosages and dosage

4    frequency determined to be safe and effective.

5         39.    Success or failure of a clinical trial is determined by the ability of the trial to meet its

6    endpoints, including a demonstration that the results are statistically significant.  "Statistically

7    significant" means that a given result is unlikely to have occurred by random chance, or due to

8    factors outside of the control of the study.  Statistical significance is measured on a scale of zero (0)

9    to one (1).  A statistical significance level of 0.05 (5%) is the traditional scientific standard for

10   determining whether given results are statistically significant.[3]  Results are expressed as a "p-value,"

11   which is a statistical measure of the probability that a difference between groups in a clinical trial

12   happened by chance.  Statistical significance consisting of a p-value of less than 0.05 has

13   traditionally been considered convincing evidence by the FDA.  A p-value of 0.05 means that there

14   is a 5 in 100 likelihood that the result occurred by chance.  The lower the p-value, the more likely it

15   is that the difference between groups was caused by the drug, rather than by chance.

16        40.    According to CW1, the protocols for all of the clinical trials of alfimeprase were

17   written by Love, Dietcher and Pena.[4]  Pena had previously worked as a research associate at

18   _____

19   [3]     Defendant Love stated on the December 11, 2006 conference call that "we had an agreement
20   with the FDA that the P-value would be far lower than .05 which would be the traditional number."

21   [4]     Clinical studies are accomplished pursuant to a protocol, which is a written submission to the
     FDA as part of the IND.  The protocol documents the manner of data analysis to be employed during
22   the various phases of testing, and is required to document the following factors: (a) a clear statement
     of objectives and methods for final data analysis, including the establishment of "endpoints" by
23   which to measure the efficacy and safety of the drug; (b) a design that permits comparison of the test
     group with a control group to quantitatively determine the study drug's effectiveness and safety; (c)
24   procedures for selecting subjects that include methods for verifying that they have the condition
     being studied; (d) a method of treatment assignment selected to minimize bias and assure
25   comparability of subjects with respect to age, sex, severity and duration of disease, and uses of
     concomitant therapy; (e) sufficient "blinding" procedures (experimental design so that neither the
26   doctor nor the patient is aware of whether the patient is receiving the experimental drug, a placebo or
     a control) to minimize bias on the part of the subjects and investigation team; (f) outcome measures
27   that are well-defined and reliable; and (g) an analysis chosen to determine an outcome that is
     appropriate to the design.

28

1  Genentech, under Love's supervision.  Despite his lack of prior experience or an advanced medical

2  degree or doctorate, Pena was hired by Love to become Nuvelo's VP of Medical Development.

3  CW1 characterized Pena as Love's "lackey."  CW4 reported that data from the Phase 2 trials was

4  used while designing the Phase 3 trials.  CW4 reported that Love and Deitcher were involved in

5  designing the Phase 3 protocols along with Company statistician Fong Wang-Clow ("Wang-Clow").

6  According to CW3 and CW4, the Company encountered difficulties in designing the Phase 3

7  protocols, including from a statistical perspective.  Both witnesses reported that the difficulties were

8  due in part to the involvement of Deitcher who had little industry experience or experience designing

9  clinical trials.  CW4 indicated that Deitcher and Wang-Clow had many disagreements over the

10  design of the Phase 3 protocols.  CW4 stated that he/she was concerned with the low p-value

11  imposed by the FDA on the Phase 3 CO trial, and that during his/her tenure, the low p-value

12  imposed by the FDA on the Phase 3 CO trial was a topic of discussion with Deitcher and Wang-

13  Clow.  CW1 said that, approximately six to eight months before the completion of the Phase 2

14  clinical trials, Nuvelo formed an "alfimeprase team" consisting of the people primarily responsible

15  for the investigational drug.  The team included Love, Deitcher, Pena, and VP of Regulatory Affairs

16  and Quality Assurance Brian Kersten.  Pena was subsequently fired by Nuvelo in 2005 and replaced

17  on the team by Levy, VP of Research and Development.

18  **1.     PAO Clinical Program**

19       41.     Nuvelo's clinical trial program for PAO was known as "NAPA," which stood for

20  Novel Arterial Perfusion with Alfimeprase.  PAO occurs when arterial blood supply to the

21  extremities is occluded by a clot, thus decreasing the flow of blood to some portion of the body,

22  commonly the lower limbs.  Each year, more than 100,000 Americans suffer from PAO, also known

23  as leg attack.  PAO is the result of underlying peripheral arterial disease ("PAD"), in which chronic

24  fatty plaque buildup restricts blood flow.  The classic early symptom of PAO is leg pain or fatigue

25  during activity that subsides with rest.  Continued restriction of blood flow leads to pain at rest and,

26  if the condition continues, can lead to ulcers, gangrene, tissue death and if untreated, foot or leg

27  amputation.

28

42.    Treatments for PAO include balloon angioplasty (with or without stents), open vascular surgery, catheter based intervention and off-label use of thrombolytic agents.  The majority of patients treated for PAO receive surgery, while less than half receive off-label thrombolytics for 24-36 hours, requiring an overnight stay in an intensive care unit in addition to an angiogram every four hours to monitor the blood clot.

43.    There are no FDA approved drugs specifically indicated for use in the treatment of PAO.  According to defendants, Nuvelo had the potential to capture up to half of the $400 million market for treatment of PAO, because alfimeprase would provide a less-invasive and more cost-effective alternative to surgery.  During the Class Period, defendants were promoting alfimeprase as a fast acting, safe drug therapy for PAO which, if approved by the FDA for PAO, would be the first such approved therapy.  However, as defendants well knew, during and prior to the Class Period, several Genentech drugs were regularly being prescribed by physicians for "off-label" treatment of PAO, rendering the market opportunity of alfimeprase less clear than Nuvelo claimed.[5]

**a.    Phase 2 Study**

44.    Nuvelo's Phase 2 study of alfimeprase in PAO was a 24-center, 113 patient, open label, randomized, dose escalation study evaluating the safety and efficacy of alfimeprase as a treatment for acute PAO.  Patients received 0.1 mg./kg., 0.3 mg./kg. or 0.6 mg./kg. of alfimeprase in two separate 5-15 minute pulsed infusions administered via a side-hole catheter.  The Phase 2 PAO trial was a safety trial.  The study's primary endpoint was safety, including major bleeding events, up to 30 days after dosing.  Secondary endpoints included open-surgery free survival at 14 and 30 days, patency (restoration of blood flow), increase in ankle-brachial index and reduction in severity of planned surgical interventions.  There was no placebo arm in this study.

---

[5]    Use of an approved drug for any purpose other than those indications specifically approved by the FDA is referred to as an "off-label" use.  Off-label uses include treating a condition not indicated on the label, treating the indicated condition at a different dosage or dosage frequency, or treating a different patient population than those approved by the FDA.  Under the Food and Drug Administration Modernization Act of 1997, if a manufacturer wished to market or promote an approved drug for off-label uses, the manufacturer must comply with a set of stringent requirements prior to marketing including, submitting a supplemental application to the FDA demonstrating the safety and effectiveness of the drug for treating the off-label use.  21 U.S.C. §§360aaa(b) and (c).

45.     In September 2004, investigators presented the data from the study at the Transcatheter Cardiovascular Therapeutics Scientific Symposium.  The data which was presented revealed thrombolysis (breaking up of clots) rates of up to 76% and restoration of arterial blood flow (rates of up to 60%) were recorded within 4 hours of initiation of dosing.  None of the 113 patients suffered from intra cranial hemorrhage or death.  Sixty-one percent (30/49) of the patients receiving 0.3 mg./kg. of alfimeprase avoided open vascular surgery for 30 days.  Only one of seven major bleeding events and three of nine minor bleeding events were deemed to be possibly related to alfimeprase.  However, there was no correlation between thrombolysis and restoration of blood flow on the one hand and avoidance of open surgery on the other hand.  That is, the groups that had higher rates of thrombolysis and restoration of blood flow also had higher rates of surgery.  Also, avoidance of surgery was not dose related; the rate of surgery increased with increased dose.

### b.     Phase 3 Studies

46.     After the conclusion of the Phase 2 trial, Nuvelo started a Phase 3 program in April 2005.  The program consisted of two overlapping trials, NAPA-2 and NAPA-3, which were expected to enroll a total of approximately 700 patients.  According to CW3 and CW4, the Company encountered difficulties in designating the Phase 3 protocols, including from a statistical perspective.

47.     The first trial, NAPA-2, which opened in April 2005, enrolled approximately 300 patients randomized to receive either 0.3 mg./kg. of alfimeprase or placebo.  Patients must have had the onset of symptoms within 14 days of randomization.  No plasminogen activators were allowed.  In contrast with the Phase 2 PAO study, the primary endpoint of NAPA-2 was avoidance of open vascular surgery at 30 days.  Enrollment was completed in September 2006.  According to CW2, Nuvelo had great difficulty enrolling patients for NAPA because the trials were randomized, double-blind studies, meaning that neither patients nor their doctors would know whether they were being treated with alfimeprase or a placebo.  Most patients eligible for the study opted instead to receive treatment with a Genentech thrombolytic drug that, while not approved by the FDA for treatment of PAO, was regularly prescribed by physicians for that purpose because it had a 70% success rate in busting the clot and avoiding risky surgery.  As a result of the difficulties in enrolling patients, as well as knowledge of the market and competition, Nuvelo and its employees involved in the

1  alfimeprase trials, including Love, knew that alfimeprase would face substantial competition from

2  such "off-label" uses of drugs approved for other conditions.

3      48.    On January 23, 2006, Nuvelo announced that the FDA had granted "fast track" status

4  for the PAO program, which provides for accelerated regulatory filings and review.

5      49.    Nuvelo announced the initiation of NAPA-3, its second Phase 3 trial, in April 2006.

6  NAPA-3 was patterned after NAPA-2 and was subject to an SPA from the FDA.

7                          **2.    CO Clinical Program**

8      50.    Nuvelo's clinical program for CO was known as SONOMA, which stood for Speedy

9  Opening of Non-functional Occluded catheters with Mini-dose Alfimeprase. CO is the formation of

10  blood clots in patients with catheters. An estimated 5 million catheters are placed in patients in the

11  United States each year to deliver chemotherapy, nutritional support, antibiotics and blood products.

12  Occluded (blocked) catheters are a problem in about a quarter of the 5 million cases where catheters

13  are placed in patients each year. Occluded catheters are currently cleared using thrombolytic drugs,

14  such as Genentech's tPA, Activase (alteplase), which restores function to venous catheters in two to

15  four hours, or by more costly means, such as removing and replacing the catheter.

16                          **a.    Phase 2 Study**

17      51.    In 2004, Nuvelo conducted a Phase 2, multi-center, randomized, double-blind study

18  of patients with occluded central venous catheters. The study compared three doses of alfimeprase

19  (0.3 mg., 1.0 mg. and 3.0 mg.) against Genentech's approved dose of plasminogen activator Cathflo

20  Activase ("Cathflo") (alteplase) (2.0 mg.). The study was to be conducted in up to 100 patients

21  across 32 centers in the United States.

22      52.    On June 8, 2004, Nuvelo issued a press release announcing the "successful

23  completion of a planned interim analysis of its Phase 2 trial with its lead product candidate,

24  alfimeprase, for the potential treatment of venous catheter occlusion." The June 8th press release

25  stated that a planned interim analysis had been conducted on data from the first 48 patients enrolled

26  in the trial, and that, following review of the data for those patients, the Data Safety and Monitoring

27  Board and the Trial Operations Committee recommended that the trial continue to enroll in the two

28  highest dose groups, 1.0 mg and 3.0 mg, compared to the approved dose of Cathflo, thus eliminating

1    the lowest dose of 0.3 mg from further enrollment.  The June 8th press release further stated that this

2    study had begun in June 2003, and "is being conducted in approximately 90 patients."

3        53.    Approximately one month later, on July 12, 2004 Nuvelo issued a press release

4    announcing that "the Company has decided to close its Phase 2 alfimeprase trial in patients with

5    occluded central venous catheters sooner than expected in order to accelerate the program.  The

6    Phase 2 trial concluded with 56 patients dosed."  The July 12, 2004 press release further stated that a

7    Data Safety and Monitoring Board analysis indicated that there were no safety concerns in any of the

8    alfimeprase dose groups, and quoted the statement of the Company's VP of Medical Affairs

9    Deitcher, that "We believe this data is more than sufficient to guide our continuing development

10   efforts."  The July 12th press release also revealed that the "study was designed to treat up to 100

11   patients. . . ."

12       54.    In early December 2004, data for the 55 patients enrolled in the Company's Phase 2

13   clinical trial of alfimeprase for use in restoration of function in catheter occlusion were reported in a

14   December 6, 2004 Nuvelo press release, presented by Deitcher at the Annual Meeting and

15   Exposition of the American Society of Hematology, and posted on the Company's website.  The

16   December 6, 2004 press release reported that the 3.0 mg alfimeprase dose produced cumulative flow

17   (patency) rates of 50% at 15 minutes after the first dose, 60% at 120 minutes after the first dose, and

18   80% at 120 minutes after the second dose.  In contrast, Cathflo produced patency rates of 0% at 15

19   minutes after the first dose, 46% at 120 minutes after the first dose, and 62% at 120 minutes after the

20   second dose.  According to the December 6th press release there were no major hemorrhagic events

21   in any treated patients.  In addition, that press release noted that "[w]hen a catheter becomes

22   occluded, the ultimate goal is to restore patency (*i.e.*, flow) in a timely and cost effective manner

23   with minimal risk to the patient."

24           **b.    Phase 3 Studies**

25       55.    In May 2005, Nuvelo announced its Phase 3 clinical trial program for CO.  Nuvelo

26   conducted two Phase 3 trials: SONOMA-2 and SONOMA-3.  According to CW3 and CW4, the

27   Company encountered difficulties in designating the Phase 3 protocols, including from a statistical

28   perspective.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                                    - 18 -

56.     The first trial, SONOMA-2, enrolled its first patients in September 2005 and completed enrollment in September 2006. SONOMA-2 was a randomized, double-blind, 300 patient trial, comparing 3 mg. alfimeprase against placebo as a treatment for patients with occluded central venous catheters. Two-thirds of the 300 patients received alfimeprase and the remainder received placebo. The primary endpoint of the SONOMA-2 trial was the restoration of function to occluded central venous catheters at 15 minutes, *i.e.*, the success of the trial was to be judged by the statistical difference in the restoration of function between the alfimeprase group and the placebo group.

57.     The second trial, SONOMA-3, began enrollment in February 2006 and was designed as an open-label, single-arm trial evaluating the safety of alfimeprase in 800 patients.

58.     Investors reasonably understood and expected that Nuvelo would have to demonstrate statistical significance to a p-value of 0.05. On December 11, 2006, defendants admitted that the results of SONOMA-2 did not meet the extraordinarily high threshold for regulatory approval required by the FDA for the Nuvelo trial. Love admitted that "we had an agreement with the FDA that the p-value would be far lower than 0.05 which would be the traditional number." Subsequently, on June 26, 2007, Nuvelo admitted that the ***p-value requirement for SONOMA-2 was less than 0.00125***:

> Data from the first Phase 3 trial in the CO program, SONOMA-2, showed that alfimeprase restored catheter function in patients with occluded catheters within 15 minutes with a p-value of 0.022. ***It did not, however, meet the more stringent p-value required for a single pivotal trial, less than 0.00125, nor did it meet the company's target product profile for commercial success.*** [6]

59.     A p-value of 0.00125 is extraordinarily low, and is virtually unheard of in the industry, as it is exceedingly difficult to meet. Plaintiffs have been unable to identify even one example of another FDA drug trial that was required to meet such a low p-value.

