COOLEY GODWARD KRONISH LLP
SCOTT D. DEVEREAUX (146050) (devereauxsd@cooley.com)
GRANT P. FONDO (181530) (gfondo@cooley.com)
JEFFREY M. KABAN (235743) (jkaban@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
Telephone:    (650) 843-5000
Facsimile:    (650) 857-0663

Attorneys for Defendants
NUVELO, INC., MICHAEL D. LEVY, TED W. LOVE
and GARY S. TITUS

UNITED STATES DISTRICT COURT

NORTHERN  DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re NUVELO, INC. SECURITIES LITIGATION | Master File No. 07-CV-04056-MJJ |

**CLASS ACTION**

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date:   March 25, 2008
Time:           9:30 a.m.
Courtroom:      11
Judge:          Hon. Martin J. Jenkins

Trial Date:     Not yet set

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

DEFENDANTS' MOTION TO DISMIS
CASE NO.  07-CV-04056-MJJ

TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ............................................................................. 2

II.    BACKGROUND FACTS ................................................................... 2

    A.     Defendants............................................................................. 2

    B.     Alfimeprase ........................................................................... 3

    C.     Nuvelo Successfully Completes Phase II Trials for PAO and CO ...... 4

        1.     PAO Phase II Trial – NAPA-1 ..................................... 4

        2.     CO Phase II Trial – SONOMA-1 .................................. 4

    D.     Phase III Clinical Studies ....................................................... 5

    E.     Nuvelo Launches Phase III Trials of Alfimeprase for Both PAO and CO ............ 6

        1.     PAO Phase III Trials – NAPA-2 and NAPA-3 ........................ 6

        2.     CO Phase III Trials – SONOMA-2 and SONOMA-3 ............... 7

    F.     Bayer Agrees To A Partnership With Nuvelo For The Development Of Alfimeprase And Agrees To Pay Nuvelo $50 million Up-Front ......................... 8

    G.     The December 11, 2006 Announcement and Subsequent Events.................... 8

    H.     Allegations of Wrongdoing ..................................................... 8

III.   LEGAL STANDARDS..................................................................... 9

    A.     General Standards For Motions To Dismiss .............................. 9

    B.     Essential Elements Of A Section 10(b) Claim ........................... 10

    C.     Plaintiffs Must Plead Falsity, Materiality And Scienter With A High Degree Of Particularity .......................................................... 10

IV.    ARGUMENT ................................................................................. 11

    A.     Plaintiffs Fail To State A Claim For A Section 10(b) Violation ........................ 11

        1.     The Confidential Witness Allegations Are Not Probative Of Materiality, Falsity Or Scienter................................................. 12

        2.     Plaintiffs Fail To Allege Materiality and Falsity With Particularity........ 13

            a.     Plaintiffs Fail To Allege With Particularity That Any Statements Regarding the PAO Trials Were Materially False When Made ................................................... 14

                (1)     Plaintiffs' Allegations Regarding The Hypothesis That The Catheter Dissolved The Clots Do Not Establish Materiality or Falsity ......................................... 14

                (2)     Plaintiffs' Allegation That PAO's Market Was Smaller Than Predicted Is Irrelevant And Does Not Establish Materiality Or Falsity ........................................ 16

            b.     Plaintiffs Fail To Allege With Particularity That Any Statements Regarding The CO Trials Were Materially False When Made ...................................... 17

TABLE OF CONTENTS
(CONTINUED)

|  |  |  |  | PAGE |
|---|---|---|---|---|
| | | (1) | Defendants Did Not Make Any False or Misleading Statements Regarding The "P-Value" Of The CO Phase III Trial | 17 |
| | | (2) | The Alleged Failure To Disclose That CO Had A Target Product Profile Does Not Render Any Statement Materially False | 19 |
| | 3. | | Bayer's Partnership With Nuvelo Negates Any Inference Of Materiality, Falsity Or Scienter | 19 |
| | 4. | | Plaintiffs Fail To Allege A Strong Inference Of Scienter As To Any Individual Defendant | 20 |
| | 5. | | The Alleged Statements Are Protected By The PSLRA's "Safe Harbor" | 22 |
| | | a. | All The Alleged Misstatements Were Forward-Looking And Identified As Such | 22 |
| | | b. | Defendants' Forward Looking Statements Were Accompanied By Appropriate Cautionary Language | 23 |
| | 6. | | Defendants' Statements Of Optimism Are Non-Actionable | 24 |
| | 7. | | Plaintiffs Fail To Allege Loss Causation | 25 |
| B. | | | Plaintiffs Fail to State a Claim for Violation of Section 20(a) | 25 |
| V. | THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE | | | 25 |
| VI. | CONCLUSION | | | 25 |

# TABLE OF AUTHORITIES

PAGE

**CASES**

Albrecht v. Lund,
  845 F.2d 193 (9th Cir. 1988) ............................................................ 25

Blake v. Dierdorff,
  856 F.2d 1365 (9th Cir. 1988) ......................................................... 10

Branch v. Tunnell,
  14 F.3d 449 (9th Cir. 1994) ............................................................ 10

DSAM Global Value Fund v. Altris Software, Inc.,
  288 F.3d 385 (9th Cir. 2002) .......................................................... 10

Dura Pharmaceuticals, Inc. v. Broudo,
  544 U.S. 336 (2005) ...................................................................... 25

Galbraith v. County of Santa Clara,
  307 F.3d 1119 (9th Cir. 2002) ......................................................... 10

Glen Holly Entertainment, Inc. v. Tektronix, Inc.,
  352 F.3d 367 (9th Cir. 2003) .......................................................... 24

Gompper v. VISX, Inc.,
  298 F.3d 893 (9th Cir. 2002) ..................................................... 11, 20

Harris v. IVAX Corp.,
  182 F.3d 799 (11th Cir. 1999) ..................................................... 22, 23

In re 2TheMart.com. Sec. Litig.,
  114 F. Supp. 2d. 955 (C.D. Cal. 2000) ............................................. 14

In re Autodesk, Inc. Sec. Litig.,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) .......................................... 10, 20

In re Bristol-Myers Squibb Sec. Litig.,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................................. 24

In re Calpine Corp. Sec. Litig.,
  288 F. Supp. 2d 1054 (N.D. Cal. 2003) ........................................... 20

In re Copper Mountain Sec. Litig.,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................. 24

In re Ford Motor Co. Sec. Litig.,
  381 F.3d 563 (6th Cir. 2004) .......................................................... 22

In re Fritz Cos. Sec. Litig.,
  282 F. Supp. 2d 1105 (N.D. Cal. 2003) ........................................... 14

In re FVC.COM Sec. Litig.,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000) ........................................... 25

In re GlenFed, Inc. Sec. Litig.,
  42 F.3d 1541 (9th Cir. 1994) .......................................................... 14

In re ICN Pharms., Inc. Sec. Litig.,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................... 21

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000)..................................................... 13

*In re Metawave Communications Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003) ................................................ 13

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ...................................................... 10, 11, 21

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
  No C 050295 PJH, 2006 WL 648683 (N.D. Cal. March 10, 2006)............... 13, 20

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) ...................................................... 18, 24

*In re Thoratec Corp. Sec. Litig.*,
  No. C-04-03168 RMW, 2006 WL 1305226 (N.D. Cal. 2006)...................... 21

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002)......................................................... 11

*In re VeriFone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) *aff'd*, 11 F.3d 865 (9th Cir. 1993) .............. 10, 25

*In re Viropharma Inc. Sec. Litig.*,
  No. CIV. A. 02-1627, 2003 WL 1824914  (E.D. Pa. April 7, 2003) ............... 24

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)....................................................... 20, 21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...................................................... 11, 14

*Nathenson v. Zonagen, Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...................................................... 24

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ...................................................... 10

*Noble Asset Management v. Allos Therapeutics, Inc.*,
  No. CIVA-04CV-1030-RPM, 2005 WL 4161977 (D. Col. Oct. 25, 2005)........... 22, 24

*Padnes v. Scios Nova, Inc.*,
  No. C 95-1693 MHP, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996).............. 15, 16, 19

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ...................................................... 25

*Robertson v. Dean Witter Reynolds, Inc.*,
  749 F.2d 530 (9th Cir. 1984) ...................................................... 10

*Ronconi v. Larson*,
  253 F.3d 423 (9th Cir. 2001) ...................................................... 11, 13, 21

*Securities and Exchange Commission v. Guenthner*,
  395 F. Supp. 2d 835 (D. Neb. 2005) ................................................ 19

