# Exhibit E



# FORM 10-K

## NUVELO INC - NUVO

**Filed: March 15, 2006 (period: December 31, 2005)**

Annual report which provides a comprehensive overview of the company for the past year

## PART I

3
**Item 1.**  Business 3

## PART I

**Item 1.**  Business
**Item 1A.** Risk Factors
**Item 1B.** Unresolved Staff Comments
**Item 2.**  Properties
**Item 3.**  Legal Proceeding
**Item 4.**  Submission of Matters to a Vote of Security Holders

## PART II

**Item 5.**  Market for Registrant s Common Equity and Related Stockholder Matters
**Item 6.**  Selected Consolidated Financial Data
**Item 7.**  Management s Discussion and Analysis of Financial Condition and Results of Operations
**Item 7A.** Qualitative and Quantitative Disclosures About Market Risk
**Item 8.**  Financial Statements and Supplementary Data
**Item 9.**  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
**Item 9A.** Controls and Procedures

## PART III

**Item 10.** Directors and Executive Officers of the Registrant
**Item 11.** Executive Compensation
**Item 12.** Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matt
**Item 13.** Certain Relationships and Related Transactions
**Item 14.** Principal Accountant Fees and Services

## PART IV

**Item 15.** Exhibits and Financial Statement Schedules
SIGNATURES
EXHIBIT INDEX
EX-10.55 (OFFER LETTER DATED SEPTEMBER 7)

EX-10.56 (LICENSE AND COLLABORATION AGREEMENT DATED JANUARY 4)

EX-21.1 (SUBSIDIARIES OF NUVELO)

EX-23.1 (CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM)

EX-31.1 (CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO SECTION 302)

EX-31.2 (CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 302)

EX-32.1 (CERTIFICATION OF CEO AND CFO PURSUANT TO SECTION 906)

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended December 31, 2005**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 0-22873**

# NUVELO, INC.
### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **DELAWARE** | **36-3855489** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **201 Industrial Road, Suite 310, San Carlos, CA** | **94070** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code:**
**650-517-8000**

**Securities registered pursuant to Section 12(b) of the Exchange Act: None**

**Securities registered pursuant to Section 12(g) of the Exchange Act:**
**Common Stock, $.001**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in rule 405 of the Securities Act.  Yes ☐  No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 and Section 15(d) of the Act.  Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 75 days.  Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer (as defined in Rule 12b-2 of the Act).  Large accelerated filer ☐  Accelerated filer ☑  Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☑

The aggregate market value of the common stock held by non-affiliates of the Registrant on June 30, 2005 was $297,399,359, based on the last sale price of the common stock as reported by the Nasdaq Stock Market.*

As of February 28, 2006, the Registrant had 51,656,770 shares of common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Definitive Proxy Statement, which will be filed with the Commission pursuant to Section 14A in connection with the 2006 meeting of stockholders, are incorporated by reference into Part III of this Form 10-K.

---

* Excludes 3,575,900 shares of Common Stock held by directors, officers and stockholders whose beneficial ownership exceeded 5% of the Registrant's Common Stock outstanding. The number of shares owned by stockholders whose beneficial ownership exceeded 5% of the Registrant's Common Stock outstanding was determined based upon information supplied by such

persons and upon Schedules 13D and 13G, if any, filed with the SEC. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the Registrant, that such person is controlled by or under common control with the Registrant, or that such persons are affiliates for any other purpose.

Source: NUVELO INC, 10-K, March 15, 2006

# TABLE OF CONTENTS

PART I

Item 1. Business                                                                                   3

Item 1A. Risk Factors                                                                              3

Item 1B. Unresolved Staff Comments                                                                16

Item 2. Properties                                                                                39

Item 3. Legal Proceeding                                                                          39

Item 4. Submission of Matters to a Vote of Security Holders                                        39

PART II                                                                                           40

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters                      41

Item 6. Selected Consolidated Financial Data                                                       41

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations       42

Item 7A. Qualitative and Quantitative Disclosures About Market Risk                                44

Item 8. Financial Statements and Supplementary Data                                                58

   REPORTS OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM                          60

   CONSOLIDATED BALANCE SHEETS                                                         61

   CONSOLIDATED STATEMENTS OF OPERATIONS                                               63

   CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)                           64

   CONSOLIDATED STATEMENTS OF CASH FLOWS                                               65

   NOTES TO CONSOLIDATED FINANCIAL STATEMENTS                                          66

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure        67

Item 9A. Controls and Procedures                                                                  90

PART III                                                                                          90

Item 10. Directors and Executive Officers of the Registrant                                         92

Item 11. Executive Compensation                                                                    92

Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters  92

Item 13. Certain Relationships and Related Transactions                                            92

Item 14. Principal Accountant Fees and Services                                                    92

PART IV                                                                                            92

Item 15. Exhibits and Financial Statement Schedules                                                93

SIGNATURES                                                                                        93

                                                                                              99

2

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

PART I

## Item 1.    Business

We have included or incorporated by reference into this Annual Report on Form 10-K statements that may constitute "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words including "anticipate", "believe", "intends", "estimates", "expect", "should", "may", "potential", and similar expressions. Such statements are based on our management's current expectations and involve risks and uncertainties. Our actual results and performance could differ materially from those projected in the forward-looking statements as a result of many factors discussed in this Annual Report, including those set forth in this section under the caption "Item 1A. Risk Factors," as well as those under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," and those discussed elsewhere in this Annual Report on Form 10-K.

## Business Overview

We are a biopharmaceutical company dedicated to improving the lives of patients through the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. Our development pipeline includes three acute cardiovascular programs focused on alfimeprase, rNAPc2 and a thrombin inhibiting aptamer. We also have an emerging pre-clinical oncology pipeline.

Our lead cardiovascular development program is for alfimeprase, a novel, direct-acting thrombolytic agent, or blood clot dissolver, which is currently in Phase 3 clinical trials for the treatment of acute peripheral arterial occlusion, or PAO, and for the treatment of catheter occlusion. We also intend to expand this development program by initiating a Phase 2 clinical trial in the second half of 2006 to evaluate the potential of alfimeprase for the treatment of ischemic stroke and another Phase 2 clinical trial in 2007 to evaluate the potential of alfimeprase to treat deep venous thrombosis, or DVT. As provided in the collaboration and license agreement that we entered into in January 2006, we granted Bayer HealthCare AG, or Bayer, the right to commercialize alfimeprase outside the United States, while retaining the right to commercialize alfimeprase in the United States.

Our second cardiovascular development program is for recombinant nematode anticoagulant protein c2, or rNAPc2, an anticoagulant that inhibits the factor VIIa and tissue factor protease complex, which is responsible for initiating the blood clotting process. We recently completed a Phase 2a clinical trial with rNAPc2 in acute coronary syndrome, or ACS, and are currently enrolling patients in a subsequent Phase 2 trial intended to evaluate its potential use as a replacement for heparin, an anticoagulant, in patients with ACS.

Our third cardiovascular development program is in the preclinical stage and is focused on identifying an optimized thrombin inhibiting aptamer for potential use as a rapid-on/rapid-off anticoagulant for patients undergoing acute cardiovascular procedures, such as coronary artery bypass graft, or CABG, surgery.

In addition to these programs, we have an emerging oncology development pipeline. We are progressing a potent gastrointestinal epithelial growth factor, NU206, as a preclinical development candidate for the potential treatment of mucositis, which is a side effect of chemotherapy and radiation therapies received by cancer patients. NU206 is targeted to enter Phase 1 clinical development in the second half of 2006. We are also investigating the potential of rNAPc2 as a cancer therapy based on its apparent role in the cellular signaling of both metastasis and angiogenesis in a variety of cancers.

Finally, we have a drug discovery effort focused on two research programs: the first investigating secreted proteins and the second investigating antibodies against cell surface proteins as potential cancer targets. Through these programs, we plan to further expand our pipeline and create additional partnering and licensing opportunities.

As of December 31, 2005, our cash, cash equivalents and short-term investments totaled $70.3 million. In January 2006, following our entry into the alfimeprase collaboration and license agreement with Bayer, we

3

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

received a $50.0 million up-front cash payment from Bayer, and in February 2006, we raised approximately $111.9 million in a public offering, after deducting underwriters' fees and stock issuance costs of approximately $7.7 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share.

We expect gross operating expenses to increase significantly in 2006, as we advance our alfimeprase Phase 3 clinical trial activity, increase alfimeprase manufacturing expenditures under our agreement with Avecia Ltd. and future agreements with any other drug manufacturers and incur additional general corporate expenses, including those for continued preparations for the planned commercial launch of alfimeprase. This gross operating expense increase will be partially offset by cost-sharing reimbursements from Bayer for 40 percent of alfimeprase-related global development spending. We are currently operating at a loss and do not expect to be profitable, or to generate revenues from product sales, until we have successfully commercialized a product candidate.

## Product Pipeline

The following table summarizes key information about our current product pipeline:



## Products in Development

### Alfimeprase

Our lead product candidate, alfimeprase, is a thrombolytic agent with a novel mechanism of action, for which we obtained worldwide development and commercialization rights from Amgen in October 2004. Alfimeprase is a modified and recombinant version of fibrolase, a naturally occurring enzyme that directly and rapidly degrades fibrin, the protein that provides the structural scaffold of blood clots. Thrombolytics currently on the market, such as Activase (alteplase), are plasminogen activators that work by activating plasminogen to form plasmin, which in turn degrades fibrin. In contrast, alfimeprase directly degrades fibrin, creating the potential for more rapid clot dissolution, or lysis. Alfimeprase is locally delivered at the site of the blood clot and is inactivated quickly by alpha-2 macroglobulin, a naturally occurring protein in the bloodstream. We believe this clearance mechanism limits the systemic activity of alfimeprase and implies that patients may experience fewer of the bleeding side effects associated with plasminogen activators.

4

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Alfimeprase in acute peripheral arterial occlusion*

The lead medical indication we are pursuing for alfimeprase is acute PAO. Acute PAO is a significant cause of morbidity in the United States, with estimates of over 100,000 cases reported annually. Acute PAO occurs when arterial blood flow is blocked to a distant part of the body, usually the leg, by a blood clot. Traditionally, surgical approaches have been used to treat acute PAO. However, thrombolytic agents such as Activase have been used as a less-invasive alternative, even though they have not been approved by the FDA to treat acute PAO. Studies have shown that current thrombolytic therapies can take 24 to 36 hours or more to restore flow to the blocked limb, with five to 16 percent of patients experiencing a major bleed and one to two percent of patients experiencing intracerebral hemorrhage. We believe alfimeprase has the potential to be a more effective agent than existing agents for use in treating acute PAO by reducing treatment time and the potential for bleeding side effects.

We completed our Phase 2 clinical trial in patients with acute PAO in the second quarter of 2004. This trial was an open label, dose-escalation study evaluating the safety and activity of alfimeprase. The trial enrolled 113 patients in multiple centers in the United States, Europe, Russia and other locations. The Phase 2 results indicate that alfimeprase has the potential to offer significant advances in the rapid resolution of a blood clot while minimizing potentially fatal side effects such as intracerebral hemorrhage and other bleeding complications. Analysis of the Phase 2 results showed that alfimeprase has the potential to partially or completely break up blood clots within four hours of initiation of dosing with rates of up to 76 percent and to restore arterial flow with rates of up to 60 percent. Up to 69 percent of study patients were able to avoid open vascular surgical intervention in the 30 days following treatment with alfimeprase. Among the 113 patients enrolled, there were no intracerebral hemorrhages or deaths at 30 days. There were seven major bleeding events reported, none of which was categorized as systemic bleeding events and only one of which was categorized by the investigator as possibly related to alfimeprase. Incidents of transient hypotension were also reported and were dose-related. Events associated with distal embolism were also noted. We do not believe that these events were more significant in number or severity than similar events associated with other therapies delivered by catheter to blood clots.

In April 2005, we commenced the first of two clinical trials in the alfimeprase Phase 3 acute PAO program, known as NAPA, or Novel Arterial Perfusion with Alfimeprase. This program consists of two overlapping trials that will include a total of 600 patients between the two trials. The first trial in this program, NAPA-2, is a randomized, double-blind study comparing 0.3 mg/kg of alfimeprase versus placebo in 300 patients. The trial is being conducted in approximately 100 centers worldwide. The study's primary endpoint is avoidance of open vascular surgery within 30 days of treatment. Open vascular surgery includes procedures such as surgical embolectomy, peripheral arterial bypass graft surgery and amputation, but does not include catheter-based procedures such as percutaneous angioplasty or stenting. A variety of secondary endpoints are also being evaluated, including safety endpoints such as the incidence of bleeding, as well as pharmacoeconomic endpoints such as length of hospital and intensive care unit stay. We expect to complete enrollment in the NAPA-2 trial in the second half of 2006.

