# Exhibit E

Table of Contents

owned by directors, officers and employee stock plans in which employee participants do not have the right to determine confidentially whether shares held under the plan will be tendered in a tender or exchange offer; or

- on or after this date, the merger or sale is approved by the board of directors and the holders of at least two-thirds of the outstanding voting stock that is not owned by the stockholder.

The provisions of our governing documents, stockholder rights plan and current Delaware law may, collectively:

- lengthen the time required for a person or entity to acquire control of us through a proxy contest for the election of a majority of our board of directors;

- discourage bids for our common stock at a premium over market price; and

- generally deter efforts to obtain control of us.

**We have adopted an Executive Change in Control and Severance Benefit Plan that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

In December 2004, our board of directors approved an "Executive Change in Control and Severance Benefit Plan" for our executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain of our eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted by us previously. All of our executive employees at the level of Vice President or above have been designated as participants in the plan and our board of directors may designate other eligible individuals as participants. The plan provides that, upon a change in control of the company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause, or constructively terminated, within one month preceding our change in control. If a participant is terminated without cause or constructively terminated one month before or one year after our change in control, he or she will also be entitled to certain cash severance and continued medical benefits. The change in control and severance benefits for certain of our employees provided for under this plan could make it more difficult and expensive, or less desirable, for a third party to acquire us, even if doing so would benefit our stockholders.

## RISKS RELATED TO INTELLECTUAL PROPERTY AND OTHER LEGAL MATTERS

**The commercial success of our products will be dependent upon our ability to protect the intellectual property rights associated with our products and drug candidates.**

Our competitive success will depend, in part, on our ability to obtain and maintain patent protection for our inventions, technologies and discoveries, including intellectual property that we license. The patent positions of biotechnology companies involve complex legal and factual questions, and we cannot assure you that our patents and licenses will successfully preclude others from using our technology. We could incur substantial costs in seeking enforcement of our proprietary rights against infringement.

We currently have, or have in-licensed, issued patents and pending patent applications that include claims to our in-licensed clinical products. We obtained exclusive worldwide rights to alfimeprase from Amgen in October 2004. We obtained exclusive worldwide rights for all indications of rNAPc2 and all of the rNAPc molecules owned by Dendreon in February 2004. The United States government may claim a non-exclusive right to use rNAPc2 with respect to the treatment of hemorrhagic fever. We also currently have patents that cover some of our technological discoveries and patent applications that we expect to protect some of our gene, protein and technological discoveries. We will continue to apply for patents for our discoveries. We cannot assure you that any of our applications, or our licensors' applications, will issue as patents, or that any patent issued or licensed

36

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

to us will not be challenged, invalidated, circumvented or held unenforceable by way of an interference proceeding or litigation.

The timing of the grant of a patent cannot be predicted. Patent applications describing and seeking patent protection of methods, compositions, or processes relating to proprietary inventions involving human therapeutics could require us to generate data, which may involve substantial costs. Our pending patent applications may lack priority over others' applications or may not result in the issuance of patents. Even if issued, our patents may not be sufficiently broad to provide protection against competitors with similar technologies and may be challenged, invalidated or circumvented.

In addition to patents, we rely on a combination of trade secrets, copyright and trademark laws, nondisclosure agreements, licenses and other contractual provisions and technical measures to maintain and develop our competitive position with respect to intellectual property. Nevertheless, these measures may not be adequate to safeguard the technology underlying our products. For example, employees, consultants and others who participate in the development of our products may breach their agreements with us regarding our intellectual property and we may not have adequate remedies for the breach. Our trade secrets could become known through other unforeseen means. We depend on our collaborators and other third parties that license intellectual property to us to protect our licensed intellectual property. These collaborators and other third parties could fail to take a necessary step to protect our licensed intellectual property, which could seriously harm our intellectual property position.

We also may not be able to effectively protect our intellectual property rights in some foreign countries, as many countries do not offer the same level of legal protection for intellectual property as the United States. Furthermore, certain of the patent applications describing our proprietary methods are filed only in the United States. Even where we have filed our patent applications internationally, for some cases and in certain countries, we have chosen not to maintain foreign patent protection by opting not to enter national phase or opting not to pay maintenance annuities.

Notwithstanding our efforts to protect our intellectual property, our competitors may independently develop similar or alternative technologies or products that are equal or superior to our technology. Our competitors may also develop similar products without infringing on any of our intellectual property rights or design around our proprietary technologies.

**If our products infringe on the intellectual property rights of others, we could face costly litigation, which could cause us to pay substantial damages or licensing fees and limit our ability to sell some or all of our products.**

Extensive litigation regarding patents and other intellectual property rights has been common in the biopharmaceutical industry. Litigation may be necessary to assert infringement claims, enforce patent rights, protect trade secrets or know-how and determine the enforceability, scope and validity of certain proprietary rights. The defense and prosecution of intellectual property lawsuits, United States Patent and Trademark Office interference proceedings, and related legal and administrative proceedings in the United States and internationally involve complex legal and factual questions. As a result, such proceedings are costly and time-consuming to pursue and their outcome is uncertain.

Regardless of merit or outcome, our involvement in any litigation, interference or other administrative proceedings could cause us to incur substantial expense and could significantly divert the efforts of our technical and management personnel. An adverse determination may subject us to the loss of our proprietary position or to significant liabilities, or require us to seek licenses that may include substantial cost and ongoing royalties. Licenses may not be available from third parties, or may not be obtainable on satisfactory terms. An adverse determination or a failure to obtain necessary licenses may restrict or prevent us from manufacturing and selling our products, if any. These outcomes could materially harm our business, financial condition and results of operations.

37

Source: NUVELO INC, 10-K, March 15, 2006

**Table of Contents**

Our market success depends in part on us neither infringing valid, enforceable patents or proprietary rights of third parties, nor breaching any licenses that may relate to our technologies and products. We are aware of third-party patents that may relate to our technology. We may be required to obtain licenses to patents or other proprietary rights of others in order to conduct research, development or commercialization of some or all of our programs. We plan to seek licenses, as we deem appropriate, but it is possible that we may infringe upon these patents or proprietary rights of third parties. If we do not obtain these licenses, we may encounter delays in product market introductions, incur substantial costs while we attempt to design around existing patents or not be able to develop, manufacture or sell products. In response, third parties may assert infringement or other intellectual property claims against us. We may consequently be subjected to substantial damages for past infringement or be required to modify our products if it is ultimately determined that our products infringe a third party's proprietary rights. Further, we may be prohibited from selling our products before we obtain a license, which, if available at all, may require us to pay substantial royalties, which could adversely impact our product costs and have an impact on our business. Further, if we do obtain these licenses, the agreed terms may necessitate reevaluation of the potential commercialization of any one of our programs. Failing to obtain a license could result in litigation. Even if these claims are without merit, defending a lawsuit takes significant time, may be expensive and may divert management attention from other business concerns. Any public announcements related to litigation or interference proceedings initiated or threatened against us could cause our stock price to decline.

**We face product liability exposure and potential unavailability of insurance.**

We risk financial exposure to product liability claims in the event that the use of products developed by us, or our collaboration partners, if any, result in personal injury.

We may experience losses due to product liability claims in the future. We have obtained limited product liability insurance coverage. Such coverage, however, may not be adequate or may not continue to be available to us in sufficient amounts or at an acceptable cost, or at all. We may not be able to obtain commercially reasonable product liability insurance for any product approved for marketing. A product liability claim or other claim, product recalls, as well as any claims for uninsured liabilities or in excess of insured liabilities, may significantly harm our business, financial condition and results of operations.

**We use hazardous materials, chemicals and patient samples in our business and any disputes relating to improper handling, storage or disposal of these materials could be time consuming and costly.**

Our research and development and production activities involve the controlled use of hazardous or radioactive materials, chemicals, including oxidizing and reducing reagents, patient tissue and blood samples. We, our collaborators and service providers, are subject to federal, state and local laws and regulations governing the use, storage, handling and disposal of these materials and certain waste products. We could be liable for accidental contamination or discharge or any resultant injury from hazardous materials, and conveyance, processing, and storage of and data on patient samples. If we, or our collaborators or service providers, fail to comply with applicable laws or regulations, we could be required to pay penalties or be held liable for any damages that result and this liability could exceed our financial resources. Further, future changes to environmental health and safety laws could cause us to incur additional expense or restrict our operations. In addition, our collaborators and service providers may be working with hazardous materials, including viruses and hazardous chemicals, in connection with our collaborations. In the event of a lawsuit or investigation, we could be held responsible for any injury caused to persons or property by exposure to, or release of, patient samples that may contain viruses and hazardous materials. The cost of this liability could exceed our resources.

**Variagenics has been named as a defendant in a class action suit and defending this litigation could hurt our business.**

Variagenics has been named as a defendant in a securities class action lawsuit alleging the failure to disclose additional and excessive commissions purportedly solicited by and paid to underwriters who are also named

38

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

defendants in the lawsuit. Plaintiffs in the suit allege that underwriters took these commissions and in exchange allocated shares of Variagenics' stock to their preferred customers through alleged agreements with these preferred customers that tied the allocation of initial public offering shares to agreements by the customers to make additional aftermarket purchases at pre-determined prices. As a result of our merger with Variagenics, we are obligated to continue to defend against this litigation. Currently we are in the process of approving a settlement by and between the issuers that are defendants in the lawsuit, the insurers of those issuers, and the plaintiffs. We believe that any loss or settlement amount will not be material to our financial position or results of operation, and that any settlement payment and attorneys' fees accrued with respect to the suit will be paid by our insurance provider. However, we cannot assure you that this will be the case until a final settlement is executed. Failure to finalize a settlement could require us to pay substantial damages.

**Item 1B.**     *Unresolved Staff Comments*

None.

**Item 2.**     *Properties*

In January 2005, we entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for 61,826 square feet of industrial space at 201 Industrial Road in San Carlos, California, which became our primary headquarters in September 2005. The lease commenced on September 1, 2005 and contains an option to cancel the lease after five years upon payment of certain amounts specified in the lease, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), rights of first refusal over all vacant space in the building during the first two years of the lease, and an expansion option for a specified amount of space. On March 10, 2006, the lease was amended to provide for the exercise of our expansion option over 7,624 square feet of rentable space.

We also lease approximately 140,000 square feet of space at 985 Almanor Avenue in Sunnyvale, California, which is currently primarily being used for storage. The lease on this space extends through May 2011.

**Item 3.**     *Legal Proceeding*

On or about December 6, 2001, Variagenics, Inc. was sued in a complaint filed in the United States District Court for the Southern District of New York naming it and certain of its officers and underwriters as defendants. The complaint purportedly is filed on behalf of persons purchasing Variagenics' stock between July 21, 2000 and December 6, 2000, and alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.

The complaint alleges that, in connection with Variagenics' July 21, 2000 initial public offering, or IPO, the defendants failed to disclose additional and excessive commissions purportedly solicited by and paid to the underwriter defendants in exchange for allocating shares of Variagenics' stock to preferred customers and alleged agreements among the underwriter defendants and preferred customers tying the allocation of IPO shares to agreements to make additional aftermarket purchases at predetermined prices. Plaintiffs claim that the failure to disclose these alleged arrangements made Variagenics' registration statement on Form S-1 filed with the SEC in July 2000 and the prospectus, a part of the registration statement, materially false and misleading. Plaintiffs seek unspecified damages. On or about April 19, 2002, an amended complaint was filed which makes essentially the same allegations. On or about July 15, 2002, Variagenics and the individuals filed a motion to dismiss. We are involved in this litigation as a result of our merger with Variagenics in January 2003.

On July 16, 2003, Nuvelo's Board of Directors approved a settlement proposal initiated by the plaintiffs. The final terms of the settlement are still being negotiated. We believe that any loss or settlement amount will not be material to our financial position or results of operations, and that any settlement payment and attorneys' fees

39

Table of Contents

accrued with respect to the suit will be paid by our insurance provider. However, it is possible that the parties may not reach agreement on the final settlement documents or that the Federal District Court may not approve the settlement in whole or part. We could be forced to incur material expenses in the litigation if the parties do not reach agreement of the final settlement documents, and in the event there is an adverse outcome, our business could be harmed.

**Item 4.**    *Submission of Matters to a Vote of Security Holders*

No matters were submitted to the vote of stockholders through the solicitation of proxies or otherwise during the fourth quarter of the year ended December 31, 2005.

40

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

PART II

Item 5.    *Market for Registrant's Common Equity and Related Stockholder Matters*

Our common stock began trading on the Nasdaq Stock Market on August 8, 1997 as Hyseq, Inc. (HYSQ), and has traded under the symbol "NUVO" since January 31, 2003, (except for the period between June 19, 2003 and March 19, 2004, where we temporarily traded under the symbol "NUVOD"). On February 23, 2004, we completed a one-for-three reverse split of our common stock. Unless otherwise indicated, all per share amounts in this Form 10-K have been adjusted to reflect the reverse split. The following table sets forth, for the periods indicated, the high and low bid information for our common stock, as reported by the Nasdaq Stock Market under these symbols:

| | High | Low |
|---|---|---|
| **Year ended December 31, 2004** | | |
| First quarter | $ 16.50 | $ 10.36 |
| Second quarter | 13.20 | 7.57 |
| Third quarter | 10.44 | 6.77 |
| Fourth quarter | 11.23 | 8.36 |
| **Year ended December 31, 2005** | | |
| First quarter | $ 10.33 | $ 6.35 |
| Second quarter | 8.00 | 5.75 |
| Third quarter | 10.35 | 7.35 |
| Fourth quarter | 9.93 | 7.53 |

As of February 28, 2006, there were approximately 219 stockholders of record of our common stock, and the last sale price reported on The Nasdaq National Market for our common stock was $17.14 per share.

