# Exhibit E

Table of Contents

In January 2005, the Company entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for 61,826 square feet of industrial space at 201 Industrial Road in San Carlos, California at $2.35 per square foot per month, subject to annual increases of $0.07 per square foot per month. The lease commenced on September 1, 2005 and contains an option to cancel the lease after five years upon payment of certain amounts specified in the lease, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), rights of first refusal over all vacant space in the building during the first two years of the lease, and an expansion option for a specified amount of space (see Note 19). The lease contains a tenant improvement allowance of $8.9 million, which was fully utilized in 2005, and has been recorded to leasehold improvements and deferred rent, with the respective balances being charged to depreciation and credited to rent expense over the lease term. In the event of the Company's default under the lease, the landlord has the right to recover any damages to compensate for such default.

As a result of the entry into this lease, a review for impairment of leasehold improvements at 985 Almanor Avenue in Sunnyvale, California took place in January 2005. As identifiable cash flows related to these assets are not independent of those of the Company as a whole, these assets were grouped with all the assets and liabilities of the Company for the purposes of the impairment review, and as a result, no impairment of these assets was identified, as the fair value of the net assets of the Company exceeds its carrying value. In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets,"* if the Company subleases or otherwise exits this facility, an impairment charge will be recorded based on the difference between the carrying value and fair value of the leasehold improvements at the time of the sublease or exit.

The Company has estimated that it will incur future restoration costs for the premises at 985 Almanor Avenue with a current fair value of $0.3 million. Under Statement of Financial Accounting Standards No. 143, *"Accounting for Asset Retirement Obligations,"* this amount has been recorded as an increase to both leasehold improvements and other non-current liabilities in the balance sheet. Depreciation and interest accretion expense charged during the year was immaterial.

In August 2002, the lease on the property at 985 Almanor Avenue was amended to provide for a rent deferral of $4.9 million over the subsequent three years, retroactive to June 1, 2002. The Company is currently repaying the deferred rent liability, plus interest, over a four-year period beginning June 1, 2005 in equal monthly installments of $0.1 million. In October 2003, the lease was amended for a second time, to provide for an additional rent deferral of $2.9 million, to be repaid on May 30, 2011, the end of the lease term. In order to receive this rent deferral, the Company pre-paid $2.7 million of base rental payments in October 2003 to cover the nine-month period beginning October 1, 2003 and ending June 30, 2004, with no base rent being due for the period July 1, 2004 through March 30, 2005. Other agreement terms included the early reinstatement of the original rental rates if the Company successfully raised $75.0 million in a single public or private offering, with the remaining amount of rent deferred under both lease amendments up to that date becoming due immediately. In September 2005, a third amendment to the lease was entered into, which amended this provision so that if the Company raises $75.0 million or more in cash as a result of a single public or private offering, The Irvine Company will be paid the lesser of (i) 10% of any amount raised in excess of $75.0 million, or (ii) any remaining deferred rent obligation (see Note 19). The third amendment also required the Company to increase the letter of credit related to this lease from $4.0 million to $6.0 million (see Note 9), and released Dr. Rathmann from further obligations as a guarantor under the lease (see Note 16).

## 12. Stockholders' Equity

### Preferred Stock

Since reincorporation as a Delaware corporation on March 25, 2004, the Company is authorized to issue 5,000,000 shares of preferred stock. The Company's Board of Directors may set the rights and privileges of any preferred stock issued. As of December 31, 2005 and 2004, there were no issued and outstanding shares of preferred stock.

78

Table of Contents

In June 5, 1998, the Company's Board of Directors adopted a rights plan and declared a dividend with respect to each share of common stock then outstanding. This dividend took the form of a right that entitles the holders to purchase one one-thousandth of a share of our Series A junior participating preferred stock at a purchase price that is subject to adjustment from time to time. These rights have also been issued in connection with each share of common stock issued after June 5, 1998. The rights are exercisable only if a person or entity or affiliated group of persons or entities acquires, or has announced its intention to acquire, 15% (27.5% in the case of certain approved stockholders) or more of the Company's outstanding common stock. The adoption of the rights plan makes it more difficult for a third party to acquire control of the Company without the approval of the Board of Directors. This rights agreement was amended on March 19, 2004, to reflect the Company's reincorporation under Delaware law.

### Common Stock

In February 2005, the Company raised $68.4 million in a public offering, after deducting underwriters' fees and stock issuance costs of $4.9 million, from the sale of 9,775,000 shares of common stock, including 1,275,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share. The Company intends to use the net proceeds from this offering for general corporate purposes, including the advancement of our drug candidates in clinical trials, capital spending and working capital.

In August 2005, the Company entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge Capital Ltd., under which Kingsbridge has committed to purchase up to $75.0 million of the Company's common stock within a three-year period, subject to certain conditions and limitations. As part of the arrangement, the Company issued a warrant to Kingsbridge to purchase 350,000 shares of the Company's common stock at a price of approximately $12.07 per share, which is exercisable beginning six months after the date of grant and for a period of five years thereafter. The warrant's fair value on the date of grant of $2.1 million, being $5.94 per share, was recorded as a deferred financing cost to additional paid-in capital. The fair value was established using the Black-Scholes option-pricing model with the following assumptions: expected dividend yield of 0.0%; risk free interest rate of 4.15%; contractual life of 5.5 years, and volatility of 82%. The opposing current liability has and will continue to be marked-to-market each quarter, with the change being recorded to general and administrative expenses. The fair value of the warrant as of December 31, 2005 was $1.5 million, and is included in other current liabilities in the balance sheet. Under the CEFF, the Company may require Kingsbridge to purchase newly-issued shares of common stock at prices between 90% and 94% of the volume weighted average price (VWAP) on each trading day during an 8-day pricing period. The value of the maximum number of shares the Company may issue in any pricing period is the lesser of 2.5% of the Company's market capitalization immediately prior to the commencement of the pricing period, or $10.0 million. The minimum VWAP for determining the purchase price at which the Company's stock may be sold in any pricing period is the greater of $2.50, or 85% of the closing price of the Company's common stock on the day prior to the commencement of the pricing period. The CEFF also requires the Company to file a resale registration statement with respect to the resale of shares issued pursuant to the CEFF and underlying the warrant, to use commercially reasonable efforts to have the registration statement declared effective by the SEC, and to maintain its effectiveness. The registration statement was declared effective on October 13, 2005. The Company may sell a maximum of 8,075,000 shares under the CEFF (exclusive of the shares underlying the warrant), which may further limit the potential proceeds from the CEFF. The Company is not obligated to sell any of the $75.0 million of common stock available under the CEFF and there are no minimum commitments or minimum use penalties. The Company sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005 under the CEFF, and may sell the balance of $60.6 million of common stock over the remainder of the three-year term of the CEFF.

### Warrants

As of December 31, 2005, warrants to purchase 1,786,685 shares of common stock were outstanding at exercise prices ranging from $4.05 to $24.87, with a weighted average exercise price per share of $19.15. These

79

Table of Contents

warrants, which were granted as part of various financing and business agreements, expire at various times between August 2006 and February 2011. Warrants are recorded at their estimated fair market value at the date of grant using the Black-Scholes option-pricing model. Any warrants recorded as liabilities as opposed to equity will be marked-to-market each quarter, as with the Kingsbridge warrants above.

### Stock Option Plans

In May 2004, the Company adopted the 2004 Equity Incentive Plan, (2004 Plan), to authorize the grant of stock options (including indexed options), stock appreciation rights, restricted stock purchase rights, restricted stock bonuses, restricted stock units, performance shares, performance units and deferred stock units. Under the 2004 Plan, all awards may be granted to employees, directors and consultants of the Company, except for incentive stock options, which may be granted only to employees. The 2004 Plan replaces all prior option plans (detailed below), which were terminated upon its adoption, with no new awards to be granted thereunder. A total of 7,204,085 common shares were initially reserved for issuance under the 2004 Plan, including up to 2,454,085 shares previously reserved for issuance under prior plans, and as of December 31, 2005 there were 1,198,843 shares reserved for future option grants. For stock options, the 2004 Plan requires that the exercise price of each option may not be less than the fair market value of a share of common stock on the date of grant, and in the case of incentive stock options granted to an owner of more than 10% of the total combined voting power of all classes of the Company's stock (10% Owners), must have an exercise price equal to at least 110% of the fair market value on the date of grant. Options granted to employees generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As of December 31, 2005, 5,380,435 options were outstanding under the 2004 Plan. The maximum term of any option granted under the 2004 Plan is ten years, provided that incentive stock options granted to 10% Owners must have a term not exceeding five years.

In 1995, the Company's stockholders adopted the 1995 Employee Stock Option Plan (Employee Plan). Options granted under the Employee Plan were either incentive stock options or non-statutory stock options. Incentive stock options were granted to employees with exercise prices of not less than fair market value and non-statutory options were granted to employees at exercise prices of not less than par value of the common stock on the date of grant as determined by the Board of Directors. Options vest as determined by the Board of Directors (generally in four equal annual installments commencing one year after the date of grant), and expire 10 years from the date of grant. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2005, options to purchase 397,967 shares were outstanding under the Employee Plan.

In 1997, the Company's stockholders adopted the Non-Employee Director Stock Option Plan (Directors Plan), providing for periodic stock option grants to non-employee directors of the Company. Under the Directors Plan, each new, non-employee director received a one-time grant of options to purchase 7,680 shares of common stock, of which options to purchase 3,840 shares vest immediately, with the balance vesting in two equal allotments on the first and second anniversaries of joining the Board. All non-employee directors automatically received options to purchase up to 1,920 shares each year (such that the amount received under the Directors Plan when added to all prior options granted to a director which vest in that year totaled 1,920) on the date of the annual meeting of the stockholders. Options under the Directors Plan were granted at the fair market value of the Company's common stock on the date of the grant. In 2000, the Company's stockholders approved an amendment to the Directors Plan that changed the method for determining the number of shares granted under the plan, and lengthened the vesting date for the new director's initial and first annual grants of options. Under the amendment, the number of shares granted were equal to the lesser of the number determined by dividing $200,000 by the fair market value of the Company's common stock on the date of grant, or 3,333 shares. The amendment also revised the vesting date for initial options that were granted when a new director joined the Company's Board such that 50% of a new director's option vest one year after the grant date and the other 50% vest two years after the grant date. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2005, options to purchase 90,713 shares were outstanding under the Directors Plan.

