# Exhibit E

ARTICLE 4
DEVELOPMENT

4.1 Diligence; Compliance.

(a) Following the Effective Date, each Party will use Commercially Reasonable Efforts to undertake Development of Licensed Product in all indications agreed to by the Parties in each Party's portion of the Territory in the manner contemplated in this Agreement. Without limiting the foregoing, Bayer will endeavor to file a Drug Approval Application with respect to obtaining Regulatory Approval of a first indication for Licensed Product in Europe and Canada within [  *  ] after the date that Nuvelo files a Drug Approval Application in the United States for that same indication and both Parties will thereafter use Commercially Reasonable Efforts to obtain Regulatory Approval for the Licensed Product in such countries.

(b) To the extent applicable, Bayer agrees to maintain all regulatory and governmental permits, licenses and approvals and to comply with all Bayer Territory Drug Laws that are applicable to its activities in each country in the Bayer Territory and the particular stage of Development of Licensed Product in such country in the Bayer Territory. In addition, to the extent applicable, Bayer will comply with good laboratory practices ("**GLP**"), good clinical practices ("**GCP**") and good manufacturing practices ("**GMP**") as these standards are defined in accordance with the applicable guidance and regulations including the International Conference of Harmonization (ICH). To the extent applicable, Nuvelo agrees to maintain all regulatory and governmental permits, licenses and approvals and to comply with all US Drug Laws that are applicable to its activities in the Nuvelo Territory and the particular stage of Development of Licensed Product in the Nuvelo Territory. In addition, to the extent applicable, Nuvelo will comply with GLP, GCP and GMP as these standards are defined in accordance with the applicable FDA rules and regulations.

4.2 Joint Development Committee. Within ten (10) days after the Effective Date, the Parties will establish a Joint Development Committee (the "**JDC**") comprised of at least three (3) members representing each Party, all of whom shall have appropriate expertise and seniority to enable them to make decisions on behalf of the Parties with respect to the issues falling within the jurisdiction of the JDC. The JDC will follow the organizational and meeting procedures set forth in Section 4.4.

4.3 JDC Responsibilities. The JDC will be responsible for developing a plan for the overall worldwide strategy for the Development of Licensed Product including, without limitation the following:

(a) reviewing and recommending to the JSC Global Development Programs and Country Specific Trials for each country, including any changes to Global Development Programs as the JDC considers appropriate in response to Regulatory Authority requirements imposed or directed following preparation of an annual budget for a Global Development Program, and managing and allocating clinical drug supply of Licensed Product to facilitate Global Development Programs, Country Specific Trials and Phase 4 Clinical Trials for post-launch marketing support, or other purposes;

---

[*]  Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

(b) reviewing and recommending to the JSC a detailed annual budget and a three-year projection for Development Expenses associated with Global Development Programs beginning with the 2007 calendar year, the Parties having approved the budget for Global Development Programs in 2006 prior to the Effective Date, a summary of which is attached hereto as Exhibit E;

(c) establishing and recommending to the JSC forecasts for non-clinical and clinical supply of Licensed Product;

(d) together with the JCC, recommending to the JSC Phase 4 Clinical Trials and target product profiles for Licensed Product, including acute peripheral arterial occlusion, catheter occlusion, stroke, deep vein thrombosis, and other indications for Licensed Product as they are identified as potential indications for which the Parties intend to Develop Licensed Product;

(e) facilitating the exchange of all data, Information, Materials or results relating to Licensed Product; and

(f) performing such other functions as appropriate to further Development of Licensed Product in the Territory.

4.4 Decision Making; Administrative Matters.

(a) Decision Making. The JDC will operate by consensus. The representatives from each Party will have collectively one vote on behalf of that Party. If the members of the JDC cannot reach consensus on a matter, the matter will be referred to the JSC for resolution as provided in Section 3.6, and a special meeting of the JSC may be called for such purpose.

(b) Administrative Matters. The JDC will establish its own procedural rules for its operation, consistent with the terms of this Article 4. The chairperson for each meeting of the JDC will be a representative of the Party hosting that meeting. The chairperson will be responsible for calling regular meetings of the JDC and for leading the meetings. The regular meetings will be held at least once per calendar quarter either by phone, videoconference or in person. The chairperson of each JDC meeting will alternate between the parties. A JDC member of the Party hosting the JDC meeting will serve as secretary of that meeting. Within ten (10) business days following each meeting, the secretary of the meeting will prepare and distribute to all members of the JDC the written minutes of the meeting. The minutes will provide a reasonably detailed description of the meeting discussions and a list of any actions, decisions or determinations approved by the JDC. The minutes of each JDC meeting will be approved or disapproved by each member within ten (10) business days of receipt, and revised as necessary, at the next meeting. Final minutes of each meeting will be distributed to the members of the JDC by the chairperson prior to commencement of the next meeting. Each Party shall bear its own costs associated with its participation on the JDC, including all travel and living expenses.

(c) Attendance at JDC Meetings. If a Party's representative is unable to attend a meeting, that Party may designate an alternate representative with decision making authority for that Party to attend the meeting. Any decision made by that attendee be considered to be a decision made by the absent representative. In addition, each Party may, at its discretion (and

Source: NUVELO INC, 10-K, March 15, 2006

with the consent of the other Party), invite additional employees, consultants or scientific advisors to attend any JDC meetings, provided that any individual so invited will not have any voting power at such JDC meetings. A quorum for each JDC meeting will consist of at least two (2) members from each Party.

4.5 Information and Data. Each Party will disclose to the other Party all material scientific, medical or technical information relating to Licensed Product that it discovers in the course of its Development activities in its portion of the Territory, promptly after it is learned or its materiality is appreciated. Nuvelo will own and maintain a Clinical Trial database containing data from all Global Development Programs and all Country Specific Trials in the Territory. In addition, Bayer will maintain a database that contains all Clinical Trial data accumulated by Bayer from Global Development Programs and Country Specific Trials conducted or sponsored by Bayer. Each Party will be entitled to have access, during regular business hours and upon reasonable advance notice, to the other Party's database. Each Party will own the complete interest in all data and Information generated by such Party in its Clinical Trials of Licensed Product, however the other Party will have the right to use all such data and Information for any purpose necessary for the other Party to Develop and Commercialize Licensed Product in such other Party's Territory.

4.6 Quality Assurance Audit. Nuvelo will have the right to conduct reasonable quality assurance audits with respect to all facilities, operations and laboratories (and any records related thereto) operated by Bayer or its Third Party subcontractors, where Development activities are conducted, as is reasonably necessary solely for the purpose of verifying Bayer's conformance with applicable GMP, GLP, GCP and other regulatory requirements in each country in the Bayer Territory. All audits initiated by Nuvelo will be conducted at Nuvelo's sole expense, upon reasonable prior notice to Bayer, and during regular business hours. Bayer will have the right to conduct reasonable quality assurance audits with respect to all facilities, operations and laboratories (and any records related thereto) operated by Nuvelo or its Third Party contractors where Development or manufacturing activities for Licensed Product are conducted, including the right to audit activities that formed the basis of CMC documentation, only to the extent reasonably necessary for Bayer to carry out its Development and Commercialization obligations hereunder and as is reasonably necessary solely for the purpose of verifying Nuvelo's conformance with applicable GMP, GLP, GCP and other regulatory requirements in the Nuvelo Territory. All audits initiated by Bayer will be conducted at Bayer's sole expense, upon reasonable prior notice to Nuvelo, and during regular business hours.

4.7 Funding.

(a) All Development Expenses incurred in conducting the Global Development Programs will be funded jointly by the Parties, with Bayer responsible for forty percent (40%) of all such Development Expenses, and Nuvelo responsible for sixty percent (60%) of all such Development Expenses, subject to the provisions of this Section 4.7. Reimbursable Development Expenses for the Global Development Programs will include all amounts actually incurred up to the amounts budgeted and approved pursuant to Sections 3.4 and 4.3(b), and any additional Development Expenses incurred in conducting the Global Development Program up to [ * ] percent ([ * ]%) in excess of the total amounts so budgeted. Development Expenses incurred in conducting Global Development Programs in excess of [ * ]% of the amounts so budgeted shall

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

also be reimbursed if both Parties approve the excess Development Expenses (either before or after they are incurred). Within thirty (30) days after the end of each calendar quarter, the Parties will send to each other written statements showing Development Expenses incurred by it during that calendar quarter in connection with Global Development Programs. Within fifty (50) days after the end of each calendar quarter, the Party that has incurred less than its pro rata share of Development Expenses for Global Development Programs during that calendar quarter shall reimburse the other Party, so that following any such Development Expense reimbursement Nuvelo will have incurred sixty percent (60%) of such Development Expenses and Bayer will have incurred forty percent (40%) of such Development Expenses during that calendar quarter.

(b) Nuvelo will not be obligated to expend more than [ * ] Dollars ($[ * ]) as its share of Development Expenses for Global Development Programs for Licensed Product in any calendar year during the term of this Agreement (the "**Nuvelo Development Cap**"). If the JSC approves an annual budget for such Global Development Programs, [ * ] percent ([ * ]%) of which would exceed the Nuvelo Development Cap, or if during the course of any calendar year Nuvelo incurs agreed-upon Development Expenses that exceed the Nuvelo Development Cap, upon Nuvelo's written request, Bayer will have the right, but not the obligation to advance any such excess amounts. Bayer will have the right to recover any such advances by reducing royalties payable to Nuvelo under Section 8.3 by [ * ] percent ([ * ]%) on annual Net Sales of Licensed Products less than or equal to [ * ] Dollars ($[ * ]) and [ * ] percent ([ * ]%) on annual Net Sales of Licensed Products in excess of [ * * ] Dollars. In addition, all amounts owed to Bayer as a result of any advances made by Bayer under this Section 4.7(b) will become due and payable within [*] ([*]) business days following the earlier of (i) the tenth anniversary of the Effective Date; and (ii) any merger or acquisition of the equity or assets of Nuvelo pursuant to which a single Third Party acquires control of more than fifty percent (50%) of the voting securities of Nuvelo.

