# Exhibit E

Technology outside the scope of any licenses so granted. Without limiting the generality of the previous sentence, neither Party will sell any Licensed Product outside of its portion of the Territory and each Party will use reasonable efforts to prevent the unauthorized importation of Licensed Product into the other Party's portion of the Territory.

(h) No Misappropriation. It will not knowingly misappropriate the trade secret of a Third Party in its activities to Develop, manufacture, or Commercialize Licensed Product.

13.4 Additional Covenants of Nuvelo. Nuvelo acknowledges that Bayer will be substantially damaged as a result of any termination of this Agreement by Amgen, Inc. in the event of termination of the Amgen-Nuvelo Agreement as a result of Nuvelo's default thereunder. Accordingly, Nuvelo hereby covenants to Bayer:

(a) On an ongoing basis throughout the term of the Amgen-Nuvelo Agreement Nuvelo will keep Bayer apprised of Nuvelo's performance of its obligations under the Amgen-Nuvelo Agreement and the Warrant Purchase Agreement (as defined in the Amgen-Nuvelo Agreement) including by (i) transmitting to Bayer on a quarterly basis a summary report of Nuvelo's performance of (or failure to perform) its obligations under the Amgen-Nuvelo Agreement and/or the Warrant Purchase Agreement during the preceding quarter (or, if applicable, a report that no such performance was due during such quarter) and (ii) providing copies to Bayer of all reports and statements required to be delivered by Nuvelo under the Amgen-Nuvelo Agreement as and when Nuvelo transmits the same to Amgen, Inc. All such reports and statements shall be the Confidential Information of Nuvelo and shall be subject to Article 12.

(b) Nuvelo will continue to comply with and perform all of its obligations under the Amgen-Nuvelo Agreement and the Warrant Purchase Agreement. Nuvelo will in good faith consider and act on any concerns reasonably raised by Bayer with respect to Nuvelo's compliance with the Amgen-Nuvelo Agreement and/or the Warrant Purchase Agreement.

(c) Within five (5) days of receipt of any Notice of Default or any other notice of termination from Amgen, Inc. under the Amgen-Nuvelo Agreement, Nuvelo shall give written notice of the same to Bayer. Bayer shall have the right, but not the obligation, to cure any Nuvelo default in its obligations to Amgen if Bayer in its reasonable judgment believes that Nuvelo's efforts to cure that default will not be sufficient to avoid termination of the Amgen-Nuvelo Agreement. Nuvelo will provide to Bayer all data, reports and other information reasonably requested by Bayer in connection with Bayer's effort to cure as provided in the preceding sentence. Bayer may offset any amounts paid by Bayer to Amgen or otherwise expended by Bayer to cure the default, plus an additional [ * ] percent ([ * ]%), against any payments subsequently due to be paid by Bayer to Nuvelo under Section 4.7 or Article 8 of this Agreement.

(d) Within ten (10) days of execution of this Agreement by the Parties, Nuvelo will inform Amgen, Inc. that the Parties have entered into this Agreement and, thereafter, Nuvelo shall use reasonable efforts to negotiate and enter into an amendment of the Amgen-Nuvelo Agreement with Amgen, Inc. whereby Amgen will waive its right under Section 2.3(a) of the Amgen-Nuvelo Agreement to terminate this Agreement and will agree that, in the event of

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

termination of the Amgen-Nuvelo Agreement pursuant to Article 12 thereof, Nuvelo shall assign this Agreement to Amgen and this Agreement shall remain in full force and effect between Amgen and Bayer.

13.5 <u>Additional Covenants of Bayer</u>. Bayer acknowledges that Nuvelo will be substantially damaged as a result of any termination of the Amgen-Nuvelo Agreement by Amgen, Inc. as a result of Bayer's default hereunder. Accordingly, Bayer hereby covenants to Nuvelo that if Nuvelo receives any Notice of Default from Amgen, Inc. under the Amgen-Nuvelo Agreement that arises as a result of any breach of this Agreement by Bayer, Nuvelo shall have the right, but not the obligation, to cure any such Bayer breach if Nuvelo in its reasonable judgment believes that Bayer's efforts to cure that breach will not be sufficient to avoid termination of the Amgen-Nuvelo Agreement. Within thirty (30) days of Nuvelo's cure of any such breach on Bayer's behalf, Bayer will pay to Nuvelo any amounts paid by Nuvelo to Amgen or otherwise expended by Nuvelo to cure the default, plus an additional [*] percent ([*]%). For the avoidance of doubt, nothing in Section 13.4 or this Section 13.5 shall require Bayer to make any payments to Amgen under the Amgen-Nuvelo Agreement, and, as provided in Section 8.4, Nuvelo shall be responsible for paying any and all amounts due to Amgen under the Amgen-Nuvelo Agreement.

13.6 <u>Disclaimers</u>. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE LICENSE GRANTS, MATERIALS AND INFORMATION PROVIDED HEREUNDER ARE BEING PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 13, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE WHATSOEVER UNDER THIS AGREEMENT OR REGARDING THE MATERIALS AND INFORMATION. EACH PARTY EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE OR OF NONINFRINGEMENT.

ARTICLE 14
INDEMNIFICATION

14.1 <u>Indemnification by Nuvelo</u>. Nuvelo hereby agrees to defend, hold harmless and indemnify (collectively **"Indemnify"** or be **"Indemnified"**) Bayer and its Affiliates, agents, directors, officers and employees (the **"Bayer Indemnitees"**) from and against any and all Losses resulting from any Third Party claims, suits, actions or demands arising out of (a) any of Nuvelo's representations and warranties set forth in this Agreement being untrue in any material respect when made and/or (b) any material breach or material default by Nuvelo of its covenants, agreements or obligations under this Agreement, except to the extent such Losses result from (i) any of Bayer's representations or warranties set forth in this Agreement being untrue in any material respect when made, or (ii) any material breach or material default by Bayer of its covenants, agreements or obligations under this Agreement. To be eligible to be so Indemnified as described in this Section 14.1, the Bayer Indemnitees will provide Nuvelo with prompt written notice of any claims, suits, actions or demands (with a description of the claim and the nature and amount of any such Loss) giving rise to the indemnification obligation pursuant to this Section 14.1 and the exclusive ability to defend such claims, suits, actions or demands (with the reasonable cooperation of Bayer Indemnitees). Nuvelo will be relieved of its obligations only if any failure by the Bayer Indemnitee to deliver prompt notice will have been prejudicial to its ability to defend such claims, suits, actions or demands. Bayer will have the right to retain its

[*]    Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Source: NUVELO INC, 10-K, March 15, 2006

own counsel, at its own expense. Nuvelo will not settle or consent to the entry of any judgment with respect to any claim for Loss for which indemnification is sought, in a manner that would materially adversely affect Bayer, without Bayer's prior written consent (not to be unreasonably withheld). Nuvelo's obligation to Indemnify the Bayer Indemnitees pursuant to this Section 14.1 will not apply to the extent of any Losses (i) that arise from the negligence or intentional misconduct of any Bayer Indemnitee; (ii) that arise from Bayer's material breach of any representation, warranty, covenant or obligation under this License Agreement; or (iii) for which Bayer is obligated to Indemnify the Nuvelo Indemnitees pursuant to Section 14.2 of this License Agreement.

14.2 <u>Indemnification by Bayer</u>. Bayer hereby agrees to Indemnify Nuvelo and its Affiliates, agents, directors, officers and employees (the "**Nuvelo Indemnitees**") from and against any and all Losses arising from Third Party claims, suits, actions or demands resulting directly or indirectly from (a) any of Bayer's representations and warranties set forth in this Agreement being untrue in any material respect when made and/or (b) any material breach or material default by Bayer of its covenants, agreements or obligations under this Agreement, except to the extent such Losses result from (i) any of Nuvelo's representations and warranties set forth in this Agreement being untrue in any material respect when made, or (ii) any material breach or material default by Nuvelo of its covenants, agreements or obligations under this Agreement. To be eligible to be Indemnified as described above in this Section 14.2, the Nuvelo Indemnitees will provide Bayer with prompt written notice of any claims, suits, actions or demands (with a description of the claim and the nature and amount of any such Loss) giving rise to the indemnification obligation pursuant to this Section 14.2 and the exclusive ability to defend such claims, suits, actions or demands (with the reasonable cooperation of Nuvelo Indemnitees). Bayer will be relieved of its obligations only if any failure by the Nuvelo Indemnitee to deliver prompt notice will have been prejudicial to its ability to defend such claims, suits, actions or demands. Nuvelo will have the right to retain its own counsel, at its own expense. Bayer will not settle or consent to the entry of any judgment with respect to any claim for Loss for which indemnification is sought, in a manner that would materially adversely affect Nuvelo, without Nuvelo's prior written consent (not to be unreasonably withheld). Bayer's obligation to Indemnify the Nuvelo Indemnitees pursuant to this Section 14.2 will not apply to the extent of any Losses (i) that arise from the negligence or intentional misconduct of any Nuvelo Indemnitee (including but not limited to that arising from the manufacture of Licensed Product by Nuvelo), (ii) that arise from any material breach by Nuvelo of any representation, warranty, covenant or obligation under this License Agreement or (iii) for which Nuvelo is obligated to Indemnify the Bayer Indemnitees pursuant to Section 14.1 of this License Agreement.

