# Exhibit J



# FORM 10-Q

## NUVELO INC - NUVO

**Filed: May 09, 2006 (period: March 31, 2006)**

Quarterly report which provides a continuing view of a company's financial position

## Part I

Financial Information
**Item 1.**    Condensed Consolidated Financial Statements (unaudited) 3

## PART I.

FINANCIAL INFORMATION
**ITEM 1.**    CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
**ITEM 2.**    MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS
**ITEM 3.**    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
**ITEM 4.**    CONTROLS AND PROCEDURES

## PART II.

OTHER INFORMATION
**ITEM 1.**    LEGAL PROCEEDINGS
**ITEM 1A.** RISK FACTORS
**ITEM 2.**    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS
**ITEM 3.**    DEFAULTS UPON SENIOR SECURITIES
**ITEM 4.**    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
**ITEM 5.**    OTHER INFORMATION
**ITEM 6.**    EXHIBITS
SIGNATURE
EXHIBIT INDEX
EX-31.1 (SECTION 302 CEO CERTIFICATION)

EX-31.2 (SECTION 302 CFO CERTIFICATION)

EX-32.1 (SECTION 906 CEO AND CFO CERTIFICATION)

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

**(Mark One)**

☒ QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2006

OR

☐ TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM_____ TO _____

Commission File Number 000-22873

# NUVELO, INC.
### (Exact Name of Registrant as Specified in Its Charter)

| DELAWARE | 36-3855489 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

201 INDUSTRIAL ROAD, SUITE 310, SAN CARLOS, CA 94070-6211
(Address of Principal Executive Offices, including Zip Code)

650-517-8000
(Registrant's Telephone Number, including Area Code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Sections 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer ☐    Accelerated Filer ☒    Non-accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Number of Shares Outstanding |
|---|---|
| Common Stock $0.001 par value | On April 30, 2006: 51,803,771 |

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

NUVELO, INC.

FORM 10-Q

FOR THE QUARTER ENDED MARCH 31, 2006

TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| Part I | Financial Information | | |
| | Item 1. Condensed Consolidated Financial Statements (unaudited) | | |
| | Condensed Consolidated Balance Sheets as of March 31, 2006 and December 31, 2005 | | 3 |
| | Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2006 and 2005 | | 3 |
| | Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2006 and 2005 | | 4 |
| | Notes to Condensed Consolidated Financial Statements | | 5 |
| | Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | | 6 |
| | Item 3. Quantitative and Qualitative Disclosures about Market Risk | | 13 |
| | Item 4. Controls and Procedures | | 20 |
| | | | 20 |
| Part II | Other Information | | |
| | Item 1. Legal Proceedings | | |
| | Item 1A. Risk Factors | | 21 |
| | Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | | 21 |
| | Item 3. Defaults Upon Senior Securities | | 37 |
| | Item 4. Submission of Matters to a Vote of Security Holders | | 37 |
| | Item 5. Other Information | | 37 |
| | Item 6. Exhibits | | 37 |
| Signature | | | 37 |
| | | | 39 |

2

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

PART I. FINANCIAL INFORMATION

ITEM 1. CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

NUVELO, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(unaudited)

| | March 31, 2006 | December 31, 2005 |
|---|---|---|
| | (In thousands, except share data) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 166,010 | $ 37,764 |
| Short-term investments | 34,264 | 32,572 |
| Accounts receivable | 59 | 72 |
| Clinical trial supplies | 14,572 | 12,261 |
| Other current assets | 10,699 | 3,096 |
| **Total current assets** | 225,604 | 85,765 |
| Equipment, leasehold improvements and capitalized software, at cost | 30,219 | 29,615 |
| Accumulated depreciation and amortization | (15,208) | (14,450) |
| Equipment, leasehold improvements and capitalized software, net | 15,011 | 15,165 |
| Goodwill | 4,671 | 4,671 |
| Patents, licenses and other assets, net | 2,806 | 2,445 |
| **Total assets** | $ 248,092 | $ 108,046 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Accounts payable | $ 3,578 | $ 4,919 |
| Accrued employee liabilities | 1,482 | 2,272 |
| Accrued clinical trial and drug manufacturing costs | 3,754 | 4,482 |
| Current portion of deferred revenue | 3,640 | 250 |
| Current portion of deferred rent | 12,650 | 17,105 |
| Accrued interest | 3,264 | 3,092 |
| Current portion of bank loans | 1,540 | 1,540 |
| Notes payable | 4,000 | 4,000 |
| Current portion of capital lease obligations | 29 | 9 |
| Current portion of related party line of credit | 2,750 | 2,750 |
| Other current liabilities | 4,798 | 2,933 |
| **Total current liabilities** | 41,485 | 43,352 |
| Non-current portion of deferred revenue | 47,263 | 1,563 |
| Non-current portion of deferred rent | 2,346 | 2,224 |
| Non-current portion of bank loans | 1,107 | 1,492 |
| Non-current portion of capital lease obligations | 86 | 13 |
| Non-current portion of related party line of credit | 1,604 | 2,292 |
| Other non-current liabilities | 353 | 346 |
| **Total liabilities** | 94,244 | 51,282 |
| Stockholders' equity: | | |
| Preferred stock, par value $0.001; 5,000,000 shares authorized; none issued and outstanding as of March 31, 2006 and December 31, 2005 | — | — |
| Common stock, par value $0.001; 100,000,000 shares authorized; 51,801,087 and 44,149,456 issued and outstanding as of March 31, 2006 and December 31, 2005, respectively | 52 | 44 |
| Additional paid-in capital | 501,284 | 384,629 |
| Accumulated other comprehensive loss | (178) | (250) |
| Accumulated deficit | (347,310) | (327,659) |
| **Total stockholders' equity** | 153,848 | 56,764 |
| **Total liabilities and stockholders' equity** | $ 248,092 | $ 108,046 |

See accompanying notes to condensed consolidated financial statements.

3

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

**NUVELO, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (In thousands, except per share data) | |
| Contract revenue | $ 1,065 | $ 42 |
| Operating expenses: | | |
| Research and development | 12,099 | 11,057 |
| General and administrative | 10,208 | 3,813 |
| Loss (gain) on sale or disposal of assets | (7) | 24 |
| Total operating expenses | 22,300 | 14,894 |
| Operating loss | (21,235) | (14,852) |
| Interest expense — related party | (97) | (118) |
| Interest expense — other | (132) | (147) |
| Interest income | 1,813 | 457 |
| Other income (expense), net | — | (2) |
| Net loss | $ (19,651) | $ (14,662) |
| Basic and diluted net loss per share | $ (0.40) | $ (0.39) |
| Weighted average shares used in computing basic and diluted net loss per share | 48,913 | 37,960 |

See accompanying notes to condensed consolidated financial statements.

4

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

**NUVELO, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(unaudited)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (In thousands) | |
| Cash flows from operating activities: | | |
| Net loss | $(19,651) | $(14,662) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 772 | 734 |
| Loss (gain) on disposal of assets | (7) | 24 |
| Stock compensation expense | 3,264 | 308 |
| Change in fair value of warrant | 2,877 | |
| Other non-cash items | (15) | |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 13 | 235 |
| Clinical trial supplies | (2,315) | 1,102 |
| Other current assets | (7,603) | (551) |
| Other non-current assets | (365) | (52) |
| Accounts payable | (1,341) | (1,039) |
| Accrued employee liabilities | (790) | (518) |
| Accrued clinical trial and drug manufacturing costs | (728) | 573 |
| Deferred revenue | 49,090 | — |
| Deferred rent | (4,333) | 1,386 |
| Accrued interest | 172 | 194 |
| Other current liabilities | (948) | (93) |
| Net cash provided by (used in) operating activities | 18,092 | (12,359) |
| Cash flows from investing activities: | | |
| Sales or maturities of short-term investments | 16,878 | 10,206 |
| Purchases of short-term investments | (18,543) | (16,087) |
| Purchases of equipment, leasehold improvements and software capitalization | (504) | (56) |
| Proceeds from sale of assets | 7 | — |
| Net cash used in investing activities | (2,162) | (5,937) |
| Cash flows from financing activities: | | |
| Proceeds from bank loans | — | 1,500 |
| Payments on bank loans | (385) | — |
| Payments on capital lease obligations | (10) | (952) |
| Payments on related party line of credit | (688) | (688) |
| Proceeds from issuance of common stock from public offerings, net | 112,010 | 68,524 |
| Proceeds from issuance of common stock upon exercise of options, warrants and under employee stock purchase plan | 1,389 | 69 |
| Net cash provided by financing activities | 112,316 | 68,453 |
| Net increase in cash and cash equivalents | 128,246 | 50,157 |
| Cash and cash equivalents at beginning of period | 37,764 | 16,811 |
| Cash and cash equivalents at end of period | $166,010 | $66,968 |
| Supplemental disclosures of cash flow information: | | |
| Interest paid | $ 50 | $ 83 |
| Income taxes paid | $ 2 | $ 2 |
| Non-cash investing and financing activities: | | |
| Acquisition of leasehold improvements under tenant improvement allowance | $ — | $ 221 |
| Acquisition of property and equipment under capital lease | $ 103 | $ — |
| Capitalization of estimated future building restoration costs | $ 7 | $ 2 |

See accompanying notes to condensed consolidated financial statements.

5

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

NUVELO, INC.
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
March 31, 2006
(Unaudited)

### 1. Basis of Presentation and Significant Accounting Policies

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements have been prepared by Nuvelo, Inc. ("Nuvelo," or the "Company") in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America (GAAP) for complete financial statements. The accompanying financial information is unaudited, but includes all adjustments (consisting of normal recurring adjustments) that the Company considers necessary for a fair presentation of the financial position, operating results and cash flows for the periods presented. The condensed consolidated balance sheet as of December 31, 2005 is derived from the Company's audited financial statements. Certain prior period amounts have been reclassified to conform to the current period's presentation. The results of operations for the interim period shown herein are not necessarily indicative of operating results expected for the entire year.

The unaudited condensed consolidated financial statements include the accounts of Nuvelo, Inc. and Hyseq Diagnostics, Inc., Nuvelo's wholly owned and inactive subsidiary. All significant inter-company transactions and accounts have been eliminated on consolidation. Nuvelo is engaged in the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. The Company's development pipeline includes three acute cardiovascular programs focused on alfimeprase, rNAPc2 and a thrombin inhibiting aptamer, as well as an emerging oncology pipeline.

*Use of Estimates*

Conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and on assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for the judgments made about the carrying values of assets and liabilities that are not readily apparent from other sources. Future results may differ from these estimates. The Company believes significant judgment is involved in evaluating if there continues to be alternative future use or the need for reserves for capitalized clinical drug material, and in estimating goodwill and long-lived asset impairment, clinical trial accruals, stock-based compensation and in determining revenue recognition.

*Liquidity and Concentration Risk*

The Company's primary sources of liquidity are from financing activities and collaboration receipts. The Company plans to continue to raise funds through additional public and/or private offerings and collaboration activities in the future. The primary use of capital has been to fund operating activities, including research, clinical development and drug manufacturing expenses, license payments and spending on capital items.

The Company currently relies on a sole source, Avecia Ltd., for the manufacture of alfimeprase drug substance, and did not have a manufacturing agreement in place for alfimeprase final drug product as of March 31, 2006. If Avecia and a final drug product manufacturer are unable to produce alfimeprase in the quantities and with the quality required, the Company may incur significant additional expenses, and efforts to complete clinical trials and obtain approval to market alfimeprase could be significantly delayed.

*Significant Accounting Policies*

During the interim period, the Company has followed the accounting policies described in its Form 10-K for the fiscal year ended December 31, 2005. Additional detail has been added to the revenue recognition policy as a result of the entry into a license and collaboration agreement with Bayer HealthCare AG (Bayer) during the first quarter of 2006, and the stock-based compensation policy has been updated as a result of the adoption by the Company of Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* on January 1, 2006. The updated policies are detailed hereunder.

