# Exhibit J

In addition, in order to market any products outside of the United States, we and our collaborators must establish and comply with numerous and varying regulatory requirements of other jurisdictions, including the European Medicines Evaluation Agency, or EMEA, regarding safety and efficacy. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods. The time required to obtain approval in other countries differs from that required to obtain FDA approval. The regulatory approval process in other countries can include all of the risks detailed above regarding FDA approval in the

22

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

United States as well as other risks. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. Failure to obtain regulatory approval in other countries or any delay or setback in obtaining such approval could have the same adverse effects detailed above regarding FDA approval in the United States.

If and when our products do obtain such approval or clearances, the manufacturing, marketing, and distribution of such products would remain subject to extensive ongoing regulatory requirements. Failure to comply with applicable regulatory requirements could result in:

- warning letters;

- fines;

- civil penalties;

- injunctions;

- recall or seizure of products;

- total or partial suspension of production;

- refusal of the government to grant approvals; or

- withdrawal of approvals and criminal prosecution.

Any delay or failure by us, or our collaboration partners, to obtain regulatory approvals for our product candidates:

- would adversely affect our ability to generate product, milestone and royalty revenues;

- could impose significant additional costs on us or our collaboration partners;

- could diminish competitive advantages that we may attain;

- would adversely affect the marketing of our products; and

- could cause the price of our shares to decline.

Even if we do receive regulatory approval for our drug candidates, the FDA or international regulatory authorities may impose limitations on the indicated uses for which our products may be marketed, subsequently withdraw approval or take other actions against us, or our products, that are adverse to our business. The FDA and comparable international regulatory authorities generally approve products for particular indications. An approval for a limited indication reduces the size of the potential market for the product. Product approvals, once granted, may be withdrawn if problems occur after initial marketing.

We also are subject to numerous federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals, the environment and the use and disposal of hazardous substances used in connection with our discovery, research and development work, including radioactive compounds and infectious disease agents. In addition, we cannot predict the extent of government regulations or the impact of new governmental regulations that might significantly harm the discovery, development, production and marketing of our products. We may be required to incur significant costs to comply with current or future laws or regulations, and we may be adversely affected by the cost of such compliance.

**If we fail to maintain existing licenses and collaborations, or fail to develop new collaborations, our business will be harmed.***

The success of our business is dependent, in significant part, upon our ability to maintain current licensing and collaborative relationships and enter into multiple new licenses and collaboration agreements. We also must manage effectively the numerous issues that arise from such arrangements and agreements. Management of our relationships with these third parties has required and will require:

- a significant amount of our management team's time and effort;

- effective allocation of our and third-party resources to multiple projects;

- agreements with third parties as to ownership of proprietary rights and development plans, including clinical trials or regulatory approval strategy; and

- the recruitment and retention of management, scientific and other personnel.

Source: NUVELO INC, 10-Q, May 09, 2006

In January 2006, we entered into a license and collaboration agreement with Bayer for the development and commercialization of alfimeprase internationally. Under the agreement, Bayer will commercialize alfimeprase in all territories outside the United States and will pay us tiered royalties ranging from a minimum of 15 percent to a maximum of 37.5 percent of net sales. We will retain all commercialization rights and profits from alfimeprase sales in the United States. We received an up-front cash payment from Bayer of $50.0 million upon entry into the agreement, and are eligible to receive up to an additional $335.0 million in milestone payments, including

23

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

$165.0 million in development milestones and $170.0 million in sales and commercialization milestones, over the course of the agreement. In addition, Bayer will be responsible for 40 percent of the costs for global development programs. We will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. Each party will solely bear the expense of any country-specific alfimeprase clinical trials conducted by it, where the country-specific clinical trials are not part of the agreed global development program. If we fail to maintain a successful collaboration with Bayer, Bayer could terminate our agreement, which could force us to expend additional amounts to obtain regulatory approval, delay the commercial launch of alfimeprase outside the United States, delay our ability to obtain regulatory approval for alfimeprase in the stroke and deep venous thrombosis indications, and have a negative impact on the success of alfimeprase's commercial launch, all of which would have a material, adverse effect on our business.

In October 2004, we obtained worldwide rights to develop and commercialize alfimeprase from Amgen in exchange for payment to Amgen of future development milestones and royalties. Future milestone payments under the license agreement could total as much as $35.0 million. Under our agreement with Bayer, we retain sole responsibility for making these payments to Amgen. In accordance with the terms of the license agreement, Amgen has transferred the technology necessary for the manufacture of alfimeprase drug substance to our designated manufacturer, Avecia.

In February 2004, we entered into a license agreement with Dendreon relating to rNAPc2, in accordance with which we are to make milestone payments, ranging from $2.0 million to $6.0 million, upon dosing of the first patient in a Phase 3 clinical trial, upon submission of an NDA and upon first commercial sale, for both the first and second indications of rNAPc2. If these and other milestones are all achieved, total milestone payments to Dendreon may reach as much as $23.5 million.

In March 2005, we entered into a collaboration agreement with the Pharmaceutical Division of Kirin for the development and commercialization of NU206. All operating expenses and profits related to the development and commercialization of NU206 will be shared 60 percent by us and 40 percent by Kirin. If this agreement is terminated, or we or Kirin elect under certain circumstances to no longer actively participate in the collaboration, the relationship with respect to NU206 will convert from an expense and profit sharing structure to a royalty-based structure. Our 2001 collaboration agreement with Kirin for research and development of secreted proteins expired in December 2005 in accordance with its terms.

In January 2004, we entered into a collaboration agreement with Archemix for the research and development of a thrombin inhibiting aptamer, in accordance with which we share equally all research and development costs and revenues subsequent to our initial funding of $4.0 million of these costs through the third quarter of 2004. We are to make a milestone payment of $10.0 million upon dosing of the first patient in a Phase 2 trial, which milestone is payable if Archemix voluntarily terminates the agreement or we terminate the agreement for Archemix's material default, so long as we have rights to the compound when the Phase 2 trial is initiated. During the collaboration we are limited in our ability to influence Archemix's conduct of clinical trials prior to the dosing of the first patient in a Phase 2 trial. We also are to make a $1.0 million milestone payment upon the designation of any backup compound selected by both us and Archemix for pre-clinical studies.

Under our collaboration with Archemix, we have the option to lead commercialization in which both parties may participate if we establish certain commercialization capabilities; however, if we do not establish such commercialization capabilities, Archemix, or a third party selected by the parties' joint steering committee, will have the option to lead commercialization. We currently do not have established commercialization experience or an internal trained sales force and if we do not successfully develop such capabilities we will be dependent on Archemix or a third party's experience in commercialization and ability to perform. Archemix can terminate its collaboration with us on limited notice and for reasons outside our control. If Archemix terminates the collaboration for our breach, all our rights in any collaboration products will become the property of Archemix, and we may not conduct research, development, manufacturing and commercialization activities in the field of modifying blood-clotting times in therapeutic applications through the use of aptamers.

Our efforts to manage simultaneously a number of collaboration arrangements may not be successful, and our failure to manage effectively such collaborations would significantly harm our business, financial condition and results of operations.

Due to these factors and other possible disagreements with current or potential collaborative partners, we may be delayed or prevented from developing or commercializing alfimeprase, rNAPc2, NU206, a thrombin inhibiting aptamer or other pre-clinical product candidates, or we may become involved in litigation or arbitration, which would be time-consuming or expensive and could have a material adverse effect on our stock price.

In addition to our existing collaborations, we will focus on effecting new collaborative arrangements where we would share costs of identifying, developing and marketing drug candidates. We cannot assure you that we will be able to negotiate new collaboration arrangements of this type on acceptable terms, or at all.

**We are currently dependent on third parties for a variety of functions and may enter into future arrangements for the manufacture and sale of our products. Our arrangements with these third parties may not provide us with the benefits we expect.**

We currently rely upon third parties to perform administrative functions and functions related to the research, development, pre-clinical testing and clinical trials of our drug candidates. In addition, because we do not have the resources, facilities or experience to manufacture our drug candidates on our own, we currently rely, and will continue to rely, on third parties to manufacture, which includes manufacturing bulk compound, filling and finishing, and labeling and packaging, our drug candidates for clinical trials, and, if our products are approved, in quantities for commercial sales. We currently rely on a number of sole-source service providers and suppliers and do not have long-term supply agreements with our third-party manufacturers.

We do not currently have manufacturing facilities for clinical or commercial production of our drug candidates and depend on contract research and manufacturing organizations. We may not be able to finalize contractual arrangements, transfer technology or maintain relationships with such organizations in order to file an investigational new drug application, or IND, with the FDA, and proceed with clinical trials for any of our drug candidates. Until recently, we have relied on Amgen to manufacture our clinical drug product, alfimeprase.