### 3.     Nuvelo Announces Failure of *Both* PAO and CO Phase 3 Trials

60.     Before    the opening of trading on December 11, 2006, Nuvelo and Bayer unexpectedly issued a press release announcing the failure of ***both*** the PAO and CO Phase 3 trials.

---

[6]     Emphasis added unless otherwise noted.

1   The release, entitled "Nuvelo and Bayer Healthcare Announce Phase 3 Trials of Alfimeprase in

2   Patients With Acute Peripheral Arterial Occlusion and Catheter Occlusion Did Not Meet Primary

3   Endpoints," stated in relevant part:

> Nuvelo, Inc. (Nasdaq: NUVO) and Bayer HealthCare today announced top-line data demonstrating that the Phase 3 clinical trial of alfimeprase in acute peripheral arterial occlusion (PAO), known as NAPA-2 (Novel Arterial Perfusion with Alfimeprase-2), did not meet its primary endpoint of avoidance of open vascular surgery within 30 days of treatment.  The companies also announced that the Phase 3 trial in catheter occlusion (CO), known as SONOMA-2 (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase- 2), did not meet the endpoint of restoration of function at 15 minutes.  These trials did not meet key secondary endpoints.  In addition, the companies announced that they have temporarily suspended enrollment in the ongoing Phase 3 trials, NAPA-3 and SONOMA-3, until further analyses and discussions with outside experts and regulatory agencies are completed.

> ***These data will be submitted for presentation at the next appropriate medical meetings.***

> 'These outcomes are disappointing particularly for patients with acute PAO, who have few treatment options,' said Dr. Ted W. Love, chairman and chief executive officer of Nuvelo.  'We and our partner Bayer will conduct further analyses and have discussions with the Data Safety and Monitoring Board members, outside experts and regulatory authorities to determine how to proceed with the development of alfimeprase, including the possibility of alternative dosing and delivery.'

17      61.    During a December 11, 2006 conference call following the announcement, Love

18  explained that in the PAO trial, although alfimeprase dissolved some clots, the drug failed to perform

19  significantly better than the placebo because a substantial number of clots had not been dissolved by

20  the drug, but had instead been broken up by the insertion of a catheter into the clot in patients who

21  received a placebo.  When pressed, Love and Levy admitted that since none of the Company's prior

22  clinical testing had included the use of a placebo, any past instances of alfimeprase "dissolving blood

23  clots" was more likely than not simply attributable to the clots being broken up by the insertion of a

24  catheter directly into the clots – rather than any "dissolving" effect the drug had.  Additionally,

25  defendants admitted that even if they could increase the dosage of alfimeprase to increase its

26  thrombolytic clot busting effect for PAO, it could likely be prohibitively unsafe to do so, as there

27  was an increased incidence of bleeding in patients with alfimeprase as compared to the placebo.

28

62.     During the conference call, Love was specifically questioned on whether insertion of the catheter had an effect on the Phase 2 trial – and he was forced to admit it had:

> Jim Birchenough [Lehman Brothers analyst]:  So I'm just trying to understand why that might not have happened in the Phase II experience where it seems that you had higher thrombolysis rates?
>
> Dr. Ted W. Love:  . . . ***I actually think it did probably happen in Phase II***.

63.     In addition, Love admitted in the conference call that the CO trial also faced far greater risks than previously revealed:

> While the data from the SONOMA-2 trial show a statistically significant difference in the rate at which alfimeprase and placebo dissolved clots in venous catheters at 15 minutes, this result did not meet the high threshold established by the FDA for regulatory approval based on only one control trial.
>
> \*           \*           \*
>
> ***[W]e had an agreement with the FDA that the P-value would be far lower than .05 would be the traditional number***.  We were below that number.

64.     Nuvelo has yet to publish data regarding the conduct or results of the Phase 3 trials in any medical journal, which has caused some members of the scientific community to question Nuvelo's scientific integrity.[7]  As CW2 stated, it is "ridiculous," and "non-scientific" not to publish results from clinical trials, whether or not the results were positive.  In addition, Nuvelo has contacted numerous potential witnesses in this action, encouraging them not to discuss ***anything*** related to the Phase 3 clinical trials of alfimeprase with plaintiffs or their investigators.  This conduct, designed to conceal the full extent of defendants' misconduct, contrasts starkly with the Company's rush to disclose favorable trial results when it was raising money from the public.

65.     On June 26, 2007, Nuvelo conducted another conference call following the announcement that Bayer, like Amgen before it, had pulled the plug from further efforts to commercialize alfimeprase. During that call, defendant Levy revealed that, in addition to an

---

[7]     On November 7, 2007, Nuvelo announced that data from the Phase 3 CO trial will be presented at a meeting in Atlanta next month, a year after the results of the failed trial were announced.

1  extremely stringent p-value, ***alfimeprase also had failed to meet its previously undisclosed "target***

2  ***product profile," thus rendering it unmarketable for CO***:

> 3  [Levy]: The second indication we are pursuing is catheter occlusion.
> Data from the first Phase 3 trial from this program, SONOMA-2
> 4  showed that while Alfimeprase restored catheter function in patients
> with occluded catheters within 15 minutes with a p-value of .022, it
> 5  did not meet the more stringent p-value required for a single pivotal
> trial of less than .00125.
>
> 6
> While the p-value achieved in SONOMA-2 accompanied by a second
> 7  controlled trial with comparable results could potentially support
> registration, ***it likely would not meet the target product profile we***
> 8  ***believe necessary for commercial success in the marketplace.***
> Accordingly, we have decided to investigate whether a single, higher,
> 9  more concentrated dose of Alfimeprase would generate results more
> consistent with the desired target product profile for this indication.

10
11  66.    In an August 1, 2007 conference call with analysts, Levy provided further insight on

12  the undisclosed "product profile":

> 13  [Analyst] William Ho:  . . . And why do you think the catheter
> occlusion will work just at the higher doses?
>
> 14  Dr. Michael Levy:  Well, I think it's important to recognize that on
> some level, catheter occlusion did work in the preceding Phase 3 trial.
> 15  It worked to the extent that we were able to confirm it was an active
> thrombolytic.  It worked to the extent that we were able to get a p-
> 16  value better than .05, which is the standard test for scientific
> significance.
>
> 17
> But what it didn't do was at the p-value that we set for regulatory
> 18  approval with a single trial and ***it didn't hit the target product profile***
> ***that we were looking for to be successful in this marketplace.***
> 19  ***Clearly, the marketplace today is only around $100 million and to***
> ***be successful, you really have to have a very good product profile.***

20
21  67.    On August 22, 2007, the Company announced that it was re-initiating the SONOMA-

22  3 trial of alfimeprase in patients with CO.  The revised trial was designed to determine whether a

23  single, higher, more concentrated dose of alfimeprase could restore function to blocked central

24  venous catheters within 15 minutes.  On the news, Nuvelo's shares rose 26 cents or 16 %, to $1.89 in

25  afternoon trading.  Brean Murray Carret & Co. ("Brean Murray") analyst Jonathan Aschoff

26  ("Aschoff") upgraded the stock to "Hold" from "Sell" and removed his target price of $2 per share.

27  However, Aschoff wrote that the past trial results show the drug will not succeed: "***We view the***

28

1    *alfimeprase program mostly as terminal,* given that the drug failed to deliver on either its primary

2    or any key secondary endpoints in either the NAPA-2 or SONOMA-2 Phase 3 trials . . . ."

3    **VII.    DEFENDANTS' SCHEME TO DEFRAUD**

4           **A.    Defendants Falsely Represented the Significance and Reliability of the
             Phase 2 Alfimeprase Trial Data, and Conceal Material Risks to FDA
5           Approval and Commercial Marketability for PAO and CO.**

6           68.    Throughout the Class Period, Nuvelo and its top officers repeatedly claimed that the

7    Phase 2 trials had demonstrated alfimeprase's ability to dissolve clots in patients with acute PAO,

8    and cleared blocked catheters much more quickly than existing treatments.    Simultaneously,

9    defendants proclaimed that the Phase 3 PAO and CO trials represented a "low risk" path to FDA

10   approval with a "high probability of success."    At the same time, however, defendants failed to

11   specifically disclose the significant risks that affected the then-ongoing Phase 3 trials, including

12   known limitations of the Phase 2 trials.    Together, these statements and omissions misled investors

13   both about the quality and reliability of the Phase 2 data and the existing risks to success in the

14   ongoing Phase 3 trials.

15          69.    Investors had repeatedly been reassured of the efficacy of alfimeprase as compared to

16   a placebo.    For example, a May 2, 2005 statement at the Company's earnings conference, that would

17   be reconfirmed repeatedly throughout the Class Period, claimed that the Company had "*power*

18   *calculations*" that clearly established the efficacy of alfimeprase as compared to a placebo.

19   Defendants failed to disclose that the "power calculations" were based upon placebo assumptions

20   which had no reasonable basis in fact because defendants did not know how many patients avoided

21   open surgery for 30 days as a result of the catheter insertion breaking up the clot.    Defendant Levy

22   falsely claimed that the numbers in the Phase 3 trial are driven by "the need to put in place a good

23   size safety database *rather the need to confirm the efficacy of this drug, which we are all very*

24   *bullish on obviously.*"

25          70.    Nuvelo never disclosed any of the specific risks that rendered success in the Phase 3

26   trials much less likely than represented.    Rather, Nuvelo's periodic reports filed with the SEC during

27   (and prior to) the Class Period contained only general and generic risk warnings, such as "Our near-

28   term success is dependent on the success of our lead product candidate, alfimeprase, and we cannot

1   be certain that it will receive regulatory approval or be successfully commercialized," and "We face

2   heavy government regulation, and FDA and international regulatory approval of our products is

3   uncertain."  However, the reports did ***not*** contain any specific risk warnings regarding the Phase 2

4   trials, the possibility that the results of those trials were caused by the catheter being pushed through

5   a blood clot, the extraordinary statistical significance barrier imposed on the SONOMA Phase 3 trial,

6   or that the Company had an undisclosed target product profile which was necessary to meet in order

7   to market the drug for CO.

8           71.    Rather, Love and Levy frequently told investors that Nuvelo was starting with PAO

9   and CO because it provided a "low risk path to regulatory approval" or a "rapid & low risk entry

10  strategy" with a "high probability of success."  In addition, defendants represented that following

11  approval of the PAO and CO indications, Nuvelo claimed it would be able to use alfimeprase to treat

12  stroke victims and patients suffering with deep vein thrombosis, both potentially huge markets.  This

13  theme would be repeated throughout the Class Period. In a presentation to investors, for example,

14  Nuvelo graphically illustrated its claims that its "low risk entry strategy" with a "high probability of

15  success" would lead to enormous revenue growth:



16

17

18

19

20

21

22

23

24

25

26          72.    On January 5, 2006, the first day of the Class Period, Nuvelo announced it had

27  entered into a new financial alliance – this time with Bayer.  The Bayer deal provided a $50 million

28  upfront payment to Nuvelo and included up to $385 million in additional fees and payments.  The

1    Company's stock price surged on the January 5, 2006 announcement, increasing 41%, its largest

2    increase in six years on extremely high volume.  During a conference call that day, Love claimed

3    PAO and CO were just "the tip of the iceberg" for the drug:

> Cory Kasimov, Analyst, Oppenheimer & Co: . . . You have long  talked about the
> potential market opportunity for Alfimeprase and the number you've consistently
> thrown out there is greater than $500 million in worldwide market potential.  How
> does that change now with the confirmation that you will indeed be taking
> Alfimeprase into the clinic to evaluate it against both stroke and DVT?[8]

> Dr. Ted Love:  The number certainly goes up quite dramatically.  The $500 million
> number that you reference is in fact an accurate number.  We built that number off
> looking at two indications.  And with the two indications that we had under study,
> that is acute PAO and catheter occlusion. It has been very clear to us from the very
> beginning that stroke and DVT are much larger market opportunities.  But we did not
> start with those indications *because of the development strategy was really focused
> on going after indications which will be rapid to market, which would demonstrate
> the superior advantage of the compound in terms of its fast speed of action and
> would provide a low-risk regulatory path for approval.*  Now that we've got those
> programs obviously well underway, we plan to turn our attention to DVT, stroke,
> other indications to really exploit the full commercial potential and the full medical
> benefit of the product.

13    73.    Market analysts and investors reasonably understood Nuvelo's deal with Bayer as an

14    endorsement of alfimeprase.  In a January 5, 2006 Company Alert, Deutsche Bank Securities Inc.

15    ("Deutsche Bank") analyst Jennifer Chao ("Chao") reported, "In our view, this collaboration

16    significantly validates the science and clinical/regulatory strategy for alfimeprase as a potential

17    blockbuster thrombolytic."  Similarly, Prudential Equity Group, LLC ("Prudential") analyst Jason

18    Zhang ("Zhang") reported, "We are encouraged by the timing of this partnership announcement as

19    we think that it validates the [alfimeprase's] potential, even in its pre-approval stage of

20    development."  Oppenheimer & Co., Inc. ("Oppenheimer") even raised the profile of Nuvelo's stock

21    based on the Bayer agreement: "Based on Bayer agreement, we are increasing our 12-month target

22    price to $18 from $13."

23    74.    That same day, CIBC World Markets analysts stated in a report upgrading Nuvelo to

24    "Sector Outperformer": "We believe the partnership provides substantial validation for the safety,

25    efficacy, and market potential of alfimeprase."  Unaware of the stringent p-value requirement

26

27    [8]    DVT refers to deep venous thrombosis.

28

1  imposed on the Phase 3 CO data by the FDA or that the Phase 3 PAO trial was at risk of failing

2  because positive results were simply caused by the breaking up of clots by a catheter, the analysts

3  wrote in the same report with respect to the Phase 3 CO program: "Based on the phase II data, we

4  believe the phase III catheter occlusion program has a high chance of success. . . . The phase II data

5  . . . showed strongly superior efficacy at 15 minutes to alteplase . . . at all tested doses." The analysts

6  further noted that "alfimeprase is likely to succeed in ph.III studies for PAO and CO," and

7  specifically regarding trials for PAO, "We believe the study is substantially overpowered and has a

8  high probability of success."

9        75.    On January 23, 2006, the Company announced it had been granted FDA "Fast Track

10  Status" for alfimeprase. Love stated that "Fast track designation represent[ed] a further step in the

11  achievement of [the Company's] regulatory strategy . . . ." Again, unaware of the stringent

12  requirements placed on the alfimeprase development program by the FDA and other undisclosed

13  risks to FDA approval, the market reacted favorably to Love's announcement. CIBC World Markets

14  analysts noted that "[f]ast track status will allow NUVO to submit a 'rolling' NDA for alfimeprase

15  and may signal a willingness by the FDA to consider accelerated review." Furthermore "while the

16  receipt of Fast Track designation for alifmeprase (sic) in PAO is not surprising, we believe it is

17  positive and may provide a shorter course to market for alfimeprase. We believe ph.III trials of

18  alfimeprase in PAO and CO are likely to succeed and expect the stock to appreciate into ph.III data."

19        76.    On January 24, 2006 the Company again used apparently good news to tap the

20  financial markets, announcing it would conduct a Follow-On Offering of 5.5 million shares

21  underwritten by JP Morgan, Lehman Brothers, Inc. and Deutsche Bank. On January 31, 2006, the

22  Company issued and sold approximately 7.5 million shares of its common stock at $16 per share in

23  the offering, receiving over $119 million in proceeds.