*Tellabs, Inc. v. Makor Issues & Rights, LTD., et al.*,
  127 S. Ct. 2499 (2007)................................................................ 11, 22

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                          iv.                          DEFENDANTS' MOTION TO DISMIS
                                                                    CASE NO.  07-CV-04056-MJJ

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Washington Legal Found. v. Henney,*
    202 F.3d 331 (D.C. Cir. 2000) ................................................................. 16

*Wenger v. Lumisys,*
    2 F. Supp. 2d 1231 (N.D. Cal. 1998)........................................................ 13

*Wietschner v. Monterey Pasta Co.,*
    294 F. Supp. 2d 1102 (N.D. Cal. 2003)..................................................... 13

*Wool v. Tandem Computers, Inc.,*
    818 F.2d 1433 (9th Cir. 1987).................................................................. 25

*Zucco Partners, LLC v. Digimarc Corp.,*
    445 F. Supp. 2d 1201 (D. Ore. 2006) ....................................................... 13

**STATUTES**

15 U.S.C. § 78u-4(b) ................................................................. 1, 10, 11, 14, 22, 23

**OTHER AUTHORITIES**

H.R. REP. NO. 104-369 (1995).............................................................................. 23

**RULES**

Federal Rules of Civil Procedure 12(b)(6) ................................................. 1, 9, 10

Federal Rules of Civil Procedure 9(b)............................................................. 1, 10

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

V.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS MATTER:**

PLEASE TAKE NOTE that on March 25, 2008, at 9:30 a.m., or as soon thereafter as this motion may be heard, defendant Nuvelo, Inc. ("Nuvelo" or the "Company") and individual defendants Michael D. Levy, Ted W. Love and Gary S. Titus ("Individual Defendants" and, collectively with Nuvelo, the "Defendants") will and hereby do move to dismiss all claims asserted against them in Plaintiffs' Consolidated Complaint For Violations Of The Federal Securities Laws ("Complaint"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and Section 21D(b) ("PSLRA") of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4(b).

The Defendants make this motion on five grounds. First, with respect to the first claim for relief (violation of § 10(b) of the Exchange Act), Plaintiffs fail to plead with the required particularity that Defendants' public statements were materially false and misleading at the time they were made. Second, Plaintiffs fail to allege facts giving rise to a strong inference that the Defendants possessed the requisite state of mind. Third, the Defendants' alleged statements are forward-looking statements protected by the PSLRA's "safe harbor" provision and are non-actionable "puffery." Fourth, Plaintiffs fail to plead loss causation. And fifth, with respect to the second claim for relief (violation of § 20(a)), Plaintiffs fail to plead that the Individual Defendants are liable as control persons. This motion is based on the pleadings on file; the accompanying Memorandum of Points and Authorities and attached Appendix; Defendants' Request for Judicial Notice ("RJN"); the Declaration of Grant Fondo and exhibits thereto; and such other matters as may be presented in connection with the hearing on the motion.

## STATEMENT OF ISSUES TO BE DECIDED

A.    With respect to the first claim for relief (violation of Exchange Act § 10(b)), whether Plaintiffs plead with the required particularity that the Defendants' statements were materially false or misleading at the time they were made, were made with a strong inference of scienter, fall outside the PSLRA's "safe harbor;" or fail to plead loss causation.

B.    With respect to the second claim for relief (violation of Exchange Act § 20(a)), whether Plaintiffs plead that the Individual Defendants are liable as control persons.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    1.                    DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Nuvelo is a biopharmaceutical company that was conducting phase III clinical trials for its drug candidate, alfimeprase.  On December 11, 2006, Nuvelo announced that these trials did not meet their anticipated endpoints.    Plaintiffs immediately filed suit, alleging that Defendants' prior statements concerning alfimeprase and the clinical trials were materially false and misleading.  The issue before this Court is whether Plaintiffs have pled particularized facts demonstrating that there were material, undisclosed risks at the time of the alleged misstatements, and that each defendant knew that these undisclosed risks would cause the phase III trials to not meet their endpoints and thus render the statements false.  Plaintiffs have pled no such facts.

First, Plaintiffs have pled no particularized facts demonstrating that each defendant (or anyone) knew that any statement was materially false or misleading or that Nuvelo's phase III clinical trials would not meet their endpoints.  Second, Plaintiffs fail to allege scienter with particularity as to each defendant, relying instead on one defendant's sale of stock, at the time of his departure, and on boilerplate assertions such as the defendants' "desire" to increase bonuses and the reliance on the "group pleading" doctrine, all of which have routinely been rejected by the courts.  Third, Nuvelo's statements at issue were forward-looking statements, and it fully disclosed the risks associated with conducting the phase III clinical trials and that the trials might not succeed.  Therefore, the statements at issue are protected by the PSLRA's safe harbor.  In short, there are numerous, independent reasons why the Complaint fails.  Accordingly, Defendants submit that the Court should grant their motion to dismiss, with prejudice.

## II.    BACKGROUND FACTS

### A.    Defendants

Nuvelo, Inc., a Delaware corporation, is a biopharmaceutical company that engages in the discovery, development and commercialization of drugs for acute cardiovascular and cancer therapy.  (¶ 16.)[1]  Nuvelo's principal place of business is in San Carlos, California.  (*Id.*)  The Complaint also

---

[1]  All paragraph references are to the Complaint.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    2.                    DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1  names as defendants Ted W. Love, Nuvelo's Chief Executive Officer, Gary S. Titus, Nuvelo's former

2  VP of Finance and Chief Accounting Officer, and Michael D. Levy, Nuvelo's Senior VP, Research

3  and Development. (¶¶ 17, 18, 19.)

4  **B.     Alfimeprase**

5      Alfimeprase, the drug in development by Nuvelo that is at issue in this case, is a direct acting

6  thrombolytic agent, or blood clot dissolver. (¶ 2.)  The Food and Drug Administration ("FDA") must

7  approve new drugs before they can be marketed and sold in the United States. (¶ 38.)  The FDA does

8  not give blanket approval for a drug; rather, it approves a drug for a treatment of a specific condition,

9  or "indication." (¶ 38.)  Initially, Nuvelo developed alfimeprase for treatment of two indications: (1)

10  acute peripheral arterial occlusion ("PAO"); and (2) catheter occlusion ("CO"). (¶ 5.)

11      PAO occurs when arterial blood supply to the extremities is occluded or blocked by a clot,

12  decreasing the flow of blood to some portion of the body, often the legs. (¶ 41.)  PAO is sometimes

13  called "leg attack" and more than 100,000 Americans suffer from it each year. (*Id.*)  PAO can lead to

14  ulcers, gangrene, tissue death and, if untreated, foot or leg amputation. (*Id.*)  The majority of patients

15  treated for PAO receive surgery requiring an overnight stay in the intensive care unit and an

16  angiogram every four hours to monitor the blood clot. (*Id.*)  There are no drugs approved by the FDA

17  specifically for treatment of PAO. (¶ 43.)

18      CO is the formation of blood clots in patients with catheters. (¶ 50.)  Approximately 5 million

19  catheters are placed in patients in the United States each year to deliver chemotherapy, nutritional

20  support, antibiotics and blood products. (¶ 50.)  Blocked catheters, as a result of blood clots, are a

21  problem in 25% of the five million catheters placed in patients each year. (¶ 50.)  Currently,

22  thrombolytic drugs[2], such as Genentech, Inc.'s tPA Activase (alteplase), which restores function to

23  catheters in two to four hours, or more costly means such as removing and replacing the catheter, are

24  used to restore functionality to blocked catheters. (¶ 50.)

25

26

27

28

---

[2] Thromblytic drugs are drugs which dissolve blood clots. (*See* ¶ 2.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

3.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

C.    **Nuvelo Successfully Completes Phase II Trials for PAO and CO**

Before the FDA will approve a drug, the safety and efficacy of the drug must be established through human clinical trials. (¶ 38.) The clinical trials typically proceed in three phases. (¶ 38.) In September and December 2004, Nuvelo announced that it had successfully completed its phase II clinical trials for PAO and CO, respectively. (¶¶ 31; 34.)