The second Phase 3 trial, NAPA-3, is the subject of a special protocol assessment, or SPA, agreement with the U.S. Food and Drug Administration, or FDA, and will essentially replicate the NAPA-2 trial. Under an SPA, the FDA provides guidance on the design of a trial prior to its initiation. We expect to begin enrollment in the NAPA-3 trial in early 2006.

We have been granted fast track designation by the FDA for alfimeprase in acute PAO. Fast track designation can potentially facilitate development and expedite review of biologics license applications, or BLAs. Fast track designation is reserved for new drugs that demonstrate the potential to address an unmet medical need and are intended for treatment of a serious or life-threatening condition. In addition, we have obtained orphan drug status for alfimeprase in the United States and Europe for the treatment of acute PAO, which may provide us with up to seven and ten years of market exclusivity in the United States and Europe, respectively, following market authorization.

5

Table of Contents

*Alfimeprase in catheter occlusion*

Alfimeprase is also in late-stage clinical development for use in catheter occlusion. Catheter occlusion is the obstruction of blood flow through a central venous catheter. It is estimated that about five million catheters are implanted in patients each year in the United States, and approximately 25 percent become occluded. Current treatment for catheter occlusion includes removal and replacement of the catheter, or treatment with Cathflo Activase (alteplase). Based on clinical trial evidence of alfimeprase's activity, we believe alfimeprase has the potential to restore flow to occluded catheters more rapidly than Cathflo Activase.

In the third quarter of 2004, we completed patient enrollment in a Phase 2 multi-center, double-blind, randomized study in 55 patients with occluded central venous catheters comparing three doses (0.3 mg, 1.0 mg and 3.0 mg) of alfimeprase against the approved dose of Cathflo Activase (2.0 mg). The alfimeprase 3.0 mg dose produced cumulative flow rates of 40 percent at five minutes after the first dose, 50 percent at 15 minutes after the first dose, 60 percent at 30 minutes and 120 minutes after the first dose, and 80 percent at 120 minutes after the second dose. This is compared to Cathflo Activase, which produced flow rates of zero percent at five minutes after the first dose, zero percent at 15 minutes after the first dose, 23 percent at 30 minutes after the first dose, 46 percent at 120 minutes after the first dose, and 62 percent at 120 minutes after the second dose. No major hemorrhagic events were reported in any treated patients and only one patient had a catheter-related infection.

In September 2005, we commenced the first of two multi-national trials in the alfimeprase Phase 3 catheter occlusion program, known as SONOMA, or Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase. The first trial is an efficacy study called SONOMA-2, which is a randomized, double-blind trial, comparing 3.0 mg of alfimeprase with placebo in 300 patients with occluded central venous catheters. Two-thirds of the patients will receive alfimeprase and the remainder will receive placebo. The study's primary endpoint is restoration of function to occluded central venous catheters at 15 minutes. We expect to complete enrollment in the SONOMA-2 trial in the second half of 2006.

The second study, known as SONOMA-3, is an open label, single-arm trial evaluating alfimeprase in 800 patients. This study's primary endpoint is safety, although we will be evaluating efficacy in these patients as well. We began enrolling patients in this trial in February 2006.

*Alfimeprase in stroke*

In January 2006, we announced our intention to expand the alfimeprase development program and initiate a Phase 2 clinical trial in the second half of 2006 to study the potential of alfimeprase to treat patients with ischemic stroke. Each year, approximately 650,000 patients suffering from stroke are admitted into hospitals in the United States. Some of these patients have hemorrhagic strokes, which are characterized by the rupture of blood vessels in the brain and usually result in death. The large majority of stroke patients suffer from ischemic strokes, which are characterized by blood clots that prevent the flow of blood to the brain, thereby depriving the brain of oxygen. Depending on the location and severity of the blood clot, the most common consequence of ischemic stroke is loss of function, including paralysis.

Currently, the therapeutic options for patients with ischemic stroke are limited. Activase has been approved in the United States for treatment of ischemic stroke. Its use has been limited, however, by the requirement that patients receive it within three hours of onset of the stroke and by the increased bleeding risk associated with its use. We believe that alfimeprase has the potential to expand the treatment window for ischemic strokes due to its rapid and direct mechanism of action and its potential safety profile.

*Alfimeprase in deep venous thrombosis*

In January 2006, we also announced our intention to initiate a Phase 2 clinical program in 2007 to evaluate the potential of alfimeprase to treat patients suffering from DVT. Each year, approximately 300,000 patients are diagnosed with DVT in the United States. DVT is characterized by blood clots in the venous system of peripheral

6

Table of Contents

limbs, typically the legs. The consequences of DVT include pain and swelling of the affected limb and, in relatively rare circumstances, pulmonary embolism which can result in death.

Currently, very few DVT patients receive thrombolytics. DVT is rarely a life-threatening condition and, therefore, doctors are typically reluctant to administer thrombolytics, which expose DVT patients to significant bleeding risk. As a result, DVT patients generally receive anticoagulants intended to prevent further propagation of the blood clot and are told to limit activity until the blood clot resolves, often over a period of months. We believe alfimeprase has the potential to treat this patient population with a reduced bleeding risk because of its unique mechanism of action and its potential safety profile.

## rNAPc2

Our second drug candidate, rNAPc2, is a recombinant version of a naturally occurring protein that has anticoagulant properties. Specifically, rNAPc2 has been shown to block the factor VIIa and tissue factor protease complex, which is responsible for the initiation of the process leading to blood clot formation and has also been shown to play a role in both metastasis, or the secondary growth of cancer cells, and angiogenesis, or the formation of new blood vessels, as they relate to tumor growth. Compared to other commercially available anticoagulants, which all exert their effects at later stages of the blood coagulation cascade, rNAPc2 is designed to block the first step in the cascade. By blocking the coagulation cascade before amplification of the coagulation process, rNAPc2 could prove to be more effective in treating patients with conditions such as ACS, or as a prophylactic against clot formation in conditions such as DVT. In addition, the novel mechanism of action of rNAPc2 offers the potential to have therapeutic utility in cancer.

ACS occurs when an atherosclerotic plaque ruptures in a coronary artery, which triggers the coagulation cascade and results in the formation of a blood clot. The clot blocks the flow of blood to the heart muscle, depriving it of oxygen and causing chest pain and, if severe, permanent heart muscle death. In the United States, ACS accounts for approximately 1.4 million hospital admissions annually. Patients with ACS are traditionally given aspirin and heparin, among other agents, to stabilize their medical condition. Recent guidelines also recommend the addition of the antiplatelet agent Plavix (clopidogrel) to the standard of care. However, based upon the significant number of patients with ACS who continue to experience poor outcomes, such as recurrent angina, myocardial infarction or death, we believe there is a need for improved antithrombotic therapies.

rNAPc2, given alone or with standard therapy, may reduce the risk of subsequent heart attack or death in patients suffering from ACS. Unlike aspirin, heparin, and other current antithrombotic agents, which all exert their effects at later stages of the blood coagulation cascade, rNAPc2 blocks the first step in the clotting cascade. A medical regimen that includes rNAPc2 could, therefore, enable a multi-pronged attack at several points along the blood coagulation process. Alternatively, by stopping coagulation at the outset, rNAPc2 could also prove effective as a stand-alone therapy.

We licensed the worldwide rights for all indications of rNAPc2 and all of the rNAPc molecules owned by Dendreon Corporation in February 2004. The United States government may claim a non-exclusive right to use rNAPc2 with respect to the treatment of hemorrhagic fever. To date, rNAPc2 has been shown to be well tolerated in over 650 patients and healthy volunteers in several Phase 1 and 2 clinical studies.

In May 2005, we completed a Phase 2a double-blind, placebo-controlled clinical trial that was conducted with the TIMI Study Group, showing that rNAPc2 has an acceptable safety profile and is well tolerated in doses up to ten micrograms/kg in patients being treated for ACS, including unstable angina and non-ST segment elevation myocardial infarction. Results showed that treatment with rNAPc2, in addition to standard antithrombotic therapies in patients with ACS, resulted in a dose-related inhibition of thrombin generation without an increase in clinically significant bleeding. The difference in TIMI major or minor bleed rate was not statistically significant between the two treatment groups (4.3 percent in patients treated with rNAPc2 versus 2.5 percent in those treated with placebo). In addition, rNAPc2 suppressed prothrombin fragments one and two and

7

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

prolonged the prothrombin time, both in a dose-related fashion. Additional data is now being generated from this Phase 2a trial based on surrogate endpoints, and we expect to present efficacy data sometime in 2006.

Based on the encouraging safety results from the Phase 2a trial, we initiated a Phase 2 heparin-replacement trial with rNAPc2 in August 2005. The Phase 2 study, which is also being conducted with the TIMI Study Group, is an open label study that is evaluating the efficacy and safety of rNAPc2 by reducing the dose of, and ultimately replacing, unfractionated heparin in patients being treated for ACS. The study will include 50 to 100 patients and is being conducted in approximately 25 centers across the United States and Canada. This trial is expected to complete enrollment in the first half of 2006.

In addition, we are planning to investigate the potential of rNAPc2 as a cancer therapy. The factor VIIa and tissue factor protease complex, which rNAPc2 inhibits, has been shown to play a role in the cellular signaling of both metastasis and angiogenesis in a variety of cancers. As an inhibitor of these processes, which are critical to the progression of a number of cancer types, rNAPc2 may have potential as a therapy for these cancers.

**Thrombin inhibiting aptamer**

We continue to pursue the development of a thrombin inhibiting aptamer under a collaboration agreement entered into with Archemix Corporation, a privately held biotechnology company located in Cambridge, Massachusetts, in January 2004. In September 2005, we concluded a Phase 1 clinical study for the first target molecule from this program, ARC183. This study evaluated the safety, tolerability, anticoagulation activity and titratability of ARC183 for potential use in acute cardiovascular settings such as CABG surgery. Preliminary results from the trial showed that administration of ARC183 resulted in a rapid onset of anticoagulation and demonstrated stable, dose-related anticoagulation activity and rapid self-reversal of drug effects after administration of the drug infusion ceased. However, the amount of drug needed to achieve the desired anticoagulation for use in CABG surgery resulted in a sub-optimal dosing profile. For that reason, we decided jointly with Archemix not to pursue further development of ARC183 and instead are pursuing optimized thrombin inhibiting aptamers.

**NU206**

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin Brewery Company, Ltd., for the development and commercialization of NU206. Under this collaboration, we expect to initiate a Phase 1 clinical program with NU206 in the second half of 2006. We plan to initially pursue NU206 as a supportive cancer therapy, specifically to treat radiation and chemotherapy-induced mucositis in the gastrointestinal tract. Research to date indicates that NU206 acts as a highly specific and potent stimulator of gastrointestinal epithelial cells. In addition, NU206 appears to be highly active in multiple animal models of gastrointestinal disease that could support clinical testing in additional indications.

**Research programs**

In addition to our clinical and development stage drug candidates, we have two ongoing drug discovery programs focused on the identification of novel human genes that encode proteins with therapeutic potential: the first program is focused on secreted proteins and the second on cancer antibody targets. Over the long-term, we intend to develop additional product opportunities from our ongoing discovery efforts. In addition to the development of internal therapeutic candidates, we intend to leverage these discoveries to create revenue-generating licensing and partnering arrangements.

The secreted protein program included a research program with Kirin and includes our internal discovery program. Our 2001 collaboration agreement with Kirin for the research and development of secreted proteins expired December 31, 2005, in accordance with its terms. We and Kirin have already advanced several secreted protein candidates to more extensive studies to better define their therapeutic utility based upon early findings in

8

Table of Contents

initial mouse models, and are currently discussing the possibility of engaging in additional research and development with respect to certain secreted proteins to be selected by us and Kirin from the pool of candidates that were the subject of the 2001 collaboration. Within our internal secreted protein discovery program, we have developed a fast and efficient method of expressing human secreted proteins in mice. This program could significantly bolster our ability to identify which secreted proteins within our patent estate have the greatest potential for therapeutic use.