The holders of our common stock are entitled to dividends in such amounts and at such times, if any, as may be declared by our board of directors out of legally available funds. We have not paid any dividends on our common stock and do not anticipate paying any cash dividends on our common stock in the foreseeable future. Under our August 31, 2004 Loan and Security Agreement with Silicon Valley Bank, we cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of our capital stock.

Information relating to compensation plans under which our equity securities are authorized for issuance is included in Item 12 of Part III of this Annual Report, which is incorporated by reference from our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

**Recent Sales of Unregistered Securities**

On August 4, 2005, we entered into a Committed Equity Financing Facility, or CEFF, with Kingsbridge Capital Ltd. In connection with the CEFF, we issued a warrant to Kingsbridge to purchase 350,000 shares of our common stock at a price of $12.0718 per share. The warrant is exercisable beginning six months after the date of grant and for a period of five years thereafter. Subject to certain conditions and limitations, from time to time under the CEFF, we may require Kingsbridge to purchase newly-issued shares of our common stock at a price that is between 90% and 94% of the volume weighted average price on each trading day during a 8 day pricing period. The value of the maximum number of shares we may issue in any pricing period shall be the lesser of 2.5% of our market capitalization immediately prior to the commencement of the pricing period, or $10.0 million. The minimum acceptable volume weighted average price for determining the purchase price at which our stock may be sold in any pricing period is determined by the greater of $2.50, or 85% of the closing price for our common stock on the day prior to the commencement of the pricing period. Under the terms of the CEFF, the maximum number of shares we may sell is 8,075,000 shares (exclusive of the shares underlying the warrant).

41

Source: NUVELO INC, 10-K, March 15, 2006

**Table of Contents**

Under the CEFF, in November 2005 we sold 653,103 shares for gross proceeds of $5.0 million, and in December 2005 we sold 1,186,297 shares for gross proceeds of $9.4 million. Nuvelo is not obligated to sell any of the remaining $60.6 million of common stock available under the CEFF and there are no minimum commitments or minimum use penalties.

We relied on the exemption from registration contained in Section 4(2) of the Securities Act, and Regulation D, Rule 506 thereunder, in connection with obtaining Kingsbridge's commitment under the CEFF, and for the issuance of the warrant in consideration of such commitment.

Item 6.    *Selected Consolidated Financial Data*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | (In thousands, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Contract revenues | $ 545 | $ 195 | $ 1,024 | $ 25,554 | $ 24,550 |
| Loss from continuing operations | (71,611) | (48,942) | (46,229) | (39,512) | (33,836) |
| Loss from discontinued operations, including loss on disposal | — | (3,547) | (3,958) | (5,466) | (2,636) |
| Net loss | $ (71,611) | $ (52,489) | $ (50,187) | $ (44,978) | $ (36,472) |
| Basic and diluted net loss per share: | | | | | |
| Continuing operations | (1.73) | (1.59) | (2.19) | (5.48) | (6.29) |
| Discontinued operations | — | (0.11) | (0.18) | (0.76) | (0.49) |
| Total basic and diluted net loss per share | $ (1.73) | $ (1.70) | $ (2.37) | $ (6.24) | $ (6.78) |
| Weighted average shares used in computing basic and diluted net loss per share | 41,279 | 30,874 | 21,054 | 7,220 | 5,386 |

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | (In thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and short-term investments | $ 70,336 | $ 50,625 | $ 34,189 | $ 2,225 | $ 12,329 |
| Working capital | 40,850 | 45,261 | 25,772 | (20,728) | (1,717) |
| Total assets | 108,046 | 79,264 | 57,809 | 27,072 | 39,904 |
| Bank loans | 3,032 | 2,600 | — | — | — |
| Notes payable | 4,000 | 4,000 | 6,600 | 6,600 | 4,000 |
| Capital lease obligations | 22 | 1,079 | 3,070 | 2,242 | 4,734 |
| Related party line of credit | 5,042 | 7,792 | 10,542 | 10,000 | |
| Accumulated deficit | (327,659) | (256,048) | (203,559) | (153,372) | (108,394) |
| Total stockholders equity (deficit) | 56,764 | 45,589 | 22,701 | (4,564) | 15,421 |

A factor affecting the comparability of information between 2004 and 2005 was our public offering in February 2005, in which an aggregate of approximately 9.8 million shares of common stock were sold for net proceeds of approximately $68.4 million.

A factor affecting the comparability of information between 2003 and 2004 was our public offering in March 2004, in which an aggregate of approximately 5.8 million shares of common stock were sold for net proceeds of approximately $69.5 million.

Two factors affecting the comparability of information between 2002 and 2003 was our merger with Variagenics, Inc. on January 31, 2003, in which approximately 13.3 million shares of common stock were issued

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

to Variagenics shareholders for an approximate net purchase price of $48.6 million. In addition, in October 2003, an aggregate of approximately 3.8 million shares of common stock were sold in an underwritten public offering for net proceeds of approximately $26.3 million.

A factor affecting the comparability of information between 2001 and 2002 was our private placement offering in April 2002, in which an aggregate of approximately 1.2 million shares of common stock and warrants to purchase an aggregate of approximately 0.3 million shares of common stock were sold for net proceeds of approximately $14.3 million.

43

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Item 7.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

We have included or incorporated by reference into this Management's Discussion and Analysis of Financial Condition and Results of Operations and elsewhere in this Annual Report on Form 10-K, and from time to time our management may make statements that constitute "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words including "anticipate," "believe," "intends," "estimates," "expect," "should," "may," "potential" and similar expressions. Such statements are based on our management's current expectations and involve risks and uncertainties. Although we believe that the expectations reflected in the forward-looking statements are reasonable, our actual results and performance could differ materially from those projected in the forward-looking statements as a result of many factors discussed in this Annual Report, including those set forth in this Item 7 as well as under "Item 1. Business" and "Item 1A. Risk Factors." We do not intend to update any of the forward-looking statements after the date of this Annual Report to conform these statements to actual results unless required by law.

## Overview

We are a biopharmaceutical company dedicated to improving the lives of patients through the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. Our development pipeline includes three acute cardiovascular programs focused on alfimeprase, a direct-acting thrombolytic in Phase 3 clinical trials for the treatment of thrombotic-related disorders; rNAPc2, an anticoagulant that inhibits the factor VIIa and tissue factor protease complex that is currently in Phase 2 clinical development for acute coronary syndrome, and a thrombin inhibiting aptamer for anticoagulation during medical procedures. We are also progressing an emerging oncology pipeline, which includes preclinical candidate NU206, for the potential treatment of chemotherapy/radiation therapy-induced mucositis and rNAPc2 for potential use in a variety of cancers based on its apparent role in the cellular signaling of both metastasis and angiogenesis. In addition, we expect to leverage our expertise in secreted proteins and cancer antibody discovery to further expand our pipeline and create additional partnering and licensing opportunities.

### Alfimeprase

Our lead product candidate, alfimeprase, is a thrombolytic agent with a novel mechanism of action. It is a modified and recombinant version of fibrolase, a naturally occurring enzyme that directly and rapidly degrades fibrin, the protein that provides the structural scaffold of blood clots. Currently, we have two Phase 3 programs in progress for alfimeprase, one in patients with acute PAO and one in patients with occluded central venous catheters. In April 2005, we commenced the first of two trials in the alfimeprase Phase 3 acute PAO program, known as NAPA (Novel Arterial Perfusion with Alfimeprase). This program consists of two overlapping trials that will include a total of 600 patients between the two trials. The first trial in this program, NAPA-2, is a randomized, double-blind study comparing 0.3 mg/kg of alfimeprase versus placebo in 300 patients. The trial will be conducted in approximately 100 centers worldwide. The study's primary endpoint is avoidance of open vascular surgery within 30 days of treatment. Open vascular surgery includes procedures such as surgical embolectomy, peripheral arterial bypass graft surgery and amputation, but does not include catheter-based procedures such as percutaneous angioplasty or stenting. A variety of secondary endpoints are also being evaluated, including safety endpoints such as the incidence of bleeding, as well as pharmacoeconomic endpoints such as length of hospital and intensive care unit stay. We expect to complete enrollment in the NAPA-2 trial in the second half of 2006. The second Phase 3 trial, NAPA-3, is under a special protocol assessment (SPA) agreement with the U.S. Food and Drug Administration (FDA), and will essentially replicate the NAPA-2 trial. Under an SPA, the FDA provides guidance on the design of a trial prior to its initiation. We expect to begin enrollment in the NAPA-3 trial in early 2006. We have been granted fast track designation by the FDA for alfimeprase in acute PAO. Fast track designation can potentially facilitate development and expedite review of biologics license applications. Fast track designation is reserved for new drugs that demonstrate the potential to address an unmet medical need and are intended for treatment of a serious or life-threatening condition. In addition, we have obtained orphan drug status for alfimeprase in the United States and Europe for the treatment

44

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

of acute PAO, which may provide us with up to seven and ten years of market exclusivity in the United States and Europe, respectively, following market authorization.

In September 2005, we commenced the first of two multi-national trials in the alfimeprase Phase 3 catheter occlusion program, known as SONOMA (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase). The first trial is an efficacy study called SONOMA-2, which is a randomized, double-blind trial, comparing 3.0 mg of alfimeprase with placebo in 300 patients with occluded central venous catheters. Two-thirds of the patients will receive alfimeprase and the remainder will receive placebo. The study's primary endpoint is restoration of function to occluded central venous catheters at 15 minutes. We expect to complete enrollment in the SONOMA-2 trial in the second half of 2006. The second study, known as SONOMA-3, is an open label, single-arm trial evaluating alfimeprase in 800 patients. This study's primary endpoint is safety, although we will be evaluating efficacy in these patients as well. We began enrolling patients in this trial in February 2006.

We also intend to expand our alfimeprase pipeline by initiating a Phase 2 clinical trial in the second half of 2006 to evaluate the potential of alfimeprase for the treatment of ischemic stroke and another Phase 2 clinical trial in 2007 to evaluate the potential of alfimeprase to treat deep venous thrombosis (DVT).

In January 2006, we entered into a license and collaboration agreement with Bayer for the global development and commercialization of alfimeprase. Under this agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay us tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent. We retain all commercialization rights and profits from alfimeprase sales in the United States. We are eligible to receive up to $385.0 million in milestone payments from Bayer, including a $50.0 million up-front cash payment that we received in January 2006, up to $165.0 million in development milestones and $170.0 million in sales and commercialization milestones over the course of the agreement. We expect to receive a $10.0 million development milestone fee in the second half of 2006 upon the initiation of a phase 2 trial for alfimeprase in ischemic stroke. In addition, Bayer will be responsible for 40 percent of the costs for global development programs. We will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. Each party will bear its own expenses for any country-specific alfimeprase clinical trials it conducts, where the country-specific clinical trials are not part of the agreed global development program.

In October 2004, we obtained worldwide rights to develop and commercialize alfimeprase from Amgen, in exchange for the future payment to Amgen of previously negotiated milestone payments and royalties. As a result of dosing the first patient in the first Phase 3 clinical trial for alfimeprase in April 2005, we paid a $5.0 million milestone fee to Amgen in May 2005. Future milestone payments under the license agreement could total as much as $35.0 million, although we currently cannot predict if or when any of these additional milestones will be achieved. Under our agreement with Bayer, we will continue to bear sole responsibility for these milestone payments and royalties owed to Amgen.

In June 2005, we entered into a development and validation agreement with Avecia Limited for the scaled-up manufacturing process of alfimeprase. In accordance with the terms of this agreement, Avecia will conduct process development and validation work for the manufacture of alfimeprase drug substance, in accordance with FDA regulations. Under the terms of our license agreement with Amgen, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to Avecia. We are to pay Avecia fees totaling £12.9 million for completion of this work, payable upon completion by Avecia of pre-negotiated milestones, including £2.9 million as a result of an amendment to the work program in December 2005 to provide for additional process development and validation work. Of the £12.9 million total commitment, £7.7 million ($13.6 million) had yet to be paid as of December 31, 2005.

45

Table of Contents
*rNAPc2*

Our second drug candidate, rNAPc2, is a recombinant version of a naturally occurring protein that has anticoagulant properties. Specifically, rNAPc2 has been shown to block the factor VIIa and tissue factor protease complex, which is responsible for the initiation of the process leading to blood clot formation and has also been shown to play a role in both metastasis, or the secondary growth of cancer cells, and angiogenesis, or the formation of new blood vessels, as they relate to tumor growth. In May 2005, we completed a Phase 2a double-blind, placebo-controlled clinical trial showing that rNAPc2 has an acceptable safety profile and is well tolerated in doses up to ten micrograms/kg in patients being treated for ACS, including unstable angina, and non-ST segment elevation myocardial infarction. Additional data is now being generated from this Phase 2a trial based on surrogate endpoints, and we expect to present efficacy data sometime in 2006. Based on these encouraging results, we initiated a Phase 2 heparin-replacement trial with rNAPc2 in August 2005. This trial is expected to complete enrollment in the first half of 2006. In addition, we are investigating the potential of rNAPc2 as a cancer therapy.