80

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

In 1999, the Company adopted a Scientific Advisory Board/Consultants Stock Option Plan (SAB/Consultant Plan) that provided for periodic grants of non-qualified stock options to members of the Company's scientific advisory board and allowed the Board of Directors to approve grants of stock options to consultants. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. At December 31, 2005, options to purchase 1,666 shares were outstanding under the SAB/Consultant Plan.

In August 2002, the Company adopted the 2002 Equity Incentive Plan (2002 Plan), to grant stock options or make restricted stock awards to employees (including officers or employee directors) and consultants. The 2002 Plan authorized the grant of incentive stock options and restricted stock awards to employees and of non-qualified stock options and restricted stock awards to employees and consultants. The 2002 Plan required that the exercise price of options be not less than the fair value of the common shares at the grant date for those options intended to qualify as performance-based compensation and be not less than 110% of the fair value in the case of incentive stock options granted to 10% Owners. Options generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2005, options to purchase 319,203 shares were outstanding under the 2002 Plan.

On January 31, 2003, in connection with the merger of Variagenics, Inc., the Company assumed Variagenics' existing stock option plan, the Amended 1997 Employee, Director and Consultant Stock Option Plan (1997 Plan), by reserving and registering an additional 2,269,666 shares of common stock. The 1997 Plan authorized the grant of incentive and non-qualified stock options to employees, directors and consultants of the Company. Options generally vest ratably over three- to five-year periods and expire after 10 years if not exercised. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2005, no options to purchase shares were outstanding under the 1997 Plan.

In 1998, the Company granted options outside of any of the Company's stock option plans to purchase a total of 3,806 shares of common stock to three non-employee directors and a scientific advisory board member at prices between $14.25 and $30.19 per share. The options vest over periods of up to four years. In February 2000, a director who was previously an officer of the Company was granted an option to purchase 333,333 shares of common stock at $95.06 per share, the closing price on the day prior to the grant, as an inducement to become an employee of the Company. This option became exercisable one-third upon the date of grant, one-third on the one-year anniversary and one third on the two-year anniversary of the date of grant. In 2001, the Company granted options outside of any of the Company's stock option plans to purchase a total of 422,720 shares to five employee officers at prices between $29.87 and $37.69 per share as inducements to become employees of the Company. In August 2001, a director of the Company was granted an option to purchase 333,333 shares of common stock at $25.91 per share, the closing price on the day prior to the grant. As of December 31, 2005, 823,539 options issued outside of any of the Company's stock option plans were outstanding.

The Directors Plan, the Employee Plan, the 2002 Plan, the 2004 Plan and the options granted to a director to purchase 666,666 shares (as described above) provide for the acceleration of vesting of options upon certain specified events.

In December 2004, the Company's Board of Directors approved an "Executive Change in Control and Severance Benefit Plan" for executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted previously. The plan provides that, upon a change in control of the Company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause or constructively terminated within one month

81

Table of Contents

preceding a change in control. In addition, if a participant is terminated without cause or constructively terminated outside the context of change in control, he or she shall be credited with an additional year of vesting with respect to Nuvelo stock options and stock awards held. If a change in control occurs in the future, it is possible that material additional stock-based compensation expense could be incurred.

A summary of the Company's stock option activity, and related information follows:

| | Year Ended December 31, | | | | | |
| | 2005 | | 2004 | | 2003 | |
| | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|---|---|
| Options outstanding at beginning of period | 4,766,669 | $ 18.77 | 2,680,170 | $ 26.52 | 1,968,373 | $ 36.33 |
| Options assumed from Variagenics acquisition | | $ — | | $ — | 1,576,356 | $ 5.64 |
| Options granted | 3,232,000 | $ 8.69 | 2,773,980 | $ 9.76 | 755,873 | $ 4.89 |
| Options exercised | (243,065) | $ 5.34 | (234,534) | $ 3.79 | (641,918) | $ 2.07 |
| Options canceled | (742,081) | $ 13.76 | (452,947) | $ 17.23 | (978,514) | $ 12.00 |
| Options outstanding at end of period | 7,013,523 | $ 15.11 | 4,766,669 | $ 18.77 | 2,680,170 | $ 26.52 |

The following table summarizes information about stock options outstanding and exercisable as of December 31, 2005:

| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number of Shares | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| $ 2.34 – $ 6.63 | 806,780 | 7.78 | $ 5.78 | 507,366 | $ 5.70 |
| 6.73 – 8.41 | 830,479 | 9.18 | 7.67 | 204,062 | 7.32 |
| 8.46 – 8.96 | 270,166 | 9.28 | 8.67 | 42,313 | 8.75 |
| 9.04 – 9.17 | 1,643,085 | 9.57 | 9.16 | 144,004 | 9.16 |
| 9.21 – 9.67 | 738,222 | 8.57 | 9.52 | 412,070 | 9.57 |
| 9.68 – 9.88 | 709,296 | 8.96 | 9.83 | 147,251 | 9.83 |
| 9.90 – 10.18 | 821,043 | 8.45 | 10.15 | 302,056 | 10.16 |
| 10.19 – 37.04 | 709,685 | 6.19 | 22.80 | 611,044 | 24.67 |
| 37.50 – 132.38 | 483,767 | 4.35 | 80.15 | 483,767 | 80.15 |
| 285.56 – 285.56 | 1,000 | 4.16 | 285.56 | 1,000 | 285.56 |
| | 7,013,523 | 8.31 | $ 15.11 | 2,854,933 | $ 24.05 |

The weighted-average grant date fair values of options granted during the years ended December 31, 2005, 2004 and 2003 were $5.58, $7.17 and $3.69, respectively.

*Employee Stock Purchase Plan*

The Company's stockholders have approved an employee stock purchase plan, covering an aggregate of 250,000 shares of the Company's common stock. Each quarter, an eligible employee may elect to purchase shares of the Company's stock through payroll deductions at a price equal to the lower of 85% of the fair market value of the stock as of the first business day of the quarter or the last business day. In the year ended December 31, 2005, 63,332 shares of the Company's stock were sold under the employee stock purchase plan at

82

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

a weighted-average price of $6.64 per share. The weighted-average grant date fair values of the purchase rights granted during the years ended December 31, 2005, 2004 and 2003 were $7.81, $9.77 and $1.71 per share, respectively.

**13.  Collaborative and Manufacturing Agreements**

*Amgen*

In October 2004, Nuvelo obtained worldwide rights to develop and commercialize alfimeprase from Amgen, in exchange for the future payment to Amgen of previously negotiated milestone payments and royalties. In accordance with the terms of the license agreement, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to Nuvelo's designated manufacturer, Avecia. Between January 2002 and October 2004, Nuvelo had been operating under a 50/50 cost/profit sharing collaboration agreement with Amgen, and recorded related expenses of $6.7 million in 2004 and $7.5 million in 2003. In connection with the termination of this agreement, the Company entered into an opt-out, termination, settlement and release agreement with Amgen, whereby the Company made a payment of $8.5 million to Amgen, of which $8.3 million was related to the remaining reimbursement of its manufacturing costs incurred under the agreement and was capitalized accordingly. As a result of dosing the first patient in the first Phase 3 clinical trial for alfimeprase in April 2005, Nuvelo paid a $5.0 million milestone fee to Amgen in May 2005, which was charged to research and development expense. Future milestone payments under the license agreement could total as much as $35.0 million. The Company recognizes clinical trial drug manufacturing expense when completed drug material is shipped from the manufacturing or storage facility for use in a clinical trial or for testing, or is otherwise consumed. Prior to shipment of alfimeprase from the drug manufacturing or storage facility, the Company reflects the manufacturing work in process as clinical trial supplies, a current asset on the balance sheet, which totaled $12.3 million and $12.6 million as of December 31, 2005 and 2004, respectively.

*Avecia*

In June 2005, Nuvelo entered into a development and validation agreement with Avecia Limited for the scaled-up manufacturing process of alfimeprase. In accordance with the terms of this agreement, Avecia will conduct process development and validation work for the manufacture of alfimeprase drug substance, in accordance with FDA regulations. Nuvelo is to pay Avecia fees totaling £12.9 million for completion of this work, payable upon completion by Avecia of pre-negotiated milestones, including £2.9 million as a result of an amendment to the work program in December 2005 to provide for additional process development and validation work. The milestone fees paid to date have been recorded as either research and development expenses in the income statement or clinical trial supplies in the balance sheet, depending on the nature of the expense. The Company is also paying certain related fees and expenses including the cost of supplies, materials, specified subcontracted work and equipment. The agreement does not cover the commercial manufacture of alfimeprase drug substance, but the Company and Avecia have agreed to negotiate in good faith towards the completion of a commercial supply agreement once Avecia has commenced the validation campaign. The agreement remains in force until the completion of the work contemplated under it, but may be terminated early by Avecia if the Company breaches the agreement, and by the Company for any reason, subject in some cases to cancellation fees and penalties.

*Dendreon*

Nuvelo obtained exclusive worldwide rights to all indications of rNAPc2 and all other rNAPc molecules owned by Dendreon Corporation, as a result of a licensing agreement entered into with them in February 2004. Under the terms of the agreement, the Company paid Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock), and incurred $5.6 million in expenses for this and related development costs in 2004 and $1.5 million for related development costs in 2005. Future milestone payments to Dendreon could reach as much as $23.5 million if all development and commercialization milestones are

83

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

achieved. If rNAPc2 is commercialized, Nuvelo will also be responsible for paying future royalties to Dendreon depending on sales of rNAPc2.

### Archemix

The Company continues to pursue the development of a thrombin inhibiting aptamer under a collaboration agreement entered into with Archemix Corporation, a privately held biotechnology company located in Cambridge, Massachusetts, in January 2004. In accordance with the terms of the agreement, Nuvelo paid Archemix an upfront fee of $3.0 million and paid the first $4.0 million of costs associated with development. Nuvelo and Archemix will equally share all development and commercialization costs in excess of $4.0 million. The Company incurred $7.7 million in expenses for the upfront fee and related development costs in 2004 and $2.6 million for related development costs in 2005. Archemix is initially responsible for leading development and for all clinical development activities through the dosing of the first patient in a Phase 2 study. Thereafter, Nuvelo and Archemix will agree on leadership of clinical development and commercialization activities. Nuvelo is required to pay Archemix total development milestone payments of up to $11.0 million, consisting of $10.0 million upon dosing of the first patient in a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Archemix and the Company for IND-enabling studies.