(c) Upon reasonable notice, during normal business hours, and no more than once per calendar year, each Party shall have the right to have independent, certified public accountants, which shall be reasonably acceptable to the audited Party, audit the records of the other Party with respect to Development Expenses incurred by the audited Party during the previous three (3) calendar years. The report of such accountant will be limited to a certificate verifying the correctness of such Development Expenses as previously reported by the audited Party, or identifying any discrepancy between actual and reported Development Expenses, along with an explanation of the basis for such a finding. The result of the audit and the audit report shall be subject to Article 12. The results of such audit may be disputed by the audited Party in accordance with Section 16.1. If an audit discloses a discrepancy between actual and reported Development Expenses, within sixty (60) days of the Parties' receipt of the audit report or, if disputed, within sixty (60) days after resolution of such dispute, the Party who is obligated to reimburse the other Party for any Development Expenses resulting from the discrepancy will do so. The Party requesting the audit shall bear the full cost and expense of the performance of any such audit, unless such audit discloses an overstatement by a Party of its Development Expenses in the audited period by more than five percent (5%), in which case the audited Party will reimburse the auditing Party the full cost of the performance of such audit. Upon the expiration of three (3) years following the end of any calendar year, the calculation of Development Expenses for purposes of this Section 4.7 will be binding upon the Parties.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

(d) Each Party will be solely responsible for all Development Expenses incurred in connection with Country Specific Trials required to support Regulatory Approval in a country in such Party's portion of the Territory and for all Unilateral Activities pursued by such Party. If Bayer desires to use the efficacy data from a Country Specific Trial in the Nuvelo Territory to support an application for Regulatory Approval in a country in the Bayer Territory, Bayer shall bear forty percent (40%) and Nuvelo shall bear sixty percent (60%) of the Development Expenses incurred in conducting such Country Specific Trial (and Bayer shall make reconciling payments as needed to reflect such split, plus [ * ] percent ([ * ]%) of Bayer's share of such Development Expenses). If Nuvelo desires to use the efficacy data from a Country Specific Trial in the Bayer Territory to support an application for Regulatory Approval in United States, Bayer shall bear forty percent (40%) and Nuvelo shall bear sixty percent (60%) of the Development Expenses incurred in conducting such Country Specific Trial (and Nuvelo shall make reconciling payments as needed to reflect such split, plus [ * ] percent ([ * ]%) of Nuvelo's share of such Development Expenses). Nothing in this Section 4.7(d) will require either Party to compensate the other Party if it submits to a Regulatory Authority in that Party's portion of the Territory data from a Country Specific Trial conducted by the other Party solely because the Regulatory Authority or applicable statutes or regulations require it to do so.

4.8 Unilateral Activities.

(a) In the event the JSC cannot agree whether to pursue a Clinical Trial in support of an indication for a Licensed Product (other than an indication for Licensed Product agreed upon by the Parties as of the Effective Date), a Party shall have the right, on written notice to the other Party, to proceed unilaterally with such Clinical Trial solely to support Regulatory Approval or Commercialization of such Licensed Product in such Party's portion of the Territory (such activities, the **"Unilateral Activities"**), and the non-pursuing Party shall be deemed to have opted-out (each, an **'Opt-Out"**), with respect to such Unilateral Activities, *provided* that, subject to Section 4.8(b), (i) the pursuing Party shall be solely responsible for all Development Expense incurred in connection with such Unilateral Activities, and (ii) the non-pursuing Party shall have no further financial obligation to support or otherwise fund any additional efforts in respect of such Unilateral Activities, and no obligation, responsibility, or authority regarding such additional efforts in respect of such Unilateral Activities; *provided, however,* that if the non-pursuing Party reasonably believes that the pursuing Party's conduct of such Unilateral Activities would prevent or significantly impinge on such non-pursuing Party's ability to undertake the Development or Commercialization of Licensed Product for agreed-upon indication(s) in such non-pursuing Party's portion of the Territory, then the non-pursuing Party shall have the right to refer such decision to the Chief Executive Officer of Nuvelo and the Head of the Pharmaceutical Division of Bayer, and such dispute shall be resolved in accordance with Section 16.1. Until such dispute is resolved, the Parties shall refrain from taking action on the decision; provided that this Section shall not apply to any decision relating to a Clinical Trial required by a Regulatory Authority, and the affected Party shall be entitled to conduct such Clinical Trial as so required.

(b) The non-pursuing Party shall have the right to opt-in (**"Opt-In"**) with respect to any Unilateral Activities of which such Party Opted-Out at any time in accordance with this Section 4.8(b). Within twenty (20) days after receipt of a written request by the non-pursuing Party, the pursuing Party shall provide to the non-pursuing Party a written statement of

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Development Expenses incurred by the pursuing Party in connection with such Unilateral Activities to date. Within thirty (30) days after receipt of such statement (subject to the non-pursuing Party's audit rights in accordance with Section 4.7(c)), the non-pursuing Party shall have the right to Opt-In with respect to such Unilateral Activities by providing written notice thereof to the pursuing Party (an **"Opt-In Notice"**), which Opt-In Notice shall be accompanied by a payment equal to (i) [ * ] percent ([ * ]%) of the total amount of the non-pursuing Party's share of such Development Expenses, as though such costs and expenses were Development Expenses shared in accordance with Section 4.7(a), and (ii) all interest on such amount accrued from the date that such costs would have been reimbursed had the non-pursuing Party not Opted-Out of such Unilateral Activities (calculated in accordance with Section 10.1(d)). From and after the pursuing Party's receipt of such payment for the non-pursuing Party's share of such Development Expenses, such Unilateral Activities shall cease to be Unilateral Activities and shall be deemed Global Development Programs Development Expenses, and the Parties shall share all such Development Expenses in accordance with Section 4.7(a).

ARTICLE 5
REGULATORY

5.1 Regulatory Filings and Regulatory Approvals. Bayer will prepare, file and own all right, title and interest in Regulatory Filings and Regulatory Approvals relating to Licensed Product in each country in the Bayer Territory. Nuvelo will prepare, file and own all right, title and interest in Regulatory Filings and Regulatory Approvals relating to Licensed Product in the Nuvelo Territory.

5.2 Country Specific Trials. Bayer will be the sponsor of record for each Country Specific Trial in the Bayer Territory and Nuvelo will be the sponsor of record for each Country Specific Trial in the Nuvelo Territory, and each such Party will have the right and obligation to monitor, review and direct all aspects of regulatory matters regarding Licensed Product for each such Country Specific Trial, including making all strategic and tactical decisions with respect thereto and establishing the methods and means by which it performs such services, including the management of permitted subcontractors. Bayer will have responsibility for all official correspondence, communications and Regulatory Filings with Regulatory Authorities regarding Country Specific Trials in the Bayer Territory and Nuvelo will have responsibility for all official correspondence, communications and Regulatory Filings with Regulatory Authorities regarding Country Specific Trials in the Nuvelo Territory. Each Party will promptly provide the other Party with copies of all Regulatory Filings, Regulatory Approvals and all official correspondence with Regulatory Authorities in the United States, Major Countries, Canada and Japan. Bayer will also promptly provide Nuvelo with copies of all Regulatory Filings, Regulatory Approvals and all official correspondence with Regulatory Authorities addressing matters of material importance to the Development or Commercialization of Licensed Product in every other country in the Bayer Territory. Bayer will not transfer title in or otherwise attempt in any manner to dispose of any Regulatory Filings or Regulatory Approvals or other governmental licenses, approvals or certificates for Licensed Product in the Bayer Territory, or otherwise impair Nuvelo's rights in the Regulatory Filings or Regulatory Approvals, or other governmental licenses, approvals or certificates.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

5.3 <u>Transfer of Regulatory Filings</u>. Promptly after the Effective Date, Nuvelo will transfer to Bayer ownership of all Regulatory Filings and Regulatory Approvals in the Bayer Territory for Licensed Product that are Controlled by Nuvelo as of the Effective Date.

5.4 <u>Drug Approval Applications in the Bayer Territory</u>. Bayer will have full responsibility for filing all Drug Approval Applications and seeking Regulatory Approvals for Licensed Product in all countries in the Bayer Territory. Bayer will provide Nuvelo with a reasonable opportunity to review and comment on all such applications prior to submission.

5.5 <u>Adverse Event Reporting; Customer Complaints</u>. Consistent with the terms of the Pharmacovigilance Agreement (defined in Section 5.6):

(a) Bayer will maintain a record of all non-medical and medical product-related complaints and reports of adverse events that it receives with respect to Licensed Product in the Bayer Territory. Bayer will notify Nuvelo of any safety-related complaint received by it and, within seven (7) days (but, in the event of serious adverse events, three (3) days) of the initial receipt, provide Nuvelo with a copy of such safety-related complaint(s) and adverse event reports.

(b) Bayer will be responsible for reporting to Regulatory Authorities in all countries in the Bayer Territory any adverse experience and safety issues for Licensed Product in compliance with Bayer Territory Drug Laws. Bayer will promptly provide Nuvelo with a copy of such report.

(c) Nuvelo will maintain a record of all non-medical and medical product-related complaints and reports of adverse events that it receives with respect to Licensed Product in the United States. Nuvelo will notify Bayer of any safety-related complaint received by it and, within seven (7) days (but, in the event of serious adverse events, three (3) days) of the initial receipt, provide Bayer with a copy of such safety-related complaint(s) and adverse event reports.

(d) Nuvelo will be responsible for reporting to Regulatory Authorities in the United States any adverse experience and safety issues for Licensed Product in compliance with US Drug Laws. Nuvelo will promptly provide Bayer with a copy of such report.

5.6 <u>Drug Safety Information</u>. Notwithstanding anything to the contrary in this Agreement, the Parties shall execute a pharmacovigilance agreement (**"Pharmacovigilance Agreement"**) within ninety (90) days after the Effective Date. Unless otherwise agreed by the Parties, Nuvelo shall have the sole right to create and maintain a master drug safety database that shall cross-reference any Adverse Event (as such term shall be defined in the Pharmacovigilance Agreement) relating to Licensed Product occurring anywhere in the Territory. Nuvelo shall be the sole owner of this master drug safety database and Clinical Trial registry. Bayer shall submit to Nuvelo all data collected by it with respect to Adverse Events relating to Licensed Product in accordance with the timelines set forth in the Pharmacovigilance Agreement.

5.7 <u>Regulatory Communications in the Bayer Territory</u>.

(a) Bayer will have exclusive responsibility for all correspondence and for any official communication (except as Nuvelo may be required by applicable laws or regulations or a

Source: NUVELO INC, 10-K, March 15, 2006

Regulatory Authority to communicate) regarding Development of Licensed Product in the Bayer Territory with applicable Regulatory Authorities in the Bayer Territory. Nuvelo will have the right to be present (and to participate at the request of the Regulatory Authority) at all teleconference, videoconference, or face-to-face meetings scheduled with Regulatory Authorities in the Bayer Territory. To the extent practicable, Bayer will give Nuvelo at least ten (10) business days' advance notice of any planned communication for Nuvelo's planning purposes.

(b) Nuvelo, or its designated Third Party(ies) responsible for manufacturing Licensed Product, will cooperate with Bayer regarding communications with Regulatory Authorities in the Bayer Territory directed to the manufacture of Licensed Product by Nuvelo or its Third Party(ies) for supply to Bayer; provided however, that Nuvelo's obligation to provide Bayer or Regulatory Authorities with Nuvelo Material and Manufacturing Information is limited to the extent the information is reasonably required for Bayer to carry out its Development responsibilities as those responsibilities relate to Regulatory Filings or Regulatory Approval, or is required by law, rule, regulation or a Regulatory Authority having jurisdiction in the Bayer Territory, to have access. Bayer will only be entitled to use the Nuvelo Material and Manufacturing Information to the extent required by such law, rule, regulation or Regulatory Authority or to the extent required to carry out its Development activities. For so long as Nuvelo or its Third Party(ies) is supplying Bayer with Licensed Product hereunder, Nuvelo will have the right to be present at all meetings and to participate in telephone calls with all Regulatory Authorities in the Bayer Territory having jurisdiction in the Bayer Territory wherein the chemistry, manufacturing and control section (**"CMC"**) contained in any Regulatory Filing is to be discussed.

(c) Bayer will have exclusive responsibility for all correspondence and for any official communications (except as Nuvelo may be required by applicable laws or regulations or a Regulatory Authority to communicate) with Regulatory Authorities in the Bayer Territory (e.g., annual reports, filing of Promotional Materials) consistent with Bayer Territory Drug Laws.