14.3 <u>Product Liability Claims</u>.

(a) Bayer hereby agrees to Indemnify the Nuvelo Indemnitees from and against any and all Losses arising from Product Liability Claims in the Bayer Territory and Nuvelo hereby agrees to Indemnify the Bayer Indemnitees from and against any and all Losses arising from Product Liability Claims in the Nuvelo Territory, except as follows: Each Party shall be solely responsible for all Product Liability Claims resulting from, and to the extent allocable to, (i) such Party's or its Affiliate's material failure to adhere to the terms of any Development or Commercialization plan approved by the JSC, (ii) the distribution by such Party or its Affiliate of

Source: NUVELO INC, 10-K, March 15, 2006

Promotional Materials that fall outside the guidelines established by the JSC, (iii) the making of any claim or representation in respect of the Licensed Product or the respective characteristics thereof by or on behalf of such Party or its Affiliate (by members of its sales force or otherwise) that have not been approved by the JSC or which do not represent an accurate summary or explanation of the labeling of the Licensed Product or a portion thereof or (iv) Non-Conformance of the Licensed Product where, with respect to Bayer, such Non-Conformance occurred after such Licensed Product was delivered to Bayer by Nuvelo and, with respect to Nuvelo, such Non-Conformance existed at the time such Licensed Product was delivered by Nuvelo.

(b) Each Party shall give the other prompt written notice of any Product Liability Claim, but the omission of such notice shall not relieve either Party from its obligations under this Section 14.4, except to the extent the other Party can establish actual prejudice and direct damages as a result thereof. With respect to each Product Liability Claim, Nuvelo shall have the first right to defend and settle such Product Liability Claim. In the event that Nuvelo does not assume the defense of such Product Liability Claim within ninety (90) days following Nuvelo's receipt of notice of the commencement or assertion of such Product Liability Claim, Bayer shall have the right, but not the obligation, to take the lead role in the defense of such Product Liability Claim. The Party assuming the defense of any Product Liability Claim as permitted under this Section 14.4 (the "**Controlling Party**") shall consult with the other Party on all material aspects of the defense and the Parties shall cooperate fully with each other in connection therewith. The non-defending Party shall also have the right to participate in the defense of any Product Liability Claim using attorneys of its choice, at its own expense. In furtherance of the Parties' cooperation, the Controlling Party will consult with the other Party regarding strategic decisions, including without limitation the retention of counsel and defense of each Product Liability Claim. The Controlling Party will otherwise keep the other Party fully informed of the status and progress of the defense and any settlement discussions concerning the Product Liability Claim. Any settlement of a Product Liability Claim that would admit liability on the part of any Party or its Affiliates, or that would involve any relief other than the payment of money damages within a budget previously agreed to by the Parties, shall be subject to the prior written approval of both Parties, such approval not to be unreasonably withheld or delayed. All damages and expenses (including attorney's fees) incurred in connection with the defense of a Product Liability Claim shall be allocated between Nuvelo and Bayer in accordance with Section 14.4(a).

14.4 <u>Insurance</u>. During the Term and for a period of five (5) years after the expiration of this Agreement or the earlier termination thereof, each Party shall obtain and/or maintain, respectively, at its sole cost and expense, product liability insurance (including any self-insured arrangements) in amounts, respectively, which are reasonable and customary in the pharmaceutical industry for companies of comparable size and activities at the respective place of business of each Party; *provided* that Clinical Trial insurance policies will be required only while trials are ongoing. Such product liability insurance or self-insured arrangements shall insure against all liability, including without limitation personal injury, physical injury, or property damage arising out of, for Nuvelo, the manufacture of the Licensed Product, and for each Party, the sale, distribution, or marketing of the Licensed Product in such Party's portion of the Territory. Such insurance will not be construed to create a limit of either Party's liability with respect to its indemnification obligations under this Article 14. Each Party will provide the other Party with a copy of the certificate of insurance or other evidence of such insurance and/or self-insurance, upon request. Each Party will provide the other Party with written notice at least thirty (30) days prior to the cancellation, non-renewal or material change in such insurance or self-insurance that materially adversely affects the rights of the other Party hereunder.

Source: NUVELO INC, 10-K, March 15, 2006

14.5 Limitation of Liability. EXCEPT FOR A PARTY'S BREACH OF ITS OBLIGATIONS UNDER ARTICLE 12, NEITHER PARTY NOR ITS RESPECTIVE AFFILIATES, WILL BE LIABLE FOR SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER IN CONTRACT, WARRANTY, TORT, STRICT LIABILITY OR OTHERWISE INCURRED BY THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO DAMAGES MEASURING LOST PROFITS OR BUSINESS OPPORTUNITIES. THIS SECTION 14.6, WILL NOT BE CONSTRUED TO LIMIT EITHER PARTY'S OBLIGATION UNDER SECTIONS 14.1 THROUGH 14.4.

ARTICLE 15
TERM AND TERMINATION

15.1 Term. This Agreement will become effective on the Effective Date and will remain in full force and effect, unless earlier terminated pursuant to this Article 15, on a country-by-country basis until there is no remaining Royalty payment obligation in any country, as set forth in Section 8.5. Upon the expiry of Bayer's obligation to pay Royalties under this Agreement for Licensed Product in a country, Bayer will have a fully paid-up, royalty-free, license for use of joint inventions and under the Nuvelo Technology and the Nuvelo Material and Manufacturing Information to use, sell, offer to sell, have sold, import, export and otherwise exploit, transfer physical possession of and transfer title or interest in or to Licensed Product in such country, and the purchase and supply commitments of the Parties in such case will terminate except as otherwise provided in the Manufacturing Agreement, if then in effect.

15.2 Remedies for Default.

(a) If any material representation or warranty made hereunder by either Party will have been untrue in any material respect ("**Representation Default**"), or upon any material breach or material default of an obligation of this Agreement by a Party ("**Performance Default**"), the Party not in default ("**Non-Defaulting Party**") must first give the other Party ("**Defaulting Party**") written notice thereof ("**Notice of Default**"), which notice must state the nature of the Representation Default or Performance Default in reasonable detail and must request the Defaulting Party cure such Representation Default or Performance Default within sixty (60) days. During any such 60-day period after receipt or delivery of a Notice of Default under this Section 15.2(a), all of the Party's respective rights and obligations under the affected parts of this Agreement, including but not limited to Development, manufacturing and Commercialization, will (to the extent applicable) remain in force and effect. If the Defaulting Party disputes the existence, extent or nature of any default set forth in a Notice of Default or an alleged failure to cure a default, the Parties will use good faith efforts to resolve the dispute as provided in Section 16.1, and if those good faith efforts do not resolve the dispute, Nuvelo will have the rights set forth in Section 15.2(b) in the event of a Representation Default or a Performance Default by Bayer, and Bayer will have the rights set forth in Section 15.2(c) in the event of a Representation Default or a Performance Default by Nuvelo.

(b) Bayer. In the event of a Representation Default or a Performance Default by Bayer that will not have been cured within the 60-day period set forth in Section 15.2(a) above

Source: NUVELO INC, 10-K, March 15, 2006

after receipt of a Notice of Default (or Bayer will not have presented a reasonably achievable plan to cure such Default as promptly as is reasonably practicable under the circumstances), and if efforts to resolve a dispute, if any, under Section 16.1 are unsuccessful, Nuvelo, at its option and on written notice to Bayer, may bring an action against Bayer for damages or equitable relief pursuant to Section 16.2; provided that such action shall be without prejudice to any of its other rights conferred on it by this Agreement and will be in addition to any other remedies available to it by law or in equity.

(c) Nuvelo. In the event of a Representation Default or a Performance Default by Nuvelo that will not have been cured within the 60-day period set forth in Section 15.2(a) after receipt of a Notice of Default (or Nuvelo will not have presented a reasonably achievable plan to cure such Default as promptly as is reasonably practicable under the circumstances), and, if efforts to resolve a dispute, if any under Section 16.1 are unsuccessful, Bayer, at its option and on written notice to Nuvelo, may bring an action against Nuvelo for damages or equitable relief pursuant to Section 16.2; provided that such action shall be without prejudice to any of its other rights conferred on it by this Agreement and will be in addition to any other remedies available to it by law or in equity.