**Revenue Recognition**

The Company recognizes revenue in accordance with Staff Accounting Bulletin No. 104, *"Revenue Recognition"* (SAB 104) when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. The Company defers up-front refundable fees and recognizes revenues upon the later of when they become non-refundable or when performance obligations under the related agreement are completed or considered perfunctory or inconsequential. In situations where there are no continuing performance obligations, or continuing obligations are perfunctory or inconsequential, revenue is recognized for up-front non-refundable fees on the effective date of the related agreement. Up-front non-refundable licensing fees that require continuing involvement in the form of development, manufacturing or other commercialization efforts by the Company are recognized as revenue ratably over the term of the related agreement.

If we determine that separate elements do not exist in a revenue arrangement under Emerging Issues Task Force Issue No. 00-21, *"Revenue Arrangements with Multiple Deliverables"* (EITF 00-21), all revenues from up-front licensing fees, milestones and contract manufacturing are recognized ratably over the term of the related agreement until the fair values of all undelivered elements of the arrangement are known. Once the fair values of all undelivered elements are known, the Company immediately recognizes any remaining deferred revenue from previously delivered elements, including milestones. All revenues from this point onwards are recognized when the associated earnings process is complete and when payment is reasonably assured.

6

Table of Contents
**Stock-Based Compensation**

Effective January 1, 2006, the Company adopted the provisions of Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* (SFAS 123(R)). SFAS 123(R) establishes accounting for stock-based awards exchanged for employee services. Accordingly, stock-based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the employee's requisite service period. The Company previously applied Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees"* (APB 25) and related Interpretations and provided the required pro forma disclosures of SFAS No. 123, *"Accounting for Stock-Based Compensation"* (SFAS 123). The Company has elected to adopt the modified prospective application method as provided by SFAS 123(R). Under the modified prospective method, the fair values of new and previously granted but unvested stock options are recognized as compensation expense in the income statement over the related vesting periods, and prior period results are not restated.

The Company has selected the Black-Scholes option–pricing model as the most appropriate fair-value method for its stock-based awards. For options granted prior to January 1, 2006 and valued in accordance with SFAS 123, the Company uses the graded-vested (multiple option) method for expense attribution and prior to January 1, 2006, recognized option forfeitures as they occurred. For options granted after January 1, 2006 and valued in accordance with SFAS 123(R), the Company is using the straight-line (single option) method for expense attribution and now estimates forfeitures and only recognizes expense for those shares expected to vest. See Note 2 for a more detailed discussion of SFAS 123(R).

The Company accounts for compensation expense related to stock options granted to non-employees based on the fair values estimated using the Black-Scholes model on the date of grant and re-measured at each reporting date in compliance with Emerging Issues Task Force Issue No. 96-18 *"Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* The compensation expense is amortized using the straight-line method.

**2. Stock-Based Compensation**

*Stock Plans*

In May 2004, the Company adopted the 2004 Equity Incentive Plan, (2004 Plan), to authorize the grant of stock options (including indexed options), stock appreciation rights, restricted stock purchase rights, restricted stock bonuses, restricted stock units, performance shares, performance units and deferred stock units. The 2004 Plan was amended and restated on May 24, 2005 and again on March 7, 2006. Under the 2004 Plan, all awards may be granted to employees, directors and consultants of the Company, except for incentive stock options, which may be granted only to employees. The 2004 Plan replaces all prior option plans (detailed below), with no new awards to be granted under the prior plans. A total of 7,204,085 common shares were initially reserved for issuance under the 2004 Plan, including up to 2,454,085 shares previously reserved for issuance under prior plans, and as of March 31, 2006 there were 1,131,143 shares reserved for future option grants. For stock options, the 2004 Plan requires that the exercise price of each option may not be less than the fair market value of a share of common stock on the date of grant, and in the case of incentive stock options granted to an owner of more than 10% of the total combined voting power of all classes of the Company's stock (10% Owners), must have an exercise price equal to at least 110% of the fair market value on the date of grant. The maximum term of any option granted under the 2004 Plan is 10 years, provided that incentive stock options granted to 10% Owners must have a term not exceeding 5 years. Options granted to employees generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As of March 31, 2006, 5,326,930 options were outstanding under the 2004 Plan.

In 1995, the Company's stockholders adopted the 1995 Employee Stock Option Plan (Employee Plan). Options granted under the Employee Plan were either incentive stock options or non-statutory stock options. Incentive stock options were granted to employees with exercise prices of not less than fair market value and non-statutory options were granted to employees at exercise prices of not less than par value of the common stock on the date of grant as determined by the Board of Directors. Options vest as determined by the Board of Directors (generally in four equal annual installments commencing one year after the date of grant), and expire 10 years from the date of grant. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of March 31, 2006, options to purchase 393,621 shares were outstanding under the Employee Plan.

In 1997, the Company's stockholders adopted the Non-Employee Director Stock Option Plan (Directors Plan), providing for periodic stock option grants to non-employee directors of the Company. Under the Directors Plan, each new, non-employee director received a one-time grant of options to purchase 7,680 shares of common stock, of which options to purchase 3,840 shares vest immediately, with the balance vesting in two equal allotments on the first and second anniversaries of joining the Board. All non-employee directors automatically received options to purchase up to 1,920 shares each year (such that the amount received under the Directors Plan when added to all prior options granted to a director which vest in that year totaled 1,920) on the date of the annual meeting of the stockholders. Options under the Directors Plan were granted at the fair market value of the Company's common stock on the date of the grant. In 2000, the Company's stockholders approved an amendment to the Directors Plan that changed the method for determining the number of shares granted under the plan, and lengthened the vesting date for the new director's initial and first annual grants of options. Under the amendment, the number of shares granted were equal to the lesser of the number determined by dividing $200,000 by the fair market value of the Company's common stock on the date of grant, or 3,333 shares. The amendment also revised the vesting date for initial options that were granted when a new director joined the Company's Board such that 50% of a new director's option vest one year after the grant date and the other 50% vest two years after the grant date. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of March 31, 2006, options to purchase 75,461 shares were outstanding under the Directors Plan.

In 1999, the Company adopted a Scientific Advisory Board/Consultants Stock Option Plan (SAB/Consultant Plan) that provided for periodic grants of non-qualified stock options to members of the Company's scientific advisory board and allowed the Board of Directors to approve grants of stock options to consultants. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. At March 31, 2006, options to purchase 1,666 shares were outstanding under the SAB/Consultant Plan.

In 2002, the Company adopted the 2002 Equity Incentive Plan (2002 Plan), to grant stock options or make restricted stock awards to employees (including officers or employee directors) and consultants. The 2002 Plan authorized the grant of incentive stock options and restricted stock awards to employees and of non-qualified stock options and restricted stock awards to employees and consultants. The 2002 Plan required that the exercise price of options be not less than the fair value of the common shares at the grant date for those intended to qualify as performance-based compensation and be not less than 110% of the fair value in the case of incentive stock options granted to 10% Owners. Options generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of March 31, 2006, options to purchase 302,293 shares were outstanding under the 2002 Plan.

On January 31, 2003, in connection with the merger of Variagenics, Inc., the Company assumed Variagenics' existing stock option plan, the Amended 1997 Employee, Director and Consultant Stock Option Plan (1997 Plan), by reserving and registering an additional 2,269,666 shares of common stock. The 1997 Plan authorized the grant of incentive and non-qualified stock options to employees, directors and consultants of the Company. Options generally vested ratably over three- to five-year periods. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of March 31, 2006, no options to purchase shares were outstanding under the 1997 Plan.

7

Source: NUVELO INC, 10-Q, May 09, 2006

**Table of Contents**

In 1998, the Company granted options outside of any of the Company's stock option plans to purchase a total of 3,806 shares of common stock to three non-employee directors and a scientific advisory board member at prices between $14.25 and $30.19 per share. The options vest over periods of up to four years. In February 2000, a director who was previously an officer of the Company was granted an option to purchase 333,333 shares of common stock at $95.06 per share, the closing price on the day prior to the grant, as an inducement to become an employee of the Company. This option became exercisable one-third upon the date of grant, one-third on the one-year anniversary and one third on the two-year anniversary of the date of grant. In 2001, the Company granted options outside of any of the Company's stock option plans to purchase a total of 422,720 shares to five employee officers at prices between $29.87 and $37.69 per share as inducements to become employees of the Company. In August 2001, a director of the Company was granted an option to purchase 333,333 shares of common stock at $25.91 per share, the closing price on the day prior to the grant. As of March 31, 2006, 823,539 options issued outside of any of the Company's stock option plans were outstanding.

The Directors Plan, the Employee Plan, the 2002 Plan, the 2004 Plan and the options granted to a director to purchase 666,666 shares (as described above) provide for the acceleration of vesting of options upon certain specified events.

In December 2004, the Company's Board of Directors approved an "Executive Change in Control and Severance Benefit Plan" for executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted previously. The plan provides that, upon a change in control of the Company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause or constructively terminated within one month preceding a change in control. In addition, if a participant is terminated without cause or constructively terminated outside the context of change in control, he or she shall be credited with an additional year of vesting with respect to Nuvelo stock options and stock awards held. If a change in control occurs in the future, it is possible that material additional stock-based compensation expense could be incurred.

The Company maintains an employee stock purchase plan (ESPP), covering an aggregate of 250,000 shares of the Company's common stock. Each quarter, an eligible employee may elect to purchase shares of the Company's stock through payroll deductions at a price equal to the lower of 85% of the fair market value of the stock as of the first business day of the quarter or the last business day. As of March 31, 2006, there were 224,482 shares available for issuance under the ESPP.

***Stock-Based Compensation – Stock Options and ESPP***

Effective January 1, 2006, the Company adopted the provisions of SFAS 123(R), which establishes accounting for stock-based awards exchanged for employee services. Stock-based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the employee's requisite service period. Compensation cost is calculated on the date of grant using the fair value of the award as determined using the Black-Scholes option-pricing model, which requires assumptions to be made for the expected term of the awards, expected volatility of the Company's stock price, risk-free interest rates and expected dividend yields. The Company then amortizes compensation cost for awards expected to vest over the related vesting periods, generally being four years for employee stock options.

For all option grants, the Company considers the contractual term and historical data to estimate future exercises and cancellations, including post-vesting termination behavior, and therefore the expected term of each option. The risk-free interest rate assumptions are based on the yield of U.S. Treasury instruments with similar durations as the expected term of the related awards. The expected dividend yield assumption is based on the Company's historic and expected dividend payouts. For options granted prior to January 1, 2006 and valued in accordance with SFAS 123, the expected volatility was based solely on the historical volatility of the Company's common stock and option pricing model were recognized as they occurred. The graded-vested (multiple option) method continues to be used for expense attribution of these options that were unvested as of January 1, 2006. For options granted after January 1, 2006 and valued in accordance with SFAS 123(R), the Company is using a combination of historic and implied volatility of the Company's common stock to derive expected volatility. Forfeitures are estimated such that the Company only recognizes expense for those shares expected to vest, and adjustments are made if actual forfeitures differ form those estimates. The straight-line (single option) method is being used for expense attribution of all awards granted on or after January 1, 2006.

The fair values of employee stock options granted under the Company's stock option plans during the periods presented were estimated at the date of grant using the Black-Scholes model with the following assumptions:

|  | Three months ended March 31, | |
|  | 2006 | 2005 |
| --- | --- | --- |
| Expected term | 5.41 years | 5.59 years |
| Expected volatility | 0.73 | 0.92 |
| Risk-free interest rate | | |
| Expected dividend yield | 4.55% | 3.91% |

The fair values of purchase rights granted under the Company's ESPP during the periods presented were estimated at the date of grant using the Black-Scholes model with the following assumptions:

|  | Three months ended March 31, | |
|  | 2006 | 2005 |
| --- | --- | --- |
| Expected term | 0.25 years | 0.25 years |
| Expected volatility | 0.81 | 0.39 |
| Risk-free interest rate | | |
| Expected dividend yield | 4.60% | 2.75% |

8

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

The Black-Scholes model requires the input of highly subjective assumptions, including the expected term of the stock-based award and expected stock price volatility. These assumptions listed above involve inherent uncertainties and are based on management's best estimates and judgment. If other assumptions had been used, employee stock-based compensation expense could have been materially different from amounts recorded in the financial statements under SFAS 123(R) and disclosed on a pro forma basis under SFAS 123. In addition, under SFAS 123(R), the Company is required to estimate the expected forfeiture rate of awards and only recognize expense for those awards expected to vest. If the actual forfeiture rate is materially different from the estimate, the stock-based compensation expense could be materially different from amounts recorded in the financial statements.