In June 2005, we entered into a definitive agreement with Avecia for the scale up and validation of the manufacturing process for alfimeprase drug substance, in anticipation of the potential commencement of the manufacture of commercial quantities, and in May 2006, we executed a drug product development and clinical supply agreement with Baxter for the lyophilization, filling, finishing, packaging and testing of alfimeprase, and process development related thereto. While we currently believe we have enough supplies of alfimeprase for phase 3 trials for the treatment of acute PAO and catheter occlusion, additional supplies may be necessary for these trials and for anticipated trials in other indications, and we are not yet certain that Avecia and Baxter will succeed in manufacturing additional supplies of alfimeprase for such trials. We may need to conduct comparative studies or utilize other means to determine bioequivalence between alfimeprase manufactured by Avecia and Baxter and that previously manufactured by Amgen.

We have transitioned the process of alfimeprase manufacture from Amgen to Avecia, but do not yet have a definitive agreement with Avecia for the manufacture of commercial quantities of alfimeprase drug substance. Additionally, we do not have an agreement in place for the commercial-scale manufacture of alfimeprase

final drug product. If Avecia and Baxter are unable to manufacture clinical or commercial grade alfimeprase for us, or we are unable to complete commercial arrangements with Avecia and Baxter, we may not have adequate supplies of alfimeprase to complete our clinical trials or to obtain regulatory approvals for alfimeprase on our anticipated schedule. If Avecia and Baxter are unable to produce alfimeprase in the quantities and with the quality we need, when we need it, we may incur significant additional expenses, and our and Bayer's efforts to complete our clinical trials and obtain approval to market alfimeprase could be significantly delayed.

Our drug candidates have never been manufactured on a commercial scale. We received a supply of rNAPc2 from Dendreon, which we have used in our research and

24

Table of Contents

development activities. When we deplete this existing supply, we will need to contract with a third party manufacturer to produce additional rNAPc2. Third-party manufacturers may not be able to manufacture these drug candidates at a cost, in quantities or with the quality necessary to make them commercially viable.

In addition, if and when any of our other drug candidates, such as NU206, enter the clinical trial phase, we will initially depend on third-party contract manufacturers to develop the necessary production processes, and produce the volume of cGMP-grade material needed to complete such trials. We will need to enter into contractual relationships with these or other organizations in order to (i) complete the Good Laboratory Practices, or GLP, toxicology and other studies necessary to file an IND with the FDA, (ii) produce a sufficient volume of cGMP-grade material in order to conduct clinical trials of these other drug candidates, and (iii) fill and finish, and label and package our material. We cannot be certain that we will be able to complete these tasks on a timely basis or that we will be able to obtain sufficient quantities of material or other manufacturing services on commercially reasonable terms. In addition, the failure of any of these relationships with third-party contract organizations may delay our filing for an IND or impede our progress through the clinical trial phase. Any significant delay or interruption would have a material adverse effect on our ability to file an IND with the FDA and/or proceed with the clinical trial phase for any of our drug candidates.

Moreover, contract manufacturers that we may use must continually adhere to cGMP enforced by the FDA through a facilities inspection program. If one of our contract manufacturers fails to maintain compliance, the production of our product candidates could be interrupted, resulting in delays, additional costs and potentially lost revenues. In addition, if the facilities of such manufacturers do not pass a pre-approval plant inspection, the FDA will not grant pre-market approval of our products.

We are dependent on third-party contract research organizations to conduct certain research, including GLP toxicology studies, in order to gather the data necessary to file INDs with the FDA for any of our drug candidates. These third parties may not conduct their research properly, or they may fail to complete their contract research on the anticipated schedule. In either case, the progress of our clinical programs may be delayed and our research and development costs may increase, which may in turn have a material adverse affect on our business.

Our reliance on these relationships poses a number of risks, including:

- delays in, or failures to achieve, scale-up to commercial quantities, or changes to current raw material suppliers or product manufacturers (whether the change is attributable to us or the supplier or manufacturer), resulting in delayed clinical studies, regulatory submissions and commercialization of our drug candidates;

- inability of third parties to manufacture, including filing and finishing, and labeling and packaging, our drug candidates in a cost-effective or timely manner or in quantities needed for clinical trials or commercial sales;

- our inability to effectively control the resources devoted by our partners to our programs or products;

- disagreements with third parties that could disrupt our operation or delay or terminate the research, development or manufacturing of drug candidates, or result in litigation or arbitration;

- inadequate contractual protection or difficulty in enforcing the contracts if one of our partners fails to perform;

- failure of these third parties to comply with regulatory requirements;

- conflicts of interest between third parties' work for us and their work for another entity, and the resulting loss of their services;

- failure to identify acceptable manufacturers or other suppliers or enter into favorable long-term agreements with them; and

- lack of all necessary intellectual property rights to manufacture and sell our drug candidates.

Given these risks, our current and future arrangements with third parties may not be successful. If these efforts fail, we would be required to devote additional internal resources to the activities currently performed, or to be performed, by third parties, to seek alternative third-party sources, or to delay our product development or commercialization.

**We may not achieve our projected development goals in the time frames we announce and expect.**

We set goals for and make public statements regarding the timing of certain accomplishments, such as the commencement and completion of clinical trials, anticipated regulatory approval dates and time of product launch, which we sometimes refer to as milestones. These milestones may not be achieved, and the actual timing of these events can vary dramatically due to a number of factors such as delays or failures in our clinical trials, disagreements with current or future clinical development collaborative partners, the uncertainties inherent in the regulatory approval process and manufacturing scale-up and delays in achieving manufacturing or marketing arrangements sufficient to commercialize our products. There can be no assurance that our clinical trials will be completed, that we will make regulatory submissions or receive regulatory approvals as planned or that we will be able to adhere to our current schedule for the launch of any of our products. If we fail to achieve one or more of these milestones as planned, our business will be materially adversely affected and the price of our shares will decline.

**We are dependent on key personnel and we must attract and retain qualified employees, collaborators and consultants.**

The success of our business is highly dependent on the principal members of our scientific and management staff, including our senior management team. The loss of the services of any such individual might seriously harm our product development and commercialization efforts. In addition, we will require additional skilled personnel in areas such as clinical development. Retaining and training personnel with the requisite skills is challenging and extremely competitive.

particularly in Northern California, where we are located.

Our success will depend on our ability to attract and retain qualified employees to help develop our potential products and execute our research, development and commercialization strategy. We have programs in place to retain personnel, including programs to create a positive work environment and competitive compensation packages. Because competition for employees in our field is intense, however, we may be unable to retain our existing personnel or attract additional qualified employees. Our success also depends on the continued availability of outside scientific collaborators, including collaborators at research institutions, to perform

25

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

research and develop processes to advance and augment our internal research efforts. Competition for collaborators is intense. We also rely on services provided by outside consultants. Attracting and retaining qualified outside consultants is competitive, and, generally, outside consultants can terminate their relationship with us at will. If we do not attract and retain qualified personnel, outside consultants and scientific collaborators, or if we experience turnover or difficulties recruiting new employees or outside consultants, our research, development and commercialization programs could be delayed and we could experience difficulties in generating sufficient revenue to maintain our business.

We currently have limited sales, marketing and distribution capability. As the potential commercialization of our products approaches, we intend to hire marketing and sales personnel to enable us to participate in the commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate qualifications and talent, our ability to generate product revenues will be adversely affected.

**The success of our potential products in pre-clinical studies does not guarantee that these results will be replicated in humans.**

Although our clinical development-stage drug candidates have shown results in pre-clinical studies, these results may not be replicated in our clinical trials with humans. Consequently, there is no assurance that the results in our pre-clinical studies are predictive of the results that we will see in our clinical trials with humans or that they are predictive of whether the resulting products will be safe and effective in humans.

**Because we have not yet commercialized any of our drug candidates, our ability to develop and subsequently commercialize products is unproven.**

We have not yet commercialized any of our in-licensed therapeutic product candidates. Moreover, we have not clinically developed any therapeutic products using proteins produced by the genes we have discovered in our internal research programs. Before we make any products available to the public from our internal research and development programs, we or our collaboration partners will need to conduct further research and development and complete laboratory testing and animal and human studies. We, or our collaboration partners, will need to obtain regulatory approval before releasing any drug products. We have spent, and expect to continue to spend, significant amounts of time and money in the clinical development of our in-licensed product candidates, and in our internal research programs in determining the function of genes and the proteins they produce, using our own capabilities and those of our collaboration partners. Such a determination process constitutes the first step in developing commercial products from our in-licensed product candidates and internal research programs. We also have spent and will continue to spend significant amounts of time and money in developing processes for manufacturing our in-licensed product candidates and our recombinant proteins under pre-clinical development. We may not be able to produce sufficient proteins for pre-clinical studies of our internally-generated product candidates. A commercially viable product may never be developed from our gene discoveries.