24        77.    On February 27, 2006, the Company announced that it had begun patient enrollment

25  in SONOMA-3, a second pivotal study of alfimeprase for the treatment of CO. On this and other

26  positive statements made by defendants, analysts such as Caroline Stewart at Morgan Joseph &

27  Company Inc. ("Morgan Joseph") increased their price targets by 56% – from $16 to $25 per share.

28

1    In a February 28, 2006 report, Deutsche Bank analyst Chao similarly raised the price target for

2    Nuvelo stock from $18 to $24.

3        78.    In a CIBC World Markets analyst report dated February 28, 2006, the analysts,

4    unaware that the p-value requirement for SONOMA-2 (Phase 3 trial for CO) was less than 0.00125,

5    which was forty times less than the p-value typically imposed by the FDA or that the NAPA trials

6    for PAO were at risk of failing because positive results were simply caused by the insertion of a

7    catheter into a blood clot, reiterated their January 5, 2006 positive outlook: "Alfimeprase is likely to

8    be effective in PAO and CO."  Regarding the Phase 3 trial for PAO, the analysts repeated, "We

9    believe the study is substantially overpowered and has a high probability of success."  And with

10   respect to CO, the analysts wrote: "The phase II data in this indication demonstrated strongly

11   superior efficacy at 15 minutes to alteplase . . . at all tested doses, and based on this data we believe

12   the phase III program has a high probability of success."

13       79.    Nuvelo announced that it had begun patient enrollment in a second Phase 3 trial of

14   alfimeprase for PAO – NAPA-3 – on April 10, 2006, again reiterating that the Phase 2 PAO trial

15   purportedly showed that alfimeprase "can restore arterial blood flow within four hours of initiation

16   of dosing [and] has a favorable safety profile with minimal bleeding complications. . . ."  These

17   statements were repeated again on May 5, 2006, when Nuvelo announced first quarter 2006 financial

18   results.  That same day, still unaware of the undisclosed risks to FDA approval, Oppenheimer

19   analysts wrote, "Based primarily on Phase II trial results, we have a high conviction level that both

20   studies [NAPA-2 and SONOMA-2] will be successful."  Similar sentiments were reflected in a June

21   19, 2006 Needham & Company, LLC ("Needham") report following the Company's analyst day,

22   which stated: "[W]e believe that prior clinical trials have demonstrated that alfimeprase is an

23   effective clot buster."

24       80.    On July 6, 2006, the Company announced the publication of Phase 2 alfimeprase trial

25   results in CO in the July 1, 2006 issue of the Journal of Clinical Oncology.  In the press release,

26   Nuvelo stated that the results "demonstrat[e] that alfimeprase can quickly restore function to

27   occluded central venous access devices (CVADs)."  Love stated: "Based on these promising Phase 2

28   results, we have initiated two overlapping, multi-national Phase 3 trials evaluating the 3 mg dose of

1    alfimeprase in catheter occlusion.  We anticipate data from the first of these trials, the SONOMA-2

2    trial, in the second half of this year, and hope to confirm the ability of alfimeprase to restore function

3    to occluded catheters in 15 minutes or less."  In a Company Alert issued that same day, Deutsche

4    Bank repeated the Company's announcement that the results showed "that alfimeprase can restore

5    function to occluded central venous access devices (CVADs)," and reiterated its "Buy"

6    recommendation.

7    　　　　81.    On August 3, 2006, Nuvelo announced second quarter 2006 financial results, again

8    taking the opportunity to tout alfimeprase's Phase 2 results.  Following Nuvelo's conference call

9    announcing the results, on August 4, 2006, Brean Murray, unaware of the undisclosed risks to FDA

10   approval, reported, "During the Q&A session of the conference call, Nuvelo indicated that in the

11   NAPA-2 trial, alfimeprase was working well in large and small clots, as well as in old and new

12   clots."  Similarly, in a CIBC World Markets analyst report of the same day, the analysts, remaining

13   in the dark, reiterated their belief that "alfimeprase has a high probability of success in PAO and

14   CO."   Regarding the Phase 3 trial for PAO, the analysts repeated, "We believe the study is

15   substantially overpowered and has a high probability of success."  With respect to CO, the analysts

16   wrote: "The recently published phase II data for alfimeprase in this indication demonstrated superior

17   efficacy at 15 minutes to alteplase at all tested doses. . . .  Based on this data we believe the phase III

18   program has a high probability of success."

19   　　　　82.    By late summer, more analysts had initiated coverage of Nuvelo due to the

20   significance of alfimeprase.  Miller Johnson Steichen Kinnard Investment Securities ("Miller

21   Johnson") initiated coverage of Nuvelo in an August 23, 2006 analyst report in which  it noted that

22   for both PAO and CO, alfimeprase "has potential to emerge as the standard of care, addressing peak

23   market sales potential in excess of $500MM."  Similarly, a September 12, 2006 Wachovia Capital

24   Markets, LLC ("Wachovia") report initiating coverage of Nuvelo touted the Phase II results of

25   alfimeprase for both the PAO and CO indications: "Relatively simple path to approval: Data from a

26   Phase II trial evaluating alfimeprase efficacy and safety in 113 patients with peripheral arterial

27   occlusion (PAO) supports the likelihood of a positive Phase III outcome for this niche indication and

28   a relatively simple means to market, in our view.  Phase II data in catheter occlusion (CO) also

1   confirms activity with top-line Phase III results from both indications potentially ready for release in

2   Q4 2006." The report further noted as its investment summary: "alfimeprase is well positioned to

3   become the standard of care for treating all blood clot disorders . . . ."

4          83.     The pattern repeated itself again when Nuvelo announced its third quarter 2006

5   financial results on November 2, 2006, again misrepresenting alfimeprase's Phase 2 results and

6   Phase 3 prospects. Still, unaware of the undisclosed risks, analysts, like Oppenheimer, maintained

7   "a high level of conviction for a successful outcome for [NAPA-2 and SONOMA-2]."

8          **B.     Defendants' Scheme Unravels.**

9          84.     Prior to the start of trading on December 11, 2006, the investment community was

10  shocked when **Bayer** announced that alfimeprase had **completely failed** to meet the primary

11  endpoints in the clinical trials for **both** PAO and CO. The primary endpoint for the PAO trial was

12  preventing patients with blood clots in their legs from needing surgery within 30 days of taking the

13  drug. The trial failed to reach it. The primary endpoint for the CO treatment study was the ability to

14  unblock catheters within 15 minutes of taking the drug, demonstrated to a p-value of 0.00125. The

15  trial failed to reach it. The clinical trials also failed to reach any of their key secondary endpoints.

16  *Supra*, ¶¶10, 47, 56, 60-63.

17         85.     In reaction to the news of the failure of the NAPA-2 and SONOMA-2 trials before the

18  market opened on December 11, 2006, the price of Nuvelo shares plunged 80%, to their lowest level

19  in over three and a half years, making Nuvelo the biggest percentage decliner on the NASDAQ

20  composite. Nuvelo's stock closed at $4.05 a share, down $15.50 a share in unusually heavy trading

21  of 90 million shares, more than 176 times the average daily trading volume. Nuvelo's stock had

22  been trading an average of 450,000 shares a day in recent weeks. At one point, the stock fell as low

23  as $3.35, its worst performance since April 2003, prompting an immediate chorus of negative analyst

24  comments including downgrades. Nuvelo's options became worthless.

25         86.     For example, UBS Investment Research ("UBS") analyst Maged Shenouda

26  downgraded Nuvelo to "Reduce" from "Buy." The Company's target price went to $3 from $28.

27  Shenouda said Bayer is likely to exit the collaboration in the first quarter of 2007. At Oppenheimer,

28  analyst Cory Kasimov ("Kasimov") downgraded the Company to "Neutral" from "Buy" and

1   removed his $24 price target. Kasimov added that the rest of the Company's pipeline is high risk

2   and at an early stage of development, and that there is concern that Bayer could potentially walk

3   away from the alfimeprase partnership. Wachovia analyst George Farmer cut his rating to market

4   perform from outperform, saying he saw only "modest value" in the remainder of Nuvelo's pipeline.

5   He valued the stock between $3 and $5. JP Morgan downgraded the stock to neutral from

6   overweight, explaining that alfimeprase had been a key driver in Nuvelo's investment value – and

7   valued the Company at the $3 per share cash it had on its books.

8       87.    In a December 11, 2006 Prudential report, analyst Zhang wrote:

9       Sometimes, when a stock is hammered badly after failure of a key clinical trial, it
        could be a good buying opportunity if the trial could be salvaged or if the drug is in
10      other clinical trials that could yield positive data to support further development or
        approval. We believe that is not the case here. Alfimeprase is the main drug from
11      Nuvelo's pipeline and represents more than 80% of the company's value. Without a
        reasonable expectation this drug would be approved for the two indications the
12      company sought, the stock is unlikely to recover anytime soon.

13      88.    Also, on December 11, 2006, analysts Kasimov and Sa'ar Yaniv, of Oppenheimer

14   issued an analyst report entitled "Downgrading to Neutral on Alf Failure" stating:

15      **Is alfimeprase dead?** On the heels of these results, enrollment has been suspended
        in the Phase III NAPA-3 study in PAO (-100 pts enrolled to date) and SONOMA-3
16      study in CO (-250 pts enrolled to date). Planned Phase II trials in stroke and DVT
        have also been postponed. Additionally, we are concerned that Bayer (BAY, $52.48,
17      Not Covered) could potentially walk away from the alfimeprase partnership.

18      **What else does NUVO have?** Aside from alfimeprase, the rest of NUVO's pipeline
        is early and high risk. . . .
19

20      89.    On June 26, 2007, Nuvelo announced **Bayer had terminated its partnership with

     Nuvelo**.  In response to the Company's announcement, analysts expressed further pessimism about
21
     alfimeprase and on June 26, 2007, shares of Nuvelo fell $0.74, or 22%, to $2.60 in after hours
22
     trading, after falling $0.01 to close at $3.34. On June 27, 2007 Brean Murray analyst Aschoff wrote
23
     that the Bayer partnership was critical to Nuvelo's cash flow and reiterated a $2 price target: "We are
24
     uncertain as to how and why Nuvelo will fund the development of Alfimeprase, considering it has
25
     already failed to meet its primary endpoint in two Phase 3 trials." Banc of America Securities LLC
26
     ("Banc of America") analyst William Ho, maintaining a "Neutral" rating and a $3.50 target price,
27
     said there was little chance the drug will succeed in new trials.
28

1    90.    On August 1, 2007, Nuvelo announced that it was terminating employees to reduce its

2    workforce by approximately 30% and realigning its organization to focus on core development

3    programs that it believes will produce nearest-term proof of concept data.  As a result of the

4    reduction in workforce, effective August 3, 2007, the Company stated that it expected to have less

5    than 80 employees, a reduction of 45% from 2006, and expected this realignment of personnel and

6    programs to result in reduced annual expenses of about $15 million from current levels.  As part of

7    the reorganization, H. Ward Wolff, Senior VP and CFO left the Company effective August 14, 2007.

8    **VIII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS
          PERIOD**

9

10    91.    Throughout the Class Period, defendants mischaracterized the results of the Phase 2

11    trials of alfimeprase for CO and PAO and the design and parameters of the Phase 3 trials and

12    misrepresented the risks associated with approval of alfimeprase for treatment of CO and PAO.

13    Each defendant is liable for (i) making false statements and/or (ii) failing to disclose adverse facts

14    known to him about Nuvelo.  Defendants' fraudulent scheme and course of business that operated as

15    a fraud or deceit on purchasers of Nuvelo securities was a success, as it: (i) deceived the investing

16    public regarding Nuvelo's prospects and business, and specifically the prospects for the Company's

17    leading drug candidate, alfimeprase; (ii) artificially inflated the prices of Nuvelo securities; (iii)

18    allowed defendants to arrange to sell and actually sell $119 million worth of Nuvelo securities at

19    artificially inflated prices in the Follow-On Offering; (iv) allowed defendants to draw huge salaries

20    and obtain large bonuses which were directly tied to the Company's financial success; (v) permitted

21    defendant Titus to sell $1.5 million worth of Nuvelo stock at inflated prices; and: (vi) caused

22    plaintiffs and other members of the Class to purchase Nuvelo's publicly traded securities at inflated

23    prices.

24    **A.    Defendants' January 5, 2006 False and Misleading Statements**

25    92.    Before the opening of trading on January 5, 2006, Nuvelo and Bayer issued a release

26    entitled "Nuvelo and Bayer HealthCare Enter Comprehensive Collaboration Agreement to Maximize

27    Global Development and Commercialization of Alfimeprase," which stated in relevant part:

28             Nuvelo, Inc. (Nasdaq: NUVO) today announced that it has
             entered into a collaboration agreement with Bayer HealthCare AG

(BHC) to maximize the global development and commercialization of alfimeprase, Nuvelo's lead Phase 3 product candidate.  Alfimeprase, a novel, first-in-class thrombolytic or blood clot dissolver that directly degrades fibrin, *has been shown in clinical studies to provide rapid clot dissolution with a well tolerated safety profile.*

93.    Also on January 5, 2006, Nuvelo conducted a conference call with analysts to discuss the Bayer deal.  Defendants Love, Titus and Levy each participated in and spoke on behalf of Nuvelo during the call.  At the outset of the call, Love repeated the information contained in the press release, and also claimed that alfimeprase "has blockbuster potential" that could become a "transformational therapy, much like serotonin reuptake inhibitors were in Depression," a reference to one of the biggest-selling class of drugs on the market:

> *[E]veryone that came in the door quite frankly was consistently impressed with the data that we generated with Alfimeprase, suggesting a dramatic feat of action* and also its safety profile which emanates from the inactivation by alpha-2 macroglobulin.  *And it is really that profile and the confidence that that profile will be demonstrated in Phase III that generated excitement at Bayer and generated excitement quite frankly in every organization that we spoke with*. . . .So I think it really is looking forward recognizing that there are a great deal of thromboembolic disease out there, probably 10 million patients worldwide that really are not being well served with current therapies and Alfimeprase could deliver that unmet medical need.

94.    Defendant Love explained that Nuvelo started with the PAO and CO indications because they would provide a "*low-risk regulatory path for approval*," from which defendants could expand alfimeprase to the much larger markets for stroke and DVT:

> It has been very clear to us from the very beginning that stroke and DVT are much larger market opportunities.  *But we did not start with those indications because of the development strategy was really focused on going after indications which will be rapid to market, which would demonstrate the superior advantage of the compound in terms of its fast speed of action and would provide a low-risk regulatory path for approval.*  Now that we've got those programs obviously well underway, we plan to turn our attention to DVT, stroke, [and] other indications to really exploit the full commercial potential and the full medical benefit of the product.