1.    **PAO Phase II Trial – NAPA-1**

Nuvelo referred to its clinical trial program for PAO as Novel Arterial Perfusion with Alfimeprase, or "NAPA." (¶ 41.) The phase II trial for PAO was referred to as NAPA-1. (Declaration of Grant Fondo ("Fondo Dec."), Ex. G.) NAPA-1 was a 24-clinical-center, 113 patient, open label, randomized, dose escalation study evaluating the effectiveness and safety of alfimeprase for treating acute PAO. (¶ 44.) The dose levels were 0.1 mg/kg, 0.3 mg/kg, and 0.6 mg/kg of alfimeprase. (¶ *Id.*) The study's primary endpoint was safety, including major bleeding events, up to 30 days after dosing. (¶ *Id.*) Its secondary endpoints included, among other things, open-surgery free survival at 14 and 30 days. (¶ *Id.*) As disclosed, NAPA-1 was not a placebo-controlled study; rather, it was a dose escalation study, meaning that the study examined the safety and efficacy of alfimeprase at different doses. (¶ *Id.*) In September 2004, Nuvelo publicly presented the data from the NAPA-1 study. (¶ 45) The analysis revealed that alfimeprase was generally safe and well-tolerated in acute PAO in the study patients. (Fondo Dec., Ex. P.) With regards to the efficacy of alfimeprase, the analysis revealed, among other things, that roughly 50 to 70% of patients avoided open vascular surgery. (¶ 45; Fondo Dec., Ex. P.)

2.    **CO Phase II Trial – SONOMA-1**

Nuvelo referred to its clinical program for CO as Speedy Opening of Non-functional Occluded catheters with Mini-dose Alfimeprase, or "SONOMA." (¶ 50.) The phase II trial was called SONOMA-1 and compared three doses of alfimeprase against Genentech's approved dose of Cathflo Activase (alteplase). (¶ 50.) The study was a multi-center, randomized, double-blind study[3] of patients with occluded venous catheters. (¶ 51.) In December 2004, Nuvelo announced the results

---

[3] A double-blind study means that neither the doctor nor the patient is aware whether the patient is receiving the experimental drug or the placebo. (¶ 40 n.4.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA          4.          DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

of the SONOMA-1 trial which showed alfimeprase to be significantly more effective than Cathflo Activase, restoring catheter flow in 50% of the patients after 15 minutes as compared to Cathflo Activase restoring catheter flow to 0% of the patients at 15 minutes. (¶ 54.)

### D.    Phase III Clinical Studies

While the design of a clinical trial is complicated, at its most basic it can be understood as a carefully designed scientific experiment testing a drug's effect on human subjects. As with all scientific experiments, one begins the trial by asking a question, or identifying a hypothesis one wants to test. In the case of a phase III clinical trial, the question typically involves measuring whether a drug in development will have a positive effect on a patient's condition, as compared to a placebo. This measure of the drug's effectiveness, or efficacy, is generally referred to as the "primary endpoint." To specify the primary endpoint, the trial designer must estimate how much he or she thinks that the drug will outperform a placebo.

Once the primary endpoint has been specified, the next step is to determine the confidence level, or "p-value" that the FDA will require for approval. The p-value is simply the probability that the result observed in the trial is an accident. (¶ 39.) Thus, for example, if a "p-value" is 0.05, that means that there is a 5 percent, or 1 in 20, chance that the result observed in the trial is a fluke.

When determining the appropriate p-value to use, a drug company must consider the FDA's position on what p-value is appropriate given the studies being conducted. (*See* Fondo Dec., Ex. Z.) So, for example, the FDA is less stringent for two placebo-controlled studies rather than one because the second study provides a replication of the first, and thus provides the FDA with independent substantiation of the test results. (*See* Fondo Dec., Ex. Z, p. 4-5.) Where two double-blind studies are done, the standard p-value is 0.05. (Fondo Dec., Ex. AA) If, however, a second placebo-controlled study is not conducted, the company must provide a different means to substantiate the validity of their study. One such means is the use of "a *very* low p-value [which] indicates that the result is highly inconsistent with the null hypothesis of no treatment effect," i.e., a p-value lower than 0.05. (Fondo Dec., Ex. Z, p. 15 (emphasis added).)

Having identified the required p-value, the next step is to determine the "power." The power is an estimate of the likelihood of achieving the endpoint with the pre-specified confidence level, or p-

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                              5.                    DEFENDANTS' MOTION TO DISMISS
                                                                 CASE NO. 07-CV-04056-MJJ

1    value.  The power is a function of the number of patients studied in the trial.  Typically in clinical

2    trials it is considered good practice to design or power studies so that there is a 80% to 90% chance of

3    achieving the primary endpoint with the pre-specified p-value.  Ultimately, the important figure is the

4    power calculation – are the prior clinical trials and the study design such that a phase III clinical trial

5    has a 80% to 90% chance of meeting its endpoints if the assumptions are correct.

6    **E.    Nuvelo Launches Phase III Trials of Alfimeprase for Both PAO and CO**

7    **1.    PAO Phase III Trials – NAPA-2 and NAPA-3**

8    In April 2005, Nuvelo commenced its Phase III trials for PAO.  (¶ 46.)  Phase III consisted of

9    two placebo-controlled overlapping trials, NAPA-2 and NAPA-3, beginning with NAPA-2.  (¶¶ 46-

10   47.)  The NAPA-2 study was a randomized, double-blind study comparing 0.3 mg/kg of alfimeprase

11   to a placebo in approximately 300 patients.  (¶ 47.)  Nuvelo conducted the study at over 100 centers

12   worldwide, and its primary endpoint was the avoidance of open vascular surgery within thirty days of

13   treatment.  (*Id.,* Fondo Dec., Ex. K.)

14   Nuvelo disclosed that it believed that alfimeprase might have a success rate of 70% versus

15   a 5-6% effectiveness rate for the placebo.  (Fondo Dec., Ex. L.)  Based on these assumptions, i.e.,

16   the significant difference between effectiveness, the results of the NAPA-2 study would have

17   been statistically significant if only 50 patients were enrolled.  (*Id.*)  However, in order to have

18   sufficient safety data, Nuvelo increased the NAPA-2 study to approximately 300 patients.  (¶ 120;

19   Fondo Dec., Exs. L, N, X.)  This means that the study had enough patients in it so that if there

20   was only a 22% difference between the effectiveness of alfimeprase and the placebo (compared to

21   the 70% versus 5-6% difference that Nuvelo thought possible), the study would have a 90%

22   chance of being statistically significant.  (Fondo Dec., Exs. H, L, X.)

23   The NAPA-3 study was a randomized, double-blind study comparing 0.3 mg/kg of

24   alfimeprase to a placebo in approximately 300 patients, with a primary endpoint of avoiding open

25   vascular surgery within thirty days of treatment.  (¶ 47, Fondo Dec., Ex. G.)  On January 23, 2006,

26   Nuvelo announced that the FDA had granted the PAO program "fast track" status, which provides for

27   accelerated regulatory filings and review for drugs that address an unmet medical need for the

28   treatment of a serious or life-threatening condition.  (¶ 48.)  In April 2006, Nuvelo announced that it

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                    6.                    DEFENDANTS' MOTION TO DISMISS
                                                                       CASE NO. 07-CV-04056-MJJ

1    had begun patient enrollment in NAPA-3. (¶ 49.)  On September 6, 2006, Nuvelo announced that

2    patient enrollment in NAPA-2 had concluded, and that it expected to release the top-line data in late

3    2006 or early 2007.  (*Id.* at Ex. BB.)

### 2.    CO Phase III Trials – SONOMA-2 and SONOMA-3

5        In contrast to the PAO phase III studies, Nuvelo did not conduct two placebo-controlled

6    studies for CO.  Instead, Nuvelo disclosed that it modeled its phase III trials for CO on the phase III

7    trials that led to the approval of Genentech's Cathflo Activase for this indication.  (Fondo Dec., Ex. L,

8    O, W.)  Genentech's trials for treatment of CO consisted of a double-blind placebo-controlled efficacy

9    study and a large single arm open label safety study.  (*Id.* at Ex. Y.)  Approximately 150 patients took

10   part in Genentech's Cathflo placebo-controlled study.  (Fondo Dec., Ex. Y.)  The study generated a

11   statistical significance, or p-value, of less than 0.0001.  (*Id.*)

12       Similar to Genentech's Cathflo Activase trials, Nuvelo initiated SONOMA-2, a randomized,

13   double-blind, trial comparing 3.0 mg/kg of alfimeprase against a placebo as a treatment for patients

14   with blocked catheters.  (¶ 56.)  Nuvelo's placebo-controlled trial differed from the Genentech trial in

15   that it included twice the number of subjects.  (*Id.*; Fondo Dec., Ex. Y.) The primary endpoint for

16   SONOMA-2 was the restoration of function to the catheters at 15 minutes.  (¶ 56.)  The SONOMA-3

17   trial was a single arm open label safety study enrolling approximately 800 patients.  (¶ 57.)  Nuvelo

18   agreed to a statistical significance of at least 0.00125 with the FDA for the SONOMA-2 trial.  (¶ 58.)