The cancer antibody program is focused on screening our proprietary gene sequence collection to identify proteins located on the surface of tumor cells that could be targeted by therapeutic monoclonal antibodies.

## Our Strategy

We are focused on building a successful biopharmaceutical business and committed to creating a product-focused company that leverages our drug discovery and development expertise. Key elements of our strategy are to:

### *Successfully develop and commercialize our lead drug candidate, alfimeprase*

We are seeking to develop and commercialize our lead drug candidate, alfimeprase, for the treatment of acute PAO, catheter occlusion, and a variety of other thrombotic conditions, including stroke and DVT. As part of this strategy, in 2005 we initiated two pivotal Phase 3 clinical programs in acute PAO and in catheter occlusion. We have exclusive rights to this compound in the United States and in 2006 we entered into a significant development and collaboration agreement with Bayer for the development and commercialization of alfimeprase outside the United States.

### *Commercialize our hospital-based products in the United States*

Rather than license other companies to commercialize our products in the United States, we plan to sell them ourselves through our own hospital-based sales force. We believe that the resources required to develop a sales and marketing organization to sell products to hospitals is manageable for a company of our size, and will allow us to capture more value from potential commercialization successes. In 2005, we began to hire a marketing organization, which we plan to expand in 2006. Our marketing organization is currently performing market research and planning for the anticipated launch of alfimeprase.

### *Leverage our expertise in cardiovascular disease and oncology to advance our clinical development programs*

We are primarily focused on the development of acute, hospital-based, cardiovascular drug candidates and oncology drug candidates. We believe this portfolio leverages our expertise in cardiovascular and oncology drug development, enabling us to pursue a more rapid path toward drug commercialization.

### *Build a diversified pipeline of product candidates*

We are pursuing several drug development candidates in various stages of clinical and preclinical development. In addition, we seek to identify drug development candidates that have the potential to receive regulatory approval to treat a number of different indications, thereby further diversifying our risk by providing each drug candidate with a number of potential commercialization paths. We believe this strategy reduces our exposure to the impact of any single product failure, maximizes our potential returns from successful compounds, and increases our flexibility to eliminate programs we deem less promising. By broadening our portfolio across indications and products, we intend to increase the probability of clinical and commercial success. In addition, we focus on molecules that we believe have a greater chance of success due to the predictability of preclinical models used in their development.

9

Table of Contents

*Opportunistically seek to license or acquire complementary products*

We intend to supplement our internal drug discovery efforts through the acquisition of products that complement our development strategy. We continue to identify, evaluate and pursue the acquisition or licensing of strategically valuable product opportunities.

**Corporate Information**

We were incorporated as "Hyseq, Inc." in Illinois in 1992 and reincorporated in Nevada in 1993. On January 31, 2003, we merged with Variagenics, Inc., a publicly traded Delaware corporation based in Massachusetts, and, in connection with the merger, changed our name to "Nuvelo, Inc." On March 25, 2004, we reincorporated from Nevada to Delaware. Our principal executive offices are located at 201 Industrial Road, Suite 310, San Carlos, California 94070.

We file our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 electronically with the Securities and Exchange Commission. The public may read or copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that site is http://www.sec.gov.

You may obtain a free copy of our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports on the day of filing with the SEC on our website, on the World Wide Web at http://www.nuvelo.com or by contacting the Investor Relations Department at our corporate office by calling (650) 517-8000 or sending an e-mail message to ir@nuvelo.com. Information found on our website is not incorporated by reference into this report.

**Research and Development Collaborations**

Expenditures for research and development were $57.8 million, $40.0 million and $30.0 million in 2005, 2004 and 2003, respectively. Our significant research and development collaborations are as follows:

*Bayer*

In January 2006, we entered into a license and collaboration agreement with Bayer for the global development and commercialization of alfimeprase. Under this agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay us tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent. We retain all commercialization rights and profits from alfimeprase sales in the United States. We are eligible to receive up to $385.0 million in milestone payments from Bayer, including a $50.0 million up-front cash payment that we received in January 2006, up to $165.0 million in development milestones and $170.0 million in sales and commercialization milestones over the course of the agreement. We expect to receive a $10.0 million development milestone fee in the second half of 2006 upon the initiation of a phase 2 trial for alfimeprase in ischemic stroke. In addition, Bayer will be responsible for 40 percent of the costs for global development programs. We will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. Each party will bear its own expenses for any country-specific alfimeprase clinical trials it conducts, where the country-specific clinical trials are not part of the agreed global development program.

*Amgen*

In October 2004, we obtained worldwide rights to develop and commercialize alfimeprase from Amgen, in exchange for the future payment to Amgen of previously negotiated milestone payments and royalties. In

10

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

accordance with the terms of the license agreement, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to our designated manufacturer, Avecia. As a result of dosing the first patient in the first Phase 3 clinical trial for alfimeprase in April 2005, we paid a $5.0 million milestone fee to Amgen in May 2005, which was charged to expense. Future milestone payments under the license agreement could total as much as $35.0 million, although we currently cannot predict if or when any of these additional milestones will be achieved. Under our agreement with Bayer, we will continue to bear sole responsibility for these milestone payments and royalties owed to Amgen.

### Dendreon

We have obtained exclusive worldwide rights to all indications of rNAPc2 and all other rNAPc molecules owned by Dendreon Corporation, as a result of a licensing agreement entered into with them in February 2004. Under the terms of the agreement, we paid Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock), and incurred $5.6 million in expenses for this and related development costs in 2004 and $1.5 million for related development costs in 2005. Future milestone payments to Dendreon could reach as much as $23.5 million if all development and commercialization milestones are achieved. A $2.0 million milestone for dosing of the first patient in a Phase 3 clinical trial may be achieved within the next 12 months, although we currently cannot predict if or when this or any other milestones will be achieved. If rNAPc2 is commercialized, we will also be responsible for paying future royalties to Dendreon depending on sales of rNAPc2.

### Archemix

We continue to pursue the development of a thrombin inhibiting aptamer under a collaboration agreement entered into with Archemix Corporation, a privately held biotechnology company located in Cambridge, Massachusetts, in January 2004. In accordance with the terms of the agreement, we paid Archemix an upfront fee of $3.0 million and paid the first $4.0 million of costs associated with development. We and Archemix will equally share all development and commercialization costs in excess of $4.0 million. We incurred $7.7 million in expenses for the upfront fee and related development costs in 2004 and $2.6 million for related development costs in 2005. Archemix is initially responsible for leading development and for all clinical development activities through the dosing of the first patient in a Phase 2 study. Thereafter, we and Archemix will agree on leadership of clinical development and commercialization activities. We are required to pay Archemix total development milestone payments of up to $11.0 million, consisting of $10.0 million upon dosing of the first patient in a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Archemix and us for IND-enabling studies. The milestone for designation of a backup compound may be achieved within the next 12 months, although we currently cannot predict if or when this or the $10.0 million milestone will be achieved.

### Pharmaceutical Division of Kirin Brewery Company, Ltd.

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin Brewery Company, Ltd., for the development and commercialization of NU206. Under this agreement, we received a $2.0 million upfront cash payment from Kirin in April 2005, and we will lead worldwide development, manufacturing and commercialization of the compound. All operating expenses and profits related to the development and commercialization of NU206 will be shared 60 percent by us and 40 percent by Kirin. If this agreement is terminated, or Kirin or we elect under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit-sharing structure to a royalty-based structure. We have recorded expenses of $2.7 million in 2005 in relation to this collaboration.

Our 2001 collaboration agreement with Kirin for the research and development of secreted proteins expired December 31, 2005, in accordance with its terms. We and Kirin are currently discussing the possibility of

11

Table of Contents

engaging in additional research and development with respect to certain secreted proteins to be selected by us and Kirin from the pool of candidates that were the subject of the 2001 collaboration. We recorded expenses of $0.3 million in 2005, $3.0 million in 2004, and $0.2 million in 2003, in relation to this collaboration.

### Manufacturing

In June 2005, we entered into a development and validation agreement with Avecia Limited, a United Kingdom-based company, for the scaled-up manufacturing process of alfimeprase. In accordance with the terms of this new agreement, Avecia will conduct process development and validation work for the manufacture of alfimeprase drug substance, in accordance with FDA regulations. We are to pay Avecia fees totaling £12.9 million for completion of this work, payable upon completion by Avecia of pre-negotiated milestones, including £2.9 million as a result of an amendment to the work program in December 2005 to provide for additional process development and validation work. The milestone fees paid to date have been recorded as either research and development expenses in the income statement or clinical trial supplies in the balance sheet, depending on the nature of the expense. We are also paying certain related fees and expenses including the cost of supplies, materials, specified subcontracted work and equipment. The agreement does not cover the commercial manufacture of alfimeprase drug substance, but we and Avecia have agreed to negotiate in good faith towards the completion of a commercial supply agreement once Avecia has commenced the validation campaign. The development and validation agreement remains in force until the completion of the work contemplated under it, but may be terminated early by Avecia if we breach the agreement, and by us for any reason, subject in some cases to cancellation fees and penalties.

In accordance with the terms of the license and collaboration agreement with Bayer, we will supply alfimeprase to Bayer for use in global development of alfimeprase without charging Bayer separately for those supplies, but will be entitled to include the costs of manufacturing these supplies in the development expenses shared by the two parties. In addition, we and Bayer have agreed to use diligent efforts to negotiate and complete a manufacturing agreement within 6 months from entering into the license and collaboration agreement, pursuant to which Nuvelo will sell alfimeprase to Bayer for use in any country-specific trials conducted by Bayer and for commercial sale by Bayer in any countries outside the United States in which alfimeprase is approved for sale.

We rely on Avecia as a sole-source manufacturer of alfimeprase drug substance, and currently do not have a long-term supply agreement for the commercial-scale manufacture of this drug substance or for the manufacture of alfimeprase final drug product. If Avecia and a final drug product manufacturer are unable to produce alfimeprase in the quantities and with the quality required, we may incur significant additional expenses, and efforts to complete clinical trials and obtain approval to market alfimeprase could be significantly delayed. Additionally, we do not have long-term supply agreements in place for the manufacture of rNAPc2 or NU206.

### Patents and Trade Secrets

We own or have rights in a number of patents and patent applications relating to each of our clinical candidate molecules, and we also own or have acquired rights in many of our pre-clinical molecules and technologies. The table below shows the actual or estimated year that the primary patent for each of our clinical candidate molecules expires:

| Clinical Molecule | Territory | Anticipated Expiration |
|---|---|---|
| Alfimeprase | U.S. | 2019 |
| Alfimeprase | Europe | 2020 |
| rNAPc2 | U.S. | 2016 |
| rNAPc2 | Europe | 2015 |

12

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

In some cases, certain of the U.S. patents may be entitled to an extension of their term and certain European patents may be entitled to supplemental protection in one or more countries in Europe. The length of any such extension, if an extension is granted, will vary by country.

We cannot ensure that any of the patents that we own or have rights in will provide sufficient legal protection for the molecules or processes that such patents cover, or any competitive advantage. Any of our granted patents could be challenged, and held unenforceable or invalid in legal proceedings, or could be infringed or circumvented by others. Further, it is possible that others could obtain patent protection for molecules, processes and the like that are competitive with our potential products. In addition, other patent holders could assert their patents against us, claiming that such patents prevent us from marketing our products. Upon expiration of each of the relevant patents, other entities could enter the market with competitive products and/or processes in each country where a patent has expired.

We place a high value on our trade secrets. To protect these trade secrets, we typically require employees to enter in to a confidentiality agreement upon commencing employment. In addition, we generally require our consultants, licensing and collaboration partners, and scientific advisors to enter into confidentiality agreements. There can be no assurance, however, that these confidentiality agreements will be honored or that we can effectively protect our rights to such unpatented trade secrets. Moreover, there can be no assurance that others will not independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets.

**Competition**

The biopharmaceutical industry is intensely competitive and is accentuated by the rapid pace of technological development. We expect to face increased competition in the future as new companies enter our markets. Research and discoveries by others may result in breakthroughs that render our potential products obsolete even before they begin to generate any revenue. Our competitors include major pharmaceutical, medical device and biotechnology firms, many of which have substantially greater research and product development capabilities and financial, scientific, marketing and human resources than we have. Our lead product candidate alfimeprase, if approved, will face competition in the catheter occlusion indication from alteplase, an approved Genentech, Inc. product, and will potentially face competition in the acute PAO indication from product candidates being developed and/or marketed by PDL BioPharma, Inc. and Genentech.