We have obtained exclusive worldwide rights to all indications of rNAPc2 and all other rNAPc molecules owned by Dendreon Corporation, as a result of a licensing agreement entered into with them in February 2004. Under the terms of the agreement, we paid Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock), and incurred $5.6 million in expenses for this and related development costs in 2004 and $1.5 million for related development costs in 2005. Future milestone payments to Dendreon could reach as much as $23.5 million if all development and commercialization milestones are achieved. A $2.0 million milestone for dosing of the first patient in a Phase 3 clinical trial may be achieved within the next 12 months, although we currently cannot predict if or when this or any other milestones will be achieved. If rNAPc2 is commercialized, we will also be responsible for paying future royalties to Dendreon depending on sales of rNAPc2.

*Thrombin Inhibiting Aptamer*

We continue to pursue the development of a thrombin inhibiting aptamer under a collaboration agreement entered into with Archemix Corporation, a privately held biotechnology company located in Cambridge, Massachusetts, in January 2004. In September 2005, we concluded a Phase 1 clinical study for the first target molecule from this program, ARC183. This study evaluated the safety, tolerability, anticoagulation activity and titratability of ARC183 for potential use in acute cardiovascular settings such as CABG surgery. Preliminary results from the trial showed that administration of ARC183 resulted in a rapid onset of anticoagulation and demonstrated stable, dose-related anticoagulation activity and rapid self-reversal of drug effects after administration of the drug infusion ceased. However, the amount of drug needed to achieve the desired anticoagulation for use in CABG surgery resulted in a sub-optimal dosing profile. For that reason, we decided jointly with Archemix not to pursue further development of ARC183 and instead are pursuing optimized thrombin inhibiting aptamers.

In accordance with the terms of the agreement, we paid Archemix an upfront fee of $3.0 million and paid the first $4.0 million of costs associated with development. We and Archemix will equally share all development and commercialization costs in excess of $4.0 million. We incurred $7.7 million in expenses for the upfront fee and related development costs in 2004 and $2.6 million for related development costs in 2005. Archemix is initially responsible for leading development and for all clinical development activities through the dosing of the first patient in a Phase 2 study. Thereafter, we and Archemix will agree on leadership of clinical development and commercialization activities. We are required to pay Archemix total development milestone payments of up to $11.0 million, consisting of $10.0 million upon dosing of the first patient in a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Archemix and us for IND-enabling studies. The milestone for designation of a backup compound may be achieved within the next 12 months, although we currently cannot predict if or when this or the $10.0 million milestone will be achieved.

46

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents
### NU206

Preclinical candidate, NU206, is a highly specific and potent gastrointestinal epithelial growth factor. We plan to initially pursue NU206 as a supportive cancer therapy, specifically to treat radiation and chemotherapy-induced mucositis in the gastrointestinal tract and expect to initiate a Phase 1 clinical program with NU206 in the second half of 2006.

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin Brewery Company, Ltd., for the development and commercialization of NU206. Under this agreement, we received a $2.0 million upfront cash payment from Kirin in April 2005, and we will lead worldwide development, manufacturing and commercialization of the compound. All operating expenses and profits related to the development and commercialization of NU206 will be shared 60 percent by us and 40 percent by Kirin. If this agreement is terminated, or Kirin or we elect under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit-sharing structure to a royalty-based structure.

### Financing and Facilities

In February 2006, we raised approximately $111.9 million in a public offering, after deducting underwriters' fees and stock issuance costs of approximately $7.7 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share. We intend to use the net proceeds from this offering for the advancement of our drug candidates in clinical trials, the development of a commercialization infrastructure, capital expenditures, and to meet working capital needs. The amounts and timing of the expenditures will depend on numerous factors, such as the timing and progress of our clinical trials and research and development efforts, technological advances and the competitive environment for our drug candidates. We expect from time to time to evaluate the acquisition of businesses, products and technologies for which a portion of the net proceeds may be used, although we currently are not planning or negotiating any such transactions. In addition, under our lease agreement for our facilities at 985 Almanor Avenue, Sunnyvale, California, as amended, in February 2006 we paid The Irvine Company approximately $3.7 million from these proceeds, being ten percent of the net amount raised in excess of $75.0 million.

In August 2005, we entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge Capital Ltd., under which Kingsbridge has committed to purchase up to a total of $75.0 million of our common stock within a three-year period, subject to certain conditions and limitations. We plan to use the net proceeds from any securities issued under this agreement for general corporate purposes, including the advancement of our drug candidates in clinical trials, capital spending and working capital. As part of the arrangement, we issued a warrant to Kingsbridge to purchase 350,000 shares of our common stock at a price of $12.07 per share. Under this facility, we sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005.

In February 2005, we raised $68.4 million in a public offering, after deducting underwriters' fees and stock issuance costs of $4.9 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share.

In January 2005, we entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for 61,826 square feet of industrial space at 201 Industrial Road in San Carlos, California, which became our primary headquarters in September 2005. The lease commenced on September 1, 2005 and contains an option to cancel the lease after five years upon payment of certain amounts specified in the lease, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), rights of first refusal over all vacant space in the building during the first two years of the lease, and an expansion option for a specified amount of space. The lease contains a tenant improvement allowance of $8.9

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

million, which was fully utilized in 2005. On March 10, 2006, the lease was amended to provide for the exercise of our expansion option over 7,624 square feet of rentable space. The amendment allows for a tenant improvement allowance of $1.0 million.

## Results of Operations

Nuvelo's core business is to discover, develop and commercialize novel acute cardiovascular and cancer therapies. The following results of operations include those of both Nuvelo and Callida Genomics, Inc. (Callida), through its disposal on December 3, 2004. The results of Callida have been reclassified to discontinued operations for all periods presented.

### Contract Revenues

Contract revenues were $0.5 million in 2005, compared to $0.2 million in 2004 and $1.0 million in 2003. The $0.3 million increase in 2005 from 2004 was primarily due to the recognition of revenue from the one-time upfront fee of $2.0 million received from Kirin under the NU206 collaboration agreement, which was deferred and is being recognized on a straight-line basis over the related performance period. The $0.8 million decrease in 2004 from 2003 was primarily due to $0.5 million of deferred revenues recognized in 2003 from the $4.0 million license payment received from Affymetrix as part of the October 2001 settlement of all our outstanding litigation with Affymetrix, with no corresponding amount in 2004.

We expect revenues to increase significantly during 2006, due to the recognition of revenue from the upfront license fee of $50.0 million received from Bayer in January 2006. This amount will be recognized on a straight-line basis over the related performance period. In addition, we expect to record revenues following the receipt of a $10.0 million milestone due from Bayer if we initiate a trial for alfimeprase in ischemic stroke in the second half of 2006. Our revenues may vary significantly from quarter to quarter as a result of this and other licensing or collaboration activities. In the future, we may not be able to maintain existing collaborations, obtain additional collaboration partners or obtain revenue from other sources, which could have a material adverse effect on our revenues, operating results and cash flows.

### Research and Development Expenses

| | Years Ended December 31, | | | % Change in 2005 | % Change in 2004 |
|---|---|---|---|---|---|
| | 2005 | 2004 (In thousands) | 2003 | | |
| Research and development | $57,778 | $39,970 | $30,014 | 45% | 33% |

Research and development (R&D) expenses, primarily consist of R&D personnel costs, clinical trial and drug manufacturing costs, license, collaboration and royalty fees and allocated facilities expenses. The expense for 2005 includes an adjustment of $0.6 million that was recorded subsequent to our earnings release dated February 27, 2006.

The $17.8 million increase in R&D expense in 2005 as compared to 2004 was primarily due to a $12.1 million increase in consulting and outside service expenses related to clinical trials, a $6.7 million increase in clinical trial supplies expense, largely from the use of alfimeprase drug product in clinical trials and from a $2.0 million write-off for drug product in excess of anticipated requirements, and a $3.8 million increase in R&D personnel expenses in support of these activities. These increases were partially offset by a $2.2 million decrease in license fees, primarily as a result of the difference between the $5.0 million milestone payment to Amgen in 2005 and the $7.0 million of license fees paid to Archemix and Dendreon in 2004.

The $10.0 million increase in R&D expense in 2004 as compared to 2003 was primarily due to $7.0 million in upfront fees related to our license and collaboration agreements signed with Dendreon and Archemix,

48

Table of Contents

respectively, in the first quarter of 2004, and an increase of $4.7 million in overall clinical trial and research-related costs to continue supporting development of our current drug candidates in 2004, partially offset by $2.7 million in R&D savings realized during 2004 from completion of the shut-down of our Variagenics research operations in Cambridge, Massachusetts in 2003.

R&D expenses included in the statement of operations for 2005 and since inception for our significant programs are as follows (including license and collaboration fees):

| Program | 2005 | Since Inception |
|---|---|---|
| | (In millions) | |
| Alfimeprase | $ 34.8 | $ 61.6 |
| rNAPc2 | $ 1.5 | $ 7.1 |
| Thrombin inhibiting aptamer | $ 2.6 | $ 10.3 |
| NU206 | $ 2.7 | $ 2.7 |

We expect gross R&D expenses to increase significantly during 2006, as we intensify our alfimeprase Phase 3 clinical trial activity and increase alfimeprase manufacturing expenditures under our agreement with Avecia and future agreements with any other drug manufacturers. The increase will be partially offset by cost-sharing reimbursements from Bayer for 40 percent of alfimeprase-related global development spending.

The timing, cost of completing the clinical development of any product candidate, and any potential future product revenues will depend on a number of factors, including the disease or medical condition to be treated, clinical trial design and endpoints, availability of patients to participate in trials and the relative efficacy of the product versus treatments already approved. Due to these uncertainties, we are unable to estimate the length of time or the costs that will be required to complete the development of these product candidates. We do not expect to generate any product revenue until we reach the commercialization stage for any of our drug products, if this ever occurs.

### General and Administrative Expenses

| | Years Ended December 31, | | | % Change in 2005 | % Change in 2004 |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | | |
| | (In thousands) | | | | |
| General and administrative | $15,801 | $8,702 | $15,069 | 82% | (42)% |

General and administrative (G&A) expenses primarily consist of G&A personnel and consulting costs, including those related to pre-commercialization activities, professional fees, insurance, facilities and depreciation expenses, and various other administrative costs.

The $7.1 million increase in G&A expense in 2005 as compared to 2004 was primarily due a $2.4 million increase in G&A personnel costs and a $2.1 million increase in consulting and outside service expenses, as we build the infrastructure necessary to support our growth and begin preparations for the planned commercial launch of alfimeprase.

The $6.4 million decrease in G&A expense in 2004 as compared to 2003 was primarily due to a $4.6 million decrease from rent and option termination expenses in 2003 related to the Humboldt Court facility lease, and $3.6 million in G&A savings realized during 2004 from completion of the shut-down of our Variagenics' operations in 2003, offset by increases in consulting and professional fees associated with the internal controls documentation, testing and auditing required under the Sarbanes-Oxley Act of 2002.

We expect G&A expenses to continue to increase in 2006 in order to support growth in our general operating activities and as we continue preparations for the planned commercial launch of alfimeprase.

49

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Loss on Sale of Assets*

Losses on sales of assets were $4,000 in 2005, compared to $0.2 million in 2004 and $1.2 million in 2003. The $1.0 million decrease in 2004 was primarily due to the $1.2 million write-off in 2003 of Humboldt Court leasehold improvements in connection with our decision not to exercise a purchase option in April 2003 related to an early lease termination agreement executed in November 2002.

*Interest and Other Income (Expense), net*

We had net interest and other income of $1.4 million in 2005, compared to net interest and other expense of $0.3 million in 2004 and $0.9 million in 2003. The $1.7 million increase in the net amount for 2005 as compared to 2004 was primarily due to decreased amortization of premiums/discounts related to our investment balances. The $0.6 million decrease in net expense for 2004 as compared to 2003 was primarily due to the increase in interest income resulting from higher average cash and investment balances due to public offerings completed in October 2003 and March 2004, partially offset by increased amortization of premiums/discounts related to our investment balances.

*Loss from Continuing Operations*

Since our inception, we have incurred significant net losses, and as of December 31, 2005, our accumulated deficit was $327.7 million. During 2005, we incurred a net loss from continuing operations of $71.6 million as compared to $48.9 million in 2004 and $46.2 million in 2003. The $22.7 million increase in the loss from continuing operations in 2005 as compared to 2004 resulted primarily from increases in R&D expenses related to clinical trials and drug manufacturing for alfimeprase, the use of alfimeprase drug product as we progress our late-stage clinical trials and personnel costs in support of these activities, and higher general and administrative expenses incurred to build the infrastructure to support the company's growth and begin preparations for the planned commercial launch of alfimeprase.

We expect to continue to incur significant losses from continuing operations for the foreseeable future, which may increase substantially as we continue development of our clinical stage drug candidates, alfimeprase and rNAPc2, our thrombin inhibiting aptamer program, and our preclinical stage drug candidate, NU206. In addition, we expect to incur significant costs as we continue preparations for the planned commercial launch of alfimeprase, further expand research and development of potential biopharmaceutical product candidates, potentially in-license other drug candidates, and continue to prosecute and enforce our intellectual property rights.

*Loss from Discontinued Operations*

On December 3, 2004, we sold our subsidiary, Callida Genomics, Inc. (Callida). In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"*, the operating results of Callida have been reclassified to discontinued operations for all periods presented, with the related net losses being $3.5 million and $4.0 million in 2004 and 2003, respectively. The loss in 2004 includes a charge to our earnings of $1.6 million resulting from the sale of Callida, primarily representing the difference between the value of the convertible promissory notes received and the carrying value of Callida's assets and liabilities on our balance sheet.