### Pharmaceutical Division of Kirin Brewery Company, Ltd.

In March 2005, Nuvelo entered into a collaboration agreement with the Pharmaceutical Division of Kirin Brewery Company, Ltd., for the development and commercialization of NU206. Under this agreement, the Company received a $2.0 million upfront cash payment from Kirin in April 2005, which was deferred and is being recognized on a straight-line basis over the related performance period. Nuvelo will lead worldwide development, manufacturing and commercialization of the compound. All operating expenses and profits related to the development and commercialization of NU206 will be shared 60 percent by Nuvelo and 40 percent by Kirin. If this agreement is terminated, or Kirin or Nuvelo elects under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit-sharing structure to a royalty-based structure. Research and development expenses of $2.7 million were recorded in 2005 in relation to this collaboration.

The 2001 collaboration agreement with Kirin for the research and development of secreted proteins expired December 31, 2005, in accordance with its terms. Nuvelo and Kirin are currently discussing the possibility of engaging in additional research and development of certain secreted proteins to be selected by both parties. The Company recorded research and development expenses of $0.3 million in 2005, $3.0 million in 2004, and $0.2 million in 2003, in relation to this collaboration.

### Affymetrix

In October 2001, the Company and Affymetrix Inc. resolved all outstanding litigation and entered into a collaboration to accelerate development and commercialization of a high speed universal DNA sequencing chip. This collaboration with Affymetrix was through N-Mer, Inc., a wholly-owned subsidiary of Callida, which in turn was a majority-owned subsidiary of the Company until its sale on December 3, 2004. The Company contributed cash and certain assets consisting primarily of equipment, capitalized software, and intellectual property to Callida upon its formation in exchange for a 90% interest in Callida. Affymetrix received a 10% equity interest in Callida in exchange for a contribution of certain intellectual property to Callida. The Company accounted for the Affymetrix 10% ownership share as minority interest in Callida in the statement of operations until Affymetrix' initial minority interest investment was depleted. Beyond that point, which occurred in 2002, the Company absorbed 100% of Callida's net losses until December 3, 2004, when the Company and Affymetrix sold all Callida stock respectively owned (see Note 3).

Affymetrix paid a total of $8.0 million in cash to the Company at the close of the settlement. The $8.0 million payment comprised of two pieces. Firstly, Affymetrix made a license payment of $4.0 million in return

84

Table of Contents

for a non-exclusive license, without the right to grant sublicenses, under 11 U.S. patents and 30 U.S. patent applications and counterpart foreign patents and applications to make, use, sell, and import products in the non-universal array field. The remaining deferred revenues of $0.5 million from the original $4.0 million license payment was recognized in 2003.

Secondly, Affymetrix made a loan to the Company of $4.0 million in the form of a 5-year promissory note bearing annual interest of 7.5%, for the Company's cash investment in Callida. Consequent to the sale of Callida, the note is collateralized by the $0.9 million promissory note issued by SBH Genomics to the Company, patents and patent applications transferred to SBH Genomics and any royalties payable by SBH Genomics related to them. Accrued interest will be paid with the final principal payment on November 13, 2006, unless both are repaid before then. As of December 31, 2005, the remaining principal and accrued interest to date totaled $5.2 million. The outstanding principal and interest under the note may be repaid in whole or in part at any time, at the Company's option, by conversion into shares of Nuvelo's common stock at a price based upon 90% of the average price of Nuvelo's common stock over a 10-day period ending 2 days prior to the conversion. As of December 31, 2005, 700,011 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

**14.   Foreign Currency Derivatives**

In July 2005, the Company entered into a development and validation agreement with Avecia Ltd. under which payments for their services are denominated in British pounds. In order to reduce exposure to fluctuations in the British pound prior to any payment made under this contract, the Company entered into a number of foreign currency forward hedging contracts in 2005, all maturing within one year and being designated as cash flow hedges under SFAS 133. In accordance with SFAS 133, all derivatives, such as foreign currency forward contracts, are recognized as either assets or liabilities in the balance sheet and measured at fair value. The contract currencies and duration reflect the anticipated foreign currency-denominated transaction details at inception, and effectiveness is calculated by affirming the probability of the transaction and comparing, on a spot-to-spot basis, the change in fair value of the hedge contract to the change in fair value of the forecasted transaction (the underlying hedged item). The effective component of hedge gains and losses is recorded in other comprehensive income (loss) within stockholders' equity in the balance sheet and reclassified to research and development expenses in the statement of operations when the forecasted transaction itself is recorded to the statement of operations. Any residual change in the fair value of the hedge contracts, such as ineffectiveness or time value excluded from effectiveness testing is recognized immediately as a general and administrative expense. In 2005, an immaterial amount was recorded to general and administrative expense associated with the time value excluded from effectiveness testing. Should a hedge be de-designated or the hedge instrument terminated prior to recognition of the forecasted transaction, amounts accumulated in other comprehensive income (loss) will remain there until the hedged item impacts earnings. In the event the forecasted transaction is considered unlikely to occur or does not occur in the appropriate time frame, all gains and losses on the related hedge will be recognized immediately as a general and administrative expense.

As of December 31, 2005, the Company had notional amounts outstanding of £5.7 million ($10.0 million) on these contracts and the outstanding contracts had a negative fair value of $150,000, which is recorded in current liabilities in the balance sheet. The following table summarizes the activity in accumulated other comprehensive loss related to derivatives classified as cash flow hedges held by the Company during the period presented (in thousands):

| | Year Ended December 31, 2005 |
|---|---|
| Balance at beginning of period | $   — |
| Changes in fair value of derivatives, net | (191) |
| Reclasses to research and development expense from other comprehensive loss | (6) |
| Balance at end of period | $   (197) |

85

Table of Contents

All of the $197,000 unrealized loss reported in accumulated other comprehensive loss at December 31, 2005 is expected to be reclassified to the income statement within 12 months.

**15. Income Taxes**

The Company had no current state or federal income taxes for the years ended December 31, 2005, 2004, and 2003. The reconciliations between the amounts computed by applying the U.S. federal statutory tax rate of 34% to loss from continuing operations and the actual provision for income taxes for the years ended December 31, 2005, 2004 and 2003 are as follows (in thousands):

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Loss from continuing operations | $ (71,611) | $ (48,942) | $ (46,229) |
| Federal tax benefit at statutory rate | (24,348) | (16,640) | (15,718) |
| Current year net operating losses and temporary differences, for which a full valuation allowance is recorded | 24,556 | 16,655 | 15,978 |
| State taxes, net of federal benefit | 3 | 16 | 4 |
| Other permanent differences | (211) | (31) | (264) |
| Provision for income taxes | $ — | $ — | $ — |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets for federal and state income taxes are as follows (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Deferred tax assets: | | | |
|   Property and equipment | $ 2,337 | $ 3,843 | $ 2,535 |
|   Accruals and reserves | 4,741 | 4,361 | 4,292 |
|   Net operating loss carryforwards | 136,814 | 110,093 | 96,272 |
|   Research and other tax credit carryforwards | 23,469 | 18,065 | 16,158 |
|   Capital loss carryforward — discontinued operations | 3,152 | 3,152 | |
|   Capitalized research and development costs | 9,002 | 6,858 | 5,250 |
|   Stock-based compensation | 3,492 | 3,485 | 5,070 |
|   Other | 792 | — | |
|   State taxes | 1 | 8 | 2 |
| Total deferred tax assets | 183,800 | 149,865 | 129,579 |
| Valuation allowance | (183,800) | (149,865) | (129,579) |
| Deferred tax assets, net of valuation allowance | $ — | $ — | $ — |

Deferred tax assets are reduced by a valuation allowance, as management believes that it is more likely than not that the deferred tax assets will not be realized. The net valuation allowance increased by $33.9 million, $20.3 million and $55.3 million for the years ended December 31, 2005, 2004 and 2003, respectively.

As of December 31, 2005, the Company had net operating loss carryforwards for federal and state income tax purposes of approximately $385.5 million and $98.5 million, respectively. The Company also had federal and California research and development tax credit carryforwards of approximately $12.0 million and $9.9 million, respectively. The federal net operating loss and credit carryforwards will expire at various dates beginning in the year 2008 through 2025, if not utilized. The State of California net operating losses will expire at various dates beginning in 2006 through 2015, if not utilized.

86

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

On December 3, 2004, the Company sold its subsidiaries, Callida Genomics and N-Mer. The related capital loss carryforward is $7.9 million. The federal and California capital loss carryforwards will expire in 2009.

Utilization of the Company's net operating loss carryforwards and credits may be subject to an annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state provisions. The annual limitation may result in the expiration of net operating losses and credits before utilization.

Approximately $13.3 million of the federal net operating losses and $7.2 million of the state net operating losses relate to deductions from stock-based compensation. No income statement benefit will result from the realization of these losses.

The tax benefit of approximately $5.0 million in deferred tax assets related to the merger with Variagenics will be treated as a reduction to goodwill and other intangible assets under the provisions of SFAS 109 when realized.

## 16.  Transactions with Related Parties

Dr. Rathmann, a member of the Company's board of directors and chairman emeritus, provided a $20.0 million line of credit to the Company in August 2001, of which $11.0 million has been drawn down, with the remaining $9.0 million having expired unused. The related promissory note bears interest at the prime rate plus 1%. In November 2003, the Company began repaying the outstanding balance over 48 months with equal monthly principal payments of $0.2 million. Accrued interest will be paid with the final payment in October 2007, unless both are repaid before then. As of December 31, 2005, the remaining principal and accrued interest to date totaled $6.9 million, and the interest rate on the note on this date was 8.25%. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of the Company's common stock at a price based upon the average price of Nuvelo's common stock over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of December 31, 2005, 818,347 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

The personal guarantee that Dr. Rathmann had provided to The Irvine Company, related to the 985 Almanor Avenue facility lease, was terminated during 2005 (see Note 11).