(d) Bayer will promptly notify Nuvelo of and provide Nuvelo with a copy of any correspondence or other reports or complaints submitted to or received from any Regulatory Authority, or other Third Party claiming that any Promotional Materials are inconsistent with the product labeling or are otherwise in violation of any Bayer Territory Drug Laws.

5.8 <u>Regulatory Communications in the United States</u>.

(a) Nuvelo will have exclusive responsibility for all correspondence and for any official communication (except as Bayer may be required by applicable laws or regulations or a Regulatory Authority to communicate) regarding Development of Licensed Product in the Nuvelo Territory with applicable Regulatory Authorities in the Nuvelo Territory. Bayer will have the right to be present (and to participate at the request of the Regulatory Authority) at all teleconference, videoconference, or face-to-face meetings scheduled with Regulatory Authorities in the Nuvelo Territory. To the extent practicable, Nuvelo will give Bayer at least ten (10) business days' advance notice of any planned communication for Bayer's planning purposes.

Source: NUVELO INC, 10-K, March 15, 2006

(b) Nuvelo will have exclusive responsibility for all correspondence and for any official communications (except as Bayer may be required by applicable laws or regulations or a Regulatory Authority to communicate) with Regulatory Authorities in the United States (e.g., annual reports, filing of Promotional Materials) consistent with US Drug Laws.

(c) Nuvelo will promptly notify Bayer of and provide Bayer with a copy of any correspondence or other reports or complaints submitted to or received from any Regulatory Authority in the United States, or other Third Party claiming that any Promotional Materials are inconsistent with the product labeling or are otherwise in violation of any US Drug Laws.

5.9 Applications for Regulatory Exclusivity. The Parties recognize the commercial value of exclusivity rights to Licensed Product granted or provided for under regulatory laws of the countries in the Bayer Territory. To the extent permitted by law, Bayer will have the exclusive right to file for, request and maintain any regulatory exclusivity rights for Licensed Product in the Bayer Territory (including without limitation regulatory exclusivity rights based upon an orphan drug designation of Licensed Product) and to conduct and prosecute any proceedings or actions to enforce the regulatory exclusivity rights.

5.10 Recalls.

(a) The Parties will exchange their internal standard operating procedures, if any, as to Licensed Product Recalls ("**SOPs**") reasonably promptly after the Effective Date and thereafter reasonably promptly after such SOPs are approved or modified. If either Party becomes aware of information about quantities of Licensed Product which may not conform to the specifications for the Licensed Product, or for which there are potential adulteration, misbranding and/or other issues regarding safety or effectiveness, or for which the Licensed Product itself is alleged or proven to be the subject of a Recall in any country in the Territory, it will promptly so notify the other Party. Either Party may take immediate action, with notice to the JDC, with respect to a Recall in such Party's portion of the Territory when regulatory timeframes or public safety considerations so require. The JDC will meet (in person, by telephone or otherwise) to discuss other circumstances of a Recall in the Territory and to consider appropriate courses of action with respect such Recall, which courses of action will be consistent with the internal SOPs of Bayer or Nuvelo, as applicable. Each Party shall provide all pertinent records and such other assistance to the other Party as such other Party reasonably may request to assist in effecting any Recall. In addition, Each Party will maintain all records relating to the Recall for the period required by legal requirements, but for no less than three (3) years. Nuvelo shall bear the cost of recalls that are a result of any Licensed Product manufactured by Nuvelo that does not conform to the specifications in the Manufacturing Agreement (as defined in Section 7.1) at the time of delivery to Bayer.

(b) If Bayer elects not to conduct a Recall of Licensed Product in the Bayer Territory when, in the good faith opinion of Nuvelo, a Recall of the Licensed Product should be undertaken to address specific issues of Licensed Product safety due to manufacturing defect or Product design that have been identified by Nuvelo in writing to Bayer ("**Safety Issues**"), then Nuvelo shall have no obligation to defend or indemnify Bayer under Section 14.1 or 14.3 for any Product Liability Claims arising in connection with the Safety Issues, and Bayer will defend and indemnify Nuvelo under Section 14.2 for any such Product Liability Claims.

Source: NUVELO INC, 10-K, March 15, 2006

5.11 Manufacturing Documents. In order to help preserve the proprietary nature of Nuvelo's manufacturing information (e.g., the CMC section contained in any Regulatory Filings), Nuvelo will have the right, to the extent permitted by Regulatory Authorities, to file a drug master file with a Regulatory Authority to make the information regarding such manufacturing information available directly to the Regulatory Authority; provided however, for all countries in the Bayer Territory, Bayer will have the right to access and reference the Regulatory Filing, including the CMC section and documentation, to the extent required by law, rule, regulation or a Regulatory Authority having jurisdiction in each country in the Bayer Territory. Bayer will only be entitled to use the manufacturing information to the extent reasonably required by local law, rule, regulation or Regulatory Authority and to carry out its Development responsibilities.

ARTICLE 6
COMMERCIALIZATION

6.1 Diligence. Throughout the term of this Agreement, Bayer will use Commercially Reasonable Efforts to Commercialize the Licensed Product throughout the Bayer Territory for all indications agreed upon by the JSC and Nuvelo will use Commercially Reasonable Efforts to Commercialize the Licensed Product throughout the United States for all indications agreed upon by the JSC for the benefit of both Bayer and Nuvelo. Without limiting the generality of the previous sentence, Bayer will endeavor to commence selling Licensed Product within[ * ][ * ] [ * ] of obtaining Regulatory Approval in each country in the Bayer Territory in which it files a Drug Approval Application. In addition, in Commercializing Licensed Product in Major Countries, Japan and Canada, Bayer will apply Field Force resources comparable to or greater than those applied by Bayer in those countries for its own specialty pharmaceutical products on an indication-by-indication basis.

6.2 Joint Commercial Committee. Within ten (10) days of the Effective Date, the Parties will establish a Joint Commercial Committee (the "JCC") comprised of at least three (3) members representing each Party, all of whom shall have appropriate expertise and seniority to enable them to make decisions on behalf of the Parties with respect to the issues falling within the jurisdiction of the JCC. The JCC will follow the organizational and meeting procedures set forth in Section 6.4.

6.3 JCC Responsibilities. The JCC will be responsible for reviewing and developing a plan for the overall worldwide strategy for the Commercialization of Licensed Product, including, without limitation, the following functions:

(a) recommending to the JSC whether a single brand will be used for Commercialization of Licensed Product for one or more indications throughout the United States, Major Countries, Japan, and Canada ("**Global Brand**"). If the JCC agrees that a Global Brand(s) for the Licensed Product is desirable, the JCC will diligently outline and implement a process to define the architecture of the Global Brand(s). If there is agreement on that process and architecture, the JCC will proceed to develop the Global Brand. If the JCC does not agree on a Global Brand(s) or the associated process or architecture and such disagreement is not resolved in accordance with Section 3.6 or Section 3.7, each Party will use a separate brand for the Commercialization of Licensed Product;

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

(b) reviewing and recommending to the JSC strategic launch plans for Commercialization of each indication of Licensed Product in the Territory and country specific plans for the United States, Major Countries, Japan and Canada, including size and composition of the Bayer Field Force in each of those countries (other than the United States) as well as marketing plans, advertising campaigns, and other efforts to launch the Licensed Product;

(c) if a Global Brand is pursued, then ensuring that country specific launch plans in the Territory are consistent with (a), above;

(d) reviewing and recommending to the JSC forecasts for commercial supply of Licensed Product in the Bayer Territory;

(e) recommending to the JSC a recommended annual minimum budget and three-year projection for Bayer's Commercialization activities under this Article 6 for each year that this Agreement in force;

(f) to the extent permissible by law, recommending to the JSC suggested pricing bands;

(g) together with the JDC, recommending to the JSC Phase 4 Clinical Trials and target product profiles for Licensed Product, including acute peripheral arterial occlusion, catheter occlusion, stroke, deep vein thrombosis, and other indications for Licensed Product as they are identified as potential indications for which the Parties intend to Develop Licensed Product; and

(h) performing such other functions as appropriate to further Commercialization of Licensed Product in the Territory.

6.4 <u>Decision Making; Administrative Matters.</u>

(a) The JCC will operate by consensus. The representatives from each Party will have collectively one vote on behalf of that Party. If the members of the JCC cannot reach consensus on a matter, the matter will be referred to the JSC for resolution as provided in Section 3.6, and a special meeting of the JSC may be called for such purpose.

(b) The JCC will establish its own procedural rules for its operation, consistent with the terms of this Article 6. The chairperson for each meeting of the JCC will be a representative of the Party hosting that meeting. The chairperson of each JCC meeting will alternate between the Parties. The chairperson will be responsible for calling regular meetings of the JCC and for leading the meetings. The regular meetings will be held at least once per calendar quarter either by phone, videoconference or in person. A JCC member of the Party hosting the JCC meeting will serve as secretary of that meeting. Within ten (10) business days following each meeting, the secretary of the meeting will prepare and distribute to all members of the JCC the written minutes of the meeting. The minutes will provide a reasonably detailed description of the meeting discussions and a list of any actions, decisions or determinations approved by the JCC. The minutes of each JCC meeting will be approved or disapproved by each member within ten (10) business days of receipt, and revised as necessary, at the next meeting. Final minutes of each meeting will be distributed to the members of the JCC by the chairperson prior to commencement of the next meeting. Each Party shall bear its own costs associated with its participation on the JCC, including all travel and living expenses.

Source: NUVELO INC, 10-K, March 15, 2006

(c) If a Party's representative is unable to attend a meeting, that Party may designate an alternate representative with decision making authority for that Party to attend the meeting. Any decision made by that attendee will be considered to be a decision made by the absent representative. In addition, each Party may, at its discretion (and with the consent of the other Party), invite additional employees, consultants or scientific advisors to attend any JCC meetings. A quorum for each JCC meeting will consist of at least two (2) members from each Party.

6.5 Exchange of Information. Bayer will use reasonable efforts to provide Nuvelo with full access to Bayer information relating to the Commercialization of the Licensed Product in the Bayer Territory, including without limitation information relating to the development of sales targets by customer segment and territory, key market metrics (e.g. awareness, usage, therapy change), market research, sales forecasting and modeling, sales, prescription and patient data, reimbursement, and Field Force plans, goals, incentives and training. Nuvelo will use reasonable efforts to provide Bayer with access to the following information of Nuvelo relating to the Commercialization of the Product in the United States: key market metrics, market research, prescription and patient data, and sales goals.

6.6 Pricing and Reimbursement. Each Party and its Sublicensees will have sole authority for determining and establishing the price of Licensed Product for each country in such Party's portion of the Territory; provided that pricing shall optimize the economic value of the Licensed Product in such Territory. Each Party will provide the other Party with drafts of all submissions relating to pricing and reimbursement approvals in, with respect to Nuvelo, the United States, and, with respect to Bayer, the Major Countries, Canada and Japan for the other Party's review and comment, which comments shall be considered in good faith prior to the submission. Each Party will also provide the other Party with copies of any material documents or other material correspondence pertaining to pricing and reimbursement approvals in, with respect to Nuvelo, the United States and, with respect to Bayer, the Major Countries, Canada and Japan.