(d) Subject to Section 13.4(d), if Amgen Inc. terminates the Amgen-Nuvelo Agreement due to a material breach of the Amgen-Nuvelo Agreement by Nuvelo, then at Amgen's discretion Amgen shall have the right to terminate this Agreement or to require assignment of Nuvelo's rights under this Agreement to Amgen. If Amgen elects to so terminate this Agreement at any time prior to [ * ] years after the First Commercial Sale of a Licensed Product in a Major Country, Canada or Japan, then, within [ * ] of such termination, Nuvelo shall pay to Bayer an amount equal to [ * ] under this Agreement, including without limitation all [ * ] prior to the date of such termination. If Amgen elects to so terminate this Agreement in any of the [ * ] through the [ * ] after the First Commercial Sale of a Licensed Product in a Major Country, Canada or Japan, the foregoing payment obligation shall be reduced by [ * ] percent ([ * ]%) per [ * ] and if Amgen elects to so terminate this Agreement at any time after ten (10) years after the First Commercial Sale of Licensed Product in a Major Country, Canada or Japan, Nuvelo shall have no obligation to pay Bayer under this Section 15.2(d).

(e) Subject to Section 13.5, if Amgen Inc. terminates the Amgen-Nuvelo Agreement due to a breach of this Agreement by Bayer at any time prior to [ * ] years after the First Commercial Sale of Licensed Product in any Major Country, Canada or Japan, then within [ * ] of such termination, Bayer shall pay to Nuvelo all [ * ] as notified by Nuvelo to Bayer in writing, together with all [ * ] as of the effective date of such termination, whether or not such [ * ] are otherwise payable [ * ]. If Amgen elects to so terminate the Amgen-Nuvelo Agreement in any of the [ * ] through the [ * ] after the First Commercial Sale of a Licensed Product in a Major Country, Canada or Japan, the foregoing payment obligation shall be reduced by [ * ] percent ([ * ]%) per year, and if Amgen elects to so terminate the Amgen-Nuvelo Agreement at any time after [ * ] after the First Commercial Sale of Licensed Product in a Major Country, Canada or Japan, Bayer shall have no obligation to pay Nuvelo under this Section 15.2(e).

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

15.3 <u>Bankruptcy</u>.

(a) Either Party may terminate this Agreement if the other Party (the "**Bankrupt Party**") will file in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the Bankrupt Party or of its assets, or if the Bankrupt Party proposes a written agreement of composition or extension of its debts, or if the Bankrupt Party will be served with an involuntary petition in bankruptcy or seeking reorganization, liquidation, dissolution, winding-up arrangement, composition or readjustment of its debts or any other relief under any bankruptcy, insolvency, reorganization or other similar act or law of any jurisdiction now or hereafter in effect, or there will have been issued a warrant of attachment, execution, or similar process against it, filed in any insolvency proceeding, and the petition will not be dismissed within ninety (90) days after the filing thereof, or if the Bankrupt Party will propose or be a party to any dissolution or liquidation, or if the Bankrupt Party will make an assignment for the benefit of creditors.

(b) All rights and licenses granted under or pursuant to this Agreement by Nuvelo or Bayer are and will otherwise be deemed to be for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code. The Parties agree that each Party will retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code. The Parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against a bankrupt Party under the U.S. Bankruptcy Code, the other Party will be entitled to a complete duplicate of (or complete access to, as appropriate) any intellectual property and all embodiments of such intellectual property, and same, if not already in the other Party's possession, will be promptly delivered to the other Party (i) upon any such commencement of a bankruptcy proceeding, upon the other Party's written request therefor, unless the non-bankrupt Party (or a trustee on behalf of the non-bankrupt Party) elects to continue to perform all of its obligations under this Agreement or (ii) if not delivered under (i) above, upon the rejection of this Agreement by or on behalf of the non-bankrupt Party, upon written request therefor by the other Party.

15.4 <u>Bayer Termination; Effects of Termination</u>. Bayer may at its option, at any time during the Term, terminate this Agreement upon giving Nuvelo twelve (12) months' written notice. If Nuvelo commits a Performance Default for failure to timely pay any Development Expenses in accordance with Section 4.7 and does not cure such Performance Default within the period set forth in Section 15.2(a) after receipt of a Notice of Default, Bayer may terminate this Agreement upon giving Nuvelo sixty (60) days' written notice. In addition to any other remedies that may be available at law or equity, upon termination of this Agreement, the rights and obligations of the Parties will be as set forth in this Section 15.4. In addition, if Bayer terminates this Agreement under the first sentence of this Section 15.4, Bayer will continue to reimburse Nuvelo for Bayer's share of Development Expenses under Section 4.7 incurred in conducting Global Development Programs approved by the JSC prior to the date of Bayer's notice of termination to Nuvelo.

(a) The following provisions will remain in full force and effect after the expiration or termination of this Agreement: Article 1 (Definitions); Article 10 (Payments, Records, Audit, only with respect to accrued rights and obligations as to payments); Article 11

Source: NUVELO INC, 10-K, March 15, 2006

(Publications); Article 12 (Confidentiality); Section 13.6 (Disclaimers); Article 14 (Indemnification); Article 15 (Term and Termination); Article 16 (Dispute Resolution); and Article 17 (General).

(b) The Parties will retain their respective ownership rights as set forth in Section 9.1. Nuvelo will have the right to file, prosecute, defend and maintain Joint Patent Rights under Section 9.2 and Product Trademarks under Section 9.2, enforce Joint Patent Rights under Section 9.3 and Product Trademarks under Section 9.3 and defend any action claiming the infringement of any Third Party Patent Rights or any Third Party Trademark under Section 9.4 and to publish under Article 11.

(c) Bayer will within thirty (30) days (other than with respect to Nuvelo Material and Manufacturing Information, in which case by no later than completion of its obligations, if any, under Section 15.4(d) below) destroy, or at Nuvelo's request return, all Nuvelo Confidential Information, Nuvelo Know-How and Nuvelo Material and Manufacturing Information (other than with respect to maintaining one (1) archival copy of Confidential Information related thereto for its legal files, for the sole purpose of determining its obligations hereunder) and will provide Nuvelo with certification by an officer of Bayer that all such materials have been destroyed or returned to Nuvelo. Nuvelo will within thirty (30) days destroy, or at Bayer's request return, all Bayer Confidential Information and Bayer Know-How (other than with respect to maintaining one (1) archival copy of Confidential Information related thereto for its legal files, for the sole purpose of determining its obligations hereunder) and will provide Bayer with certification by an officer of Nuvelo that all such materials have been destroyed or returned to Bayer.

(d) Bayer will promptly transfer to Nuvelo ownership of all Regulatory Filings and Regulatory Approvals then in Bayer's name for all Licensed Product and will notify the appropriate Regulatory Authorities and take any other action reasonably necessary to effect such transfer of ownership. Bayer will assign to Nuvelo Bayer's right, title and interest in the Product Trademarks. Bayer will grant to Nuvelo a paid up, royalty-free, non-exclusive, worldwide license under Bayer's copyrights in all Promotional Materials. If ownership of a Regulatory Filing or Regulatory Approval in any country cannot be transferred from Bayer to Nuvelo, Bayer will grant to Nuvelo an exclusive right of access and reference to the Regulatory Filing or Regulatory Approval in the country in order to enable Nuvelo to become a sponsor and party of record of an IND. If such right of access and reference is not sufficient to permit Nuvelo to file a Drug Approval Application and receive Regulatory Approval or to Develop, manufacture or Commercialize Licensed Product, Bayer will provide Nuvelo with any and all information necessary for Nuvelo to carry out such activities.

(e) Nuvelo will have the right to use Bayer's Trademarks in the selling of any existing inventory of Licensed Product(s) and to use Promotional Materials it then has on hand, but only if Nuvelo promptly creates new Promotional Materials (which do not use Bayer's corporate name and/or logo), with no obligation of accounting to Bayer. The license granted by Bayer to Nuvelo under Section 2.3 will survive termination of this Agreement by Nuvelo under Section 15.2 or Section 15.3, except that the rights conferred thereunder will become worldwide upon such termination.

Source: NUVELO INC, 10-K, March 15, 2006

(f) Bayer will within thirty (30) days (other than with respect to Third Party agreements entered into pursuant to Section 2.4, in which case by no later than completion of its obligations if any under Section 15.4(g) below), at the request of Nuvelo, assign (if assignable under its terms) to Nuvelo all of Bayer's rights and obligations under any then-existing Third Party licenses having a license grant limited specifically to Licensed Product, regarding the use, selling, offering to sell, and importing, exporting or otherwise transferring physical possession of or otherwise transferring title in or to Licensed Product and will not (until receiving notice of whether or not Nuvelo desires such an assignment) terminate or amend any such Third Party license. Otherwise, Bayer will, at the request of Nuvelo, sublicense (if sublicensable under its terms) to Nuvelo all of Bayer's rights and obligations under any then-existing Third Party licenses regarding the use, selling, offering to sell, and importing, exporting or otherwise transferring physical possession of or otherwise transferring title in or to Licensed Product and will not (until receiving notice of whether or not Nuvelo desires such a license) terminate or amend any Third Party license. The assignment or sublicense will be made for no additional consideration and be under the same terms and conditions as the underlying agreement.