In the three months ended March 31, 2006, we granted 153,000 options with an estimated fair value of $1.5 million. Stock options granted in the three months ended March 31, 2006 and 2005 had an estimated weighted-average grant date fair value of $10.05 and $6.50, respectively. The estimated weighted-average grant date fair values of the purchase rights granted under the ESPP during the same periods were $5.58 and $1.76 respectively. The total intrinsic value of options exercised for the three months ended March 31, 2006 and 2005 was $1.4 million and $4,000, respectively.

For the three months ended March 31, 2006, the Company recorded $3.1 million of employee stock-based compensation expense related to stock options and ESPP purchase rights, of which $1.3 million and $1.8 million was recorded to research and development expense and general and administrative expense, respectively. Employee stock-based compensation expense of $0.2 million was recognized in the statements of operations for the three months ended March 31, 2005 under APB 25. Stock-based compensation expense related to non-employees was $0.2 million and $0.1 million in the three months ended March 31, 2006 and 2005, respectively. As a result of adopting SFAS 123(R), the Company's net loss for the three months ended March 31, 2006 is $3.0 million higher than if it had continued to account for employee stock-based compensation under APB 25, as it did in the comparable prior year period. Basic and diluted net loss per share for the three months ended March 31, 2006 would have been $0.34 if SFAS 123(R) had not been adopted, compared to reported basic and diluted net loss per share of $0.40. The Company has not recognized, and does not expect to recognize in the near future, any tax benefit related to employee stock based compensation cost as a result of the full valuation allowance on its net deferred tax assets.

A summary of the Company's stock option activity for the three months ended March 31, 2006, and related information as of the period end, is as follows:

| | Three Months Ended March 31, 2006 | | | |
|---|---|---|---|---|
| | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value as of March 31, 2006 (In thousands) |
| Options outstanding at beginning of period | 7,013,523 | $ 15.11 | | |
| Options granted | 153,000 | $ 14.87 | | |
| Options exercised | (157,713) | $ 7.92 | | |
| Options forfeited | (82,911) | $ 8.46 | | |
| Options expired | (2,389) | $ 27.17 | | |
| Options outstanding at end of period | 6,923,510 | $ 15.35 | | |
| Options vested or expected to vest | 6,923,510 | $ 15.35 | 8.09 | $ 51,042 |
| Options exercisable at end of period | 3,139,736 | $ 22.65 | 7.08 | $ 19,579 |

The following table summarizes information about stock options outstanding and exercisable as of March 31, 2006:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number of Shares | Weighted-Average Remaining Contractual Term | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
| $ 2.34 – $ 6.63 | 779,404 | 7.57 | $ 5.79 | 594,839 | $ 5.80 |
| 6.73 – 8.41 | 721,052 | 9.03 | 7.67 | 206,210 | 7.41 |
| 8.42 – 8.96 | 293,333 | 9.13 | 8.63 | 51,094 | 8.74 |
| 9.04 – 9.17 | 1,586,376 | 9.33 | 9.16 | 231,858 | 9.16 |
| 9.21 – 9.67 | 718,749 | 8.33 | 9.53 | 412,994 | 9.57 |
| 9.75 – 9.91 | 733,488 | 8.72 | 9.83 | 200,850 | 9.84 |
| 9.99 – 10.14 | 87,500 | 8.93 | 10.07 | 19,208 | 10.05 |
| 10.18 – 10.18 | 699,586 | 8.10 | 10.18 | 312,140 | 10.18 |
| 10.19 – 29.87 | 732,704 | 6.65 | 20.79 | 539,225 | 22.99 |
| 31.16 – 285.56 | 571,318 | 4.28 | 73.27 | 571,318 | 73.27 |
| 2.34 – 285.56 | 6,923,510 | 8.09 | $ 15.35 | 3,139,736 | $ 22.65 |

The fair value of options vested in the three months ended March 31, 2006 and 2005 was $2.7 million and $2.6 million, respectively. The unamortized compensation expense related to unvested options as of March 31, 2006, excluding estimated forfeitures, was $16.6 million. The weighted-average period over which compensation expense related to these options is expected to be recognized is 1.52 years.

9

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

The following table illustrates the pro forma effect under SFAS 123 of options and ESPP purchase rights granted on the Company's net loss and net loss per share in the three months ended March 31, 2005, net of related tax effects (in thousands, except for per share data):

| | Three Months Ended March 31, 2005 |
|---|---|
| Net loss, as reported | |
| Add: Stock-based employee compensation expense included in reported net loss | $ (14,662) |
| Deduct: Total stock-based employee compensation expense determined under fair value-based method for all awards | 178 |
| Pro forma net loss | (2,908) |
| Basic and diluted loss per share: | $ (17,392) |
| Total basic and diluted net loss per share, as reported | |
| Pro forma basic and diluted net loss per share | $ (0.39) |
| | $ (0.46) |

## 3. Comprehensive Loss

The components of comprehensive loss for each period presented, net of any related tax effects, are as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2006 | 2005 |
| Net loss, as reported | $ (19,651) | $ (14,662) |
| Unrealized gain on hedging instruments | 45 | — |
| Unrealized gain on available-for-sale securities | 27 | 29 |
| Comprehensive loss | $ (19,579) | $ (14,633) |

## 4. Borrowing Arrangements

In August 2004, the Company entered into a Loan and Security Agreement (Loan Agreement), with Silicon Valley Bank (SVB) that originally provided a $6.0 million term loan facility and a $4.0 million revolving credit line, and grants SVB a security interest over certain of the Company's assets, excluding intellectual property. The Loan Agreement contains certain covenants and reporting requirements, with which the Company was in compliance as of March 31, 2006. Proceeds may be used solely for working capital or other general business needs.

In December 2004, the Company completed a $2.6 million initial draw-down and in March 2005 completed a $1.5 million second draw-down from this facility. On June 30, 2005, the remaining $1.9 million of the facility expired unused. The $2.6 million draw-down is being repaid in 30 equal monthly installments, plus accrued interest of 6.43% per annum, starting from May 1, 2005. The $1.5 million draw-down is being repaid in 36 equal monthly installments, plus accrued interest of 6.78% per annum, starting from April 1, 2005.

In July 2005, the Loan Agreement was amended to increase the revolving credit line facility from $4.0 million to $8.0 million and to extend the facility through August 29, 2006. As of March 31, 2006, the Company has yet to draw-down any of the funds available under this revolving credit line. Of the $8.0 million total facility, $6.0 million is currently being reserved to collateralize a letter of credit issued to The Irvine Company related to the lease for the facility at 985 Almanor Avenue in Sunnyvale, California, and the remaining $2.0 million is being reserved in part as collateral for foreign exchange hedging contracts with SVB (see Note 8), with the remainder being available for working capital or other general business needs. Any borrowings under this line shall bear interest at SVB's prime rate, being 7.75% as of March 31, 2006, and would cause replacement collateral to be required for the items above.

10

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

## 5. Facilities Lease Agreement

In January 2005, the Company entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for 61,826 square feet of industrial space at 201 Industrial Road in San Carlos, California at $2.35 per square foot per month, subject to annual increases of $0.07 per square foot per month. The lease commenced on September 1, 2005 and contains an option to cancel the lease after five years upon payment of certain amounts specified in the lease, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), rights of first refusal over all vacant space in the building during the first two years of the lease, and an expansion option for a specified amount of space. The lease contains a tenant improvement allowance of $8.9 million, which was fully utilized in 2005, and has been recorded to leasehold improvements and deferred rent, with the respective balances being charged to depreciation and credited to rent expense over the lease term. In the event of the Company's default under the lease, the landlord has the right to recover any damages to compensate for such default. On March 10, 2006, the lease on this property was amended to provide for the exercise of the Company's expansion option over 7,624 square feet of rentable space. The amendment allows for a tenant improvement allowance of $1.0 million, and the related lease rental payments are expected to commence in the third quarter of 2006.

As a result of the entry into the above lease, a review for impairment of leasehold improvements at 985 Almanor Avenue in Sunnyvale, California took place in January 2005. As identifiable cash flows related to these assets are not independent of those of the Company as a whole, these assets were grouped with all the assets and liabilities of the Company for the purposes of the impairment review, and as a result, no impairment of these assets was identified, as the fair value of the net assets of the Company exceeds its carrying value. In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets,"* if the Company subleases or otherwise exits this facility, an impairment charge will be recorded based on the difference between the carrying value and fair value of the leasehold improvements at the time of the sublease or exit. The Company has estimated that it will incur future restoration costs for the premises at 985 Almanor Avenue with a current fair value of $0.4 million. Under Statement of Financial Accounting Standards No. 143, *"Accounting for Asset Retirement Obligations,"* this amount has been recorded as an increase to both leasehold improvements and other non-current liabilities in the balance sheet. Depreciation and interest accretion expense charged during the quarter was immaterial.

In August 2002, the lease on the property at 985 Almanor Avenue was amended to provide for a rent deferral of $4.9 million over the subsequent three years, retroactive to June 1, 2002. The Company is currently repaying the deferred rent liability, plus interest, over a four-year period beginning June 1, 2005 in equal monthly installments of $0.1 million. In October 2003, the lease was further amended, to provide for an additional rent deferral of $2.9 million, to be repaid on May 30, 2011, the end of the lease term. In order to receive this rent deferral, the Company agreed to pre-pay $2.7 million of base rental payments in October 2003 to cover the nine-month period beginning October 1, 2003 and ending June 30, 2004, with no base rent being due for the period July 1, 2004 through March 30, 2005, and agreed to the early reinstatement of the original rental rates if the Company successfully raised $75.0 million in a single public or private offering, with the remaining amount of rent deferred under both lease amendments up to that date becoming due immediately. In September 2005, a third amendment to the lease was entered into to provide that if the Company raises $75.0 million or more in cash as a result of a single public or private offering, The Irvine Company will be paid the lesser of (i) 10% of any amount raised in excess of $75.0 million, or (ii) any remaining deferred rent obligation. As a result of the public offering in February 2006 (see Note 6), the Company paid The Irvine Company $3.7 million towards the remaining deferred rent obligation under the terms of this third amendment. The third amendment also required the Company to increase the letter of credit related to this lease from $4.0 million to $6.0 million (see Note 4), and released Dr. Rathmann from further obligations as a guarantor under the lease.

## 6. Common Stock

In February 2006, the Company raised $112.0 million in a public offering, after deducting underwriters' fees and stock issuance costs of $7.6 million, from the sale of 7,475,000 shares of common stock, including 975,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share.

In August 2005, the Company entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge Capital Ltd. (Kingsbridge), under which Kingsbridge has committed to purchase up to $75.0 million of the Company's common stock within a three-year period, subject to certain conditions and limitations. As part of the arrangement, the Company issued a warrant to Kingsbridge to purchase 350,000 shares of the Company's common stock at a price of approximately $12.07 per share, which is exercisable beginning six months after the date of grant and for a period of five years thereafter. The warrant's fair value on the date of grant of $2.1 million, being $5.94 per share, was recorded as a deferred financing cost to additional paid-in capital. The opposing current liability has and will continue to be marked-to-market each quarter, with the change recorded to general and administrative expenses. The fair value of the warrant as of March 31, 2006 was $4.4 million, and is included in other current liabilities in the balance sheet. Under the CEFF, the Company may require Kingsbridge to purchase newly-issued shares of common stock at prices between 90% and 94% of the volume weighted average price (VWAP) on each trading day during an 8-day pricing period. The value of the maximum number of shares the Company may issue in any pricing period is the lesser of 2.5% of the Company's market capitalization immediately prior to the commencement of the pricing period, or $10.0 million. The minimum VWAP for determining the purchase price at which the Company's stock may be sold in any pricing period is the greater of $2.50, or 85% of the closing price of the Company's common stock on the day prior to the commencement of the pricing period. The CEFF also required the Company to file a resale registration statement with respect to the resale of shares issued pursuant to the CEFF and underlying the warrant, to use commercially reasonable efforts to have the registration statement declared effective by the SEC, and to maintain its effectiveness. The registration statement was declared effective in October 2005. The Company may sell a maximum of 8,075,000 shares under the CEFF (exclusive of the shares underlying the warrant), which may further limit the potential proceeds from the CEFF. The Company is not obligated to sell any of the $75.0 million of common stock available under the CEFF and there are no minimum commitments or minimum use penalties. Under the CEFF, the Company sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005, and may sell the balance of $60.6 million of common stock over the remainder of the three-year term of the CEFF, subject to the above limitations.