Our commercialization of products is subject to several risks, including but not limited to:

- the possibility that a product is toxic, ineffective or unreliable;

- failure to obtain regulatory approval for the product;

- difficulties in manufacturing the product on a large scale;

- difficulties in planning, coordinating and executing the commercial launch of the product;

- difficulties in marketing, distribution or sale of the product;

- competition from superior products; or

- third-party patents that preclude us from marketing a product.

Our internal drug development programs are currently in the research stage or in pre-clinical development. None of our potential therapeutic protein candidates from our own portfolio has advanced to Phase 1 clinical trials. Our programs may not move beyond their current stages of development. Even if our internal research does advance, we will need to engage in certain additional pre-clinical development efforts to determine whether a product is sufficiently safe and effective to enter clinical trials. We have little experience with these activities with respect to protein candidates and may not be successful in developing or commercializing such products.

Under our license and collaboration agreement with Bayer, we share the costs of global development of alfimeprase, with Nuvelo responsible for 60 percent of these costs and Bayer responsible for 40 percent. We and Bayer manage the design and conduct of the global development program jointly, but in the event of a disagreement, we retain the right to make any final decision.

Under our collaboration with Archemix, Archemix leads development until the first dosing of a patient in a Phase 2 clinical trial, and thereafter, a joint steering committee will designate one party to lead development until commercialization. With respect to these arrangements, we run the risk that Bayer or Archemix may not pursue clinical development in a timely or effective manner.

Any regulatory approvals that we or our collaboration partners receive for our product candidates may be subject to limitations on the intended uses for which the product candidates may be marketed or contain requirements for potentially costly post-marketing follow-up studies. In addition, if the FDA approves of our or our collaboration partners' product candidates, the labeling, packaging, adverse event reporting, storage, advertising, promotion and record-keeping for the products will be subject to extensive regulatory requirements.

We, our collaborators and our suppliers, may also not be able to produce any products in commercial quantities at a reasonable cost or may not be able to successfully market such products. If we do not develop a commercially viable product, then we will suffer significant harm to our business, financial condition and operating results.

Source: NUVELO INC, 10-Q, May 09, 2006

Finally, even if a product candidate such as alfimeprase or rNAPc2 were approved for commercial sale, significant strategic planning and resources will be necessary to effectively coordinate commercial launch of the product in the approved indication or indications, and to effectively market, distribute and sell the product for use in the approved indication or indications. In addition, the marketing, distribution, sale and reimbursement of pharmaceutical products is heavily regulated, and we must comply with all such applicable laws and regulations, or incur costs, fees and other liabilities associated with non-compliance. If our or a collaboration partner's commercial launch of a product approved for commercial sale were to be unsuccessful, or if we or a collaboration partner were to fail in our or their efforts to properly market, distribute or sell any product approved for sale, our business, financial condition and operating results would suffer significant harm.

26

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
**We lack marketing and commercialization experience for biopharmaceutical products and we may have to rely on third parties for these capabilities.**

We currently have limited sales, marketing and distribution capability. As the potential commercialization of our products approaches, we intend to hire additional marketing and sales personnel to enable us to participate in the commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate technical and sales expertise or in developing an adequate distribution capability to support them, our ability to generate product revenues will be adversely affected. To the extent we cannot or choose not to use internal resources for the marketing, sales or distribution of any potential products in the United States or elsewhere, we intend to rely on collaboration partners or licensees. We may not be able to establish or maintain such relationships. To the extent that we depend on collaboration partners or other third parties for marketing, sales and distribution, any revenues we receive will depend upon their efforts. Such efforts may not be successful, and we will not be able to control the amount and timing of resources that collaboration partners or other third parties devote to our products.

**Our products may not be accepted in the marketplace, and we may not be able to generate significant revenue, if any.**

Even if they are approved for marketing, our products, if any, may never achieve market acceptance among physicians, patients and the medical community. Our products, if successfully developed, will compete with a number of traditional drugs and therapies manufactured and marketed by major pharmaceutical, medical device and biotechnology companies. Our products will also compete with new products currently under development by such companies and others. The degree of market acceptance of any products developed by us, alone, or in conjunction with our collaboration partners, will depend on a number of factors, including:

- the establishment and demonstration of the clinical efficacy and safety of the products;

- convenience and ease of administration;

- cost-effectiveness;

- our products' potential advantages over alternative treatment methods;

- marketing, sales and distribution support of our products; and

- reimbursement policies of government and third-party payers.

Physicians, patients or the medical community in general may not accept and utilize any of the products that we alone, or in conjunction with our collaboration partners, develop. In practice, competitors may be more effective in marketing their drugs. The lack of such market acceptance would significantly harm our business, financial condition and results of operations.

Even if our product candidates are approved for marketing and are accepted by physicians, patients and the medical community, the size of the market for these products may be insufficient to sustain our business, or may not provide an acceptable return on our investment in the development of these products. For example, our lead product candidate, alfimeprase, is undergoing clinical trials for the treatment of acute PAO. There are currently no thrombolytic agents specifically approved for the treatment of acute PAO in the United States or overseas, and as a result there is currently limited market data available for us to use in judging the market size for a therapeutic product of this nature. The number of incidents of acute PAO that are treatable with an approved thrombolytic agent may not be sufficient to create a sustainable market for alfimeprase, if approved. As a result, the commercialization of alfimeprase for the treatment of acute PAO, or any of our other product candidates, could fail even if we receive marketing approval from the FDA or similar foreign authority, and acceptance by the medical and patient communities.

**We are expanding our operations, and any difficulties managing this growth could disrupt our business.***

The implementation of our business strategy requires us to expand our operations, which will place additional demands on our financial, administrative and information technology resources and increase the demands on our financial systems and controls. We have begun the process of hiring a commercial organization and putting the infrastructure in place to support a potential commercial launch of alfimeprase. Our strategy also calls for us to undertake increased research and development activities, and to manage an increasing number of relationships with collaborators and other third parties. As our operations grow, we must expand and enhance our financial, administrative and information technology infrastructures. We may also need to expand our office and laboratory facilities to accommodate any future growth, but may be unable to lease additional space at our current San Carlos facility at commercially reasonable rates, if at all. We may be required to seek additional facilities. If we are unable to effectively manage the growth of our operations, we may not be able to implement our business strategy, and our financial condition and results of operations may be adversely affected.

**We face intense competition.**

The biopharmaceutical industry is intensely competitive and is accentuated by the rapid pace of technological development. We expect to face increased competition in the future as new companies enter our markets. Research and discoveries by others may result in breakthroughs that render our potential products obsolete even before they begin to generate any revenue. Our competitors include major pharmaceutical, medical device and biotechnology firms, many of which have substantially greater research and product development capabilities and financial, scientific, marketing and human resources than we have. Our lead product candidate, alfimeprase, if approved, will face competition in the catheter occlusion indication from alteplase, an approved Genentech, Inc. product, and will potentially face competition in the acute PAO indication from product candidates being developed and/or marketed by PDL BioPharma, Inc. and Genentech.

Our competitors may obtain patents and regulatory approvals for their competing products more rapidly than we, or our collaboration partners, develop products that are more effective than those developed by us, or our collaboration partners. All of our products will face competition from companies developing similar products as well as from companies developing other forms of treatment for the same conditions.

Many of the companies developing competing products have significantly greater financial resources than we have. Many such companies also have greater expertise than we have, and may have greater expertise than our collaboration partners have, in discovery, research and development, manufacturing, pre-clinical and clinical testing, obtaining regulatory approvals and marketing. Other smaller companies may also prove to be significant competitors, particularly through

collaborative arrangements with large and established companies. These companies and institutions compete with us in recruiting and retaining qualified scientific and management personnel as well as in acquiring technologies complementary to our programs. We will face competition with respect to:

- product efficacy and safety;

27

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

- the timing and scope of regulatory approvals;

- availability of resources;

- reimbursement coverage; and

- price and patent position, including the potentially dominant patent positions of others.

There can be no assurance that research and development by others will not render the products that we may develop obsolete or uneconomical, or result in treatments or cures superior to any therapy developed by us or that any therapy we develop will be preferred to any existing or newly-developed alternative products.

**We face uncertainty with respect to coverage, pricing, third-party reimbursements and healthcare reform.**

Our ability to collect significant revenues from our products may depend on our ability, and the ability of our collaboration partners or customers, to obtain adequate levels of coverage for our products and reimbursement from third-party payers such as:

- government health administration authorities;

- private health insurers;

- health maintenance organizations;

- pharmacy benefit management companies; and

- other healthcare-related organizations.