**1.    Reasons Why Defendants' January 5, 2006 Statements Were False and Misleading**

95.    The statements in the January 5, 2006 press release and conference call that alfimeprase "has been shown in clinical studies to provide rapid clot dissolution," that the Phase 2

1   data "suggest[s] a dramatic feat of action" and "fast speed of action" that "will be demonstrated" in

2   Phase 3, that the Phase 3 trials therefore represented a "low risk regulatory path for approval," and

3   that alfimeprase "has blockbuster potential" and "will be rapid to market" for PAO and CO, were

4   false because the Phase 2 data was not as reliable or significant as defendants had led the market to

5   believe, nor were the existing risks to FDA Approval or commercial marketability of alfimeprase for

6   PAO and CO fully disclosed.

7           96.    As alleged previously, defendants knew that blood flow in some patients enrolled in

8   the NAPA PAO trials would be restored simply by inserting the catheter into the clot to deliver the

9   drug, rather than through any action of alfimeprase, and had no basis for representing to the market

10  the degree to which the drug caused the purportedly successful Phase 2 results.  Based on the small

11  size of the CO Phase 2 trial, preclinical studies which showed greater efficacy at higher doses and

12  the lower than expected rate of catheter clearance in the comparator alteplase arm, defendants also

13  had no reasonable basis for predicting success in the Phase 3 trials for CO, because they did not

14  know whether the dose of alfimeprase chosen for the study in SONOMA-2 would yield the required

15  results or would be appropriate for the commercial success of alfimeprase in this indication.  As a

16  result, the regulatory path for approval for CO was far from "low risk," nor was there a "high

17  probability" of success in the Phase 3 PAO and CO trials, as defendants had previously represented.

18          97.    These statements, together with defendants' other statements regarding the purported

19  success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as elsewhere alleged,

20  were also materially false and misleading to investors because Nuvelo omitted to disclose, in the

21  press release, on the conference call, or elsewhere, known risks that reduced the likelihood that the

22  Phase 2 results could be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the

23  drug would be marketable, including that: (i) in the Phase 2 PAO trial the clot may have simply been

24  broken up by the action of the catheter pushing into the clot, rather than dissolved by the action of

25  the drug, a possibility that had been raised internally at Nuvelo even before the Phase 2 PAO trials

26  were completed; (ii) in the Phase 3 CO trial, Nuvelo had agreed with the FDA to demonstrate

27  success at a statistical significance level that was *forty times more stringent* than what the market

28  believed, rendering success much less likely; (iii) the market opportunity for the drug in PAO was

1   much smaller than represented to analysts and the market because of competition from off-label use

2   of other drugs and mechanical clot-busting techniques, the potential impact of which was not timely

3   or accurately disclosed to investors; (iv) Nuvelo had an undisclosed "target product profile" which

4   would be necessary to meet in order for the Company to market alfimeprase for CO, and the

5   Company would not proceed to market alfimeprase for that indication if the trial results did not meet

6   that profile, even if the drug was otherwise qualified for FDA approval.

7              **2.    Scienter**

8              98.    The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

9   a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

10  knew or was deliberately reckless in not knowing that the foregoing statements in the January 5,

11  2006 press release and conference call were materially false and misleading when made:

12             (a)    Defendants Love, as Chairman and CEO, Titus, as CAO, and Levy as Senior

13  VP of Research and Development, were responsible for and/or knew about the clinical testing of

14  alfimeprase, the agreements with the FDA about the required p-value for SONOMA-2 and the target

15  product profile for marketing alfimeprase for CO.  They were responsible for the reports and claims

16  relating to alfimeprase as well as the press releases issued by the Company.  Specifically, defendants

17  were privy to the facts surrounding the results of the alfimeprase Phase 2 CO and PAO trials and the

18  specific facts surrounding the design of the alfimeprase Phase 3 CO and PAO trials, including the

19  requirements imposed by the FDA on SONOMA-2 (the alfimeprase Phase 3 CO trial).

20             (b)    According to CW1, defendant Love wrote the protocols for all of the clinical

21  trials of alfimeprase, including the protocol for SONOMA-2, and was a member of the "alfimeprase

22  team" consisting of people primarily responsible for the testing and marketing of the drug.

23  Therefore, he had actual knowledge of the extremely stringent p-value of 0.00125 which the FDA

24  imposed on the SONOMA-2 trial and the "target product profile" for marketing alfimeprase for CO.

25             (c)    As they admitted first on December 11, 2006 and in more detail on June 26,

26  2007, defendants knew that the FDA had imposed an extremely stringent p-value requirement of less

27  than 0.00125 for the alfimeprase Phase 3 CO trial (SONOMA-2), which was forty times less than the

28

1   standard p-value of 0.05, and that, because of the stringent p-value imposed by the FDA, success in

2   the Phase 3 trial and FDA approval were unlikely.

3           (d)        Defendants knew or recklessly disregarded that the action of catheter insertion

4   can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

5   Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

6   defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

7   been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

8   rather than the action of the alfimeprase. The insertion of the catheter alone could have restored the

9   blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

10  recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

11  that would accurately predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that

12  would indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability

13  of the drug for PAO.

14          (e)        Defendants knew or recklessly disregarded that their "power calculations"

15  were not reliable because they were based upon placebo assumptions which had no reasonable basis.

16  Defendants did not know how many patients avoided open surgery for 30 days as a result of the

17  action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

18  for assuming how many patients in the placebo arm would avoid open surgery because their clots

19  were broken up simply by the insertion of the catheter. According to defendants, these power

20  calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

21  without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

22  dissolved, and restoration of blood flow avoids surgery.

23          (f)        Because of Love's and Nuvelo's VP of Manufacturing's involvement with

24  alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

25  opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

26  because of competition from off-label use of other drugs and mechanical clot-busting techniques and

27  devices.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                                    - 35 -

1        (g)      Defendants knew that Nuvelo had an undisclosed "target product profile"

2   which would be necessary to meet for the marketability and commercial success of alfimeprase in

3   CO, and that the Company would not proceed to market alfimeprase for that indication if the

4   SONOMA-2 trial results did not meet that profile, even if the drug was otherwise qualified for FDA

5   approval.

6        (h)      Because defendants Love and Titus signed Nuvelo's filings with the SEC

7   during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known

8   material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of

9   alfimeprase, as detailed herein in ¶¶131-144.

10       99.      The totality of these circumstances, in addition to facts alleged elsewhere in this

11  Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that

12  each of the defendants had actual knowledge or recklessly disregarded that their January 5, 2006

13  statements were materially false and misleading when made.

14  **B.      Defendants' February 27, 2006 False and Misleading Statements**

15       100.     On February 27, 2006, the Company and Bayer issued a press release entitled

16  "Nuvelo and Bayer HealthCare Begin SONOMA-3, Second Phase 3 Trial of Alfimeprase in Patients

17  With Central Venous Catheter Occlusion," which stated in relevant part:

18           Nuvelo Inc. (Nasdaq: NUVO) and Bayer HealthCare (BHC) today
             announced that they have begun patient enrollment in a second
19           pivotal Phase 3 clinical trial of lead product candidate, alfimeprase,
             for the treatment of central venous catheter occlusion (CO).
20
                          *          *          *
21
             'We believe that alfimeprase has the potential to quickly dissolve
22           clots and rapidly restore the ability to infuse critical therapy such as
             chemotherapy or antibiotics through once occluded catheters,' said
23           Steven R. Deitcher, M.D., vice president of medical sciences for
             Nuvelo and former principal investigator of the Phase 2 trial. 'We
24           look forward to completing the first trial in this program, SONOMA-
             2, later this year and ***expect the Phase 3 trial results to confirm the
25           ability of alfimeprase to restore function to occluded catheters in 15
             minutes or less, as demonstrated in our Phase 2 trial***.'
26
             Previously announced results from a Phase 2 multi-center,
27           randomized, double-blind study in 55 patients with occluded central
             venous catheters ***demonstrated that alfimeprase restored flow to 40
28           percent and 50 percent of occluded catheters 5 and 15 minutes after***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                              - 36 -

1

*the first dose, respectively*. By comparison, Cathflo(R)Activase(R) (alteplase) did not restore flow at either time point. Alfimeprase also restored flow to 60 percent of occluded catheters at 120 minutes after the first dose and to 80 percent of occluded catheters at 120 minutes after the second dose compared with 46 percent at 120 minutes after the first dose and 62 percent at 120 minutes after the second dose with Cathflo(R)Activase(R).

2

3

4

5    101.    On February 27, 2006, Nuvelo conducted a conference call with analysts to discuss

6    the Company's FY05 and 4Q05 results.  Defendants Love, Titus and Levy each participated in and

7    spoke on behalf of Nuvelo during the call.  On the call, Levy and Love provided the following

8    update on the status of the alfimeprase trials:

9

[Levy]:  [I]n January of this year, the FDA granted alfimeprase fast track designation. This designation is reserved for drugs that demonstrate the potential to address an unmet medical need and are intended for the treatment of a serious or life-threatening condition. In the case of acute PAO, *there is no currently available FDA approved drug* making it an unmet medical need and *the Phase 2 data for alfimeprase has demonstrated that it has a real potential to transform the treatment of this condition.*

10

11

12

13                                    *        *        *

14

Having made progress on our initial clinical programs in 2006 we will begin to implement our label expansion strategy for alfimeprase. *We have always known that alfimeprase holds the potential to treat a wide range of clot disorders and that acute PAO and catheter occlusion represented the most rapid and low risk market entry strategy for us.*  Now that we've advanced both of these initial programs, we are able to pursue follow-on opportunities for alfimeprase being ischemic stroke and NDBT.  We believe that alfimeprase has the potential to transform both of these markets where currently there is little penetration by existing agents.

15

16

17

18

19

20                                    *        *        *

21

[Love]:  *Our partnership with Bayer is predicated on a belief that alfimeprase has the potential to transform treatment for the more than 10 million people in the western world who suffer from blood clot related conditions each year and that the market opportunity extends far beyond acute PAO and catheter occlusion. . . .*

22

23

24

After our announcement with Bayer in January, we have moved swiftly to kick off the partnership.  We are off to a great start and have been working to establish the appropriate joint committees between our companies.  In other words, we've already started to put a solid foundation in place for our very successful collaboration and *we continue to make excellent progress with alfimeprase development*.

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:07-cv-04056-MMJ                                                                          - 37 -

1

           **1.**     **Reasons Why Defendants' February 27, 2006 Statements Were**
                     **False and Misleading**

2

3
      102.    The statements in the February 27, 2006 press release and the February 27, 2006

4
conference call that Nuvelo expected the Phase 3 trials to "confirm" the ability of alfimeprase to

5
restore function to occluded catheters, as "demonstrated' in the Phase 2 trial, and that "acute PAO

6
and catheter occlusion represented the most rapid and low risk market entry strategy" for the

7
Company, were false because the Phase 2 data was not as reliable or significant as defendants had

8
led the market to believe, nor were the existing risks to FDA Approval or commercial marketability

9
of alfimeprase for PAO and CO fully disclosed.

10
      103.    As alleged previously, defendants knew that blood flow in some patients enrolled in

11
the NAPA PAO trials would be restored simply by inserting the catheter into the clot to deliver the

12
drug, rather than through any action of alfimeprase, and had no basis for representing to the market

13
the degree to which the drug caused the purportedly successful Phase 2 results.  Based on the small

14
size of the CO Phase 2 trial and the lower than expected rate of catheter clearance in the comparator

15
alteplase arm, defendants also had no reasonable basis for predicting success in the Phase 3 trials for

16
CO, because they did not know whether the dose of alfimeprase chosen for the study in SONOMA-2

17
would yield the required results or would be appropriate for the commercial success of alfimeprase

18
in this indication.  As a result, the regulatory path for approval for CO was far from "low risk," nor

19
was there a "high probability" of success in the Phase 3 PAO and CO trials, as defendants had

20
previously represented.

21
      104.    These statements, together with defendants' other statements regarding the purported

22
success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as elsewhere alleged,

23
were also materially false and misleading to investors because Nuvelo omitted to disclose, in the

24
press release, on the conference call, or elsewhere, known risks that reduced the likelihood that the

25
Phase 2 results could be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the

26
drug would be marketable, including that: (i) in the Phase 2 PAO trial, the blood clot may have

27
simply been broken up by the action of the catheter pushing into the clot, rather than dissolved by the

28
action of the drug, a possibility that had been raised internally at Nuvelo even before the Phase 2

1   PAO trials were completed; (ii) in the Phase 3 CO trial, Nuvelo had agreed with the FDA to

2   demonstrate success at a statistical significance level that was **forty times more stringent** than what

3   the market believed, rendering success much less likely; (iii) the market opportunity for the drug in

4   PAO was much smaller than represented to analysts and the market because of competition from off-

5   label use of other drugs and mechanical clot-busting techniques, the potential impact of which was

6   not timely or accurately disclosed to investors; (iv) Nuvelo had an undisclosed "target product

7   profile" which would be necessary to meet in order for the Company to market alfimeprase for CO,

8   and the Company would not proceed to market alfimeprase for that indication if the trial results did

9   not meet that profile, even if the drug was otherwise qualified for FDA approval.

10                    **2.     Scienter**

11          105.    The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

12   a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

13   knew or was deliberately reckless in not knowing that the foregoing statements in the February 27,

14   2006 press release and conference call were materially false and misleading when made:

15                    (a)     Defendants Love, as Chairman and CEO, Titus, as CAO, and Levy as Senior

16   VP of Research and Development, were responsible for and/or knew about the clinical testing of

17   alfimeprase, the agreements with the FDA about the required p-value for SONOMA-2 and the target

18   product profile for marketing alfimeprase for CO.  They were responsible for the reports and claims

19   relating to alfimeprase as well as the press releases issued by the Company.  Specifically, defendants

20   were privy to the facts surrounding the results of the alfimeprase Phase 2 CO and PAO trials and the

21   specific facts surrounding the design of the alfimeprase Phase 3 CO and PAO trials, including the

22   requirements imposed by the FDA on SONOMA-2 (the alfimeprase Phase 3 CO trial).

23                    (b)     According to CW1, defendant Love wrote the protocols for all of the clinical

24   trials of alfimeprase, including the protocol for SONOMA-2, and was a member of the "alfimeprase

25   team" consisting of people primarily responsible for the testing and marketing of the drug.

26   Therefore, he had actual knowledge of the extremely stringent p-value of less than 0.00125 which

27   the FDA imposed on the SONOMA-2 trial and the "target product profile" for marketing

28   alfimeprase for CO.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                          - 39 -

1    (c)    As they admitted first on December 11, 2006 and in more detail on June 26,

2    2007, defendants knew that the FDA had imposed an extremely stringent p-value requirement of less

3    than 0.00125 for the alfimeprase Phase 3 CO trial (SONOMA-2), which was forty times less than the

4    standard p-value of 0.05, and that, because of the stringent p-value imposed by the FDA, success in

5    the Phase 3 trial and FDA approval were unlikely.

6    (d)    Defendants knew or recklessly disregarded that the action of catheter insertion

7    can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

8    Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

9    defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

10   been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

11   rather than the action of the alfimeprase.  The insertion of the catheter alone could have restored the

12   blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

13   recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

14   that would predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that would

15   indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability of the

16   drug for PAO.

17   (e)    Defendants knew or recklessly disregarded that their "power calculations"

18   were not reliable because they were based upon placebo assumptions which had no reasonable basis.

19   Defendants did not know how many patients avoided open surgery for 30 days as a result of the

20   action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

21   for assuming how many patients in the placebo arm would avoid open surgery because their clots

22   were broken up simply by the insertion of the catheter.  According to defendants, these power

23   calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

24   without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

25   dissolved, and restoration of blood flow avoids surgery.

26   (f)    Because of Love's and Nuvelo's VP of Manufacturing's involvement with

27   alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

28   opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

1   because of competition from off-label use of other drugs and mechanical clot-busting techniques and

2   devices.

3           (g)    Defendants knew that Nuvelo had an undisclosed "target product profile"

4   which would be necessary to meet for the marketability and commercial success of alfimeprase in

5   CO, and that the Company would not proceed to market alfimeprase for that indication if the

6   SONOMA-2 trial results did not meet that profile, even if the drug was otherwise qualified for FDA

7   approval.