19   The 0.00125 p-value level is consistent with the FDA's guidance for one study, and is equivalent to

20   the same level of statistical significance as if Nuvelo had instead conducted two studies.[4]  (Fondo

21   Dec., Exs. Z, AA.)  While modeled after Genentech's trials, the SONOMA-2 trial's target p-value of

22   0.00125 was higher than the 0.0001 p-value shown in the Genentech trial.

23       In February 2006, Nuvelo announced that it had begun patient enrollment in  SONOMA-3. (¶

24   57.)  On September 5, 2006 Nuvelo announced that patient enrollment in SONOMA-2 had

25   concluded, and that it expected to be able to announce the top-line data in late 2006 or early 2007.

26

27   [4] A two study p-value typically is 0.05.  Since Nuvelo did one study, achieving the same level of statistical
28   significance is a simple calculation.  It is the p-value of two studies (0.05), divided by the number of
     studies (two) or 0.05 x 0.05 ÷ 2.  This yields a p-value of 0.00125.  (Fondo Dec. , Ex. AA.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    7.                    DEFENDANTS' MOTION TO DISMISS
                                                       CASE NO. 07-CV-04056-MJJ

(Fondo Dec., Ex. CC.)

**F.    Bayer Agrees To A Partnership With Nuvelo For The Development Of Alfimeprase And Agrees To Pay Nuvelo $50 million Up-Front**

On January 5, 2006, Nuvelo announced that it had entered into a financial partnership with Bayer HealthCare AG ("Bayer"), a multibillion dollar international pharmaceutical company, to develop and commercialize alfimeprase. (¶ 92; Fondo Dec. Ex. A.) The collaboration gave Bayer the right to commercialize alfimeprase outside of the U.S. market in exchange for Bayer's initial payment to Nuvelo of $50 million and the potential of another $335 million in milestone payments over time, along with Bayer funding 40% of Nuvelo's global clinical development expenses for alfimeprase. (*Id.*)

**G.    The December 11, 2006 Announcement and Subsequent Events.**

On December 11, 2006, Nuvelo announced that the alfimeprase phase III trials for both PAO and CO did not meet their primary and secondary endpoints. (¶ 60.) Nuvelo stated that for PAO the mechanical disruption caused by the insertion of the catheter dissolved more clots than expected. (¶ 61.) For CO, Nuvelo stated that while the data did demonstrate that alfimeprase was effective at 15 minutes, it did not reach the threshold established by the FDA for regulatory approval based on one controlled study. (¶ 63.) Nuvelo's stock price fell from $19.55 per share on December 8, 2006, to $4.05 per share on December 11, 2006. (¶ 158.)

On August 22, 2007, Nuvelo announced it would reinitiate the SONOMA-3 trial of alfimeprase in patients with CO, but with a higher dose and concentration. (¶ 67.) Nuvelo stated that the SONOMA-2 trial demonstrated that alfimeprase restored catheter function in trial patients after 15 minutes with a p-value of 0.022 and that, therefore, Nuvelo believed that the increased dosage would be even more effective. (Fondo Dec., Ex. Q.)

**H.    Allegations of Wrongdoing**

Plaintiffs allege that on six occasions between January 5, 2006 and August 3, 2006 Defendants made materially false and misleading statements pertaining to alfimeprase and, in particular, concerning the PAO and CO clinical trials. (¶¶ 92-95, 100-103, 107-109, 111, 116-117, 120-121, 124-126.) The alleged materially false statements fall into four categories: (1) statements

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

8.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

concerning the effectiveness of alfimeprase and the phase II studies (*see e.g.* ¶¶ 92, 95, 100-103, 108-111, 116, 125); (2) statements that PAO and CO compared to other indications represented a "low risk path to regulatory approval" and would be "rapid to market" (*see e.g.* ¶¶ 94, 95, 101, 102, 109); (3) statements that the design of the PAO trial was conservative and had an overwhelming statistical power (*see e.g.* ¶¶ 120-121); and (4) statements that the commercialization of alfimeprase continued to go well. (*See e.g.* ¶ 124.)

Plaintiffs do not allege that any of the phase II data was incorrect or misrepresented, that Defendants had any access to phase III data before it was unblinded, or that the defendants knew the results of the phase III trials prior the alleged misstatements. Rather, Plaintiffs allege that the statements were false and misleading for two reasons. First, the Defendants had no basis for representing to the market "the degree to which the drug caused the purportedly successful Phase 2 results" because the blood flow in the PAO trial could have been restored by inserting a catheter as opposed to the drug and, because of the small size of the CO trial, Defendants did not have a basis for predicting success or that the path to market would be low risk. (¶¶ 96, 103, 112, 127.)

Second, Defendants allegedly failed to disclose four "known" risks: (1) in the PAO phase II trial the clot may have been broken up by the insertion of the catheter pushing into the clot rather than by alfimeprase; (2) in the CO phase III trial Nuvelo had agreed to a p-value of 0.00125; (3) the market opportunity for PAO was less than predicted because of competition from off-label drugs; and (4) Nuvelo had an undisclosed "target product profile" that was necessary for the phase III CO trial to meet in order for the Company to proceed to market alfimeprase for this indication. (*See e.g.* 97, 104, 113, 121, 128.)

Plaintiffs allege Defendants' statements were made with scienter because the Individual Defendants knew or should have known they were false when made, their compensation was tied to Nuvelo's financial performance, they were motivated to gain access to capital through a follow-on offering, and a defendant sold stock during the Class Period. (*See e.g.* ¶¶ 129, 145-52.)

## III.   LEGAL STANDARDS

### A.   General Standards For Motions To Dismiss.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                      9.                        DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Pursuant to Federal Rule of Civil Procedure 12(b)(6), courts may dismiss a complaint as a matter of law for two reasons: (1) the lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations as true. *See Blake v. Dierdorff*, 856 F.2d 1365, 1368 (9th Cir. 1988). The court need not, however, accept legal conclusions asserted as "facts." *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1476 n.5 (N.D. Cal. 1992) (citation omitted), *aff'd*, 11 F.3d 865 (9th Cir. 1993). Judicial notice of documents that plaintiffs reference in their complaint is appropriate under the doctrine of incorporation by reference. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

### B.    Essential Elements Of A Section 10(b) Claim.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which they relied (5) which proximately caused plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citation omitted).

### C.    Plaintiffs Must Plead Falsity, Materiality And Scienter With A High Degree Of Particularity.

Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Rule "requires the inclusion of specific facts regarding the alleged fraudulent activity, such as the time, date, places, content of each fraudulent representation, the reasons that the representation is false, and the identity of the person or persons engaged in the fraud." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000) (citation omitted). The PSLRA significantly heightened pleading requirements in private securities litigation in order to eliminate meritless claims and imposes even more stringent requirements for pleading falsity and scienter. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). Specifically, both fraud and scienter must be pled with particularity. 15 U.S.C. § 78u-4(b)(1)-(3).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                           10.                DEFENDANTS' MOTION TO DISMISS
                                                           CASE NO. 07-CV-04056-MJJ

1    To satisfy these heightened pleading requirements, plaintiffs must identify with particularity

2  (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is

3  misleading, and (3) if an allegation regarding the statement or omission is made on information and

4  belief, all facts on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1)*; In re Vantive Corp. Sec.*

5  *Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002). All allegations are deemed to be made on information

6  and belief unless plaintiffs have personal knowledge of the facts. *Vantive*, 283 F.3d at 1085, n.3.

7  Plaintiffs must further allege particularized facts demonstrating that the alleged misstatement or

8  omission is material, that is that "there is a substantial likelihood that a reasonable investor would

9  have acted differently if the misrepresentation had not been made or the truth had been disclosed."

10  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

11    A complaint must also "state with particularity facts giving rise to a strong inference that the

12  defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has

13  defined the requisite state of mind as "deliberately reckless or conscious misconduct," and requires

14  plaintiffs to plead "particular facts giving rise to a strong inference" of that mental state. *Silicon*

15  *Graphics,* 183 F.3d at 974. In order to establish that a defendant has acted with "deliberate

16  reckless[ness] or conscious misconduct," a plaintiff "must state facts that come closer to

17  demonstrating intent, as opposed to mere motive and opportunity." *Id.*; *see also Ronconi v. Larkin*,

18  253 F.3d 423, 429 (9th Cir. 2001). "When determining whether plaintiffs have shown a strong

19  inference of scienter, the court must consider all reasonable inferences to be drawn from the

20  allegations, *including inferences unfavorable to the plaintiffs*." *Gompper v. VISX, Inc.,* 298 F.3d 893,

21  897 (9th Cir. 2002) (emphasis added). A complaint will only survive a motion to dismiss "if a

22  reasonable person would deem the inference of scienter cogent and at least as compelling as any

23  opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights,*

24  *LTD.,* 127 S. Ct. 2499, 2510 (2007).