Our competitors may obtain patents and regulatory approvals for their competing products more rapidly than we, or our collaboration partners, or develop products that are more effective than those developed by us, or our collaboration partners. All of our products will face competition from companies developing similar products as well as from companies developing other forms of treatment for the same conditions.

Many of the companies developing competing products have significantly greater financial resources than we have. Many such companies also have greater expertise than we have, and may have greater expertise than our collaboration partners have, in discovery, research and development, manufacturing, pre-clinical and clinical testing, obtaining regulatory approvals and marketing. Other smaller companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These companies and institutions compete with us in recruiting and retaining qualified scientific and management personnel as well as in acquiring technologies complementary to our programs.

We will face competition with respect to product efficacy and safety, the timing and scope of regulatory approvals, availability of resources, reimbursement coverage, and price and patent position, including the potentially dominant patent positions of others. There can be no assurance that research and development by others will not render the products that we may develop obsolete or uneconomical, or result in treatments or cures superior to any therapy developed by us or that any therapy we develop will be preferred to any existing or newly-developed alternative products.

13

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents
**Government Regulation**

Regulation by governmental authorities in the United States and most foreign countries will be a significant factor in manufacturing and marketing our potential products and in our ongoing research and product development activities. Virtually all of our products and those of our partners will require regulatory approval by governmental agencies prior to commercialization. In particular, human therapeutic products are subject to rigorous pre-clinical and clinical testing and other approval requirements by the U.S. Food and Drug Administration, or FDA, and comparable agencies in foreign countries.

Pre-clinical studies are generally conducted in the laboratory to evaluate the potential efficacy and safety of a therapeutic product. The results of these studies are submitted to the FDA as part of an Investigational New Drug application, or IND, which must be reviewed by FDA personnel before clinical testing can begin. Typically, clinical evaluation involves three sequential phases, which may overlap. During Phase 1, clinical trials are conducted with a relatively small number of subjects to determine the early safety profile of a drug, as well as the pattern of drug distribution and drug metabolism. In Phase 2, trials are conducted with groups of patients afflicted by a specific target disease to determine preliminary efficacy, optimal dosages, and dosage tolerance and to gather additional safety data. In Phase 3, larger-scale, multi-center trials are conducted with patients afflicted with a specific target disease to provide data for the statistical proof of efficacy and safety as required by the FDA and foreign regulatory agencies. The FDA, the clinical trial sponsor or the investigator may suspend clinical trials at any time if they believe that clinical subjects are being exposed to an unacceptable health risk.

The results of pre-clinical and clinical testing are submitted to the FDA in the form of a Biologic License Application, or BLA, for biological products such as those we currently have in research and development programs. In responding to a BLA, the FDA may grant marketing approval, request additional information, or deny the application if the FDA determines that the application does not satisfy its regulatory approval criteria. Product approvals may subsequently be withdrawn if compliance with regulatory standards is not maintained or if problems are identified after the product reaches the market. The FDA may require testing and surveillance programs to monitor the effect of a new product and may prevent or limit future marketing of the product based on the results of these post-marketing programs.

Currently one of our product candidates, alfimeprase, qualifies as an orphan drug for the treatment of acute peripheral arterial occlusion in the United States and the European Union. Under the Orphan Drug Act in the United States and the Orphan Drug Regulation in the European Union, incentives are provided to manufacturers to undertake development and marketing of products to treat relatively rare diseases or those diseases that affect fewer than 200,000 persons annually in the United States or not more than 5 in 10,000 persons annually in the European Union. A drug that receives orphan drug designation by the FDA in the United States or by the European Medicines Evaluation Agency, or EMEA, in the European Union and is the first product to receive marketing approval for its product claim is entitled to various advantages, including an exclusive marketing period of seven years in the United States and ten years in Europe for that product claim. However, any drug that is considered by the FDA or the EMEA to be different from or clinically superior to a particular orphan drug, including any orphan drug of ours that has been so designated by the FDA or EMEA, will not be precluded from sale in the United States or Europe during the seven-year and ten year exclusive marketing period, respectively.

Whether or not FDA approval has been obtained, approval of a product by comparable foreign regulatory authorities is necessary prior to the commencement of marketing of a product in those countries. The approval procedures vary among countries and can involve additional testing. The time required to obtain approval may differ from that required for FDA approval. Although there are some centralized procedures for filings in the European Union countries, in general each country has its own procedures and requirements.

Even if regulatory approval for a product is obtained, the product and the facilities manufacturing the product are subject to continued review and periodic inspection. Each drug-manufacturing establishment in the United States must be registered with the FDA. Domestic and foreign manufacturing establishments are subject to inspections by the FDA and must comply with the FDA's cGMP regulations, as well as regulatory agencies in

14

Table of Contents

other countries if products are sold outside the United States. The FDA stringently applies regulatory standards for manufacturing drugs, biologics, and medical devices. The FDA's cGMP regulations require that drugs and medical devices be manufactured and records be maintained in a prescribed manner with respect to manufacturing, testing and control activities.

Our policy is to conduct research activities in compliance with the National Institutes of Health Guidelines for Research Involving Recombinant DNA Molecules. We also are subject to various federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals and the use and disposal of hazardous or potentially hazardous substances, including radioactive compounds and infectious disease agents, used in connection with our work. The extent and character of governmental regulation that might result from future legislation or administrative action cannot be accurately predicted.

**Human Resources**

As of December 31, 2005, we had 103 full-time equivalent employees, 46 of whom hold Ph.D., M.D., J.D., or other advanced degrees. Approximately 75 of these employees are engaged in research and development activities, and approximately 28 are engaged in finance, business development, commercial operations and administration. None of our employees is represented by a collective bargaining agreement, nor have we experienced work stoppages. We believe that relations with our employees are good.

15

Table of Contents

Item 1A.    *Risk Factors*

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. The following discussion highlights some of these risks.

## RISKS RELATED TO OUR BUSINESS

**Our near-term success is dependent on the success of our lead product candidate, alfimeprase, and we cannot be certain that it will receive regulatory approval or be successfully commercialized.**

Alfimeprase is currently being evaluated in Phase 3 clinical trials for the treatment of each of acute PAO and catheter occlusion and will require the successful completion of these or other planned Phase 3 clinical trials before we are able to submit a biologics license application, or BLA, to the FDA for approval. If our Phase 3 or other clinical trials fail to demonstrate that alfimeprase is safe and effective, it will not receive regulatory approval. Even if alfimeprase receives FDA approval, it may never be successfully commercialized. We may also have inadequate financial or other resources to pursue this product candidate through the clinical trial process or through commercialization. In addition, prior to initiating our current Phase 3 trials for alfimeprase, we had never conducted a Phase 3 clinical trial, and we may be unable to successfully complete clinical trials involving the number of clinical sites and patients as planned for our alfimeprase Phase 3 clinical trials. If we are unable to successfully commercialize or obtain regulatory approval for alfimeprase, we may not be able to generate revenue, become profitable or continue our operations. One of our Phase 3 trials of alfimeprase, NAPA-3, is the subject of a special protocol assessment agreement with the FDA. Under this agreement, the FDA provides guidance on the design of a trial prior to its initiation. We have also been granted fast track designation by the FDA for alfimeprase in acute PAO. The special protocol assessment agreement and the fast track designation do not offer any assurance that alfimeprase will receive FDA approval, and the FDA is in no way constrained by the agreement or the designation in its ability to deny approval for alfimeprase.

**Development of our other products will take years, and our products require regulatory approval before they can be sold.**

We currently have two clinical stage drug candidates. All of our other potential products currently are in research or pre-clinical development, and revenues from the sales of any products may not occur for several years, if at all. We cannot be certain that any of our products will be demonstrated to be safe and effective or that we will obtain regulatory approvals for any indication. We cannot predict whether we will be able to develop and commercialize any of our drug candidates successfully. If we are unable to obtain regulatory approval and successfully commercialize our potential products, our business, results of operations and financial condition will be affected in a materially adverse manner.

**Our clinical trials may not yield results that will enable us to obtain regulatory approval for our products.**

We, and our collaborators, will only receive regulatory approval for a drug candidate if we can demonstrate in carefully designed and conducted clinical trials that the drug candidate is safe and effective. We do not know whether our current or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or will result in marketable products. Clinical trials are lengthy, complex and expensive processes with uncertain results. It will take us several years to complete our testing, and failure can occur at any stage of testing. To date, we have not successfully completed any Phase 3 clinical trials, and we have not completed all planned pre-clinical and Phase 1 clinical trials for each of our product candidates. The results we obtain in pre-clinical testing and early clinical trials may not be predictive of results that are obtained in later studies. We may suffer significant setbacks in advanced clinical trials, even after promising results in earlier studies. Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue development of one or more of our drug candidates. If we fail to adequately demonstrate the safety and efficacy of our products under development, we will not be able to obtain the required regulatory approvals to commercialize our drug candidates, and our business, results of operations and financial condition will be materially adversely affected.

16

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Clinical trials are subject to continuing oversight by governmental regulatory authorities and institutional review boards, or IRBs, and must meet the requirements of these authorities in the United States and in foreign countries, including those for informed consent and good clinical practices. We may not be able to comply with these requirements and the FDA, a similar foreign authority, an IRB, or we may suspend or terminate clinical trials at any time.

Administering our drug candidates to humans may produce undesirable side effects. These side effects could interrupt, delay or halt clinical trials of our drug candidates and could result in the FDA or other regulatory authorities denying approval of our drug candidates for any or all targeted indications.

We rely on third parties, including contract research organizations and outside consultants, to assist us in managing and monitoring clinical trials. Our reliance on these third parties may result in delays in completing, or in failing to complete, these trials if they fail to perform with the speed and competency we expect.

If clinical trials for a drug candidate are unsuccessful, we will be unable to commercialize the drug candidate. If one or more of our clinical trials are delayed, we will be unable to meet our anticipated development or commercialization timelines. Either circumstance could cause the market price of our common stock to decline.

**If we encounter difficulties enrolling patients in our clinical trials, our trials could be delayed or otherwise adversely affected.**

Clinical trials for our drug candidates require that we identify and enroll a large number of patients with the disorder or condition under investigation. We, or our collaborators, may not be able to enroll a sufficient number of patients to complete our clinical trials in a timely manner.

Patient enrollment is affected by factors including:

- design of the protocol;

- the size of the patient population;

- eligibility criteria for the study in question;

- perceived risks and benefits of the drug under study;

- availability of competing therapies;

- efforts to facilitate timely enrollment in clinical trials;

- the success of our personnel in making the arrangements with potential clinical trial sites necessary for those sites to begin enrolling patients;

- patient referral practices of physicians; and

- availability of clinical trial sites.

If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay or terminate ongoing or planned clinical trials, either of which would have a negative effect on our business. Delays in enrolling patients in our clinical trials would also adversely affect our ability to generate product, milestone and royalty revenues and could impose significant additional costs on us or on our collaborators.

**We face heavy government regulation, and FDA and international regulatory approval of our products is uncertain.**

The research, testing, manufacturing and marketing of drug products such as those proposed to be developed by us or our collaboration partners are subject to extensive regulation by federal, state and local governmental

17

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

authorities, including the FDA, and comparable agencies in other countries. To obtain regulatory approval of a drug product, we or our collaboration partners must demonstrate to the satisfaction of the applicable regulatory agency, among other things, that the product is safe and effective for its intended uses. In addition, we must show that the manufacturing facilities used to produce the products are in compliance with current Good Manufacturing Practices, or cGMP, regulations, and that the process for manufacturing the product has been validated in accordance with the requirements of the FDA and comparable agencies in other countries.

The process of obtaining FDA and other required regulatory approvals and clearances typically takes several years and will require us to expend substantial capital and resources. Despite the time and expense expended, regulatory approval is never guaranteed. The number of pre-clinical and clinical tests that will be required for FDA and international regulatory approval varies depending on the drug candidate, the disease or condition that the drug candidate is in development for, and the regulations applicable to that particular drug candidate. The FDA or comparable international regulatory authorities can delay, limit or deny approval of a drug candidate for many reasons, including:

- a drug candidate may not be safe or effective;

- the FDA or comparable international regulatory authorities may interpret data from pre-clinical and clinical testing in different ways than we and our collaboration partners interpret them;

- the FDA or comparable international regulatory authorities may not approve our manufacturing processes or facilities or the processes or facilities of our collaboration partners; or

- the FDA or comparable international regulatory officials may change their approval polices or adopt new regulations.