50

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents
Liquidity and Capital Resources

Cash, cash equivalents and short-term investment balances at the end of 2005 and 2004 were as follows:

|  | December 31, 2005 | December 31, 2004 |
|---|---|---|
|  | (In thousands) | |
| Cash and cash equivalents | $ 37,764 | $ 16,811 |
| Short-term investments | 32,572 | 33,814 |
| Cash, cash equivalents and short-term investments | $ 70,336 | $ 50,625 |

Cash flows from operating, investing and financing activities in 2005, 2004 and 2003, including those from discontinued operations, were as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (In thousands) | | |
| Net cash used in operating activities | $(59,035) | $(50,112) | $(45,066) |
| Net cash (used in) provided by investing activities | (1,175) | (13,576) | 28,393 |
| Net cash provided by financing activities | 81,163 | 67,358 | 27,589 |
| Net increase in cash and cash equivalents | $ 20,953 | $ 3,670 | $ 10,916 |

### Cash, Cash Equivalents and Short-Term Investments

As of December 31, 2005, we had total cash, cash equivalents and short-term investments of $70.3 million, as compared to $50.6 million as of December 31, 2004. The increase of $19.7 million resulted primarily from net cash proceeds of $68.4 million from a public offering in February 2005 and $14.2 million from two draw-downs under the Kingsbridge CEFF in the fourth quarter of 2005, being offset by $59.0 million of cash used in operating activities and $4.9 million of payments on debt obligations in 2005.

In January 2006, we received a $50.0 million up-front cash payment from Bayer upon entry into the license and collaboration agreement for alfimeprase, and in February 2006, we raised approximately $111.9 million in a public offering, after deducting underwriters' fees and stock issuance costs of approximately $7.7 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share.

As of December 31, 2005, all of our short-term investments in marketable securities have maturities of less than one year, and have been classified as available-for-sale securities, as defined by Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities"* (SFAS 115). These securities are recorded at their fair value and consist of U.S. government agency and corporate debt, and asset-backed securities. We make our investments in accordance with our investment policy. The primary objectives of our investment policy are liquidity, safety of principal and diversity of investments.

### Sources and Uses of Capital

Our primary sources of liquidity to date have been cash from financing activities, collaboration receipts and our merger with Variagenics in January 2003. We plan to continue to raise funds through additional public and/or private offerings and collaboration activities in the future.

In February 2005, we raised $68.4 million in a public offering, after deducting underwriters' fees and stock issuance costs of $4.9 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share.

51

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

In August 2005, we entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge, under which Kingsbridge has committed to purchase up to a total of $75.0 million of our common stock within a three-year period, subject to certain conditions and limitations. As of December 31, 2005, we had $60.6 million remaining available under the CEFF, having sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005 under this facility.

In August 2004, we entered into a Loan and Security Agreement (Loan Agreement), with Silicon Valley Bank (SVB) that originally provided a $6.0 million term loan facility and a $4.0 million revolving credit line, and grants SVB a security interest over certain of our assets, excluding intellectual property. The Loan Agreement contains certain covenants and reporting requirements, which we were in full compliance with as of December 31, 2005. Proceeds may be used solely for working capital or other general business needs. In December 2004, we completed a $2.6 million initial draw-down from the term loan facility, the proceeds of which were used to repay a note for the same amount that was owed to AMB Property, LP in relation to the termination of a lease agreement for facilities at Humboldt Court in Sunnyvale, California. In March 2005, we completed a $1.5 million second draw-down from the term loan facility, with $0.6 million of these proceeds being used to pay off certain capital leases. On June 30, 2005, the remaining $1.9 million of the term loan facility expired unused. The $2.6 million draw-down is being repaid in 30 equal monthly installments, plus accrued interest of 6.43% per annum, starting from May 1, 2005; the $1.5 million draw-down is being repaid in 36 equal monthly installments, plus accrued interest of 6.78% per annum, starting from April 1, 2005.

In July 2005, the Loan Agreement was amended to increase the revolving credit line facility from $4.0 million to $8.0 million and extend the facility through August 29, 2006. We have yet to draw-down any of the funds available under this revolving credit line. Of the $8.0 million total facility, $6.0 million is currently being used to collateralize a letter of credit issued to The Irvine Company related to the lease for the facility at 985 Almanor Avenue in Sunnyvale, California. This letter of credit was increased from $4.0 million to $6.0 million in July 2005 in order to replace the guarantee provided by Dr. Rathmann to The Irvine Company. The remaining $2.0 million is being used partly as collateral for foreign exchange hedging contracts with SVB, and partly being available for working capital or other general business needs. Any borrowings under this line shall bear interest at SVB's prime rate, and would cause replacement collateral to be required for the items above.

Dr. Rathmann, a member of our board of directors and chairman emeritus, provided us with a $20.0 million line of credit in August 2001, of which we have drawn down $11.0 million, with the remaining $9.0 million having expired unused. The related promissory note bears interest at the prime rate plus 1%. In November 2003, we began repaying the outstanding balance over 48 months with equal principal payments of $0.2 million. Accrued interest will be paid with the final payment in October 2007, unless both are repaid before then. As of December 31, 2005, the remaining principal and accrued interest to date totaled $6.9 million, and the interest rate on the note on this date was 8.25%. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of our common stock at a price based upon the average price of our common stock over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of December 31, 2005, 818,347 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

We issued Affymetrix a five-year promissory note for $4.0 million in November 2001, bearing a fixed annual interest rate of 7.5%. Accrued interest will be paid with the final principal payment on November 13, 2006, unless both are repaid before then. As of December 31, 2005, the remaining principal and accrued interest to date totaled $5.2 million. The outstanding principal and interest under the note may be repaid in whole or in part at any time, at our option, by conversion into shares of our common stock at a price based upon 90% of the average price of our common stock over a 10-day period ending 2 days prior to the conversion. As of December 31, 2005, 700,011 shares would be issuable to fully repay the principal and interest outstanding upon conversion. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable if our market capitalization is under $50.0 million and Affymetrix reasonably determines that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed 10% of our market capitalization.

52

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Our primary uses of capital resources to date have been to fund operating activities, including research, clinical development and drug manufacturing expenses, license payments, and spending on capital items.

### Cash Used in Operating Activities

Net cash used in operating activities was $59.0 million in 2005, compared to $50.1 million in 2004 and $45.1 million in 2003. The increase of $8.9 million in 2005 as compared to 2004 was primarily due to an increase in spending related to clinical trials and drug manufacturing for alfimeprase. The increase of $5.0 million in 2004 as compared to 2003 was primarily due to payments to Amgen of $8.5 million in relation to the termination of the collaboration agreement in October 2004, as well as total license and collaboration agreement fees of $3.5 million paid to Dendreon and Archemix, partially offset by the elimination of $6.3 million of expenses incurred in 2003 resulting from our merger with Variagenics in January 2003.

We expect gross operating spending to increase significantly during 2006, as we advance our alfimeprase Phase 3 clinical trial activity and increase alfimeprase manufacturing expenditures under our agreement with Avecia and future agreements with any other drug manufacturers, and incur additional general corporate expenses, including those for continued preparations for the planned commercial launch of alfimeprase. This increase in spending is expected to be offset by the $50.0 million up-front payment received from Bayer in January 2006 upon entry into our license and collaboration agreement for alfimeprase, the related 40 percent cost sharing reimbursements for global development spending, and a potential $10.0 million milestone fee due from Bayer if we initiate a trial for a stroke indication. Our future milestone payments under current agreements with Amgen, Dendreon and Archemix could total $69.5 million, although we currently cannot predict with any certainty if or when any of these milestones will be achieved.

### Cash Used in / Provided by Investing Activities

Net cash used in investing activities was $1.2 million in 2005, compared to $13.6 million in 2004 and $28.4 million provided by investing activities in 2003. The net decrease of $12.4 million in 2005 as compared to 2004 was primarily due to an increase in cash provided by sales or maturities of investments. The net increase of $42.0 million in 2004 as compared to 2003 was primarily due to $25.7 million of cash received from the acquisition of Variagenics in 2003, and increased purchases of short-term investments as a result of cash raised from the public offering completed in March 2004, partially offset by an increase in proceeds from the subsequent sales or maturities of those investments.

### Cash Provided by Financing Activities

Net cash provided by financing activities was $81.2 million in 2005, compared to $67.4 million in 2004 and $27.6 million in 2003. The amounts are primarily comprised of the net proceeds from public offerings of $68.4 million, $69.5 million and $26.5 million in 2005, 2004 and 2003, respectively, plus additional net cash proceeds of $14.2 million from two draw-downs under the Kingsbridge CEFF in 2005.

Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth under "Item 1A. Risk Factors." We may not be able to secure additional financing to meet our funding requirements on acceptable terms, if at all. If we raise additional funds by issuing equity securities, substantial dilution to our existing stockholders may result. If we are unable to obtain additional funds, we will have to reduce our operating costs and delay our research and development programs. We believe that we have adequate cash reserves to fund our operations for at least the next twelve months.

53

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Contractual Obligations*

The following table summarizes our significant contractual obligations as of December 31, 2005, and the effect such obligations are expected to have on our liquidity and cash flow in future periods (in thousands):

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 and Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Contractual obligations: | | | | | | | |
| Operating lease obligations | $ 9,021 | $ 9,292 | $ 9,572 | $ 8,822 | $ 8,379 | $ 8,984 | $ 54,070 |
| Bank loans (a) | 1,695 | 1,420 | 126 | — | — | — | 3,241 |
| Note payable (b) | 5,239 | — | — | — | — | — | 5,239 |
| Capital lease obligations (a) | 12 | 14 | — | — | — | — | 26 |
| Related party line of credit (c) | 2,750 | 4,145 | — | — | — | — | 6,895 |
| Facility restoration obligation (d) | — | — | — | — | — | 509 | 509 |
| Total contractual obligations | $ 18,717 | $ 14,871 | $ 9,698 | $ 8,822 | $ 8,379 | $ 9,493 | $ 69,980 |

(a)   Includes interest payments at fixed rates of interest.

(b)   Fixed interest of 7.5% per annum is accrued and due with the final loan payment in November 2006. Includes $1.2 million interest accrued as of December 31, 2005. The outstanding principal and interest may be repaid in whole or in part at any time, at our option, by conversion into shares of our common stock.

(c)   Interest is accrued at a variable rate based on the current prime rate plus 1% and is due with the final line of credit payment in October 2007. Includes $1.9 million interest accrued as of December 31, 2005. The outstanding principal and interest may be repaid at any time upon mutual agreement, by conversion into shares of our common stock.

(d)   Includes estimated interest accretion at 7.25% per annum.

The foregoing table does not include milestone payments potentially payable by us under our collaboration agreements and licenses. Such milestone payments are dependent upon the occurrence of specific milestones events and not the passage of time.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our operating results and financial condition is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of the financial statements requires us to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent amounts. While we believe our estimates, judgments and assumptions are reasonable, the inherent nature of estimates is that actual results will likely differ from the estimates made.

We believe the following critical accounting policies, among others, affect the more significant judgments and estimates used in the preparation of our consolidated financial statements.

*Clinical Trial Drug Manufacturing Expense and Clinical Trial Supplies Asset*

In accordance with Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 2, *"Accounting for Research and Development Costs"* (SFAS 2), we capitalize clinical trial drug manufacturing costs as "clinical trial supplies", a current asset on our balance sheet, as long as there are alternative future uses for the related clinical trial drug material in other indications not currently being studied, (e.g., for alfimeprase, these include deep-vein thrombosis and stroke). We recognize clinical trial drug manufacturing expense when completed drug material is shipped from the manufacturing or storage facility for use in a clinical trial or for testing, or is otherwise consumed. On a quarterly basis, we evaluate whether there continues to be alternative future use for any capitalized drug material, and if the material is obsolete or in excess

54

Table of Contents

of anticipated requirements. Any capitalized drug material will be written-off to research and development expense in the quarter in which there ceases to exist an alternative future use, or if the material is obsolete or in excess of anticipated requirements, which may result in a significant adverse impact to our financial condition and results of operations. In the fourth quarter of 2005, a non-cash write-off of $2.0 million was charged to research and development expense for drug product in excess of anticipated requirements.

### Impairment or Disposal of Long-Lived Assets

Periodically, we determine whether any long-lived asset or related asset group has been impaired based on the criteria established in Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"* (SFAS 144). SFAS 144 requires, among other things, that impairment losses be recognized whenever the carrying amount of the asset or asset group exceeds its fair value. Intangibles with determinable useful lives and other long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, and we perform an annual impairment review regardless of any such events or changes. Our judgments regarding the existence of impairment indicators are based on historical and projected future operating results, changes in the manner of our use of the acquired assets, our overall business strategy or market and economic trends. Events may occur that could cause us to conclude that impairment indicators exist and that certain long-lived assets or related asset groups are impaired, which may result in a significant adverse impact to our financial condition and results of operations. There were assessed to be no impairments to long-lived assets as of December 31, 2005.

### Goodwill

We applied the provisions of Statement of Financial Accounting Standards No. 142, *"Goodwill and Other Intangible Assets"* (SFAS 142) upon the completion of the merger with Variagenics in January 2003. SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and these assets will be reviewed for impairment in accordance with SFAS 144 as noted above.

The SFAS 142 goodwill impairment model involves a two-step process. First, we compare the fair value of the reporting unit with its carrying value, including goodwill. The estimated fair value of the reporting unit, in this case the Nuvelo business segment, being the only business segment in the company, is computed by multiplying the quoted market price of the company's common stock on the Nasdaq National Market by the outstanding common stock of the company at that time.