## 17.  Segment and Geographic Data

### Segment data

The Company is engaged in the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. The Company has only one reportable segment since the sale of its majority-owned subsidiary, Callida Genomics, Inc., in December 2004. Accordingly, all segment-related financial information required by Statement of Financial Accounting Standards No. 131, *"Disclosures About Segments of an Enterprise and Related Information"* is included in the consolidated financial statements. Reportable segments reflect the Company's structure, reporting responsibilities to the chief executive officer and the nature of the products under development.

87

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents
*Geographic data*

For geographical reporting, revenues are attributed to the geographical location where the customer or collaboration partner is located. Long-lived assets consist primarily of equipment, leasehold improvements and capitalized software and are attributed to the geographical location where the assets are located. Revenues and long-lived assets by geographical location were as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Revenues: | | | |
| United States | $ 357 | $ 195 | $ 984 |
| Japan | 188 | — | — |
| Germany | — | — | 40 |
| Total revenues | $ 545 | $ 195 | $ 1,024 |
| Long-lived assets: | | | |
| United States | $ 14,627 | $ 6,048 | $ 9,955 |
| England | 538 | — | — |
| Total long-lived assets | $ 15,165 | $ 6,048 | $ 9,955 |

Revenues from collaborative agreements or other sources representing 10% or more of total revenues in each period were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| Source: | 2005 | 2004 | 2003 |
| MTHFR technology sublicensing | 66% | 100% | 18% |
| Kirin | 34% | * | * |
| Affymetrix | * | * | 51% |
| Celera Diagnostics | * | * | 24% |

———————

\* less than 10%

## 18. Legal Matters

On or about December 6, 2001, Variagenics was sued in a complaint filed in the United States District Court for the Southern District of New York naming it and certain of its officers and underwriters as defendants. The complaint purportedly is filed on behalf of persons purchasing the Company's stock between July 21, 2000 and December 6, 2000, and alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.

The complaint alleges that, in connection with Variagenics' July 21, 2000 initial public offering, or IPO, the defendants failed to disclose additional and excessive commissions purportedly solicited by and paid to the underwriter defendants in exchange for allocating shares of Variagenics' stock to preferred customers and alleged agreements among the underwriter defendants and preferred customers tying the allocation of IPO shares to agreements to make additional aftermarket purchases at predetermined prices. Plaintiffs claim that the failure to disclose these alleged arrangements made Variagenics' registration statement on Form S-1 filed with the SEC in July 2000 and the prospectus, a part of the registration statement, materially false and misleading. Plaintiffs seek unspecified damages. On or about April 19, 2002, an amended complaint was filed which makes essentially the same allegations. On or about July 15, 2002, Variagenics and the individuals filed a motion to dismiss. The Company is involved in this litigation as a result of the merger with Variagenics in January 2003.

88

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

On July 16, 2003, the Company's Board of Directors approved a settlement proposal initiated by the plaintiffs. The final terms of the settlement are still being negotiated. Nuvelo believes that any loss or settlement amount will not be material to the Company's financial position or results of operations, and that any settlement payment and attorneys' fees accrued with respect to the suit will be paid by our insurance provider. However, it is possible that the parties may not reach agreement on the final settlement documents or that the Federal District Court may not approve the settlement in whole or part. The Company could be forced to incur material expenses in the litigation if the parties do not reach agreement of the final settlement documents, and in the event there is an adverse outcome, the Company's business could be harmed.

**19.  Subsequent Events**

In January 2006, the Company entered into a license and collaboration agreement with Bayer HealthCare AG, or Bayer, for the global development and commercialization of alfimeprase. Under this agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent. Nuvelo retains all commercialization rights and profits from alfimeprase sales in the United States and is eligible to receive up to $385.0 million in milestone payments from Bayer, including a $50.0 million up-front cash payment that was received in January 2006, up to $165.0 million in development milestones and $170.0 million in sales and commercialization milestones over the course of the agreement. In addition, Bayer will be responsible for 40 percent of the costs for global development programs. Nuvelo will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. Each party will bear its own expenses for any country-specific alfimeprase clinical trials it conducts, where the country-specific clinical trials are not part of the agreed global development program. Nuvelo will continue to bear sole responsibility for milestone payments and royalties owed to Amgen.

In February 2006, the Company raised approximately $111.9 million in a public offering, after deducting underwriters' fees and stock issuance costs of approximately $7.7 million, from the sale of 7,475,000 shares of common stock, including 975,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share. As a result of this offering, in February 2006, the Company paid The Irvine Company $3.7 million towards the remaining deferred rent obligation under the terms of the related lease agreement (see Note 11).

On March 10, 2006, the lease on the property at 201 Industrial Road was amended to provide for the exercise of the Company's expansion option over 7,624 square feet of rentable space (see Note 11). The amendment allows for a tenant improvement allowance of $1.0 million, and the related lease rental payments are expected to commence in the third quarter of 2006.

**20.  Selected Quarterly Financial Data (Unaudited)**

Summarized selected quarterly financial data is as follows (in thousands, except per share amounts):

| | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2005 | September 30, 2005 | June 30, 2005 | March 31, 2005 |
| Contract revenues | $      183 | $      123 | $      197 | $      42 |
| Operating loss | (21,895) | (18,852) | (17,439) | (14,852) |
| Loss from continuing operations | (21,484) | (18,459) | (17,007) | (14,661) |
| Net loss | (21,484) | (18,459) | (17,007) | (14,661) |
| Basic and diluted net loss per share from continuing operations* | (0.50) | (0.44) | (0.40) | (0.39) |
| Total basic and diluted net loss per share* | (0.50) | (0.44) | (0.40) | (0.39) |

89

Table of Contents

| | Quarter Ended | | | |
| | December 31, 2004 | September 30, 2004 | June 30, 2004 | March 31, 2004 |
|---|---|---|---|---|
| Contract revenues | $ 43 | $ 54 | $ 20 | $ 78 |
| Operating loss | (10,778) | (10,274) | (10,629) | (16,963) |
| Loss from continuing operations | (10,837) | (10,295) | (10,643) | (17,166) |
| Loss from discontinued operations | (2,145) | (574) | (317) | (512) |
| Net loss | (12,982) | (10,869) | (10,960) | (17,678) |
| Basic and diluted net loss per share from continuing operations* | (0.33) | (0.32) | (0.33) | (0.63) |
| Total basic and diluted net loss per share* | (0.40) | (0.34) | (0.34) | (0.65) |

\*   The sum of earnings per share for the four quarters may be different from the full year amount as a result of computing the quarterly and full year amounts based on the weighted average number of common shares outstanding in the respective periods.

Historically, the Company's revenues have varied considerably from period to period due to the nature of the Company's collaborative arrangements. As a consequence, the Company's results in any one quarter are not necessarily indicative of results to be expected for a full year.

**Item 9.**    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

**Item 9A.**    *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of management, including our Chief Executive Officer and our Chief Financial Officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures. Disclosure controls and procedures are controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the 1934 Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

**Changes in Internal Control over Financial Reporting**

We have recently completed our second annual company-wide assessment of our internal control over financial reporting as part of the process of complying with Section 404 of the Sarbanes-Oxley Act of 2002, and as a complement to our existing overall internal control over financial reporting. As a result, we have continued to improve the design and effectiveness of our internal control over financial reporting. We anticipate that improvements and changes will continue to be made. However, there has been no change in the Company's internal controls over financial reporting during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on the Effectiveness of Controls**

Our management, including the Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected.

90

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our internal control system was designed to provide reasonable assurance to management and our board of directors regarding the preparation and fair presentation of published financial statements.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is a more than remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we have assessed the effectiveness of our internal control over financial reporting as of December 31, 2005. In making our assessment of internal control over financial reporting, we used the criteria issued in the report Internal Control-Integrated Framework by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We have concluded that our internal control over financial reporting was effective as of December 31, 2005 based on these criteria.

Our independent registered public accounting firm, KPMG LLP, has audited management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005, as stated in their report included on page 62.

91

Table of Contents

**PART III**

**Item 10.**    *Directors and Executive Officers of the Registrant*

The information required by this item is incorporated by reference to "Election of Board of Directors," "Section 16(a) Beneficial Ownership Reporting Compliance" and "Executive Officers" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

**Item 11.**    *Executive Compensation*

The response to this item is incorporated by reference to "Executive Compensation," "Director Compensation" and "Compensation Committee Report" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

**Item 12.**    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The response to this item is incorporated by reference to "Security Ownership of Certain Beneficial Owners and Management" and "Executive Compensation" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

**Item 13.**    *Certain Relationships and Related Transactions*

The response to this item is incorporated by reference to "Certain Relationships and Related Transactions" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

**Item 14.**    *Principal Accountant Fees and Services*

The response to this item is incorporated by reference to "Ratification of Selection of Independent Auditors" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2006 Annual Meeting of Stockholders.

Consistent with Section 10A(i)(2) of the Securities Exchange Act of 1934, as added by Section 202 of the Sarbanes-Oxley Act of 2002, we are responsible for listing the non-audit services approved by our Audit Committee to be performed by KPMG LLP, our independent registered public accounting firm. Non-audit services are defined as services other than those provided in connection with an audit or a review of our financial statements. The Audit Committee did not approve the engagement of KPMG LLP for any non-audit services in 2005.

92

Table of Contents

PART IV

Item 15.    *Exhibits and Financial Statement Schedules*

(a)    *The following documents are filed as part of this Report:*

1.    Consolidated financial statements filed as part of this Report are listed under Part II, Item 8, page 60 of this Form 10-K.

2.    No schedules are required because either the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements or the notes thereto.

(b)    *Exhibits*

The following documents are filed as part of this annual report on Form 10-K. The Company will furnish a copy of any exhibit listed to requesting stockholders upon payment of the Company's reasonable expenses in furnishing those materials.