6.7 Medical and Other Inquiries. Each Party will have responsibility for all correspondence and communication with physicians and other health care professionals and customers in such Party's portion of the Territory regarding product complaints (e.g., quality) and all adverse drug experience information and all other correspondence and communication with physicians and other health care professionals and customers in such Party's portion of the Territory. Each Party will keep such records and make such reports as will be reasonably necessary to document such communications in compliance with all applicable regulatory requirements. Upon request, each Party will make all information under this Section 6.7 available to the other Party for inspection.

6.8 Promotional Materials.

(a) Bayer will be responsible, consistent with the guidelines agreed upon by the JSC, for the creation, preparation, production and reproduction of all Promotional Materials and

Source: NUVELO INC, 10-K, March 15, 2006

for filing, as appropriate, all Promotional Materials with all Regulatory Authorities in the Bayer Territory. Upon request, Nuvelo will have the right to review and comment on all major Promotional Materials for use in a Major Country, Canada or Japan prior to their distribution by Bayer for use in such Major Country, Canada or Japan, as applicable. Nuvelo will be responsible, consistent with the guidelines agreed upon by the JSC, for the creation, preparation, production and reproduction of all Promotional Materials and for filing, as appropriate, all Promotional Materials with all Regulatory Authorities in the Nuvelo Territory. Upon request, Bayer will have the right to review and comment on all major Promotional Materials prior to their distribution by Nuvelo.

(b) Each Party shall use its own corporate name and/or logo on Promotional Materials and Licensed Product labels in connection with Commercialization of Licensed Product in such Party's portion of the Territory, unless otherwise mutually agreed by the Parties.

(c) In order to maintain the value of each Party's Product Trademarks and each Party's corporate name and logo, when using the other Party's Product Trademarks, corporate name or logo, each Party will maintain the reasonable quality standards as it maintains for its own corporate name and/or logo and will comply with the other Party's then-current policies regarding use of its Product Trademarks, corporate name and logo. Prior to a Party's use thereof in the United States, a Major Country, Canada or Japan, such Party will provide to the other Party a prototype of any Promotional Materials or product labeling for use in the United States, a Major Country, Canada or Japan which contains the other Party's Product Trademarks, corporate name or logo, so that the other Party may review the manner in which they are used therein. Within ten (10) business days after delivery of such prototype, the other Party will notify such Party whether the other Party approves or disapproves of the manner of use and, in the case of disapproval, the specific reasons therefor and an acceptable alternative. All Promotional Materials used in the Bayer Territory will state that Licensed Product is sold under license from Nuvelo.

6.9 <u>Compliance with Laws, Regulations and Guidelines</u>. Bayer agrees to comply with all Bayer Territory Drug Laws and in all material respects to conform its practices and procedures with, as applicable, the European Federation of Pharmaceutical Industries Associations and the equivalent thereof in each country in the Bayer Territory, as the same may be amended from time to time, with respect to the Commercialization of Licensed Product in the Bayer Territory. Nuvelo agrees to comply with all US Drug Laws and in all material respects to conform its practices and procedures with applicable industry guidelines and codes with respect to Commercialization of Licensed Product in the Nuvelo Territory, including without limitation the PhRMA Code on Interactions with Healthcare Professionals. Each Party will conduct its business operations and cause each of its employees, representatives and agents to refrain from activities that such Party knows or reasonably should know would undermine the good will or reputation of the other Party or the Licensed Product. Neither Party will undertake any activity relating to the Commercialization of Licensed Product that it believes, in good faith, may violate any law or regulations. Each Party will promptly notify the other Party of and provide to the other Party a copy of any correspondence or other reports with respect to the Commercialization of Licensed Product submitted to or received by Bayer from the IFPMA or equivalent organizations in the Bayer Territory. Bayer will in all material respects conform its practices and procedures relating to educating the medical community in the Bayer Territory with respect to

Source: NUVELO INC, 10-K, March 15, 2006

Licensed Product to any applicable EMEA regulations or guidelines, as the same may be amended from time to time, and, as applicable, equivalent guidelines throughout the Bayer Territory.

6.10 Reports/Audits.

(a) Beginning on the calendar quarter in which Regulatory Authorities grant Regulatory Approval for the Licensed Product in each Major Country, Canada or Japan, Bayer will provide Nuvelo with quarterly reports of the activity within its Field Force in each such country, which will include reasonable data from reports created by Bayer for its internal management purposes. Beginning on the calendar quarter in which the Regulatory Authority grants Regulatory Approval for the Licensed Product in the Nuvelo Territory, Nuvelo will provide Bayer with quarterly reports of the activity within its Field Force in the United States, which will include reasonable data from reports created by Nuvelo for its internal management purposes.

(b) Beginning on the calendar quarter in which Regulatory Authorities grant Regulatory Approval for the Licensed Product in the Bayer Territory, Nuvelo will have the right to audit and review, no more than once in each calendar year, the total money spent that year on pre- and post-launch activities for Licensed Product, and the Field Force allocation and efforts on pre- and post-launch efforts of Licensed Product. Nuvelo shall conduct such audits upon reasonable notice to Bayer and during normal business hours.

ARTICLE 7
MANUFACTURE AND SUPPLY

7.1 Supply of Licensed Product. Nuvelo shall supply, free of charge, all of Bayer's requirements for clinical supplies of Licensed Product for Global Development Programs, the manufacturing costs of which shall be included in Development Expenses. In addition, the Parties will use diligent efforts to negotiate and complete a manufacturing, supply and quality agreement within six (6) months after the Effective Date, pursuant to which Nuvelo will supply Bayer with, and Bayer will purchase from Nuvelo, all of Bayer's requirements for Licensed Product for use in Country Specific Trials in the Bayer Territory and commercial sales of Licensed Product in the Bayer Territory (the **"Manufacturing Agreement"**). Among other items, the Manufacturing Agreement will provide the following:

(a) Subject to Section 7.2, Nuvelo will supply Bayer with unlabeled Licensed Product FOB the manufacturing facility of Nuvelo or its contract manufacturer in sufficient quantities for Bayer's use in connection with the Development and Commercialization of Licensed Product in the Bayer Territory.

(b) Subject to Section 7.1(c), Nuvelo will have the right to make all decisions with respect to manufacturing in its sole discretion, including without limitation, decisions relating to process development and manufacturing procedures, work to support quality assurance, improving manufacturing/cost efficiency and commercial scale-up manufacturing, provided that Nuvelo will manufacture or have the Licensed Product manufactured in conformity with all applicable laws and regulations in the Major Countries and will use Commercially

Source: NUVELO INC, 10-K, March 15, 2006

Reasonable Efforts to manufacture or have manufactured the Licensed Product in conformity with all applicable laws and regulations in all other countries in the Bayer Territory and in conformity with all Licensed Product specifications set forth in the Manufacturing Agreement. Nuvelo shall timely notify Bayer of any manufacturing change that may have an impact on Bayer's ability to timely receive Regulatory Approval or jeopardize current status of the Licensed Product in the Bayer Territory and in connection with any such change Nuvelo shall supply any information or documents or support any actions required to facilitate Bayer's commercialization efforts.

(c) Unless otherwise agreed by the Parties, Bayer will have final decision making authority to fulfill all regulatory responsibilities over all subsequent steps of the manufacturing process for Licensed Product in the Bayer Territory (including finish and fill, labeling and packaging, lot release and management of subcontractors).

(d) In cases of shortages of Licensed Product, available supplies will be allocated, as between the Parties pro rata based on their forecasted requirements for Licensed Product over the relevant period.

(e) Nuvelo will agree to manufacture or have Licensed Product manufactured in accordance with applicable GMP requirements in the United States and the Major Countries, and will provide reasonable warranties regarding its transfer of title to Licensed Product to Bayer and the compliance of Licensed Product with applicable specifications, subject to customary limitations of liability. If Bayer notifies Nuvelo in writing of additional or different GMP requirements in other countries in the Bayer Territory, Nuvelo and Bayer will use reasonable efforts to identify a mechanism to address any such country-specific requirements, including any financial consequences thereof and Nuvelo will use Commercially Reasonable Efforts to manufacture or have Licensed Product manufactured in accordance with such requirements.

(f) If (i) Nuvelo supplies Bayer with materially reduced quantities of its requirements for Licensed Product, as compared with amounts forecast and ordered by Bayer, on time frames established in the Manufacturing Agreement, for a period of twelve (12) consecutive months, (ii) the Licensed Product is subject to a Recall in the Bayer Territory, the cause of which is attributed to the manufacturing process, or (iii) a Regulatory Authority notifies Nuvelo or Bayer in writing that the manufacturing process does not comply with applicable laws, rules or regulations in the Bayer Territory, and Nuvelo is unable to cure such noncompliance within a twelve (12) month period to the satisfaction of the applicable Regulatory Authority, then Nuvelo will grant to Bayer a nonexclusive license to manufacture or have manufactured Licensed Product in the Bayer Territory solely to meet the requirements of Bayer and its Sublicensees for Development and Commercialization of Licensed Product in the Bayer Territory. If Bayer selects a contract manufacturer to manufacture Licensed Product, Nuvelo will have the right to approve the contract manufacturer, such approval not to be unreasonably withheld. Nuvelo will use Commercially Reasonable Efforts to support the transfer of manufacturing information to the approved manufacturer of Licensed Product under this Section 7.1(e), including, without limitation, transfer of the then-current manufacturing technology with respect to Licensed Product.

Source: NUVELO INC, 10-K, March 15, 2006

(g) Bayer shall supply the Canadian and Mexican markets with Licensed Product in quantities that are appropriate to the size of each such market (not including cross-border sales).

(h) The Manufacturing Agreement will also set forth all other terms and conditions applicable to the manufacture, distribution, forecast, supply and the like of Licensed Product for Development and Commercialization in the Bayer Territory.

7.2 Transfer Price. Pursuant to the Manufacturing Agreement described in Section 7.1, Nuvelo will sell Licensed Product to Bayer at a price equal to Nuvelo's direct cost for Licensed Product plus [ * ] percent [ * ]%). The Parties agree that such transfer price shall not be included in Development Expenses.

ARTICLE 8
CONSIDERATION

8.1 Upfront Payment. Within five (5) business days of the Effective Date, Bayer will pay to Nuvelo the non-refundable, non-creditable amount of Fifty Million Dollars ($50,000,000.00).