(g) If Nuvelo becomes entitled to terminate this Agreement at any time after the First Commercial Sale of Licensed Product in the Bayer Territory, Bayer will, in no event in excess of ninety (90) days after Nuvelo's delivery of notice of termination to Nuvelo (other than with respect to obligations which explicitly exceed such 90-day period), conduct an orderly transition of rights and responsibilities from Bayer to Nuvelo or to a Third Party, as the case may be. Further, Bayer will cooperate and assist Nuvelo to effect any such transition of rights and responsibilities in an orderly, reasonable and businesslike manner. The assistance will include, but not be limited to (i) making its personnel and other resources reasonably available to Nuvelo, as necessary and (ii) transferring copies of all relevant information, files or data containing Information and all Materials to Nuvelo.

(h) Except as expressly set forth in this Section 15.4, all other rights and obligations under this Agreement will terminate upon termination of this Agreement in accordance with this Article 15.

15.5 Accrued Rights. Termination, relinquishment or expiration of any licenses under this Agreement for any reason in accordance with this Article 15 will be without prejudice to any rights which will have accrued to the benefit of either Party or any liability incurred by either Party prior to the effective date of termination, relinquishment or expiration, and will not preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement nor prejudice either Party's right to obtain performance of any obligation.

ARTICLE 16
DISPUTE RESOLUTION

16.1 Disputes. The Parties recognize that disputes as to certain matters may from time to time arise during the term of this Agreement that relate to either Party's rights or obligations hereunder. It is the objective of the Parties to establish procedures to facilitate the resolution of disputes arising from, concerning or in any way relating to this Agreement in an expedient manner by mutual cooperation and without resort to litigation. To accomplish this objective, the Parties agree to follow the procedures set forth in this Article 16 if and when a dispute arises under this Agreement.

Source: NUVELO INC, 10-K, March 15, 2006

(a) The Parties will undertake good faith efforts to resolve any dispute in good faith. In the event the Parties will be unable to resolve such dispute, either Party may, by written notice to the other Party, have any dispute between the Parties referred to the Chief Executive Officer of Nuvelo and the Head of the Pharmaceutical Division of Bayer who shall meet for attempted resolution by good faith negotiations within thirty (30) days after such matter is referred to such officers. In the event such designated officers are not able to resolve such dispute within such thirty (30)-day period, then either of such designated officers may, but shall not be obligated to, request, within five (5) business days after the expiration of such period, that the Parties attempt non-binding mediation of any such matter for a period not to exceed thirty (30) days. Upon any such request, the Parties shall participate in good faith in such non-binding mediation. If the matter remains unresolved after such thirty (30)-day mediation period, or if neither of such designated officers so requests such non-binding mediation, then any such unresolved matter shall be resolved as set forth in Section 16.1(b) or Section 16.1(c), as applicable.

(b) Any Expert Matter shall be resolved by expedited arbitration by an Expert as follows:

(1) Upon written request by either Party to the other Party, the Parties shall promptly negotiate in good faith to appoint an appropriate Expert. If the Parties are not able to agree within five (5) days after the receipt by a Party of the written request in the immediately preceding sentence, the CPR Institute for Dispute Resolution, or such other similar entity as the Parties may agree, shall be responsible for selecting an Expert within seven (7) days of being approached by a Party. The fees and costs of the Expert and the CPR Institute for Dispute Resolution (or such other entity) shall be borne equally by Nuvelo and Bayer.

(2) Within fifteen (15) days after the designation of the Expert, the Parties shall each simultaneously submit to the Expert and one another a written statement of their respective positions on such disagreement. Each Party shall have five (5) business days from receipt of the other Party's submission to submit a written response thereto, which shall include any scientific and technical information in support thereof. The Expert shall have the right to meet with the Parties, either alone or together, as necessary to make a determination.

(3) No later than thirty (30) days after the designation of the Expert, the Expert shall make a determination and shall provide the Parties with a written statement setting forth the basis of the determination. The decision of the Expert shall be final, binding and conclusive, absent manifest error.

(c) Any unresolved dispute that is not an Expert Matter shall, at the election of either Party, be decided by litigation in accordance with Section 16.2. Notwithstanding the above, either Party will be entitled at all times and without delay to seek equitable relief, provided that such relief is sought exclusively from a court as provided in Section 16.2.

Source: NUVELO INC, 10-K, March 15, 2006

16.2 Governing Law; Judicial Resolution. Resolution of all disputes arising out of or related to this Agreement, or the performance, enforcement, breach or termination of this Agreement and any remedies relating thereto, will be governed by and construed under the substantive laws of the State of New York as applied to agreements executed and performed entirely in the State of New York by residents of the State of New York, without regard to conflicts of law rules. Subject to Section 16.1, each Party irrevocably and unconditionally consents to the exclusive jurisdiction of the courts of general jurisdiction of the State of New York and the United States District Court for the Southern District of New York (collectively, the "**Courts**"), for any action, suit or proceeding (other than appeals therefrom) solely for a dispute arising out of this Agreement, and agrees not to commence any action, suit or proceeding (other than appeals therefrom) solely for disputes arising out of this Agreement except in such courts. Submission to United States jurisdiction is for the limited purpose of disputes arising out of this Agreement and does not create general jurisdiction. Each party hereby consents to the jurisdiction of the Courts and waives any other venue to which it may be entitled by virtue of domicile or otherwise.

16.3 Patent and Trademark Dispute Resolution. Notwithstanding the above Section 16.2, as between the Parties, any dispute, controversy or claim relating to the scope, validity, enforceability, inventorship or ownership of intellectual property rights shall be submitted by either Party to a court of competent jurisdiction in the country in which such rights apply.

ARTICLE 17
GENERAL

17.1 Force Majeure. Both Parties will be excused from the performance of their obligations under this Agreement to the extent that such performance is prevented by Force Majeure and the nonperforming Party promptly provides notice of the prevention to the other Party. Such excuse will be continued so long as the condition constituting Force Majeure continues and the nonperforming Party uses reasonable efforts to remove the condition. When such circumstances arise, the Parties will discuss what, if any, modification of the terms of this Agreement may be required in order to arrive at an equitable solution. Notwithstanding anything to the contrary, failure to fulfill payment obligations may only be excused under this Section 17.1 if the actual payment process is affected by the Force Majeure.

17.2 Notices. Any notice required or permitted to be given under this Agreement will be in writing, will specifically refer to this Agreement and will be deemed to have been sufficiently given for all purposes if mailed by first class certified or registered mail, postage prepaid, express delivery service or personally delivered or, if sent by facsimile, electronic transmission is confirmed. Unless otherwise notified in writing, the mailing addresses and fax numbers for notice of the Parties will be as described below.

Source: NUVELO INC, 10-K, March 15, 2006

For Bayer:        Bayer HealthCare AG
                  Division Pharmaceuticals
                  D-51368 Leverkusen
                  Attention: Business Development and Licensing
                  Facsimile: +49-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

                  With a copy to:

                  Bayer HealthCare AG
                  CAO-Law and Patents
                  D-51368 Leverkusen
                  Attention: General Counsel
                  Facsimile: +49-214-82986

For Nuvelo:       Nuvelo Inc.
                  201 Industrial Road, Suite 310
                  San Carlos, Ca 94070

                  Attention: Chief Executive Officer

                  With a copy to: General Counsel

17.3 Maintenance of Records. Each Party will keep and maintain all records required by law or regulation with respect to Licensed Product and will make copies of such records available to the other Party upon request.

17.4 No Strict Construction. This Agreement has been prepared jointly and will not be strictly construed against either Party.

17.5 Assignment. Other than as set forth in Section 2.4 with respect to Bayer's right to grant Sublicenses under this Agreement and in Sections 13.4(d) and 15.2(d) with respect to the possible assignment of Nuvelo's rights under this Agreement to Amgen, Inc., neither Party may assign or transfer this Agreement or any rights or obligations hereunder without the prior written consent of the other, except that a Party may make such an assignment without the other Party's consent to Affiliates or to an entity that acquires all or substantially all of the assets of such Party to which this Agreement pertains, whether in a merger, consolidation, reorganization, acquisition, sale or otherwise, so long as such entity shall assume (expressly in writing or by operation of law) the performance of all of the terms of this Agreement. Notwithstanding the foregoing, Nuvelo shall provide written notice to Bayer of any proposed acquisition by a Third Party of all or substantially all of the assets of Nuvelo to which this Agreement pertains sufficiently in advance of any such acquisition as to allow Bayer a reasonable opportunity to make a counteroffer to such Third Party acquisition. This Agreement will be binding on the successors and assigns of the assigning Party, and the name of a Party appearing herein will be deemed to include the name(s) of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this Agreement. Any assignment or attempted assignment by either Party in violation of the terms of this Section 17.5 will be null and void and of no legal

Source: NUVELO INC, 10-K, March 15, 2006

effect. The assigning Party will forward to the other Party a copy of those portions of each fully executed assignment agreement that relate to the assumption of the rights and responsibilities of the assigning Party, within sixty (60) days of the execution of such assignment agreement.