## 7. Collaborative and Manufacturing Agreements

In January 2006, the Company entered into a license and collaboration agreement with Bayer HealthCare AG (Bayer) for the global development and commercialization of alfimeprase. Under this agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent of net sales. Nuvelo retains all commercialization rights and profits from alfimeprase sales in the United States and is eligible to receive up to $385.0 million in milestone payments from Bayer, including a $50.0 million up-front cash payment that was received in January 2006, up to $165.0 million in development milestones and $170.0 million in sales and commercialization milestones over the course of the agreement. The $50.0 million up-front cash payment was deferred upon receipt, and as the fair value of all undelivered elements under the agreement are currently not known, is being recognized as revenue on a straight-line basis over the term of the agreement, estimated to be through September 2020. In addition, Bayer is responsible for 40 percent of the costs for global development programs and Nuvelo is responsible for the remaining 60 percent of the costs. Nuvelo will remain the lead for the design and conduct of the global development programs. Each party will bear its own expenses for any country-specific alfimeprase clinical trials it conducts, where the country-specific clinical trials are not part of the agreed global development program. Nuvelo will continue to bear sole responsibility for milestone payments and royalties owed to Amgen.

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

In June 2005, Nuvelo entered into a development and validation agreement with Avecia Limited for the scaled-up manufacturing process of alfimeprase. In accordance with the terms of this agreement, Avecia will conduct process development and validation work for the manufacture of alfimeprase drug substance, in accordance with FDA regulations. Nuvelo is to pay Avecia fees totaling £13.6 million ($23.8 million), for completion of this work, payable upon completion to Avecia of pre-negotiated milestones, including £3.6 million ($6.3 million) as a result of amendments to the work program in December 2005 and March 2006 to provide for additional process development and validation work. The milestone fees paid to date have been recorded as either research and development expenses in the income statement or clinical trial supplies in the balance sheet, depending on the nature of the expense. The Company is also paying certain related fees and expenses including the cost of supplies, materials, specified subcontracted work and equipment. The agreement does not cover the commercial manufacture of alfimeprase drug substance, but the Company and Avecia have agreed to negotiate in good faith towards the completion of a commercial supply agreement once Avecia has commenced the validation campaign. The agreement remains in force until the completion of the work contemplated under it, but may be terminated early by Avecia if the Company breaches the agreement, and by the Company for any reason, subject in some cases to cancellation fees and penalties.

Receivables from collaboration partners of $6.7 million and $1.2 million were included in other current assets in the balance sheets as of March 31, 2006 and December 31, 2005, respectively, and payables to collaboration partners of $0.5 million were included in accrued clinical trials and drug manufacturing costs in each balance sheet. Expenses reimbursable by collaboration partners are reflected as an offset to expenses in the accompanying statements of operations.

**8. Foreign Currency Derivatives**

In July 2005, the Company entered into a development and validation agreement with Avecia Ltd. under which Nuvelo's payments to Avecia are denominated in British pounds. In order to reduce exposure to fluctuations in the British pound prior to any payment made under this contract, the Company has entered into a number of foreign currency forward hedging contracts, all maturing or having matured within one year, and all being designated as cash flow hedges under SFAS 133. In accordance with SFAS 133, all derivatives, such as foreign currency forward contracts, are recognized as either assets or liabilities in the balance sheet and measured at fair value. At hedge inception, critical terms in the derivative contract that may not precisely match the contract over its life are evaluated for effectiveness using regression analysis. Ongoing effectiveness is calculated by affirming the probability of the transaction and comparing, on a spot-to-spot basis, the change in fair value of the hedge contract to the change in fair value of the forecasted transaction (the underlying hedged item). The effective component of hedge gains and losses is recorded in other comprehensive income (loss) within stockholders' equity in the balance sheet and reclassified to research and development expenses in the statement of operations when the forecasted transaction itself is recorded to the statement of operations. Any residual change in the fair value of the hedge contracts, such as ineffectiveness or time value excluded from effectiveness testing is recorded to the statement of operations. In 2005 and the three months ended March 31, 2006, immaterial amounts were recorded to general and administrative expense associated with the time value excluded from effectiveness testing. Should a hedge be de-designated or the hedge instrument terminated prior to recognition of the forecasted transaction, amounts accumulated in other comprehensive income (loss) will remain there until the hedged item impacts earnings. In the event the forecasted transaction is considered unlikely to occur or does not occur in the appropriate time frame, all gains and losses on the related hedge will be recognized immediately as a general and administrative expense.

As of March 31, 2006, the Company had notional amounts outstanding of £5.6 million ($9.8 million) on these contracts and the outstanding contracts were in a fair value loss position of $86,000, which is recorded in current liabilities in the balance sheet. The following table summarizes the activity in accumulated other comprehensive loss related to derivatives classified as cash flow hedges held by the Company during the period presented (in thousands):

|  | Three Months Ended March 31, 2006 |
|---|---|
| Balance at beginning of period | $ — |
| Changes in fair value of derivatives, net | (197) |
| Reclasses to research and development expense from other comprehensive loss | 44 |
| Balance at end of period | $ (152) |

All unrealized losses reported in accumulated other comprehensive loss at March 31, 2006 are expected to be reclassified to the income statement within 12 months.

**9. Transactions with Related Parties**

Dr. Rathmann, a member of the Company's board of directors and chairman emeritus, provided a $20.0 million line of credit to the Company in August 2001, of which $11.0 million has been drawn down, with the remaining $9.0 million having expired unused. The related promissory note bears interest at the prime rate plus 1%. In November 2003, the Company began repaying the outstanding balance over 48 months with equal monthly principal payments of $0.2 million. Accrued interest will be paid with the final payment in October 2007, unless both are repaid before then. As of March 31, 2006, the remaining principal and accrued interest to date totaled $6.3 million, and the interest rate on the note on this date was 8.75%. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of the Company's common stock at a price based upon the average price of Nuvelo's common stock over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of March 31, 2006, 371,972 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

**10. Segment Information**

The Company is engaged in the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. The Company has only one reportable segment, therefore all segment-related financial information required by Statement of Financial Accounting Standards No. 131, *"Disclosures About Segments of an Enterprise and Related Information"* is included in the condensed consolidated financial statements. The reportable segment reflects the Company's structure, reporting responsibilities to the chief executive officer and the nature of the products under development.

**11. Subsequent Events**

On May 5, 2006, the Company executed a drug product development and clinical supply agreement with Baxter Pharmaceutical Solutions LLC (Baxter) that became effective on April 28, 2006, for the lyophilization, filling, finishing, packaging and testing of alfimeprase, and process development related thereto. Under the terms of the agreement, the Company and Baxter will agree upon project plans, development plans and regulatory plans in accordance with which the work agreed upon by the parties will be conducted. In accordance with current plans, Nuvelo expects to pay Baxter approximately $5.1 million, which will increase as additional plans are executed by both parties. Nuvelo is also paying related fees and expenses, including the costs of supplies, materials, equipment and subcontracted work. The agreement does not cover the commercial lyophilization, filling, finishing, packaging or testing of alfimeprase. The agreement

remains in force until the completion of the ... contemplated under it, but may be terminated early by B.... if Nuvelo breaches the agreement, and may be terminated by Nuvelo for any reason, subject in some cases to cancellation fees and penalties.

12

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This Management's Discussion and Analysis of Financial Condition and Results of Operations contains "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words including "will," "anticipate," "believe," "intends," "estimates," "expect," "should," "may," "potential" and similar expressions. Such statements are based on our management's current expectations and involve risks and uncertainties. Actual results and performance could differ materially from those projected in the forward-looking statements as a result of many factors discussed herein and elsewhere including, in particular, those factors described under the "Risk Factors" set forth below, and in our other periodic reports filed from time to time with the Securities and Exchange Commission, or SEC. Actual results and performance could also differ materially from time to time from those projected in our filings with the SEC.*

### Overview

We are a biopharmaceutical company dedicated to improving the lives of patients through the discovery, development and commercialization of novel acute cardiovascular and cancer therapies. Our development pipeline includes three acute cardiovascular programs: alfimeprase, a direct-acting thrombolytic in Phase 3 clinical trials for the treatment of thrombotic disorders; rNAPc2, an anticoagulant that inhibits the factor VIIa and tissue factor protease complex that is currently in Phase 2 clinical development for acute coronary syndromes, and a program to develop a thrombin inhibiting aptamer for anticoagulation during medical procedures. We also are progressing an emerging oncology pipeline, which includes preclinical candidate NU206, for the potential treatment of chemotherapy/radiation therapy-induced mucositis, and rNAPc2, for potential use in a variety of cancers based on its apparent role in the cellular signaling related to metastasis and angiogenesis. In addition, we expect to leverage our expertise in secreted proteins and cancer antibody discovery to further expand our pipeline and create additional partnering and licensing opportunities.

### Alfimeprase

Our lead product candidate, alfimeprase, is a thrombolytic agent with a novel mechanism of action. It is a modified and recombinant version of fibrolase, a naturally occurring enzyme that directly and rapidly degrades fibrin, the protein that provides the structural scaffold of blood clots. Currently, we have two Phase 3 programs in progress for alfimeprase, one in patients with acute peripheral arterial occlusion (PAO) and one in patients with occluded central venous catheters.

In April 2005, we commenced the first of two trials in the alfimeprase Phase 3 acute PAO program, known as NAPA (Novel Arterial Perfusion with Alfimeprase). This program consists of two trials known as NAPA-2 and NAPA-3. Both trials are randomized, double-blind studies comparing 0.3 mg/kg of alfimeprase versus placebo in 300 patients each. The primary endpoint is avoidance of open vascular surgery within 30 days of treatment. Open vascular surgery includes procedures such as surgical embolectomy, peripheral arterial bypass graft surgery and amputation, but does not include catheter-based procedures such as percutaneous angioplasty or stenting. A variety of secondary endpoints are also being evaluated, including safety endpoints, such as the incidence of bleeding, and pharmacoeconomic endpoints, such as length of hospital and intensive care unit stay. Each trial is being conducted in approximately 100 centers worldwide. We expect to complete enrollment in the NAPA-2 trial in the second half of 2006. In April 2006, we began enrollment in the NAPA-3 trial, which is under a special protocol assessment (SPA) agreement with the U.S. Food and Drug Administration (FDA). Under an SPA, the FDA provides guidance on the design of a trial prior to its initiation. Alfimeprase in acute PAO has received fast track designation from the FDA. Fast track designation can potentially facilitate development and expedite review of biologics license applications. Fast track designation is reserved for new drugs that demonstrate the potential to address an unmet medical need and are intended for treatment of a serious or life-threatening condition. In addition, we have obtained orphan drug status for alfimeprase in the United States and Europe for the treatment of acute PAO, which may provide us with up to seven and ten years of market exclusivity in the United States and Europe, respectively, following market authorization.

In September 2005, we commenced the first of two multi-national trials in the alfimeprase Phase 3 catheter occlusion program, known as SONOMA (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase). The first trial is an efficacy study called SONOMA-2, which is a randomized, double-blind study, comparing 3.0 mg of alfimeprase with placebo in 300 patients with occluded central venous catheters. Two-thirds of the patients will receive alfimeprase and the remainder will receive placebo. The study's primary endpoint is restoration of function to occluded central venous catheters at 15 minutes. We expect to complete enrollment in the SONOMA-2 trial in the second half of 2006. The second trial, known as SONOMA-3, began patient enrollment in February 2006. This is an open label, single-arm study evaluating alfimeprase in 800 patients. This study's primary endpoint is safety, although we will be evaluating efficacy in these patients as well.