Third-party payers may deny coverage or offer inadequate levels of reimbursement if they determine that a prescribed product has not received appropriate clearances from the FDA or other government regulators, is not used in accordance with cost-effective treatment methods as determined by the third-party payer, or is experimental, unnecessary or inappropriate. If third-party payers deny coverage or offer inadequate levels of reimbursement, we may not be able to market our products effectively. We also face the risk that we will have to offer our products at prices lower than anticipated as a result of the current trend in the United States towards managed healthcare through health maintenance organizations. Currently, third-party payers are increasingly challenging the prices charged for medical products and services. Prices could be driven down by health maintenance organizations that control or significantly influence purchases of healthcare services and products. Existing U.S. laws, such as the Medicare Prescription Drug and Modernization Act of 2003, or future legislation to reform healthcare or reduce government insurance programs could also adversely affect prices of our approved products, if any. The cost-containment measures that healthcare providers are instituting and the results of potential healthcare reforms may prevent us from maintaining prices for our products that are sufficient for us to realize profits and may otherwise significantly harm our business, financial condition and operating results. In addition, to the extent that our products are marketed outside of the United States, foreign government pricing controls and other regulations may prevent us and our collaboration partners from maintaining prices for our products that are sufficient for us to realize profits and may otherwise significantly harm our business, financial condition and operating results.

**We may merge with or acquire other companies, and our failure to receive the anticipated benefits in these transactions could harm our business.**

In January 2003, we merged with Variagenics, and we may merge with or acquire other companies in the future. The success of any merger or acquisition depends, in part, on our ability to realize the anticipated synergies, cost savings and growth opportunities from integrating the business of the merged or acquired company with our business. The integration of two independent companies is a complex, costly and time-consuming process. The difficulties of combining the operations of the companies and/or our subsidiary include, among others:

- consolidating research and development operations;

- retaining key employees;

- consolidating corporate and administrative infrastructures;

- preserving the research and development and other important relationships of the companies;

- integrating and managing the technology of two companies;

- using the merged or acquired company's liquid capital and other assets efficiently to develop the business of the combined company;

- minimizing the diversion of management's attention from ongoing business concerns; and

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

• coordinating geographically separate organizations.

We cannot assure you that we will receive all of the anticipated benefits of any mergers or acquisitions, or that any of the risks described above will not occur. Our failure to receive anticipated benefits of, and our exposure to inherent risks in, any such merger or acquisition transaction could significantly harm our business, financial condition and operating results.

**We are subject to the risk of natural disasters.**

Our facilities are located in Northern California. If a fire, earthquake, flood or other natural disaster disrupts our research or development efforts, our business, financial condition and operating results could be materially adversely affected. Some of our landlords may maintain earthquake coverage for our facilities. Although we maintain personal property and business interruption coverage, we do not maintain earthquake coverage for personal property or resulting business interruption.

## RISKS RELATED TO OUR CAPITAL STRUCTURE AND FINANCIAL RESULTS

**We have not been profitable, anticipate continuing losses and may never become profitable.***

We had net losses of $52.5 million in 2004, $71.6 million in 2005 and $19.7 million in the three months ended March 31, 2006. As of March 31, 2006, we had an accumulated deficit of $347.3 million.

All of our product candidates are in various stages of product development, and some are still in research or in early development. None of them are approved for sale. The process of developing our drug products will require significant additional research and development, pre-clinical testing, clinical trials and regulatory approvals.

These activities, together with general administrative and other expenses, are expected to result in operating losses for the foreseeable future. To date, we have not generated any revenues from product sales. We do not expect to achieve significant product sales or royalty revenue from product sales for several years, and we may never do so. We expect to incur additional operating losses in the future, and these losses may increase significantly as we continue pre-clinical research and clinical trials, apply for regulatory approvals, develop our drug candidates, expand our operations and develop systems that support commercialization of our potential products. These losses, among other things, have caused and may cause our stockholders' equity and working capital to decrease. We may not be successful in developing our drug candidates, obtaining regulatory approvals and commercializing our products, and our operations may not be profitable even if any of our drug candidates are commercialized. We may never generate profits and, as a result, the market price of our common stock could decline.

Moreover, utilization of our net operating loss carry forwards and credits may be subject to an annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state law provisions. It is possible that certain transactions that we have entered into, including our merger with Variagenics in January 2003, when considered in connection with other transactions, may result in a "change in ownership" for purposes of these provisions.

In January 2005, we entered into a lease agreement for 61,826 square feet of industrial space in San Carlos, California. In connection with our lease of this new facility, we are examining the potential to sublease or otherwise exit our facility at 985 Almanor Avenue in Sunnyvale, California, which is currently primarily being used for storage and for which we have a lease through May 30, 2011. In accordance with Statement of Financial Accounting Standards No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," if we sublease or otherwise exit this facility, we could incur a significant charge to our earnings based on the remaining lease rental expense for this facility, reduced by the estimated income from sublease rental, if any. As of March 31, 2006, the remaining lease rental expense for this facility was $29.1 million. Similarly, in accordance with Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," if we sublease or otherwise exit this facility, we could also incur a significant charge to our earnings for the impairment of leasehold improvements related to this facility, based on the difference between their carrying value and fair value at the time of the sublease or exit. As of March 31, 2006, this difference was estimated to be $3.5 million.

We are potentially subject to additional non-cash charges which can negatively impact our results of operations. For example, as a result of our adoption of SFAS 123(R), we must measure compensation cost for stock-based awards made to employees at the grant date, based on the fair value of the award, and recognize the cost as an expense over the employee's requisite service period. As the variables that are used as a basis for valuing these awards change over time, the magnitude of the expense that we must recognize may increase significantly. In addition, in August 2005, in connection with our entry into a Committed Equity Financing Facility, we issued a warrant to Kingsbridge Capital Ltd. to purchase 350,000 shares of our common stock. The warrant's fair value was recorded as a deferred financing cost to additional paid-in capital, and the opposing current liability has and will continue to be marked-to-market each quarter, with the change being recorded as a charge to our general and administrative expenses. Changes in the price of our common stock over time have and may continue to cause significant charges to expense. Our results of operations could be materially and adversely affected by these or other non-cash charges that we may incur in the future.

**We will need to raise additional capital, and such capital may be unavailable to us when we need it or not available on acceptable terms.**

We will need to raise significant additional capital to finance the research and clinical development of our drug products. If future securities offerings are successful, they could dilute our current shareholders' equity interests and reduce the market price of our common stock. Financing may be unavailable when we need it or may not be available on acceptable terms. The unavailability of financing may require us to delay, scale back or eliminate expenditures for our research, development and marketing activities necessary to commercialize our potential biopharmaceutical products. We may also be required to raise capital by granting rights to third parties to develop and market drug candidates that we would prefer to develop and market on our own, potentially reducing the ultimate value that we could realize from these drug candidates.

If we are unable to obtain additional financing when we need it, the capital markets may perceive that we are not able to raise the amount of financing we desire, or on the terms that we desire. This perception, if it occurs, may negatively affect the market price of our common stock. If sufficient capital is not available, we may be forced to delay, reduce the scope of, eliminate or divest one or more of our research or development programs. Any such action could significantly harm our business, financial condition and results of operations.

Our future capital requirements and the adequacy of our currently available funds will depend on many factors, including, among others, the following:

- our ability to maintain, and the financial commitments involved in, our existing collaborative and licensing arrangements;

- the success of our collaborative relationship with Bayer, in accordance with the alfimeprase license and collaboration agreement we entered into in January 2006;

- progress in current and anticipated clinical studies of our products, including alfimeprase, rNAPc2, NU206 and a thrombin inhibiting aptamer;

29

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

- the cost of manufacturing our material for pre-clinical, clinical and commercial purposes;

- our ability to establish new collaborative relationships with other companies to share costs and expertise of identifying and developing drug candidates;

- the magnitude and scope of our research and development programs, including development of product candidates;

- continued scientific progress in our research and development programs, including progress in our research and pre-clinical studies;

- the cost involved in any facilities expansion to support research and development of our product candidates;

- the cost of prosecuting and enforcing our intellectual property rights;

- the time and cost involved in obtaining regulatory approvals;

- our need to develop, acquire or license new technologies or products;

- competing technological and market developments;

- our ability to use our common stock to repay an outstanding convertible promissory note to Affymetrix and our line of credit with Dr. George Rathmann;

- future funding commitments to our collaborators;

- general conditions in the financial markets and in the biotech sector;

- the uncertain condition of the capital markets and in the biotech sector; and

- other factors not within our control.