8           (h)    Because defendants Love and Titus signed Nuvelo's filings with the SEC

9   during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known

10  material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of

11  alfimeprase, as detailed herein in ¶¶131-144.

12      106.    The totality of these circumstances, in addition to facts alleged elsewhere in this

13  Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that

14  each of the defendants had actual knowledge or recklessly disregarded that their February 27, 2006

15  statements were materially false and misleading when made.

16      **C.    Misleading Statements in Nuvelo's FY05 Report on Form 10-K**

17      107.    On March 15, 2006, Nuvelo filed with the SEC its Report on Form 10-K for its 2005

18  fiscal year, ending December 31, 2005, signed by defendants Titus and Love.

19      108.    Regarding the Phase 2 clinical trials of alfimeprase, the 10-K Report stated:

20  We completed our Phase 2 clinical trial in patients with acute PAO in the second
    quarter of 2004. This trial was an open label, dose-escalation study evaluating the
21  safety and activity of alfimeprase. The trial enrolled 113 patients in multiple centers
    in the United States, Europe, Russia and other locations. ***The Phase 2 results***
22  ***indicate that alfimeprase has the potential to offer significant advances in the rapid***
    ***resolution of a blood clot while minimizing potentially fatal side effects such as***
23  ***intracerebral hemorrhage and other bleeding complications. Analysis of the Phase***
    ***2 results showed that alfimeprase has the potential to partially or completely break***
24  ***up blood clots within four hours of initiation of dosing with rates of up to 76***
    ***percent and to restore arterial flow with rates of up to 60 percent. Up to 69 percent***
25  ***of study patients were able to avoid open vascular surgical intervention in the 30***
    ***days following treatment with alfimeprase. Among the 113 patients enrolled, there***
26  ***were no intracerebral hemorrhages or deaths at 30 days.*** There were seven major
    bleeding events reported, none of which was categorized as systemic bleeding events
27  and only one of which was categorized by the investigator as possibly related to
    alfimeprase. Incidents of transient hypotension were also reported and were dose-
28  related. Events associated with distal embolism were also noted. We do not believe

that these events were more significant in number or severity than similar events associated with other therapies delivered by catheter to blood clots.

\*        \*        \*

In the third quarter of 2004, we completed patient enrollment in a Phase 2 multi-center, double-blind, randomized study in 55 patients with occluded central venous catheters comparing three doses (0.3 mg, 1.0 mg and 3.0 mg) of alfimeprase against the approved dose of Cathflo Activase (2.0 mg). **The alfimeprase 3.0 mg dose produced cumulative flow rates of 40 percent at five minutes after the first dose, 50 percent at 15 minutes after the first dose, 60 percent at 30 minutes and 120 minutes after the first dose, and 80 percent at 120 minutes after the second dose. This is compared to Cathflo Activase, which produced flow rates of zero percent at five minutes after the first dose, zero percent at 15 minutes after the first dose, 23 percent at 30 minutes after the first dose, 46 percent at 120 minutes after the first dose, and 62 percent at 120 minutes after the second dose.** No major hemorrhagic events were reported in any treated patients and only one patient had a catheter-related infection.

109.    A letter to shareholders accompanying Nuvelo's 2005 Annual Report to Shareholders signed by Love, similarly stated:

**Alfimeprase is being developed as a clot dissolver and has the potential to fundamentally change the treatment of a wide range of clot related disorders. We chose our initial clinical programs for alfimeprase in acute peripheral arterial occlusion (PAO) and catheter occlusion (CO), to permit more rapid and lower risk market entry, with the expectation that we would later expand our efforts into additional indications. We are well on our way to achieving this goal.**

\*        \*        \*

**Given alfimeprase's speed of action and safety profile**, we believe it could offer a superior alternative to currently available therapies this large and undeserved markets. We expect to initiate a Phase 2 trial with alfimeprase in stroke in the second half of 2006 and a Phase 2 trial in DVT in 2007.

110.    The Report on Form 10-K did not include any specific warnings about the known risks of the applicability of the Phase 2 results to the ongoing Phase 3 trials, the likelihood of FDA approval in view of the FDA's extremely stringent p-value requirements for the Phase 3 CO trial and the undisclosed target product profile for the marketability of the drug for CO.

### 1.    Reasons Why the Statements in the FY05 Report on Form 10-K Were Materially False and Misleading to Investors.

111.    The statements in the Report on Form 10-K and accompanying shareholder letter that the Phase 2 results for PAO indicate alfimeprase's ability to "offer significant advances in the rapid resolution of [] blood clot[s]" and that it "has the potential to partially or completely break up blood clots within four hours," were false and misleading because the Phase 2 data was not as reliable or

1    significant as defendants had led the market to believe, nor were the existing risks to FDA Approval

2    or commercial marketability of alfimeprase for PAO and CO fully disclosed.

3           112.    As alleged previously, defendants knew that blood flow in some patients enrolled in

4    the NAPA PAO trials would be restore simply by inserting the catheter into the clot to deliver the

5    drug, rather than through any action of alfimeprase, and had no basis for representing to the market

6    the degree to which the drug caused the purportedly successful Phase 2 results.  Based on the small

7    size of the CO Phase 2 trial and the lower than expected rate of catheter clearance in the comparator

8    alteplase arm, defendants also had no reasonable basis for predicting success in the Phase 3 trials for

9    CO, because they did not know whether the dose of alfimeprase chosen for the study in SONOMA-2

10   would yield the required results or would be appropriate for the commercial success of alfimeprase

11   in this indication.  As a result, the regulatory path for approval for CO was far from "low risk," nor

12   was there a "high probability" of success in the Phase 3 PAO and CO trials, as defendants had

13   previously represented.

14          113.    These statements, together with defendants' other statements regarding the purported

15   success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as elsewhere alleged,

16   were also materially false and misleading to investors because Nuvelo omitted to disclose, in the

17   press release, on the conference call, or elsewhere, known risks that reduced the likelihood that the

18   Phase 2 results could be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the

19   drug would be marketable, including that: (i) in the Phase 2 PAO trial, the blood clot may have

20   simply been broken up by the action of the catheter pushing into the clot, rather than dissolved by the

21   action of the drug, a possibility that had been raised internally at Nuvelo even before the Phase 2

22   PAO trials were completed; (ii) in the Phase 3 CO trial, Nuvelo had agreed with the FDA to

23   demonstrate success at a statistical significance level that was *forty times more stringent* than what

24   the market believed, rendering success much less likely; (iii) the market opportunity for the drug in

25   PAO was much smaller than represented to analysts and the market because of competition from off-

26   label use of other drugs and mechanical clot-busting techniques, the potential impact of which was

27   not timely or accurately disclosed to investors; (iv) Nuvelo had an undisclosed "target product

28   profile" which would be necessary to meet in order for the Company to market alfimeprase for CO,

1  and the Company would not proceed to market alfimeprase for that indication if the trial results did

2  not meet that profile, even if the drug was otherwise qualified for FDA approval.

### 2.   Scienter

4     114.   The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

5  a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

6  knew or was deliberately reckless in not knowing that the statements in the FY05 Report on Form

7  10-K were materially false and misleading when made:

8     (a)   Defendants Love, as Chairman and CEO, Titus, as CAO and Levy as Senior

9  VP of Research and Development, were responsible for and/or knew about the clinical testing of

10  alfimeprase, the agreements with the FDA about the required p-value for SONOMA-2 and the target

11  product profile for marketing alfimeprase for CO.  They were responsible for the reports and claims

12  relating to alfimeprase as well as the press releases issued by the Company.  Specifically, defendants

13  were privy to the facts surrounding the results of the alfimeprase Phase 2 CO and PAO trials and the

14  specific facts surrounding the design of the alfimeprase Phase 3 CO and PAO trials, including the

15  requirements imposed by the FDA on SONOMA-2 (the alfimeprase Phase 3 CO trial).

16     (b)   According to CW1, defendant Love wrote the protocols for all of the clinical

17  trials of alfimeprase, including the protocol for SONOMA-2, and was a member of the "alfimeprase

18  team" consisting of people primarily responsible for the testing and marketing of the drug.

19  Therefore, he had actual knowledge of the extremely stringent p-value of less than 0.00125 which

20  the FDA imposed on the SONOMA-2 trial and the "target product profile" for marketing

21  alfimeprase for CO.

22     (c)   As they admitted first on December 11, 2006 and in more detail on June 26,

23  2007, defendants knew that the FDA had imposed an extremely stringent p-value requirement of less

24  than 0.00125 for the alfimeprase Phase 3 CO trial (SONOMA-2), which was forty times less than the

25  standard p-value of 0.05, and that, because of the stringent p-value imposed by the FDA, success in

26  the Phase 3 trial and FDA approval were unlikely.

27     (d)   Defendants knew or recklessly disregarded that the action of catheter insertion

28  can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

1    Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

2    defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

3    been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

4    rather than the action of the alfimeprase.  The insertion of the catheter alone could have restored the

5    blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

6    recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

7    that would predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that would

8    indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability of the

9    drug for PAO.

10              (e)        Defendants knew or recklessly disregarded that their "power calculations"

11   were not reliable because they were based upon placebo assumptions which had no reasonable basis.

12   Defendants did not know how many patients avoided open surgery for 30 days as a result of the

13   action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

14   for assuming how many patients in the placebo arm would avoid open surgery because their clots

15   were broken up simply by the insertion of the catheter.  According to defendants, these power

16   calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

17   without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

18   dissolved, and restoration of blood flow avoids surgery.

19              (f)        Because of Love's and Nuvelo's VP of Manufacturing's involvement with

20   alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

21   opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

22   because of competition from off-label use of other drugs and mechanical clot-busting techniques and

23   devices.

24              (g)        Defendants knew that Nuvelo had an undisclosed "target product profile"

25   which would be necessary to meet for the marketability and commercial success of alfimeprase in

26   CO, and that the Company would not proceed to market alfimeprase for that indication if the

27   SONOMA-2 trial results did not meet that profile, even if the drug was otherwise qualified for FDA

28   approval.

1        (h)     Because defendants Love and Titus signed Nuvelo's filings with the SEC during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of alfimeprase, as detailed herein in ¶¶131-144.

115.    The totality of these circumstances, in addition to facts alleged elsewhere in this Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that each of the defendants had actual knowledge or recklessly disregarded that the statements in the FY05 Report on Form 10-K and the letter to shareholders accompanying Nuvelo's 2005 Annual Report to Shareholders were materially false and misleading when made.

**D.    Defendants' False and Misleading Statements in April 10, 2006 Press Release**

116.    On April 10, 2006, defendants, along with Bayer, issued a press release entitled "Nuvelo and Bayer Healthcare Begin NAPA-3, Second Pivotal Phase 3 Trial of Alfimeprase for Acute Peripheral Arterial Occlusion," which announced the commencement of the NAPA 2 trial, and then stated, in relevant part:

> ***Previously announced results from the NAPA-1 trial, a Phase 2 dose- escalation study, demonstrated that alfimeprase can restore arterial blood flow within four hours of initiation of dosing, has a favorable safety profile with minimal bleeding complications, and resulted in a majority of patients avoiding open vascular surgery within 30 days of treatment.***

**1.    Reasons Why Defendants' April 10, 2006 Statement Was False and Misleading**

117.    The statement in the April 10, 2006 press release that the Phase 2 study in PAO had "demonstrated that alfimeprase can restore arterial blood flow within four hours of initiation of dosing" was false because in fact, blood flow in the patients enrolled in the NAPA PAO trials had been restored simply by inserting the catheter into the clot to deliver the drug, rather than through any action of alfimeprase.  The statement, together with defendants' other statements regarding the purported success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as elsewhere alleged, were also materially false and misleading to investors because Nuvelo omitted to disclose in the press release, or elsewhere, known risks that reduced the likelihood that the Phase 2 results could

1    be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the drug would be

2    marketable, including that: (i) in the Phase 2 PAO trial, the blood clot may have simply been broken

3    up by the action of the catheter pushing into the clot, rather than dissolved by the action of the drug,

4    a possibility that had been raised internally at Nuvelo even before the Phase 2 PAO trials were

5    completed; and (ii) the market opportunity for the drug in PAO was much smaller than represented

6    to analysts and the market because of competition from off-label use of other drugs and mechanical

7    clot-busting techniques, the potential impact of which was not timely or accurately disclosed to

8    investors.

9              **2.    Scienter**

10             118.    The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

11   a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

12   knew or was deliberately reckless in not knowing that the foregoing statement in the April 10, 2006

13   press release was materially false and misleading when made:

14             (a)    Defendants Love, as Chairman and CEO, Titus, as CAO, and Levy as Senior

15   VP of Research and Development, were responsible for and/or knew about the clinical testing of

16   alfimeprase.  They were responsible for the reports and claims relating to alfimeprase as well as the

17   press releases issued by the Company.  Specifically, defendants were privy to the facts surrounding

18   the results of the alfimeprase Phase 2 CO and PAO trials and the specific facts surrounding the

19   design of the alfimeprase Phase 3 CO and PAO trials.

20             (b)    According to CW1, defendant Love wrote the protocols for all of the clinical

21   trials of alfimeprase and was a member of the "alfimeprase team" consisting of people primarily

22   responsible for the testing and marketing of the drug.

23             (c)    Defendants knew or recklessly disregarded that the action of catheter insertion

24   can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

25   Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

26   defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

27   been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

28   rather than the action of the alfimeprase.  The insertion of the catheter alone could have restored the

1   blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

2   recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

3   that would predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that would

4   indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability of the

5   drug for PAO.

6          (d)    Defendants knew or recklessly disregarded that their "power calculations"

7   were not reliable because they were based upon placebo assumptions which had no reasonable basis.

8   Defendants did not know how many patients avoided open surgery for 30 days as a result of the

9   action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

10  for assuming how many patients in the placebo arm would avoid open surgery because their clots

11  were broken up simply by the insertion of the catheter. According to defendants, these power

12  calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

13  without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

14  dissolved, and restoration of blood flow avoids surgery.

15         (e)    Because of Love's and Nuvelo's VP of Manufacturing's involvement with

16  alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

17  opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

18  because of competition from off-label use of other drugs and mechanical clot-busting techniques and

19  devices.  According to defendants these power calculators were based on assumptions about the

20  percentage of clots dissolved in the placebo group, without regard to the fact that blood flow is

21  restored with disruption of a clot that is not dissolved, and restoration of blood flow avoids surgery.

22         (f)    Because defendants Love and Titus signed Nuvelo's filings with the SEC

23  during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known

24  material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of

25  alfimeprase, as detailed herein in ¶¶131-144.

26         119.   The totality of these circumstances, in addition to facts alleged elsewhere in this

27  Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that

28

1    each of the defendants had actual knowledge or recklessly disregarded that their April 10, 2006

2    statement was materially false and misleading when made.

3        **E.    Defendants' May 5, 2006 False and Misleading Statements**

4        120.    On May 5, 2006, Nuvelo conducted a conference call with analysts to discuss the

5    Company's 1Q06 results.  Defendants Love, Titus and Levy each participated in and spoke on behalf

6    of Nuvelo during the call.  During the call, defendants made the following statements in response to

7    questions from analysts regarding the ongoing NAPA trials for PAO:

8            [Love]:  So you asked two questions.  I'll answer the statistical one
             first.  Yes, *we took a very conservative case when we prepared the*
9            *trial*.  Obviously in an ideal world, everyone who received placebo
             wouldn't respond to therapy and require surgery, and the vast
10           components of people who received alfimeprase would respond[.]
             But *we took a conservative case scenario and allowed for a certain*
11           *percentage of patients to be deemed to respond to placebo; and as*
             *we've discussed in past conferences in particular, the statistical*
12           *power is still overwhelming for this trial, and we have 90%*
             *[INAUDIBLE], 22% difference in the ultimate rate between the two*
13           *therapies, placebo and alfimeprase.*

14                           *        *        *

15           [Titus]:  . . . [W]e believe that the prudent case to plan for is two trials
             for approval.  That's typically what's required by the FDA.  *And*
16           *really the driver here is not the statistical power for approving*
             *efficacy, because we believe that can be done with a relatively small*
17           *patient sample*; but we need to generate a reasonable size patient
             safety database to seek approval.  So that's certainly the way we're
18           planning.