25  **IV.    ARGUMENT**

26    **A.    Plaintiffs Fail To State A Claim For A Section 10(b) Violation**

27    In their first claim for relief, Plaintiffs assert a claim under Section 10(b). As an initial matter,

28  Plaintiffs *do not* allege that any of the phase II data was incorrect or misrepresented, that Defendants

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

11.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1    had any access to phase III data before it was unblinded, or that Defendants knew the results of the

2    phase III trials prior the alleged misstatements.  The question before this Court is whether Plaintiffs

3    have pled particularized facts demonstrating that there were material, undisclosed risks at the time of

4    the statements at issue, and that each defendant knew that these undisclosed risks would cause the

5    phase III clinical trials to not meet their endpoints[5] and therefore, render their statements materially

6    false.  Plaintiffs have not.  Specifically, Plaintiffs' claim fails because (1) Plaintiffs' allegations rely

7    on confidential witnesses whose allegations are not probative of falsity or scienter; (2) Plaintiffs fail to

8    plead falsity with particularity; (3) Plaintiffs fail to allege facts creating a strong inference of scienter;

9    (4) the statements cited by Plaintiffs are not actionable since they are forward-looking statements

10   protected by the "safe harbor" language accompanying them and/or constitute "puffery;" and (5)

11   Plaintiffs fail to allege loss causation.

### 1.    The Confidential Witness Allegations Are Not Probative Of Materiality, Falsity Or Scienter.

12

13          Plaintiffs rely upon four confidential witnesses ("CW") as their primary source for the

14   Complaint's assertion that the Defendants knowingly made false and misleading statements.    Their

15   allegations are as follows.  CW 1 alleged that "s/he discussed the potential for the drug delivery

16   system to disrupt the clot during  quarterly company-wide meetings . . . ." (¶ 37.)  CW 2 alleged that

17   Nuvelo had difficulty enrolling patients for NAPA because "[m]ost patients eligible for the study

18   opted" to be treated "with a Genentech thrombolytic drug" instead.  (¶ 47.)  CW 3 alleged the

19   Company had difficulty designing the phase III protocols.  (¶ 40.)  CW 4 stated that s/he was

20   concerned by the low p-value and that Deitcher and Wang-Clow discussed the low p-value. (¶ 40.)

21   The CWs' allegations fall far short of demonstrating materiality, falsity or scienter.

22          First, CW 1, 3, and 4 each left Nuvelo before Nuvelo completed the phase II trials (September

23   and December of 2004) and well prior to the start of the class period.  (*see* ¶¶ 22, 24, 25, 45, 54.)

24   Therefore, these CWs could not have had personal knowledge of the "truth" during the class period or

25   what the Defendants knew at that time. *See In re Silicon Storage Tech., Inc., Sec. Litig.,* No C 05-

26

27   ───────────────
[5]  The alleged false statements, made on or before August 3, 2006, were made before either phase III trial
28   had finished enrolling patients.  (Fondo Dec., Ex. BB, CC.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                        12.                    DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1   0295 PJH, 2006 WL 648683 at *10 (N.D. Cal. Mar. 10, 2006) (holding that confidential witnesses

2   who were not employed by the company during the class period were not in a position to have

3   personal knowledge regarding the defendants alleged misstatements).

4       Second, the Complaint does not identify sufficient facts "'accompanied by enough

5   particularized detail to support a reasonable conviction in the informant's basis of knowledge.'"

6   *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1112 (N.D. Cal. 2003) (citation omitted);

7   *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1271 (N.D. Cal. 2000).  For

8   example, there is no explanation of any of the CWs' job responsibilities.  Further, Plaintiffs admit that

9   CW 1 did *not* even work on alfimeprase.  (¶ 22.)  Similarly, CW 2 is alleged to have been "*a principal*

10  *investigator*" for one of the PAO phase III trials – this means CW 2 was nothing more than a doctor at

11  one clinical site. (¶ 23.)  Plaintiffs have failed to allege any facts from which the Court could conclude

12  that CW 2 knew about the enrollment at other clinical sites or any basis for her to know what Nuvelo

13  did or did not know.  The same is true as to CW 3 and CW 4.  (*See* ¶¶ 24, 25.)

14      Third, CW 1's allegations that employees expressed doubts about alfimeprase and CW 4's

15  allegation that the low p-value was a topic of conversation among Deitcher and Wang-Clow are

16  nothing more than rumor and hearsay and certainly are not probative of falsity or scienter.  (¶¶ 22,

17  40.)  "The Court must be able to tell whether a confidential witness is speaking from personal

18  knowledge or 'merely regurgitating gossip and innuendo' . . . knowledge based on hearsay can not be

19  imputed to the Individual Defendants." *In re Metawave Commc'n Corp. Sec. Litig.*, 298 F. Supp. 2d

20  1056, 1068-69 (W.D. Wash. 2003) (citation omitted); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F.

21  Supp. 2d 1201, 1207 (D. Ore. 2006) (allegations by confidential witnesses based on hearsay are not

22  probative).  Finally, none of the allegations attributed to the CWs are probative of anything.  For

23  example, the difficulty in enrolling patients or expressions of "concern," even if true, fail to

24  demonstrate materiality, falsity or scienter.

## 2.    Plaintiffs Fail To Allege Materiality and Falsity With Particularity

26      "Fraud by hindsight is not actionable." *Ronconi*, 253 F.3d at 430 n.12 (citation omitted); *see*

27  *also Wenger v. Lumisys*, 2 F. Supp. 2d 1231, 1250 (N.D. Cal. 1998) ("[T]he fact that a prediction

28  proves to be wrong in hindsight does not render the statement untrue when made.") (citation omitted).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    13.                    DEFENDANTS' MOTION TO DISMISS
                                                        CASE NO. 07-CV-04056-MJJ

1    Plaintiffs must "set forth, as part of the circumstances constituting fraud, an explanation as to why the

2    disputed statement was untrue or misleading *when made*." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d

3    1541, 1549 (9th Cir. 1994).  And that the misstatement must be material.  *Livid Holdings Ltd.*, 416

4    F.3d at 946.

5            "In order to establish false and misleading statements, plaintiffs must allege (1) specific

6    factual conditions contemporaneous with false statements, which conditions (2) were known by

7    defendants."  *In re Fritz Cos. Sec. Litig.*, 282 F. Supp. 2d 1105, 1112 (N.D. Cal. 2003) (citation

8    omitted).  Plaintiff must plead with "*particularity all facts*" forming the basis for plaintiff's belief in

9    great detail.   15 U.S.C. § 78u-4(b)(1) (emphasis added); *Silicon Graphics*, 183 F. 3d at 983.

10   Statements of expectation or belief are only actionable if (1) the statement is not genuinely believed;

11   (2) there is no reasonable basis for the belief; or (3) the speaker is aware of undisclosed facts tending

12   to seriously undermine the accuracy of the statement.  *In re 2TheMart.com., Inc., Sec. Litig.*, 114 F.

13   Supp. 2d. 955, 961 (C.D. Cal. 2000).

14              a.      **Plaintiffs Fail To Allege With Particularity That Any Statements**
                        **Regarding the PAO Trials Were Materially False When Made**
15

16           Plaintiffs' theory is that the statements were false and misleading because Defendants failed to

17   disclose two "known risks" regarding the PAO indication (1) that in the Phase 2 trial "the blood clot

18   may have simply been broken up by the action of the catheter pushing into the clot, rather than

19   dissolved by the action of the drug" and (2) the market opportunity for PAO was much smaller than

20   represented to analysts because of competition from off-label drugs.  (¶¶ 97, 104, 113, 117, 121.)