In addition, in order to market any products outside of the United States, we and our collaborators must establish and comply with numerous and varying regulatory requirements of other jurisdictions, including the European Medicines Evaluation Agency, or EMEA, regarding safety and efficacy. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods. The time required to obtain approval in other countries differs from that required to obtain FDA approval. The regulatory approval process in other countries can include all of the risks detailed above regarding FDA approval in the United States as well as other risks. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. Failure to obtain regulatory approval in other countries or any delay or setback in obtaining such approval could have the same adverse effects detailed above regarding FDA approval in the United States.

If and when our products do obtain such approval or clearances, the marketing, distribution and manufacture of such products would remain subject to extensive ongoing regulatory requirements. Failure to comply with applicable regulatory requirements could result in:

- warning letters;

- fines;

- civil penalties;

- injunctions;

- recall or seizure of products;

- total or partial suspension of production;

- refusal of the government to grant approvals; or

- withdrawal of approvals and criminal prosecution.

18

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Any delay or failure by us, or our collaboration partners, to obtain regulatory approvals for our product candidates:

- would adversely affect our ability to generate product, milestone and royalty revenues;

- could impose significant additional costs on us or our collaboration partners;

- could diminish competitive advantages that we may attain;

- would adversely affect the marketing of our products; and

- could cause the price of our shares to decline.

Even if we do receive regulatory approval for our drug candidates, the FDA or international regulatory authorities may impose limitations on the indicated uses for which our products may be marketed, subsequently withdraw approval or take other actions against us, or our products, that are adverse to our business. The FDA and comparable international regulatory authorities generally approve products for particular indications. An approval for a limited indication reduces the size of the potential market for the product. Product approvals, once granted, may be withdrawn if problems occur after initial marketing.

We also are subject to numerous federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals, the environment and the use and disposal of hazardous substances used in connection with our discovery, research and development work, including radioactive compounds and infectious disease agents. In addition, we cannot predict the extent of government regulations or the impact of new governmental regulations that might significantly harm the discovery, development, production and marketing of our products. We may be required to incur significant costs to comply with current or future laws or regulations, and we may be adversely affected by the cost of such compliance.

**If we fail to maintain existing licenses and collaborations, or fail to develop new collaborations, our business will be harmed.**

The success of our business is dependent, in significant part, upon our ability to maintain current licensing and collaborative relationships and enter into multiple new licenses and collaboration agreements. We also must manage effectively the numerous issues that arise from such arrangements and agreements. Management of our relationships with these third parties has required and will require:

- a significant amount of our management team's time and effort;

- effective allocation of our and third-party resources to multiple projects;

- agreements with third parties as to ownership of proprietary rights and development plans, including clinical trials or regulatory approval strategy; and

- the recruitment and retention of management, scientific and other personnel.

In January 2006, we entered into a license and collaboration agreement with Bayer for the development and commercialization of alfimeprase internationally. Under the agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay us tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent. We will retain all commercialization rights and profits from alfimeprase sales in the United States. We received an up-front cash payment from Bayer of $50.0 million upon entry into the agreement, and are eligible to receive up to an additional $335.0 million in milestone payments, including $165.0 million in development milestones and $170.0 million in sales and commercialization milestones, over the course of the agreement. In addition, Bayer will be responsible for 40 percent of the costs for global development programs. We will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. Each party will solely bear the expense of any country-specific alfimeprase clinical trials conducted by it, where the country-specific clinical trials are not part of the agreed global

19

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

development program. If we fail to maintain a successful collaboration with Bayer, Bayer could terminate our agreement, which could force us to expend additional amounts to obtain regulatory approval, delay the commercial launch of alfimeprase outside the United States, delay our ability to obtain regulatory approval for alfimeprase in the stroke and deep venous thrombosis indications, and have a negative impact on the success of alfimeprase's commercial launch, all of which would have a material, adverse effect on our business.

In October 2004, we obtained worldwide rights to develop and commercialize alfimeprase from Amgen in exchange for payment to Amgen of future development milestones and royalties. Future milestone payments under the license agreement could total as much as $35.0 million. Under our agreement with Bayer, we retain sole responsibility for making these payments to Amgen. In accordance with the terms of the license agreement, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to our designated manufacturer, Avecia. In June 2005, we entered into a definitive agreement with Avecia for the scale up and validation of the manufacturing process for alfimeprase drug substance, in anticipation of the potential commencement of the manufacture of commercial quantities. We currently do not have an agreement in place for the manufacture of alfimeprase final drug product. While we currently believe we have enough supplies of alfimeprase for phase 3 trials for the treatment of acute PAO and catheter occlusion, additional supplies may be necessary for these trials and for anticipated trials in other indications, and we are not yet certain that Avecia and a final drug product manufacturer will succeed in manufacturing additional supplies of alfimeprase for such trials. We may need to conduct comparative studies or utilize other means to determine bioequivalence between alfimeprase manufactured by Avecia and a final drug product manufacturer and that previously manufactured by Amgen. If Avecia and a final drug product manufacturer are unable to produce alfimeprase in the quantities and with the quality we need, when we need it, we may incur significant additional expenses, and our and Bayer's efforts to complete our clinical trials and obtain approval to market alfimeprase could be significantly delayed.

Pursuant to our licensing arrangement with Dendreon relating to rNAPc2, we are to make milestone payments, ranging from $2.0 million to $6.0 million, upon dosing of the first patient in a Phase 3 clinical trial, upon submission of an NDA and upon first commercial sale, for both the first and second indications of rNAPc2. If these and other milestones are all achieved, total milestone payments to Dendreon may reach as much as $23.5 million.

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin for the development and commercialization of NU206. All operating expenses and profits related to the development and commercialization of NU206 will be shared 60 percent by us and 40 percent by Kirin. If this agreement is terminated, or we or Kirin elect under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit sharing structure to a royalty-based structure. Our 2001 collaboration agreement with Kirin for research and development of secreted proteins expired on December 31, 2005 in accordance with its terms. We and Kirin are currently discussing the possibility of engaging in additional research and development with respect to certain secreted proteins to be selected by us and Kirin from the pool of candidates that were the subject of the 2001 collaboration. If we cannot reach agreement on a continuation of the research program with Kirin, we may need to find another partner to research and develop the compounds previously being researched in collaboration with Kirin, or we may have to delay or abandon further research and development of these compounds.

In our collaboration with Archemix for the research and development of a thrombin inhibiting aptamer, we share equally all research and development costs and revenues subsequent to our initial funding of these costs reaching $4.0 million in the third quarter of 2004. We are to make milestone payments of $10.0 million upon dosing of the first patient in a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both us and Archemix for pre-clinical studies. During the collaboration we are limited in our ability to influence Archemix's conduct of clinical trials prior to the dosing of the first patient in a Phase 2 trial. The payment of $10.0 million upon reaching the Phase 2 milestone is payable even if Archemix voluntarily terminates the collaboration, or does not meet its obligations under the agreement and we terminate the collaboration for Archemix's default, provided that in any of those cases we have rights to the compound when

20

Table of Contents

the Phase 2 trial is initiated. Archemix can terminate its collaboration with us on limited notice and for reasons outside our control. We lose significant rights if the collaboration is terminated because we fail to meet our obligations under it. In particular, if Archemix terminates the collaboration for our breach, all of our rights to collaboration products will become the property of Archemix, and we may not practice certain activities, including research and development, manufacturing and commercialization activities, in the field of modifying blood-clotting times in therapeutic applications through the use of aptamers.

Under our collaboration with Archemix, we have the option to lead commercialization in which both parties may participate if we establish certain commercialization capabilities; however, if we do not establish such commercialization capabilities, Archemix, or a third party selected by the parties' joint steering committee, will have the option to lead commercialization. We do not currently have established commercialization experience or an internal trained sales force and we may not successfully develop such capabilities without incurring additional expenses. If we cannot develop an internal sales force, we will not be able to lead commercialization activities on our own. If we do not lead the commercialization efforts, we are dependent on Archemix or a third party's experience in commercialization and ability to perform and we may also incur additional expenses for a third party to undertake commercialization efforts.

Our efforts to manage simultaneously a number of collaboration arrangements may not be successful, and our failure to manage effectively such collaborations would significantly harm our business, financial condition and results of operations.

Due to these factors and other possible disagreements with current or potential collaborative partners, we may be delayed or prevented from developing or commercializing alfimeprase, rNAPc2, NU206, a thrombin inhibiting aptamer or other pre-clinical product candidates, or we may become involved in litigation or arbitration, which would be time-consuming or expensive and could have a material adverse effect on our stock price.

In addition to our existing collaborations, we will focus on effecting new collaborative arrangements where we would share costs of identifying, developing and marketing drug candidates. We cannot assure you that we will be able to negotiate new collaboration arrangements of this type on acceptable terms, or at all.

**We are currently dependent on third parties for a variety of functions and may enter into future arrangements for the manufacture and sale of our products. Our arrangements with these third parties may not provide us with the benefits we expect.**

We currently rely upon third parties to perform administrative functions and functions related to the research, development, pre-clinical testing and clinical trials of our drug candidates. In addition, because we do not have the resources, facilities or experience to manufacture our drug candidates on our own, we currently rely, and will continue to rely, on third parties to manufacture, which includes manufacturing bulk compound, filling and finishing, and labeling and packaging, our drug candidates for clinical trials, and, if our products are approved, in quantities for commercial sales. We currently rely on a number of sole-source service providers and suppliers and do not have long-term supply agreements with our third-party manufacturers.

We do not currently have manufacturing facilities for clinical or commercial production of our drug candidates and depend on contract research and manufacturing organizations. We may not be able to finalize contractual arrangements, transfer technology or maintain relationships with such organizations in order to file an investigational new drug application, or IND, with the FDA, and proceed with clinical trials for any of our drug candidates. Until recently, we have relied on Amgen to manufacture our clinical drug product, alfimeprase. We have entered into a definitive development and validation agreement with Avecia for the scale up and validation of the alfimeprase drug substance manufacturing process and have transitioned the process of its manufacture from Amgen to Avecia, but do not yet have a definitive agreement with Avecia for the manufacture of commercial quantities of alfimeprase drug substance. Additionally, we do not have an agreement in place for the

21

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

manufacture of alfimeprase final drug product. We may need to conduct comparative studies or utilize other means to determine bioequivalence between alfimeprase manufactured by Avecia and a final drug product manufacturer and that previously manufactured by Amgen. If Avecia and a final drug product manufacturer are unable to manufacture clinical or commercial grade alfimeprase for us, or we are unable to complete commercial arrangements with Avecia and a final drug product manufacturer, we may not have adequate supplies of alfimeprase to complete our clinical trials or to obtain regulatory approvals for alfimeprase on our anticipated schedule. Our drug candidates have never been manufactured on a commercial scale. We received a supply of rNAPc2 from Dendreon, which we have used in our research and development activities. When we deplete this existing supply, we will need to contract with a third party manufacturer to produce additional rNAPc2. Third-party manufacturers may not be able to manufacture these drug candidates at a cost or in quantities necessary to make them commercially viable.

In addition, if and when any of our other drug candidates, such as NU206, enter the clinical trial phase, we will initially depend on third-party contract manufacturers to develop the necessary production processes, and produce the volume of cGMP-grade material needed to complete such trials. We will need to enter into contractual relationships with these or other organizations in order to (i) complete the Good Laboratory Practices, or GLP, toxicology and other studies necessary to file an IND with the FDA, (ii) produce a sufficient volume of cGMP-grade material in order to conduct clinical trials of these other drug candidates, and (iii) fill and finish, and label and package our material. We cannot be certain that we will be able to complete these tasks on a timely basis or that we will be able to obtain sufficient quantities of material or other manufacturing services on commercially reasonable terms. In addition, the failure of any of these relationships with third-party contract organizations may delay our filing for an IND or impede our progress through the clinical trial phase. Any significant delay or interruption would have a material adverse effect on our ability to file an IND with the FDA and/or proceed with the clinical trial phase for any of our drug candidates.