If the fair value of the reporting unit is determined to be more than its carrying value, including goodwill, no goodwill impairment is recognized. If the fair value of the reporting unit is determined to be less than its carrying value, goodwill impairment, if any, is computed using the second step. The second step requires the fair value of the reporting unit to be allocated to all the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination at the date of the impairment test and the fair value of the reporting unit was the price paid to acquire it. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied value of goodwill, which is used to determine the impairment amount.

We have designated October 31 as the annual impairment testing date for goodwill, although additional testing may be performed if circumstances warrant a re-evaluation. If it is determined that the carrying value of goodwill has been impaired, the value would be reduced by a charge to operations in the amount of the impairment, which may result in a significant adverse impact to our financial condition and results of operations. There was assessed to be no goodwill impairment based on the testing performed on October 31, 2005.

55

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Clinical Trial and Drug Manufacturing Accruals*

We accrue costs for clinical trial and drug manufacturing activities based upon estimates of the services received and related expenses incurred that have yet to be invoiced by the contract research organizations (CROs), clinical study sites, drug manufacturers, collaboration partners, laboratories, consultants, or otherwise. Related contracts vary significantly in length, and may be for a fixed amount, a variable amount based on actual costs incurred, capped at a certain limit, or for a combination of these elements. Activity levels are monitored through close communication with the CROs and other vendors, including detailed invoice and task completion review, analysis of expenses against budgeted amounts, and pre-approval of any changes in scope of the services to be performed. Each CRO or significant vendor provides an estimate of costs incurred but not invoiced at the end of each period for each individual trial or project. The estimates are reviewed and discussed with the CRO or vendor as necessary, and are included in research and development expenses for the related period or capitalized as clinical trial supplies, as necessary. For clinical study sites, which are paid at least quarterly on a per-patient basis to the institutions performing the clinical study, we accrue an estimated amount based on patient enrollment in each period. All estimates may differ significantly from the actual amounts subsequently invoiced. No adjustments for material changes in estimates have been recognized in any period presented.

*Revenue Recognition*

We recognize revenue when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. We defer upfront refundable fees and recognize revenues upon the later of when they become non-refundable or when performance obligations are completed or considered perfunctory or inconsequential. In situations where we have no continuing performance obligations, or our continuing obligations are perfunctory or inconsequential, we recognize upfront non-refundable fees as revenues on the effective date of the related agreement. Upfront non-refundable licensing fees that require continuing involvement in the form of development, manufacturing or other commercialization efforts by us are recognized as revenue ratably over the period until our performance obligations in relation to these fees become inconsequential. Revenues related to collaborative research agreements and government grants are generally recognized ratably over the term of the related agreement as the services are performed.

*Stock-Based Compensation*

In accordance with the provisions of Statement of Financial Accounting Standards No. 123, *"Accounting for Stock-Based Compensation"* (SFAS 123), as amended by SFAS No. 148, *"Accounting for Stock-Based Compensation — Transition and Disclosure"* (SFAS 148), we have elected to account for stock-based employee compensation under the provisions of Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees,"* and its related interpretations, and to adopt the "disclosure only" alternative described in SFAS 123, as amended by SFAS 148. Stock options granted to non-employees are accounted for in accordance with SFAS 123 and Emerging Issues Task Force No. 96-18, *"Accounting for Equity Instruments that Are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* Effective from the beginning of our 2006 fiscal year, we will be subject to Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment,"* which will have a material adverse effect on our consolidated results of operations (see Recent Accounting Pronouncements below).

*Income Taxes*

Income taxes are accounted for under the asset and liability method pursuant to Statement of Financial Accounting Standards No. 109, *"Accounting for Income Taxes"* (SFAS 109). Under SFAS 109, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates

56

Table of Contents

expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

We record a valuation allowance to reduce deferred income tax assets to an amount that is more likely than not to be realized. Assessment of the realization of deferred income tax assets requires that estimates and assumptions be made as to the taxable income of future periods. Our deferred tax assets have been reduced to zero, as management believes that it is more likely than not that the deferred tax assets will not be realized. Projection of future period earnings is inherently difficult as it involves consideration of numerous factors such as our overall strategies and estimates of new product development and acceptance, product lifecycles, selling prices and volumes, responses by competitors, manufacturing costs and assumptions as to operating expenses and other industry specific and macro and micro economic factors. In addition, consideration is also given to ongoing and constantly evolving global tax laws and our own tax minimization strategies.

### Foreign Currency Transactions and Contracts

We use foreign exchange forward contracts, and similar instruments, to mitigate the currency risk associated with the acquisition of goods and services under agreements with vendors that are denominated in foreign currency. Contracts for anticipated transactions are designated and documented as cash flow hedges under Statement of Financial Accounting Standards No. 133, *"Accounting for Derivative Instruments and Hedging Activities"* (SFAS 133) at hedge inception, and are evaluated for effectiveness at least quarterly. We only hedge exposures that can be confidently identified and quantified, and do not enter into speculative foreign currency transactions. All contracts have maturities of one year or less. In accordance with SFAS 133, all derivatives, such as foreign currency forward contracts, are recognized as either assets or liabilities in the balance sheet and measured at fair value. The effective component of the hedge gains and losses are recorded in other comprehensive income (loss) within stockholders' equity in the balance sheet and reclassified to research and development expenses in the statement of operations when the forecasted transaction itself is recorded to the statement of operations. Any residual change in the fair value of the hedge contracts, such as ineffectiveness or time value excluded from effectiveness testing is recognized immediately as a general and administrative expense.

### Recent Accounting Pronouncements

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* (SFAS 123(R)), an amendment of Statement of Financial Accounting Standards No. 123, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize the fair value of employee stock options and other stock-based compensation as an expense. The statement eliminates the ability to account for share-based employee compensation transactions using APB Opinion No. 25, *"Accounting for Stock Issued to Employees,"* (APB 25), and generally requires instead that companies account for such transactions using a fair value based method, such as the Black-Scholes option pricing model, to fairly value stock options and recognize that value as an expense over the requisite service period. The standard is effective for us as of the beginning of the fiscal year commencing January 1, 2006. For all periods prior to January 1, 2006, we have accounted for our stock-based employee compensation plans in accordance with APB 25. SFAS 123(R) offers companies alternative methods of adopting this standard. We intend to adopt SFAS 123(R) using the modified prospective method. The adoption of SFAS 123(R) is expected to have a material adverse effect on our results of operations.

In May 2005, the FASB issued Statement of Financial Accounting Standards No. 154, *"Accounting Changes and Error Corrections — a Replacement of APB Opinion No. 20 and FASB Statement No. 3"* (SFAS 154). This statement changes the requirements for the accounting for and reporting of a change in accounting principle and applies to all voluntary changes in accounting principle and to changes required by an accounting pronouncement in the instance that the pronouncement does not include specific transition provisions. SFAS 154

57

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

requires retrospective application to prior periods' financial statements of the direct effects caused by a change in accounting principle, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. Further, changes in depreciation, amortization or depletion methods for long-lived, non-financial assets are to be accounted for as a change in accounting estimate affected by a change in accounting principle. SFAS 154 is effective for accounting changes and corrections made in fiscal years beginning after December 15, 2005. The adoption of this standard, beginning in fiscal year 2006, is not expected to have any material effect on our results of operations or financial condition.

## Off-Balance Sheet Arrangements

We have not participated in any transactions with unconsolidated entities, such as special purpose entities (SPEs), which would have been established for the purpose of facilitating off-balance sheet arrangements.

## Indemnifications

In the ordinary course of business, we enter into contractual arrangements under which we may agree to indemnify certain parties from any losses incurred relating to the services they perform on our behalf or for losses arising from certain events as defined within the particular contract. Such indemnification obligations may not be subject to maximum loss clauses. Historically, payments made related to these indemnifications have been immaterial. In addition, we have entered into indemnity agreements with each of our directors and executive officers. Such indemnity agreements contain provisions, which are in some respects broader than the specific indemnification provisions contained in Delaware law. We also maintain an insurance policy for our directors and executive officers insuring against certain liabilities arising in their capacities as such.

**Item 7A.**    *Qualitative and Quantitative Disclosures About Market Risk*

**Interest Rate Risk**

We place our investments with high quality issuers and, by policy, limit the amount of credit exposure with any one issuer. We do not use derivative financial instruments in our investment portfolio. We are averse to principal loss, and strive to ensure the safety and preservation of our invested funds by limiting default, market and reinvestment risk.

- We have exposure to changes in interest rates on our cash equivalents, which are held primarily in money market funds and debt securities with original maturities of 90 days or less, and that earn interest at variable rates.

- Changes in interest rates do not affect interest income on our short-term investments as they are maintained in U.S. government agency and corporate debt and asset-backed securities with fixed rates and original maturities of less than 24 months.

- Changes in interest rates do not affect interest income on any restricted cash we may hold, as it is generally maintained in commercial paper with fixed rates and original maturities of less than 90 days.

Changes in interest rates do not affect interest expense on our outstanding bank loans, note payable and capital leases, as they bear fixed rates of interest.

We have exposure to changes in interest rates on our revolving bank line of credit with Silicon Valley Bank, which bears interest at their prime rate. No draw-downs have been made on this line of credit to date.

We have exposure to changes in interest rates on our line of credit with Dr. George Rathmann, which bears interest at the prime rate plus 1%. Our interest rate exposure is mitigated by our ability to repay amounts outstanding under the line of credit with our common stock.

58

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

A hypothetical 10% change in market interest rates is not expected to have a material effect on our near-term financial condition or results of operations.

The table below summarizes the carrying amounts as of December 31, 2005 and 2004 and related average annual interest rates of our various financial instruments:

| | 2005 Average Rate | 2005 Carrying Amount | 2004 Average Rate | 2004 Carrying Amount |
|---|---|---|---|---|
| | | (In thousands) | | (In thousands) |
| Cash equivalents | 3.24% | $ 37,764 | 0.97% | $ 16,811 |
| Short-term investments | 2.71% | $ 32,572 | 1.49% | $ 13,814 |
| Restricted cash | —% | $ — | 1.37% | $ 191 |
| Bank loans | 6.56% | $ 3,032 | 6.43% | $ 2,600 |
| Notes payable | 7.50% | $ 4,000 | 7.50% | $ 4,000 |
| Capital lease obligations | 12.59% | $ 22 | 10.18% | $ 1,079 |
| Related party line of credit | 7.19% | $ 5,042 | 5.38% | $ 7,792 |

**Foreign Exchange Risk**

Some payments to overseas suppliers of goods or services may be denominated in foreign currencies. Accordingly, as part of our corporate risk management strategy, we have implemented a policy of hedging significant foreign currency exposures that can be confidently identified and quantified, in order to mitigate the impact of currency rate fluctuations on our cash outflows. We do not enter into speculative foreign currency transactions. In July 2005, we entered into a development and validation with Avecia Ltd. under which payments for their services are denominated in British pounds. As a result, our financial results could be adversely affected by future increases in the British pound exchange rate. In order to reduce our exposure to fluctuations in the British pound prior to any payment made under this contract, we entered into a number of foreign currency forward hedging contracts in 2005, all maturing within one year and being designated as cash flow hedges under SFAS 133. The table below provides information about the open derivative contracts at December 31, 2005, with amounts in U.S. dollar equivalents (in thousands, except for average contract rate):

| | December 31, 2005 | | |
|---|---|---|---|
| | Notional Amount | Average Contract Rate | Fair Value - Gain (Loss) |
| British pounds | $ 9,959 | 0.57 | $ (150) |

We have no investments denominated in foreign currencies, and therefore our investments are not subject to foreign currency exchange risk. However, at each quarter end, we may have liabilities for costs incurred by overseas providers that are denominated in foreign currencies that are not hedged because of their small size and/or short time until settlement. An increase or decrease in exchange rates on these unhedged exposures may affect our operating results.

59

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Item 8.    *Financial Statements and Supplementary Data*

Nuvelo, Inc.'s financial statements and notes thereto appear on pages 61 to 90 of this Annual Report on Form 10-K.

|  | Page |
| --- | --- |
| Reports of Independent Registered Public Accounting Firm | 61 |
| Consolidated Balance Sheets as of December 31, 2005 and 2004 | 63 |
| Consolidated Statements of Operations for the years ended December 31, 2005, 2004 and 2003 | 64 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the years ended December 31, 2005, 2004 and 2003 | 65 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2005, 2004 and 2003 | 66 |
| Notes to Consolidated Financial Statements | 67 |

60

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders of Nuvelo, Inc.:

We have audited the accompanying consolidated balance sheets of Nuvelo, Inc. and subsidiary as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the three-year period ended December 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Nuvelo, Inc. and subsidiary as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Nuvelo, Inc.'s internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2006 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/   KPMG LLP

San Francisco, California
March 15, 2006

61

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Nuvelo, Inc.:

We have audited management's assessment, included in Management's Report on Internal Control over Financial Reporting, that Nuvelo, Inc. maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Nuvelo, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Nuvelo, Inc. maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, Nuvelo, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Nuvelo, Inc. and subsidiary as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the three-year period ended December 31, 2005, and our report dated March 15, 2006 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

San Francisco, California
March 15, 2006

62

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

NUVELO, INC.