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger between Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc. dated November 9, 2002.(16) |
| 2.2 | Agreement and Plan of Merger between Nuvelo, Inc. and Nuvelo, Inc., a Nevada corporation and Nuvelo, Inc.'s predecessor in interest dated March 19, 2004.(23) |
| 2.3 | Stock Purchase Agreement between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc. dated December 3, 2004.(27) |
| 3.1 | Amended and Restated Certificate of Incorporation of Nuvelo, Inc.(23) |
| 3.2 | Amended and Restated By-Laws of Nuvelo, Inc.(31) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate.(23) |
| 4.2 | Certificate of Designations of Series A Junior Participating Preferred Stock.(23) |
| 4.3 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998.(4) |
| 4.4 | Amendment to Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated November 9, 2002.(17) |
| 4.5 | Amendment to Rights Agreement between Nuvelo, Inc. and U.S. Stock Transfer Corporation dated March 19, 2004.(23) |
| 4.6 | Hyseq Promissory Note in the principal amount of $4,000,000 dated November 13, 2001.(10) |
| 4.7 | Registration Rights Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(10) |
| 4.8 | Pledge and Security Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(10) |
| 4.9 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc. dated January 8, 2002.(7) |
| 4.10 | Form of Warrant dated April 5, 2002.(13) |
| 4.11 | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(29) |

93

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

| Exhibit Number | Description |
|---|---|
| 4.12 | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(29) |
| 4.13 | Replacement Warrant to purchase 50,000 shares (pre split) of Common Stock of Nuvelo, Inc. dated June 7, 2005.(33) |
| 4.14 | Warrant to purchase 350,000 shares of Common Stock of Nuvelo, Inc. dated August 4, 2005.(35) |
| 4.15 | Registration Rights Agreement by and between Nuvelo, Inc. and Kingsbridge Capital Limited dated August 4, 2005.(35) |
| 4.16 | Replacement Warrant to purchase 109,607 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(37) |
| 4.17 | Replacement Warrant to purchase 222,536 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(37) |
| 4.18 | Reference is made to Exhibits 3.1 and 3.2. |
| 10.1 | Form of Indemnification Agreement between Hyseq, Inc. and each of its directors and officers.(1) |
| 10.2 | Patent License Agreement dated June 7, 1994 between Arch Development Corporation and Hyseq, Inc.(1) |
| 10.3 | Stock Purchase Agreement dated May 28, 1997 for Series B Convertible Preferred Stock.(1) |
| 10.4† | Stock Option Plan, as amended.(2) |
| 10.5† | Employee Stock Purchase Plan, as amended and restated on December 14, 2004.(36) |
| 10.6† | Non-Employee Director Stock Option Plan, as amended.(3) |
| 10.7 | Collaboration and License Agreement dated December 10, 1999 between Hyseq, Inc. and American Cyanamid Company.(5) |
| 10.8† | Non-Qualified Employee Stock Purchase Plan.(6) |
| 10.9† | Scientific Advisory Board/Consultants Stock Option Plan.(6) |
| 10.10† | Employment and Confidential Information Agreement dated January 11, 2001 between Hyseq, Inc. and Dr. Ted W. Love.(7) |
| 10.11 | Lease dated April 30, 2001 between The Irvine Company and Hyseq, Inc.(8) |
| 10.12 | Form of Registration Rights Agreement dated August 28, 2001 between Hyseq, Inc. and the investors party thereto.(9) |
| 10.13† | Stock Option Agreement dated February 1, 2000 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.14† | Stock Option Agreement dated August 21, 2001 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.15 | Line of Credit Agreement dated August 6, 2001 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.16 | Interference Settlement Agreement dated October 24, 2001 between Hyseq, Inc. and Affymetrix, Inc.(10) |
| 10.17 | Settlement Agreement dated October 24, 2001 between Hyseq, Inc. and Affymetrix, Inc.(10) |
| 10.18† | Form of Non-Stockholder Approved Stock Option Agreement for Officers.(11) |

94

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.19† | Stock Option Agreement dated September 21, 2001 between Nuvelo, Inc. and Dr. George B. Rathmann.(10) |
| 10.20† | Form of Non-Stockholder Approved Option Agreement for Officers.(11) |
| 10.21 | Registration Rights Agreement dated April 5, 2002 between Hyseq, Inc. and the investors party thereto.(13) |
| 10.22 | Collaboration Agreement dated of January 8, 2002 between Hyseq, Inc. and Amgen, Inc.(14) |
| 10.23 | Amendment No. 1 to Lease Agreement dated August 1, 2002 between Hyseq, Inc. and The Irvine Company.(15) |
| 10.24 | Form of Warrant Purchase Agreement, entered into January 8, 2002 between Hyseq, Inc. and Amgen, Inc.(12) |
| 10.25 | Securities Purchase Agreement dated April 5, 2002, among Hyseq, Inc. and the investors party thereto.(13) |
| 10.26† | Variagenics, Inc. Amended 1997 Employee, Director and Consultant Stock Option Plan.(18) |
| 10.27 | Guarantee by George Rathmann in favor of AMB Property, L.P. dated October 1, 2002.(19) |
| 10.28 | Amendment to Amended and Restated Line of Credit dated November 9, 2002 between Hyseq, Inc. and Dr. George B. Rathmann.(19) |
| 10.29† | Nuvelo, Inc. 2002 Equity Incentive Plan.(20) |
| 10.30 | Second Amendment to Lease dated October 21, 2003 by and between the Irvine Company and Nuvelo, Inc.(21) |
| 10.31 | Collaboration Agreement dated January 12, 2004 between Nuvelo, Inc. and Archemix Corp.(22) |
| 10.32 | License Agreement dated February 4, 2004, among Dendreon San Diego LLC, Dendreon Corporation and Nuvelo, Inc.(22) |
| 10.33 | Amended and Restated Secreted Protein Development and Collaboration Agreement dated January 28, 2004 between Deltagen, Inc. and Nuvelo, Inc.(24) |
| 10.34† | Nuvelo, Inc. 2004 Equity Incentive Plan.(36) |
| 10.35† | Form of Notice of Grant of Stock Option under Nuvelo, Inc. 2004 Equity Incentive Plan.(25) |
| 10.36† | Form of Nuvelo, Inc. Stock Option Agreement (Single Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(25) |
| 10.37† | Form of Nuvelo, Inc. Stock Option Agreement (Double Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(26) |
| 10.38 | Amendment No. 3 to Collaboration Agreement dated September 10, 2004 between Nuvelo, Inc. and Kirin Brewery Co., Ltd.(26) |
| 10.39 | Loan and Security Agreement dated August 31, 2004 between Nuvelo, Inc., and Silicon Valley Bank.(26) |
| 10.40† | Nuvelo, Inc. Executive Change in Control and Severance Benefit Plan.(28) |
| 10.41§ | Opt-Out, Termination, Settlement and Release Agreement dated October 29, 2004 between Nuvelo, Inc. and Amgen, Inc.(28) |
| 10.42§ | License Agreement dated November 3, 2004 between Nuvelo, Inc. and Amgen, Inc.(29) |

95

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.43 | Lease Agreement dated January 11, 2005 between Nuvelo, Inc. and BMR-201 Industrial Road LLC.(29) |
| 10.44§ | Interim Agreement dated January 21, 2005 between Nuvelo, Inc. and Avecia Limited.(29) |
| 10.45 | Letter Agreement dated March 30, 2005 between Silicon Valley Bank and Nuvelo, Inc.(30) |
| 10.46§ | Collaboration Agreement dated March 31, 2005 between Kirin Brewery Company and Nuvelo, Inc.(31) |
| 10.47 | First Amendment to Lease dated May 10, 2005 between BMR-2001 Industrial Road LLC and Nuvelo, Inc.(32) |
| 10.48 | Development and Validation Agreement dated June 30, 2005 between Avecia Limited and Nuvelo, Inc.(36) |
| 10.49 | First Amendment to Loan and Security Agreement dated July 18, 2005 between Silicon Valley Bank and Nuvelo, Inc.(34) |
| 10.50 | Common Stock Purchase Agreement dated August 4, 2005 by and between Kingsbridge Capital Limited and Nuvelo, Inc.(35) |
| 10.51 | Third Amendment to Lease dated September 15, 2005 between The Irvine Company and Nuvelo, Inc.(38) |
| 10.52† | 2005 Base Salaries for Named Executive Officers.(34) |
| 10.53 | Separation agreement between Linda Fitzpatrick and Nuvelo, Inc. dated August 4, 2005.(39) |
| 10.54† | Nuvelo, Inc. Management Bonus Amounts for Named Executive Officers for the 2005 Fiscal Year.(40) |
| 10.55†* | Offer Letter dated September 7, 2004 between Nuvelo, Inc. and Dr. Michael Levy. |
| 10.56§* | License and Collaboration Agreement dated January 4, 2006 between Bayer Healthcare AG and Nuvelo, Inc. |
| 21.1* | Subsidiaries of Nuvelo, Inc. as of December 31, 2005. |
| 23.1* | Consent of Independent Registered Public Accounting Firm. |
| 24.1* | Power of Attorney (included in the signature page hereto) |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

* Filed herewith.

† Compensatory plan or agreement.

§ Confidential treatment has been requested for portions of this document, which are omitted and filed separately with the SEC.

(1) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-1, as amended, File No. 333-29091.

(2) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-8, filed on December 5, 1997, File No. 333-41663.

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

(3)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-8, filed on May 20, 1998, File No. 333-53089.

(4)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No. 00-22873.

(5)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on March 20, 2000, File No. 000-22873.

(6)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K/A, filed on March 17, 2000, File No. 00-22873.

(7)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K filed April 2, 2001, File No. 000-22873.

(8)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on May 21, 2001, File No. 000-22873.

(9)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, as amended, filed on September 25, 2001, File No. 333-70134.

(10)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on April 1, 2002, File No. 000-22873.

(11)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K/A, filed on May 9, 2002, File No. 000-22873.

(12)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q, filed on May 15, 2002, File No. 000-22873.

(13)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed on June 14, 2002, File No. 333-90458.

(14)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q/A, filed on July 22, 2002, File No. 000-22873.

(15)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q, filed on November 8, 2002, File No. 000-22873.

(16)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873.

(17)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-4, filed on November 27, 2002, File No. 333-101503.

(18)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-8, filed on February 7, 2003, File No. 333-103055.

(19)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 31, 2003, File No. 000-22873.

(20)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-8, filed on September 5, 2003, File No. 333-108563.

(21)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 14, 2003, File No. 000-22873.

(22)   Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed on February 19, 2004, File No. 000-22873.

97

Source: NUVELO INC, 10-K, March 15, 2006

<u>Table of Contents</u>

(23)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed March 26, 2004, File No. 000-22873.

(24)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2004, File No. 000-22873.

(25)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2004, File No. 000-22873.

(26)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 9, 2004, File No. 000-22873.

(27)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 9, 2004, File No. 000-22873.

(28)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 20, 2004, File No. 000-22873.