8.2 Milestones.

(a) Within thirty (30) days following the first achievement or occurrence with the Licensed Product of each of the following milestone events (**"Regulatory Milestone Event(s)"**) by performance of Bayer or an Affiliate or Sublicensee of Bayer, Bayer will pay to Nuvelo the corresponding one-time, non-creditable, non-refundable milestone payments (**"Regulatory Milestone Payment(s)"**) set forth herein:

| | Regulatory Milestone Event | Regulatory Milestone Payment |
|---|---|---|
| (i) | Upon the first filing of a Drug Approval Application for Licensed Product in a Major Country or EMEA for any indication | [ * ]Dollars ($[ * ]) |
| (ii) | Upon (a) the first Regulatory Approval (including price approval) for Licensed Product in a Major Country or (b) [ * ] after the first Regulatory Approval (excluding price approval) by EMEA for Licensed Product, whichever of (a) or (b) comes first, for any indication other than a stroke or deep vein thrombosis indication | [ * ]Dollars ($[ * ]) |
| (iii) | Upon the first filing of a Drug Approval Application for Licensed Product in Canada for any indication | [ * ]Dollars ($[ * ]) |

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

| | Regulatory Milestone Event | Regulatory Milestone Payment |
|---|---|---|
| (iv) | Upon (a) the first Regulatory Approval (including price approval) for Licensed Product in Canada or (b) [ * ] after the first Regulatory Approval (excluding price approval) for Licensed Product in Canada, whichever of (a) or (b) comes first, for any indication other than a stroke or deep vein thrombosis indication | Ten Million Dollars ($10,000,000.00) |
| (v) | Upon the first Regulatory Filing for Licensed Product in Japan for any indication | [ * ]Dollars ($[ * ]) |
| (vi) | Upon (a) the first Regulatory Approval (including price approval) for Licensed Product in Japan or (b) [ * ] after the first Regulatory Approval for Licensed Product in Japan, whichever of (a) or (b) comes first, for any indication other than a stroke or deep vein thrombosis indication | [ * ]Dollars ($[ * ]) |
| (vii) | Upon the Initiation of a Global Development Program for Licensed Product that is a Phase 2 Clinical Trial in a stroke indication | [ * ]Dollars ($[ * ]) |
| (viii) | Upon Initiation of a Global Development Program for Licensed Product that is a Phase 3 Clinical Trial in a stroke indication | [ * ]Dollars ($[ * ]) |
| (ix) | Upon (a) Regulatory Approval (including price approval) for Licensed Product in a Major Country, Canada or Japan, or (b) [ * ] after Regulatory Approval (excluding price approval) in a Major Country, Canada or Japan, whichever of (a) or (b) comes first, for a stroke indication | [ * ]Dollars ($[ * ]) |
| (x) | Upon Initiation of a Global Development Program for Licensed Product that is a Phase 3 Clinical Trial in the deep vein thrombosis indication | [ * ]Dollars ($[ * ]) |
| (xi) | Upon (a) Regulatory Approval (including price approval) for Licensed Product in a Major Country, Canada or Japan or (b) [ * ] after Regulatory Approval (excluding price approval) for Licensed Product in a Major Country, Canada or Japan, whichever of (a) or (b) comes first, for the deep vein thrombosis indication | [ * ]Dollars ($[ * ]) |

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

(b) Within thirty (30) days following the achievement or occurrence of each of the following milestone events (**"Sales Milestone Event(s)"**) by performance of Bayer or an Affiliate or Sublicensee of Bayer, Bayer will pay to Nuvelo the corresponding one-time, non-creditable, non-refundable milestone payments (**"Sales Milestone Payment(s)"**) set forth herein:

| Sales Milestone Event | | Sales Milestone Payment |
|---|---|---|
| (i) | First calendar year in which Net Sales in the Bayer Territory in such year equal or exceed [ * ] Dollars | [ * ]Dollars ($[ * ]) |
| (ii) | First calendar year in which Net Sales in the Bayer Territory in such year equal or exceed [ * ] Dollars | [ * ]Dollars ($[ * ]) |
| (xiii) | First calendar year in which Net Sales in the Bayer Territory in such year equal or exceed [ * ] Dollars | [ * ]Dollars ($[ * ]) |
| (xiv) | First calendar year in which Net Sales in the Bayer Territory in such year equal or exceed [ * ] Dollars | [ * ]Dollars ($[ * ]) |

(c) Each of the Royalty Milestone Payments and Sales Milestone Payments (each a **"Milestone Payment"**) shall be paid only once upon achievement of each corresponding Royalty Milestone Event and Sales Milestone Event; provided, however, that Bayer shall make only one Sales Milestone Payment per year. If two Sales Milestone Payments would have been payable in a single year under Section 8.2(b) except for the previous sentence, then Nuvelo will be entitled to the larger of those Sales Milestone Payments in that year, and will be entitled to receive the smaller of those Sales Milestone Payments in a subsequent year if Net Sales reach the required amount for such smaller Sales Milestone Payment. For purposes of clarification, each Milestone Payment is in addition to any other Milestone Payment set forth above and each Milestone Payment will be nonrefundable and noncreditable against Royalties payable pursuant to Section 8.3 and any other fees, other Milestone Payments or other payments due Nuvelo with respect to Licensed Product(s) under this Agreement or under the Manufacturing Agreement described in Article 7.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

8.3 Royalties. Subject to Sections 4.7, 8.4 and 8.5, Bayer will pay to Nuvelo a Royalty, based on the following Royalty rates, for annual Net Sales of Licensed Product by Bayer, its Affiliates, or its Sublicensees in the Bayer Territory:

(a) a Royalty rate of fifteen percent (15.0%) of that portion of annual Net Sales in the Bayer Territory of Licensed Product that is less than or equal to [ * ] Dollars ($[ * ]);

(b) a Royalty rate of [ * ] percent ([*]%) of that portion of annual Net Sales in the Bayer Territory of Licensed Product that is greater than [ * ] Dollars ($[ * ]) and less than or equal to [ * ] Dollars ($[ * ]);

(c) a Royalty rate of [ * ] percent ([*]%) of that portion of annual Net Sales in the Bayer Territory of Licensed Product that is greater than [ * ] Dollars ($[ * ]) and less than or equal to [ * ] Dollars ($[ * ]);

(d) a Royalty rate of [ * ] percent ([*]%) of that portion of annual Net Sales in the Bayer Territory of Licensed Product that is greater than [ * ] Dollars ($[ * ]) and less than or equal to [ * ] and

(e) a Royalty rate of thirty seven and a half percent (37.5%) of that portion of annual Net Sales in the Bayer Territory of Licensed Product that is greater than [ * ] Dollars ($[ * ]).

8.4 Third Party Royalty Reduction. Nuvelo will be responsible for paying any and all amounts due to Amgen, Inc. under the Amgen-Nuvelo Agreement. Bayer will be responsible for obtaining any other licenses, and for making any Third Party Payments thereunder, or making any then-due Third Party Payments to Nuvelo (for forwarding to the licensing Third Party) under any license granted by Nuvelo hereunder, for rights to any Third Party intellectual property required to develop, use, sell, lease, offer to sell or lease, have sold, import, export or otherwise exploit, or transfer physical possession of or title in, Licensed Product in one or more countries in the Bayer Territory. If Bayer is required to pay Third Party royalties for any license (other than royalties payable by Nuvelo to Amgen, Inc.), ([ * ] percent [ * ]%) of such Third Party royalties which are payable by Bayer will be creditable by Bayer against any Royalties due to Nuvelo under Section 8.3 above for the Net Sales of Licensed Product in that country, but Bayer's Royalty rate set forth in Section 8.3 in any given year will not be reduced in excess of [ * ] percent [ * ]% (e.g., [ * ]%, [ * ]%, [ * ]%, [ * ]% and [ * ]% respectively) as a consequence of any royalties being creditable against the Royalties to be paid to Nuvelo by Bayer hereunder Bayer will have sole discretion, authority and right with respect to determining whether to enter into an agreement for a license or other rights and to incur an obligation for any Third Party Payments.

8.5 Term of Royalties. Nuvelo's right to receive Royalties under Section 8.3 will expire, on a country-by-country basis, upon the later of: (a)[ * ]([ * ]) years after the date of First Commercial Sale of Licensed Product in that country; or (b) the earlier of (i) the date of expiration of regulatory exclusivity for the Licensed Product as described in Section 5.8 in that country; or (ii) the date of expiration of the last-to-expire of the Nuvelo Patent Rights and Joint

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Patent Rights containing an issued Valid Claim that, but for the license granted by Nuvelo to Bayer hereunder, would be directly or contributorily infringed by the use or sale by Bayer, its Affiliates and permitted Sublicensees of such Licensed Product in that country. Where the Joint Patent Rights described in subparagraph (b)(ii) subsist after expiration of the Nuvelo Patent Rights, then upon expiration of the Nuvelo Patent Rights, the Royalties payable pursuant to this Article 8 will be further reduced by [ * ] percent ([ * ]%) of the amount payable immediately before expiry of the Nuvelo Patent Rights, and will continue to be payable by Bayer.

## ARTICLE 9
## INTELLECTUAL PROPERTY

9.1 Technology Ownership. Ownership of inventions made during the Term will be determined in accordance with the rules of inventorship under United States patent laws. Subject to the licenses granted in Section 2.1, as between the Parties, Nuvelo owns or Controls all right, title and interest in and to Nuvelo Know-How and Nuvelo Patent Rights, and any Confidential Information contained therein is Confidential Information of Nuvelo. As between the Parties, all right and interest in and to Joint Know-How (which will be considered the joint Confidential Information of the Parties) and Joint Patent Rights is owned jointly by Bayer and Nuvelo, and is subject to the license granted by Nuvelo to Bayer in Section 2.1 and the license granted by Bayer to Nuvelo in Section 2.3.

9.2 Prosecution.

(a) At its own cost and expense, Bayer will be responsible (using mutually acceptable outside counsel) for the filing, prosecution, defense and maintenance of the Nuvelo Patent Rights listed in Exhibit C hereto (the "Existing Nuvelo Patent Rights") before all patent authorities in the Bayer Territory. Nuvelo has the right to review and comment on the filing, prosecution and defense of the Existing Nuvelo Patent Rights and if outside counsel concludes that taking any specific action(s) may likely have an adverse effect on the scope or validity of any Existing Nuvelo Patent Rights, then Bayer will not take the specific action(s) without the prior, express written consent of Nuvelo and, if Nuvelo does not give its consent to the action, Bayer will propose an alternative strategy for Nuvelo's consideration. To that end, Bayer will instruct outside counsel to furnish Nuvelo with a reasonably complete draft of each potential submission to a patent authority in the Bayer Territory regarding the Existing Nuvelo Patent Rights no later than thirty (30) days (or if given less than thirty (30) days to respond as soon as practicable) prior to the date such submission is proposed to be made, and will reasonably consider any of Nuvelo's timely comments thereon. Additionally, Bayer will instruct outside counsel to provide Nuvelo with a copy of each submission made to and document received from a patent authority in the Bayer Territory regarding any Existing Nuvelo Patent Rights reasonably promptly after making such filing or receiving each document. If Bayer decides not to file, prosecute, defend or maintain any claim or patent application or patent within the Existing Nuvelo Patent Rights in any country in the Bayer Territory, then Bayer will provide Nuvelo with thirty (30) days prior written notice of the decision, and Nuvelo will have the right to file, prosecute and maintain the claim or patent application or patent on behalf of Nuvelo (at Nuvelo's sole cost and expense).