17.6 Performance by Affiliates. Each of Nuvelo and Bayer acknowledge that obligations under this Agreement may be performed by Affiliates of Nuvelo and Bayer. Each of Nuvelo and Bayer guarantee performance of this Agreement by its Affiliates, notwithstanding any assignment to Affiliates in accordance with Section 17.5 of this Agreement. Wherever in this Agreement the Parties delegate responsibility of this Agreement or act contrary to its terms in any way. the Affiliates/entities may not make decisions inconsistent with this Agreement, nor amend the terms of this Agreement or act contrary to its terms in any way. Bayer will forward to Nuvelo a copy of each fully executed sublicense agreement within sixty (60) days of the execution. In case any Affiliate of a Party materially breaches this Agreement, the non-breaching Party will have the right to bring a cause of action directly against the other Party whether or not its Affiliate is named as a defendant in that action.

17.7 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

17.8 Severability. If any one or more of the provisions of this Agreement are held to be invalid or unenforceable by any court of competent jurisdiction from which no appeal can be or is taken, such provisions will be considered severed from this Agreement and will not serve to invalidate any remaining provisions hereof. The Parties will make a good faith effort to replace any invalid or unenforceable provision with a valid and enforceable one such that the objectives contemplated by the Parties when entering this Agreement, as evidenced by the terms of this Agreement in accordance with Section 17.8, may be realized.

17.9 Headings. The headings for each Article and Section in this Agreement have been inserted for convenience of reference only and are not intended to limit or expand on the meaning of the language contained in the particular Article or Section. Unless otherwise specified, (a) references in this Agreement to any Article, Section or Exhibit will mean references to such Article, Section or Exhibit of this Agreement, (b) references in any Section to any clause are references to such clause of such Section, and (c) references to any agreement, instrument or other document in this Agreement refer to such agreement, instrument or other document as originally executed or, if subsequently varied, replaced or supplemented from time-to-time, as so varied, replaced or supplemented and in effect at the relevant time of reference thereto.

17.10 Further Actions. Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

17.11 Independent Contractors. The relationship between Bayer and Nuvelo created by this Agreement is one of independent contractors. This Agreement does not create any agency, distributorship, employee-employer, partnership, joint venture or similar business relationship between the parties. Neither Party is a legal representative of the other Party, and neither Party

Source: NUVELO INC, 10-K, March 15, 2006

can assume or create any obligation, representation, warranty or guarantee (express or implied) on behalf of the other Party for any purpose whatsoever. Each Party will use its own discretion and will have complete and authoritative control over its employees and the details of performing its obligations under this Agreement.

17.12 <u>No Benefit of Third Parties</u>. The representations, warranties, covenants and agreements set forth in this Agreement are for the sole benefit of the Parties hereto and their successors and permitted assigns, and they will not be construed as conferring any rights on any Third Parties.

17.13 <u>Use of Name</u>. Except as expressly provided in this Agreement, no Party hereto will use, and no rights are granted in or to, the names or Trademarks (including the names "Nuvelo" and "Bayer"), physical likeness, employee names or owner symbol of the other Party for any purpose (including, without limitation, private or public securities placements) without the prior written consent of the affected Party, such consent not to be unreasonably withheld or delayed so long as the use of such name is limited to an objective statement of fact rather than for endorsement purposes. Neither Party will use any Trademark which either substantially resembles or is confusingly similar to, misleading or deceptive with respect to, or which dilutes any of the other Party's Trademarks in connection with the subject matter of this Agreement.

17.14 <u>No Waiver</u>. Any delay in enforcing a Party's rights under this Agreement or any waiver as to a particular default or other matter will not constitute a waiver of such Party's rights to the future enforcement of its rights under this Agreement, except with respect to an express written and signed waiver relating to a particular matter for a particular period of time.

17.15 <u>Export Requirements</u>. It is understood and acknowledged that the transfer of certain commodities and technical data may be subject to United States laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the United States Department of Commerce. Each Party hereby agrees and by entering into this Agreement gives written assurance that it will comply with all United States laws and regulations controlling the export of commodities and technical data within Information and Materials, that it will be solely responsible for any violation of any such laws and regulations by itself, its Affiliates or its Sublicensees, and that it will indemnify, defend and hold the other Party harmless from any liability in the event of any legal action of any nature occasioned by such violation, pursuant to Section 14.1 (in the case of Nuvelo) or Section 14.2 (in the case of Bayer).

17.16 <u>Entire Agreement; Amendment</u>. Except for the Mutual Confidential Disclosure Agreement dated November 15, 2005 between the Parties, this Agreement (including all Exhibits) sets forth the complete, final and exclusive agreement and all the covenants, promises, agreements, warranties, representations, conditions and understandings between the Parties hereto and supersedes and terminates all prior agreements and understandings between the Parties. This Agreement may only be modified or supplemented in a writing expressly stated for this purpose and signed by an authorized officer of each Party (i.e., it may not be modified by any purchase order, change order, acknowledgment, order acceptance, standard terms of sale, invoice or the like).

Source: NUVELO INC, 10-K, March 15, 2006

17.17 <u>Exhibits.</u> All Exhibits referenced herein and attached hereto are incorporated in this Agreement by reference.

IN WITNESS WHEREOF, the Parties have executed this Agreement in duplicate originals by their duly authorized representatives as of the Effective Date.

NUVELO, INC.

By:        /s/ Ted W. Love

Print Name:   Ted W. Love

Title:      Chairman & CEO

BAYER HEALTHCARE AG

By:        _____

Print Name:   _____

Title:      _____


By:        _____

Print Name:   _____

Title:      _____

Source: NUVELO INC, 10-K, March 15, 2006

IN WITNESS WHEREOF, the Parties have executed this Agreement in duplicate originals by their duly authorized representatives as of the Effective Date.

NUVELO, INC.

By:

Print Name:

Title:

BAYER HEALTHCARE AG

By:          /s/ Rey

Print Name:
             Rey

Title:       BHC General Counsel

By:          /s/ ppa Joachim Neipp

Print Name:  Neipp

Title:       BHC-PH Vice President Finance

Source: NUVELO INC, 10-K, March 15, 2006

EXHIBIT A

DEFINED TERMS

A.1 **"Affiliate"** means, with respect to a Party, an individual, a partnership, a joint venture, a corporation, or any other entity or any combination of the aforementioned entities that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Party. For purposes of this definition, "control" will mean the possession, direct or indirect, of the power to cause the direction of the management and policies of a Party, whether through ownership of more than fifty percent (50%) of the voting securities of such Party, by contract or otherwise.

A.2 **"Alfimeprase"** means the polypeptide having the amino acid sequence which is set forth in Exhibit B.

A.3 **"Amgen-Nuvelo Agreement"** means the license agreement by and between Amgen Inc. and Nuvelo, Inc. dated 4 November 2004.

A.4 **"Bayer Know-How"** means all Information and Materials Controlled by Bayer during the term of this Agreement necessary or useful to manufacture, Develop or Commercialize of Licensed Product, including but not limited to the following information: (1) all Bayer-sponsored collaborator data and results (subject to any contractual confidentiality obligations of Bayer to Third Parties regarding such results), (2) any regulatory data which Bayer provides to Nuvelo; and (3) such information which Bayer expressly designates in writing it intends to include as Bayer Know-How under this Agreement.

A.5 **"Bayer Patent Rights"** means Bayer's rights in those Patent Rights Controlled by Bayer during the term of this Agreement that would, but for the licenses granted by Bayer to Nuvelo under this Agreement, be directly or contributorily infringed by the manufacture, use or sale of Licensed Product.

A.6 **"Bayer Technology"** means all Bayer Patent Rights and Bayer Know-How and Bayer's interest in the Joint Patent Rights and Joint Know-How.

A.7 **"Bayer Territory"** means all countries in the world except for the United States.

A.8 **"Bayer Territory Drug Laws"** means all laws, rules and regulations that are applicable to the manufacture, use, sale, and promotion of pharmaceutical products for human use in the Bayer Territory and that materially affect Bayer's performance under this Agreement, including any such laws, rules or regulations that correspond to any US Drug Laws.

A.9 **"Clinical Trial"** means any Phase 1 Clinical Trial, Phase 2 Clinical Trial, Phase 3 Clinical Trial or Phase 4 Clinical Trial.

A.10 **"Commercialize"** or **"Commercialization"** means all activities relating to the promotion, marketing, advertisement, sale, reimbursement and distribution of Licensed Product, and other pre-launch and post-launch marketing and sale activities for Licensed Product for all indications.