We also intend to expand our alfimeprase development program by initiating a Phase 2 clinical trial in the second half of 2006 to evaluate the potential of alfimeprase for the treatment of acute ischemic stroke and another Phase 2 clinical trial in 2007 to evaluate the potential of alfimeprase to treat deep venous thrombosis (DVT).

In January 2006, we entered into a license and collaboration agreement with Bayer HealthCare AG (Bayer) for the global development and commercialization of alfimeprase. Under this agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay us tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent of net sales. We retain all commercialization rights and profits from alfimeprase sales in the United States. We are eligible to receive up to $385.0 million in milestone payments from Bayer, including a $50.0 million up-front cash payment that we received in January 2006, up to $165.0 million in development milestones and $170.0 million in sales and commercialization milestones over the course of the agreement. We expect to receive a $10.0 million development milestone fee in the second half of 2006 upon the initiation of a phase 2 trial for alfimeprase in acute ischemic stroke. In addition, Bayer is responsible for 40 percent of the costs for global alfimeprase development programs, and we are responsible for the remaining 60 percent of the costs. We will remain the lead for the design and conduct of the global development programs. Each party will bear its own expenses for any country-specific alfimeprase clinical trials it conducts, where the country-specific clinical trials are not part of the agreed global development program. In the first quarter of 2006, $5.6 million was billable to Bayer for our alfimeprase-related global development spending as a result of this cost-sharing arrangement.

In October 2004, we obtained worldwide rights to develop and commercialize alfimeprase from Amgen Inc., in exchange for the future payment to Amgen of previously negotiated milestone payments and royalties. As a result of dosing the first patient in the first Phase 3 clinical trial for alfimeprase in April 2005, we paid a $5.0 million milestone fee to Amgen in May 2005. Future milestone payments under the license agreement could total as much as $35.0 million, although we currently cannot predict if or when any of these additional milestones will be achieved. Under our agreement with Bayer, we will continue to bear sole responsibility for these milestone payments and royalties owed to Amgen.

In June 2005, we entered into a development and validation agreement with Avecia Limited for the scaled-up manufacturing process of alfimeprase. In accordance with the terms of this agreement, Avecia will conduct process development and validation work for the manufacture of alfimeprase drug substance, in accordance with FDA regulations. Under the terms of our license agreement with Amgen, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to Avecia. We are to pay Avecia fees totaling £13.6 million ($23.8 million), for completion of this work, payable upon completion by Avecia of pre-negotiated milestones, including £3.6 million ($6.3 million), as a result of amendments to the work program in December 2005 and March 2006

to provide for additional process development and validation work. Of the total commitment, £6.4 million (₤11.3 million) had yet to be paid as of March 31, 2006.

13

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

On May 5, 2006, we executed a drug product development and clinical supply agreement with Baxter Pharmaceutical Solutions LLC (Baxter) that became effective on April 28, 2006, for the lyophilization, filling, finishing, packaging and testing of alfimeprase, and process development related thereto. Under the terms of the agreement, we and Baxter will agree upon project plans, development plans and regulatory plans in accordance with which the work agreed upon is executed by both parties. Nuvelo is also paying related fees and expenses, including the costs of supplies, materials, equipment and subcontracted work. The agreement does not cover the commercial lyophilization, filling, finishing, packaging or testing of alfimeprase. The agreement remains in force until the completion of the work contemplated under it, but may be terminated early by Baxter if Nuvelo breaches the agreement, and may be terminated by us for any reason, subject in some cases to cancellation fees and penalties.

### rNAPc2

Our second drug candidate, rNAPc2, is a recombinant, modified version of a naturally occurring protein that has anticoagulant properties. Specifically, rNAPc2 has been shown to block the factor VIIa and tissue factor protease complex, which is responsible for the initiation of the process leading to blood clot formation and has also been shown to play a role in both metastasis, or local and distant spread of cancer cells, and angiogenesis, or the formation of new blood vessels, as they relate to tumor growth. In May 2005, we completed a Phase 2a double-blind, placebo-controlled clinical trial showing that rNAPc2 has an acceptable safety profile and is well tolerated in doses up to ten micrograms/kg in patients being treated for ACS, including unstable angina, and non-ST segment elevation myocardial infarction. Additional data is now being generated from this Phase 2a trial based on surrogate endpoints, and we expect to present efficacy data sometime in 2006. Based on these encouraging results, we initiated a Phase 2 heparin-replacement trial with rNAPc2 in August 2005. This trial is expected to be completed in the second quarter of 2006 and we expect to present data from this trial at an appropriate medical meeting in the second half of this year. In addition, we are investigating the potential of rNAPc2 as a cancer therapy.

We have obtained exclusive worldwide rights to all indications of rNAPc2 and all other rNAPc molecules owned by Dendreon Corporation, as a result of a licensing agreement entered into with them in February 2004. Under the terms of the agreement, we paid Dendreon an up-front fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock), and incurred $5.6 million in expenses for this and related development costs in 2004, and $1.5 million and $1.0 million for related development costs in 2005 and the three months ended March 31, 2006, respectively. Future milestone payments to Dendreon could reach as much as $23.5 million if all development and commercialization milestones are achieved. A $2.0 million milestone for dosing of the first patient in a Phase 3 clinical trial may be achieved within the next 12 months, although we currently cannot predict if or when this or any other milestones will be achieved. If rNAPc2 is commercialized, we will also be responsible for paying royalties to Dendreon depending on sales of rNAPc2.

### Thrombin Inhibiting Aptamer

We continue to pursue the development of a thrombin inhibiting aptamer under a collaboration agreement entered into with Archemix Corporation, a privately held biotechnology company located in Cambridge, Massachusetts, in January 2004. In September 2005, we concluded a Phase 1 clinical study for the first target molecule from this program, ARC183. This study evaluated the safety, tolerability, anticoagulant activity and titratability of ARC183 for potential use in acute cardiovascular settings such as coronary artery bypass graft (CABG) surgery. Results from the trial showed that administration of ARC183 resulted in a rapid onset of anticoagulation and demonstrated stable, dose-related anticoagulant activity and rapid self-reversal of drug effects after the cessation of drug infusion. However, the amount of drug needed to achieve the desired anticoagulation for use in CABG surgery resulted in a sub-optimal dosing profile. For that reason, we decided jointly with Archemix not to pursue further development of ARC183 and instead are pursuing optimized thrombin inhibiting aptamers.

In accordance with the terms of the agreement, we paid Archemix an up-front fee of $3.0 million and paid the first $4.0 million of costs associated with development. We and Archemix are equally sharing all development and commercialization costs in excess of this initial $4.0 million. We incurred $7.7 million in expenses for the up-front fee and related development costs in 2004, and $2.6 million and $0.4 million for related development costs in 2005 and the three months ended March 31, 2006, respectively. Archemix is initially responsible for leading development and for all clinical development activities through the dosing of the first patient in a Phase 2 study. Thereafter, we and Archemix will agree on leadership of clinical development and commercialization activities. We are required to pay Archemix total development milestone payments of up to $11.0 million, consisting of $10.0 million upon dosing of the first patient in a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Archemix and us for IND-enabling studies. The milestone for designation of a backup compound may be achieved within the next 12 months, although we currently cannot predict if or when this or the $10.0 million milestone will be achieved.

### NU206

Preclinical candidate, NU206, is a highly specific and potent gastrointestinal epithelial growth factor. We plan to initially pursue NU206 as a supportive cancer therapy, specifically to treat radiation and chemotherapy-induced mucositis in the gastrointestinal tract and expect to initiate a Phase 1 clinical program with NU206 in the second half of 2006.

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin Brewery Company, Ltd. (Kirin), for the development and commercialization of NU206. Under this agreement, we received a $2.0 million up-front cash payment from Kirin in April 2005, and we lead worldwide development, manufacturing and commercialization of the compound. All operating expenses and profits related to the development and commercialization of NU206 are being shared 60 percent by us and 40 percent by Kirin. If this agreement is terminated, or Kirin or we elect under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit-sharing structure to a royalty-based structure.

### Financing and Facilities

In February 2006, we raised $112.0 million in a public offering, after deducting underwriters' fees and stock issuance costs of $7.6 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share. We intend to use the net proceeds from this offering for the advancement of our drug candidates in clinical trials, the development of a commercialization infrastructure, capital expenditures, and to meet working capital needs. The amounts and timing of the expenditures will depend on numerous factors, such as the timing and progress of our clinical trials and research and development efforts, technological advances and the competitive environment for our drug candidates. We expect from time to time to evaluate the acquisition of businesses, products and technologies for which a portion of the net proceeds may be used, although we currently are not planning or negotiating any such transactions. In addition, under our lease agreement for our facilities at 985 Almanor Avenue, Sunnyvale, California, as amended, in February 2006 we paid The Irvine Company $3.7 million from these proceeds, being ten percent of the net amount raised in excess of $75.0 million.

Source: NUVELO INC, 10-Q, May 09, 2006

In August 2005, we entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge Capital Ltd., under which Kingsbridge has committed to purchase up to a total of $75.0 million of our common stock within a three-year period, subject to certain conditions and limitations. We plan to continue using the net proceeds from any securities issued under this agreement for general corporate purposes, including the advancement of our drug candidates in clinical trials, capital spending and working capital. As part of the arrangement, we issued a warrant to Kingsbridge to purchase 350,000 shares of our common stock at a price of $12.07 per share. As of March 31, 2006, we had $60.6 million remaining available under the CEFF, having sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005 under this facility.

14

Source: NUVELO INC, 10-Q, May 09, 2006

<u>Table of Contents</u>
**Results of Operations**

*Contract Revenue*

Contract revenues were $1.1 million in the three months ended March 31, 2006, compared to $42,000 in the corresponding periods of 2005. The increase was primarily due to the recognition of $0.8 million of revenue from the up-front license fee of $50.0 million received from Bayer in January 2006. The up-front license fee was recorded as deferred revenue upon receipt and is being recognized on a straight-line basis over the term of the agreement, estimated to be through September 2020, when the last significant alfimeprase-related patent expires. Any other amounts billable to Bayer for milestones achieved or for sales of alfimeprase to Bayer for use in their country-specific trials or commercial sale outside of the United States will be recognized on a similar basis, as will the associated cost of sales. Once the development of alfimeprase has been substantially completed, any remaining deferred revenue and expenses will be recognized at that point, and any milestones and sales of alfimeprase that are billable to Bayer after that point will be recognized as they are earned.

We expect revenues to increase significantly during 2006 as compared to 2005, due to the ongoing revenue recognition from this up-front license fee. In addition, we expect to record revenues following the receipt of a $10.0 million milestone fee due from Bayer if we initiate a Phase 2 trial for alfimeprase in acute ischemic stroke in the second half of 2006. Revenue from this milestone will be recognized on a straight-line basis over the remaining term of the agreement, as noted above. Our revenues may vary significantly from quarter to quarter as a result of this and other licensing or collaboration activities. In the future, we may not be able to maintain existing collaborations, obtain additional collaboration partners or obtain revenue from other sources, which could have a material adverse effect on our revenues, operating results and cash flows.

*Research and Development Expenses*

Research and development (R&D) expenses, primarily consist of R&D personnel costs, including related stock-based compensation expense, clinical trial and drug manufacturing costs, license, collaboration and royalty fees and allocated facilities expenses.

R&D expenses were $12.1 million in the three months ended March 31, 2006, compared to $11.1 million in the corresponding period of 2005. The increase of $1.0 million was primarily due to a $4.6 million increase in consulting and outside service expenses related to clinical trials and drug manufacturing, and a $2.6 million increase in R&D personnel expenses in support of these activities, including $1.3 million of stock-based compensation expense related to the implementation of SFAS 123(R). These increases were largely offset by a $5.9 million increase in amounts billable to our collaboration partners under cost-sharing arrangements, primarily to Bayer, which is reimbursing 40 percent of alfimeprase-related global development spending.