**We may face fluctuations in operating results.***

Our operating results may rise or fall significantly from period to period as a result of many factors, including:

- the amount of research and development we engage in;

- the number of product candidates we have, their progress in research, pre-clinical and clinical studies and the costs involved in manufacturing them;

- our ability to expand our facilities to support our operations;

- our ability to maintain existing and enter into new strategic relationships;

- the scope, duration and effectiveness of our licensing and collaborative arrangements;

- the costs involved in prosecuting, maintaining and enforcing patent claims;

- the possibility that others may have or obtain patent rights that are superior to ours;

- changes in government regulation;

- changes in the price of our common stock or other variables used as a basis for valuing stock-based awards;

- changes in accounting policies or principles; and

Source: NUVELO INC, 10-Q, May 09, 2006

- release of successful products into the market by our competitors.

Excluding our two clinical stage drug candidates, our potential products currently are in research or pre-clinical development, and revenues from the sales of any products resulting from this research and development may not occur for several years, if at all. A high percentage of our expenses are fixed costs such as lease obligations, and certain charges to our statement of operations are dependent on movements in the price of our common stock, which historically has been and is likely to remain highly volatile. As a result, we may experience fluctuations in our operating results from quarter to quarter and continue to generate losses. Quarterly comparisons of our financial results may not necessarily be meaningful, and investors should not rely upon such results as an indication of our future performance. In addition, investors may react adversely if our reported operating results are less favorable than in a prior period or are less favorable than those anticipated by investors or the financial community, which may result in a drop in the market price of our common stock.

30

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

**Our stock price has historically been and is likely to remain highly volatile, and an investment in our stock could suffer a decline in value.**

Stock prices and trading volumes for many biopharmaceutical companies fluctuate widely for a number of reasons, including factors which may be unrelated to their businesses or results of operations, such as media coverage, legislative and regulatory measures and the activities of various interest groups or organizations. This market volatility, as well as general domestic or international economic, market and political conditions, could materially and adversely affect the market price of our common stock and the return on your investment.

Historically, our stock price has been extremely volatile. Between January 1, 2005 and December 31, 2005, the price ranged between a high of $10.35 per share and a low of $5.75 per share, and between January 1, 2006 and March 31, 2006, the price ranged between a high of $18.71 per share and a low of $8.16 per share. The significant market price fluctuations of our common stock can be due to a variety of factors, including:

- the depth of the market for the common stock;

- the experimental nature of our potential products;

- actual or anticipated fluctuations in our operating results;

- sales of our common stock by existing holders, or sales of shares issuable upon exercise of outstanding options and warrants, upon repayment of our outstanding convertible promissory note to Affymetrix, or upon repayment of our line of credit with Dr. George Rathmann;

- market conditions relating to the biopharmaceutical and pharmaceutical industries;

- any announcements of technological innovations, new commercial products or collaborations, or clinical progress or lack thereof by us, our collaborative partners or our competitors;

- announcements concerning regulatory developments, developments with respect to proprietary rights and our collaborations;

- changes in or our failure to meet market or, to the extent securities analysts follow our common stock, securities analysts' expectations;

- loss of key personnel;

- changes in accounting principles;

- general market conditions; and

- public concern with respect to our products.

In addition, the stock market in general, and the market for biotechnology and other life science stocks in particular, has historically been subject to extreme price and volume fluctuations. This volatility has had a significant effect on the market prices of securities issued by many companies for reasons unrelated to the operating performance of these companies. In the past, following periods of volatility in the market price of a company's securities, class action securities litigation has often been instituted against such a company. Any such litigation instigated against us could result in substantial costs and a diversion of management's attention and resources, which could significantly harm our business, financial condition and operating results.

**Future sales or the possibility of future sales of our common stock may depress the market price of our common stock.**

Sales in the public market of substantial amounts of our common stock could depress prevailing market prices of our common stock. As of March 31, 2006, we had 51,801,087 shares of our common stock outstanding. All of these shares are freely transferable without restriction or further registration under the Securities Act, except for shares held by our directors, officers and greater than five percent stockholders and unregistered shares held by non-affiliates. As of March 31, 2006, our directors, officers and greater than five percent stockholders held approximately 16.5 percent of the shares of our outstanding common stock. Although we do not believe that our directors, officers and greater than five percent stockholders have any present intentions to dispose of large amounts of any shares of common stock owned by them, there can be no assurance that such intentions will not change in the future. The sale of these additional shares could depress the market price of our common stock.

Under registration statements on Form S-8 under the Securities Act, as of March 31, 2006, we have also registered approximately 8,279,135 shares of our common stock which may be issued under our 2004 Equity Incentive Plan, 2002 Equity Incentive Plan, 1995 Stock Option Plan, Non-Employee Director Stock Option Plan, Scientific Advisory Board/Consultants Stock Option Plan, stock option agreements entered into outside of any of our stock option plans, and our Employee Stock Purchase Plan. Included in the 8,279,135 shares, as of March 31, 2006, are (i) 6,099,971 shares of our common stock issuable under outstanding options to purchase our common stock under the specified plans, (ii) 823,539 shares of our common stock issuable under stock option agreements entered into outside of any of our stock option plans, (iii) 1,131,143 shares of our common stock reserved for future option grants under our 2004 Equity Incentive Plan, and (iv) 224,482 shares of our common stock reserved for future issuance under our Employee Stock Purchase Plan. As of March 31, 2006, 3,118,017 of the shares issuable upon exercise of our outstanding options were exercisable. Once these shares are exercised, such shares are available for sale in the open market without further registration under the Securities Act. The existence of these outstanding options and share reserves may negatively affect our ability to complete future equity financings at acceptable prices and on acceptable terms. The exercise of those options, and the prompt resale of shares of our common stock received, may also result in downward pressure on the price of our common stock.

As of March 31, 2006, 1,786,685 shares of our common stock were issuable upon the exercise of outstanding warrants, which were all exercisable as of this date. Once a warrant is exercised, the holder can arrange for the resale of shares either by invoking any applicable registration rights, causing the shares to be registered under the Securities Act and thus freely transferable, or by relying an exemption to the Securities Act. If these registration rights, or similar registration rights that may apply to securities we may issue in the future, are exercised, it could result in additional sales of our common stock in the market, which may have an adverse effect on our stock price.

31

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

As of March 31, 2006, $5.3 million of our common stock was issuable, at our option, to repay our convertible promissory note held by Affymetrix, Inc., including accrued interest, at a conversion price based on 90 percent of the average price of our common stock over a ten-day period ending two days prior to conversion. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable in the event that our market capitalization is under $50.0 million and Affymetrix reasonably determines that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed ten percent of our market capitalization. Pursuant to registration rights we granted to Affymetrix, we have registered for resale a portion of these shares on a registration statement that has been declared effective by the SEC. If we decide to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock by Affymetrix may also result in significant downward pressure on the market price of our common stock.

As of March 31, 2006, $6.3 million of our common stock was issuable, upon mutual agreement, to convert the remaining amount due on the promissory note under our line of credit with Dr. George Rathmann, including accrued interest, at a conversion price equal to the average price of our common stock over a 20-day period, ending two days prior to conversion, or, if in connection with an equity financing, at the offering price. If we agree to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock received by Dr. Rathmann may also result in significant downward pressure on the market price of our common stock.

Under the August 2005 committed equity financing facility, or CEFF, that we entered into with Kingsbridge Capital Ltd., and related stock purchase and registration rights agreements, we may periodically sell up to $75.0 million in shares of our common stock to Kingsbridge over a three-year period, subject to certain conditions and restrictions. In November 2005, under this CEFF, we sold 653,103 shares for gross proceeds of $5.0 million, and in December 2005 sold 1,186,297 shares for gross proceeds of $9.4 million. We may sell the balance of $60.6 million of shares of our common stock over the remainder of the three-year term of the CEFF. Should we sell further securities under the CEFF, it could have a dilutive effective on the holdings of our current stockholders, and may result in downward pressure on the market price of our common stock.

We will need to raise significant additional capital to finance the research, development and commercialization of our drug products. If future securities offerings are successful, they could dilute our current stockholders' equity interests and reduce the market price of our common stock.

**We do not intend to pay cash dividends on our common stock in the foreseeable future.**

We do not anticipate paying cash dividends on our common stock in the foreseeable future. Any payment of cash dividends will depend upon our financial condition, results of operations, capital requirements and other factors and will be at the discretion of our board of directors. Under our August 31, 2004 Loan and Security Agreement with Silicon Valley Bank, as amended, we cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of our capital stock. Furthermore, we may incur additional indebtedness that may severely restrict or prohibit the payment of dividends.

**We face exposure to currency fluctuations for transactions denominated in foreign currencies, which may adversely affect our results of operations.**

To mitigate the impact of currency exchange rate fluctuations on our cash outflows for certain foreign currency-denominated purchases, we have developed and implemented a foreign exchange risk management policy utilizing forward contracts to hedge against this exposure. For example, we have entered into a number of foreign exchange hedge contracts with Silicon Valley Bank in relation to our development and validation agreement with Avecia, pursuant to which we are required to make payments to Avecia in British pounds. Although we use forward contracts to reduce the impact of foreign currency fluctuations on our future results, these efforts may not be successful, and any such fluctuations could adversely affect our results of operations.