19                           *        *        *

20           *[W]e believe we still have overwhelming statistical power to detect*
             *the difference between and active therapy such as alfimeprase --*
21           *which is indeed very active based on our Phase 2 studies to date --*
             *and placebo.*
22
             **1.    Reasons Why Defendants' May 5, 2006 Statements Were False**
23           **and Misleading**

24       121.    The statements by Love and Titus on the May 5, 2006 conference call that the Phase 3

25   NAPA trials for PAO were "conservatively" designed with "overwhelming" statistical power to

26   detect differences between alfimeprase- and placebo-caused results, and that "the driver here is not

27   the statistical power for efficacy" because the drug was "indeed very active based on our Phase 2

28   studies," were false because in fact, blood flow in the patients enrolled in the NAPA PAO trials had

1  been restored simply by inserting the catheter into the clot to deliver the drug, rather than through

2  any action of alfimeprase. These statements, together with defendants' other statements regarding

3  the purported success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as

4  elsewhere alleged, were also materially false and misleading to investors because Nuvelo omitted to

5  disclose, on the conference call, or elsewhere, known risks that reduced the likelihood that the

6  Phase 2 results could be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the

7  drug would be marketable, including that: (i) in the Phase 2 PAO trial, the blood clot may have

8  simply been broken up by the action of the catheter pushing into the clot, rather than dissolved by the

9  action of the drug, a possibility that had been raised internally at Nuvelo even before the Phase 2

10  PAO trials were completed; and (ii) the market opportunity for the drug in PAO was much smaller

11  than represented to analysts and the market because of competition from off-label use of other drugs

12  and mechanical clot-busting techniques, the potential impact of which was not timely or accurately

13  disclosed to investors.

14          **2.     Scienter**

15          122.    The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

16  a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

17  knew or was deliberately reckless in not knowing that the foregoing statements in the May 5, 2006

18  conference call were materially false and misleading when made:

19          (a)     Defendants Love, as Chairman and CEO, Titus, as CAO, and Levy as Senior

20  VP of Research and Development, were responsible for and/or knew about the clinical testing of

21  alfimeprase. They were responsible for the reports and claims relating to alfimeprase as well as the

22  press releases issued by the Company. Specifically, defendants were privy to the facts surrounding

23  the results of the alfimeprase Phase 2 CO and PAO trials and the specific facts surrounding the

24  design of the alfimeprase Phase 3 CO and PAO trials.

25          (b)     According to CW1, defendant Love wrote the protocols for all of the clinical

26  trials of alfimeprase and was a member of the "alfimeprase team" consisting of people primarily

27  responsible for the testing and marketing of the drug.

28

1           (c)       Defendants knew or recklessly disregarded that the action of catheter insertion

2  can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

3  Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

4  defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

5  been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

6  rather than the action of the alfimeprase.  The insertion of the catheter alone could have restored the

7  blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

8  recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

9  that would predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that would

10  indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability of the

11  drug for PAO.

12           (d)       Defendants knew or recklessly disregarded that their "power calculations"

13  were not reliable because they were based upon placebo assumptions which had no reasonable basis.

14  Defendants did not know how many patients avoided open surgery for 30 days as a result of the

15  action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

16  for assuming how many patients in the placebo arm would avoid open surgery because their clots

17  were broken up simply by the insertion of the catheter. According to defendants, these power

18  calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

19  without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

20  dissolved, and restoration of blood flow avoids surgery.

21           (e)       Because of Love's and Nuvelo's VP of Manufacturing's involvement with

22  alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

23  opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

24  because of competition from off-label use of other drugs and mechanical clot-busting techniques and

25  devices.

26           (f)       Because defendants Love and Titus signed Nuvelo's filings with the SEC

27  during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                         - 51 -

1   material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of

2   alfimeprase, as detailed herein in ¶¶131-144.

3          123.    The totality of these circumstances, in addition to facts alleged elsewhere in this

4   Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that

5   each of the defendants had actual knowledge or recklessly disregarded that their May 5, 2006

6   statements were materially false and misleading when made.

7          **F.    Defendants' August 3, 2006 False and Misleading Statements**

8          124.    On August 3, 2006, Nuvelo conducted a conference call with analysts to discuss the

9   Company's 2Q06 financial results.  Defendants Love and Levy each participated in and spoke on

10  behalf of Nuvelo during the call.  During the call, defendant Love reassured investors that the

11  Company's "collaboration with Bayer HealthCare to develop and commercialize alfimeprase

12  *continues to go very well*, and [that Nuvelo was] tracking to [its] goals and milestones laid out for

13  the  program."     Although  Levy  highlighted  the  progress  Nuvelo  was  making  on  the

14  commercialization of alfimeprase and touted Bayer's continuing support, he refused to discuss or

15  disclose any clinical data with respect to CO:

16

17          [Levy]: Moving now to our second target indication, catheter
            occlusion.  *We are pleased to announce that results from our phase*
18          *II trial of alfimeprase in its indication were published in the July*
            *1st issue of the Journal of Clinical Oncology. In addition, our*
19          *phase III program in this indication is progressing well*.   We
            achieved our milestone of initiating the second phase III catheter
20          occlusion trial, SONOMA-3, in the first half of 2006.  This open-
            label single-arm trial is evaluating the safety and efficacy of three
21          milligrams of alfimeprase in 800 patients with occluded central
            venous catheters.

22          We also continue to be on track to complete enrollment in
            SONOMA-2, the first trial in this program, in the second half of
23          2006, and expect to provide top-line results several months
            afterwards.  *More complete analysis of the data will be presented at*
24          *an appropriate medical conference as soon as possible thereafter.*

25         125.    In addition, in response to questions from an analyst, defendant Levy stated the

26  following with respect to PAO:

27          [Levy]:  So, as you suggest, the group of patients that present are
            heterogeneous.  Almost all the patients, if not all the patients, do have
28          some sort of underlying fixed peripheral vascular disease, and that a

thrombus generally forms on top of that when flow is diminished to a critical stage. We do of course select in this trial for patients who have had an acute occlusion of less than 14 days. That's one thing we do. And obviously I have no data to share with you about this particular trial, but *I can say that we were very gratified in phase [2] to find that alfimeprase worked very well on big clots and on small clots, and we've discussed that in the past, that we've had some examples of very large clots, clots up to 60 centimeters in length, that we've dissolved rapidly.*

*And it's worked on what we thought were new clots and old clots, based on the angiograms that we read showing extensive collateralizations, which tend to be evidence of an older clot. And on top of that, in phase I, we looked at patients who had chronic peripheral vascular disease where the burden of their illness was fixed disease and very little was acute thrombus. And we were gratified that in 40% of those patients as well we could see improvements on the angiogram and restoration of blood flow.*

1. **Reasons Why Statements Made on the August 3, 2006 Conference Call Were False and Misleading.**

126. The statements on the August 3, 2006 conference call that Nuvelo's effort to commercialize alfimeprase "continues to go very well, and [that Nuvelo was] tracking to [its] goals and milestones laid out for the program," that Nuvelo was "gratified . . . to *find* that alfimeprase worked very well on big clots and on small clots" in PAO that it "had some examples of very large clots, clots up to 60 centimeters in length, *that we've dissolved rapidly*," and that alfimeprase had "*worked* on what we thought were new clots and old clots" and improved blood flows in 40% of patients in the Phase 1 trials were false because the Phase 2 data was not as reliable or significant as defendants had led the market to believe, nor were the existing risks to FDA Approval or commercial marketability of alfimeprase for PAO and CO fully disclosed.

127. As alleged previously, defendants knew that blood flow in some patients enrolled in the NAPA PAO trials would be restore simply by inserting the catheter into the clot to deliver the drug, rather than through any action of alfimeprase, and had no basis for representing to the market the degree to which the drug caused the purportedly successful Phase 2 results. Based on the small size of the CO Phase 2 trial and the lower than expected rate of catheter clearance in the comparator alteplase arm, defendants also had no reasonable basis for predicting success in the Phase 3 trials for CO, because they did not know whether the dose of alfimeprase chosen for the study in SONOMA-2 would yield the required results or would be appropriate for the commercial success of alfimeprase

1   in this indication.  As a result, the regulatory path for approval for CO was far from "low risk," nor

2   was there a "high probability" of success in the Phase 3 PAO and CO trials, as defendants had

3   previously represented.

4          128.    These statements, together with defendants' other statements regarding the purported

5   success of the Phase 2 trials and the likelihood of success in the Phase 3 trials as elsewhere alleged,

6   were also materially false and misleading to investors because Nuvelo omitted to disclose, in the

7   press release, on the conference call, or elsewhere, known risks that reduced the likelihood that the

8   Phase 2 results could be replicated in Phase 3 trials, that the Phase 3 trials would succeed or that the

9   drug would be marketable, including that: (i) in the Phase 2 PAO trial, the blood clot may have

10  simply been broken up by the action of the catheter pushing into the clot, rather than dissolved by the

11  action of the drug, a possibility that had been raised internally at Nuvelo even before the Phase 2

12  PAO trials were completed; (ii) in the Phase 3 CO trial, Nuvelo had agreed with the FDA to

13  demonstrate success at a statistical significance level that was **forty times more stringent**  than what

14  the market believed, rendering success much less likely; (iii) the market opportunity for the drug in

15  PAO was much smaller than represented to analysts and the market because of competition from off-

16  label use of other drugs and mechanical clot-busting techniques, the potential impact of which was

17  not timely or accurately disclosed to investors; (iv) Nuvelo had an undisclosed "target product

18  profile" which would be necessary to meet in order for the Company to market alfimeprase for CO,

19  and the Company would not proceed to market alfimeprase for that indication if the trial results did

20  not meet that profile, even if the drug was otherwise qualified for FDA approval.

21              **2.      Scienter**

22         129.    The following facts, as alleged in more detail elsewhere in the Complaint, give rise to

23  a cogent inference which is stronger than any non-culpable inferences, that each of the defendants

24  knew or was deliberately reckless in not knowing that the foregoing statements in the August 3, 2006

25  conference call were materially false and misleading when made:

26              (a)     Defendants Love, as Chairman and CEO, Titus, as CAO, and Levy as Senior

27  VP of Research and Development, were responsible for and/or knew about the clinical testing of

28  alfimeprase, the agreements with the FDA about the required p-value for SONOMA-2 and the target

1    product profile for marketing alfimeprase for CO. They were responsible for the reports and claims

2    relating to alfimeprase as well as the press releases issued by the Company. Specifically, defendants

3    were privy to the facts surrounding the results of the alfimeprase Phase 2 CO and PAO trials and the

4    specific facts surrounding the design of the alfimeprase Phase 3 CO and PAO trials, including the

5    requirements imposed by the FDA on SONOMA-2 (the alfimeprase Phase 3 CO trial).

6          (b)    According to CW1, defendant Love wrote the protocols for all of the clinical

7    trials of alfimeprase, including the protocol for SONOMA-2, and was a member of the "alfimeprase

8    team" consisting of people primarily responsible for the testing and marketing of the drug.

9    Therefore, he had actual knowledge of the extremely stringent p-value of less than 0.00125 which

10   the FDA imposed on the SONOMA-2 trial and the "target product profile" for marketing

11   alfimeprase for CO.

12         (c)    As they admitted first on December 11, 2006 and in more detail on June 26,

13   2007, defendants knew that the FDA had imposed an extremely stringent p-value requirement of less

14   than 0.00125 for the alfimeprase Phase 3 CO trial (SONOMA-2), which was forty times less than the

15   standard p-value of 0.05, and that, because of the stringent p-value imposed by the FDA, success in

16   the Phase 3 trial and FDA approval were unlikely.

17         (d)    Defendants knew or recklessly disregarded that the action of catheter insertion

18   can restore blood flow where there was a clot. This precise risk had been raised by CW1 prior to the

19   Class Period with high ranking officers of Nuvelo, including Love, Pena and Deitcher. Thus,

20   defendants knew that the results obtained in the Phase 2 trial of alfimeprase for PAO could have

21   been the result, in whole or in part, of the insertion of the catheter used to administer the alfimeprase,

22   rather than the action of the alfimeprase. The insertion of the catheter alone could have restored the

23   blood flow resulting in patients not requiring open surgery within 30 days. Thus, defendants knew or

24   recklessly disregarded that the Phase 2 trial of alfimeprase for PAO did not produce reliable results

25   that would predict the success of alfimeprase in the Phase 3 trial or FDA approval, or that would

26   indicate there would be a "low risk" path to FDA approval or "rapid path" to the marketability of the

27   drug for PAO.

28

1      (e) Defendants knew or recklessly disregarded that their "power calculations"

2   were not reliable because they were based upon placebo assumptions which had no reasonable basis.

3   Defendants did not know how many patients avoided open surgery for 30 days as a result of the

4   action of the catheter breaking up the clot in the Phase 2 PAO trial, and thus, had no reasonable basis

5   for assuming how many patients in the placebo arm would avoid open surgery because their clots

6   were broken up simply by the insertion of the catheter.  According to defendants, these power

7   calculations were based on assumptions about the percentage of clots dissolved in the placebo group,

8   without regard to the fact that blood flow is restored by disruption of a clot, even if it is not

9   dissolved, and restoration of blood flow avoids surgery.

10     (f) Because of Love's and Nuvelo's VP of Manufacturing's involvement with

11  alteplase while employed by Genentech, defendants knew or recklessly disregarded that the market

12  opportunity for alfimeprase for PAO was much smaller than represented to analysts and the market

13  because of competition from off-label use of other drugs and mechanical clot-busting techniques and

14  devices.

15     (g) Defendants knew that Nuvelo had an undisclosed "target product profile"

16  which would be necessary to meet for the marketability and commercial success of alfimeprase in

17  CO, and that the Company would not proceed to market alfimeprase for that indication if the

18  SONOMA-2 trial results did not meet that profile, even if the drug was otherwise qualified for FDA

19  approval.

20     (h) Because defendants Love and Titus signed Nuvelo's filings with the SEC

21  during the Class Period, they knew or recklessly disregarded that Nuvelo had not disclosed known

22  material risks to the success of the Phase 3 trials, FDA approval and the commercial potential of

23  alfimeprase, as detailed herein in ¶¶131-144.

24    130. The totality of these circumstances, in addition to facts alleged elsewhere in this

25  Complaint, give rise to a cogent inference which is stronger than any non-culpable inferences that

26  each of the defendants had actual knowledge or recklessly disregarded that their August 3, 2006

27  statements were materially false and misleading when made.

28

1    **IX.    MISLEADING RISK WARNINGS PROVIDE NO SAFE HARBOR**

2    131.    The statutory safe harbor provided for forward-looking statements under certain

3    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

4    specific statements pleaded herein were not forward-looking and were not identified as "forward-

5    looking statements" when made.  Rather, the false statements alleged herein are statements of

6    present fact, including statements rendered misleading by defendants' failure to accurately or

7    completely disclose current known risks to its business and operations.