21   Plaintiffs' theory fails because they have not alleged one particularized fact that establishes that any of

22   Nuvelo's statements concerning the phase II trial for PAO and the likely success of alfimeprase in the

     phase III trials for PAO were materially false when made.
23

24              (1)     **Plaintiffs' Allegations Regarding The Hypothesis That The**
                        **Catheter Dissolved The Clots Do Not Establish Materiality**
25                      **or Falsity**

26           Plaintiffs allege that Defendants' statements concerning success of the phase II trial and the

27   potential success of the phase III trial were unreasonable because CW 1, who Plaintiffs concede did

28   not work on alfimeprase, said that in either 2004 or 2005 she "discussed the potential for the drug

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

764447 v11/PA                          14.                    Defendants' Motion to Dismiss
                                                              Case No. 07-CV-04056-MJJ

delivery system to disrupt the clot during quarterly company-wide meetings regularly held after each Board of Directors meeting." (¶ 37.) Plaintiffs' allegations do not come close to providing particularized facts sufficient to conclude that each statement was materially false and misleading when made.

First, Plaintiffs do not even allege the date(s) of the meeting other than they were in 2004 or 2005, whether each defendant was in attendance at the meeting or heard her "discuss" it, details as to what specifically was actually discussed or said, or the context thereof. At most, this allegation shows that one individual who did not work on alfimeprase raised a possible countervailing hypothesis before the completion of the phase II trials and well before any alleged misstatement was made. Second, Plaintiffs provide no particularized allegations that after the phase II data was collected and analyzed the Defendants knew that the catheter was disrupting a material number of clots, and identify no reports or other documents demonstrating that alfimeprase did not work. Failing to disclose an unsupported hypothesis made to persons unknown by a person who was not even working on alfimeprase does not constitute fraud. *See Padnes v. Scios Nova, Inc.*, No. C 95-1693 MHP, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) ("Reasonable minds could differ with respect to the value of the Colorado study in determining the therapeutic effects of Auriculin. Reasonable minds cannot conclude, however, that defendants' failure to exhaustively catalogue those possibilities was fraudulent.").

Moreover, it is undisputed that Nuvelo accurately reported and publicly disclosed the results of its phase II PAO trial. Where a company accurately reports the findings of its study, it is under no obligation to second guess the study or how best to interpret the data. *See Padnes*, 1996 WL 539711, at *5. In *Padnes*, plaintiffs alleged that defendants' statements regarding a study were false and misleading because they failed to disclose certain design defects – i.e. the study was not completely randomized, was not double-blinded, and different dosages were used. *Id.* at *5. The court, in evaluating the failure to disclose much more significant information than is alleged here, concluded that where a company accurately reports the results of the study it need not disclose "alternative [procedures] that were not utilized and various opinions with respect to the effects of these choices on the interpretation of the outcome data." *Id.*

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    15.                    DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1    Plaintiffs have pled no facts demonstrating that Defendants did not reasonably believe their

2    statements. The paucity of Plaintiffs' allegations is further reinforced when one examines the design

3    of the NAPA-2 study. Defendants disclosed their belief that alfimeprase would have a success rate of

4    70% and that the placebo would have a success rate of 5-6%. (Fondo Dec., Exs. L, O.) Further,

5    based on these assumptions, the study would be statistically significant if the assumptions held true

6    and it only enrolled 50 patients. (*Id.*) However, because of the need for adequate safety data, the

7    study enrolled approximately 300 patients. As a result, the study was of an adequate size to

8    demonstrate a statistically significant difference between the placebo and alfimeprase even if the

9    difference in the rate of effectiveness ended up being only 22% as opposed to the much larger

10   difference between 70% and 5-6%, the difference Nuvelo was expecting. (Fondo Dec., Exs. H, L, X.)

11   Hence, Defendants had every reason to be confident that the NAPA-2 trial would be successful and

12   that its power was more than adequate to demonstrate the anticipated effect of the drug.

13          (2)    **Plaintiffs' Allegation That PAO's Market Was Smaller Than Predicted Is Irrelevant And Does Not Establish Materiality Or Falsity**

14

15   Plaintiffs' allegation that Defendants failed to disclose that the market for PAO was smaller

16   than they predicted due to competition from off-label drugs fails for several reasons. First, Nuvelo

17   has never commercialized alfimeprase for PAO, thus whether the market is smaller than Nuvelo

18   stated is irrelevant. In fact, at this time no one knows the size of the market for PAO since the FDA

19   has never specifically approved a drug to treat PAO. As a matter of law and logic, therefore, one

20   cannot determine today whether Nuvelo's market estimates were inaccurate. Second, Plaintiffs do not

21   provide any link as to why an alleged failure to disclose competition from off-label drugs would

22   render any of its statements regarding the phase II trials or the potential success of the phase III trials

23   materially false and misleading. Third, in its March 15, 2006 Form 10-K, Nuvelo disclosed that off-

24   label drugs were being used to treat PAO. (Fondo Dec., Ex. E, p. 5.) *See Washington Legal Found.*

25   *v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) (stating that off-label use is "commonplace in modern

26   medical practice and ubiquitous in certain specialties"). Fourth, Plaintiffs have failed to sufficiently

27   allege that Nuvelo's prediction that alfimeprase "had the potential to capture up to half of the $400

28   million market for treatment of PAO" was knowingly inaccurate. (¶ 43.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                          16.                    DEFENDANTS' MOTION TO DISMISS
                                                              CASE NO. 07-CV-04056-MJJ

1

      **b.**     **Plaintiffs Fail To Allege With Particularity That Any Statements Regarding The CO Trials Were Materially False When Made**

2

Plaintiffs have also failed to allege one fact, particular or otherwise, that establishes that any of

3

Nuvelo's statements concerning the phase II trial for CO and the likely success of alfimeprase in the

4

phase III trials for CO were materially false when made.[6]  Plaintiffs' theory is that the statements were

5

materially false and misleading because Defendants failed to disclose two "known risks" regarding

6

the CO indication: (1) that Nuvelo had agreed with the FDA to demonstrate that CO was statistically

7

significant to a p-value of 0.00125; and (2) that Nuvelo had an undisclosed "target product profile"

8

which it would be necessary to meet for the Company to market alfimeprase.  (¶¶ 97, 104, 113, 128.)

9

      **(1)**     **Defendants Did Not Make Any False or Misleading Statements Regarding The "P-Value" Of The CO Phase III Trial**

10

11

Plaintiffs allege that Defendants failed to disclose that the p-value for the SONOMA-2 trial

12

was below 0.005 and that this rendered the Defendants' statements during the class period materially

13

false and misleading.  Plaintiffs are wrong.

14

First, the market was aware that the p-value for the SONOMA-2 study was below 0.05.

15

Nuvelo repeatedly disclosed that the phase III trials for CO were modeled after the successful

16

Genentech Cathflo Activase trials.  (Fondo Dec., Exs. L, O, W.)  Like Genentech's trials, Nuvelo

17

proceeded with one double-blind placebo-controlled study to test the efficacy of the drug and one

18

larger open-label study that was not compared against a placebo that tested the safety of the drug.

19

Since Nuvelo did not conduct a second placebo-controlled, double-blind study, the company,

20

pursuant to the FDA's Guidance (published on the FDA's website), had to provide a different means

21

to substantiate the validity of its study and did – it used "a *very* low p-value," i.e. lower than 0.005.

22

(Fondo Dec., Ex. Z, p. 15 (emphasis added).)  The FDA Guidance "is presumed to be known in an

23

efficient market." *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. CIVA-04CV-1030-RPM, 2005

24

WL 4161977, at * 7 (D. Colo. Oct. 20, 2005).  The p-value used, 0.00125, simply represents the same

25

26

---

[6]  The statements that PAO and CO represented a "low risk path to regulatory approval" and would be

27

"rapid to market" must be read in context.  Nuvelo made these statements in comparison to other indications for alfimeprase, such as a use for stroke or deep vein thrombosis.  (¶¶ 94, 95, 101, 102, 109.)

28

Further, as discussed in Sections IV. B.5 and IV.B.6., *infra*, these are non-actionable statements.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

17.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1    statistical significance as if two trials were done – 0.05 x 0.05 divided by two trials equals 0.00125.

2    Not surprisingly, the Complaint does not allege that any analyst asked about the p-value or that

3    Defendants misled them.  The market could not have reasonably assumed that the SONOMA-2 trial

4    would have a p-value of two clinical trials, or 0.05.

5         Second, even if the market could not have known that the CO phase III trial had a p-value

6    below 0.05, this does not render the Defendants' statements materially false or misleading.  The issue

7    is whether the Defendants knew that the trial would not meet this p-value and would cause the phase

8    III trials for CO and PAO to fail, as "[t]he fact that a prediction proves to be wrong in hindsight does

9    not render the statement untrue when made." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir.

10   1996).  Plaintiffs have pled no such particularized facts.