Moreover, contract manufacturers that we may use must continually adhere to cGMP regulations enforced by the FDA through a facilities inspection program. If one of our contract manufacturers fails to maintain compliance, the production of our product candidates could be interrupted, resulting in delays, additional costs and potentially lost revenues. In addition, if the facilities of such manufacturers do not pass a pre-approval plant inspection, the FDA will not grant pre-market approval of our products.

We are dependent on third-party contract research organizations to conduct certain research, including GLP toxicology studies, in order to gather the data necessary to file INDs with the FDA for any of our drug candidates. These third parties may not conduct their research properly, or they may fail to complete their contract research on the anticipated schedule. In either case, the progress of our clinical programs may be delayed and our research and development costs may increase, which may in turn have a material adverse affect on our business.

Our reliance on these relationships poses a number of risks, including:

- delays in, or failures to achieve, scale-up to commercial quantities, or changes to current raw material suppliers or product manufacturers (whether the change is attributable to us or the supplier or manufacturer), resulting in delayed clinical studies, regulatory submissions and commercialization of our drug candidates;

- inability of third parties to manufacture, including filing and finishing, and labeling and packaging, our drug candidates in a cost-effective or timely manner or in quantities needed for clinical trials or commercial sales;

- our inability to effectively control the resources devoted by our partners to our programs or products;

- disagreements with third parties that could disrupt our operation or delay or terminate the research, development or manufacturing of drug candidates, or result in litigation or arbitration;

- inadequate contractual protection or difficulty in enforcing the contracts if one of our partners fails to perform;

22

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

- failure of these third parties to comply with regulatory requirements;

- conflicts of interest between third parties' work for us and their work for another entity, and the resulting loss of their services;

- failure to identify acceptable manufacturers or other suppliers or enter into favorable long-term agreements with them; and

- lack of all necessary intellectual property rights to manufacture and sell our drug candidates.

Given these risks, our current and future arrangements with third parties may not be successful. If these efforts fail, we would be required to devote additional internal resources to the activities currently performed, or to be performed, by third parties, to seek alternative third-party sources, or to delay our product development or commercialization.

**We may not achieve our projected development goals in the time frames we announce and expect.**

We set goals for and make public statements regarding the timing of certain accomplishments, such as the commencement and completion of clinical trials, anticipated regulatory approval dates and time of product launch, which we sometimes refer to as milestones. These milestones may not be achieved, and the actual timing of these events can vary dramatically due to a number of factors such as delays or failures in our clinical trials, disagreements with current or future clinical development collaborative partners, the uncertainties inherent in the regulatory approval process and manufacturing scale-up and delays in achieving manufacturing or marketing arrangements sufficient to commercialize our products. There can be no assurance that our clinical trials will be completed, that we will make regulatory submissions or receive regulatory approvals as planned or that we will be able to adhere to our current schedule for the launch of any of our products. If we fail to achieve one or more of these milestones as planned, our business will be materially adversely affected and the price of our shares will decline.

**We are dependent on key personnel and we must attract and retain qualified employees, collaborators and consultants.**

The success of our business is highly dependent on the principal members of our scientific and management staff, including our senior management team. The loss of the services of any such individual might seriously harm our product development and commercialization efforts. In addition, we will require additional skilled personnel in areas such as clinical development. Retaining and training personnel with the requisite skills is challenging and extremely competitive, particularly in Northern California, where we are located.

Our success will depend on our ability to attract and retain qualified employees to help develop our potential products and execute our research, development and commercialization strategy. We have programs in place to retain personnel, including programs to create a positive work environment and competitive compensation packages. Because competition for employees in our field is intense, however, we may be unable to retain our existing personnel or attract additional qualified employees. Our success also depends on the continued availability of outside scientific collaborators, including collaborators at research institutions, to perform research and develop processes to advance and augment our internal research efforts. Competition for collaborators is intense. We also rely on services provided by outside consultants. Attracting and retaining qualified outside consultants is competitive, and, generally, outside consultants can terminate their relationship with us at will. If we do not attract and retain qualified personnel, outside consultants and scientific collaborators, or if we experience turnover or difficulties recruiting new employees or outside consultants, our research, development and commercialization programs could be delayed and we could experience difficulties in generating sufficient revenue to maintain our business.

We currently have limited sales, marketing and distribution capability. As the potential commercialization of our products approaches, we intend to hire marketing and sales personnel to enable us to participate in the

23

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate qualifications and talent, our ability to generate product revenues will be adversely affected.

In September 2005, we relocated our corporate headquarters from Sunnyvale, California to San Carlos, California. This relocation has caused and could cause some of our employees to seek new employment with employers located closer to their homes. The loss of key employees could have a serious adverse effect on our operations.

**The success of our potential products in pre-clinical studies does not guarantee that these results will be replicated in humans.**

Although our clinical development-stage drug candidates have shown results in pre-clinical studies, these results may not be replicated in our clinical trials with humans. Consequently, there is no assurance that the results in our pre-clinical studies are predictive of the results that we will see in our clinical trials with humans or that they are predictive of whether the resulting products will be safe and effective in humans.

**Because we have not yet commercialized any of our drug candidates, our ability to develop and subsequently commercialize products is unproven.**

We have not yet commercialized any of our in-licensed therapeutic product candidates. Moreover, we have not developed any therapeutic products using proteins produced by the genes we have discovered in our internal research programs. Before we make any products available to the public from our internal research and development programs, we or our collaboration partners will need to conduct further research and development and complete laboratory testing and animal and human studies. We, or our collaboration partners, will need to obtain regulatory approval before releasing any drug products. We have spent, and expect to continue to spend, significant amounts of time and money in the clinical development of our in-licensed product candidates, and in our internal research programs in determining the function of genes and the proteins they produce, using our own capabilities and those of our collaboration partners. Such a determination process constitutes the first step in developing commercial products from our in-licensed product candidates and internal research programs. We also have spent and will continue to spend significant amounts of time and money in developing processes for manufacturing our in-licensed product candidates and our recombinant proteins under pre-clinical development. We may not be able to produce sufficient proteins for pre-clinical studies of our internally-generated product candidates. A commercially viable product may never be developed from our gene discoveries.

Our commercialization of products is subject to several risks, including but not limited to:

- the possibility that a product is toxic, ineffective or unreliable;

- failure to obtain regulatory approval for the product;

- difficulties in manufacturing the product on a large scale;

- difficulties in planning, coordinating and executing the commercial launch of the product;

- difficulties in marketing, distribution or sale of the product;

- competition from superior products; or

- third-party patents that preclude us from marketing a product.

Our internal drug development programs are currently in the research stage or in pre-clinical development. None of our potential therapeutic protein candidates from our own portfolio has advanced to Phase 1 clinical trials. Our programs may not move beyond their current stages of development. Even if our internal research does advance, we will need to engage in certain additional pre-clinical development efforts to determine whether a product is sufficiently safe and effective to enter clinical trials. We have little experience with these activities with respect to protein candidates and may not be successful in developing or commercializing such products.

24

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Under our license and collaboration agreement with Bayer, we share the costs of global development of alfimeprase, with Nuvelo responsible for 60 percent of these costs and Bayer responsible for 40 percent. We and Bayer will manage the design and conduct of the global development program jointly, but in the event of a disagreement, we retain the right to make any final decision.

Under our collaboration with Archemix, Archemix leads development until the first dosing of a patient in a Phase 2 clinical trial, and thereafter, a joint steering committee will designate one party to lead development until commercialization. With respect to these arrangements, we run the risk that Bayer or Archemix may not pursue clinical development in a timely or effective manner.

Any regulatory approvals that we or our collaboration partners receive for our product candidates may be subject to limitations on the intended uses for which the product candidates may be marketed or contain requirements for potentially costly post-marketing follow-up studies. In addition, if the FDA approves of our or our collaboration partners' product candidates, the labeling, packaging, adverse event reporting, storage, advertising, promotion and record-keeping for the products will be subject to extensive regulatory requirements.

We, our collaborators and our suppliers, may also not be able to produce any products in commercial quantities at a reasonable cost or may not be able to successfully market such products. If we do not develop a commercially viable product, then we will suffer significant harm to our business, financial condition and operating results.

Finally, even if a product candidate such as alfimeprase or rNAPc2 were approved for commercial sale, significant strategic planning and resources will be necessary to effectively coordinate commercial launch of the product in the approved indication or indications, and to effectively market, distribute and sell the product for use in the approved indication or indications. In addition, the marketing, distribution, sale and reimbursement of pharmaceutical products is heavily regulated, and we must comply with all such applicable laws and regulations, or incur costs, fees and other liabilities associated with non-compliance. If our or a collaboration partner's commercial launch of a product approved for commercial sale were to be unsuccessful, or if we or a collaboration partner were to fail in our or their efforts to properly market, distribute or sell any product approved for sale, our business, financial condition and operating results would suffer significant harm.

**We lack marketing and commercialization experience for biopharmaceutical products and we may have to rely on third parties for these capabilities.**

We currently have limited sales, marketing and distribution capability. As the potential commercialization of our products approaches, we intend to hire additional marketing and sales personnel to enable us to participate in the commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate technical and sales expertise or in developing an adequate distribution capability to support them, our ability to generate product revenues will be adversely affected. To the extent we cannot or choose not to use internal resources for the marketing, sales or distribution of any potential products in the United States or elsewhere, we intend to rely on collaboration partners or licensees. We may not be able to establish or maintain such relationships. To the extent that we depend on collaboration partners or other third parties for marketing, sales and distribution, any revenues we receive will depend upon their efforts. Such efforts may not be successful, and we will not be able to control the amount and timing of resources that collaboration partners or other third parties devote to our products.

**Our products may not be accepted in the marketplace, and we may not be able to generate significant revenue, if any.**

Even if they are approved for marketing, our products, if any, may never achieve market acceptance among physicians, patients and the medical community. Our products, if successfully developed, will compete with a number of traditional drugs and therapies manufactured and marketed by major pharmaceutical, medical device

25

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

and biotechnology companies. Our products will also compete with new products currently under development by such companies and others. The degree of market acceptance of any products developed by us, alone, or in conjunction with our collaboration partners, will depend on a number of factors, including:

- the establishment and demonstration of the clinical efficacy and safety of the products;

- convenience and ease of administration;

- cost-effectiveness;

- our products' potential advantages over alternative treatment methods;

- marketing, sales and distribution support of our products; and

- reimbursement policies of government and third-party payers.

Physicians, patients or the medical community in general may not accept and utilize any of the products that we alone, or in conjunction with our collaboration partners, develop. In practice, competitors may be more effective in marketing their drugs. The lack of such market acceptance would significantly harm our business, financial condition and results of operations.

Even if our product candidates are approved for marketing and are accepted by physicians, patients and the medical community, the size of the market for these products may be insufficient to sustain our business, or may not provide an acceptable return on our investment in the development of these products. For example, our lead product candidate, alfimeprase, is undergoing clinical trials for the treatment of acute PAO. There are currently no thrombolytic agents specifically approved for the treatment of acute PAO in the United States or overseas, and as a result there is currently limited market data available for us to use in judging the market size for a therapeutic product of this nature. The number of incidents of acute PAO that are treatable with an approved thrombolytic agent may not be sufficient to create a sustainable market for alfimeprase, if approved. As a result, the commercialization of alfimeprase for the treatment of acute PAO, or any of our other product candidates, could fail even if we receive marketing approval from the FDA or similar foreign authority, and acceptance by the medical and patient communities.

**We are expanding our operations, and any difficulties managing this growth could disrupt our business.**

The implementation of our business strategy requires us to expand our operations, which will place additional demands on our financial, administrative and information technology resources and increase the demands on our financial systems and controls. We have begun the process of hiring a commercial organization and putting the infrastructure in place to support a potential commercial launch of alfimeprase. Our strategy also calls for us to undertake increased research and development activities, and to manage an increasing number of relationships with collaborators and other third parties. As our operations grow, we must expand and enhance our financial, administrative and information technology infrastructures. If we are unable to effectively manage the growth of our operations, we may not be able to implement our business strategy, and our financial condition and results of operations may be adversely affected.

**We face intense competition.**

The biopharmaceutical industry is intensely competitive and is accentuated by the rapid pace of technological development. We expect to face increased competition in the future as new companies enter our markets. Research and discoveries by others may result in breakthroughs that render our potential products obsolete even before they begin to generate any revenue. Our competitors include major pharmaceutical, medical device and biotechnology firms, many of which have substantially greater research and product development capabilities and financial, scientific, marketing and human resources than we have. Our lead product candidate, alfimeprase, if approved, will face competition in the catheter occlusion indication from alteplase, an approved Genentech, Inc. product, and will potentially face competition in the acute PAO indication from product candidates being developed and/or marketed by PDL BioPharma, Inc. and Genentech.