CONSOLIDATED BALANCE SHEETS

| | As of December 31, | |
| | 2005 | 2004 |
| | (In thousands, except share information) | |
| ASSETS | | |
| Cash and cash equivalents | $ 37,764 | $ 16,811 |
| Short-term investments | 32,572 | 33,814 |
| Accounts receivable | 72 | 271 |
| Clinical trial supplies | 12,261 | 12,637 |
| Other current assets | 3,096 | 2,462 |
| Total current assets | 85,765 | 65,995 |
| Equipment, leasehold improvements and capitalized software, at cost | 29,615 | 25,866 |
| Accumulated depreciation and amortization | (14,450) | (19,818) |
| Equipment, leasehold improvements and capitalized software, net | 15,165 | 6,048 |
| Restricted cash | — | 191 |
| Goodwill | 4,671 | 4,671 |
| Patents, licenses and other assets, net | 2,445 | 2,359 |
| Total assets | $ 108,046 | $ 79,264 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Accounts payable | $ 4,919 | $ 3,107 |
| Accrued employee liabilities | 2,272 | 1,337 |
| Accrued clinical trial and drug manufacturing costs | 4,482 | 931 |
| Deferred revenue | 1,813 | — |
| Current portion of deferred rent | 17,105 | 8,259 |
| Accrued interest | 3,092 | 2,341 |
| Current portion of bank loans | 1,540 | 693 |
| Current portion of notes payable | 4,000 | — |
| Current portion of capital lease obligations | 9 | 966 |
| Current portion of related party line of credit | 2,750 | 2,750 |
| Other current liabilities | 2,933 | 350 |
| Total current liabilities | 44,915 | 20,734 |
| Non-current portion of deferred rent | 2,224 | 1,879 |
| Non-current portion of bank loans | 1,492 | 1,907 |
| Non-current portion of notes payable | | 4,000 |
| Non-current portion of capital lease obligations | 13 | 113 |
| Non-current portion of related party line of credit | 2,292 | 5,042 |
| Other non-current liabilities | 346 | — |
| Total liabilities | 51,282 | 33,675 |
| Commitments and contingencies (Note 11) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.001; 5,000,000 shares authorized; none issued and outstanding as of December 31, 2005 and 2004 | — | — |
| Common stock, par value $0.001; 100,000,000 shares authorized; 44,149,456 and 32,228,732 issued and outstanding as of December 31, 2005 and 2004, respectively | 44 | 32 |
| Additional paid-in capital | 384,629 | 301,811 |
| Accumulated other comprehensive loss | (250) | (206) |
| Accumulated deficit | (327,659) | (256,048) |
| Total stockholders' equity | 56,764 | 45,589 |
| Total liabilities and stockholders' equity | $ 108,046 | $ 79,264 |

See accompanying Notes to Consolidated Financial Statements.

63

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

NUVELO, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | (In thousands, except per share data) | | |
| Contract revenues | $ 545 | $ 195 | $ 1,024 |
| Operating expenses: | | | |
| Research and development | 57,778 | 39,970 | 30,014 |
| General and administrative | 15,801 | 8,702 | 15,069 |
| Loss on sale or disposal of assets | 4 | 167 | 1,225 |
| Total operating expenses | 73,583 | 48,839 | 46,308 |
| Operating loss | (73,038) | (48,644) | (45,284) |
| Interest expense — related party | (450) | (481) | (557) |
| Interest expense — other | (554) | (880) | (846) |
| Interest income | 2,158 | 2,893 | 747 |
| Other income (expense), net | 273 | (1,830) | (289) |
| Loss from continuing operations | (71,611) | (48,942) | (46,229) |
| Loss from discontinued operations (including loss on disposal of $1,641 in 2004, net of tax of $0) | — | (3,547) | (3,958) |
| Net loss | $(71,611) | $(52,489) | $(50,187) |
| Basic and diluted net loss per share: | | | |
| Continuing operations | $ (1.73) | $ (1.59) | $ (2.19) |
| Discontinued operations | — | (0.11) | (0.18) |
| Total basic and diluted net loss per share | $ (1.73) | $ (1.70) | $ (2.37) |
| Weighted average shares used in computing basic and diluted net loss per share | 41,279 | 30,874 | 21,054 |

See accompanying Notes to Consolidated Financial Statements.

64

Table of Contents

NUVELO, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
For the Years Ended December 31, 2005, 2004 and 2003

(In thousands)

| | Common Stock | | Additional Paid-in Capital | Deferred Compensation | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | | | |
| Balance at December 31, 2002 | 7,700 | $ 8 | $ 148,806 | $ (6) | — | $ (153,372) | $ (4,564) |
| Components of comprehensive loss: | | | | | | | |
| Net loss | — | — | — | — | — | (50,187) | (50,187) |
| Unrealized loss on available-for-sale securities | — | — | — | — | (15) | — | (15) |
| Comprehensive loss | | | | | | | (50,202) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 700 | 1 | 1,524 | — | — | — | 1,525 |
| Issuance of common stock in connection with Variagenics merger | 13,262 | 13 | 48,755 | — | — | — | 48,768 |
| Warrants issued | — | — | 192 | — | — | — | 192 |
| Issuance of common stock upon cashless exercise of warrants | 126 | — | — | — | — | — | — |
| Issuance of common stock through a public offering in October 2003, net of issuance cost of $1,846 | 3,833 | 4 | 26,326 | — | — | — | 26,330 |
| Deferred stock compensation in connection with Variagenics merger | — | — | 322 | (160) | — | — | 162 |
| Compensation expense related to stock option modifications | — | — | 415 | — | — | — | 415 |
| Amortization of deferred stock compensation | — | — | — | 75 | — | — | 75 |
| Market value adjustment of deferred stock compensation | — | — | (61) | 61 | — | — | — |
| Balance at December 31, 2003 | 25,621 | $ 26 | $ 226,279 | $ (30) | $ (15) | $ (203,559) | $ 22,701 |
| Components of comprehensive loss: | | | | | | | |
| Net loss | — | — | — | — | — | (52,489) | (52,489) |
| Unrealized loss on available-for-sale securities | — | — | — | — | (191) | — | (191) |
| Comprehensive loss | | | | | | | (52,680) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 267 | — | 1,148 | — | — | — | 1,148 |
| Issuance of common stock upon exercise of warrants | 241 | — | 1,199 | — | — | — | 1,199 |
| Issuance of common stock upon cashless exercise of warrants | 87 | — | — | — | — | — | — |
| Issuance of common stock through a public offering in March 2004, net of issuance cost of $5,308 | 5,750 | 6 | 69,436 | — | — | — | 69,442 |
| Issuance of common stock in connection with Dendreon license agreement | 263 | — | 3,500 | — | — | — | 3,500 |
| Compensation expense related to stock option modification | — | — | 152 | — | — | — | 152 |
| Consultant stock compensation expense | — | — | 127 | — | — | — | 127 |
| Market value adjustment of deferred stock compensation | — | — | (30) | 30 | — | — | — |
| Balance at December 31, 2004 | 32,229 | $ 32 | $ 301,811 | $ — | $ (206) | $ (256,048) | $ 45,589 |
| Components of comprehensive loss: | | | | | | | |
| Net loss | — | — | — | — | — | (71,611) | (71,611) |
| Unrealized loss on hedging instruments | — | — | — | — | (197) | — | (197) |
| Unrealized gain on available-for-sale securities | — | — | — | — | 153 | — | 153 |
| Comprehensive loss | | | | | | | (71,655) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 307 | — | 1,717 | — | — | — | 1,717 |
| Issuance of common stock through a public offering in February 2005, net of issuance cost of $4,865 | 9,775 | 10 | 68,438 | — | — | — | 68,448 |
| Issuance of common stock under Kingsbridge CEFF, net of issuance cost of $220 | 1,839 | 2 | 14,180 | — | — | — | 14,182 |
| Fair value of warrant granted in connection with Kingsbridge CEFF | — | — | (2,078) | — | — | — | (2,078) |
| Compensation expense related to stock option modification | — | — | 394 | — | — | — | 394 |
| Consultant stock compensation expense | — | — | 167 | — | — | — | 167 |
| Balance at December 31, 2005 | 44,150 | $ 44 | $ 384,629 | $ — | $ (250) | $ (327,659) | $ 56,764 |

See accompanying Notes to Consolidated Financial Statements.

65

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

NUVELO, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | | (In thousands) | |
| Cash flows from operating activities: | | | |
| Net loss | $(71,611) | $(52,489) | $(50,187) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 2,668 | 4,117 | 5,529 |
| Loss on disposal of assets | 4 | 167 | 1,225 |
| Write-off of clinical trial supplies | 1,984 | | |
| Stock compensation expense | 561 | 279 | 490 |
| License expense | — | 3,500 | |
| Change in deferred revenue | (187) | — | (565) |
| Change in fair value of warrant | (567) | — | |
| Other non-cash items | (31) | — | 192 |
| Loss on disposal of discontinued operations | — | 1,641 | |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 199 | 70 | 2,210 |
| Clinical trial supplies | (1,624) | (8,611) | (4,026) |
| Other current assets | (634) | (1,161) | 650 |
| Other non-current assets | (103) | (559) | 2,010 |
| Accounts payable | 1,812 | 997 | (1,976) |
| Accrued employee liabilities | 935 | 574 | (1,542) |
| Accrued clinical trial and drug manufacturing costs | 3,551 | (4,717) | 5,646 |
| Deferred revenue | 2,000 | — | 40 |
| Deferred rent | 335 | 5,391 | 759 |
| Accrued interest | 751 | 781 | 856 |
| Accrued license fee | — | — | (1,775) |
| Other current liabilities | 922 | (92) | (4,602) |
| Net cash used in operating activities | (59,035) | (50,112) | (45,066) |
| Cash flows from investing activities: | | | |
| Sales or maturities of short-term investments | 64,161 | 50,866 | 22,480 |
| Purchases of short-term investments | (62,766) | (63,823) | (20,227) |
| Purchases of equipment, leasehold improvements and software capitalization | (2,570) | (664) | (320) |
| Proceeds from sale of assets | — | 45 | 745 |
| Cash received in conjunction with the acquisition of Variagenics, net of merger costs | — | — | 25,715 |
| Net cash (used in) provided by investing activities | (1,175) | (13,576) | 28,393 |
| Cash flows from financing activities: | | | |
| Proceeds from release of restricted cash | 191 | 310 | 1,355 |
| Payment of promissory note | — | (2,600) | — |
| Proceeds from bank loans | 1,500 | 2,600 | — |
| Payments on bank loans | (1,068) | | |
| Payments on capital lease obligations | (1,057) | (1,991) | (2,318) |
| Proceeds from related party line of credit | — | — | 1,000 |
| Payments on related party line of credit | (2,750) | (2,750) | (458) |
| Proceeds from issuance of common stock from public offerings, net | 82,630 | 69,442 | 26,485 |
| Proceeds from issuance of common stock upon the exercise of options, warrants and under the employee stock purchase plan | 1,717 | 2,347 | 1,525 |
| Net cash provided by financing activities | 81,163 | 67,358 | 27,589 |
| Net increase in cash and cash equivalents | 20,953 | 3,670 | 10,916 |
| Cash and cash equivalents at beginning of year | 16,811 | 13,141 | 2,225 |
| Cash and cash equivalents at end of year | $ 37,764 | $ 16,811 | $ 13,141 |
| Supplemental disclosures of cash flow information: | | | |
| Interest paid | $ 250 | $ 436 | $ 535 |
| Income taxes paid | $ 3 | $ 7 | $ 5 |
| Non-cash investing and financing activities: | | | |
| Acquisition of leasehold improvements under tenant improvement allowance | $ 8,856 | $ — | $ — |
| Capitalization of estimated future building restoration costs | $ 346 | $ — | $ — |
| Fair value of warrant granted as deferred equity financing facility costs | $ 2,078 | $ — | $ — |
| Cashless exercise of warrants | $ — | $ 646 | $ 1,208 |
| Fair value of common stock, stock options and warrants issued and exchanged in connection with the acquisition of Variagenics | $ — | $ — | $ 48,768 |

See accompanying Notes to Consolidated Financial Statements.

66

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

NUVELO, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. Organization and Summary of Significant Accounting Policies

*Organization*

Nuvelo, Inc. ("Nuvelo," or the "Company") was incorporated as "Hyseq, Inc." in Illinois in 1992 and reincorporated in Nevada in 1993. On January 31, 2003, the Company merged with Variagenics, Inc., a publicly traded Delaware corporation based in Massachusetts, and, in connection with the merger, changed its name to "Nuvelo, Inc." On March 25, 2004, the Company was reincorporated from Nevada to Delaware. The Company's wholly owned subsidiary, Hyseq Diagnostics, Inc., is inactive.

The Company is engaged in the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. The Company's development pipeline includes three acute cardiovascular programs focused on alfimeprase, rNAPc2 and a thrombin inhibiting aptamer, as well as an emerging oncology pipeline.

*Basis of Presentation and Principles of Consolidation*

The consolidated financial statements have been prepared by the Company in accordance with accounting principles generally accepted in the United States of America (GAAP). Certain prior period items have been reclassified to conform to the current year presentation. Conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and on assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for the judgments made about the carrying values of assets and liabilities that are not readily apparent from other sources. Future results may differ from these estimates. The Company believes significant judgment is involved in evaluating if there continues to be alternative future use or the need for reserves for alfimeprase clinical drug material, and in estimating goodwill and long-lived asset impairment, clinical trial accruals, stock-based compensation and in determining revenue recognition.

The consolidated financial statements include the accounts of Nuvelo, Inc., Hyseq Diagnostics, Inc. and Callida Genomics, Inc. (Callida), through its disposal on December 3, 2004. The results of operations of Callida have been reclassified to discontinued operations for all periods presented. All significant inter-company transactions and accounts have been eliminated on consolidation.