(29)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 16, 2005, File No. 000-22873.

(30)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed April 4, 2005, File No. 000-22873.

(31)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2005, File No. 000-22873.

(32)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed May 13, 2005, File No. 000-22873.

(33)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on July 14, 2005, File No. 333-126591.

(34)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed July 21, 2005, File No. 000-22873.

(35)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed August 5, 2005, File No. 000-22873.

(36)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on August 8, 2005, File No. 000-22873.

(37)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on September 14, 2005, File No. 333-128316.

(38)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2005, File No. 000-22873.

(39)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed November 8, 2005, File No. 000-22873.

(40)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed February 10, 2006, File No. 000-22873.

98

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Carlos, State of California, on March 15, 2006.

NUVELO, INC.

By:                /s/  GARY S. TITUS
                      Gary S. Titus
                      Vice President and acting Chief Financial Officer

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Ted W. Love and Gary S. Titus, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution for him, and in his name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of Nuvelo, Inc., in the capacities indicated, on March 15, 2006.

| Signature | Title |
|---|---|
| /s/  TED W. LOVE<br>Ted W. Love | Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/  GARY S. TITUS<br>Gary S. Titus | Vice President and acting Chief Financial Officer<br>(Principal Financial Officer) |
| /s/  BARRY L. ZUBROW<br>Barry L. Zubrow | Vice Chairman of the Board |
| /s/  MARY K. PENDERGAST<br>Mary K. Pendergast | Director |
| /s/  MARK L. PERRY<br>Mark L. Perry | Director |
| /s/  KIMBERLY POPOVITS<br>Kimberly Popovits | Director |
| /s/  GEORGE B. RATHMANN<br>George B. Rathmann | Director and Chairman Emeritus |
| /s/  BURTON E. SOBEL<br>Burton E. Sobel | Director |

99

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger between Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc. dated November 9, 2002.(16) |
| 2.2 | Agreement and Plan of Merger between Nuvelo, Inc. and Nuvelo, Inc., a Nevada corporation and Nuvelo, Inc.'s predecessor in interest dated March 19, 2004.(23) |
| 2.3 | Stock Purchase Agreement between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc. dated December 3, 2004.(27) |
| 3.1 | Amended and Restated Certificate of Incorporation of Nuvelo, Inc.(23) |
| 3.2 | Amended and Restated By-Laws of Nuvelo, Inc.(31) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate.(23) |
| 4.2 | Certificate of Designations of Series A Junior Participating Preferred Stock.(23) |
| 4.3 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998.(4) |
| 4.4 | Amendment to Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated November 9, 2002.(17) |
| 4.5 | Amendment to Rights Agreement between Nuvelo, Inc. and U.S. Stock Transfer Corporation dated March 19, 2004.(23) |
| 4.6 | Hyseq Promissory Note in the principal amount of $4,000,000 dated November 13, 2001.(10) |
| 4.7 | Registration Rights Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(10) |
| 4.8 | Pledge and Security Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(10) |
| 4.9 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc. dated January 8, 2002.(7) |
| 4.10 | Form of Warrant dated April 5, 2002.(13) |
| 4.11 | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(29) |
| 4.12 | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(29) |
| 4.13 | Replacement Warrant to purchase 50,000 shares (pre split) of Common Stock of Nuvelo, Inc. dated June 7, 2005.(33) |
| 4.14 | Warrant to purchase 350,000 shares of Common Stock of Nuvelo, Inc. dated August 4, 2005.(35) |
| 4.15 | Registration Rights Agreement by and between Nuvelo, Inc. and Kingsbridge Capital Limited dated August 4, 2005.(35) |
| 4.16 | Replacement Warrant to purchase 109,607 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(37) |
| 4.17 | Replacement Warrant to purchase 222,536 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(37) |
| 4.18 | Reference is made to Exhibits 3.1 and 3.2. |

1

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.1 | Form of Indemnification Agreement between Hyseq, Inc. and each of its directors and officers.(1) |
| 10.2 | Patent License Agreement dated June 7, 1994 between Arch Development Corporation and Hyseq, Inc.(1) |
| 10.3 | Stock Purchase Agreement dated May 28, 1997 for Series B Convertible Preferred Stock.(1) |
| 10.4† | Stock Option Plan, as amended.(2) |
| 10.5† | Employee Stock Purchase Plan, as amended and restated on December 14, 2004.(36) |
| 10.6† | Non-Employee Director Stock Option Plan, as amended.(3) |
| 10.7 | Collaboration and License Agreement dated December 10, 1999 between Hyseq, Inc. and American Cyanamid Company.(5) |
| 10.8† | Non-Qualified Employee Stock Purchase Plan.(6) |
| 10.9† | Scientific Advisory Board/Consultants Stock Option Plan.(6) |
| 10.10† | Employment and Confidential Information Agreement dated January 11, 2001 between Hyseq, Inc. and Dr. Ted W. Love.(7) |
| 10.11 | Lease dated April 30, 2001 between The Irvine Company and Hyseq, Inc.(8) |
| 10.12 | Form of Registration Rights Agreement dated August 28, 2001 between Hyseq, Inc. and the investors party thereto.(9) |
| 10.13† | Stock Option Agreement dated February 1, 2000 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.14† | Stock Option Agreement dated August 21, 2001 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.15 | Line of Credit Agreement dated August 6, 2001 between Hyseq, Inc. and Dr. George B. Rathmann.(10) |
| 10.16 | Interference Settlement Agreement dated October 24, 2001 between Hyseq, Inc. and Affymetrix, Inc.(10) |
| 10.17 | Settlement Agreement dated October 24, 2001 between Hyseq, Inc. and Affymetrix, Inc.(10) |
| 10.18† | Form of Non-Stockholder Approved Stock Option Agreement for Officers.(11) |
| 10.19† | Stock Option Agreement dated September 21, 2001 between Nuvelo, Inc. and Dr. George B. Rathmann.(10) |
| 10.20† | Form of Non-Stockholder Approved Option Agreement for Officers.(11) |
| 10.21 | Registration Rights Agreement dated April 5, 2002 between Hyseq, Inc. and the investors party thereto.(13) |
| 10.22 | Collaboration Agreement dated of January 8, 2002 between Hyseq, Inc. and Amgen, Inc.(14) |
| 10.23 | Amendment No. 1 to Lease Agreement dated August 1, 2002 between Hyseq, Inc. and The Irvine Company.(15) |
| 10.24 | Form of Warrant Purchase Agreement, entered into January 8, 2002 between Hyseq, Inc. and Amgen, Inc.(12) |
| 10.25 | Securities Purchase Agreement dated April 5, 2002, among Hyseq, Inc. and the investors party thereto.(13) |

2

Source: NUVELO INC, 10-K, March 15, 2006

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.26† | Variagenics, Inc. Amended 1997 Employee, Director and Consultant Stock Option Plan.(18) |
| 10.27 | Guarantee by George Rathmann in favor of AMB Property, L.P. dated October 1, 2002.(19) |
| 10.28 | Amendment to Amended and Restated Line of Credit dated November 9, 2002 between Hyseq, Inc. and Dr. George B. Rathmann.(19) |
| 10.29† | Nuvelo, Inc. 2002 Equity Incentive Plan.(20) |
| 10.30 | Second Amendment to Lease dated October 21, 2003 by and between the Irvine Company and Nuvelo, Inc.(21) |
| 10.31 | Collaboration Agreement dated January 12, 2004 between Nuvelo, Inc. and Archemix Corp.(22) |
| 10.32 | License Agreement dated February 4, 2004, among Dendreon San Diego LLC, Dendreon Corporation and Nuvelo, Inc.(22) |
| 10.33 | Amended and Restated Secreted Protein Development and Collaboration Agreement dated January 28, 2004 between Deltagen, Inc. and Nuvelo, Inc.(24) |
| 10.34† | Nuvelo, Inc. 2004 Equity Incentive Plan.(36) |
| 10.35† | Form of Notice of Grant of Stock Option under Nuvelo, Inc. 2004 Equity Incentive Plan.(25) |
| 10.36† | Form of Nuvelo, Inc. Stock Option Agreement (Single Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(25) |
| 10.37† | Form of Nuvelo, Inc. Stock Option Agreement (Double Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(26) |
| 10.38 | Amendment No. 3 to Collaboration Agreement dated September 10, 2004 between Nuvelo, Inc. and Kirin Brewery Co., Ltd.(26) |
| 10.39 | Loan and Security Agreement dated August 31, 2004 between Nuvelo, Inc., and Silicon Valley Bank.(26) |
| 10.40† | Nuvelo, Inc. Executive Change in Control and Severance Benefit Plan.(28) |
| 10.41§ | Opt-Out, Termination, Settlement and Release Agreement dated October 29, 2004 between Nuvelo, Inc. and Amgen, Inc.(28) |
| 10.42§ | License Agreement dated November 3, 2004 between Nuvelo, Inc. and Amgen, Inc.(29) |
| 10.43 | Lease Agreement dated January 11, 2005 between Nuvelo, Inc. and BMR-201 Industrial Road LLC.(29) |
| 10.44§ | Interim Agreement dated January 21, 2005 between Nuvelo, Inc. and Avecia Limited.(29) |
| 10.45 | Letter Agreement dated March 30, 2005 between Silicon Valley Bank and Nuvelo, Inc.(30) |
| 10.46§ | Collaboration Agreement dated March 31, 2005 between Kirin Brewery Company and Nuvelo, Inc.(31) |
| 10.47 | First Amendment to Lease dated May 10, 2005 between BMR-2001 Industrial Road LLC and Nuvelo, Inc.(32) |
| 10.48 | Development and Validation Agreement dated June 30, 2005 between Avecia Limited and Nuvelo, Inc.(36) |
| 10.49 | First Amendment to Loan and Security Agreement dated July 18, 2005 between Silicon Valley Bank and Nuvelo, Inc.(34) |

3

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.50 | Common Stock Purchase Agreement dated August 4, 2005 by and between Kingsbridge Capital Limited and Nuvelo, Inc.(35) |
| 10.51 | Third Amendment to Lease dated September 15, 2005 between The Irvine Company and Nuvelo, Inc.(38) |
| 10.52† | 2005 Base Salaries for Named Executive Officers.(34) |
| 10.53 | Separation agreement between Linda Fitzpatrick and Nuvelo, Inc. dated August 4, 2005.(39) |
| 10.54† | Nuvelo, Inc. Management Bonus Amounts for Named Executive Officers for the 2005 Fiscal Year.(40) |
| 10.55†* | Offer Letter dated September 7, 2004 between Nuvelo, Inc. and Dr. Michael Levy. |
| 10.56§* | License and Collaboration Agreement dated January 4, 2006 between Bayer Healthcare AG and Nuvelo, Inc. |
| 21.1* | Subsidiaries of Nuvelo, Inc. as of December 31, 2005. |
| 23.1* | Consent of Independent Registered Public Accounting Firm. |
| 24.1* | Power of Attorney (included in the signature page hereto) |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

* Filed herewith.