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

(b) At its own cost and expense, Bayer will be responsible (using mutually acceptable outside counsel) for the filing, prosecution, defense and maintenance of Joint Patent Rights before all patent authorities in the Bayer Territory. Nuvelo will have the right to review and comment on the filing, prosecution and defense of the Joint Patent Rights by Bayer and if outside counsel concludes that taking any specific action(s) may likely have an adverse effect on the scope or validity of any Joint Patent Rights, then Bayer will not take the specific action(s) without the prior express written consent of Nuvelo and, if Nuvelo does not give its consent to such action, Bayer will propose an alternative strategy for Nuvelo's consideration. To that end, Bayer will instruct outside counsel to furnish Nuvelo with a reasonably complete draft of each potential submission to a patent authority regarding Joint Patent Rights no later than thirty (30) days (or if given less than thirty (30) days to respond, as soon as practicable) prior to the date the submission is proposed to be made, and will reasonably consider any of Nuvelo's timely comments thereon. Additionally, Bayer will instruct such outside counsel to provide Nuvelo with a copy of each submission made to and document received from a patent authority in the Bayer Territory regarding any Joint Patent Rights reasonably promptly after making the filing or receiving such document. If Bayer decides to not file, prosecute, defend or maintain or any claim or patent application or patent within Joint Patent Rights in any country in the Bayer Territory, then Bayer will provide Nuvelo with thirty (30) days prior written notice of the decision. Nuvelo will have the right and opportunity to file, prosecute, defend and maintain the claim or patent application or patent (at Nuvelo's sole cost and expense), and Bayer will assign its complete interest in the claim or patent application or patent to Nuvelo.

(c) Nuvelo and Bayer will each provide to the other any invention disclosures submitted to its respective outside or in-house patent counsel in the normal course of its business that disclose an invention within Nuvelo Know-How and Joint Know-How, respectively. Nuvelo and Bayer will cooperate with each other and render all reasonable assistance in prosecuting and maintaining all intellectual property licensed to Bayer under this Agreement. Both Parties will meet regularly, either in person or by telephone or videoconference, but not less than on a quarterly basis, to discuss the prosecution (and other related proceedings, such as interferences and oppositions) of all intellectual property licensed to Bayer under this Agreement. Nuvelo and Bayer will cooperate with each other in these matters, and will sign any necessary legal papers and provide the Party responsible for prosecution with data or other information in support thereof (and use their best efforts to ensure the cooperation of any of their respective personnel and, in the case of Bayer, it's Affiliates and licensee(s) as might reasonably be requested).

(d) At its own cost and expense, Bayer will be responsible (using mutually acceptable outside counsel) for the filing, prosecution, defense and maintenance of the Product Trademarks before all trademark authorities in the Bayer Territory. For the Product Trademarks solely or jointly owned by Nuvelo, Nuvelo will have the right to review and comment on the filing, prosecution and defense of the Product Trademarks by Bayer and if outside counsel mutually acceptable to Bayer and Nuvelo concludes that taking any specific action(s) may likely have an adverse effect on the scope or validity of any Product Trademarks, then Bayer will not take such specific action(s) without the prior express written consent of Nuvelo, and Bayer will propose an alternative strategy for Nuvelo's consideration. To that end, Bayer will instruct outside counsel to furnish Nuvelo with a reasonably complete draft of each submission to a trademark authority regarding the Product Trademarks no later than thirty (30) days prior to the

date the submission is proposed to be made, or if given less than thirty (30) days to respond as soon as practicable, and Bayer will reasonably consider any of Nuvelo's timely comments thereon. Additionally, Bayer will instruct outside counsel to provide Nuvelo with a copy of each submission made to or document received from a trademark authority regarding any Product Trademarks reasonably promptly after making the filing or receiving the document. If Bayer decides to not file, prosecute, defend or maintain a Product Trademark in any country, then Bayer will provide Nuvelo with thirty (30) days prior written notice of the decision. Nuvelo will have the opportunity to file, prosecute, defend and maintain the Product Trademark at its sole expense, and Bayer will assign its complete interest, if any, in the Product Trademark to Nuvelo.

9.3 Infringement of Patents and Trademarks by Third Parties.

(a) At its own expense, Bayer may, but will not be obligated to, elect to enforce Nuvelo Patent Rights against any actual, alleged or threatened infringement by Third Parties in the Bayer Territory and may also elect to defend the Nuvelo Patent Rights against any challenges in the Bayer Territory. If Bayer so elects to enforce Nuvelo Patent Rights against Third Party infringement which may in any way affect the rights conferred to Bayer pursuant to this Agreement to Develop, manufacture and Commercialize Licensed Product, Bayer will seek and take under advisement Nuvelo's comments before determining the strategy and Nuvelo, at Bayer's request and sole cost and expense, will reasonably assist and cooperate in any enforcement or defense. If Bayer finds it necessary or desirable to join Nuvelo as a party, Nuvelo will execute all papers or perform any other acts as may reasonably be required by Bayer, at the expense of Bayer. If Bayer does not commence an enforcement and/or defense action pursuant to this Section 9.3(a) within forty-five (45) days after Nuvelo notifies Bayer or is notified by Bayer in writing of an actual, alleged or threatened infringement by a Third Party of the Nuvelo Patent Rights in the Bayer Territory (or of the filing of a declaratory judgment action) which may in any way affect the rights conferred to Bayer pursuant to this Agreement to Develop, manufacture and Commercialize Licensed Product, Nuvelo will be entitled to bring and prosecute such an action at its own cost and expense. If Nuvelo elects to bring and prosecute such an action, then Nuvelo will seek and reasonably consider Bayer's comments on strategy, and Bayer (at Nuvelo's request and sole cost and expense) will reasonably assist and cooperate in any enforcement or defense. If Nuvelo finds it necessary or desirable to join Bayer as a party, Bayer will execute all papers or perform other acts as may be reasonably be required by Nuvelo, at Nuvelo's expense.

(b) At its own cost and expense, Bayer may, but will not be obligated to, elect to enforce Joint Patent Rights against any actual, alleged or threatened infringement by Third Parties in the Bayer Territory and to defend the Joint Patent Rights against any challenges in the Bayer Territory. If Bayer so elects, Bayer will seek and reasonably consider Nuvelo's comments before determining the strategy, and Nuvelo (at Bayer's request and sole cost and expense) will reasonably assist and cooperate in any enforcement or defense. If Bayer finds it necessary or desirable to join Nuvelo as a party, Nuvelo will execute all papers or perform other acts as may reasonably be required by Bayer, at the expense of Bayer. In the event Bayer does not commence an enforcement and/or defense action pursuant to this Section 9.3(b) within forty-five (45) days after Nuvelo notifies Bayer or is notified by Bayer in writing of an actual, alleged or threatened infringement by a Third Party of the Joint Patent Rights in the Bayer Territory (or of the filing of a declaratory judgment action), Nuvelo will be entitled to bring and prosecute an

Source: NUVELO INC, 10-K, March 15, 2006

action at its own cost and expense. If Nuvelo elects to bring and prosecute an action, then Nuvelo will seek and reasonably consider Bayer's comments on strategy, and Bayer (at Nuvelo's request and sole cost and expense) will reasonably assist and cooperate in any enforcement or defense. If Nuvelo finds it necessary or desirable to join Bayer as a party, Bayer will execute all papers or perform other acts as may be reasonably be required by Nuvelo, at Nuvelo's expense. Bayer will, at its own expense, be entitled to participate in and to have counsel selected by it participate in any action in which Bayer is a named party.

(c) At its own cost and expense, Bayer may, but will not be obligated to, elect to enforce the Product Trademarks against Third Parties in the Bayer Territory and to defend the Product Trademarks against any challenges in the Bayer Territory. Bayer will seek and reasonably consider Nuvelo's comments before determining the strategy and Nuvelo, at Bayer's request and sole cost and expense, will reasonably assist and cooperate in any enforcement or defense. If Bayer finds it necessary or desirable to join Nuvelo as a party, Nuvelo will execute all papers or perform other acts as may reasonably be required by Bayer, at the expense of Bayer. If Bayer does not commence an enforcement and/or defense action pursuant to this Section 9.3(c) within forty-five (45) days after Nuvelo notifies or is notified by Bayer in writing of an infringement of the Product Trademarks in the Bayer Territory (or of the filing of a declaratory judgment action, in the case of defense actions), Nuvelo will be entitled to bring and prosecute an action at its own cost and expense. If Nuvelo elects to bring and prosecute an action, then Nuvelo will seek and reasonably consider Bayer's comments on strategy and Bayer, at Nuvelo's request and sole cost and expense, will reasonably assist and cooperate in any such enforcement or defense. If Nuvelo finds it necessary or desirable to join Bayer as a party, Bayer will execute all papers or perform such other acts as may be reasonably be required by Nuvelo and at Nuvelo's expense.

(d) Any recovery realized as a result of any infringement actions described in this Section 9.3 (after reimbursement of the Parties' reasonable attorneys' fees for outside counsel and litigation expenses) will be allocated in proportion to each Party's respective profits realized from the Development and Commercialization of Licensed Product under this Agreement during the calendar year immediately preceding commencement of the infringement action.

(e) Neither Party will enter into any settlement of any action brought under this Section 9.3 that affects the other Party's rights or interests without the other Party's prior written consent.

(f) A Party bringing suit under this Section 9.3 will notify the other Party of all substantive developments with respect to such enforcement or defensive actions including, but not limited to, all material filings, court papers and other related documents, substantive settlement negotiations and offers of settlement.

(g) Each Party will promptly notify the other upon becoming aware of any Third Party infringement of the Nuvelo Patent Rights, Joint Patent Rights, Product Trademarks, Nuvelo Know-How or Joint Know-How.

Source: NUVELO INC, 10-K, March 15, 2006

9.4 Infringement of Third Party Rights.

(a) At its own cost and expense, Bayer will have the right to defend any action naming Bayer, but not Nuvelo, and claiming the infringement of (i) any Third Party Patent Rights or other intellectual property rights through the developing, making, having made, using, selling, offering to sell or having sold, importing, exporting or otherwise exploiting, or transferring possession of title or interest in, Licensed Product, or (ii) any Third Party Trademark through the Development, manufacturing or Commercialization of a Licensed Product. The Parties will confer with each other and cooperate during the defense of any action. At Bayer's cost and expense, Nuvelo will assist and cooperate with Bayer in the defense of any such action. Subject to the foregoing, Nuvelo will, at its own expense, be entitled to participate in and to have counsel selected by it participate in any such action.

(b) At its own cost and expense, each Party will have the right to defend itself in any action naming both Parties and claiming the infringement of (i) any Third Party Patent Rights or other intellectual property rights through the developing, making, having made, using, selling, offering to sell or having sold, importing, exporting or otherwise exploiting, or transferring possession of title or interest in, Licensed Product, or (ii) any Third Party Trademark through the Development, manufacturing or Commercialization of a Licensed Product. The Parties will each have the right to select their own counsel, and will confer with each other and, to the extent their interests are the same, will cooperate during the defense of any such action. To the extent the Parties' interests in the action diverge, each Party will have the right to represent itself, with its own counsel. Each Party will bear all of its own costs.

(c) Each Party will promptly notify the other upon becoming aware of any actual, alleged or threatened Third Party claim or action against Bayer and/or Nuvelo for infringement of any Third Party Trademark through the Development, manufacturing or Commercialization of Licensed Product, or any Third Party Patent Rights through the developing, making, having made, using, selling, offering to sell, and importing, exporting or otherwise transferring physical possession of or otherwise transferring title in and to Licensed Product in the Bayer Territory.

(d) Neither Party will enter into any settlement of any suit referenced under this Section 9.4 that affects the other Party's rights or interests without the other Party's prior written consent.

(e) A Party defending suit under this Section 9.4 will notify the other Party of all substantive developments with respect to enforcement or defensive actions including, but not limited to, all material filings, court papers and other related documents, substantive settlement negotiations and offers of settlement.