A-1

Source: NUVELO INC, 10-K, March 15, 2006

A.11 **"Commercially Reasonable Efforts"** means the level of efforts and resources required to Develop, manufacture and Commercialize, as applicable, a Licensed Product in a sustained manner consistent with the efforts a similarly situated biopharmaceutical company (in the case of Nuvelo) or pharmaceutical company (in the case of Bayer) would typically devote to a product of similar market potential at a similar stage in its product life, profit potential or strategic value resulting from its own research efforts, based on conditions then prevailing. Commercially Reasonable Efforts will be determined on a country-by-country (each country including its territories) basis for a particular Licensed Product, and it is anticipated that the level of effort will change over time reflecting changes in the status of the Licensed Product and the country (including its territories) involved. Commercially Reasonable Efforts requires that the Party, at a minimum: (a) promptly assign responsibility for such obligations to specific employee(s) who are held accountable for progress and monitor such progress on an ongoing basis; (b) set and consistently seek to achieve specific and meaningful objectives for carrying out such obligations; and (c) consistently make and implement decisions and allocate resources designed to advance progress with respect to such objectives.

A.12 **"Competitive Product"** means any [ * ] other than Licensed Product, that [ *

*

*

* ]

A.13 **"Confidential Information"** means all Information received by either Party from the other Party pursuant to this Agreement, other than that portion of such Information which:

(a) is publicly disclosed by the disclosing Party, either before or after it becomes known to the receiving Party;

(b) was known to the receiving Party, without obligation to keep it confidential, prior to when it was received from the disclosing Party;

(c) is subsequently disclosed to the receiving Party by a Third Party lawfully in possession thereof without obligation to keep it confidential;

(d) has been publicly disclosed other than by the disclosing Party and without breach of an obligation of confidentiality with respect thereto; or

(e) has been independently developed by the receiving Party without the aid, application or use of Confidential Information, as demonstrated by competent written proof.

A.14 **"Control"** or **"Controlled"** means, with respect to any material, information or intellectual property right, that a Party owns or has a license to such item or right, and possesses the ability to grant the other party access, a license or sublicense as applicable in or to such item or right as provided for herein without violating the terms of any agreement or other arrangement with any Third Party.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

A.15 **"Country Specific Trial"** means any Clinical Trial relating to Licensed Product that is conducted or sponsored by a Party in its portion of the Territory and that is not a Global Development Program.

A.16 **"Development"** or **"Develop"** means all non-clinical and clinical activities including without limitation, all Clinical Trials, undertaken for Licensed Product to file a Drug Approval Application and obtain Regulatory Approval of Licensed Product. For the avoidance of doubt, these activities will include drug development activities, including among other things: animal pharmacology, toxicology, statistical analysis and report writing, CMC activities, manufacturing process development, and the manufacture of non-clinical and clinical supplies, product approval and registration, and regulatory affairs related to the foregoing. When used as a verb, "Develop" means to engage in Development.

A.17 **"Development Expense"** means expenses incurred by a Party or for its account on or after January 1, 2006, which are specifically attributable to the Development of Licensed Product, including, without limitation:

(a)    costs of non-clinical design and evaluation of Licensed Product, and costs of studies on the toxicological, pharmacokinetic, metabolic or clinical aspects of Licensed Product (such costs include the costs of any consultants or other Third Parties engaged by a Party to conduct such design or evaluation);

(b)    costs of manufacturing clinical supplies of Licensed Product and, to the extent included in an approved budget for a Global Development Program or otherwise approved by the JSC, costs of process development, CMC activities and scale up of Licensed Product manufacturing; provided, that such costs shall not be included in the transfer price charged pursuant to the Manufacturing Agreement;

(c)    costs of conducting Clinical Trials on Licensed Product including the manufacturing cost of clinical supplies of the Licensed Product, regulatory compliance, quality control, medical affairs, clinical operations and study subject recruitment;

(d)    costs of preparing, submitting, reviewing or developing data or information for the purpose of submission to a Regulatory Authority to obtain approval to commence Clinical Trials or to obtain Regulatory Approval for Licensed Product;

(e)    fees, including FDA user fees, associated with Regulatory Submissions and Regulatory Filings in the United States or the Bayer Territory or other U.S. and foreign governmental requirements related to Licensed Product;

A-3

Source: NUVELO INC, 10-K, March 15, 2006

(f) costs of Third Party licenses under Patents or other intellectual property rights reasonably necessary to develop Licensed Product, but excluding any payments to Amgen Inc. under the Amgen-Nuvelo Agreement; and

(g) such other costs directly related to Development that are included in or contemplated by Development plans or annual Development budgets approved by the JSC;

(h) direct project expenses incurred by third parties being invoiced for services or materials for use in Development of Licensed Products;

(i) Licensed Product related FTEs; and

(j) excludes the Parties' overhead expenses to the extent not included in FTE Costs.

For purposes of calculating a Party's internal Development Expenses, the cost of each Party's FTEs shall be calculated using an FTE rate of $[ * ] for a U.S. based FTE and using an FTE rate of €[ * ] for a Bayer Territory based FTE, which shall include the costs associated with the FTE's compensation, benefits, and all associated support and overhead. Beginning with calendar year 2007, the foregoing FTE rates shall be subject to an annual increase at the beginning of each calendar year by the percentage increase, if any, in the Consumer Price Index for all Urban Consumers for all Items, using index base 1982-84=100 ("CPIU"), as published by the Bureau of Labor Statistics of the United States Department of Labor for the calendar month most recently preceding such calendar year over the CPIU for the same calendar month in the immediately preceding calendar year.

A.18 **"Dollar"** means a United States dollar, and "$" will be interpreted accordingly.

A.19 **"Drug Approval Application"** means an application for Regulatory Approval required before commercial sale or use of a Licensed Product as a drug or to treat a particular indication in a regulatory jurisdiction, including without limitation: (a) (i) a Biologics License Application (BLA) pursuant to 21 C.F.R. 601.2, submitted to the FDA, or any successor application or procedure and (ii) any counterpart of a U.S. BLA in another country in the Bayer Territory; and (b) all supplements and amendments, including supplemental BLAs (and any foreign counterparts), that may be filed (e.g., to expand the label) with respect to the foregoing.

A.20 **"Expert"** means a mutually acceptable, disinterested, conflict-of-interest-free individual not affiliated or consulting with either Party with such scientific, technical and regulatory experience with respect to the development of thrombolytic products as is necessary to resolve a dispute. The Expert shall not be or have been at any time an Affiliate, employee, consultant, officer or director of either Party or any of its respective Affiliates.

A.21 **"Expert Matter"** means any matter that is referred for resolution to an Expert by mutual agreement of the Parties.

A.22 **"FDA"** means the United States Food and Drug Administration, or any successor thereto.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Source: NUVELO INC, 10-K, March 15, 2006

A.23 **"FTE"** means the equivalent of one person working full time for one 12-month period in a Development, regulatory or other relevant capacity, approximating [ * ] hours per year. For clarity, however, a single U.S. based individual who works more than [ * ] hours in a single year shall be treated as one FTE regardless of how many hours in excess of [ * ] hours he or she works in the year. For a Bayer Territory based individual, the number of hours worked in a single year to be considered as one FTE will be mutually agreed on by the Parties.

A.24 **"Field Force"** means pharmaceutical sales representatives and medical science liaisons or their equivalents.

A.25 **"First Commercial Sale"** means, on a country-by-country basis in the Bayer Territory, the initial transfer by Bayer or its Affiliates or Sublicensees under this Agreement of a Licensed Product to a non-Sublicensee Third Party in exchange for cash or some equivalent to which value can be assigned for the purpose of determining Net Sales, following Regulatory Approval to market such Licensed Product in a country.

A.26 **"Force Majeure"** means any occurrence beyond the reasonable control of a Party that prevents or substantially interferes with the performance by such Party of any of its obligations hereunder, if such occurs by reason of any act of God, flood, fire, explosion, earthquake, breakdown of plant, shortage of critical equipment, loss or unavailability of manufacturing facilities or material, strike, lockout, labor dispute, casualty or accident, or war, revolution, civil commotion, acts of public enemies, blockage or embargo, or any injunction, law, order, proclamation, regulation, ordinance, demand or requirement of any government or of any subdivision, authority or representative of any such government, inability to procure or use materials, labor, equipment, transportation, or energy sufficient to meet manufacturing needs without the necessity of allocation, or any other cause whatsoever, whether similar or dissimilar to those above enumerated, beyond the reasonable control of such Party, if and only if the Party affected will have used reasonable efforts to avoid such occurrence and to remedy it promptly if it will have occurred.

A.27 **"GAAP"** means United States generally accepted accounting principles.