R&D expenses included in the statement of operations for our significant programs, including license and collaboration fees, are as follows for the periods indicated:

| Program | Three months ended March 31, 2006 | | Since Inception |
|---|---|---|---|
| | | (In millions) | |
| Alfimeprase | $ | 4.9 | $ 66.5 |
| rNAPc2 | | 1.0 | 8.1 |
| Thrombin inhibiting aptamer | | 0.4 | 10.7 |
| NU206 | | 0.7 | 3.4 |

We expect R&D expenses excluding credits for cost-sharing to increase significantly during 2006 as compared to 2005, as we intensify our alfimeprase Phase 3 clinical trial activity and increase alfimeprase manufacturing-related expenditures. This increase will be partially offset by amounts billable to our collaboration partners under cost-sharing arrangements, including an estimated $30.0 million to Bayer for 2006 as a whole.

The timing, cost of completing the clinical development of any product candidate, and any potential future product revenues will depend on a number of factors, including the disease or medical condition to be treated, clinical trial design and endpoints, availability of patients to participate in trials and the relative efficacy of the product versus treatments already approved. Due to these uncertainties, we are unable to estimate the length of time or the costs that will be required to complete the development of these product candidates. We do not expect to generate any product sales revenue until we reach the commercialization stage for any of our drug products, if this ever occurs.

*General and Administrative Expenses*

General and administrative (G&A) expenses primarily consist of G&A personnel and consulting costs, including related stock-based compensation expense, professional fees, insurance, facilities and depreciation expenses, and various other administrative costs.

G&A expenses were $10.2 million in the three months ended March 31, 2006, compared to $3.8 million in the corresponding period of 2005. The increase of $6.4 million was primarily due to a $2.5 million increase in G&A personnel costs, including $1.8 million of stock-based compensation expense related to the implementation of SFAS 123(R), a $2.9 million charge related to the quarterly revaluation of the Kingsbridge warrant, and a $0.9 million increase in consulting and outside service expenses, primarily related to pre-commercialization activities for alfimeprase.

We expect G&A expenses to continue to increase in 2006 as compared to 2005 in order to support growth in our general operating activities and as we continue preparations for the planned commercial launch of alfimeprase.

*Interest and Other Income (Expense), net*

We had net interest and other income of $1.6 million in the three months ended March 31, 2006, compared to $0.2 million in the corresponding period of 2005. The $1.4 million increase was primarily due to an increase in interest income resulting from higher average cash and investment balances and applicable interest rates in the 2006 period.

15

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
*Net Loss*

Since our inception, we have incurred significant net losses, and as of March 31, 2006, our accumulated deficit was $347.3 million. During the three months ended March 31, 2006, we incurred a net loss of $19.7 million, compared to $14.7 million in the corresponding period of 2005. The $5.0 million increase resulted primarily from the increases in expenses noted above, partially being offset by higher revenues and interest income during the 2006 period.

We expect to continue to incur significant losses from continuing operations for the foreseeable future, which may increase substantially as we continue development of our clinical stage drug candidates, alfimeprase and rNAPc2, our thrombin inhibiting aptamer program, and our preclinical stage drug candidate, NU206. In addition, we expect to incur significant costs as we continue preparations for the planned commercial launch of alfimeprase, further expand research and development of potential biopharmaceutical product candidates, and potentially in-license other drug candidates.

## Liquidity and Capital Resources

Cash, cash equivalents and short-term investment balances as of the dates indicated were as follows:

|  | March 31, 2006 | December 31, 2005 |
|---|---|---|
|  | (In thousands) | |
| Cash and cash equivalents | $ 166,010 | $ 37,764 |
| Short-term investments | 34,264 | 32,572 |
| Cash, cash equivalents and short-term investments | $ 200,274 | $ 70,336 |

Cash flows from operating, investing and financing activities in the periods indicated were as follows:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2006 | 2005 |
|  | (In thousands) | |
| Net cash provided by (used in) operating activities | $ 18,092 | $ (12,359) |
| Net cash used in investing activities | (2,162) | (5,937) |
| Net cash provided by financing activities | 112,316 | 68,453 |
| Net increase in cash and cash equivalents | $ 128,246 | $ 50,157 |

## Cash, Cash Equivalents and Short-Term Investments

As of March 31, 2006, we had total cash, cash equivalents and short-term investments of $200.3 million, as compared to $70.3 million as of December 31, 2005. The increase of $130.0 million resulted primarily from net cash proceeds of $112.0 million from a public offering in February 2006 and from a $50.0 million up-front cash payment received from Bayer in January 2006 upon entry into the license and collaboration agreement for alfimeprase. These inflows were partially offset by other operating expenditures during the quarter.

As of March 31, 2006, all of our short-term investments in marketable securities have maturities of less than one year, and have been classified as available-for-sale securities, as defined by Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities"* (SFAS 115). These securities are recorded at their fair value and consist of U.S. government agency and corporate debt, and asset-backed securities. We make our investments in accordance with our investment policy. The primary objectives of our investment policy are liquidity, safety of principal and diversity of investments.

## Sources and Uses of Capital

Our primary sources of liquidity are from financing activities and collaboration receipts. We plan to continue to raise funds through additional public and/or private offerings and collaboration activities in the future.

In February 2006, we raised $112.0 million in a public offering, after deducting underwriters' fees and stock issuance costs of $7.6 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares from the exercise of an over-allotment option granted to the underwriters, at a public offering price of $16.00 per share.

In August 2005, we entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge, under which Kingsbridge has committed to purchase up to a total of $75.0 million of our common stock within a three-year period, subject to certain conditions and limitations. As of March 31, 2006, we had $60.6 million remaining available under the CEFF, having sold 653,103 shares for gross proceeds of $5.0 million in November 2005 and 1,186,297 shares for gross proceeds of $9.4 million in December 2005 under this facility.

We have a Loan and Security Agreement in place with Silicon Valley Bank (SVB) under which we have a fully-utilized term loan facility of $4.1 million, and an $8.0 million revolving credit facility which expires on August 29, 2006. The term loan facility was utilized in two draw-downs, the first being for $2.6 million, which is being repaid in 30 equal monthly installments, plus accrued interest of 6.43% per annum, starting from May 1, 2005; the second draw-down of $1.5 million is being repaid in 36 equal monthly installments, plus accrued interest of 6.78% per annum, starting from April 1, 2005. We have yet to draw down any of the funds available under the $8.0 million revolving credit line, although $6.0 million of this amount is currently being reserved to collateralize a letter of credit issued to The Irvine Company related to the lease for the facility at 985 Almanor Avenue in Sunnyvale, California, and $2.0 million is being reserved in part as collateral for foreign exchange hedging contracts with SVB, with the remainder being available for working capital or other general business needs. Any borrowings under this line shall bear interest at SVB's prime rate, and would cause replacement collateral to be required for the items above.

16

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

Dr. Rathmann, a member of our board of directors and chairman emeritus, provided us with a $20.0 million line of credit in August 2001, of which we have drawn down $11.0 million, with the remaining $9.0 million having expired unused. The related promissory note bears interest at the prime rate plus 1%. In November 2003, we began repaying the outstanding balance over 48 months with equal principal payments of $0.2 million. Accrued interest will be paid with the final payment in October 2007, unless both are repaid before then. As of March 31, 2006, the remaining principal and accrued interest to date totaled $6.3 million, and the interest rate on the note on this date was 8.75%. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of our common stock at a price based upon the average price of our common stock over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of March 31, 2006, 371,972 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

We issued Affymetrix a five-year promissory note for $4.0 million in November 2001, bearing a fixed annual interest rate of 7.5%. Accrued interest will be paid with the final principal payment on November 13, 2006, unless both are repaid before then. As of March 31, 2006, the remaining principal and accrued interest to date totaled $5.3 million. The outstanding principal and interest under the note may be repaid in whole or in part at any time, at our option, by conversion into shares of our common stock at a price based upon 90% of the average price of our common stock over a 10-day period ending 2 days prior to the conversion. As of March 31, 2006, 351,507 shares would be issuable to fully repay the principal and interest outstanding upon conversion. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable if our market capitalization is under $50.0 million and Affymetrix reasonably determines that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed 10% of our market capitalization.

Our primary uses of capital resources to date have been to fund operating activities, including research, clinical development and drug manufacturing expenses, license payments, and spending on capital items.

*Cash Provided by (Used in) Operating Activities*

Net cash provided by operating activities was $18.1 million in the three months ended March 31, 2006, compared to $12.4 million used in the corresponding period of 2005. The change of $30.5 million was primarily due to the $50.0 million up-front license fee received from Bayer in the 2006 period, partially offset by increases in spending related to clinical trials and drug manufacturing for alfimeprase.

We expect operating spending, excluding cost-sharing reimbursements, to increase significantly during 2006 as compared to 2005, as we advance our alfimeprase Phase 3 clinical trials, increase manufacturing expenditures, and incur additional general corporate expenses, including those for continued preparations for the planned commercial launch of alfimeprase. This increase in spending will be offset by the $50.0 million up-front payment received from Bayer in January 2006 upon entry into our license and collaboration agreement for alfimeprase, and is expected to be further offset by Bayer's 40 percent cost sharing reimbursements for global development spending, and a potential $10.0 million milestone fee due from Bayer if we initiate a Phase 2 clinical trial for acute ischemic stroke. Our future milestone payments under current agreements with Amgen, Dendreon and Archemix could total $69.5 million, although we currently cannot predict with any certainty if or when any of these milestones will be achieved.

*Cash Used in Investing Activities*

Net cash used in investing activities was $2.2 million in the three months ended March 31, 2006, compared to $5.9 million in the corresponding period of 2005. The net decrease of $3.7 million was primarily due to reduced net purchases of short-term investments.

*Cash Provided by Financing Activities*

Net cash provided by financing activities was $112.3 million in the three months ended March 31, 2006, compared to $68.5 million in the corresponding period of 2005. The amounts are primarily comprised of the net proceeds from public offerings of $112.0 million and $68.5 million in the 2006 and 2005 periods, respectively.

Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth under "Risk Factors." We may not be able to secure additional financing to meet our funding requirements on acceptable terms, if at all. If we raise additional funds by issuing equity securities, substantial dilution to our existing stockholders may result. If we are unable to obtain additional funds, we will have to reduce our operating costs and delay our research and development programs. We believe that we have adequate cash reserves to fund our operations for at least the next twelve months.

*Contractual Obligations*

The following table summarizes our significant contractual obligations as of March 31, 2006, and the effect such obligations are expected to have on our liquidity and cash flow in the remainder of 2006 and future periods (in thousands):

| Contractual obligations: | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 and thereafter | Total |
|---|---|---|---|---|---|---|---|
| Operating lease obligations | $ 6,906 | $ 9,533 | $ 9,750 | $ 8,333 | $ 8,633 | $ 6,523 | $ 49,678 |
| Bank loans (a) | 1,262 | 1,420 | 126 | — | — | — | 2,808 |
| Note payable (b) | 5,314 | — | — | — | — | — | 5,314 |
| Capital lease obligations (a) | 28 | 44 | 29 | 29 | — | — | 130 |
| Related party line of credit (c) | 2,063 | 4,242 | — | — | — | — | 6,305 |
| Facility restoration obligation (d) | — | — | — | — | — | 353 | 353 |
| Total contractual obligations | $ 15,573 | $ 15,239 | $ 9,905 | $ 8,362 | $ 8,633 | $ 6,876 | $ 64,588 |

(a)   Includes interest payments at fixed rates of interest.
(b)   Fixed interest of 7.5% per annum is accrued and due with the final loan payment in November 2006. Includes $1.3 million interest accrued as of March 31, 2006. The outstanding principal and interest may be repaid in whole or in part at any time, at our option, by conversion into shares of our common stock.
(c)   Interest is accrued at a variable rate based on the current prime rate plus 1% and is due with the final line of credit payment in October 2007. Includes $2.0 million interest accrued as of March 31, 2006. The outstanding principal and interest may be repaid at any time upon mutual agreement, by conversion into

shares of our common stock.