**Recent accounting pronouncements may impact our future financial position and results of operations.**

There may be potential new accounting pronouncements or regulatory rulings, which may have an impact on our future financial position and results of operations. On December 16, 2004, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment," also known as SFAS 123(R), an amendment of Statements of Financial Accounting Standards No. 123 and 95, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize the fair value of employee stock options and other stock-based compensation as an expense. The statement eliminates the ability to account for share-based employee compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees," also known as APB 25, and generally requires instead that such transactions be accounted for using a fair value-based method, such as Black-Scholes, to fairly value stock options and recognize that value as an expense over the requisite service period. The standard is effective for us beginning in the fiscal year commencing January 1, 2006. For all periods prior to January 1, 2006, we have accounted for our stock-based employee compensation plans in accordance with APB 25. We expect that the adoption of SFAS 123(R) will have a material adverse impact to our results of operations. For example, for the three months ended March 31, 2006, our net loss increased by $3.0 million, or $0.06 per share, as a result of our adoption of SFAS 123(R). We expect that our 2006 results will continue to be adversely affected by our adoption of SFAS 123(R) and that the FASB or other rule-making bodies could issue new accounting pronouncements that could affect our future financial position and results of operations.

**The committed equity financing facility with Kingsbridge may not be available to us when we desire to draw upon it, may require us to make additional "blackout" payments to Kingsbridge, and may result in dilution to our stockholders.**

In August 2005, in connection with a committed equity financing facility, or CEFF, we entered into a stock purchase agreement and related registration rights agreement with Kingsbridge Capital Ltd. The CEFF entitles us to sell and obligates Kingsbridge to purchase, from time to time over a period of three years, shares of our common stock for cash consideration up to an aggregate of $75.0 million, subject to certain conditions and restrictions. In November 2005, under this stock purchase agreement, we sold 653,103 shares for gross proceeds of $5.0 million, and in December 2005 sold 1,186,297 shares for gross proceeds of $9.4 million. The balance of $60.6 million remains available for use by us over the remainder of the three-year period. Kingsbridge will not be obligated to purchase shares under the CEFF unless certain conditions are met, which include a minimum price for our common stock; the accuracy of representations and warranties made to Kingsbridge; compliance with laws; effectiveness of a registration statement to register such shares for resale by Kingsbridge; and the continued listing of our stock on the Nasdaq National Market. In addition, Kingsbridge is permitted to terminate the CEFF if it determines that a material and adverse event has occurred affecting our business, operations, properties or financial condition. If we are unable to access funds through the CEFF, or if the CEFF is terminated by Kingsbridge, we may be unable to access capital on favorable terms or at all.

We are entitled in certain circumstances, to deliver a blackout notice to Kingsbridge to suspend the use of the registration statement under which shares sold under the CEFF are registered for resale, thereby prohibiting Kingsbridge from selling shares. If we deliver a blackout notice in the 15 trading days following the settlement of a sale of shares under the CEFF, or if the registration statement is not effective in circumstances not permitted by our agreement with Kingsbridge, then we must make a payment to Kingsbridge, or issue Kingsbridge additional shares in lieu of this payment, calculated on the basis of the number of shares held by Kingsbridge and the change in the market price of our common stock during the period in which the use of the registration statement is suspended. If the

market price of our common stock declines during a suspension of the registration statement, the blackout payment could be significant.

32

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

Should we sell additional shares to Kingsbridge under the CEFF, or issue shares in lieu of any blackout payment, it will have a dilutive effective on the holdings of our current stockholders, and may result in downward pressure on the market price of our common stock. If we draw down under the CEFF, we will issue shares to Kingsbridge at a discount of up to ten percent from the volume weighted average price of our common stock. If we draw down amounts under the CEFF when our share price is decreasing, we will need to issue more shares to raise the same amount than if our share price was higher. Issuances in the face of a declining share price will have an even greater dilutive effect than if our share price were stable or increasing, and may further decrease our share price.

**We have implemented anti-takeover provisions that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

The existence of our stockholder rights plan and provisions of our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, even if doing so would benefit our stockholders. These provisions:

- establish a classified board of directors so that not all members of our board may be elected at one time;

- authorize the issuance of up to 5,000,000 shares of preferred stock that could be issued by our board of directors to increase the number of outstanding shares and hinder a takeover attempt;

- limit who may call a special meeting of stockholders;

- prohibit stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon at a stockholder meeting.

Specifically, our certificate of incorporation provides that all stockholder action must be effected at a duly called meeting, and not by a written consent. The by-laws provide, however, that our stockholders may call a special meeting of stockholders only upon a request of stockholders owning at least 50 percent of our common stock. These provisions of our certificate of incorporation and our by-laws could discourage potential acquisition proposals and could delay or prevent a change in control. We designed these provisions to reduce our vulnerability to unsolicited acquisition proposals and to discourage certain tactics that may be used in proxy fights. These provisions, however, could also have the effect of discouraging others from making tender offers for our shares. As a consequence, they also may inhibit fluctuations in the market price of our shares that could result from actual or rumored takeover attempts. Such provisions also may have the effect of preventing changes in our management.

We are permitted to issue shares of our preferred stock without stockholder approval upon such terms as our board of directors determines. Therefore, the rights of the holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of our preferred stock that may be issued in the future. In addition, the issuance of preferred stock could have a dilutive effect on the holdings of our current stockholders.

On June 5, 1998, our board of directors adopted a rights plan and declared a dividend with respect to each share of our common stock then outstanding. This dividend took the form of a right, which entitles the holders to purchase one one-thousandth of a share of our Series A junior participating preferred stock at a purchase price that is subject to adjustment from time to time. These rights have also been issued in connection with each share of our common stock issued after June 15, 1998. The rights are exercisable only if a person or entity or affiliated group of persons or entities acquires, or has announced its intention to acquire, 15 percent (27.5 percent in the case of certain approved stockholders) or more of our outstanding common stock. The adoption of the rights plan makes it more difficult for a third party to acquire control of us without the approval of our board of directors. This rights agreement was amended on March 19, 2004, to reflect our reincorporation under Delaware law.

We are subject to the Delaware anti-takeover laws regulating corporate takeovers. These anti-takeover laws prevent a Delaware corporation from engaging in a merger or sale of more than ten percent of its assets with any stockholder, including all affiliates and associates of the stockholder, who owns 15 percent or more of the corporation's outstanding voting stock, for three years following the date that the stockholder acquired 15 percent or more of the corporation's stock unless:

- the board of directors approved the transaction where the stockholder acquired 15 percent or more of the corporation's stock;

- after the transaction in which the stockholder acquired 15 percent or more of the corporation's stock, the stockholder owned at least 85 percent of the corporation's outstanding voting stock, excluding shares owned by directors, officers and employee stock plans in which employee participants do not have the right to determine confidentially whether shares held under the plan will be tendered in a tender or exchange offer; or

- on or after this date, the merger or sale is approved by the board of directors and the holders of at least two-thirds of the outstanding voting stock that is not owned by the stockholder.

The provisions of our governing documents, stockholder rights plan and current Delaware law may, collectively:

- lengthen the time required for a person or entity to acquire control of us through a proxy contest for the election of a majority of our board of directors;

- discourage bids for our common stock at a premium over market price; and

Source: NUVELO INC, 10-Q, May 09, 2006

- generally deter efforts to obtain control of us.

**We have adopted an Executive Change in Control and Severance Benefit Plan that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

33

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

In December 2004, our board of directors approved an "Executive Change in Control and Severance Benefit Plan" for our executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain of our eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted by us previously. All of our executive employees at the level of Vice President or above have been designated as participants in the plan and our board of directors may designate other eligible individuals as participants. The plan provides that, upon a change in control of the company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause, or constructively terminated, within one month preceding our change in control. If a participant is terminated without cause or constructively terminated one month before or one year after our change in control, he or she will also be entitled to certain cash severance and continued medical benefits. The change in control and severance benefits for certain of our employees provided for under this plan could make it more difficult and expensive, or less desirable, for a third party to acquire us, even if doing so would benefit our stockholders.

34

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
RISKS RELATED TO INTELLECTUAL PROPERTY AND OTHER LEGAL MATTERS

**The commercial success of our products will be dependent upon our ability to protect the intellectual property rights associated with our products and drug candidates.**

Our competitive success will depend, in part, on our ability to obtain and maintain patent protection for our inventions, technologies and discoveries, including intellectual property that we license. The patent positions of biotechnology companies involve complex legal and factual questions, and we cannot assure you that our patents and licenses will successfully preclude others from using our technology. We could incur substantial costs in seeking enforcement of our proprietary rights against infringement.