8    132.    To the extent there were any forward-looking statements, there were no meaningful

9    cautionary statements identifying important factors that could cause actual results to differ materially

10    from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

11    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

12    liable for those false forward-looking statements because at the time each of those forward-looking

13    statements was made, the particular speaker knew that the particular forward-looking statement was

14    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

15    of Nuvelo who knew that those statements were false when made.

16    133.    Although Nuvelo's publicly-filed reports with the SEC during the Class Period

17    included a section purporting to disclose material risks to its operations, including risks relating to

18    on-going clinical trials, those risk warnings were themselves misleading to investors.  Nuvelo's

19    Report on Form 10-K, issued on March 15, 2006, did not include, for example, any specific

20    warnings regarding the risks that the purportedly favorable results of the Phase 2 PAO trials were the

21    result of the catheter used to deliver the drug breaking up the blood clot, that the FDA had imposed

22    an extremely stringent statistical significance standard – the 0.00125 p-value – on the Phase 3 CO

23    trial, or that Nuvelo had an undisclosed "target product profile" which would be necessary to meet in

24    order for the Company to market alfimeprase for CO, and the Company would not proceed to market

25    alfimeprase for that indication if the trial results did not meet that profile even if the results otherwise

26    qualified for FDA approval.

27    134.    Instead, the Report included only general and generic risk warnings, such as "Our

28    near-term success is dependent on the success of our lead product candidate, alfimeprase, and we

1  cannot be certain that it will receive regulatory approval or be successfully commercialized," and

2  "We face heavy government regulation, and FDA and international regulatory approval of our

3  products is uncertain."  However, the Report did not contain any specific risk warnings regarding the

4  Phase 2 results.  Instead, the 10-K included only the following general and generic statement:

> **Our clinical trials may not yield results that will enable us to obtain regulatory approval for our products.**
>
> We, and our collaborators, will only receive regulatory approval for a drug candidate if we can demonstrate in carefully designed and conducted clinical trials that the drug candidate is safe and effective.  We do not know whether our current or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or will result in marketable products.  Clinical trials are lengthy, complex and expensive processes with uncertain results.  It will take us several years to complete our testing, and failure can occur at any stage of testing.  To date, we have not successfully completed any Phase 3 clinical trials, and we have not completed all planned pre-clinical and Phase 1 clinical trials for each of our product candidates. The results we obtain in pre-clinical testing and early clinical trials may not be predictive of results that are obtained in later studies.  We may suffer significant setbacks in advanced clinical trials, even after promising results in earlier studies.  Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue development of one or more of our drug candidates. If we fail to adequately demonstrate the safety and efficacy of our products under development, we will not be able to obtain the required regulatory approvals to commercialize our drug candidates, and our business, results of operations and financial condition will be materially adversely affected.

16      135.    The Report on Form 10-K was also materially false and misleading to investors

17  because it failed to disclose known risks and uncertainties regarding the comparability of the Phase 2

18  results with the Phase 3 trials then being conducted.  When considered together with defendants'

19  public statements touting the Phase 2 results and strongly suggesting that the Phase 3 clinical trials

20  would succeed and the drug would be marketable, including the statements alleged in ¶¶92-94, 100-

21  101, 107-110, the incomplete risk warnings in the Report on Form 10-K misled investors.  Among

22  the risks that were not disclosed to investors were that: (i) in the Phase 2 PAO trial, the blood clot

23  may have simply been broken up by the action of the catheter pushing into the clot, rather than

24  dissolved by the action of the drug, a possibility that had been raised internally at Nuvelo even

25  before the Phase 2 PAO trials were completed; (ii) in the Phase 3 CO trial, Nuvelo had agreed with

26  the FDA to demonstrate success at a statistical significance level that was ***forty times more stringent***

27  than what the market believed, rendering success much less likely; (iii) the market opportunity for

28  the drug in PAO was much smaller than represented to analysts and the market because of

1   competition from off-label use of other drugs and mechanical clot-busting techniques, the potential

2   impact of which was not timely or accurately disclosed to investors; and (iv) Nuvelo had an

3   undisclosed "target product profile" which would be necessary to meet in order for the Company to

4   market alfimeprase for CO, and the Company would not proceed to market alfimeprase for that

5   indication if the trial results did not meet that profile, even if the drug was otherwise qualified for

6   FDA approval.

7       136.    On May 9, 2006, Nuvelo issued its Report on Form 10-Q for the first quarter of 2006,

8   the period ending March 31, 2006, signed by Titus and certified by both Titus and Love pursuant to

9   the Sarbanes-Oxley Act.  As the CEO of Nuvelo, Love was responsible, with Titus, for reviewing

10  the Report before it was filed with the SEC and assuring the accuracy of the information reported

11  therein, including that all material known risks were disclosed to the market.

12      137.    As with Nuvelo's prior public SEC filings, the 1Q06 Report on Form 10-Q included

13  only general and generic risk warnings, such as "Our near-term success is dependent on the success

14  of our lead product candidate, alfimeprase, and we cannot be certain that it will receive regulatory

15  approval or be successfully commercialized," and "We face heavy government regulation, and FDA

16  and international regulatory approval of our products is uncertain."  However, the Report did not

17  contain any specific risk warnings regarding the Phase 2 results.  Instead, the Report merely repeated

18  the generic, general warnings found in the FY05 Report on Form 10-K, including those quoted

19  above.

20      138.    Defendants failed to disclose known risks and uncertainties regarding the

21  comparability of the Phase 2 results with the Phase 3 trials then being conducted.  When considered

22  together with defendants' public statements touting the Phase 2 results as strongly suggesting that

23  the Phase 3 clinical trials would be successful, and the drug would be marketable and commercially

24  successful, including the statements alleged in ¶¶92-94, 100-101, 107-110, 116, 120, the incomplete

25  risk warnings in the Report on Form 10-Q misled investors.

26      139.    On August 8, 2006, Nuvelo issued its Report on Form 10-Q for the second quarter of

27  2006, the period ending June 30, 2006, certified by Love pursuant to the Sarbanes-Oxley Act.  As

28  the CEO of Nuvelo, Love was responsible for reviewing the Report before it was filed with the SEC

1    and assuring the accuracy of the information reported therein, including that all material risks were

2    disclosed to the market.

3          140.    As with Nuvelo's prior public SEC filings, the 2Q06 Report on Form 10-Q included

4    only general and generic risk warnings, such as "Our near-term success is dependent on the success

5    of our lead product candidate, alfimeprase, and we cannot be certain that it will receive regulatory

6    approval or be successfully commercialized," and "We face heavy government regulation, and FDA

7    and international regulatory approval of our products is uncertain."  However, the Report did not

8    contain any specific risk warnings regarding the Phase 2 results.  Instead, the Report merely repeated

9    the generic, general warnings found in the FY05 Report on Form 10-K, including those quoted

10   above.

11         141.    Defendants failed to disclose known risks and uncertainties regarding the

12   comparability of the Phase 2 results with the Phase 3 trials then being conducted.  When considered

13   together with defendants' public statements touting the Phase 2 results as strongly suggesting that

14   the Phase 3 clinical trials would be successful, and the drug would be marketable and commercially

15   successful, including the statements alleged in ¶¶92-94, 100-101, 107-110, 116, 120, 124-125, the

16   incomplete risk warnings in the Report on Form 10-Q misled investors.

17         142.    On November 8, 2006, Nuvelo issued its Report on Form 10-Q for the third quarter of

18   2006, the period ending September 30, 2006, certified by Love pursuant to the Sarbanes-Oxley Act.

19   As the CEO of Nuvelo, Love was responsible for reviewing the Report before it was filed with the

20   SEC and assuring the accuracy of the information reported therein, including that all material risks

21   were disclosed to the market.

22         143.    As with Nuvelo's prior public SEC filings, the 3Q06 Report on Form 10-Q included

23   only general and generic risk warnings, such as "Our near-term success is dependent on the success

24   of our lead product candidate, alfimeprase, and we cannot be certain that it will receive regulatory

25   approval or be successfully commercialized," and "We face heavy government regulation, and FDA

26   and international regulatory approval of our products is uncertain."  However, the Report did not

27   contain any specific risk warnings regarding the Phase 2 results.  Instead, the Report merely repeated

28

1   the generic, general warnings found in the FY05 Report on Form 10-K, including those quoted

2   above.

3        144.   Defendants failed to disclose known risks and uncertainties regarding the

4   comparability of the Phase 2 results with the Phase 3 trials then being conducted.  When considered

5   together with defendants' public statements touting the Phase 2 results as strongly suggesting that

6   the Phase 3 clinical trials would be successful, and the drug would be marketable and commercially

7   successful, including the statements alleged in ¶¶92-94, 100-101, 107-110, 116, 120, 124-125, the

8   incomplete risk warnings in the Report on Form 10-Q misled investors.

9   **X.     ADDITIONAL SCIENTER ALLEGATIONS**

10       **A.     Individual Defendants' Compensation Was Tied to Financial
              Performance**

11

12       145.   According to defendants' Proxy Statement, filed with the SEC on April 18, 2007, the

13   Individual Defendants' bonus compensation was heavily tied to the Company's financial

    performance:

14
            The Compensation Committee determines each individual executive bonus by
15          reference to the achievement of corporate goals and the individual executive's
            achievement of functional goals for the functional organization that he or she
16          manages. The Company's Board of Directors sets annual corporate goals that fall
            into the following categories:  . . . Strengthening the Company's financial position.
17
    Also included among the 2006 goals was the completion of the NAPA-2 and SONOMA-2 Phase 3
18
    clinical trials.
19
         146.   A chart demonstrating the Individual Defendants' compensation follows.  The chart,
20
    particularly the bonuses granted to defendants Love and Levy (Titus left the Company before year-
21
    end 2006) evidence the apparent emphasis placed on "strengthening the Company's financial
22
    position" – both Love and Levy received huge 2006 bonuses – Love's was over $100,000 more than
23
    it had been in 2005, even though the Company wholly failed to obtain one of the explicit 2006 goals
24
    of completing the Phase 3 clinical trials for PAO and CO:
25

26

27

28

| Name | Year | Salary ($) | Bonus ($) | Options |
|---|---|---|---|---|
| Ted W. Love | 2006 | 640,417 | 289,248 | 375,000 |
| | 2005 | 612,500 | 187,500 | 750,000 |
| | 2004 | 596,000 | | 500,000 |
| | 2003 | 583,583 | | 133,332 |
| | | | | |
| Michael D. Levy[9] | 2006 | 398,333 | 184,828 | 80,000 |
| | 2005 | 381,250 | | 200,000 |
| | 2004 | 39,831 | 15,000 | 175,000 |
| | | | | |
| Gary S. Titus | 2006 | 182,917 | | 30,000 |
| | 2005 | 226,667 | 65,000 | 175,000 |
| | 2004 | 192,646 | | 65,000 |
| | 2003 | 169,896 | | 19,999 |

**B.      Defendants Were Motivated to Commit Fraud to Gain Access to Capital through the Follow-On Offering**

147.    Defendants had motive and opportunity to inflate the price of Nuvelo securities because the Company was desperately in need of cash.  By the end of the Company's fiscal year 2005, it had less than $38 million in cash and an established track record of using positive announcements about alfimeprase to generate cash.

148.    As a result of defendants' false statements, Nuvelo's stock traded at inflated levels during the Class Period, trading as high as $20.71 per share in August 2006, and the Company was able to sell $119 million worth of Nuvelo securities in the Follow-On Offering.

149.    On January 24, 2006, one day after Nuvelo issued its press release entitled "Nuvelo Receives FDA Fast Track Status for Alfimeprase," the Company announced it would conduct the Follow-On Offering.  Just as the Company had done since at least 2003, the Company again leveraged the buildup it created around alfimeprase, only this time through false and misleading statements, as a tool for raising much needed cash to continue business and fund the exorbitant pay packages provided to insiders.  Defendants' false and misleading statements about alfimeprase allowed it to complete the sale of 7.475 million shares at $16 per share for proceeds, before

[9]      Levy joined the Company in November 2004.

1  deducting underwriting discounts and offering expenses, of approximately $119.6 million on January

2  30, 2006.

3        150.  To convince investors of the potential for alfimeprase, defendants repeatedly claimed

4  that the CO and PAO trials were just the first step in commercial development of the drug, and other

5  treatments, with potentially larger patient populations, were also in the offing.  For example, in its

6  Registration Statement and Prospectus for the January 2006 Follow-on Offering and its Report on

7  10-K for fiscal year 2005, issued March 15, 2006, Nuvelo stated:

8          Our lead cardiovascular development program is for alfimeprase, a novel, direct-
        acting thrombolytic agent, or blood clot dissolver, which is currently in Phase 3

9          clinical trials for the treatment of acute peripheral arterial occlusion, or PAO, and for
        the treatment of catheter occlusion.  ***We also intend to expand this development***

10          ***program by initiating a Phase 2 clinical trial in the second half of 2006 to evaluate***
        ***the potential of alfimeprase for the treatment of ischemic stroke and another Phase***

11          ***2 clinical trial in 2007 to evaluate the potential of alfimeprase to treat deep venous***
        ***thrombosis, or DVT***.

12

13        151.  The Company's Registration Statement and Prospectus filed in connection with the

14  January 30, 2006 offering described the ongoing alfimeprase clinical testing and provided a chart

15  purporting to depict the Company's drug pipeline and the anticipated commercialization of

16  alfimeprase:

17  

18

19

20

21

22

23

24

25        152.  Nuvelo never initiated the planned Phase 2 clinical trial for the treatment of ischemic

26  stroke, even though it was supposed to begin ***before*** Phase 3 results for either the PAO or CO trials

27  were completed.  This suggests that defendants were aware that the Phase 2 results were not

28

1    predictive of success in Phase 3, and defendants were not confident that PAO and CO were "low

2    risk" paths to regulatory approval or would be "rapid to market," well before the failure of the Phase

3    3 study was publicly announced on December 11, 2006.

4    **XI.    PRESUMPTION OF RELIANCE AND PROXIMATE LOSS
     CAUSATION/ECONOMIC LOSS**

5            153.    Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory

6    of reliance.  The market price of Nuvelo's securities, including common stock regularly traded on

7    the NASDAQ market and options regularly traded on AMEX, CBOE, PHLX, ISE and PSE, was

8    artificially inflated by the false and misleading statements complained of herein, including

9    defendants' false statements regarding the results of the Phase 2 trials of alfimeprase, the

10   comparability of those results to the expected results from ongoing Phase 3 clinical trials of

11   alfimeprase, the likelihood of FDA approval, the marketability and commercial potential of the drug

12   and the omission of meaningful warnings about those risks.  These false statements inflated the price

13   of Nuvelo's stock, causing injury to investors when that inflation was eliminated as the risks and

14   conditions hidden by defendants' fraudulent scheme were revealed on December 11, 2006 and the

15   market learned that the Phase 3 trials had failed:

16

17   

28

1  Had defendants corrected their false statements and made meaningful disclosure of the risks prior to

2  or during the Class Period, Nuvelo's securities would not have traded as high as they did during the

3  Class Period, or would have declined sooner than they did following the end of the Class Period.

4  **A.    Applicability of Presumption of Reliance: Fraud on the Market Doctrine**

5  154.    At all relevant times, the market for Nuvelo's securities was an efficient market for

6  the following reasons, among others:

7          (a)    Nuvelo's security met the requirements for listing, and was listed and actively

8  traded on the NASDAQ market, a highly efficient and automated market;

9          (b)    Nuvelo's options met the requirements for listing and were listed and actively

10 traded on the AMEX, CBOE, PHLX, ISE and PSE, highly efficient and automated markets;

11         (c)    As a regulated issuer, Nuvelo filed periodic public reports with the SEC and

12 NASDAQ;

13         (d)    Nuvelo regularly communicated with public investors via established market

14 communication mechanisms, including through regular disseminations of press releases on the

15 national circuits of major newswire services, publications on its website and other Internet sites, and

16 through other wide-ranging public disclosures, such as through conference calls, communications

17 with the financial press and other similar reporting services; and

18         (e)    Nuvelo was followed by securities analysts employed by 15 major brokerage

19 firms, including Deutsche Bank; Prudential; Brean Murray; CIBC World Markets; Oppenheimer;

20 Needham; Pacific Growth Equities; Piper Jaffray & Co.; Miller Johnson; Banc of America; UBS;

21 Morgan Joseph; JP Morgan; Wachovia and William Blair & Company, each of which regularly

22 wrote reports which were distributed to the sales force and certain customers of their respective

23 brokerage firms. Each of these reports was publicly available and entered the public marketplace.