11        Moreover, Plaintiffs' own allegations demonstrate that Defendants had every reason to

12   believe that the phase III trial for CO would be successful.  The phase II trial showed that alfimeprase

13   had a 50% success rate at 15 minutes compared to Genentech's Cathflo Activase, which had a 0%

14   success rate at 15 minutes.  (¶ 108.)  As Nuvelo publicly disclosed multiple times, it modeled the

15   phase III trial for CO on the phase III trial for Genentech's Cathflo Activase.  (Fondo Dec., Exs. L, O,

16   W.)  The phase III trial for Genentech's Cathflo Activase, which had many fewer patients than the

17   SONOMA-2 trial, established a p-value of less than 0.0001, significantly lower than 0.00125.  (Fondo

18   Dec., Ex. Y.)  Accordingly, because alfimeprase proved much more successful at clearing catheters

19   than Genentech's Cathflo Activase, it was more than reasonable for Defendants to believe that the

20   phase III trial would be at least as statistically significant as the Genentech study.

21        Plaintiffs' sole allegation relating to the p-value is that CW 4 expressed "concern" about the

22   low p-value and that it purportedly was a topic of discussion between Deitcher and Wang-Clow,

23   neither of whom is a defendant.  (¶ 40.)  This allegation falls far short of establishing that the

24   defendants knowingly omitted a material fact.  *See In re Syntex*, 95 F.3d at 931 (holding that plaintiffs

25   failed to allege any facts demonstrating that defendants had knowledge that their drug would not be

26   approved by the date they predicted even though plaintiffs were able to show knowledge of

27   deficiencies in the testing procedures).  Moreover, CW 4's "concerns" are nothing more than that, and

28   are certainly not a fact demonstrating falsity.  Similarly, CW 4's allegation that it was a topic of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                    18.                    DEFENDANTS' MOTION TO DISMISS
                                                        CASE NO. 07-CV-04056-MJJ

conversation between Deitcher and Wang-Clow is not probative of falsity. *Padnes*, 1996 WL 539711 at *5 (finding that "[m]edical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols" and noting that the "securities laws do not impose a requirement that companies report only information from optimal studies, even if scientists could agree on what is optimal"); *Securities and Exchange Commission v. Guenthner*, 395 F. Supp. 2d 835, 848 (D. Neb. 2005) (holding that evidence of "disagreement, infighting, and differences in management styles between managers and executives of two merged corporations" does not infer securities fraud).

Further, investors evaluating clinical trial programs are primarily interested in the risk that the trial will fail to meet its primary endpoints. This risk is a function of the trial's power, which measures the probability that it will meet its endpoint with the pre-specified confidence level, or p-value. Plaintiffs have failed to allege any facts demonstrating that the SONOMA-2 trial was not of a sufficient size or "power" to give it a 90 percent chance of meeting the primary endpoint with the pre-specified p-value of .00125, and in fact the trial came very close to achieving the pre-specified p-value and did in fact achieve it for restoration of the catheter function at one hour. (Fondo Dec., Ex. DD.)

> **(2)    The Alleged Failure To Disclose That CO Had A Target Product Profile Does Not Render Any Statement Materially False**

Plaintiffs allege that Defendants failed to disclose that Nuvelo had an undisclosed "target product profile" for the CO phase III trial, and that if it did not meet that profile, the Company would not proceed to market with alfimeprase for this indication. (¶ 97.) This allegation, based on an announcement made six months after the December 11, 2006 announcement, is irrelevant. The December 11, 2006 announcement had nothing to do with the failure to meet a target product profile, but rather the failure to meet specific endpoints. Plaintiffs also do not allege any particularized facts relating to the target product profile.

> **3.    Bayer's Partnership With Nuvelo Negates Any Inference Of Materiality, Falsity Or Scienter**

Plaintiffs' allegations are severely undermined by the fact that Bayer, a sophisticated, third-party, entered into a strategic and financial partnership with Nuvelo on January 5, 2006, paying

Nuvelo $50 million up-front, and agreeing to pay $335 million in milestone payments and for 40% of the development costs for the right to license alfimeprase.  (¶ 72; Fondo Dec., Ex. A.)  The only reasonable inference is that Bayer, after extensive due-diligence, invested tens of millions of dollars in alfimeprase because they too were convinced as to the success of the phase II trials and the likelihood of success for the phase III trials.  *Gompper*, 298 F.3d at 897.

### 4.    Plaintiffs Fail To Allege A Strong Inference Of Scienter As To Any Individual Defendant

None of Plaintiffs' allegations create a strong inference that Defendants acted with "deliberate reckless[ness] or conscious misconduct."   As demonstrated above, Plaintiffs fail to plead particularized facts demonstrating that any defendant had knowledge that any disclosure was materially false and misleading, or that the statements were made with the intent to deceive.

Plaintiffs' additional, generalized allegations, collectively or otherwise, also are insufficient as a matter of law to create a strong inference of scienter as to any defendant.  Plaintiffs, rather than pleading particularized facts as to each defendant, seek to rely on "group pleading."  (¶¶ 161-65.) This doctrine is wholly inconsistent with the heightened pleading standards under the PSLRA, and has been and should be rejected.  *See In re Silicon Storage*, 2006 WL 648683 at * 21-22 (rejecting group pleading doctrine because the PSLRA requires "that plaintiffs plead facts showing scienter as to each defendant individually").  Plaintiffs further assert that the Individual Defendants' compensation was tied to the Company's financial performance.  (¶¶ 145, 146.)  This allegation has routinely been rejected as insufficient to create an inference of scienter.  *See In re Calpine Corp. Sec. Litig.,* 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003) (holding that plaintiffs' allegation that individual defendants acted with scienter because they "wished to maximize their executive compensation packages" was "insufficient" to support a strong inference of scienter); *In re Autodesk,* 132 F. Supp. 2d at 844 (holding that plaintiffs' allegation that "defendants were motivated to engage in fraud by the prospect of receiving large bonuses" was insufficient to support a finding of scienter).

Plaintiffs' allegation that the Individual Defendants were motivated to commit fraud to gain access to capital has similarly been rejected by the courts.  (¶¶ 147-152); *see, Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (holding that plaintiffs' assertions that the company's

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

20.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1    "alleged desires to obtain favorable financing and to expand abroad [were] in themselves ordinary and

2    appropriate corporate objectives" and did not create an inference of scienter); *In re Thoratec Corp.*

3    *Sec. Litig.*, No. C-04-03168 RMW, 2006 WL 1305226 at *10 (N.D. Cal. 2006) (holding that

4    plaintiff's allegations that company artificially inflated its stock price to "raise capital to cover [a]

5    shortfall" in revenue failed to create an inference of scienter).

6        Finally, Plaintiffs allege that one defendant, Titus, sold $1.5 million worth of stock.  (¶ 91.)

7    Stock sale allegations cannot raise an inference of scienter unless Plaintiffs allege specific facts

8    showing that the sales were suspicious. *Silicon Graphics,* 183 F.3d at 986.  Plaintiffs fail to allege and

9    cannot allege any facts, much less particularized facts, demonstrating that Titus' sales were

10   suspicious.  In fact, Titus' stock sales were in late August 2006 and were made by exercising his

11   vested options in connection with his resignation, announced on August 10, 2006, with an effective

12   resignation date of September 1, 2006.  (Fondo Dec., Exs. S, T.)  Pursuant to Nuvelo's stock option

13   plans, these options had to be exercised within 90 days of his departure from Nuvelo or the options

14   would expire.  (Fondo Dec., Ex. V.)  Consequently, Titus, a departing employee, exercised his

15   options.  Because upon exercising options an individual has to pay taxes on "in the money" shares, it

16   is more than a reasonable inference that Titus sold these shares in order to pay for the taxes he became

17   liable for when he exercised the shares.  Stock sales made in the context of an officer's resignation do

18   not raise an inference of scienter. *See In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1067

19   (C.D. Cal. 2004).

20       Moreover, Plaintiffs fail to allege any sales by any of the other insiders.  In fact, Love and

21   Levy, the two individuals "most in the know" did not sell any stock during the entire class period  and

22   Mark Perry, a director, actually exercised (purchased) 65,833 shares during the purported class period,

23   *but did not sell them.*  (Fondo Dec., Ex. U.)  Courts routinely hold that there is no inference of scienter

24   where the majority of the insiders hold their shares.  This is particularly true where the non-selling

25   defendants are the ones most likely in the know.  *Lipton*, 284 F.3d at 1037 (no inference of scienter

26   where "only [one insider] and not other insiders sold during the class period); *Ronconi*, 253 F.3d at

27   436 (holding that "[o]ne insider's well timed sales do not support the 'strong inference' required by

28   the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                    21.                    DEFENDANTS' MOTION TO DISMISS
                                                                        CASE NO. 07-CV-04056-MJJ

1   inference that the favorable characterizations of the company's affairs were known to be false when
2   made").  The only possible inference is that Defendants did not know any statements were false.
3   *Tellabs*, 127 S. Ct. at 2510.