26

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Our competitors may obtain patents and regulatory approvals for their competing products more rapidly than we, or our collaboration partners, or develop products that are more effective than those developed by us, or our collaboration partners. All of our products will face competition from companies developing similar products as well as from companies developing other forms of treatment for the same conditions.

Many of the companies developing competing products have significantly greater financial resources than we have. Many such companies also have greater expertise than we have, and may have greater expertise than our collaboration partners have, in discovery, research and development, manufacturing, pre-clinical and clinical testing, obtaining regulatory approvals and marketing. Other smaller companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These companies and institutions compete with us in recruiting and retaining qualified scientific and management personnel as well as in acquiring technologies complementary to our programs. We will face competition with respect to:

- product efficacy and safety;
- the timing and scope of regulatory approvals;
- availability of resources;
- reimbursement coverage; and
- price and patent position, including the potentially dominant patent positions of others.

There can be no assurance that research and development by others will not render the products that we may develop obsolete or uneconomical, or result in treatments or cures superior to any therapy developed by us or that any therapy we develop will be preferred to any existing or newly-developed alternative products.

**We face uncertainty with respect to coverage, pricing, third-party reimbursements and healthcare reform.**

Our ability to collect significant revenues from our products may depend on our ability, and the ability of our collaboration partners or customers, to obtain adequate levels of coverage for our products and reimbursement from third-party payers such as:

- government health administration authorities;
- private health insurers;
- health maintenance organizations;
- pharmacy benefit management companies; and
- other healthcare-related organizations.

Third-party payers may deny coverage or offer inadequate levels of reimbursement if they determine that a prescribed product has not received appropriate clearances from the FDA or other government regulators, is not used in accordance with cost-effective treatment methods as determined by the third-party payer, or is experimental, unnecessary or inappropriate. If third-party payers deny coverage or offer inadequate levels of reimbursement, we may not be able to market our products effectively. We also face the risk that we will have to offer our products at prices lower than anticipated as a result of the current trend in the United States towards managed healthcare through health maintenance organizations. Currently, third-party payers are increasingly challenging the prices charged for medical products and services. Prices could be driven down by health maintenance organizations that control or significantly influence purchases of healthcare services and products. Existing U.S. laws, such as the Medicare Prescription Drug and Modernization Act of 2003, or future legislation to reform healthcare or reduce government insurance programs could also adversely affect prices of our approved products, if any. The cost-containment measures that healthcare providers are instituting and the results of potential healthcare reforms may prevent us from maintaining prices for our products that are sufficient for us to

27

Table of Contents

realize profits and may otherwise significantly harm our business, financial condition and operating results. In addition, to the extent that our products are marketed outside of the United States, foreign government pricing controls and other regulations may prevent us and our collaboration partners from maintaining prices for our products that are sufficient for us to realize profits and may otherwise significantly harm our business, financial condition and operating results.

**We may merge with or acquire other companies, and our failure to receive the anticipated benefits in these transactions could harm our business.**

In January 2003, we merged with Variagenics, and we may merge with or acquire other companies in the future. The success of any merger or acquisition depends, in part, on our ability to realize the anticipated synergies, cost savings and growth opportunities from integrating the business of the merged or acquired company with our business. The integration of two independent companies is a complex, costly and time-consuming process. The difficulties of combining the operations of the companies and/or our subsidiary include, among others:

- consolidating research and development operations;

- retaining key employees;

- consolidating corporate and administrative infrastructures;

- preserving the research and development and other important relationships of the companies;

- integrating and managing the technology of two companies;

- using the merged or acquired company's liquid capital and other assets efficiently to develop the business of the combined company;

- minimizing the diversion of management's attention from ongoing business concerns; and

- coordinating geographically separate organizations.

We cannot assure you that we will receive all of the anticipated benefits of any mergers or acquisitions, or that any of the risks described above will not occur. Our failure to receive anticipated benefits of, and our exposure to inherent risks in, any such merger or acquisition transaction could significantly harm our business, financial condition and operating results.

**We are subject to the risk of natural disasters.**

Our facilities are located in Northern California. If a fire, earthquake, or other natural disaster disrupts our research or development efforts, our business, financial condition and operating results could be materially adversely affected. Some of our landlords may maintain earthquake coverage for our facilities. Although we maintain personal property and business interruption coverage, we do not maintain earthquake coverage for personal property or resulting business interruption.

## RISKS RELATED TO OUR CAPITAL STRUCTURE AND FINANCIAL RESULTS

**We have not been profitable, anticipate continuing losses and may never become profitable.**

We had net losses of $50.2 million in 2003, $52.5 million in 2004 and $71.6 million in 2005. As of December 31, 2005, we had an accumulated deficit of $327.7 million.

All of our product candidates are in various stages of product development, and some are still in research or in early development. None of them are approved for sale. The process of developing our drug products will require significant additional research and development, pre-clinical testing, clinical trials and regulatory approvals.

28

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

These activities, together with general administrative and other expenses, are expected to result in operating losses for the foreseeable future. To date, we have not generated any revenues from product sales. We do not expect to achieve significant product sales or royalty revenue from product sales for several years, and we may never do so. We expect to incur additional operating losses in the future, and these losses may increase significantly as we continue pre-clinical research and clinical trials, apply for regulatory approvals, develop our drug candidates, expand our operations and develop systems that support commercialization of our potential products. These losses, among other things, have caused and may cause our stockholders' equity and working capital to decrease. We may not be successful in developing our drug candidates, obtaining regulatory approvals and commercializing our products, and our operations may not be profitable even if any of our drug candidates are commercialized. We may never generate profits and, as a result, the market price of our common stock could decline.

Moreover, utilization of our net operating loss carry forwards and credits may be subject to an annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state law provisions. It is possible that certain transactions that we have entered into, including our merger with Variagenics in January 2003, when considered in connection with other transactions, may result in a "change in ownership" for purposes of these provisions.

In January 2005, we entered into a lease agreement for 61,826 square feet of industrial space in San Carlos, California. In connection with our lease of this new facility, we are examining the potential to sublease or otherwise exit our facility at 985 Almanor Avenue in Sunnyvale, California, which is currently primarily being used for storage and for which we have a lease through May 30, 2011. In accordance with Statement of Financial Accounting Standards No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," if we sublease or otherwise exit this facility, we could incur a significant charge to our earnings based on the remaining lease rental expense for this facility, reduced by the estimated income from sublease rental, if any. As of December 31, 2005, the remaining lease rental expense for this facility was $30.5 million. Similarly, in accordance with Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," if we sublease or otherwise exit this facility, we could also incur a significant charge to our earnings for the impairment of leasehold improvements related to this facility, based on the difference between their carrying value and fair value at the time of the sublease or exit. As of December 31, 2005, this difference was estimated to be $3.7 million.

**We will need to raise additional capital, and such capital may be unavailable to us when we need it or not available on acceptable terms.**

We will need to raise significant additional capital to finance the research and clinical development of our drug products. If future securities offerings are successful, they could dilute our current shareholders' equity interests and reduce the market price of our common stock. Financing may be unavailable when we need it or may not be available on acceptable terms. The unavailability of financing may require us to delay, scale back or eliminate expenditures for our research, development and marketing activities necessary to commercialize our potential biopharmaceutical products. We may also be required to raise capital by granting rights to third parties to develop and market drug candidates that we would prefer to develop and market on our own, potentially reducing the ultimate value that we could realize from these drug candidates.

If we are unable to obtain additional financing when we need it, the capital markets may perceive that we are not able to raise the amount of financing we desire, or on the terms that we desire. This perception, if it occurs, may negatively affect the market price of our common stock. If sufficient capital is not available, we may be forced to delay, reduce the scope of, eliminate or divest one or more of our research or development programs. Any such action could significantly harm our business, financial condition and results of operations.

29

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Our future capital requirements and the adequacy of our currently available funds will depend on many factors, including, among others, the following:

- our ability to maintain, and the financial commitments involved in, our existing collaborative and licensing arrangements;

- the success of our collaborative relationship with Bayer, in accordance with the alfimeprase license and collaboration agreement we entered into in January 2006;

- progress in current and anticipated clinical studies of our products, including alfimeprase, rNAPc2, NU206 and a thrombin inhibiting aptamer;

- the cost of manufacturing our material for pre-clinical, clinical and commercial purposes;

- our ability to establish new collaborative relationships with other companies to share costs and expertise of identifying and developing drug candidates;

- the magnitude and scope of our research and development programs, including development of product candidates;

- continued scientific progress in our research and development programs, including progress in our research and pre-clinical studies;

- the cost involved in any facilities expansion to support research and development of our product candidates;

- the cost of prosecuting and enforcing our intellectual property rights;

- the time and cost involved in obtaining regulatory approvals;

- our need to develop, acquire or license new technologies or products;

- competing technological and market developments;

- our ability to use our common stock to repay an outstanding convertible promissory note to Affymetrix and our line of credit with Dr. George Rathmann;

- future funding commitments to our collaborators;

- general conditions in the financial markets and in the biotech sector;

- the uncertain condition of the capital markets and in the biotech sector; and

- other factors not within our control.

**We may face fluctuations in operating results.**

Our operating results may rise or fall significantly from period to period as a result of many factors, including:

- the amount of research and development we engage in;

- the number of product candidates we have and their progress in research, pre-clinical and clinical studies;

- our ability to expand our facilities to support our operations;

- our ability to maintain existing and enter into new strategic relationships;

- the scope, duration and effectiveness of our licensing and collaborative arrangements;

- the costs involved in prosecuting, maintaining and enforcing patent claims;

- the possibility that others may have obtain patent rights that are superior to ours;

30

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

- changes in government regulation;

- changes in accounting policies or principles; and

- release of successful products into the market by our competitors.

Excluding our two clinical stage drug candidates, our potential products currently are in research or pre-clinical development, and revenues from the sales of any products resulting from this research and development may not occur for several years, if at all. A high percentage of our expenses are fixed costs such as lease obligations. As a result, we may experience fluctuations in our operating results from quarter to quarter and continue to generate losses. Quarterly comparisons of our financial results may not necessarily be meaningful, and investors should not rely upon such results as an indication of our future performance. In addition, investors may react adversely if our reported operating results are less favorable than in a prior period or are less favorable than those anticipated by investors or the financial community, which may result in a drop in the market price of our common stock.

**Our stock price has historically been and is likely to remain highly volatile, and an investment in our stock could suffer a decline in value.**

Stock prices and trading volumes for many biopharmaceutical companies fluctuate widely for a number of reasons, including factors which may be unrelated to their businesses or results of operations, such as media coverage, legislative and regulatory measures and the activities of various interest groups or organizations. This market volatility, as well as general domestic or international economic, market and political conditions, could materially and adversely affect the market price of our common stock and the return on your investment.

Historically, our stock price has been extremely volatile. Between January 1, 2005 and December 31, 2005, the price ranged between a high of $10.35 per share and a low of $5.75 per share, and between January 1, 2006 and February 28, 2006, the price ranged between a high of $18.71 per share and a low of $8.16 per share. The significant market price fluctuations of our common stock can be due to a variety of factors, including:

- the depth of the market for the common stock;

- the experimental nature of our potential products;

- actual or anticipated fluctuations in our operating results;

- sales of our common stock by existing holders, or sales of shares issuable upon exercise of outstanding options and warrants, upon repayment of our outstanding convertible promissory note to Affymetrix, or upon repayment of our line of credit with Dr. George Rathmann;

- market conditions relating to the biopharmaceutical and pharmaceutical industries;

- any announcements of technological innovations, new commercial products, or clinical progress or lack thereof by us, our collaborative partners or our competitors;

- announcements concerning regulatory developments, developments with respect to proprietary rights and our collaborations;

- changes in or our failure to meet market or, to the extent securities analysts follow our common stock, securities analysts' expectations;

- loss of key personnel;

- changes in accounting principles;

- general market conditions; and

- public concern with respect to our products.