*Liquidity and Concentration Risk*

To date, the Company's primary sources of liquidity have been cash from financing activities, collaboration receipts and the merger with Variagenics in January 2003. The Company plans to continue to raise funds through additional public and/or private offerings and collaboration activities in the future. The primary use of capital has been to fund operating activities, including research, clinical development and drug manufacturing expenses, license payments and spending on capital items.

The Company currently relies on a sole source, Avecia Ltd., for the manufacture of alfimeprase drug substance, and did not have a manufacturing agreement in place for alfimeprase final drug product as of December 31, 2005. If Avecia and a final drug product manufacturer are unable to produce alfimeprase in the quantities and with the quality required, the Company may incur significant additional expenses, and efforts to complete clinical trials and obtain approval to market alfimeprase could be significantly delayed.

67

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Cash Equivalents and Short-term Investments*

Cash equivalents consist of money market funds and debt securities with original maturities of 90 days or less. Short-term investments consist of U.S. government agency and corporate debt and asset-backed securities with maturities of less than one year from the balance sheet date. The Company invests its excess cash in securities with strong ratings and has established guidelines relative to diversification and their maturity with the objective of maintaining safety of principal and liquidity. These guidelines are periodically reviewed and modified to take advantage of trends in yields and interest rates.

The Company classifies all cash equivalents and short-term investments as available-for-sale securities, as defined by Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities,"* and records investments at fair value, based on quoted market prices. Unrealized holding gains and losses, net of the related tax effect, if any, on available-for-sale securities are excluded from earnings and are reported in accumulated other comprehensive loss, a separate component of stockholders' equity, until realized. The specific identification basis is utilized to calculate the cost to determine realized gains and losses from the sale of available-for-sale securities. Realized gains and losses and declines in value judged to be other than temporary are included in other income or expense in the statements of operations. Gross realized losses on available-for-sale investments were $3,000, $4,000 and $0, and gross realized gains were $0, $0 and $40,000, in 2005, 2004 and 2003, respectively.

*Clinical Trial Drug Manufacturing Expense and Clinical Trial Supplies Asset*

In accordance with Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 2, *"Accounting for Research and Development Costs"* (SFAS 2), the Company capitalizes clinical trial drug manufacturing costs as "clinical trial supplies", a current asset on the balance sheet, as long as there are alternative future uses for the related clinical trial drug material in other indications not currently being studied, (e.g., for alfimeprase, these include deep-vein thrombosis and stroke). The Company recognizes clinical trial drug manufacturing expense when completed drug material is shipped from the manufacturing or storage facility for use in a clinical trial or for testing, or is otherwise consumed. On a quarterly basis, the Company evaluates whether there continues to be alternative future use for any capitalized drug material, and if the material is obsolete or in excess of anticipated requirements. Any capitalized drug material will be written-off to research and development expense in the quarter in which there ceases to exist an alternative future use, or if the material is obsolete or in excess of anticipated requirements. In the fourth quarter of 2005, a non-cash write-off of $2.0 million was charged to research and development expense for material in excess of anticipated requirements.

*Equipment, Leasehold Improvements and Capitalized Software*

Equipment, leasehold improvements and capitalized software are recorded at cost. Equipment under capital leases is recorded at the lower of the net present value of the minimum lease payments required over the term of the lease or the fair value of the assets at the inception of the lease. Additions, renewals and betterments that significantly extend the life of an asset are capitalized. Minor replacements, maintenance, and repairs are charged to operations as incurred. Equipment is depreciated over the estimated useful lives of the related assets, ranging from three to five years, using the straight-line method. Equipment under capital leases and leasehold improvements are amortized over the shorter of their estimated useful life or the term of the lease, using the straight-line method. Capitalized software is amortized over the shorter of the estimated useful life or two years, using the straight-line method. When assets are retired or otherwise disposed of, the assets and related accumulated depreciation or amortization are eliminated from the accounts and any resulting gain or loss is reflected in the statements of operations.

*Impairment or Disposal of Long-Lived Assets*

Periodically, management determines whether any long-lived asset or related asset group has been impaired based on the criteria established in Statement of Financial Accounting Standards No. 144, *"Accounting for the*

68

Table of Contents

*Impairment or Disposal of Long-Lived Assets"* (SFAS 144). SFAS 144 requires, among other things, that impairment losses be recognized whenever the carrying amount of the asset or asset group exceeds its fair value. Intangibles with determinable useful lives and other long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, and the Company performs an annual impairment review regardless of any such events or changes. There were assessed to be no impairments to long-lived assets as of December 31, 2005.

The results of operations of components of the Company that have been sold or otherwise disposed are reclassified to discontinued operations for all periods presented, and any loss or gain related to the disposal of the component is included in discontinued operations in the period of the disposal.

### Goodwill

The Company applied the provisions of Statement of Financial Accounting Standards No. 142, *"Goodwill and Other Intangible Assets"* (SFAS 142) upon the completion of the merger with Variagenics in January 2003. SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and reviewed for impairment in accordance with SFAS 144.

The SFAS 142 goodwill impairment model involves a two-step process. During the first step, the fair value of the reporting unit is compared to its carrying value, including goodwill. The estimated fair value of the reporting unit, in this case the Nuvelo business segment, being the only business segment in the Company, is computed by multiplying the quoted market price of the Company's common stock on the Nasdaq National Market by the outstanding common stock of the Company at that time. If the fair value of the reporting unit is determined to be more than its carrying value, including goodwill, no goodwill impairment is recognized. If the fair value of the reporting unit is determined to be less than its carrying value, goodwill impairment, if any, is computed using the second step. The second step requires the fair value of the reporting unit to be allocated to all the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination at the date of the impairment test and the fair value of the reporting unit was the price paid to acquire it. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied value of goodwill, which is used to determine the impairment amount.

The Company has designated October 31 as the annual impairment testing date for goodwill, although additional testing may be performed if circumstances warrant a re-evaluation. If it is determined that the carrying value of goodwill has been impaired, the value would be reduced by a charge to operations in the amount of the impairment. There was assessed to be no goodwill impairment based on the testing performed on October 31, 2005.

### Revenue Recognition

The Company recognizes revenue when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. Upfront refundable fees are deferred and recognized as revenue upon the later of when they become non-refundable or when performance obligations are completed or considered perfunctory or inconsequential. In situations where the Company has no continuing performance obligations, or the continuing obligations are perfunctory or inconsequential, upfront non-refundable fees are recognized as revenues on the effective date of the related agreement. Upfront non-refundable licensing fees that require continuing involvement in the form of development, manufacturing or other commercialization efforts by the Company are recognized as revenue ratably over the period until the performance obligations in relation to these fees become inconsequential. Revenues related to collaborative research agreements and government grants are generally recognized ratably over the term of the related agreement as the services are performed.

69

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents
*Stock-Based Compensation*

In accordance with the provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), as amended by SFAS No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" (SFAS 148), the Company has elected to account for stock-based compensation to employees under the provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and its related interpretations, and to adopt the "disclosure only" alternative described in SFAS 123, as amended by SFAS 148. Stock options granted to non-employees are accounted for in accordance with SFAS 123 and Emerging Issues Task Force No. 96-18, "Accounting for Equity Instruments that Are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."

The Company's pro forma information for employee stock options, net of any related tax effects, is as follows (in thousands, except per share data):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
| Net loss, as reported | $ (71,611) | $ (52,489) | $ (50,187) |
| Add: Stock-based employee compensation expense included in reported net loss | 394 | 152 | 440 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards | (10,899) | (7,843) | (4,353) |
| Pro forma net loss | $ (82,116) | $ (60,180) | $ (54,100) |
| Total basic and diluted net loss per share, as reported | $ (1.73) | $ (1.70) | $ (2.37) |
| Pro forma basic and diluted net loss per share | $ (1.99) | $ (1.95) | $ (2.58) |

The fair value of employee stock options was estimated at the date of grant using the Black-Scholes option pricing model with the following weighted-average assumptions:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
| Expected volatility | 0.71 | 0.94 | 0.95 |
| Risk-free interest rate | 4.11% | 3.68% | 2.53% |
| Dividend yield | — | — | — |
| Expected term of option | 5.6 years | 5.4 years | 5.7 years |

The fair value of employee purchase rights under the Company's employee stock purchase plan was estimated using the Black-Scholes model with the following assumptions:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
| Expected volatility | 0.34 | 0.53 | 0.79 |
| Risk-free interest rate | 3.95% | 2.75% | 1.31% |
| Dividend yield | — | — | — |
| Expected term of option | 0.25 years | 1.0 years | 1.0 years |

*Income Taxes*

Income taxes are accounted for under the asset and liability method pursuant to Statement of Financial Accounting Standards No. 109, "*Accounting for Income Taxes*" (SFAS 109). Under SFAS 109, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates

70

Table of Contents

expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recorded to reduce deferred income tax assets to an amount that is more likely than not to be realized.

### Foreign Currency Transactions and Contracts

The Company has authorized the use of foreign exchange forward contracts, and similar instruments, to mitigate the currency risk associated with the acquisition of goods and services under agreements with vendors that are denominated in a foreign currency. Contracts for anticipated transactions are designated and documented as cash flow hedges under Statement of Financial Accounting Standards No. 133, *"Accounting for Derivative Instruments and Hedging Activities"* (SFAS 133) at hedge inception, and are evaluated for effectiveness at least quarterly. The Company only hedges exposures that can be confidently identified and quantified, and does not enter into speculative foreign currency transactions. All contracts have maturities of one year or less. In accordance with SFAS 133, all derivatives, such as foreign currency forward contracts, are recognized as either assets or liabilities in the balance sheet and measured at fair value. The effective component of the hedge gains and losses are recorded in other comprehensive income (loss) within stockholders' equity in the balance sheet and reclassified to research and development expenses in the statement of operations when the forecasted transaction itself is recorded to the statement of operations. Any residual change in the fair value of the hedge contracts, such as ineffectiveness or time value excluded from effectiveness testing is recognized immediately as a general and administrative expense.

### Net Loss per Share

Basic and diluted net loss per share are presented in conformity with Statement of Financial Accounting Standards No. 128, *"Earnings Per Share"* (SFAS 128) for all periods presented. In accordance with SFAS 128, basic and diluted net loss per share has been computed using the weighted average number of shares of common stock outstanding during the period. In 2005, 2004 and 2003, outstanding options and warrants for 8,800,208, 6,283,461 and 4,567,501 shares of common stock, respectively, as determined using the treasury stock method, were not included in weighted average shares outstanding, as they were anti-dilutive.

### Recent Accounting Pronouncements

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* (SFAS 123(R)), an amendment of Statement of Financial Accounting Standards No. 123, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize the fair value of employee stock options and other stock-based compensation as an expense. The statement eliminates the ability to account for share-based employee compensation transactions using APB Opinion No. 25, *"Accounting for Stock Issued to Employees,"* (APB 25), and generally requires instead that companies account for such transactions using a fair value based method, such as the Black-Scholes option pricing model, to fairly value stock options and recognize that value as an expense over the requisite service period. The standard is effective for the Company as of the beginning of the fiscal year commencing January 1, 2006. For all periods prior to January 1, 2006, the Company has accounted for stock-based employee compensation plans in accordance with APB 25. SFAS 123(R) offers companies alternative methods of adopting this standard. The Company intends to adopt SFAS 123(R) using the modified prospective method. The adoption of SFAS 123(R) is expected to have a material adverse effect on the Company's results of operations.

In May 2005, the FASB issued Statement of Financial Accounting Standards No. 154, *"Accounting Changes and Error Corrections — a Replacement of APB Opinion No. 20 and FASB Statement No. 3"* (SFAS 154). This statement changes the requirements for the accounting for and reporting of a change in accounting principle and applies to all voluntary changes in accounting principle and to changes required by an accounting pronouncement in the instance that the pronouncement does not include specific transition provisions. SFAS 154

71

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

requires retrospective application to prior periods' financial statements of the direct effects caused by a change in accounting principle, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. Further, changes in depreciation, amortization or depletion methods for long-lived, non-financial assets are to be accounted for as a change in accounting estimate affected by a change in accounting principle. SFAS 154 is effective for accounting changes and corrections made in fiscal years beginning after December 15, 2005. The adoption of this standard, beginning in fiscal year 2006, is not expected to have any material effect on the Company's results of operations or financial condition.

**2.   Stock Split**

On February 23, 2004, the Company implemented a one-for-three reverse stock split and reduced the number of outstanding shares of common stock accordingly. On the effective date of February 23, 2004, each holder of record was deemed to hold one share of common stock for every three shares held immediately prior to the effective date, with cash payments being made for fractional shares. All share and per-share amounts, with the exception of par value, have been retroactively adjusted for all periods presented. The number of common shares authorized for issuance remained at 100,000,000 shares.

**3.   Sale of Callida Segment**

On December 3, 2004, the Company sold its subsidiary, Callida Genomics, Inc. (Callida), to SBH Genomics, Inc., a privately held Delaware corporation. This transaction is part of the Company's strategy to monetize assets outside of its core business. Prior to the sale, the Company owned approximately 90% of Callida's issued and outstanding capital stock. Affymetrix, Inc., a minority stockholder in Callida, also sold its Callida shares to SBH Genomics as part of the same negotiated transaction. SBH Genomics is controlled by Radoje and Snezana Drmanac, who were employees of Callida prior to the sale. Radoje Drmanac was also an officer and director of Callida.