† Compensatory plan or agreement.

§ Confidential treatment has been requested for portions of this document, which are omitted and filed separately with the SEC.

(1) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-1, as amended, File No. 333-29091.

(2) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-8, filed on December 5, 1997, File No. 333-41663.

(3) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-8, filed on May 20, 1998, File No. 333-53089.

(4) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No. 00-22873.

(5) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on March 20, 2000, File No. 000-22873.

(6) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K/A, filed on March 17, 2000, File No. 00-22873.

(7) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K filed April 2, 2001, File No. 000-22873.

(8) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on May 21, 2001, File No. 000-22873.

Table of Contents

(9)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, as amended, filed on September 25, 2001, File No. 333-70134.

(10)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on April 1, 2002, File No. 000-22873.

(11)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K/A, filed on May 9, 2002, File No. 000-22873.

(12)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q, filed on May 15, 2002, File No. 000-22873.

(13)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed on June 14, 2002, File No. 333-90458.

(14)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q/A, filed on July 22, 2002, File No. 000-22873.

(15)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-Q, filed on November 8, 2002, File No. 000-22873.

(16)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873.

(17)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-4, filed on November 27, 2002, File No. 333-101503.

(18)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-8, filed on February 7, 2003, File No. 333-103055.

(19)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 31, 2003, File No. 000-22873.

(20)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-8, filed on September 5, 2003, File No. 333-108563.

(21)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 14, 2003, File No. 000-22873.

(22)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed on February 19, 2004, File No. 000-22873.

(23)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed March 26, 2004, File No. 000-22873.

(24)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2004, File No. 000-22873.

(25)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2004, File No. 000-22873.

(26)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 9, 2004, File No. 000-22873.

(27)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 9, 2004, File No. 000-22873.

(28)　Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 20, 2004, File No. 000-22873.

(29)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 16, 2005, File No. 000-22873.

5

Table of Contents

(30)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed April 4, 2005, File No. 000-22873.

(31)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2005, File No. 000-22873.

(32)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed May 13, 2005, File No. 000-22873.

(33)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on July 14, 2005, File No. 333-126591.

(34)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed July 21, 2005, File No. 000-22873.

(35)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed August 5, 2005, File No. 000-22873.

(36)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on August 8, 2005, File No. 000-22873.

(37)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on September 14, 2005, File No. 333-128316.

(38)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2005, File No. 000-22873.

(39)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed November 8, 2005, File No. 000-22873.

(40)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed February 10, 2006, File No. 000-22873.

6

EXHIBIT 10.55



September 7, 2004

Dr. Michael Levy

Re: Offer of Employment

Dear Michael:

Nuvelo is pleased to make you the following offer of employment and we look forward to you joining our team!

| | |
|---|---|
| **Position:** | **Senior Vice President, Research and Development** reporting to Ted Love. |
| **Salary:** | $375,000.00 per year, paid semi-monthly. |
| **Hiring Bonus** | $15,000.00, this bonus will be repayable to Nuvelo if you should voluntarily leave the company prior to the first anniversary of your employment. |
| **Annual Bonus** | You are eligible to participate in Nuvelo's Management Incentive Plan. This plan provides for an annual bonus based upon the achievement of corporate and individual goals. The current target payout is up to 25% of your base salary; your specific bonus will be approved by the Board of Directors. Since you are joining Nuvelo following January 1, your bonus payout may be pro-rated, at the discretion of the Board. |
| **Stock Options:** | Option to purchase 175,000 shares of Nuvelo, Inc common stock at an exercise price equal to the approximate fair market value on the first day of your employment with Nuvelo. The stock options will vest over 4 years, with 25% upon the first anniversary of your employment. The remaining 75% vest monthly, over the next three years. You may be eligible for additional stock options at the time of your annual review. The number of shares and the exercise price per share, of any stock options that may be granted at the time of your annual review cannot be determined at this time. |

675 Almanor Avenue, Sunnyvale, CA 94085 tel: 408-215-4000 fax: 408-215-4001 www.nuvelo.com



**Benefits:**        Medical (choice of Aetna HMO or PPO or Kaiser HMO), dental, vision and life insurance, short & long term disability, ESPP, and a 401K plan. Nuvelo currently also offers 4 weeks of paid time off (PTO) and 10 paid holidays per year in accordance with the Employee Policy Manual, as amended from time to time. You may sign up for medical, dental, vision and life insurance on date of hire. Eligibility to participate in the 401K will begin on the first payroll entry date following your hire date (see HR for details).

**Periodic Review:**    You will be given annual reviews, and will be eligible for an annual performance related salary increase and stock option grant.

**Start Date:**      We are looking forward to your joining us in the very near term.

In addition to the information specified above, you will be required to sign an "at will" employment agreement that contains confidentiality and other provisions that are fairly standard in the industry. Should you accept this offer, you will, like other employees at Nuvelo, be an employee "at will" and can be terminated at any time for any or no reason.

As we discussed on the phone Friday, should there be a change in control and as a result your position is either eliminated or not deemed to be equivalent, you will receive one (1) year pay, any accrued bonus to which you are entitled and health benefits. Your stock options will also fully vest as of the effective date of the change in control, subject to any single or double trigger provisions to be determined at the September 14, 2004 board of directors meeting. Should your employment terminate for any reason other than for cause you will receive one (1) year pay, any accrued bonus to which you are entitled and health benefits. Additionally, your stock options will continue to vest during the one (1) year of salary continuation.

This offer letter supersedes any and all prior or contemporaneous agreements or representations regarding your potential employment at Nuvelo. Once employed, the Employment and Proprietary Information Agreement and the Employee Policy Manual will govern the terms of your employment. This agreement is subject to verification of references. Please call Krista Giusti, if you have any questions, at (408) 215-4463.

Sincerely,                                     I hereby accept the offer:

Ted W. Love
President and CEO

Michael Levy

Date: Sept. 9TH, 2004

675 Almanor Avenue, Sunnyvale, CA 94085 tel: 408-215-4000 fax: 408-215-4001 www.nuvelo.com

EXHIBIT 10.56

LICENSE AND COLLABORATION AGREEMENT

BY AND BETWEEN

NUVELO, INC.

AND

BAYER HEALTHCARE AG

Source: NUVELO INC, 10-K, March 15, 2006

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

## LICENSE AND COLLABORATION AGREEMENT

THIS LICENSEAND COLLABORATION AGREEMENT ("**Agreement**") is made as of January 4, 2006 (the "**Effective Date**") by and between NUVELO, INC., a Delaware corporation having its principal place of business at 201 Industrial Road, Suite 310, San Carlos, Ca 94070-6211 ("**Nuvelo**") and BAYER HEALTHCARE AG, a corporation organized and existing under the laws of Germany and having its principal office at 51368 Leverkusen, Germany ("**Bayer**"). Nuvelo and Bayer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS Nuvelo is the exclusive licensee of worldwide rights to a polypeptide known as Alfimeprase (as defined in Exhibit A);

WHEREAS, Bayer has significant experience in the development, marketing, promotion and sale of pharmaceutical products and can make significant contributions to the successful global development and commercialization of Licensed Product (as defined in Exhibit A);

WHEREAS, Nuvelo and Bayer wish to collaborate in the global development and commercialization of Licensed Product, on the terms and conditions in this Agreement;

NOW THEREFORE, for and in consideration of the foregoing premises and the covenants, representations and agreements set forth below, the Parties, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

Capitalized terms used but not otherwise defined herein have the meanings provided in Exhibit A.

### ARTICLE 2
### GRANT OF LICENSES AND OTHER RIGHTS

2.1 Nuvelo Technology Licenses. Subject to the terms and conditions of this Agreement, Nuvelo hereby grants to Bayer, and Bayer hereby accepts, an exclusive, fee-bearing license under Nuvelo Technology to develop, use, sell, offer to sell, have sold, import, export, transfer physical possession of and transfer title or interest in and to Licensed Product in the Bayer Territory. Bayer will have the right to grant sublicenses under the foregoing license only as set forth in Section 2.4.

2.2 Trademark License. Subject to the terms and conditions of this Agreement, including without limitation Article 6, Nuvelo hereby grants to Bayer an exclusive, royalty-free license under Nuvelo's entire right, title and interest in and to the Product Trademarks, to use and

display the Product Trademarks in connection with the Commercialization of Licensed Product in the Bayer Territory. Bayer will have the right to grant sublicenses under the foregoing license only as set forth in Section 2.4.

2.3 <u>Bayer Technology License</u>. Subject to the terms and conditions of this Agreement, Bayer hereby grants to Nuvelo, and Nuvelo hereby accepts, an exclusive, fully paid- up, royalty-free, sublicensable license in the United States under Bayer Technology to make, have made, use, sell, offer to sell, have sold, import, export, transfer physical possession of and transfer title or interest in and to Licensed Product in the United States.

2.4 <u>Sublicensing</u>.

(a) Subject to this Section 2.4, Bayer will have the right to sublicense any of its rights under Section 2.1 or 2.2, provided that Bayer may grant a sublicense only to Sublicensees who are distributors doing business in one or more Sublicense Countries. Any such sublicense will require the Sublicensee to comply with the obligations of Bayer as contained herein (specifically including, without limitation, obligations under Articles 8 and 10 and Section 17.15), and include an obligation of the Sublicensee to account for and report its sales of Licensed Product to Bayer on the same basis as if such sales were Net Sales by Bayer. Any sublicense will provide for the termination of the sublicense or the conversion to a license directly between the Sublicensee and Nuvelo, at the option of Nuvelo, upon termination of this Agreement pursuant to Article 15. Bayer will forward to Nuvelo a copy of each fully executed sublicense agreement within sixty (60) days of the execution of the agreement.