9.5 Employee Obligations. Prior to beginning work relating to any aspect of the subject matter of this Agreement and/or being given access to Nuvelo Know-How or Joint Know-How or the Confidential Information of the other Party, each employee, consultant or agent of Bayer or Nuvelo will have signed or will be required to sign a non-disclosure and invention assignment agreement pursuant to which each person will agree to comply with all of the obligations of Bayer or Nuvelo, as appropriate, substantially including: (a) promptly reporting any invention, discovery, process, software program or other intellectual property right,

as appropriate within Nuvelo Know-How or Joint Know-How; (b) assigning to Bayer or Nuvelo, as appropriate, all of his or her right, title and interest in and to any invention, discovery, process, software program or other intellectual property right; (c) cooperating in the preparation, filing, prosecution, maintenance and enforcement of any Patent Rights; (d) performing all acts and signing, executing, acknowledging and delivering any and all documents required for effecting the obligations and purposes of this Agreement; and (e) abiding by the obligations of confidentiality and non-use set forth in this Agreement. It is understood by the Parties that such employee obligations shall be subject to the requirements of German Employee Invention Act. It is understood and agreed that any non-disclosure and invention assignment agreement need not be specific to this Agreement.

9.6 Patent Marking. Licensed Product marketed and sold by Bayer will be marked with appropriate patent numbers or indicia of Nuvelo Patent Rights and/or Joint Patent Rights to the extent permitted by law in those countries of the Bayer Territory in which the markings have notice value as against infringers of patents.

<div align="center">

ARTICLE 10
PAYMENTS; RECORDS; AUDIT

</div>

10.1 Payments.

(a) Payment Currency. All payments to be made under this Agreement will be made in U.S. Dollars by bank wire transfer in immediately available funds to a bank account designated by Nuvelo.

(b) Royalty Payments. All Royalties payable to Nuvelo under this Agreement will be paid within thirty (30) days of the end of each calendar quarter except as otherwise specifically provided herein. Each payment of Royalties owing to Nuvelo will be accompanied by a statement certified by an executive officer of Bayer as consistent with Bayer's standard practices in performing such computations and in accordance with GAAP, (i) on a country-by-country basis, the amount of gross sales of Licensed Product by Bayer, its Affiliates and Sublicensees, and an itemized calculation of Net Sales of each Licensed Product during such calendar quarter by Bayer, its Affiliates and Sublicensees, (ii) the amount of aggregate worldwide gross sales of Licensed Product and Net Sales during such calendar quarter by Bayer, its Affiliates and Sublicensees and (iii) on a cumulative basis for the current year and the amount of Royalty due on Net Sales during such calendar quarter.

(c) Foreign Exchange Conversion. Royalties, and any other payments due under this Agreement that are calculated based on amounts received by Bayer in currencies other than Dollars will be converted into the Dollar equivalent, at the average rate of exchange for the Calendar quarter to which such payments relate, as reported in *Bloomberg Professional*, a service of Bloomberg L.P., or in the event *The Bloomberg Professional* is not available during the Royalty period of such Net Sales, then in *The Wall Street Journal*.

(d) Late Payments. Any amounts not paid by Bayer when due under this Agreement will be subject to interest from and including the date payment is due through and including the date upon which Bayer has made a wire transfer of immediately available funds

Source: NUVELO INC, 10-K, March 15, 2006

into an account designated by Nuvelo of such payment at a rate equal to the lesser of (i) the sum of three percent (3%) plus the annual prime rate or successive annual prime rates of interest quoted in the Money Rates section of the on-line edition of *The Wall Street Journal* (at http://www.interactive.wsj.com) calculated daily on the basis of a 365-day year or (ii) the highest rate permitted by applicable law.

(e) Withholding Taxes. Any taxes, assessments and fees to be withheld by Bayer under the laws, rules or regulations of any foreign country for the account of Nuvelo will be promptly paid by Bayer for and on behalf of Nuvelo to the appropriate governmental authority, and Bayer will furnish Nuvelo with a copy of the original official receipt for the payment of such tax within thirty (30) days of payment. Any such tax, assessment and fee actually paid on Nuvelo's behalf will be deducted from any Royalty payments due to Nuvelo. Bayer agrees to make all lawful and reasonable efforts to minimize such taxes, assessments and fees to Nuvelo and will claim on Nuvelo's behalf the benefits of any available Treaty on the Avoidance of Double Taxation that applies to any such payments.

10.2 Records; Audit. Bayer will keep or cause to be kept such records as are required in sufficient detail to track and determine (in accordance with GAAP) the accuracy of calculations of all sums or credits due under this Agreement and to accurately account for the calculations of all Royalties due for Licensed Product under this Agreement. Such records will be retained for a period of the longer of (i) a three (3) year period following the year in which any payments were made hereunder and (ii) the expiration of the applicable tax statute of limitations (or any extensions thereof), or such longer period as may be required by law. Once per calendar year, Nuvelo will have the option to engage (at its own expense) an independent certified public accountant, appointed by Nuvelo and reasonably acceptable to Bayer, to examine in confidence the books and records of Bayer as may be necessary to determine, with respect to any calendar year, the correctness or completeness of any report or payment required to be made under this Agreement; provided however, that the books and records for any particular calendar year will only be subject to one audit. The report of such accountant will be limited to a certificate verifying any report made or payment submitted by Bayer during such period or identifying any over-payment or under-payment made by Bayer, accompanied by an explanation of the basis for its determination of such over-payment or under-payment. In addition, if the accountant will be unable to verify the correctness of any such payment, information relating to why such payment is unverifiable. The results of any audit performed under this Section 10.2 may be disputed by Bayer in accordance with Section 16.1. If the audit reveals any underpayment by Bayer to Nuvelo, then Bayer will pay any underpayment to Nuvelo, together will all interest accrued thereon, promptly after Bayer's receipt of the audit report or, if disputed by Bayer, promptly after resolution of such dispute. If any audit performed under this Section 10.2 discloses a variance of more than five percent (5%) from the amount of the original report showing the calculation of a Royalty under section 8.3 of this Agreement, Bayer will bear the full cost of the performance of such audit. The result of the audit and the audit report shall be subject to Article 12. Upon the expiration of three (3) years following the end of any calendar year, the calculation of any such amounts payable with respect to such calendar year will be binding and conclusive upon the Parties, and Bayer will be released from any liability or accountability with respect to such amounts for such calendar year.

Source: NUVELO INC, 10-K, March 15, 2006

ARTICLE 11
PUBLICATIONS

11.1 Procedure. Subject to the International Committee of Medical Journal Editors ("ICMJE") Uniform Requirements for Manuscripts Submitted to Biomedical Journals and applicable legal requirements, Nuvelo will determine the overall strategy for publishing and presenting results of studies pertaining to Licensed Product, except that the JDC together with the JCC (with approval of the JSC) shall determine the strategy with respect to publishing and presenting the results of any Country Specific Trials. The Parties to this Agreement recognize that the publication of papers regarding results of and other information involving the activities under this Agreement (including oral presentations and abstracts) may be beneficial to both Parties, provided the publications protect Confidential Information. Accordingly, each Party will have the right to review and comment on any proposed disclosure by the other Party (including oral presentations and abstracts) relating to Licensed Product. Before any paper is submitted for publication or an oral presentation made, the Party wishing to publish will deliver a complete copy of the paper or materials and abstracts for oral presentation to the other Party at least fourteen (14) days prior to submitting the paper to a publisher or making the presentation. The non-publishing Party will review any such paper and give its comments to the publishing Party within thirty (30) days. Each Party will comply with the other Party's request to delete references to Confidential Information in any publication and agrees to withhold publication of same for an additional thirty (30) days in order to permit the Parties to obtain patent protection, if either of the Parties deems it necessary, in accordance with the terms of this Agreement.

11.2 Credit. Any such publication or presentation will include recognition of the contributions of the other Party according to standard practice for assigning scientific credit, either through authorship or acknowledgment as may be appropriate.

ARTICLE 12
CONFIDENTIALITY

12.1 Treatment of Confidential Information. The Parties agree that during the Term, and for a period of five (5) years after this Agreement expires or terminates, a Party receiving Confidential Information of the other Party will (a) maintain such Confidential Information in confidence to the same extent such Party maintains its own confidential or proprietary information or trade secrets of similar kind and value; (b) not disclose such Confidential Information to any Third Party without the prior written consent of the disclosing Party, except for disclosures to its Affiliates and Sublicensees who agree to be bound by obligations of non-disclosure and non-use at least as stringent as those contained in this Article 12; and (c) not use Confidential Information for any purpose except those purposes permitted by this Agreement. Neither Party will knowingly disclose to the other Party any Third Party information or know-how that such Party does not have the legal right to disclose to the other Party and/or which it has a contractual obligation not to disclose to the other Party.

12.2 Authorized Disclosure. Notwithstanding any other provision of this Agreement, each Party may disclose Confidential Information of the other Party:

(a) to the extent and to the persons and entities as required by an applicable law, rule, regulation, legal process, court order or the rules of the any securities exchange on which any security issued by either Party is traded or of a Regulatory Authority; or

(b) as necessary to file, prosecute or defend those patent applications or patents for which either Party has the right to assume filing, prosecution, defense or maintenance, pursuant to Section 9.2 of this Agreement; or

(c) to prosecute or defend litigation or otherwise establish rights or enforce obligations under this Agreement, but only to the extent that any disclosure is necessary.

(d) The Party required or intending to disclose the other Party's Confidential Information under Sections 12.2(a) or (c) will first have given prompt notice to the other Party to enable it to seek any available exemptions from or limitations on such disclosure requirement and will reasonably cooperate in such efforts by the other Party.

12.3 Materials. Pursuant to this Agreement or the Manufacturing Agreement, the Parties anticipate that Nuvelo may transfer certain of its Nuvelo Know-How and Nuvelo Material and Manufacturing Information to Bayer. Bayer agrees that it will use Nuvelo Know-How and Nuvelo Material and Manufacturing Information only in accordance with the terms and conditions of this Agreement and will transfer Nuvelo Know-How and Nuvelo Material and Manufacturing Information only to a Third Party that has agreed in writing to be bound by obligations of confidentiality and non-use at least as restrictive as set forth herein and only to use in accordance with the terms of this Agreement. Bayer will promptly thereafter provide notice of the transfer to Nuvelo.