A.28 **"Global Development Programs"** means (a) with respect to the acute peripheral arterial occlusion and catheter occlusion indications, those Clinical Trials relating to Licensed Product sponsored by Nuvelo that are in progress but not complete as of the Effective Date, including HA-004, HA-005, HA-006, HA-007, and HA-008 and (b) with respect to stroke, deep vein thrombosis, or any other indications approved by the JSC, those Clinical Trials recommended by the JDC and approved by the JSC that are part of an integrated clinical development program whose primary goal is to generate data that the Parties anticipate at the time of trial design to be required to obtain Regulatory Approval of Licensed Product in the United States, the Major Countries, Canada and Japan. "Global Development Programs" also includes such CMC activities, manufacturing process development and manufacture of clinical supplies of Licensed Product as are approved by the JSC. Global Development Programs may be conducted entirely or partially within the United States, or completely within the Bayer Territory. "Global Development Programs" excludes pricing studies and studies conducted for formulary approval.

---

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Source: NUVELO INC, 10-K, March 15, 2006

A.29 **"IND"** means an Investigational New Drug application or its equivalent outside the United States.

A.30 **"Information"** means all tangible and intangible techniques, technology, practices, trade secrets, inventions (whether patentable or not), methods, knowledge, know-how, conclusions, skill, experience, test data and results (including pharmacological, toxicological and clinical test data and results), analytical and quality control data, results or descriptions, software and algorithms.

A.31 **"Initiation"** means the administration of Licensed Product to the first patient in a Global Development Program or a Country Specific Trial.

A.32 **"Joint Know-How"** means Information and Materials characterized, conceived, developed, derived, generated or identified jointly by employees of or consultants to Bayer and employees of or consultants to Nuvelo from the Effective Date through the Term.

A.33 **"Joint Patent Rights"** means all Patent Rights that claim or disclose Joint Know-How.

A.34 **"Knowledge"** means a Party's and its Affiliates' understanding in good faith of the relevant facts and information after due inquiry and reasonable investigation, resulting from the reasonable conduct of its business affairs, but without the requirement of performing an investigation with respect to any such facts and information by reason of the execution of this Agreement. Needs additional detail

A.35 **"Licensed Product"** means Alfimeprase formulated for administration in humans.

A.36 **"Losses"** means liabilities, costs, fees, expenses and/or losses, including without limitation reasonable legal costs and expenses and attorneys' fees for outside counsel.

A.37 **"Major Country"** means France, Germany, Italy, United Kingdom or Spain.

A.38 **"Materials"** means biological materials including, but not limited to, Licensed Product, screens, animal models, cell lines, cells, nucleic acids, receptors and reagents.

A.39 **"Net Sales"** means all revenues recognized in accordance with GAAP from the sale or other disposition of Licensed Product by Bayer or its Affiliates or Sublicensees to a non-Sublicensee Third Party after deducting returns and allowances (actually paid or allowed) including, but not limited to, prompt payment and volume discounts, price reductions, including government reimbursement programs in the Bayer Territory similar to Medicare and Medicaid and similar types of rebates, chargebacks from wholesalers of Licensed Product (whether in cash or trade), and rebates, when included in gross sales, but not including taxes when assessed on income derived from such sales. Amounts received by Bayer or its Affiliates for the sale of Licensed Product among Bayer or its Affiliates for resale or for transfer of Licensed Product to a Sublicensee for resale will not be included in the computation of Net Sales hereunder.

A-6

Source: NUVELO INC, 10-K, March 15, 2006

Solely for the purpose of calculating Net Sales of Licensed Products, if Bayer or its Affiliate or Sublicensee sells such Licensed Products in the form of a combination product containing any Licensed Product and one or more active ingredients or a delivery device (whether combined in a single formulation or package, as applicable, or formulated or packaged separately but sold together for a single price) (a "Combination Product"), Net Sales of such Combination Product for the purpose of determining the Royalty due to Nuvelo pursuant to this Agreement will be calculated by multiplying actual Net Sales of such Combination Product as determined in the first paragraph of this definition of "Net Sales" by the fraction A/(A+B) where A is the invoice price of such Licensed Product if sold separately, and B is the total invoice price of the other active ingredient(s) or the delivery device in the combination if sold separately. If, on a country-by-country basis, such other active ingredient or ingredients or delivery device in the Combination Product are not sold separately in such country, but the Licensed Product component of the Combination Product is sold separately in such country, Net Sales for the purpose of determining royalties due to Nuvelo pursuant to this Agreement for the Combination Product shall be calculated by multiplying actual Net Sales of the Combination Product by the fraction A/C where A is the invoice price of the Licensed Product component if sold separately, and C is the invoice price of the Combination Product. If, on a country-by-country basis, the Licensed Product component is not sold separately in that country, Net Sales for the purposes of determining royalties due to Nuvelo pursuant to this Agreement for the Combination Product shall be D/(D+E) where D is the fair market value of the portion of the Combination Products that contains the Licensed Product and E is the fair market value of the portion of the Combination Products containing the other active ingredient(s) or delivery device included in such Combination Product as such fair market values are determined by mutual agreement of the Parties.

A.40 **"Non-Conformance"** shall mean the failure of the Licensed Product to conform to specifications for the Licensed Product as set forth in the Manufacturing Agreement or as otherwise agreed upon in writing by the Parties.

A.41 **"Nuvelo Know-How"** means all Information and Materials Controlled by Nuvelo prior to or during the Term necessary or useful for the Development or Commercialization of Licensed Product, including but not limited to the following information: (1) information disclosed in the IND for Alfimeprase as of the Effective Date; (2) information disclosed as of the Effective Date in any IND supplements for Alfimeprase; (3) all Nuvelo-sponsored collaborator data and results (subject to any contractual confidentiality obligations of Nuvelo to Third Parties regarding such results), (4) any regulatory data which Nuvelo provides to Bayer; and (5) such information which Nuvelo expressly designates in writing it intends to include as Nuvelo Know-How under this Agreement. Nuvelo Know-How does not include Nuvelo Material and Manufacturing Information.

A.42 **"Nuvelo Material and Manufacturing Information"** means the most current version of (i) the Materials (other than Licensed Product); and (ii) Information pertaining to the manufacture of Licensed Product including, without limitation, Information contained in the CMC section of any applicable Regulatory Filings or Information regarding Nuvelo's manufacturing facility.

A-7

Source: NUVELO INC, 10-K, March 15, 2006

A.43 **"Nuvelo Patent Rights"** means Nuvelo's rights in those Patent Rights Controlled by Nuvelo during the term of this Agreement that would, but for the licenses granted by Nuvelo to Bayer under this Agreement, be directly or contributorily infringed by the manufacture, use or sale of Licensed Product. Nuvelo Patent Rights shall include, without limitation, Nuvelo's rights in those Patent Rights Controlled by Nuvelo on the Effective Date with respect to the Licensed Product and listed in Exhibit C.

A.44 **"Nuvelo Technology"** means all Nuvelo Patent Rights and Nuvelo Know-How and Nuvelo's interest in the Joint Patent Rights and Joint Know-How.

A.45 **"Nuvelo Territory"** means the United States (as defined below).

A.46 **"Patent Rights"** means (i) a pending application for a patent, including without limitation any provisional, converted provisional, continued prosecution application, continuation, continuation, divisional or continuation-in-part thereof; or (ii) an issued, unexpired patent (with the term "patent" being deemed to encompass, without limitation, an inventor's certificate) which has not been held invalid or unenforceable by a court of competent jurisdiction from which no appeal can be taken or has been taken within the required time period, including without limitation any substitution, extension, registration, confirmation, reissue, re-examination, renewal or any like filing thereof.

A.47 **"Phase 1 Clinical Trial(s)"** means those clinical trials conducted in patients or normal volunteers and designed to determine the metabolism and pharmacologic actions of Licensed Product in humans, the side effects associated with Licensed Product, early evidence on effectiveness, structure-activity relationships, or mechanism of action in humans, and that satisfy the requirements of 21 CFR 312.21(a) (or its successor regulation) or the equivalent thereof in any jurisdiction outside the United States.

A.48 **"Phase 2 Clinical Trial(s)"** means those clinical trials that are designed to establish the safety and preliminary efficacy of Licensed Product for its intended use, and to define warnings, precautions, and adverse reactions that are associated with the drug in the dosage range to be prescribed and that satisfy the requirements of 21 CFR 312.21(b) (or its successor regulation) or the equivalent thereof in any jurisdiction outside the United States.

A.49 **"Phase 3 Clinical Trial(s)"** means those clinical trial(s) that satisfy the provisions of 21 CFR 321.21(c) and any successor regulation, or the equivalent thereof in any jurisdiction outside the United States, and are designed to gather additional evidence of safety and efficacy of Licensed Product to support Regulatory Approval and to evaluate the overall risks and benefits of a Licensed Product.

A.50 **"Phase 4 Clinical Trial(s)"** means those clinical trial(s), conducted pre-or post-launch of a Licensed Product that may be required for approval or maintenance of a Drug Approval Application or that may be conducted by discretion. "Phase 4 Clinical Trials" may include safety or surveillance studies, pharmacoeconomic studies, pharmacoepidemiology studies or investigator sponsored studies.