(d)    Includes estimated interest accretion at 7.25% per annum.

The foregoing table does not include milestone payments potentially payable by us under our collaboration agreements and licenses. Such milestone payments are dependent upon the occurrence of specific milestones events and not the passage of time.

17

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
**Critical Accounting Policies and Estimates**

Our discussion and analysis of our operating results and financial condition is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of the financial statements requires us to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent amounts. While we believe our estimates, judgments and assumptions are reasonable, the inherent nature of estimates is that actual results will likely differ from the estimates made. We believe the following critical accounting policies, among others, affect the more significant judgments and estimates used in the preparation of our consolidated financial statements.

*Clinical Trial Drug Manufacturing Expense and Clinical Trial Supplies Asset*

In accordance with Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 2, *"Accounting for Research and Development Costs"* (SFAS 2), we capitalize clinical trial drug manufacturing costs as "clinical trial supplies," a current asset on our balance sheet, as long as there are alternative future uses for the related clinical trial drug material in other indications not currently being studied, (e.g., for alfimeprase, these include deep-vein thrombosis, stroke and acute myocardial infarction). We recognize clinical trial drug manufacturing expense when completed drug material is shipped from the manufacturing or storage facility for use in a clinical trial or for testing, or is otherwise consumed. On a quarterly basis, we evaluate whether there continues to be alternative future use for any capitalized drug material, and if the material is obsolete or in excess of anticipated requirements. Any capitalized drug material will be written-off to research and development expense in the quarter in which there ceases to exist an alternative future use, or if the material is obsolete or in excess of anticipated requirements, which may result in a significant adverse impact to our financial condition and results of operations.

*Impairment or Disposal of Long-Lived Assets*

Periodically, we determine whether any long-lived asset or related asset group has been impaired based on the criteria established in Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"* (SFAS 144). SFAS 144 requires, among other things, that impairment losses be recognized whenever the carrying amount of the asset or asset group exceeds its fair value. Intangibles with determinable useful lives and other long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, and we perform an annual impairment review regardless of any such events or changes. Our judgments regarding the existence of impairment indicators are based on historical and projected future operating results, changes in the manner of our use of the acquired assets, our overall business strategy or market and economic trends. Events may occur that could cause us to conclude that impairment indicators exist and that certain long-lived assets or related asset groups are impaired, which may result in a significant adverse impact to our financial condition and results of operations. There were assessed to be no impairments to long-lived assets as of March 31, 2006.

*Goodwill*

We applied the provisions of Statement of Financial Accounting Standards No. 142, *"Goodwill and Other Intangible Assets"* (SFAS 142) upon the completion of the merger with Variagenics in January 2003. SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and these assets will be reviewed for impairment in accordance with SFAS 144 as noted above.

The SFAS 142 goodwill impairment model involves a two-step process. First, we compare the fair value of the reporting unit with its carrying value, including goodwill. The estimated fair value of the reporting unit, in this case the Nuvelo business segment, being the only business segment in the company, is computed by multiplying the quoted market price of the company's common stock on the Nasdaq National Market by the outstanding common stock of the company at that time. If the fair value of the reporting unit is determined to be more than its carrying value, including goodwill, no goodwill impairment is recognized. If the fair value of the reporting unit is determined to be less than its carrying value, goodwill impairment, if any, is computed using the second step. The second step requires the fair value of the reporting unit to be allocated to all the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination at the date of the impairment test and the fair value of the reporting unit was the price paid to acquire it. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied value of goodwill, which is used to determine the impairment amount.

We have designated October 31 as the annual impairment testing date for goodwill, although additional testing may be performed if circumstances warrant a re-evaluation. If it is determined that the carrying value of goodwill has been impaired, the value would be reduced by a charge to operations in the amount of the impairment, which may result in a significant adverse impact to our financial condition and results of operations. There was assessed to be no goodwill impairment based on the testing performed on October 31, 2005.

*Clinical Trial and Drug Manufacturing Accruals*

We accrue costs for clinical trial and drug manufacturing activities based upon estimates of the services received and related expenses incurred that have yet to be invoiced by the contract research organizations (CROs), clinical study sites, drug manufacturers, collaboration partners, laboratories, consultants, or otherwise. Related contracts vary significantly in length, and may be for a fixed amount, a variable amount based on actual costs incurred, capped at a certain limit, or for a combination of these elements. Activity levels are monitored through close communication with the CROs and other vendors, including detailed invoice and task completion review, analysis of expenses against budgeted amounts, and pre-approval of any changes in scope of the services to be performed. Each CRO or significant vendor provides an estimate of costs incurred but not invoiced at the end of each period for each individual trial or project. The estimates are reviewed and discussed with the CRO or vendor as necessary, and are included in research and development expenses for the related period or capitalized as clinical trial supplies, as necessary. For clinical study sites, which are paid at least quarterly on a per-patient basis to the institutions performing the clinical study, we accrue an estimated amount based on patient enrollment in each period. All estimates may differ significantly from the actual amounts subsequently invoiced. No adjustments for material changes in estimates have been recognized in any period presented.

*Revenue Recognition*

We recognize revenue in accordance with Staff Accounting Bulletin No. 104, *"Revenue Recognition"* (SAB 104) when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. We defer up-front refundable fees and recognize revenues upon the later of when they become non-refundable or when performance obligations under the related agreement are completed or considered perfunctory or inconsequential. In situations where we have no continuing performance obligations, or our continuing obligations are perfunctory or inconsequential, we recognize up-front non-refundable fees as revenues on the effective date of the related agreement. Up-front non-refundable licensing fees that require continuing involvement in the form of development, manufacturing or other commercialization efforts by us are recognized as revenue ratably over the term of the related agreement.

Source: NUVELO INC, 10-Q, May 09, 2006

18

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

If we determine that separate elements do not exist in a revenue arrangement under Emerging Issues Task Force Issue No. 00-21, *"Revenue Arrangements with Multiple Deliverables"* (EITF 00-21), all revenues from up-front licensing fees, milestones and contract manufacturing are recognized ratably over the term of the related agreement until the fair values of all undelivered elements of the arrangement are known. Once the fair values of all undelivered elements are known, we immediately recognize any remaining deferred revenue from previously delivered elements, including milestones. All revenues from this point onwards are recognized when the associated earnings process is complete and when payment is reasonably assured.

*Stock-Based Compensation*

Effective January 1, 2006, we adopted the provisions of Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* (SFAS 123(R)). SFAS 123(R) establishes accounting for stock-based awards exchanged for employee services. Accordingly, stock-based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the employee's requisite service period. We previously applied Accounting Principles Board Opinion No. 25, *"Accounting for Stock Issued to Employees"* (APB 25) and related Interpretations and provided the required pro forma disclosures of SFAS No. 123, *"Accounting for Stock-Based Compensation"* (SFAS 123). We have elected to adopt the modified prospective application method as provided by SFAS 123(R). Under the modified prospective method, the fair values of new and previously granted but unvested stock options are recognized as compensation expense in the income statement over the related vesting periods, and prior period results are not restated.

We have selected the Black-Scholes option–pricing model as the most appropriate fair-value method for its stock-based awards, which requires assumptions to be made for the expected term of the awards, expected volatility of our stock price, risk-free interest rates and expected dividend yields. These assumptions are highly subjective and involve inherent uncertainties and are based on management's best estimates and judgment. If alternative assumptions had been used instead of those presented in the notes to financial statements, our stock-based compensation expense could have been materially different from amounts recorded in the financial statements under SFAS 123(R) and disclosed on a pro forma basis under SFAS 123. In addition, under SFAS 123(R) we are required to estimate the expected forfeiture rate of awards and only recognize expense for those awards expected to vest. If the actual forfeiture rate is materially different from the estimate, the stock-based compensation expense could be materially different from amounts recorded in the financial statements.

For all option grants, we use the contractual term and historical data to estimate future exercises and cancellations, including post-vesting termination behavior, and therefore the expected term of the option. The risk-free interest rate assumptions are based on the yield of U.S. Treasury instruments with similar durations as the expected term of the related awards. The expected dividend yield assumption is based on our historic and expected dividend payouts. For options granted prior to January 1, 2006, and valued in accordance with SFAS 123, the expected volatility was based solely on the historical volatility of our common stock and option forfeitures were recognized as they occurred. The graded-vested (multiple option) method continues to be used for expense attribution of these options that were unvested as of January 1, 2006. For options granted after January 1, 2006, and valued in accordance with SFAS 123(R), we are using a combination of historic and implied volatility of our common stock in deriving expected volatility. Forfeitures are estimated such that we only recognize expense for those shares expected to vest, and adjustments are made if actual forfeitures differ form those estimates. The straight-line (single option) method is being used for expense attribution of all awards granted on or after January 1, 2006.

We account for compensation expense related to stock options granted to non-employees based on the fair values estimated using the Black-Scholes model on the date of grant and re-measured at each reporting date in compliance with Emerging Issues Task Force No. 96-18 *"Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* The compensation expense is amortized using the straight-line method.

*Income Taxes*

Income taxes are accounted for under the asset and liability method pursuant to Statement of Financial Accounting Standards No. 109, *"Accounting for Income Taxes"* (SFAS 109). Under SFAS 109, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

We record a valuation allowance to reduce deferred income tax assets to an amount that is more likely than not to be realized. Assessment of the realization of deferred income tax assets requires that estimates and assumptions be made as to the taxable income of future periods. Our deferred tax assets have been reduced to zero, as management believes that it is more likely than not that the deferred tax assets will not be realized. Projection of future period earnings is inherently difficult as it involves consideration of numerous factors such as our overall strategies and estimates of new product development and acceptance, product lifecycles, selling prices and volumes, responses by competitors, manufacturing costs and assumptions as to operating expenses and other industry specific and macro and micro economic factors. In addition, consideration is also given to ongoing and constantly evolving global tax laws and our own tax minimization strategies.

*Foreign Currency Transactions and Contracts*

We use foreign exchange forward contracts, and similar instruments, to mitigate the currency risk associated with the acquisition of goods and services under agreements with vendors that are denominated in foreign currency. Contracts for anticipated transactions are designated and documented as cash flow hedges under Statement of Financial Accounting Standards No. 133, *"Accounting for Derivative Instruments and Hedging Activities"* (SFAS 133) at hedge inception, and are evaluated for effectiveness at least quarterly. We only hedge exposures that can be confidently identified and quantified, and do not enter into speculative foreign currency transactions. All contracts have maturities of one year or less. In accordance with SFAS 133, all derivatives, such as foreign currency forward contracts, are recognized as either assets or liabilities in the balance sheet and measured at fair value. The effective component of the hedge gains and losses are recorded in other comprehensive income (loss) within stockholders' equity in the balance sheet and reclassified to research and development expenses in the statement of operations when the forecasted transaction itself is recorded to the statement of operations. Any residual change in the fair value of the hedge contracts, such as ineffectiveness or time value excluded from effectiveness testing is recognized immediately as a general and administrative expense.

*Off-Balance Sheet Arrangements*

We have not participated in any transactions with unconsolidated entities, such as special purpose entities (SPEs), which would have been established for the purpose of facilitating off-balance sheet arrangements.

*Indemnifications*

In the ordinary course of business, we enter into contractual arrangements under which we may agree to indemnify certain parties from any losses incurred relating to the services they perform on our behalf or for losses arising from certain events as defined within the particular contract. Such indemnification obligations may not be subject to maximum loss clauses. Historically, payments made related to these indemnifications have been immaterial. In addition, we have entered into indemnity agreements with each of our directors and executive officers. Such indemnity agreements contain provisions, which are in some respects broader than the specific indemnification provisions contained in Delaware law. We also maintain an insurance policy for our directors and executive officers insuring against certain liabilities arising in their capacities as such.

19

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest Rate Risk**

We place our investments with high quality issuers and, by policy, limit the amount of credit exposure with any one issuer. We do not use derivative financial instruments in our investment portfolio. We are averse to principal loss, and strive to ensure the safety and preservation of our invested funds by limiting default, market and reinvestment risk.