We currently have, or have in-licensed, issued patents and pending patent applications that include claims to our in-licensed clinical products. We obtained exclusive worldwide rights to alfimeprase from Amgen in October 2004. We obtained exclusive worldwide rights for all indications of rNAPc2 and all of the rNAPc molecules owned by Dendreon in February 2004. The United States government may claim a non-exclusive right to use rNAPc2 with respect to the treatment of hemorrhagic fever. We also currently have patents that cover some of our technological discoveries and patent applications that we expect to protect some of our gene, protein and technological discoveries. We will continue to apply for patents for our discoveries. We cannot assure you that any of our applications, or our licensors' applications, will issue as patents, or that any patent issued or licensed to us will not be challenged, invalidated, circumvented or held unenforceable by way of an interference proceeding or litigation.

The timing of the grant of a patent cannot be predicted. Patent applications describing and seeking patent protection of methods, compositions, or processes relating to proprietary inventions involving human therapeutics could require us to generate data, which may involve substantial costs. Our pending patent applications may lack priority over others' applications or may not result in the issuance of patents. Even if issued, our patents may not be sufficiently broad to provide protection against competitors with similar technologies and may be challenged, invalidated or circumvented.

In addition to patents, we rely on a combination of trade secrets, copyright and trademark laws, nondisclosure agreements, licenses and other contractual provisions and technical measures to maintain and develop our competitive position with respect to intellectual property. Nevertheless, these measures may not be adequate to safeguard the technology underlying our products. For example, employees, consultants and others who participate in the development of our products may breach their agreements with us regarding our intellectual property and we may not have adequate remedies for the breach. Our trade secrets could become known through other unforeseen means. We depend on our collaborators and other third parties that license intellectual property to us to protect our licensed intellectual property. These collaborators and other third parties could fail to take a necessary step to protect our licensed intellectual property, which could seriously harm our intellectual property position.

We also may not be able to effectively protect our intellectual property rights in some foreign countries, as many countries do not offer the same level of legal protection for intellectual property as the United States. Furthermore, certain of the patent applications describing our proprietary methods are filed only in the United States. Even where we have filed our patent applications internationally, for some cases and in certain countries, we have chosen not to maintain foreign patent protection by opting not to enter national phase or opting not to pay maintenance annuities.

Notwithstanding our efforts to protect our intellectual property, our competitors may independently develop similar or alternative technologies or products that are equal or superior to our technology. Our competitors may also develop similar products without infringing on any of our intellectual property rights or design around our proprietary technologies.

**If our products infringe on the intellectual property rights of others, we could face costly litigation, which could cause us to pay substantial damages or licensing fees and limit our ability to sell some or all of our products.**

Extensive litigation regarding patents and other intellectual property rights has been common in the biopharmaceutical industry. Litigation may be necessary to assert infringement claims, enforce patent rights, protect trade secrets or know-how and determine the enforceability, scope and validity of certain proprietary rights. The defense and prosecution of intellectual property lawsuits, United States Patent and Trademark Office interference proceedings, and related legal and administrative proceedings in the United States and internationally involve complex legal and factual questions. As a result, such proceedings are costly and time-consuming to pursue and their outcome is uncertain.

Regardless of merit or outcome, our involvement in any litigation, interference or other administrative proceedings could cause us to incur substantial expense and could significantly divert the efforts of our technical and management personnel. An adverse determination may subject us to the loss of our proprietary position or to significant liabilities, or require us to seek licenses that may include substantial cost and ongoing royalties. Licenses may not be available from third parties, or may not be obtainable on satisfactory terms. An adverse determination or a failure to obtain necessary licenses may restrict or prevent us from manufacturing and selling our products, if any. These outcomes could materially harm our business, financial condition and results of operations.

Our market success depends in part on us neither infringing valid, enforceable patents or proprietary rights of third parties, nor breaching any licenses that may relate to our technologies and products. We are aware of third-party patents that may relate to our technology. We may be required to obtain licenses to patents or other proprietary rights of others in order to conduct research, development or commercialization of some or all of our programs. We plan to seek licenses, as we deem appropriate, but it is possible that we may infringe upon these patents or proprietary rights of third parties. If we do not obtain these licenses, we may encounter delays in product market introductions, incur substantial costs while we attempt to design around existing patents or not be able to develop, manufacture or sell products. In response, third parties may assert infringement or other intellectual property claims against us. We may consequently be subjected to substantial damages for past infringement or be required to modify our products if it is ultimately determined that our products infringe a third party's proprietary rights. Further, we may be prohibited from selling our products before we obtain a license, which, if available at all, may require us to pay substantial royalties, which could adversely impact our product costs and have an impact on our business. Further, if we do obtain these licenses, the agreed terms may necessitate reevaluation of the potential commercialization of any one of our programs. Failing to obtain a license could result in litigation. Even if these claims are without merit, defending a lawsuit takes significant time, may be expensive and may divert management attention from other business concerns. Any public announcements related to litigation or interference proceedings initiated or threatened against us could cause our stock price to decline.

**We face product liability exposure and potential unavailability of insurance.**

We risk financial exposure to product liability claims in the event that the use of products developed by us, or our collaboration partners, if any, result in personal injury.

We may experience losses due to product liability claims in the future. We have obtained limited product liability insurance coverage. Such coverage, however, may not be adequate or may not continue to be available to us in sufficient amounts or at an acceptable cost, or at all. We may not be able to obtain commercially

reasonable product liability insurance for any product approved for marketing. A product liability claim or other claim, product recalls, as well as any claims for uninsured liabilities or in excess of insured liabilities, may significantly harm our business, financial condition and results of operations.

35

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

**We use hazardous materials, chemicals and patient samples in our business and any disputes relating to improper handling, storage or disposal of these materials could be time consuming and costly.**

Our research and development and production activities involve the controlled use of hazardous or radioactive materials, chemicals, including oxidizing and reducing reagents, patient tissue and blood samples. We, our collaborators and service providers, are subject to federal, state and local laws and regulations governing the use, storage, handling and disposal of these materials and certain waste products. We could be liable for accidental contamination or discharge or any resultant injury from hazardous materials, and conveyance, processing, and storage of and data on patient samples. If we, or our collaborators or service providers, fail to comply with applicable laws or regulations, we could be required to pay penalties or be held liable for any damages that result and this liability could exceed our financial resources. Further, future changes to environmental health and safety laws could cause us to incur additional expense or restrict our operations. In addition, our collaborators and service providers may be working with hazardous materials, including viruses and hazardous chemicals, in connection with our collaborations. In the event of a lawsuit or investigation, we could be held responsible for any injury caused to persons or property by exposure to, or release of, patient samples that may contain viruses and hazardous materials. The cost of this liability could exceed our resources.

**Variagenics has been named as a defendant in a class action suit and defending this litigation could hurt our business.**

Variagenics has been named as a defendant in a securities class action lawsuit alleging the failure to disclose additional and excessive commissions purportedly solicited by and paid to underwriters who are also named defendants in the lawsuit. Plaintiffs in the suit allege that underwriters took these commissions and in exchange allocated shares of Variagenics' stock to their preferred customers through alleged agreements with these preferred customers that tied the allocation of initial public offering shares to agreements by the customers to make additional aftermarket purchases at pre-determined prices. As a result of our merger with Variagenics, we are obligated to continue to defend against this litigation. Currently we are in the process of approving a settlement by and between the issuers that are defendants in the lawsuit, the insurers of those issuers, and the plaintiffs. We believe that any loss or settlement amount will not be material to our financial position or results of operation, and that any settlement payment and attorneys' fees accrued with respect to the suit will be paid by our insurance provider. However, we cannot assure you that this will be the case until a final settlement is executed. Failure to finalize a settlement could require us to pay substantial damages.

36

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

Not applicable.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

Not applicable.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

Not applicable.

**ITEM 5. OTHER INFORMATION**

On May 5, 2006, the Company executed a Drug Product Development and Clinical Supply Agreement with Baxter Pharmaceutical Solutions LLC (Baxter) that became effective on April 28, 2006, for the lyophilization, filling, finishing, packaging and testing of alfimeprase, and process development related thereto. Under the terms of the Agreement, the Company and Baxter will agree upon project plans, development plans and regulatory plans in accordance with which the work agreed upon by the parties will be conducted. In accordance with current plans, Nuvelo expects to pay Baxter approximately $5.1 million, which will increase as additional plans are executed by both parties. Nuvelo is also paying related fees and expenses, including the costs of supplies, materials, equipment and subcontracted work. The agreement does not cover the commercial lyophilization, filling, finishing, packaging or testing of alfimeprase. The Drug Product Development and Clinical Supply Agreement remains in force until the completion of the work contemplated under it, but may be terminated early by Baxter if Nuvelo breaches the agreement, and may be terminated by Nuvelo for any reason, subject in some cases to cancellation fees and penalties.