24 155.    As a result of the foregoing, the market for Nuvelo's securities promptly digested

25 current information regarding Nuvelo from all publicly-available sources and reflected such

26 information as Nuvelo's securities price. Under these circumstances, all purchasers of Nuvelo's

27 securities during the Class Period suffered similar injury through their purchase of Nuvelo's

28

1    securities at artificially inflated prices and their subsequent decline in value, thus a presumption of

2    reliance applies.

3        **B.    Defendants' False and Misleading Statements Proximately Caused
             Economic Loss to Nuvelo's Investors**

4

5        156.    On January 5, 2006, the first day of the Class Period, Nuvelo announced that it had

6    convinced Bayer to fund further clinical trials of alfimeprase, which the market viewed as an

7    endorsement of defendants' prior statements regarding the Phase 2 results and the commercial

8    potential of alfimeprase, causing Nuvelo's stock price to skyrocket on elevated trading volume of

9    10,075,500 shares, more than 17 times its daily average. *Supra* ¶72. Nuvelo's stock increased from

10   $9.01 to close at $12.67, a one day gain of more than 40%. By comparison, the NASDAQ

11   Biotechnology Index ("NBI"), of which Nuvelo is a member, rose a modest 0.55% that day.

12   Nuvelo's stock price continued to increase over the next three days as the market digested and

13   reacted to this news, closing at $15.62 per share on January 10, 2006 – an additional gain of 20% in

14   value on continued elevated trading volumes in excess of 26 million shares per day. By comparison,

15   the NBI gained a modest 3.18% during the same time period.

16       157.    During the Class Period, defendants maintained the artificial inflation in Nuvelo's

17   securities prices by continuing to make false and misleading statements regarding the anticipated

18   results of the Phase 3 clinical trials of alfimeprase, the extent to which the reported results of the

19   Phase 2 trials were a reliable indicator of both the positive action of alfimeprase in dissolving blood

20   clots and catheter occlusions, the likelihood of similar results being achieved in the Phase 3 trials,

21   the "low risk" and "rapid path" to FDA approval and the marketability and commercial potential of

22   alfimeprase. But for defendants' failure to meaningfully disclose the known risks in its periodic

23   filings with the SEC or their false and misleading statements, Nuvelo's securities would not have

24   traded at the elevated levels they did during the Class Period.

25       158.    The inflation in Nuvelo's securities prices was eliminated when the market learned

26   that, contrary to defendants' statements during and even prior to the Class Period, alfimeprase had

27   ***not*** worked as represented in the Phase 2 trials, that the Phase 3 trials had failed as a result of risks

28   that had been concealed or downplayed by defendants in a manner that misled investors during the

1    Class Period, that the drug did not meet the Company's target product profile necessary to market it

2    for CO, and the FDA had imposed an extraordinary high standard for approval of the drug for CO.

3    Most of this inflation was eliminated when Nuvelo announced, on December 11, 2006 – the last day

4    of the Class Period – that alfimeprase had failed the Phase 3 clinical trials, causing Nuvelo's stock

5    price to plummet.  Nuvelo's share price fell from $19.55 to close at $4.05, a one day drop of nearly

6    80% on extraordinary trading volume of 90,150,600 shares – more than 150 times its daily average,

7    causing injury to investors who purchased at the fraud-inflated prices prevailing in the market during

8    the Class Period.  By comparison, the NBI experienced a modest drop of 0.6% that day.

9          159.    The remaining inflation was eliminated on June 27, 2007, when Bayer pulled out of

10   further efforts to develop alfimeprase and defendants revealed the full extent by which the risks of

11   failure in the Phase 3 trials had been withheld from investors, causing additional injury to Class

12   members who continued to hold their securities through the date of that announcement.  Nuvelo's

13   stock dropped from $3.34 to $2.73 that day on elevated trading volume of 6,930,900 shares, a one-

14   day decline of more than 18%.  By comparison, the NBI *increased* 1.93% on the same day.

15         160.    The foregoing allegations describe plaintiffs' general theory of damages, demonstrate

16   that plaintiffs' damages were caused by the scheme to defraud as alleged herein, and negate any

17   inference that plaintiffs' losses were the result of general market conditions or other factors wholly

18   unrelated to the false and misleading information complained of herein.  Upon further investigation

19   and expert analysis, plaintiffs may assert that there were additional inflationary or corrective events

20   that caused or contributed to the damages they incurred.

21   **XII.     GROUP PLEADING ALLEGATIONS**

22         161.    Because of their senior executive and managerial positions with Nuvelo and, in the

23   case of Love, his position as Chairman of Nuvelo's board of directors, the Individual Defendants had

24   access to the adverse undisclosed information described herein regarding the Company's business

25   operations and present and future business prospects.  The Individual Defendants obtained such

26   information through internal corporate documents and communications with other corporate officers

27   and employees, attendance at management and board of directors meetings and committees thereof

28   and through reports and other information provided to them in connection therewith.  The Individual

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                                      - 67 -

1    Defendants knew or recklessly disregarded that said adverse information had not been disclosed to,

2    and was being concealed from, the investing public.

3        162.    It is appropriate to treat the Individual Defendants as a group for pleading purposes

4    and to presume that the false, misleading and incomplete information contained in the Company's

5    public filings, press releases and other publications as alleged herein are the collective actions of the

6    narrowly defined group of Individual Defendants.  Each of the above officers and/or directors of

7    Nuvelo, by virtue of their high-level positions with the Company, directly participated in the

8    management of the Company, was directly involved in the day-to-day operations of the Company at

9    the highest levels and was privy to confidential proprietary information concerning the Company and

10    its business operations and present and future business prospects, as alleged herein.  Said defendants

11    were involved in drafting, producing, reviewing and/or disseminating the false and misleading

12    statements and information alleged herein, were aware of or deliberately disregarded that the false

13    and misleading statements were being issued regarding the Company, and approved or ratified these

14    statements, in violation of the federal securities laws.

15        163.    As officers and/or directors and controlling persons of a publicly held company

16    whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on

17    the NASDAQ, and whose options were registered and traded publicly on five options exchanges,

18    and governed by the provisions of the federal securities laws, the Individual Defendants each had a

19    duty to disseminate promptly accurate and truthful information with respect to the Company's

20    business operations and present and future business prospects, and to correct any previously issued

21    statement that had become materially misleading or untrue, so that the market price of the

22    Company's securities would be based upon truthful and accurate information.  The Individual

23    Defendants' misrepresentations and omissions during the Class Period violated these specific

24    requirements and obligations.

25        164.    Each of the defendants is liable as a direct participant with respect to the wrongs

26    complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

27    officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act,

28    and had the power and influence to cause the Company to engage in the unlawful conduct

1  complained of herein.  Because of their positions of control, the Individual Defendants were able to

2  and did, directly or indirectly, control the conduct of Nuvelo's business.

3      165.    The Individual Defendants, because of their positions with the Company, controlled

4  and/or possessed the authority to control the contents of Nuvelo's reports, press releases and

5  presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

6  the market.  Each of the Individual Defendants was provided with copies of the Company's reports

7  and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the

8  ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, each of the

9  Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

10  **XIII.   CLASS ACTION ALLEGATIONS**

11      166.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and

12  (b)(3) on behalf of a class consisting of all persons who purchased the Company's publicly traded

13  securities on the open market or in a registered stock offering during the period January 5, 2006

14  through December 8, 2006, inclusive, and who were damaged thereby (the "Class").  Excluded from

15  the Class are defendants, the Company's officers and directors, affiliates, legal representatives, heirs,

16

17  predecessors, successors and assigns, and any entity in which the Company has a controlling interest

18  or of which the Company is a parent or subsidiary.

19      167.    The members of the Class are located in geographically diverse areas and are so

20  numerous that joinder of all members is impracticable.  The disposition of their claims in a class

21  action will provide substantial benefits to the parties and the Court.  Nuvelo had approximately 53

22  million shares of its common stock outstanding and active options trading.

23

24      168.    Common questions of law or fact exist as to all members of the Class and

25  predominate over any questions affecting solely individual members of the Class.  Among the

26  questions of law or fact common to the Class are:

27          (a)    Whether the Exchange Act was violated by defendants;

28          (b)    Whether defendants omitted and/or misrepresented material facts;

1        (c)      Whether defendants' statements omitted material facts necessary to make the

2  statements made, in light of the circumstances under which they were made, not misleading;

3        (d)      Whether defendants knew or deliberately disregarded that their statements

4  were false and misleading;

5        (e)      Whether the prices of Nuvelo publicly traded securities were artificially

6  inflated; and

7        (f)      The extent of damage sustained by Class members and the appropriate

8  measure of damages.

9      169.    Plaintiffs' claims are typical of the claims of the members of the Class as plaintiffs

10  and members of the Class sustained damages arising out of defendants' wrongful conduct in

11  violation of federal laws as complained of herein.

12      170.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

13  and have retained counsel competent and experienced in class action and securities litigation.

14  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

15

16      171.    A class action is superior to other available methods for the fair and efficient

17  adjudication of this controversy since joinder of all members of the Class is impracticable.

18  Furthermore, because the damages suffered by individual Class members may be relatively small,

19  the expense and burden of individual litigation make it impossible for the Class members

20  individually to redress the wrongs done to them.  There will be no difficulty in the management of

21  this action as a class action.

22

23                **FIRST CLAIM FOR RELIEF**

24      **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
                             **Against All Defendants**

25      172.    Plaintiffs incorporate all prior allegations of the Complaint herein by reference.

26      173.    During the Class Period, defendants disseminated or approved the false statements

27  specified above, which they knew or recklessly disregarded were materially false and misleading in

28

1    that they contained material misrepresentations and failed to disclose material facts necessary in

2    order to make the statements made, in light of the circumstances under which they were made, not

3    misleading.

4
        174.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:
5
            (a)    Employed devices, schemes and artifices to defraud;
6
            (b)    Made untrue statements of material facts or omitted to state material facts
7
    necessary in order to make the statements made, in light of the circumstances under which they were
8
    made, not misleading; or
9
            (c)    Engaged in acts, practices and a course of business that operated as a fraud or
10
    deceit upon plaintiffs and others similarly situated in connection with their purchases of Nuvelo
11
    securities during the Class Period.
12
        175.    As a result of the dissemination of the materially false and misleading information
13
    and failure to disclose material facts, as set forth above, the market price of Nuvelo's publicly traded
14
    securities was artificially inflated during the Class Period.  In ignorance of the fact that the market
15
    price of Nuvelo's publicly traded securities was artificially inflated, and relying directly or indirectly
16
    on the false and misleading statements made by defendants, or upon the integrity of the market in
17
    which the securities trade, and/or on the absence of material adverse information that was known to
18
    or recklessly disregarded by defendants but not disclosed in public statements by defendants during
19
    the Class Period, plaintiffs and the other members of the Class acquired Nuvelo securities during the
20
    Class Period at artificially high prices and were damaged thereby as demonstrated, in part, by the
21
    declines in the price of Nuvelo's securities following the revelation of the relevant truth to the
22
    market.
23
        176.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the
24
    other members of the Class suffered damages in connection with their purchases of Nuvelo securities
25
    during the Class Period.
26

27

28

**SECOND CLAIM FOR RELIEF**

**For Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

177.    Plaintiffs incorporate all prior allegations of the Complaint herein by reference.

178.    The Individual Defendants acted as controlling persons of Nuvelo within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Nuvelo, and their ownership of Nuvelo stock, the Individual Defendants had the power and authority to cause Nuvelo to engage in the wrongful conduct complained of herein.  Nuvelo controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Nuvelo are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs and the members reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such equitable and/or injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  November 9, 2007                    COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                            DENNIS J. HERMAN
                                            MONIQUE C. WINKLER


                                                    /s/ Monique C. Winkler
                                            MONIQUE C. WINKLER

1

2    100 Pine Street, Suite 2600
     San Francisco, CA  94111
3    Telephone:  415/288-4545
     415/288-4534 (fax)

4    Liaison Counsel

5    BERGER & MONTAGUE, P.C.
     SHERRIE R. SAVETT
6    CAROLE A. BRODERICK
     BARBARA A. PODELL
7    PHYLLIS M. PARKER
     JOSHUA C. SCHUMACHER
8    1622 Locust Street
     Philadelphia, PA  19103
9    Telephone:  215/875-3000
     215/875-4604 (fax)

10
     SCHATZ NOBEL IZARD, P.C.
11   ANDREW M. SCHATZ
     JEFFREY S. NOBEL
12   NANCY A. KULESA
     One Corporate Center
13   20 Church Street, Suite 1700
     Hartford, CT  06103
14   Telephone:  860/493-6292
     860/493-6290 (fax)

15
     Co-Lead Counsel for Plaintiffs
16
     T:\casesSF\nuvelo\CPT00046407.doc
17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ                                                              - 73 -

1                              CERTIFICATE OF SERVICE

2          I hereby certify that on November 9, 2007, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5   mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6   participants indicated on the attached Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on November 9, 2007.

9
                                                  s/ Monique C. Winkler
10                                               MONIQUE C. WINKLER

11                                               COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
12                                               100 Pine Street, 26th Floor
                                                 San Francisco, CA  94111
13                                               Telephone:  415/288-4545
                                                 415/288-4534 (fax)
14                                               E-mail:moniquew@csgrr.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:07-cv-04056-MMJ

# Mailing Information for a Case 3:07-cv-04056-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Scott Devereaux**
  devereauxsd@cooley.com

- **Grant P. Fondo**
  gfondo@cooley.com,mcintoshjc@cooley.com

- **Dennis J. Herman**
  dennish@csgrr.com,e_file_sf@csgrr.com

- **Christopher J. Keller**
  ckeller@labaton.com,cchan@labaton.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **Phyllis Maza Parker**
  pparker@bm.net

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Barbara A Podell**
  bpodell@bm.net

- **David Avi Rosenfeld , Esq**
  drosenfeld@geller-rudman.com

- **Sherrie R. Savett**
  ssavett@bm.net

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mario Alba
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road
Suite 200
Melville, NY 11747

Samuel Howard Rudman
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
```

58 South Service Road
Suite 200
New York, NY 11747

**Marisa Megur Seifan**
Cooley Godward Kronish LLP
1114 Avenue of Americas
New York, NY 10036

**Evan J. Smith**
Brodsky & Smith L.L.C.
240 Mineola Blvd.
Mineola, NY 11501

**Nicolette Tropiano**
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA 19087