4           **5.        The Alleged Statements Are Protected By The PSLRA's "Safe Harbor"**

5           Under the PSLRA, forward-looking statements are non-actionable where either: (A) the
6   forward-looking statement is "identified as a forward-looking statement, and is accompanied by
7   meaningful cautionary statements identifying important factors that could cause actual results to differ
8   materially from those in the forward-looking statement ["Prong A"];" or (B) "the plaintiff fails to
9   prove that the forward-looking statement . . . was made with *actual knowledge* . . . that the statement
10  was false or misleading ["Prong B"]."   15 U.S.C.A. § 78u-5(c)(1)(A)(i) and (B)(i) (emphasis added).
11  Prong A of the safe harbor relies on purely objective criteria.  "Meaningful" and "important" describe
12  the cautionary statements themselves, not the speaker's or audience's view of them.  Thus, "if a
13  statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is
14  irrelevant."  *Harris v. IVAX Corp.*, 182 F.3d 799, 803 (11th Cir. 1999); *see also In re Ford Motor Co.*
15  *Sec. Litig.*, 381 F.3d 563, 568 n.3 (6th Cir. 2004).

16          **a.        All The Alleged Misstatements Were Forward-Looking And
                         Identified As Such**
17

18          The definition of "forward-looking statement" includes projections of revenues, income,
    earnings, a statement of the plans and objectives of management for future operations, including plans
19
    relating to products or services, a statement of future economic performance, or "any statement of the
20
    assumptions underlying or relating to" the same.  15 U.S.C. § 78u-5(i)(1)(A)-(D).  All the alleged
21
    misstatements fall squarely within this definition.  (*See* ¶¶ 92-94, 100, 101, 108, 109, 117, 120, 124,
22
    125.) *See e.g. Noble Asset Management* 2005 WL 4161977, at *9 ("Projections about the likelihood
23
    of FDA approval are forward-looking statements" because they are predictions of the company's
24
    plans for its product.).  Further, as detailed in the Appendix of Cautionary Statements ("Appendix"),
25
    Nuvelo identified each of the statements as a forward-looking statement.  (Fondo Dec., Exs. A-I;
26
    Appendix 2-6, 8-11.)
27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                    22.                 DEFENDANTS' MOTION TO DISMISS
                                                                     CASE NO. 07-CV-04056-MJJ

### b.     Defendants' Forward Looking Statements Were Accompanied By Appropriate Cautionary Language.

Nuvelo's cautionary statements are clearly sufficient to invoke the protection of the safe harbor's first prong.[7]   All forward-looking statements regarding the future potential success of alfimeprase were accompanied and covered by appropriate "safe harbor" language, in which Nuvelo specifically warned, among other things, that results from "early clinical trials may not be predictive of results in later studies," that "we may suffer significant setbacks in advanced clinical trials, even after promising results in earlier studies," "if our Phase 3 or other clinical trials fail to demonstrate that alfimeprase is safe and effective, it will not receive regulatory approval," prior to the phase III trials Nuvelo "had never conducted a Phase 3 clinical trial, and we may be unable to sucessfully complete" it, that Nuvelo faces competition from possibly superior products, and that "at any stage of clinical trials" Nuvelo could "redesign a trial or discontinue the development of a product," and that even if alfimeprase receives FDA approval it may never be successfully commercialized.  (Fondo Dec., Ex. E, J, R; Appendix 1, 6, 7.)

Recognizing these extensive disclosures, Plaintiffs assert that Nuvelo did not warn about certain specific risks, specifically that: it was possible that the insertion of the catheter could disrupt the blood clot; that the CO trial had to meet a p-value of 0.00125; that off-label drugs were being used to treat PAO; and that there was a target product profile for CO.  (*See, e.g.,* ¶ 135.)  First, the market was aware that these Phase III clinical trials might be unsuccesful.  (Fondo Decl., Ex. L, p. 5.) (Analyst estimating that the PAO and CO Phase III clinicals each only had a 50% chance of approval.)  Second, it is settled law that a company need not have identified the precise factor that leads to a business reversal for its cautionary statements to be sufficient.  H.R. REP. NO. 104-369 at 44 (1995) (Conf. Rep.) ("[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor"); *Harris*, 182 F.3d at 807 (holding that disclosure of the exact factor is not required, "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently

---

[7] If the Court finds that the cautionary statements are inadequate, Plaintiffs would still have to show that Defendants had "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

23.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ

1   on notice of the danger of the investment to make an intelligent decision about it according to her own

2   preferences for risk and reward"); *In re Syntex Corp.*, 95 F.3d at 930  (holding optimistic statements

3   regarding FDA approval were inactionable because "Syntex was making a prediction far in advance,

4   while the drug was still in the testing stage, about an approval decision that lies in the hands of a

5   regulatory body"); *Noble Asset Mgmt.*, 2005 WL 4161977, at *9 (holding that cautionary language

6   warning that the company might not be able to prove the efficacy of their drug or obtain FDA

7   approval was sufficient, the company was not required to warn about the specific risk that caused the

8   FDA to reject its drug application).

9                 **6.      Defendants' Statements Of Optimism Are Non-Actionable**

10          "[G]eneralized, vague and unspecific assertions" of corporate optimism or statements of

11   "mere puffery" are not actionable material misstatements of fact under federal securities laws.   *Glen*

12   *Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003).   Such statements are not

13   actionable because they are "not . . . subject to objective verification," and "reasonable investors do

14   not consider 'soft' statements or loose predictions important in making investment decisions."   *In re*

15   *Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (quotations omitted).   Under

16   settled law, Nuvelo's statements expressing optimism that alfimeprase was effective or the potential

17   success of the clinical trials are not actionable.  (See ¶¶ 92, 108, 124.); *see Nathenson v. Zonagen,*

18   *Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (holding that defendants' statement that "Vasomax was a

19   'fast-acting,' 'improved formulation' for delivering phentolamine" was "nothing more than

20   inactionable 'puffing'"); *Noble Asset Mgmt.*, 2005 WL 4161977 at *11-12 (holding that statements

21   describing phase III trial result as "compelling," "consistent," "impressive," "significant," "strong,"

22   and "positive" was mere puffing); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558, n.

23   2 (S.D.N.Y. 2004) (holding that defendants' "statement regarding FDA approval" was "non

24   actionable opinion or corporate puffery"); *In re Viropharma Inc. Sec. Litig.*, No. CIV.A. 02-1627,

25   2003 WL 1824914 at *6 (E.D. Pa. April 7, 2003) (holding that statements referring to "Pleconaril as

26   'a scientific revolution'" and to "successful clinical trials as a momentous event" were mere puffery).

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA                                   24.                    DEFENDANTS' MOTION TO DISMISS
                                                                       CASE NO. 07-CV-04056-MJJ

### 7.     Plaintiffs Fail To Allege Loss Causation

Loss causation requires "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The alleged misrepresentations, particularly regarding the market size for PAO and the target product profile for CO, even if true, could not have caused the phase III trials to fail to meet their endpoints – the drug's lack of sufficient efficacy as tested did. Therefore, there was no "loss" associated with these alleged misstatements.

### B.     Plaintiffs Fail to State a Claim for Violation of Section 20(a)

"Control person" liability pursuant to Section 20(a) of the Exchange Act requires that a primary violation of Section 10(b) was committed and that each defendant "directly or indirectly" controlled the violator. *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440, n.8 (9th Cir. 1987). Plaintiffs' failure to plead a primary violation of Section 10(b) requires dismissal of this claim. *Id.* Plaintiffs also fail to plead specific facts showing each individual defendant's ability to exercise control over the specific activity on which the primary violation is premised. *Wool*, 818 F.2d at 1440.

### V.     THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

District courts have discretion to deny plaintiffs leave to amend their complaint if amendment would be futile, and courts have rightfully done so on the first motion to dismiss. *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988); *see also In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040-41 (N.D. Cal. 2000); *VeriFone*, 784 F. Supp. at 1485-86. The Court should do so here as well.

### VI.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.


Dated:  December 21, 2007

COOLEY GODWARD KRONISH LLP

_____
Grant P. Fondo
Attorneys for Defendants

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

764447 v11/PA

25.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 07-CV-04056-MJJ