31

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

In addition, the stock market in general, and the market for biotechnology and other life science stocks in particular, has historically been subject to extreme price and volume fluctuations. This volatility has had a significant effect on the market prices of securities issued by many companies for reasons unrelated to the operating performance of these companies. In the past, following periods of volatility in the market price of a company's securities, class action securities litigation has often been instituted against such a company. Any such litigation instigated against us could result in substantial costs and a diversion of management's attention and resources, which could significantly harm our business, financial condition and operating results.

**Future sales or the possibility of future sales of our common stock may depress the market price of our common stock.**

Sales in the public market of substantial amounts of our common stock could depress prevailing market prices of our common stock. As of February 28, 2006, we had 51,656,770 shares of our common stock outstanding. All of these shares are freely transferable without restriction or further registration under the Securities Act, except for shares held by our directors, officers and greater than five percent stockholders and unregistered shares held by non-affiliates. As of February 28, 2006, our directors, officers and greater than five percent stockholders held approximately 16.5 percent of the shares of our outstanding common stock. Although we do not believe that our directors, officers and greater than five percent stockholders have any present intentions to dispose of large amounts of any shares of common stock owned by them, there can be no assurance that such intentions will not change in the future. The sale of these additional shares could depress the market price of our common stock.

Under registration statements on Form S-8 under the Securities Act, as of February 28, 2006, we have also registered approximately 8,403,244 shares of our common stock which may be issued under our 2004 Equity Incentive Plan, 2002 Equity Incentive Plan, 1995 Stock Option Plan, Non-Employee Director Stock Option Plan, Scientific Advisory Board/Consultants Stock Option Plan, stock option agreements entered into outside of any of our stock option plans, and our Employee Stock Purchase Plan. Included in the 8,403,244 shares, as of February 28, 2006, are (i) 6,234,427 shares of our common stock issuable under outstanding options to purchase our common stock under the specified plans, (ii) 823,539 shares of our common stock issuable under stock option agreements entered into outside of any of our stock option plans, (iii) 1,120,796 shares of our common stock reserved for future option grants under our 2004 Equity Incentive Plan, and (iv) 224,482 shares of our common stock reserved for future issuance under our Employee Stock Purchase Plan. As of February 28, 2006, 3,026,040 of the shares issuable upon exercise of our outstanding options were exercisable. Once these shares are exercised, such shares are available for sale in the open market without further registration under the Securities Act. The existence of these outstanding options and share reserves may negatively affect our ability to complete future equity financings at acceptable prices and on acceptable terms. The exercise of those options, and the prompt resale of shares of our common stock received, may also result in downward pressure on the price of our common stock.

As of February 28, 2006, 1,786,685 shares of our common stock were issuable upon the exercise of outstanding warrants, which were all exercisable as of this date. Once a warrant is exercised, the holder can arrange for the resale of shares either by invoking any applicable registration rights, causing the shares to be registered under the Securities Act and thus freely transferable, or by relying an exemption to the Securities Act. If these registration rights, or similar registration rights that may apply to securities we may issue in the future, are exercised, it could result in additional sales of our common stock in the market, which may have an adverse effect on our stock price.

As of February 28, 2006, $5.3 million of our common stock was issuable, at our option, to repay our convertible promissory note held by Affymetrix, Inc., including accrued interest, at a conversion price based on 90 percent of the average price of our common stock over a ten-day period ending two days prior to conversion. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable in the event that our market capitalization is under $50.0 million and Affymetrix reasonably determines

32

Table of Contents

that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed ten percent of our market capitalization. Pursuant to registration rights we granted to Affymetrix, we have registered for resale a portion of these shares on a registration statement that has been declared effective by the SEC. If we decide to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock by Affymetrix may also result in significant downward pressure on the market price of our common stock.

As of February 28, 2006, $6.5 million of our common stock was issuable, upon mutual agreement, to convert the remaining amount due on the promissory note under our line of credit with Dr. George Rathmann, including accrued interest, at a conversion price equal to the average price of our common stock over a 20-day period, ending two days prior to conversion, or, if in connection with an equity financing, at the offering price. If we agree to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock received by Dr. Rathmann may also result in significant downward pressure on the market price of our common stock.

Under the August 2005 committed equity financing facility, or CEFF, that we entered into with Kingsbridge Capital Ltd., and related stock purchase and registration rights agreements, we may periodically sell up to $75.0 million in shares of our common stock to Kingsbridge over a three-year period, subject to certain conditions and restrictions. In November 2005, under this CEFF, we sold 653,103 shares for gross proceeds of $5.0 million, and in December 2005 sold 1,186,297 shares for gross proceeds of $9.4 million. We may sell the balance of $60.6 million of shares of our common stock over the remainder of the three-year term of the CEFF. Should we sell further securities under the CEFF, it could have a dilutive effective on the holdings of our current stockholders, and may result in downward pressure on the market price of our common stock.

We will need to raise significant additional capital to finance the research, development and commercialization of our drug products. If future securities offerings are successful, they could dilute our current stockholders' equity interests and reduce the market price of our common stock.

**We do not intend to pay cash dividends on our common stock in the foreseeable future.**

We do not anticipate paying cash dividends on our common stock in the foreseeable future. Any payment of cash dividends will depend upon our financial condition, results of operations, capital requirements and other factors and will be at the discretion of our board of directors. Under our August 31, 2004 Loan and Security Agreement with Silicon Valley Bank, as amended, we cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of our capital stock. Furthermore, we may incur additional indebtedness that may severely restrict or prohibit the payment of dividends.

**We face exposure to currency fluctuations for transactions denominated in foreign currencies, which may adversely affect our results of operations.**

To mitigate the impact of currency exchange rate fluctuations on our cash outflows for certain foreign currency-denominated purchases, we have developed and implemented a foreign exchange risk management policy utilizing forward contracts to hedge against this exposure. For example, in the third quarter of 2005, we entered into $16.7 million of foreign exchange hedge contracts with Silicon Valley Bank in relation to our development and validation agreement with Avecia, pursuant to which we are required to make payments to Avecia in British pounds. Although we use forward contracts to reduce the impact of foreign currency fluctuations on our future results, these efforts may not be successful, and any such fluctuations could adversely affect our results of operations.

**Recent accounting pronouncements may impact our future financial position and results of operations.**

There may be potential new accounting pronouncements or regulatory rulings, which may have an impact on our future financial position and results of operations. On December 16, 2004, the Financial Accounting

33

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Standards Board, or FASB, issued Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment," also known as SFAS 123(R), an amendment of Statements of Financial Accounting Standards No. 123 and 95, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize the fair value of employee stock options and other stock-based compensation as an expense. The statement eliminates the ability to account for share-based employee compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees," also known as APB 25, and generally requires instead that such transactions be accounted for using a fair value-based method, such as Black-Scholes, to fairly value stock options and recognize that value as an expense over the requisite service period. The standard is effective for us beginning in the fiscal year commencing January 1, 2006. For all periods prior to January 1, 2006, we have accounted for our stock-based employee compensation plans in accordance with APB 25. We expect that the adoption of SFAS 123(R) will have a material adverse impact to our results of operations.

**The committed equity financing facility with Kingsbridge may not be available to us when we desire to draw upon it, may require us to make additional "blackout" payments to Kingsbridge, and may result in dilution to our stockholders.**

In August 2005, in connection with a committed equity financing facility, or CEFF, we entered into a stock purchase agreement and related registration rights agreement with Kingsbridge Capital Ltd. The CEFF entitles us to sell and obligates Kingsbridge to purchase, from time to time over a period of three years, shares of our common stock for cash consideration up to an aggregate of $75.0 million, subject to certain conditions and restrictions. In November 2005, under this stock purchase agreement, we sold 653,103 shares for gross proceeds of $5.0 million, and in December 2005 sold 1,186,297 shares for gross proceeds of $9.4 million. The balance of $60.6 million remains available for use by us over the remainder of the three-year period. Kingsbridge will not be obligated to purchase shares under the CEFF unless certain conditions are met, which include a minimum price for our common stock; the accuracy of representations and warranties made to Kingsbridge; compliance with laws; effectiveness of a registration statement to register such shares for resale by Kingsbridge; and the continued listing of our stock on the Nasdaq National Market. In addition, Kingsbridge is permitted to terminate the CEFF if it determines that a material and adverse event has occurred affecting our business, operations, properties or financial condition. If we are unable to access capital on favorable terms or at all, the CEFF is terminated by Kingsbridge, we may be unable to access capital on favorable terms or at all.

We are entitled in certain circumstances, to deliver a blackout notice to Kingsbridge to suspend the use of the registration statement under which shares sold under the CEFF are registered for resale, thereby prohibiting Kingsbridge from selling shares. If we deliver a blackout notice in the 15 trading days following the settlement of a sale of shares under the CEFF, or if the registration statement is not effective in circumstances not permitted by our agreement with Kingsbridge, then we must make a payment to Kingsbridge, or issue Kingsbridge additional shares in lieu of this payment, calculated on the basis of the number of shares held by Kingsbridge and the change in the market price of our common stock during the period in which the use of the registration statement is suspended. If the market price of our common stock declines during a suspension of the registration statement, the blackout payment could be significant.

Should we sell additional shares to Kingsbridge under the CEFF, or issue shares in lieu of any blackout payment, it will have a dilutive effective on the holdings of our current stockholders, and may result in downward pressure on the market price of our common stock. If we draw down under the CEFF, we will issue shares to Kingsbridge at a discount of up to ten percent from the volume weighted average price of our common stock. If we draw down amounts under the CEFF when our share price is decreasing, we will need to issue more shares to raise the same amount than if our share price was higher. Issuances in the face of a declining share price will have an even greater dilutive effect than if our share price were stable or increasing, and may further decrease our share price.

34

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

**We have implemented anti-takeover provisions that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

The existence of our stockholder rights plan and provisions of our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, even if doing so would benefit our stockholders. These provisions:

- establish a classified board of directors so that not all members of our board may be elected at one time;

- authorize the issuance of up to 5,000,000 shares of preferred stock that could be issued by our board of directors to increase the number of outstanding shares and hinder a takeover attempt;

- limit who may call a special meeting of stockholders;

- prohibit stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon at a stockholder meeting.

Specifically, our certificate of incorporation provides that all stockholder action must be effected at a duly called meeting, and not by a written consent. The by-laws provide, however, that our stockholders may call a special meeting of stockholders only upon a request of stockholders owning at least 50 percent of our common stock. These provisions of our certificate of incorporation and our by-laws could discourage potential acquisition proposals and could delay or prevent a change in control. We designed these provisions to reduce our vulnerability to unsolicited acquisition proposals and to discourage certain tactics that may be used in proxy fights. These provisions, however, could also have the effect of discouraging others from making tender offers for our shares. As a consequence, they also may inhibit fluctuations in the market price of our shares that could result from actual or rumored takeover attempts. Such provisions also may have the effect of preventing changes in our management.

We are permitted to issue shares of our preferred stock without stockholder approval upon such terms as our board of directors determines. Therefore, the rights of the holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of our preferred stock that may be issued in the future. In addition, the issuance of preferred stock could have a dilutive effect on the holdings of our current stockholders.

On June 5, 1998, our board of directors adopted a rights plan and declared a dividend with respect to each share of our common stock then outstanding. This dividend took the form of a right, which entitles the holders to purchase one one-thousandth of a share of our Series A junior participating preferred stock at a purchase price that is subject to adjustment from time to time. These rights have also been issued in connection with each share of our common stock issued after June 15, 1998. The rights are exercisable only if a person or entity or affiliated group of persons or entities acquires, or has announced its intention to acquire, 15 percent (27.5 percent in the case of certain approved stockholders) or more of our outstanding common stock. The adoption of the rights plan makes it more difficult for a third party to acquire control of us without the approval of our board of directors. This rights agreement was amended on March 19, 2004, to reflect our reincorporation under Delaware law.

We are subject to the Delaware anti-takeover laws regulating corporate takeovers. These anti-takeover laws prevent a Delaware corporation from engaging in a merger or sale of more than ten percent of its assets with any stockholder, including all affiliates and associates of the stockholder, who owns 15 percent or more of the corporation's outstanding voting stock, for three years following the date that the stockholder acquired 15 percent or more of the corporation's stock unless:

- the board of directors approved the transaction where the stockholder acquired 15 percent or more of the corporation's stock;

- after the transaction in which the stockholder acquired 15 percent or more of the corporation's stock, the stockholder owned at least 85 percent of the corporation's outstanding voting stock, excluding shares

35

Source: NUVELO INC, 10-K, March 15, 2006