The Company and Affymetrix sold the Callida stock in exchange for convertible promissory notes in the principal amount of $1.0 million, being $0.9 million for the Company, and $0.1 million for Affymetrix, and potential additional earn-out payments as described below. The notes are convertible into SBH Genomics' preferred shares if SBH Genomics raises at least $2.0 million in venture capital financing within 4 years after the date of the closing. This preferred stock will be converted at the same price per share at which it is sold to the venture capital investors, and will be granted the same rights and preferences as those provided to the venture capital investors. If SBH Genomics fails to raise at least $2.0 million in venture capital financing within this period, the notes will become due and payable. No interest or principal are payable on the notes for two years from the closing date. Simple interest of prime plus 1% per annum will be payable in years three and four on a quarterly basis. Prime will be set as of the second anniversary of the sale and adjusted on the third anniversary. The patents and patent applications owned by Callida are collateral for the notes. As additional consideration for the sale of Callida to SBH Genomics, SBH Genomics will make earn-out payments equal to 2.5% of its net annual revenues in excess of $5.0 million from the sale of, or license under, certain Callida patents for a period of 10 years. The earn-out will initially be paid to Affymetrix, until the $4.0 million promissory note owed by the Company to Affymetrix has been fully paid (see Note 13), and thereafter will be split in the same ratio as the original ownership of Callida by the two entities.

The sale of Callida's net assets resulted in a net non-cash charge to earnings of approximately $1.1 million, representing the carrying value of Callida's assets and liabilities at the time of sale. The value of the $0.9 million convertible promissory note received from SBH Genomics was assessed to be zero, due to the improbability of any collection. This note serves as collateral for the $4.0 million promissory note owed by the Company to Affymetrix. Any interest income will be credited to income in the period received. In addition, various cash and non-cash charges of $0.5 million were associated with the sale. The sale of the Callida business segment meets the criteria for presentation as a discontinued operation under the provisions of SFAS 144, "*Accounting for the*

72

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

*Impairment or Disposal of Long-Lived Assets"*. Therefore, the historical results of operations of Callida for all periods presented and the charges related to the disposal are reported under discontinued operations.

**4.  Merger with Variagenics, Inc.**

On January 31, 2003, the Company completed its merger with Variagenics, Inc., a publicly traded company incorporated in Delaware. Variagenics developed molecular diagnostic tests by identifying genetic markers associated with response to cancer therapies, with the goal of optimizing patient care. Nuvelo and Variagenics merged because they believed the merger would benefit the stockholders of both companies by leveraging the companies' assets and management to develop biotherapeutic, pharmacogenomic and molecular diagnostic products and accelerate revenue generation. As a result of the merger, Variagenics' shareholders received approximately 13.2 million Company shares, at a purchase price of $48.6 million, net of transaction costs of $1.6 million.

Each employee stock option to purchase Variagenics' common stock outstanding at January 31, 2003 was assumed by Nuvelo and converted into an option to purchase Nuvelo common stock based on the terms specified in the merger agreement. As a result, approximately 1.6 million options to purchase Nuvelo common stock were assumed, on an as converted basis. In addition, each warrant to purchase Variagenics' common stock outstanding at January 31, 2003 was assumed by Nuvelo and converted into warrants to purchase Nuvelo common stock based on the terms specified in the merger agreement. As a result, warrants to purchase approximately 0.7 million shares of Nuvelo common stock were assumed, on an as converted basis.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the date of acquisition. The allocation of the purchase price was based on the fair value of identifiable assets and liabilities (in thousands):

| | At January 31, 2003 |
|---|---|
| Assets: | |
| Cash, cash equivalents and short-term investments | $ 50,867 |
| Restricted cash | 750 |
| Other current assets | 846 |
| Property and equipment | 1,522 |
| Intangible assets | 300 |
| Total assets acquired | 54,285 |
| Liabilities: | |
| Accounts payable and accrued liabilities | (5,586) |
| Capital lease obligations | (3,146) |
| Total liabilities assumed | (8,732) |
| Fair value of net assets acquired | $ 45,553 |

The purchase price of $50.2 million exceeded the fair value of net assets acquired of $45.5 million, resulting in goodwill of $4.7 million reported in the Company's balance sheet. The Company evaluates its goodwill for impairment on an annual basis under the guidance of SFAS No. 142, *"Goodwill and Other Intangible Assets"*. The Company has accounted for this merger under the purchase method of accounting for business combinations in accordance with the provisions of SFAS No. 141, *"Business Combinations"*. The accompanying financial statements include the results of operations of Variagenics commencing from February 1, 2003.

73

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

The following unaudited pro forma financial information presents the combined results of the operations of Variagenics and the Company as if the merger had occurred on January 1, 2003 (in thousands, except per share data):

| | Year Ended December 31, 2003 |
|---|---|
| Contract revenues | $ 1,063 |
| Net loss | (50,236) |
| Total basic and diluted net loss per share | (2.39) |

## 5. Financial Instruments

*Available-For-Sale Investments*

The cost and fair value of the Company's available-for-sale investments as of December 31, 2005 and 2004 is as follows (in thousands):

| | December 31, 2005 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $ 12,639 | $ — | $ — | $ 12,639 |
| U.S. government agencies | 14,269 | 1 | (21) | 14,249 |
| Corporate debt securities | 32,805 | 4 | (26) | 32,783 |
| Asset-backed securities | 5,319 | — | (11) | 5,308 |
| | $ 65,032 | $ 5 | $ (58) | $ 64,979 |
| Reported as: | | | | |
| Cash equivalents | | | | $ 32,407 |
| Short-term investments | | | | 32,572 |
| | | | | $ 64,979 |

| | December 31, 2004 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $ 11,940 | $ — | $ — | $ 11,940 |
| U.S. government agencies | 4,141 | — | — | 4,141 |
| Corporate debt securities | 29,712 | — | (181) | 29,531 |
| Asset-backed securities | 4,308 | — | (15) | 4,283 |
| | $ 50,101 | $ — | $ (206) | $ 49,895 |
| Reported as: | | | | |
| Cash equivalents | | | | $ 16,081 |
| Short-term investments | | | | 33,814 |
| | | | | $ 49,895 |

74

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

The following is a summary of amortized cost and estimated fair value of available-for-sale investments by contract maturity (in thousands):

|  | December 31, 2005 | |
|---|---|---|
|  | Amortized Cost | Estimated Fair Value |
| Due in less than one year | $ 65,032 | $ 64,979 |

The following is a summary of available-for-sale investments with unrealized losses and their related fair value by the period of time each investment has been in an unrealized loss position (in thousands):

|  | December 31, 2005 | |
|---|---|---|
|  | Unrealized Losses | Estimated Fair Value |
| Unrealized loss position for less than one year | $ 58 | $ 30,022 |

Due to the short maturities of investments, the type and quality of security held, the relatively small size of unrealized losses compared to fair value, and the short duration of such unrealized losses, the Company believes these unrealized losses to be temporary in nature.

### Fair Value of Other Financial Instruments

The carrying amount of other financial instruments, including cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities, approximate fair value due to the short maturities of these instruments. The carrying amount of the Company's debt instruments approximate fair value as their fixed interest rates approximate current market lending rates offered for similar debt instruments proposed by the Company's current banking institution as of December 31, 2005. The carrying amount of the Company's foreign exchange forward contracts approximate fair value as they are calculated based on quoted market prices as of December 31, 2005.

## 6. Accumulated Other Comprehensive Loss

The components of accumulated other comprehensive loss for each period presented, net of any related tax effects, are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2005 | 2004 |
| Unrealized loss on hedging instruments | $ (197) | $ — |
| Unrealized loss on available-for-sale securities | (53) | (206) |
| Accumulated other comprehensive loss | $ (250) | $ (206) |

## 7. Equipment, Leasehold Improvements and Capitalized Software

Equipment, leasehold improvements and capitalized software, net, consist of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2005 | 2004 |
| Machinery, equipment and furniture | $ 7,847 | $ 7,513 |
| Computers and capitalized software | 6,009 | 7,295 |
| Leasehold improvements | 15,759 | 11,058 |
|  | 29,615 | 25,866 |
| Less: accumulated depreciation | (14,450) | (19,818) |
| Equipment, leasehold improvements and capitalized software, net | $ 15,165 | $ 6,048 |

75

Table of Contents

Depreciation expense, including expense from discontinued operations, totaled $2.7 million, $3.7 million and $5.1 million for the years ended December 31, 2005, 2004 and 2003, respectively. Equipment as of both December 31, 2005 and 2004 includes items under capital leases in the amount of $0.2 million, and related accumulated depreciation of $0.1 million. These leases are secured by the equipment leased thereunder.

## 8.  Patents and Licenses

Patent and license costs are incurred in connection with obtaining or licensing certain patents and the filing of patent applications, and are capitalized and amortized on a straight-line basis over each patent's estimated useful life, which approximates 17 years. As of December 31, 2005 and 2004, the gross carrying amounts were $0.3 million and $0.7 million, respectively, and accumulated amortization of patent costs was $50,000 and $0.4 million, respectively. Patent and license amortization expense, including expense from discontinued operations, was $17,000, $0.4 million and $0.5 million for the years ended December 31, 2005, 2004 and 2003, respectively. Additionally, impairment charges for patents of $0.2 million were recorded to loss on disposal of discontinued operations in the consolidated statement of operations for 2004, related to the disposal of Callida. Annual amortization expense for the next five years on existing balances as of December 31, 2005 is estimated to be $17,000 in each year.

## 9.  Borrowing Arrangements

In August 2004, the Company entered into a Loan and Security Agreement (Loan Agreement), with Silicon Valley Bank (SVB) that originally provided a $6.0 million term loan facility and a $4.0 million revolving credit line, and grants SVB a security interest over certain of the Company's assets, excluding intellectual property. The Loan Agreement contains certain covenants and reporting requirements, with which the Company was in compliance as of December 31, 2005. Proceeds may be used solely for working capital or other general business needs.

In December 2004, the Company completed a $2.6 million initial draw-down from the term loan facility, the proceeds of which were used to repay a note for the same amount that was owed to AMB Property, LP in relation to the termination of a lease agreement for facilities at Humboldt Court in Sunnyvale, California. In March 2005, the Company completed a $1.5 million second draw-down from the term loan facility, with $0.6 million of these proceeds being used to pay off certain capital leases. On June 30, 2005, the remaining $1.9 million of the term loan facility expired unused. The $2.6 million draw-down is being repaid in 30 equal monthly installments, plus accrued interest of 6.43% per annum, starting from May 1, 2005. The $1.5 million draw-down is being repaid in 36 equal monthly installments, plus accrued interest of 6.78% per annum, starting from April 1, 2005.

In July 2005, the Loan Agreement was amended to increase the revolving credit line facility from $4.0 million to $8.0 million and extend the facility through August 29, 2006. As of December 31, 2005, the Company has yet to draw-down any of the funds available under this revolving credit line. Of the $8.0 million total facility, $6.0 million is currently being used to collateralize a letter of credit issued to The Irvine Company related to the lease for the facility at 985 Almanor Avenue in Sunnyvale, California. This letter of credit was increased from $4.0 million to $6.0 million in July 2005 in order to replace the guarantee provided by Dr. Rathmann to The Irvine Company (see Note 11). The remaining $2.0 million is being used partly as collateral for foreign exchange hedging contracts with SVB (see Note 14), and partly being available for working capital or other general business needs. Any borrowings under this line shall bear interest at SVB's prime rate, being 7.25% as of December 31, 2005, and would cause replacement collateral to be required for the items above.

76

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

Aggregate debt repayments for the next five years under long-term borrowings as of December 31, 2005 are as follows (in thousands):

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Bank loans | $ 1,540 | $ 1,367 | $ 125 | $ — | $ — |
| Note payable (Note 13) | 4,000 | — | — | — | — |
| Related party line of credit (Note 16) | 2,750 | 2,292 | — | — | — |
| Aggregate debt repayments | $ 8,290 | $ 3,659 | $ 125 | $ — | $ — |

## 10.  Capital Lease Obligations

The Company has financed equipment purchases through capital lease agreements. The capital lease obligations are to be repaid over a term of 60 months at interest rates ranging from 13.46% to 13.95% and are secured by the related equipment.

Minimum future payments under the capital lease agreements as of December 31, 2005 are as follows (in thousands):

| Years Ending December 31, | |
|---|---|
| 2006 | $12 |
| 2007 | 14 |
| 2008 | — |
| 2009 | — |
| 2010 | — |
| Total capital lease payments | 26 |
| Less: Amount representing interest | (4) |
| Present value of future capital lease payments | 22 |
| Less: Current portion | (9) |
| Non-current portion | $13 |

## 11.  Commitments and Contingencies

### Operating Leases

As of December 31, 2005, the Company had leases for two facilities under operating lease agreements, one expiring in May 2011 and one in August 2012. The related rent is being recognized as expense on a straight-line basis. Rent expense, including expense from discontinued operations, was $6.9 million, $7.3 million and $8.0 million in 2005, 2004 and 2003 respectively.

Minimum future rental commitments under non-cancelable operating leases as of December 31, 2005 are as follows (in thousands):

| Years Ending December 31, | |
|---|---|
| 2006 | $ 9,021 |
| 2007 | 9,292 |
| 2008 | 9,572 |
| 2009 | 8,822 |
| 2010 | 8,379 |
| 2011 and thereafter | 8,984 |
| Minimum rental commitments | $54,070 |

77

Source: NUVELO INC, 10-K, March 15, 2006