(b) Bayer will remain responsible for the full and complete performance of all of Bayer's obligations and duties under this Agreement, whether the obligations and duties are performed by Bayer or by any Sublicensee. For the avoidance of doubt, Bayer will forward to Nuvelo and Bayer acknowledges that Nuvelo will be entitled to receive, Royalties on Net Sales of Licensed Product(s) sold by Sublicensees hereunder and that Bayer will be responsible to Nuvelo for paying Royalties due on Net Sales of Licensed Product sold by Sublicensees.

2.5 <u>Right of First Refusal</u>. If Nuvelo, in its sole discretion, decides to offer to a Third Party an exclusive or co-exclusive license to Commercialize Licensed Product in the United States, it shall offer such a license to Bayer (or, at Bayer's option, Bayer's Affiliate) on terms no less favorable to Bayer than those offered to that Third Party, provided that Bayer's (or its Affiliate's, as applicable) commercial infrastructure in the United States, including without limitation its United States market coverage, the size and capabilities of its United States Field Force, and its reimbursement expertise are, in Nuvelo's sole discretion, at least equal to those of the Third Party. If Bayer (or its Affiliate, as applicable) fails to accept such terms within fifteen (15) business days of Nuvelo's offer, Nuvelo shall be free to offer such a license to the Third Party for a period of nine (9) months thereafter, provided that the terms offered to the Third Party are not, in the reasonable judgment of Nuvelo, less attractive to Nuvelo, taken as a whole, than the terms previously offered to Bayer. The provisions of this Section 2.5 do not apply to any merger, acquisition or other business combination to which Nuvelo may be a party, whether or not such a transaction involves an assignment of Nuvelo's rights under this Agreement as contemplated by Section 17.5

Source: NUVELO INC, 10-K, March 15, 2006

2.6 <u>Assignment to Bayer</u>. Promptly after the Effective Date, Nuvelo will transfer to Bayer all of Nuvelo's right, title and interest in all Regulatory Filings, Drug Approval Applications and Regulatory Approvals owned or controlled in each case by Nuvelo in the Bayer Territory, and will deliver to Bayer all correspondence between Nuvelo and Regulatory Authorities relating to all Regulatory Filings, Drug Approval Applications and Regulatory Approvals in the Bayer Territory that are Controlled by Nuvelo.

2.7 <u>Retained Rights</u>. With respect to the licenses granted under this Article 2, Nuvelo reserves for itself and its Affiliates the exclusive (subject to Article 7) right to make and have made Licensed Product under Nuvelo Technology and Nuvelo Materials and Manufacturing Information in the Bayer Territory for the purpose of supplying (i) the requirements for Licensed Product of Nuvelo and any Nuvelo licensee for use in the Nuvelo Territory and (ii) Bayer's requirements for Licensed Product pursuant to this Agreement. In addition, Nuvelo retains a non-exclusive, sublicensable (with Bayer approval, which shall not be unreasonably withheld) right to distribute and use Licensed Product in the Bayer Territory exclusively for non-commercial research and Development purposes, provided that no Bayer approval will be required under this Section 2.7 with regard to Nuvelo activities in the Bayer Territory conducted under a Global Development Program. For the avoidance of doubt, Nuvelo retains all rights in Nuvelo Technology and the Nuvelo Materials and Nuvelo Manufacturing Information not expressly licensed hereunder, including the right to make, have made, use, sell, lease, offer to sell or lease, have sold, import, export or otherwise exploit, transfer physical possession of and transfer title or interest in and to products, other than Licensed Product, for any purpose in the Bayer Territory.

2.8 <u>Annual Reports</u>. On each anniversary of this Agreement, each Party will provide the other Party with a detailed written report setting forth all Development, regulatory, and Commercialization activities (pursuant to Articles 4, 5, and 6) for Licensed Product that have been conducted by such reporting Party during the past year. At the other Party's request, the reporting Party will promptly discuss with the other Party such annual report and any progress made by the reporting Party regarding its Development, regulatory and Commercialization activities.

ARTICLE 3
MANAGEMENT OF ACTIVITIES

3.1 <u>Generally</u>. Subject to the other provisions of this Agreement, the Parties agree that the principal objectives of the Parties hereunder are to jointly continue Nuvelo's in-progress worldwide Development and Commercialization of Licensed Product, including, without limitation, by sponsoring various clinical studies in the United States and worldwide in support of obtaining global Regulatory Approval of Licensed Product. The Parties agree that they shall establish a formal framework within which they will discuss strategies for the worldwide Development and Commercialization during the Term.

3.2 <u>Joint Steering Committee</u>. The formal framework referred to in Section 3.1 shall be headed by a Joint Steering Committee (the "JSC"), with such subcommittees as the JSC may establish from time to time as it deems appropriate, including, without limitation, standing subcommittees for Development and Commercialization as more fully described in Article 4 and Article 6. The Parties will establish the JSC within ten (10) days of the Effective Date.

3.3 <u>Membership of JSC</u>. The JSC will be comprised of at least three (3) members representing each Party, all of whom shall have appropriate expertise and seniority to enable them to make decisions on behalf of the Parties with respect to the issues falling within the jurisdiction of the JSC. Either Party, in its sole discretion, may substitute members of the JSC from time to time upon written notice to the other Party, <u>provided</u>, <u>however</u> that, without limiting the generality of the foregoing, a key objective with respect to membership in the JSC shall be preserving continuity. The JSC shall be chaired at each meeting by a representative of the Party hosting that meeting, as described in Section 3.5. One representative of each of Bayer and Nuvelo from the JDC and from the JCC shall take part in all meetings of the JSC.

3.4 <u>Responsibilities of JSC</u>. The JSC shall have responsibility for overseeing and coordinating the global Development and Commercialization of Licensed Product, including the following specific responsibilities:

(a) establishing a global strategy for the Development and Commercialization of Licensed Product, and overseeing the implementation of such strategy worldwide;

(b) reviewing and approving, or as appropriate amending, all plans, programs, proposals and budgets developed by the JDC and JCC, including, without limitation, Global Development Programs and the annual budget for Development Expenses associated with Global Development Programs;

(c) evaluating the broad range of indications for which Development of Licensed Product might be appropriate;

(d) determining whether the Parties should reprioritize their Development activities based on the JSC's ongoing evaluation of all such potential indications and adjusting any associated Milestone Events and Milestone Payments due hereunder accordingly; and

(e) performing such other functions as are set forth herein or as the Parties may mutually agree in writing.

3.5 <u>Administrative Matters</u>.

(a) The JSC will establish its own procedural rules for its operation, consistent with the terms of this Article 3. The chairperson of the JSC will be responsible for calling regular meetings of the JSC and for leading the meetings. The chairperson of each JSC meeting will alternate between the Parties. Regular meetings of the JSC will be held at least once per calendar quarter either by phone, videoconference or in person. The JSC also shall meet as necessary, either by phone or in person, to timely address all matters it is called upon to resolve by the JDC or the JCC. A JSC member of the Party hosting the JSC meeting will serve as secretary of that meeting. Within ten (10) business days following each meeting, the secretary of the meeting will prepare and distribute to all members of the JSC the written minutes of the meeting. The minutes will provide a reasonably detailed description of the meeting discussions and a list of any actions, decisions or determinations approved by the JSC. The minutes of each

Source: NUVELO INC, 10-K, March 15, 2006

JSC meeting will be approved or disapproved by each member within ten (10) business days of receipt, and revised as necessary, at the next meeting. Final minutes of each meeting will be distributed to the members of the JSC by the chairperson prior to commencement of the next meeting. Each Party shall bear its own costs associated with its participation on the JSC, including all travel and living expenses.

(b) If a Party's representative is unable to attend a meeting, that Party may designate an alternate representative with decision making authority for that Party to attend the meeting. Any decision made by that attendee will be considered to be a decision made by the absent representative. In addition, each Party may, at its discretion (and with the consent of the other Party), invite additional employees, consultants or scientific advisors to attend any JSC meetings, provided that any individual so invited will not have any voting power at such JSC meetings. A quorum for each JSC meeting will consist of at least two (2) members from each Party.

3.6 <u>Decision Making</u>. The JSC will operate by consensus. The representatives from each Party will have collectively one vote on behalf of that Party. If the members of the JSC cannot reach consensus on any matter that comes before the JSC, then:

(a) Bayer shall have the deciding vote on the JSC with respect to any matter that relates entirely or substantially to (i) a Country Specific Trial required to support Regulatory Approval solely in one country in the Bayer Territory; (ii) Unilateral Activities (as defined in Section 4.8) pursued by Bayer; and (iii) Commercialization of Licensed Product in the Bayer Territory (except with respect to any issue pertaining to a Global Brand); and

(b) Nuvelo shall have the deciding vote on the JSC with respect to any matter that relates entirely or substantially to (i) a Country Specific Trial required to support Regulatory Approval solely in the United States; (ii) Unilateral Activities (as defined in Section 4.8) pursued by Nuvelo; (iii) Commercialization of Licensed Product in the Nuvelo Territory; (iv) Global Development Programs; and (v) if the Parties decide to use a Global Brand for a particular indication as provided in Section 6.2(a), Global Brand issues.

For the avoidance of doubt, control of decision-making authority for any matter as provided above will not relieve the Party with control from any of its representations, warranties and/or covenants in this Agreement, nor will it enable that Party to unilaterally modify or amend the terms of this Agreement.

3.7 <u>Dispute Resolution</u>. Notwithstanding the foregoing, if either Party reasonably believes that the final decision of the Party authorized to cast the deciding vote above would prevent or significantly impinge on the other Party's ability to undertake the Development or Commercialization of a Licensed Product in such other Party's portion of the Territory, then the other Party shall have the right to refer such decision to the Chief Executive Officer of Nuvelo and the Head of the Pharmaceutical Division of Bayer, and such dispute shall be resolved in accordance with Section 16.1. Until such dispute is resolved, the Parties shall refrain from taking action on the decision; provided that this Section shall not apply to any decision relating to a Clinical Trial required by a Regulatory Authority in a Party's portion of the Territory, and the affected Party shall be entitled to conduct such Clinical Trial as so required.

Source: NUVELO INC, 10-K, March 15, 2006