12.4 Publicity; Terms of Agreement. The Parties will mutually agree upon the text of a press release announcing the execution of this Agreement. Thereafter, if either Party desires to make a public announcement concerning this Agreement or the terms hereof that differs from this mutually agreed upon text, the Party will give reasonable prior advance notice of the proposed text of the announcement to the other Party for its prior review and approval, the approval not to be unreasonably withheld or delayed. A Party will not be required to seek permission from the other Party to repeatedly publish any information as to the terms of this Agreement that have already been publicly disclosed by such Party, in accordance with the foregoing, or by the other Party. Either Party may disclose the terms of this Agreement to potential investors who agree to be bound by obligations of non-disclosure and non-use at least as stringent as those contained in this Article 12. The Parties acknowledge that Nuvelo and/or Bayer may be obligated to file a copy of this Agreement with the U.S. Securities and Exchange Commission (the "SEC") or its equivalent in each country in the Bayer Territory with its next quarterly report on Form 10-Q, annual report on Form 10-K or current report on Form 8-K or with any registration statement filed with the U.S. Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, or the equivalent in each country in the Bayer Territory. Each Party will be entitled to make the filing(s) and will have the right to exercise its sole discretion regarding any request for confidential treatment for this Agreement or any provision of this Agreement. In the event of any request for confidential treatment, the filing Party will provide the non-filing Party with an advance copy of the Agreement marked to show provisions for which the filing Party intends to seek confidential treatment and will reasonably

Source: NUVELO INC, 10-K, March 15, 2006

consider the non-filing Party's timely comments thereon. Each Party will give the other reasonable prior notice of any announcement relating to activities concerning Licensed Product. Bayer acknowledges that Nuvelo as a publicly-traded company is legally obligated to make timely disclosure of all material events relating to Licensed Product.

12.5 Use of Names, Logos or Symbols. Subject to the licenses granted under Sections 2.1 and 2.2, the provisions of Section 6.8, and the authorized disclosure provisions under Sections 12.2 and 12.4, the Parties will not use the name, Product Trademarks, physical likeness, employee names or owner symbol of the other Party for any purpose (including, without limitation, private or public securities placements) without the prior written consent of the affected Party, the consent not to be unreasonably withheld or delayed so long as the use of name is limited to objective statement of fact rather than for endorsement purposes. Except as provided in this Agreement, Bayer will not use any Trademark either substantially resembling or which is likely to cause confusion with any of Nuvelo's Product Trademarks in connection with the subject matter of this Agreement.

ARTICLE 13
REPRESENTATIONS, WARRANTIES AND COVENANTS

13.1 Representations and Warranties of Bayer. Bayer hereby represents and warrants to Nuvelo that as of the Effective Date:

(a) Corporate Existence, Power and Authority. It is a corporation duly organized, validly existing and in good standing under the laws of Germany and has full corporate power and authority and the legal right to own and operate its property and assets and to carry on its business as it is now being conducted and as contemplated in this Agreement and to perform its obligations hereunder including, without limitation the right to grant the licenses granted hereunder. It has taken all necessary corporate action on its part required to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(b) Binding Agreement. This Agreement has been duly executed and delivered on behalf of Bayer and constitutes a legal, valid and binding obligation of Bayer that is enforceable against it in accordance with its terms.

(c) No Conflict. The execution, delivery and performance of this Agreement by Bayer does not conflict with and would not result in a breach of any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor does it violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

(d) Validity. It is aware of no action, suit, inquiry or investigation instituted by any Third Party that questions or threatens the validity of this Agreement.

(e) Expertise. In entering into this Agreement, Bayer has relied solely on its own scientific and commercial experience and its own analysis and evaluation of both the scientific and commercial value of the Licensed Product.

Source: NUVELO INC, 10-K, March 15, 2006

(f) Business Condition. It is not in violation of its charter, bylaws, or any other organizational document, or in violation of any law, administrative regulation, ordinance or order of any court or governmental agency, arbitration panel or authority applicable to it, which violation, individually or in the aggregate, would reasonably likely have a materially adverse effect on its business or financial condition. Except as may be set forth in any documents required to be filed by it under the Securities Act or Exchange Act or any foreign equivalents thereof, it is not aware of any facts or circumstances, individually or in the aggregate, which would reasonably likely have a materially adverse effect on its business or financial condition.

13.2 Representations and Warranties of Nuvelo. Nuvelo hereby represents and warrants to Bayer that as of the Effective Date:

(a) Corporate Existence, Power and Authority. It is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority and the legal right to own and operate its property and assets and to carry on its business as it is now being conducted and as contemplated in this Agreement and to perform its obligations hereunder including, without limitation, the right to grant the licenses granted hereunder. It has taken all necessary corporate action on its part required to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(b) Binding Agreement. This Agreement has been duly executed and delivered on behalf of Nuvelo and constitutes a legal, valid and binding obligation of Nuvelo that is enforceable against it in accordance with its terms.

(c) No Conflict. The execution, delivery and performance of this Agreement by Nuvelo does not conflict with and would not result in a breach of any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor does it violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

(d) Validity. It is aware of no action, suit, inquiry or investigation instituted by any Third Party that questions or threatens the validity of this Agreement.

(e) Business Condition. It is not in violation of its charter, bylaws, or any other organizational document, or in violation of any law, administrative regulation, ordinance or order of any court or governmental agency, arbitration panel or authority applicable to it, which violation, individually or in the aggregate, would reasonably likely have a materially adverse effect on its business or financial condition. Except as may be set forth in any documents filed with the Securities and Exchange Commission, as required to be filed by it under the Securities Act or Exchange Act, as the case may be, it is not aware of any facts or circumstances, individually or in the aggregate, which would reasonably likely have a materially adverse effect on its business or financial condition.

(f) Nuvelo Patent Rights and Nuvelo Know-How. (i) Nuvelo owns or otherwise Controls the Nuvelo Patent Rights and Nuvelo Know-How, and has the right and authority to grant the rights and licenses granted pursuant to the terms and conditions of this Agreement. Nuvelo has not granted any right, license, or interest in, to, or under the Nuvelo Patent Rights or

Source: NUVELO INC, 10-K, March 15, 2006

Nuvelo Know-How that is inconsistent with the rights, licenses, and interests granted under the terms and conditions of this Agreement; (ii) to Nuvelo's Knowledge, the issued patents within the Nuvelo Patent Rights are valid and enforceable as of the Effective Date; (iii) Nuvelo has not placed, and to its Knowledge there does not exist, upon the Nuvelo Patent Rights and Nuvelo Know-How any encumbrance, charge or lien; (iv) Exhibit C is an accurate list of all Patent Rights which are owned or Controlled by Nuvelo as of the Effective Date and which are necessary or useful for Development and/or Commercialization of the Licensed Product in the Bayer Territory. Such listed Nuvelo Patent Rights have been filed and maintained in a manner consistent with standard practice in each country in the Territory and all applicable fees have been paid on or before the due date for payment; and (v) as of the Effective Date, to the Knowledge of Nuvelo, there is no actual infringement or threatened infringement of the Nuvelo Patent Rights by any person. Furthermore, as of the Effective Date Nuvelo has no Knowledge of any claim, litigation, action, suit, proceeding investigation, arbitration proceedings or other proceedings pending or threatened affecting, in whole or in part, the Nuvelo Patent Rights or Nuvelo Know-How in the Bayer Territory, and there is not currently outstanding any unsatisfied judgment or outstanding order, injunction, decree, stipulation or award, in whole or in part, against any of the Nuvelo Patent Rights or the Nuvelo Know-How.

(g) <u>Documents Provided</u>. Nuvelo has, up to and including the Effective Date, made available to Bayer (a) all information requested by Bayer in its possession or control relating to the Licensed Product; and (b) all other information, to Nuvelo's Knowledge, that is material to the utility or safety of the Licensed Product; and (c) all other information that, to Nuvelo's Knowledge, is reasonably likely to be material to the Development or Commercialization of Licensed Product in the Territory (as such Development and Commercialization is viewed by Nuvelo as of the Effective Date).

(h) <u>Notice of Infringement</u>. Nuvelo has not received written notice from any Third Party of any issued and enforceable patent of such Third Party which would be infringed by the Development or Commercialization of Licensed Product in the Territory under this Agreement. Further, to Nuvelo's Knowledge, the Development and Commercialization of Licensed Product under this Agreement in the Territory does not infringe upon any issued and enforceable patent of any Third Party.

(i) <u>Third Party Agreements</u>. Nuvelo has maintained, is in compliance with, and has received no notice of default under any agreements with Third Parties relating to Licensed Product, including, without limitation, the Amgen-Nuvelo Agreement and the Warrant Purchase Agreement (as defined in the Amgen-Nuvelo Agreement).

(j) <u>No Untrue Statement</u>. Neither Nuvelo nor any officer, employee or agent of Nuvelo has made an untrue statement of a material fact to any Regulatory Authority in the Territory with respect to the Licensed Product (whether in any submission to such Regulatory Authority or otherwise), or knowingly failed to disclose a material fact required to be disclosed to any Regulatory Authority in the Territory with respect to Licensed Product.

Source: NUVELO INC, 10-K, March 15, 2006

13.3 <u>Mutual Covenants</u>. Each Party hereby covenants to the other Party as of the Effective Date as follows:

(a) <u>No Conflict</u>. It will not during the term of this Agreement grant any right, license, consent or privilege to any Third Party(ies) in the Territory which would conflict with the rights granted to the other Party under this Agreement, and will not take any action that would in any way prevent it from assuming its obligations or granting the rights granted to the other Party under this Agreement or that would otherwise materially conflict with or adversely affect its obligations or its assumption of the rights granted to the other Party under this Agreement.

(b) <u>Exclusivity</u>. It will work exclusively with the other Party with respect to the Development and Commercialization of Licensed Product in the Bayer Territory (subject to the Parties' rights under Article 2 of this Agreement to grant sublicenses to Third Parties and the Parties' right to engage subcontractors). It will not, directly or indirectly, Commercialize a Competitive Product anywhere in the world during the Term. Each Party will be free to conduct research and development with respect to a Competitive Product, provided as follows: If Nuvelo develops a Competitive Product during the Term, it will either grant Bayer a license to commercialize the Competitive Product in the Bayer Territory, in which case Nuvelo will have the right to commercialize the Competitive Product in the United States on terms to be negotiated and agreed upon by the Parties, or it will license the worldwide, exclusive rights to commercialize the Competitive Product to a Third Party. If Bayer develops a Competitive Product during the Term, it will either grant Nuvelo a license to commercialize the Competitive Product in the United States on terms to be negotiated and agreed upon by the Parties, in which case Bayer will have the right to commercialize the Competitive Product in the Bayer Territory, or it will license the worldwide, exclusive rights to commercialize the Competitive Product to a Third Party.

(c) <u>Regulatory Data</u>. It will store and provide the other Party access to source data supporting all Regulatory Filings and Regulatory Approvals for the longer of (i) ten (10) years from the date of generation of such data, and (ii) the time period required by any applicable Regulatory Authority in the Territory.

(d) <u>No Debarment</u>. In the course of the Development, Commercialization and any permitted manufacture of Licensed Product during the Term, it will not knowingly use and will not have knowingly used any employee or consultant who is or has been debarred by a Regulatory Authority or, to the best of such Party's knowledge, is or has been the subject of debarment proceedings by a Regulatory Authority.

(e) <u>Compliance</u>. It will comply with all applicable statutes, regulations and guidance of Regulatory Authorities in carrying out its activities regarding the Development, manufacturing and Commercialization of Licensed Product in its portion of the Territory.

(f) <u>Diligence</u>. It will use Commercially Reasonable Efforts to carry out its obligations in accordance with the terms of this this Agreement including, as applicable, the Development, manufacturing and Commercialization of Licensed Product in its portion of the Territory in accordance with the terms of this Agreement.

(g) <u>Limitation of License Granted</u>. Bayer will not use the Nuvelo Technology or any Nuvelo Material and Manufacturing Information and Nuvelo will not use the Bayer

Source: NUVELO INC, 10-K, March 15, 2006