A-8

Source: NUVELO INC, 10-K, March 15, 2006

A.51 **"Product Liability Claim"** means any Third Party claim, suit, action or demand that arises as a result of use of the Licensed Product during the Term that results in personal injury or death.

A.52 **"Product Trademark"** means any trademarks and trade names (and trademark applications (whether or not registered) together with all goodwill associated therewith, and any renewals, extensions or modifications thereto), trade dress and packaging which (a) are owned by or Controlled by either Party and (b) are applied to or used with Licensed Product or any Promotional Materials.

A.53 **"Promotional Materials"** means all sales representative training materials and all written, printed, graphic, electronic, audio or video matter including, but not limited to, journal advertisements, sales visual aids, direct mail, direct-to-consumer advertising, Internet postings, broadcast advertisements, and sales reminder aids (e.g., scratch pads, pens and other such items) intended for use or used by a Party in connection with any promotion of Licensed Product, except for (i) the Regulatory Authority-approved full prescribing information for a Licensed Product, including any required patient information and (ii) all labels and other written, printed or graphic matter upon any container, wrapper, or any package insert or outsert utilized with or for a Licensed Product.

A.54 **"Recall"** means an event, incident or circumstance that may result in the need for a "recall" or "market withdrawal" (as those terms are defined in U.S. regulations in 21 C.F.R. 7.3 or other similar national, state or local law or regulations) or field alert or field correction of Licensed Product or any lot thereof.

A.55 **"Regulatory Approval"** means any approvals (including supplements, amendments, pre- and post-approvals, reimbursement approval and price approvals), licenses, registrations or authorizations of any national, supra-national, regional, state or local regulatory agency, department, bureau, commission, council or other governmental entity, including the FDA or equivalent foreign Regulatory Authorities, necessary for the distribution, use or sale of Licensed Product in a regulatory jurisdiction. Regulatory Approval does not include any site license for a Nuvelo manufacturing facility.

A.56 **"Regulatory Authority"** means the FDA or any foreign counterpart of the FDA.

A.57 **"Regulatory Filings"** means collectively, Indus, establishment license applications (ELAs) and drug master files (DMFs), applications for designation of a Licensed Product as an "Orphan Product" under the Orphan Drug Act, or any other similar filings (including any foreign equivalents and further including any related correspondence and discussions), and all data contained therein, as may be required by the FDA or equivalent foreign Regulatory Authorities for the Development, manufacture or Commercialization of a Licensed Product.

A.58 **"Royalty"** or **"Royalties"** means those amounts payable as royalties by Bayer to Nuvelo pursuant to Section 8.3 of this Agreement.

A.59 **"Sublicensee"** means a Third Party to whom Bayer will have granted a license or sublicense under Bayer's rights pursuant to Section 2.4 to sell, offer for sale, or import Licensed

<center>A-9</center>

Source: NUVELO INC, 10-K, March 15, 2006

Product in one or more Sublicense Countries. Solely for the purpose of any compensation payable to Nuvelo hereunder, "Sublicensee" will include a Third Party to whom Bayer or another Sublicensee will have granted the right to distribute Licensed Product wherein such distributor pays to Bayer or such other Sublicensee a royalty based upon the revenues received by the distributor for the sale of Licensed Product, but will not include (i) any Third Party who receives an implied license to use a unit of Licensed Product arising by operation of law, as a consequence of the purchase of said unit of Licensed Product or (ii) any Third Party where Bayer or another Sublicensee sells Licensed Product at a fixed transfer price to such distributor for resale by such distributor and Bayer is not compensated based on the resale price of such Licensed Product by such distributor.

A.60 "**Sublicense Countries**" means all countries in the Bayer Territory other than those countries in the European Community, Australia, Canada, Japan and the People's Republic of China.

A.61 "**Term**" has the meaning set forth in Section 15.1.

A.62 "**Territory**" means, collectively, the Bayer Territory and the Nuvelo Territory.

A.63 "**Third Party**" means any individual, or entity other than Nuvelo or Bayer or an Affiliate of either of them.

A.64 "**Third Party Payment**" means all upfront payments, milestone payments, license fees, royalties or other payments, payable to any Third Party under any Third Party Agreement, other than the Amgen-Nuvelo Agreement, deemed necessary by Bayer to use, sell, offer to sell, and import, export or otherwise transfer physical possession of or otherwise transfer title in Licensed Product.

A.65 "**Trademark**" means any and all corporate names, trade names, service marks, logos or trademarks and trademark applications (whether or not registered) together with all good will associated therewith, and any renewals, extensions or modifications thereto either filed or used.

A.66 "**United States**" or "US" means the United States of America, together with its territories and possessions.

A.67 "**US Drug Laws**" means all United States federal and state laws, rules and regulations applicable to the manufacture, use, sale, and promotion of pharmaceutical products for human use in the United States, including without limitation the United States Food, Drug and Cosmetics Act and all rules regulations promulgated thereunder.

A.68 "**Valid Claim**" means (i) an unexpired claim of an issued patent within the Nuvelo Patent Rights and Joint Patent Rights that has not been found to be unpatentable, invalid or unenforceable by a court or other authority in the country of the patent, from which decision no appeal is taken or can be taken; or (ii) a claim of a pending application within the Nuvelo Patent Rights and Joint Patent Rights, wherein such pending application claims a first priority no more than ten (10) years prior to the date upon which pendency is determined.

A-10

Source: NUVELO INC, 10-K, March 15, 2006

EXHIBIT B

PROTEIN SEQUENCE OF ALFIMEPRASE

RN    259074-76-5 ZREGISTRY

CN    3-203-Fibrolase [3-serine] (Agkistrodon contortrix contortrix recombinant) (9CI) (CA INDEX NAME)

FS    PROTEIN SEQUENCE

SQL    201

NTE

| type | location | | | | description |
|------|----------|--|--|--|-------------|
| bridge | Cys-116 | | | - Cys-196 | disulfide bridge |
| bridge | Cys-156 | | | - Cys-180 | disulfide bridge |
| bridge | Cys-158 | | | - Cys-163 | disulfide bridge |

| SEQ | 1 | SFPQRYVQLV | VADHRMNTK | YNGDSDKIRQ | WVHQIVHTIN | EIYRPLNIQF |
|-----|-----|-----|-----|-----|-----|-----|
| | 51 | TLVGLEIWSN | QDLITVTSVS | HDTLASFGNW | RETDLLRRQR | HDNAQLLTAI |
| | 101 | DFDGDTVGLA | YVGGMCQLKH | STGVIQDHSA | INLLVALTMA | HELGHNLGMN |
| | 151 | HDGNQCHCGA | NSCVMAAMLS | DQPSKLFSDC | SKKDYQTFLT | VNNPQCILNK |
| | 201 | P | | | | |

SEQ3    1   Ser-Phe-Pro-Gln-Arg-Tyr-Val-Gln-Leu-Val-
       11   Ile-Val-Ala-Asp-His-Arg-Met-Asn-Thr-Lys-
       21   Tyr-Asn-Gly-Asp-Ser-Asp-Lys-Ile-Arg-Gln-
       31   Trp-Val-His-Gln-Ile-Val-Asn-Thr-IIE-Asn-
       41   Glu-Ile-Tyr-Arg-Pro-Leu-Asn-Ile-Gln-Phe-
       51   Thr-Leu-Val-Gly-Leu-Glu-Ile-Trp-Ser-Asn-
       61   Gln-Asp-Leu-Ile-Thr-Val-Thr-Ser-Val-Ser-
       71   His-Asp-Thr-Leu-Ala-Ser-Phe-Gly-Asn-Trp-
       81   Arg-Glu-Thr-Asp-Leu-Leu-Arg-Arg-Gln-Arg-
       91   His-Asp-Asn-Ala-Gln-Leu-Leu-Thr-Ala-Ile-
      101   Asp-Phe-Asp-Gly-Asp-Thr-Val-Gly-Leu-Ala-
      111   Tyr-Val-Gly-Gly-Met-Cys-Gln-Leu-Lys-His-
      121   Ser-Thr-Gly-Val-Ile-Gln-Asp-His-Ser-Ala-
      131   Ile-Asn-Leu-Leu-Val-Ala-Leu-Thr-Met-Ala-
      141   His-Glu-Leu-Gly-His-Asn-Leu-Gly-Met-Asn-
      151   His-Asp-Gly-Asn-Gln-Cys-His-Cys-Gly-Ala-
      161   Asn-Ser-Cys-Val-Met-Ala-Ala-Met-Leu-Ser-
      171   Asp-Gln-Pro-Ser-Lys-Leu-Phe-Ser-Asp-Cys-
      181   Ser-Lys-Lys-Asp-Tyr-Gln-Thr-Phe-Leu-Thr-
      191   Val-Asn-Asn-Pro-Gln-Cys-Ile-Leu-Asn-Lys-
      201   Pro

B-1

Source: NUVELO INC, 10-K, March 15, 2006