- We have exposure to changes in interest rates on our cash equivalents, which are held primarily in money market funds and debt securities with original maturities of 90 days or less, and that earn interest at variable rates.

- Changes in interest rates do not affect interest income on our short-term investments as they are maintained in U.S. government agency and corporate debt and asset-backed securities with fixed rates and original maturities of less than 24 months.

- Changes in interest rates do not affect interest income on any restricted cash we may hold, as it is generally maintained in commercial paper with fixed rates and original maturities of less than 90 days.

Changes in interest rates do not affect interest expense on our outstanding bank loans, note payable and capital leases, as they bear fixed rates of interest.

We have exposure to changes in interest rates on our revolving bank line of credit with Silicon Valley Bank, which bears interest at their prime rate. No draw-downs have been made on this line of credit to date.

We have exposure to changes in interest rates on our line of credit with Dr. George Rathmann, which bears interest at the prime rate plus 1%. Our interest rate exposure is mitigated by our ability to repay amounts outstanding under the line of credit with our common stock.

A hypothetical 10% change in market interest rates is not expected to have a material effect on our near-term financial condition or results of operations.

There were no significant changes in our market risk exposures through the first quarter of 2006, since our Form 10-K filing on March 15, 2006.

**Foreign Exchange Risk**

Some payments to overseas suppliers of goods or services may be denominated in foreign currencies. Accordingly, as part of our corporate risk management strategy, we have implemented a policy of hedging significant foreign currency exposures that can be confidently identified and quantified, in order to mitigate the impact of currency rate fluctuations on our cash outflows. We do not enter into speculative foreign currency transactions. In July 2005, we entered into a development and validation with Avecia Ltd. under which payments for their services are denominated in British pounds. As a result, our financial results could be adversely affected by future increases in the British pound exchange rate. In order to reduce our exposure to fluctuations in the British pound prior to any payment made under this contract, we entered into a number of foreign currency forward hedging contracts in 2005 and the three months ended March 31, 2006, all maturing within one year and being designated as cash flow hedges under SFAS 133. The table below provides information about the open derivative contracts at March 31, 2006, with amounts in U.S. dollar equivalents (in thousands, except for average contract rate):

| | March 31, 2006 | | |
|---|---|---|---|
| | Notional Amount | Average Contract Rate | Fair Value Gain (Loss) |
| British pounds | $ 9,818 | 0.57 | $ (86) |

We have no investments denominated in foreign currencies, and therefore our investments are not subject to foreign currency exchange risk. However, at each quarter end, we may have liabilities for costs incurred by overseas providers that are denominated in foreign currencies that are not hedged because of their small size and/or short time until settlement. An increase or decrease in exchange rates on these unhedged exposures may affect our operating results.

**ITEM 4. CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

We continue to review and improve the design and effectiveness of our internal controls over financial reporting in order to remain in compliance with Section 404 of the Sarbanes-Oxley Act of 2002. There has been no change in our internal controls during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

On or about December 6, 2001, Variagenics, Inc. was sued in a complaint filed in the United States District Court for the Southern District of New York naming it and certain of its officers and underwriters as defendants. The complaint purportedly is filed on behalf of persons purchasing Variagenics' stock between July 21, 2000 and December 6, 2000, and alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.

The complaint alleges that, in connection with Variagenics' July 21, 2000 initial public offering, or IPO, the defendants failed to disclose additional and excessive commissions purportedly solicited by and paid to the underwriter defendants in exchange for allocating shares of Variagenics' stock to preferred customers and alleged agreements among the underwriter defendants and preferred customers tying the allocation of IPO shares to agreements to make additional aftermarket purchases at predetermined prices. Plaintiffs claim that the failure to disclose these alleged arrangements made Variagenics' registration statement on Form S-1 filed with the SEC in July 2000 and the prospectus, a part of the registration statement, materially false and misleading. Plaintiffs seek unspecified damages. On or about April 19, 2002, an amended complaint was filed which makes essentially the same allegations. On or about July 15, 2002, Variagenics and the individuals filed a motion to dismiss. We are involved in this litigation as a result of our merger with Variagenics in January 2003.

On July 16, 2003, Nuvelo's Board of Directors approved a settlement proposal initiated by the plaintiffs. The final terms of the settlement are still being negotiated. We believe that any loss or settlement amount will not be material to our financial position or results of operations, and that any settlement payment and attorneys' fees accrued with respect to the suit will be paid by our insurance provider. However, it is possible that the parties may not reach agreement on the final settlement documents or that the Federal District Court may not approve the settlement in whole or part. We could be forced to incur material expenses in the litigation if the parties do not reach agreement of the final settlement documents, and in the event there is an adverse outcome, our business could be harmed.

On March 24, 2006, we were notified that Archemix had filed with Judicial Arbitration and Mediation Services, Inc. (JAMS) a Statement of Claim requesting the initiation of an arbitration pursuant to our January 12, 2004 Collaboration Agreement with Archemix. In its Statement of Claim, Archemix seeks a declaration that the exclusive "Field" as defined in the Collaboration Agreement is limited to aptamers that bind directly to thrombin and a declaration that the Agreement prohibits the parties from developing any compounds outside of the Collaboration that bind to thrombin directly. Archemix also requests unspecified damages. We view Archemix's asserted claim as highly unlikely to result in our having any liability to Archemix.

## ITEM 1A. RISK FACTORS

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. The following discussion highlights some of these risks. Those risk factors that reflect substantive changes from the risk factors included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005 are marked with an asterisk.

### RISKS RELATED TO OUR BUSINESS

**Our near-term success is dependent on the success of our lead product candidate, alfimeprase, and we cannot be certain that it will receive regulatory approval or be successfully commercialized.**

Alfimeprase is currently being evaluated in Phase 3 clinical trials for the treatment of each of acute PAO and catheter occlusion and will require the successful completion of these or other planned Phase 3 clinical trials before we are able to submit a biologics license application, or BLA, to the FDA for approval. If our Phase 3 or other clinical trials fail to demonstrate that alfimeprase is safe and effective, it will not receive regulatory approval. Even if alfimeprase receives FDA approval, it may never be successfully commercialized. We may also have inadequate financial or other resources to pursue this product candidate through the clinical trial process or through commercialization. In addition, prior to initiating our current Phase 3 trials for alfimeprase, we had never conducted a Phase 3 clinical trial, and we may be unable to successfully complete clinical trials involving the number of clinical sites and patients as planned for our alfimeprase Phase 3 clinical trials. If we are unable to successfully commercialize or obtain regulatory approval for alfimeprase, we may not be able to generate revenue, become profitable or continue our operations. One of our Phase 3 trials of alfimeprase, NAPA-3, is the subject of a special protocol assessment agreement with the FDA. Under this agreement, the FDA provides guidance on the design of a trial prior to its initiation. We have also been granted fast track designation by the FDA for alfimeprase in acute PAO. The special protocol assessment agreement and the fast track designation do not offer any assurance that alfimeprase will receive FDA approval, and the FDA is in no way constrained by the agreement or the designation in its ability to deny approval for alfimeprase.

**Development of our products will take years, and our products require regulatory approval before they can be sold.**

We currently have two clinical stage drug candidates. All of our other potential products currently are in research or pre-clinical development, and revenues from the sales of any products may not occur for several years, if at all. We cannot be certain that any of our products will be demonstrated to be safe and effective or that we will obtain regulatory approvals for any indication. We cannot predict whether we will be able to develop and commercialize any of our drug candidates successfully. If we are unable to obtain regulatory approval and successfully commercialize our potential products, our business, results of operations and financial condition will be affected in a materially adverse manner.

**Our clinical trials may not yield results that will enable us to obtain regulatory approval for our products.**

We, and our collaborators, will only receive regulatory approval for a drug candidate if we can demonstrate in carefully designed and conducted clinical trials that the drug candidate is safe and effective. We do not know whether our current or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or will result in marketable products. Clinical trials are lengthy, complex and expensive processes with uncertain results. It will take us several years to complete our testing, and failure can occur at any stage of testing. To date, we have not successfully completed any Phase 3 clinical trials, and we have not completed all planned pre-clinical and Phase 1 clinical trials for each of our product candidates. The results we obtain in pre-clinical testing and early clinical trials may not be predictive of results that are obtained in later studies. We may suffer significant setbacks in advanced clinical trials, even after promising results in earlier studies. Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue development of one or more of our drug candidates. If we fail to adequately demonstrate the safety and efficacy of our products under development, we will not be able to obtain the required regulatory approvals to commercialize our drug candidates, and our business, results of operations and financial condition will be materially adversely affected.

Clinical trials are subject to continuing oversight by governmental regulatory authorities and institutional review boards, or IRBs, and must meet the requirements of these authorities in the United States and in foreign countries, including those for informed consent and good clinical practices. We may not be able to comply with these requirements and the FDA, a similar foreign authority, an IRB, or we may suspend or terminate clinical trials at any time.

21

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

Administering our drug candidates to humans may produce undesirable side effects. These side effects could interrupt, delay or halt clinical trials of our drug candidates and could result in the FDA or other regulatory authorities denying approval of our drug candidates for any or all targeted indications.

We rely on third parties, including contract research organizations and outside consultants, to assist us in managing and monitoring clinical trials. Our reliance on these third parties may result in delays in completing, or in failing to complete, these trials if they fail to perform with the speed and competency we expect.

If clinical trials for a drug candidate are unsuccessful, we will be unable to commercialize the drug candidate. If one or more of our clinical trials are delayed, we will be unable to meet our anticipated development or commercialization timelines. Either circumstance could cause the market price of our common stock to decline.

**If we encounter difficulties enrolling patients in our clinical trials, our trials could be delayed or otherwise adversely affected.**

Clinical trials for our drug candidates require that we identify and enroll a large number of patients with the disorder or condition under investigation. We, or our collaborators, may not be able to enroll a sufficient number of patients to complete our clinical trials in a timely manner.

Patient enrollment is affected by factors including:

- design of the protocol;

- the size of the patient population;

- eligibility criteria for the study in question;

- perceived risks and benefits of the drug under study;

- availability of competing therapies;

- efforts to facilitate timely enrollment in clinical trials;

- the success of our personnel in making the arrangements with potential clinical trial sites necessary for those sites to begin enrolling patients;

- patient referral practices of physicians; and

- availability of clinical trial sites.

If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay or terminate ongoing or planned clinical trials, either of which would have a negative effect on our business. Delays in enrolling patients in our clinical trials would also adversely affect our ability to generate product, milestone and royalty revenues and could impose significant additional costs on us or on our collaborators.

**We face heavy government regulation, and FDA and international regulatory approval of our products is uncertain.**

The research, testing, manufacturing and marketing of drug products such as those proposed to be developed by us or our collaboration partners are subject to extensive regulation by federal, state and local governmental authorities, including the FDA, and comparable agencies in other countries. To obtain regulatory approval of a drug product, we or our collaboration partners must demonstrate to the satisfaction of the applicable regulatory agency, among other things, that the product is safe and effective for its intended uses. In addition, we must show that the manufacturing facilities used to produce the products are in compliance with current Good Manufacturing Practices regulations, or cGMP, and that the process for manufacturing the product has been validated in accordance with the requirements of the FDA and comparable agencies in other countries.

The process of obtaining FDA and other required regulatory approvals and clearances typically takes several years and will require us to expend substantial capital and resources. Despite the time and expense expended, regulatory approval is never guaranteed. The number of pre-clinical and clinical tests that will be required for FDA and international regulatory approval varies depending on the drug candidate, the disease or condition that the drug candidate is in development for, and the regulations applicable to that particular drug candidate. The FDA or comparable international regulatory authorities can delay, limit or deny approval of a drug candidate for many reasons, including:

- a drug candidate may not be safe or effective;

- the FDA or comparable international regulatory authorities may interpret data from pre-clinical and clinical testing in different ways than we and our collaboration partners interpret them;

- the FDA or comparable international regulatory authorities may not approve our manufacturing processes or facilities or the processes or facilities of our collaboration partners; or

- the FDA or comparable international regulatory officials may change their approval polices or adopt new regulations.

Source: NUVELO INC, 10-Q, May 09, 2006