**ITEM 6. EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger between Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc. dated November 9, 2002.(5) |
| 2.2 | Agreement and Plan of Merger between Nuvelo, Inc. and Nuvelo, Inc., a Nevada corporation and Nuvelo, Inc.'s predecessor in interest dated March 19, 2004.(7) |
| 2.3 | Stock Purchase Agreement between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc. dated December 3, 2004.(8) |
| 3.1 | Amended and Restated Certificate of Incorporation of Nuvelo, Inc.(7) |
| 3.2 | Amended and Restated By-Laws of Nuvelo, Inc.(10) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate.(7) |
| 4.2 | Certificate of Designations of Series A Junior Participating Preferred Stock.(7) |
| 4.3 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998.(1) |
| 4.4 | Amendment to Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated November 9, 2002.(6) |
| 4.5 | Amendment to Rights Agreement between Nuvelo, Inc. and U.S. Stock Transfer Corporation dated March 19, 2004.(7) |
| 4.6 | Hyseq Promissory Note in the principal amount of $4,000,000 dated November 13, 2001.(3) |
| 4.7 | Registration Rights Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(3) |
| 4.8 | Pledge and Security Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(3) |
| 4.9 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc. dated January 8, 2002.(2) |
| 4.10 | Form of Warrant dated April 5, 2002.(4) |
| 4.11 | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(9) |
| 4.12 | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(9) |
| 4.13 | Replacement Warrant to purchase 50,000 shares (pre split) of Common Stock of Nuvelo, Inc. dated June 7, 2005.(11) |
| 4.14 | Warrant to purchase 350,000 shares of Common Stock of Nuvelo, Inc. dated August 4, 2005.(12) |
| 4.15 | Registration Rights Agreement by and between Nuvelo, Inc. and Kingsbridge Capital Limited dated August 4, 2005.(12) |
| 4.16 | Replacement Warrant to purchase 109,607 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(13) |
| 4.17 | Replacement Warrant to purchase 222,536 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(13) |
| 4.18 | Reference is made to Exhibits 3.1 and 3.2. |
| 10.54† | Nuvelo, Inc. Management Bonus Amounts for Named Executive Officers for the 2005 Fiscal Year.(14) |

37

Source: NUVELO INC, 10-Q, May 09, 2006

<u>Table of Contents</u>

| Exhibit Number | Description |
| --- | --- |
| 10.56§ | License and Collaboration Agreement dated January 4 2006 between Bayer Healthcare AG and Nuvelo, Inc.(15) |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

---

\*    Filed herewith.
†    Compensatory plan or agreement.
§    Confidential treatment requested.
(1)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No. 00-22873.
(2)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K filed April 2, 2001, File No. 000-22873.
(3)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on April 1, 2002, File No. 000-22873.
(4)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed on June 14, 2002, File No. 333-90458.
(5)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873.
(6)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-4, filed on November 27, 2002, File No. 333-101503.
(7)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed March 26, 2004, File No. 000-22873.
(8)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 9, 2004, File No. 000-22873.
(9)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 16, 2005, File No. 000-22873.
(10)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2005, File No. 000-22873.
(11)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on July 14, 2005, File No. 333-126591.
(12)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed August 5, 2005, File No. 000-22873.
(13)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on September 14, 2005, File No. 333-128316.
(14)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed February 10, 2006, File No. 000-22873.
(15)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 15, 2006, File No. 000-22873.

38

Table of Contents

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Nuvelo, Inc. (Registrant)

By: _____ /s/ GARY S. TITUS _____
**Gary S. Titus**
*Vice President and acting Chief Financial Officer*
*(Duly Authorized and Principal Financial Officer)*

Dated: May 9, 2006

39

Source: NUVELO INC, 10-Q, May 09, 2006

Table of Contents
EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger between Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc. dated November 9, 2002.(5) |
| 2.2 | Agreement and Plan of Merger between Nuvelo, Inc. and Nuvelo, Inc., a Nevada corporation and Nuvelo, Inc.'s predecessor in interest dated March 19, 2004.(7) |
| 2.3 | Stock Purchase Agreement between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc. dated December 3, 2004.(8) |
| 3.1 | Amended and Restated Certificate of Incorporation of Nuvelo, Inc.(7) |
| 3.2 | Amended and Restated By-Laws of Nuvelo, Inc.(10) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate.(7) |
| 4.2 | Certificate of Designations of Series A Junior Participating Preferred Stock.(7) |
| 4.3 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998.(1) |
| 4.4 | Amendment to Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated November 9, 2002.(6) |
| 4.5 | Amendment to Rights Agreement between Nuvelo, Inc. and U.S. Stock Transfer Corporation dated March 19, 2004.(7) |
| 4.6 | Hyseq Promissory Note in the principal amount of $4,000,000 dated November 13, 2001.(3) |
| 4.7 | Registration Rights Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(3) |
| 4.8 | Pledge and Security Agreement between Hyseq, Inc. and Affymetrix, Inc. dated November 13, 2001.(3) |
| 4.9 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc. dated January 8, 2002.(2) |
| 4.10 | Form of Warrant dated April 5, 2002.(4) |
| 4.11 | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(9) |
| 4.12 | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc. dated January 20, 2005.(9) |
| 4.13 | Replacement Warrant to purchase 50,000 shares (pre split) of Common Stock of Nuvelo, Inc. dated June 7, 2005.(11) |
| 4.14 | Warrant to purchase 350,000 shares of Common Stock of Nuvelo, Inc. dated August 4, 2005.(12) |
| 4.15 | Registration Rights Agreement by and between Nuvelo, Inc. and Kingsbridge Capital Limited dated August 4, 2005.(12) |
| 4.16 | Replacement Warrant to purchase 109,607 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(13) |
| 4.17 | Replacement Warrant to purchase 222,536 shares (pre split) of Common Stock of Nuvelo, Inc. dated July 15, 2005.(13) |
| 4.18 | Reference is made to Exhibits 3.1 and 3.2. |
| 10.54† | Nuvelo, Inc. Management Bonus Amounts for Named Executive Officers for the 2005 Fiscal Year.(14) |
| 10.56§ | License and Collaboration Agreement dated January 4 2006 between Bayer Healthcare AG and Nuvelo, Inc.(15) |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

\*    Filed herewith.
†    Compensatory plan or agreement.
§    Confidential treatment requested.
(1)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No. 00-22873.
(2)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K filed April 2, 2001, File No. 000-22873.

40

Table of Contents

(3)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 10-K, filed on April 1, 2002, File No. 000-22873.

(4)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed on June 14, 2002, File No. 333-90458.

(5)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873.

(6)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-4, filed on November 27, 2002, File No. 333-101503.

(7)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed March 26, 2004, File No. 000-22873.

(8)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 9, 2004, File No. 000-22873.

(9)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 16, 2005, File No. 000-22873.

(10)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2005, File No. 000-22873.

(11)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on July 14, 2005, File No. 333-126591.

(12)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed August 5, 2005, File No. 000-22873.

(13)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form S-3, filed on September 14, 2005, File No. 333-128316.

(14)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed February 10, 2006, File No. 000-22873.

(15)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 15, 2006, File No. 000-22873.

41

Source: NUVELO INC, 10-Q, May 09, 2006

EXHIBIT 31.1

# CERTIFICATION

I, Ted W. Love, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Nuvelo, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 9, 2006

/s/ TED W. LOVE
**Ted W. Love**
*Chairman of the Board and Chief Executive Officer*

EXHIBIT 31.2

### CERTIFICATION

I, Gary S. Titus, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Nuvelo, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting, and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 9, 2006

/s/ GARY S. TITUS
**Gary S. Titus**
*Vice President and acting Chief Financial Officer*

Source: NUVELO INC, 10-Q, May 09, 2006

EXHIBIT 32.1

**NUVELO, INC.**

**CERTIFICATION PURSUANT TO
18 U.S.C. SEC. 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Ted W. Love, Chief Executive Officer of Nuvelo, Inc. (the "Company"), and Gary S. Titus, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

(1) The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2006, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report") fully complies with the requirements of section 13(a) or 15(d) of the Exchange Act; and

(2) The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof,** the undersigned have set their hands hereto as of the 9th day of May, 2006.

| | |
|---|---|
| /s/ TED W. LOVE | /s/ GARY S. TITUS |
| **Ted W. Love** | **Gary S. Titus** |
| *Chairman of the Board and Chief Executive Officer* | *Vice President and acting Chief Financial Officer* |

"This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Nuvelo, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing."

Created by 10KWizard    www.10KWizard.com