# Exhibit R



# FORM 10-K

## NUVELO INC - NUVO

**Filed: March 16, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

## PART I

3

Item 1.    Business 3

## PART I

Item 1.    Business
Item 2.    Properties
Item 3.    Legal Proceeding
Item 4.    Submission of Matters to a Vote of Security Holders

## PART II

Item 5.    Market for Registrant s Common Equity and Related Stockholder Matters
Item 6.    Selected Consolidated Financial Data
Item 7.    Management s Discussion and Analysis of Financial Condition and Results of Operations
Item 7A.   Qualitative and Quantitative Disclosures About Market Risk
Item 8.    Financial Statements and Supplementary Data
Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
Item 9A.   Controls and Procedures

## PART III

Item 10.   Directors and Executive Officers of the Registrant
Item 11.   E xecutive Compensation
Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matt
Item 13.   Certain Relationships and Related Transactions
Item 14.   Principal Accountant Fees and Services

## PART IV

Item 15.   Exhibits and Financial Statement Schedules
SIGNATURES
EXHIBIT INDEX
EX-4.9 (REPLACEMENT WARRANT TO PURCHASE 195)

EX-4.10 (REPLACEMENT WARRANT TO PURCHASE 200)

EX-10.5 (EMPLOYEE STOCK PURCHASE PLAN)

EX-10.48 (OPT-OUT)

EX-10.49 (LICENSE AGREEMENT)

EX-10.50 (LEASE AGREEMENT)

EX-10.51 (INTERIM AGREEMENT)

EX-21.1 (SUBSIDIARIES OF NUVELO)

EX-23.1 (CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM)

EX-31.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 302)

EX-31.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 302)

EX-32.1 (CERTIFICATION OF CEO AND CFO PURSUANT TO SECTION 302)

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2004

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
Commission File Number: 0-22873

# NUVELO, INC.
(Exact Name of Registrant as Specified in Its Charter)

**DELAWARE**
(State or Other Jurisdiction of Incorporation or Organization)

**36-3855489**
(I.R.S. Employer Identification No.)

**675 Almanor Avenue, Sunnyvale, CA**
(Address of principal executive offices)

**94085**
(Zip Code)

Registrant's telephone number, including area code:
408-215-4000

Securities registered pursuant to Section 12(b) of the Exchange Act: None

Securities registered pursuant to Section 12(g) of the Exchange Act:
**Common Stock, $.001**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 75 days. Yes ☑ No☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2) Yes ☑ No☐

The aggregate market value of the common stock held by non-affiliates of the Registrant on June 30, 2004 was $244,079,679, based on the last sale price of the common stock as reported by the Nasdaq Stock Market.

As of February 28, 2005, the Registrant had 42,003,840 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Definitive Proxy Statement, which will be filed with the Commission pursuant to Section 14A in connection with the 2005 meeting of stockholders, are incorporated by reference into Part III of this Form 10-K

# TABLE OF CONTENTS

PART I

    Item 1. Business     3

RISK FACTORS     3

    Item 2. Properties     16

    Item 3. Legal Proceeding     36

    Item 4. Submission of Matters to a Vote of Security Holders     36

PART II     37

    Item 5. Market for Registrant's Common Equity and Related Stockholder Matters     38

    Item 6. Selected Consolidated Financial Data     38

    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations     39

    Item 7A. Qualitative and Quantitative Disclosures About Market Risk     41

    Item 8. Financial Statements and Supplementary Data     54

        REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM     56

        CONSOLIDATED BALANCE SHEETS     57

        CONSOLIDATED STATEMENTS OF OPERATIONS     58

        CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)     59

        CONSOLIDATED STATEMENTS OF CASH FLOWS     60

        NOTES TO CONSOLIDATED FINANCIAL STATEMENTS     61

    Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure     62

    Item 9A. Controls and Procedures     85

PART III     85

    Item 10. Directors and Executive Officers of the Registrant     88

    Item 11. Executive Compensation     88

    Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters     88

    Item 13. Certain Relationships and Related Transactions     88

    Item 14. Principal Accountant Fees and Services     88

PART IV     88

    Item 15. Exhibits and Financial Statement Schedules     89

SIGNATURES     89

     95

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

## PART I

On February 23, 2004, we completed a one-for-three reverse split of our common stock. Unless otherwise indicated, all per share amounts in this Form 10-K have been adjusted to reflect the reverse split.

### Item 1.  *Business*

We have included or incorporated by reference into this Annual Report on Form 10-K statements that may constitute "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words including "anticipate", "believe", "intends", "estimates", "expect", "should", "may", "potential", and similar expressions. Such statements are based on our management's current expectations and involve risks and uncertainties. Our actual results and performance could differ materially from those projected in the forward-looking statements as a result of many factors discussed in this Annual Report, including those set forth in this section under the caption "Risk Factors," as well as those under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and those discussed elsewhere in this Annual Report on Form 10-K.

### Company Overview

We are a biopharmaceutical company focused on the discovery, development and commercialization of therapeutics for the treatment of acute cardiovascular indications and cancer.

We currently have three drug candidates in clinical trials. Our lead drug candidate, alfimeprase, is a thrombolytic agent, or blood clot dissolver. In 2004, we completed two separate Phase 2 clinical trials for alfimeprase for the treatment of acute peripheral arterial occlusion, or PAO, and catheter occlusion. We anticipate initiating a Phase 3 trial for alfimeprase in acute PAO in the first quarter of 2005 and a Phase 3 trial for alfimeprase in patients with central venous catheter occlusion in the second half of 2005.

Our second drug candidate, recombinant nematode anticoagulant protein c2, or rNAPc2, is a recombinant version of a naturally occurring protein that has anticoagulant properties. These properties arise from its ability to block the factor VIIa/tissue factor protease complex, which is responsible for the initiation of the process leading to blood clot formation. rNAPc2, which was licensed from Dendreon in February 2004, is currently undergoing a Phase 2a double-blind, placebo-controlled clinical trial for use in treating acute coronary syndromes, or ACS, including unstable angina, and non-ST segment elevation myocardial infarction. We expect to complete enrollment of this trial in the first half of 2005.

Our third drug candidate is ARC183, a novel thrombin inhibitor, which is currently in a Phase 1 clinical development program for use as an anticoagulant in coronary artery bypass graft, or CABG, surgery. We entered into a 50/50 cost/profit sharing collaboration agreement with Archemix Corporation in January 2004 for the development and commercialization of ARC183. We anticipate completing enrollment of the Phase 1 clinical program for ARC183 in the first half of 2005.

We have exclusive worldwide rights to develop and commercialize alfimeprase, exclusive worldwide rights to all indications of rNAPc2 and all rNAPc molecules owned by Dendreon, and we share worldwide commercialization rights to ARC183 with Archemix.

In addition to our clinical and development stage drug candidates, we have an on-going discovery effort that is focused on therapeutic secreted proteins and antibody targets. Our secreted proteins program includes our collaboration with the pharmaceutical division of Kirin Brewery Company, Ltd. and our own internal discovery program. Our antibody targets program is focused on screening our proprietary gene sequence collection to identify proteins located on the surface of tumor cells that could be targeted by therapeutic monoclonal antibodies. We recently initiated pre-clinical studies on our first internally-discovered drug candidate, NU206. We expect to leverage discoveries in our research programs to extend and expand our drug pipeline and to create revenue-generating licensing and partnering arrangements.

3

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

In February 2005, we raised approximately $68.3 million in a public offering, net of underwriters' fees and stock issuance costs of approximately $5.0 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share. We intend to use the net proceeds from this offering for general corporate purposes, including capital expenditures, working capital needs, current and future clinical trials of our lead drug candidate, alfimeprase, as well as other research and drug development activities. The amounts and timing of the expenditures will depend on numerous factors, such as the timing and progress of our clinical trials and research and development efforts, technological advances and the competitive environment for our drug candidates. We expect from time to time to evaluate the acquisition of businesses, products and technologies for which a portion of the net proceeds may be used, although we currently are not planning or negotiating any such transactions.

In January 2005, we entered into a five-year lease for approximately 55,000 square feet of space at 201 Industrial Road, San Carlos, California, which we intend to become our primary headquarters.

We are currently operating at a loss and have no significant sources of revenue. We do not expect to be profitable, or to generate revenues from product sales, in the foreseeable future.

We were established in August 1992 as an Illinois corporation, reincorporated as a Nevada corporation in November 1993 and subsequently reincorporated as a Delaware corporation on March 25, 2004. On October 24, 2001, we began doing business as Hyseq Pharmaceuticals, Inc., previously having done business as Hyseq, Inc. We changed our name to Nuvelo, Inc. on January 31, 2003 upon the closing of a merger with Variagenics, Inc.

### Available Information

Our headquarters address is 675 Almanor Avenue, Sunnyvale, California 94085. Our telephone number is (408) 215-4000. We file our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 electronically with the Securities and Exchange Commission. The public may read or copy any materials we file with the SEC at the SEC's Public Reference Room at 450 Fifth Street, NW, Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that site is http://www.sec.gov.

You may obtain a free copy of our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports on the day of filing with the SEC on our website, on the World Wide Web at http://www.nuvelo.com or by contacting the Investor Relations Department at our corporate office by calling (408) 215-4000 or sending an e-mail message to ir@nuvelo.com. Information found on our website is not incorporated by reference into this report.

### Strategy

We are focused on building a successful biopharmaceutical business and committed to creating a valuable product-focused company that leverages our drug discovery and development expertise. Key elements of our strategy are to:

### Successfully develop and commercialize our lead drug candidate, alfimeprase

We are seeking to develop and commercialize our lead drug candidate, alfimeprase, for the treatment of acute PAO and catheter occlusion. We recently completed Phase 2 clinical trials in these two indications, and we expect to initiate pivotal Phase 3 trials in both indications in 2005. We have acquired worldwide, exclusive rights to this compound and are currently exploring potential partnering opportunities that would enable commercialization outside of the United States and advance us towards our goal of establishing our own

4

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

domestic sales force. Alfimeprase may also have alternative uses in other indications not currently being studied, including, but not limited to, deep vein thrombosis, stroke, myocardial infarction and pulmonary embolism.

*Leverage our expertise in cardiovascular disease to advance our clinical development programs*

We are primarily focused on the development of acute, hospital-based, cardiovascular drug candidates. We believe this portfolio leverages our expertise in cardiovascular drug development, provides synergy with alfimeprase during both development and commercialization and enables us to pursue a more rapid path toward drug development.

*Build a diversified pipeline of product candidates*

We are pursuing several drug development candidates in various stages of clinical and pre-clinical development. We believe this strategy reduces our exposure to the impact of any single product failure and increases our flexibility to eliminate programs we deem less promising. By broadening our product portfolio, we intend to increase the probability of clinical and commercial success. In addition, we focus on molecules that we believe have a greater chance of success due to the predictability of pre-clinical models used in their development.

*Opportunistically seek to license or acquire complementary products and technologies*

We intend to supplement our internal drug discovery efforts through the acquisition of products and technologies that complement our development strategy. We continue to identify, evaluate and pursue the acquisition or licensing of strategically valuable product opportunities.

## Lead Drug Candidates

*Alfimeprase*

Alfimeprase, our lead development candidate, recently completed Phase 2 clinical trials in two distinct indications, acute PAO and catheter occlusion. Alfimeprase is a thrombolytic agent, or blood clot dissolver, with a novel mechanism of action. It is a modified and recombinant version of fibrolase, a naturally occurring enzyme that directly degrades fibrin, the protein that provides the structural scaffold of blood clots. Thrombolytics currently on the market such as urokinase (Abbokinase[x]) or alteplase (Cathflo[x] Activase[x]), are plasminogen activators that work by activating plasminogen to form plasmin which, in turn, degrades fibrin. In contrast, alfimeprase directly degrades fibrin, creating the potential for more rapid clot dissolution, or lysis. Alfimeprase is locally delivered at the site of the blood clot and is inactivated quickly by a naturally occurring protein in the bloodstream. We believe this clearance mechanism limits the amount of drug in systemic circulation and implies that patients may experience fewer associated side effects. In particular, pre-clinical and Phase 2 clinical data suggest that alfimeprase has the potential to rapidly lyse clots while also reducing the bleeding complications seen with currently available agents.

Alfimeprase was identified through a research program at Amgen Inc. In January 2002 we entered into a 50/50 cost/profit sharing arrangement with Amgen for the development and commercialization of alfimeprase. In October 2004, Amgen exercised its rights pursuant to the terms of this collaboration agreement to terminate its collaboration with us and enter instead into an exclusive license whereby we are granted the worldwide rights to develop and commercialize alfimeprase in exchange for the payment to Amgen of previously negotiated milestone payments and royalties. Under the terms of our license agreement, Amgen will transfer the technology necessary for the manufacture of alfimeprase to us or to Avecia Limited, our designated manufacturer. Amgen is required to continue to supply alfimeprase to us during the transition period. In connection with the termination of the collaboration agreement with Amgen, we also entered into an opt-out, termination, settlement and release agreement with Amgen in October 2004, whereby we made a payment of $8.5 million to Amgen, of which $8.3

5

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

million was related to the remaining reimbursement of its manufacturing costs incurred under the collaboration agreement. We believe the inventory to which these manufacturing costs relate is sufficient to supply the Phase 3 program for alfimeprase as currently contemplated.

### Alfimeprase in acute Peripheral Arterial Occlusion (PAO)

Our lead medical indication for alfimeprase is acute PAO. Acute PAO is a significant cause of morbidity in the United States with over 100,000 cases reported annually. Acute PAO occurs when arterial blood flow is blocked to a distant part of the body, usually the leg, by a blood clot. Traditionally, bypass surgery and angioplasty have been used to treat acute PAO. However, thrombolytic agents such as Abbokinase or Cathflo Activase have been increasingly used as a less-invasive alternative, even though they have not received regulatory approval to treat acute PAO. Studies have shown that patients receiving current thrombolytic therapies can experience bleeding, including intracerebral hemorrhage at rates of between one to two percent. We believe alfimeprase has the potential to be more effective than existing agents for use in treating acute PAO by reducing the treatment time and potential bleeding side effects.

We completed our Phase 2 alfimeprase trial in patients with acute PAO in the second quarter of 2004. This trial was a multi-center, open label, dose-escalation study to evaluate the safety and activity of alfimeprase, and involved 113 patients across centers in the United States, Western Europe, Hungary, Russia and South Africa. The Phase 2 results indicate that alfimeprase has the potential to offer significant advances in the rapid resolution of a clot while minimizing potentially fatal side effects such as hemorrhagic stroke and other bleeding complications. In analysis of the Phase 2 results, alfimeprase showed potential to break up blood clots within four hours of initiation of dosing with rates of up to 76 percent, and was able to restore arterial flow with rates of up to 60 percent. Up to 69 percent of study patients were able to avoid open vascular surgical intervention in the 30 days following treatment with alfimeprase. Among the 113 patients enrolled, there were no intracerebral hemorrhages or deaths at 30 days. There were seven major bleeding events reported, most of which occurred at the catheter entry site. Of these, only one was categorized by the investigator as possibly related to alfimeprase. Incidents of transient hypotension were also reported and were dose related.

We expect to initiate a multi-center, multi-national, randomized, double-blind, placebo-controlled Phase 3 program to determine the efficacy and safety of alfimeprase for the treatment of patients with acute PAO in the first quarter of 2005. This Phase 3 program, also known as NAPA-2, or Novel Arterial Perfusion with Alfimprase-2, is expected to consist of two overlapping trials that will include a total of approximately 700 patients, who will be randomized to receive either 0.3 mg/kg of alfimeprase or placebo. The primary endpoint will be avoidance of open vascular surgery within 30 days. Secondary endpoints will include safety measures such as the incidence of bleeding, restoration of arterial blood flow, increase in ankle brachial index, which is a measure of ankle blood pressure, and length of intensive care unit and hospital stay. Alfimeprase has orphan drug status in the United States for the treatment of acute PAO, which may provide us with seven years of market exclusivity in the United States.

### Alfimeprase in catheter occlusion

Our second medical indication for alfimeprase is catheter occlusion. Catheter occlusion is the obstruction of blood flow through a central venous catheter by a blood clot. It is estimated that about five million catheters are implanted in patients each year in the United States, and approximately 25% become occluded. Current treatment for catheter occlusion includes invasive surgery to remove and replace the catheter, or treatment with Cathflo Activase. Based on clinical trial evidence, we believe alfimeprase has the potential to restore flow to these occluded catheters more rapidly than Cathflo Activase.

In the third quarter of 2004 we announced that we had closed patient enrollment in a Phase 2 multi-center, double-blind, randomized study in patients with occluded central venous catheters comparing three doses (0.3 mg, 1.0 mg and 3.0 mg) of alfimeprase against the approved dose of Cathflo Activase (2.0 mg). We treated 55

6

Source: NUVELO INC, 10-K, March 16, 2005

**Table of Contents**

patients in this U.S. trial. The alfimeprase 3.0 mg dose produced cumulative flow rates of 40% at 5 minutes after the first dose, 50% at 15 minutes after the first dose, 60% at 120 minutes after the first dose, and 80% at 120 minutes after the second dose. This is compared to Cathflo Activase (2.0 mg), which produced flow rates of 0% at 5 minutes after the first dose, 0% at 15 minutes after the first dose, 46% at 120 minutes after the first dose, and 62% at 120 minutes after the second dose. No major hemorrhagic events were reported in any alfimeprase treated patients and only one patient had a catheter-related infection. We believe the results from this Phase 2 study support further evaluation of alfimeprase in fixed doses ranging from 1.0 mg to 3.0 mg for the treatment of occluded catheters. We expect to initiate a Phase 3 pivotal trial of alfimeprase in catheter occlusion in the second half of 2005.

*rNAPc2*

Our second drug candidate, rNAPc2, is a recombinant version of a naturally occurring protein that has anticoagulant properties. Specifically, rNAPc2 has been shown to block the factor VIIa/tissue factor protease complex, which is responsible for the initiation of the process leading to blood clot formation. Compared to other commercially available anticoagulants, which all exert their effects at later stages of the blood coagulation cascade, rNAPc2 is designed to block the first step in the cascade. By blocking the coagulation cascade before amplification of the coagulation process, rNAPc2 could prove to be more effective in treating patients with conditions such as acute coronary syndrome, or ACS, or as a prophylactic against clot formation in conditions such as deep venous thrombosis.

ACS occurs when an atherosclerotic plaque ruptures in a coronary artery, which triggers the coagulation cascade and results in the formation of a blood clot. The clot blocks the flow of blood to the heart muscle, depriving it of oxygen and causing chest pain and, if severe, permanent heart muscle death. In the United States, ACS accounts for approximately 1.4 million hospital admissions annually. Patients with ACS are traditionally given aspirin and heparin, among other agents, to stabilize their medical condition. Recent guidelines also recommend the addition of the antiplatelet agent clopidogrel (Plavix[x]) to the standard of care. However, based upon the significant number of patients with ACS who continue to experience poor outcomes such as recurrent angina, myocardial infarction or death, we believe there is a clear need for better antithrombotic therapy.

rNAPc2, given alone or with standard therapy, may reduce the risk of subsequent heart attack or death in patients suffering from ACS. Unlike aspirin and heparin, or current antithrombotic agents, which all exert their effects at later stages of the blood coagulation cascade, rNAPc2 blocks the first step in the cascade. A medical regimen that includes rNAPc2 could, therefore, enable a multi-pronged attack at several points along the blood coagulation process. Alternatively, by stopping coagulation at the outset, rNAPc2 could also prove effective as a stand-alone therapy.

We licensed the worldwide rights for all indications of rNAPc2 and all of the rNAPc molecules owned by Dendreon Corporation in February 2004. The United States government may claim a non-exclusive right to use rNAPc2 with respect to the treatment of hemorrhagic fever. We do not currently contemplate development of rNAPc2 to treat hemorrhagic fever. To date, rNAPc2 has been shown to be well-tolerated in over 500 patients and healthy volunteers in several Phase 1 and 2 studies.

In May 2004, we reinitiated a Phase 2a double-blind, placebo controlled clinical trial to determine a safe and effective dose of rNAPc2 in moderate to high-risk patients with ACS. The study, which was originally initiated prior to our licensing of rNAPc2, is being conducted to investigate rNAPc2 in combination with current anticoagulant and antiplatelet therapies. Currently, the study is being conducted with the TIMI Study Group led by Dr. Eugene Braunwald of Brigham and Women's Hospital and Harvard Medical School. We plan to complete patient enrollment of the Phase 2a study in the first half of 2005.

7

Table of Contents

### ARC183

Our third drug candidate, ARC183, is a DNA aptamer, a single-stranded nucleic acid that binds to thrombin with high affinity and specificity. The key advantage of ARC183 compared to other thrombin inhibitors is its rapid onset of action and short half-life, giving it the potential to be highly effective for medical procedures that require rapid reversal of anticoagulation shortly after the procedure is completed.

In January 2004, we announced a collaboration agreement with Archemix, a privately held biotechnology company, located in Cambridge, Massachusetts, for the development and commercialization of ARC183. Our lead indication for ARC183 is for use as a thrombin inhibitor in coronary artery bypass graft, or CABG, surgery.

According to the American Heart Association, more than 500,000 CABG procedures are performed in the United States annually. Currently, heparin is used to limit blood clotting in this indication, but it is difficult to dose and can cause side effects such as bleeding and heparin-induced thrombocytopenia, or HIT. Moreover, the effect of heparin must be reversed with the use of an antidote called protamine. Protamine is not approved by the FDA for reversal of heparin in CABG surgery and is associated with significant complications including hypotension, platelet dysfunction, complement activation and thrombus formation. We believe that there is a significant unmet medical need for a safe, fast-acting anticoagulant for use in CABG surgery that is easier to administer, does not require a reversal agent and limits adverse side effects such as bleeding and HIT.

ARC183 has shown potential in pre-clinical studies to be equally effective, with fewer side effects, than heparin and protamine in combination. Due to its very short half-life, we believe ARC183 has the potential for more predictable dosing as well as reduced incidence of bleeding side effects compared to heparin.

In August 2004, we and our partner, Archemix, initiated a Phase 1 clinical program for ARC183 for use in CABG surgery. These studies are evaluating the safety, tolerability, anticoagulation activity and titratability of ARC183. We expect to complete enrollment of the Phase 1 clinical program of ARC183 in the first half of 2005.

### Product Pipeline

The following table summarizes selected information about our current product pipeline:

| Product/Candidate | Commercialization Rights | Research | Preclinical | Phase 1 | Phase 2 | Phase 3 | Biologics License Application |
|---|---|---|---|---|---|---|---|
| Alfimeprase (Epinephrase) | Worldwide Rights | Acute Peripheral Arterial Occlusion | | | | | |
| Alfimeprase (Epinephrase) | Worldwide Rights | Catheter Occlusion | | | | | |
| rNAPc2 | Worldwide Rights | Acute Coronary Syndromes | | | | | |
| ARC183 (Thrombin inhibitor) | 50-50 Collaboration with Archemix | Coronary Artery Bypass Graft Surgery | | | | | |
| NU206 | Collaboration discussions ongoing | | | | | | |
| Secreted Protein Program | Collaboration discussions; Internal program | A variety of indications | | | | | |
| Antibody Target Program | Worldwide Rights | Cancer and immune-related diseases | | | | | |

8

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Scientific and Industry Background**

Alfimeprase, rNAPc2, and many of the product candidates that we are identifying in our research programs belong to a class of drug compounds known as "therapeutic proteins." Therapeutic proteins include naturally occurring proteins that are administered to patients as drugs. Some naturally occurring proteins replace or supplement a protein that is deficient in the body or defective. Others signal the body to initiate or cease a biological function. Examples of therapeutic proteins include insulin, which regulates glucose metabolism for the treatment of diabetes, and tissue plasminogen activator, an enzyme that converts plasminogen to active plasmin, a protein that can break down blood clots. Other therapeutic protein-based drugs have been engineered to provide medical benefit. Examples include monoclonal antibodies such as Herceptin®, which targets and destroys breast cancer cells, and soluble receptors such as Enbrel®, which binds and blocks the activity of a protein implicated in rheumatoid arthritis. Therapeutic proteins, antibodies and other protein-based products represent a promising class of drugs in the biotechnology industry.

The use of recombinant DNA technology to manufacture therapeutic proteins has been a major breakthrough for the pharmaceutical industry. Recombinant DNA technology is used to insert a gene into non-human production cells. These cells are grown in culture and have been engineered to produce the desired protein in large quantities. The protein is then isolated from the culture and purified. Recombinant DNA technology has several advantages over proteins derived from natural sources, such as pooled human or animal blood. First, recombinant DNA technology enables the large-scale production of certain proteins that are scarce and thus too difficult or costly to derive from human or animal sources in therapeutically useful quantities. Second, recombinant DNA technology significantly reduces the contamination risks from blood-borne pathogens that cause diseases. Finally, recombinant DNA technology allows the production of therapeutic proteins using reproducible methodologies. This reproducibility in manufacturing provides for consistency between batches of the final protein product, a necessity for creating a safe drug capable of receiving regulatory approval.

**Research**

We begin our process of identifying potential therapeutic proteins and therapeutic antibodies by starting with a proprietary collection of genes that were identified earlier in our history, when we focused on the discovery of rarely-expressed genes. Starting in 1997, we discovered large numbers of novel human genes. We use advanced informatics tools techniques to identify candidate genes for biological screening. We believe genes with sequence characteristics and motifs similar to those found in known secreted proteins are more likely to be useful as protein therapeutics. We have also identified genes with sequence characteristics that suggest they are cell surface or transmembrane proteins, which we are investigating as targets for therapeutic antibodies.

The process of selecting and evaluating biopharmaceutical drug candidates involves a broad range of skills and a highly trained scientific staff. Following the initial gene sequence assessment, full-length complimentary DNAs (cDNA) encoding the secreted proteins are cloned, expressed, and screened for biological activity by our Molecular Core and Biology Research groups. Once biological activities have been identified, additional experiments are performed to support the development of a biological hypothesis that describes the protein's function. The protein candidate next moves to the validation stage, in which more directed and focused experiments are performed to confirm the biological activity and to establish a medical hypothesis. Our Protein Production and Purification group is responsible for providing larger quantities of selected proteins for further *in vitro* and *in vivo* testing. These tests are conducted by our Biology Research group, working in conjunction with contract research organizations. Throughout this process, information is provided to our legal group to pursue patent protection for our candidates. Once a product candidate is identified, it moves to the pre-clinical stage, at which time it is tested in specific animal models of diseases for safety and pharmacokinetic analysis. Following initial safety and pharmacokinetic analysis, we may contract with research organizations to conduct GLP toxicology and other studies required for filing an Investigative New Drug application, or IND. We plan to use contract organizations for the production of current Good Manufacturing Practices, or cGMP, compliant drug of our lead therapeutic protein candidates.

9

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### Secreted Proteins Program

We use a diverse set of tools to evaluate the biological functions of the secreted proteins we have discovered, in particular using animal models to provide physiologically relevant readouts. In our collaboration with the pharmaceutical division of Kirin Brewery Company, Ltd., we are developing transgenic mouse models in which our proprietary secreted protein encoding genes are expressed, allowing us to identify some of the fundamental biological activities of these proteins. To date, we have tested 50 secreted proteins genes in this collaboration and will be testing additional candidates in 2005. We can also identify the function of our genes by developing knockout mice, in which the corresponding mouse gene has been inactivated by genetic manipulation. We use dozens of independent assays to investigate the biological and biochemical activities of our novel proteins and rely on an external network of collaborators to investigate biology and conduct additional tests that we do not perform in-house.

### Antibody Targets Program

The development of immunotherapeutic antibodies is initiated by producing cDNA microarrays that include sequence elements corresponding to the predicted cell surface or transmembrane encoded cDNAs from our proprietary collection. We evaluate the expression of these genes in normal and tumor tissue samples and identify genes whose mRNA is expressed predominantly in tumors and not in normal tissues. We then develop antibody reagents to the corresponding target proteins and evaluate the protein expression patterns in normal and cancerous tissues using immunohistochemical analysis. The result of this process is a validated cell surface protein target. We then develop murine monoclonal antibodies that bind to these targets and evaluate these antibody reagents for efficacy in pre-clinical studies using in vitro and animal models of human cancer. We anticipate that the identification and validation of these monoclonal antibodies will allow us to attract partners who can assist us in additional pre-clinical studies and these partners may also participate in the clinical development of one or more potential therapeutic antibodies. To date, we are evaluating monoclonal antibodies for two targets in solid cancers and four more in blood cancers.

## Research and Development Collaborations

### Amgen

Alfimeprase was identified through a research program at Amgen Inc. In January 2002 we entered into a 50/50 cost/profit sharing arrangement with Amgen for the development and commercialization of alfimeprase. In October 2004, Amgen exercised its rights pursuant to the terms of this collaboration agreement to terminate its collaboration with us and enter instead into an exclusive license whereby we are granted the worldwide rights to develop and commercialize alfimeprase in exchange for the payment to Amgen of previously negotiated milestone payments and royalties. Under the terms of our license agreement, Amgen will transfer the technology necessary for the manufacture of alfimeprase to us or to Avecia Limited, our designated manufacturer. Amgen is required to continue to supply alfimeprase to us during the transition period. In connection with the termination of the collaboration agreement with Amgen, we also entered into an opt-out, termination, settlement and release agreement with Amgen in October 2004, whereby we made a payment of $8.5 million to Amgen, of which $8.3 million was related to the remaining reimbursement of its manufacturing costs incurred under the collaboration agreement. We believe the inventory to which these manufacturing costs relate is sufficient to supply the Phase 3 program for alfimeprase as currently contemplated. In addition, we are also required to pay Amgen $5.0 million within 30 days of dosing of the first patient in the first Phase 3 clinical trial for alfimeprase. We expect this milestone to be achieved in the first quarter of 2005. Future milestone payments under the license agreement could total as much as $40.0 million. We have recorded expenses of $6.7 million in 2004, $7.5 million in 2003, and $12.7 million in 2002, under these agreements.

10

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### Dendreon

In February 2004, we entered into a worldwide licensing agreement with Dendreon for rNAPc2, a recombinant version of a naturally occurring protein that has anticoagulant properties, and all other rNAPc molecules owned by Dendreon. Under the terms of the agreement, we paid Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock) and have expensed $5.6 million for this and related clinical trial costs in 2004. We also will pay Dendreon milestone payments before and upon any commercialization of an rNAPc based product, as well as royalties if and when we reach commercialization. If all development and commercialization milestones are achieved, total milestone payments to Dendreon could reach as much as $23.5 million. Our license from Dendreon grants us exclusive worldwide rights to all indications for rNAPc products owned by Dendreon.

### Archemix

In January 2004, we entered into a worldwide collaboration agreement with Archemix to develop and commercialize ARC183, a novel thrombin inhibitor, for use in acute cardiac surgical procedures, such as CABG surgery, PCI and other acute anticoagulant applications. In accordance with the terms of the agreement, we paid Archemix an upfront payment of $3.0 million and have expensed $7.7 million for this and related clinical trial costs in 2004. We and Archemix will equally share all revenues and costs associated with the development and commercialization of ARC183 after we fund the first $4.0 million in research and development costs, which occurred in the third quarter of 2004. Archemix will initially lead development and be responsible for all clinical development activities. We will have the option to lead commercialization efforts in which both companies may participate. We are required to pay total milestone payments of up to $11.0 million, including a $10.0 million milestone payment upon initiation of the Phase 2 trial and $1.0 million upon the designation of any backup compound. We estimate that the milestone payment of $10.0 million could occur in the first half of 2006.

### Pharmaceutical Division of Kirin Brewery Company, Ltd.

In September 2004, we extended and expanded our research and development collaboration with Kirin. The amended agreement extends the term of the current collaboration to December 31, 2005 and expands the scope of the collaboration to include additional secreted protein genes from our full-length gene portfolio. The collaboration is expected to foster further development of therapeutic candidates using Kirin's proprietary site-directed transgenic mouse technology to identify and develop secreted proteins and associated antibodies with therapeutic utility. Under the current contract, we will jointly own discoveries resulting from the collaboration, and we will jointly develop and market the resulting products while sharing costs, efforts, and revenues. We will have marketing rights in North America on all products discovered and developed under the collaboration. Kirin will have marketing rights in Asia and Oceania. We will share marketing rights equally in Europe and the rest of the world. Under our Kirin collaboration, we have completed the initial analysis of 50 secreted protein genes in mouse models and will be testing additional candidate genes in 2005. We have already advanced several secreted protein candidates to more extensive studies to better define their therapeutic utility based upon early findings in initial mouse models. We have recorded expenses of $3.0 million in 2004, $0.2 million in 2003, and $0.1 million in 2002, in relation to this collaboration.

### Callida Genomics

On December 3, 2004, we sold our subsidiary, Callida Genomics, Inc., or Callida, to SBH Genomics, Inc., a privately held Delaware corporation. This transaction is part of our strategy to monetize assets that are outside of our core business. Prior to the sale, we owned approximately 90% of Callida's issued and outstanding capital stock. Affymetrix, Inc., a minority stockholder in Callida, also sold its Callida shares to SBH Genomics as part of the same negotiated transaction. We and Affymetrix sold our stock in Callida in exchange for convertible promissory notes in the principal amount of $1.0 million, being $0.9 million for Nuvelo, and $0.1 million for

11

**Table of Contents**

Affymetrix, and potential additional payments to us from SBH Genomics based on future revenues. The notes are convertible into preferred shares of SBH Genomics under certain circumstances. As part of this transaction, Affymetrix has waived the acceleration of a $4.0 million promissory note owed by us to Affymetrix that would have become immediately payable as a result of the change in control of Callida. This convertible note arose from a loan made to us by Affymetrix in 2001 to fund our initial capital contribution to Callida and is due in November 2006. The sale of our Callida stock resulted in a net non-cash charge to our earnings of approximately $1.1 million, representing the difference between the value of the convertible promissory notes received and the carrying value of Callida's assets and liabilities in our balance sheet. In addition, various cash and non-cash charges of approximately $0.5 million were associated with the sale of this subsidiary.

**Manufacturing**

On January 21, 2005, we entered into an Interim Agreement with Avecia Limited for initial work related to the manufacture by Avecia of alfimeprase. The initial work will include assessment and planning, transfer of processes and assays to Avecia, purchase of certain capital equipment, replicated fermentation and purification runs and consulting work in preparation for the manufacture of alfimeprase pursuant to Good Manufacturing Practices regulations. We will pay Avecia fees totaling £0.7 million (approximately equivalent to $1.3 million as of December 31, 2004) for completion of this initial work, and will also pay for the purchase of necessary items of equipment, together with certain related fees and expenses. The Interim Agreement will expire upon the first to occur of completion of the work under the agreement by Avecia, entry by Nuvelo and Avecia into a definitive agreement, or termination of the agreement by either party. Either party may terminate the agreement at any time, subject to certain cancellation fees, if applicable. The Interim Agreement requires negotiation in good faith towards the potential entry into a definitive agreement with Avecia that would cover activities under the Interim Agreement as well as other activities related to the manufacture of alfimeprase.

**Patents and Trade Secrets**

We own or have rights in a number of patents and patent applications relating to each of our clinical candidate molecules, and we also own or have acquired rights in many of our pre-clinical molecules and technologies. The table below shows the actual or estimated year that the primary patent for each of our three clinical candidate molecules expires:

| Clinical Molecule | Territory | Anticipated Expiration |
|---|---|---|
| alfimeprase | U.S. | |
| alfimeprase | Europe | 2019 |
| rNAPc2 | U.S. | 2020 |
| rNAPc2 | Europe | 2016 |
| ARC183 | U.S. | 2015 |
| | | 2015 |

In some cases, certain of the U.S. patents may be entitled to an extension of their term and certain European patents may be entitled to supplemental protection in one or more countries in Europe. The length of any such extension, if an extension is granted, will vary by country.

We cannot ensure that any of the patents which we own or have rights in will provide sufficient legal protection for the molecules or processes that such patents cover, or any competitive advantage. Any of our granted patents could be challenged, and held unenforceable or invalid in legal proceedings, or could be infringed or circumvented by others. Further, it is possible that others could obtain patent protection for molecules, processes and the like that are competitive with our potential products. In addition, other patent holders could assert their patents against us, claiming that such patents prevent us from marketing our products. Upon expiration of each of the relevant patents, other entities could enter the market with competitive products and/or processes in each country where a patent has expired.

12

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

We place a high value on our trade secrets. To protect these trade secrets, we generally require employees to enter in to a confidentiality agreement upon commencing employment. In addition, we generally require our consultants, licensing and collaboration partners, and scientific advisors to enter into confidentiality agreements. There can be no assurance, however, that these confidentiality agreements will be honored or that we can effectively protect our rights to such unpatented trade secrets. Moreover, there can be no assurance that others will not independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets.

**Competition**

The pharmaceutical and biopharmaceutical industries are subject to intense competition and rapid and significant technological change. Our lead drug candidate, alfimeprase, is a thrombolytic agent, or blood clot dissolver.

We believe that the principal competitive factors in the markets for alfimeprase, rNAPc2 and ARC183 include the following:

- the length of time to receive regulatory approval;

- product performance;

- product price;

- product supply;

- marketing and sales capability, and

- enforceability of patent and other proprietary rights.

We believe that we and our collaborative partners are, or will be, competitive with respect to these factors. Nonetheless, because our products are still under development, our relative competitive position in the future is difficult to predict.

We believe the principal competitive factors we face in identifying and commercializing therapeutic protein-based products are the following:

- securing rights to develop and commercialize the products, including appropriate patent and proprietary rights;

- safety and effectiveness of the products;

- the availability of alternative therapeutic products or treatments; and

- the factors identified above for our existing drug candidates.

We expect to face increased competition in the future as new companies enter our markets. Research and discoveries by others may result in breakthroughs that render our potential products obsolete even before they begin to generate any revenue. Our competitors include major pharmaceutical and biotechnology firms, many of which have substantially greater research and product development capabilities and financial, scientific, marketing and human resources than we have. Our lead product candidate alfimeprase, if approved, will face competition in the catheter occlusion indication from alteplase, an approved Genentech, Inc. product, and will potentially face competition in the peripheral arterial occlusion, or PAO, indication from product candidates being developed and/or marketed by Abbot Laboratories, Centocor, Inc. and Genentech. Although we believe that we are well positioned to compete adequately with respect to these factors in the future, our future success is currently difficult to predict because these potential therapies are still in various stages of pre-clinical and clinical development.

13

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Government Regulation**

Regulation by governmental authorities in the United States and most foreign countries will be a significant factor in manufacturing and marketing our potential products and in our ongoing research and product development activities. Virtually all of our products and those of our partners will require regulatory approval by governmental agencies prior to commercialization. In particular, human therapeutic products are subject to rigorous pre-clinical and clinical testing and other approval requirements by the U.S. Food and Drug Administration, or FDA, and comparable agencies in foreign countries.

The time required for development and commercialization of our drug candidates and obtaining regulatory approvals is uncertain. Unexpected biological activities, some of which may result in safety issues, may arise during pre-clinical evaluation. Such observations could delay or alter the course of a development program or ultimately result in the termination of a program. Any delay in clinical testing may also delay product development. In addition, delays or rejections may be encountered based on changes in FDA or foreign regulatory policy during the period of product development and testing. Various federal statutes and regulations also regulate the manufacturing, safety, labeling, storage, record-keeping and marketing of such products. The lengthy process of obtaining regulatory approvals and ensuring compliance with appropriate federal statutes and regulations requires the expenditure of substantial resources. Any delay or failure by us or by our collaboration partners to obtain regulatory approval could adversely affect the commercialization of products we or they are developing, our ability to achieve product collaboration milestones or receive royalty revenue and thus negatively impact our liquidity and capital resources.

Pre-clinical studies are generally conducted in the laboratory to evaluate the potential efficacy and safety of a therapeutic product. The results of these studies are submitted to the FDA as part of an Investigational New Drug application, or IND, which must be reviewed by FDA personnel before clinical testing can begin. Typically, clinical evaluation involves three sequential phases, which may overlap. During Phase 1, clinical trials are conducted with a relatively small number of subjects to determine the early safety profile of a drug, as well as the pattern of drug distribution and drug metabolism. In Phase 2, trials are conducted with groups of patients afflicted by a specific target disease to determine preliminary efficacy, optimal dosages, and dosage tolerance and to gather additional safety data. In Phase 3, larger-scale, multi-center trials are conducted with patients afflicted with a specific target disease to provide data for the statistical proof of efficacy and safety as required by the FDA and foreign regulatory agencies. The FDA, the clinical trial sponsor or the investigator may suspend clinical trials at any time if they believe that clinical subjects are being exposed to an unacceptable health risk.

The results of pre-clinical and clinical testing are submitted to the FDA in the form of a New Drug Application, or NDA, for small molecule products or a Biologic License Application, or BLA, for biological products. In responding to a NDA or BLA, the FDA may grant marketing approval, request additional information, or deny the application if the FDA determines that the application does not satisfy its regulatory approval criteria. There can be no assurance that approvals will be granted on a timely basis, if at all. The failure to obtain timely permission for clinical testing or timely approval for product marketing would have a material negative effect on us. Product approvals may subsequently be withdrawn if compliance with regulatory standards is not maintained or if problems are identified after the product reaches the market. The FDA may require testing and surveillance programs to monitor the effect of a new product and may prevent or limit future marketing of the product based on the results of these post-marketing programs.

Currently one of our product candidates, alfimeprase, qualifies as an orphan drug for the treatment of acute peripheral arterial occlusion. This act generally provides incentives to manufacturers to undertake development and marketing of products to treat relatively rare diseases or those diseases that affect fewer than 200,000 persons annually in the United States. A drug that receives orphan drug designation by the FDA and is the first product to receive FDA marketing approval for its product claim is entitled to various advantages, including a seven-year exclusive marketing period in the United States for that product claim. However, any drug that is considered by the FDA to be different from or clinically superior to a particular orphan drug, including any orphan drug of ours

14

**Table of Contents**

that has been so designated by the FDA, will not be precluded from sale in the United States during the seven-year exclusive marketing period. We cannot assure you that any of our other product candidates will be designated as an orphan drug by the FDA or, if so designated, will have a positive effect on our revenues.

To manufacture our potential products, a domestic or foreign drug manufacturing facility must be registered with the FDA as a manufacturing establishment, must submit to periodic inspection by the FDA and must comply with current Good Manufacturing Practices regulations. In addition, the FDA imposes a number of complex regulations on entities that advertise and promote biologics, including, among others, standards and regulations for direct-to-consumer advertising, off-label promotions, industry-sponsored scientific and educational activities, and promotional activities involving the Internet. The FDA has very broad enforcement authority under the Federal Food, Drug and Cosmetic Act, and failure to abide by these regulations can result in penalties, including the issuance of a warning letter directing us to correct deviations from FDA standards, a requirement that future advertising and promotional materials be pre-cleared by the FDA, and civil and criminal penalties.

Whether or not FDA approval has been obtained, approval of a product by comparable foreign regulatory authorities is necessary prior to the commencement of marketing of a product in those countries. The approval procedures vary among countries and can involve additional testing. The time required to obtain approval may differ from that required for FDA approval. Although there are some centralized procedures for filings in the European Union countries, in general each country has its own procedures and requirements, and compliance with these procedures and requirements may be expensive and time-consuming. Accordingly, there may be substantial delays in obtaining required approvals from foreign regulatory authorities after the relevant applications are filed, if we ultimately receive any approvals at all.

Even if regulatory approval for a product is obtained, the product and the facilities manufacturing the product are subject to continued review and periodic inspection. Each drug-manufacturing establishment in the United States must be registered with the FDA. Domestic manufacturing establishments are subject to inspections by the FDA and must comply with the FDA's cGMP regulations, as well as regulatory agencies in other countries if products are sold outside the United States. We will need to spend funds, time and effort to ensure full technical compliance with these regulations. The FDA stringently applies regulatory standards for manufacturing drugs, biologics, and medical devices. The FDA's cGMP regulations require that drugs and medical devices be manufactured and records are maintained in a prescribed manner with respect to manufacturing, testing and control activities.

Our policy is to conduct research activities in compliance with the National Institute of Health Guidelines for Research Involving Recombinant DNA Molecules. We also are subject to various federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals and the use and disposal of hazardous or potentially hazardous substances, including radioactive compounds and infectious disease agents, used in connection with our work. The extent and character of governmental regulation that might result from future legislation or administrative action and its effect on us cannot be accurately predicted.

**Human Resources**

As of December 31, 2004, we had 80 full-time equivalent employees, 37 of whom hold Ph.D., M.D., J.D., or other advanced degrees. Approximately 53 of our employees are engaged in research and development activities, and approximately 27 are engaged in business development, finance, operations support, and administration. None of our employees are represented by a collective bargaining agreement, nor have we experienced work stoppages. We believe that relations with our employees are good.

15

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

## RISK FACTORS

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. The following discussion highlights some of these risks.

## RISKS RELATED TO OUR BUSINESS

**Development of our products will take years, and our products require regulatory approval before they can be sold.**

We have three clinical stage drug candidates. All of our other potential products currently are in research or pre-clinical development and revenues from the sales of any products resulting from this research and development may not occur for several years, if at all. We cannot be certain that any of our products will be demonstrated to be safe and effective or that we will obtain regulatory approvals. We cannot predict whether we will be able to develop and commercialize any of our drug candidates successfully. If we are unable to obtain regulatory approval and successfully commercialize our potential products, our business, results of operations and financial condition will be affected in a materially adverse manner.

We do not yet have products in the commercial markets. We must demonstrate that our product candidates satisfy rigorous standards of safety and efficacy before the FDA and comparable agencies in foreign markets. We cannot apply for regulatory approval of our potential products until we have performed significant additional research and development and testing. We cannot be certain that we, or our strategic partners, will be permitted to undertake clinical testing of our potential products or continue clinical testing of alfimeprase, rNAPc2, or ARC183. If we are successful in initiating clinical trials, we may experience delays in conducting them. Our clinical trials may not demonstrate the safety and efficacy of our potential products, and we may encounter unacceptable side effects or other problems in the clinical trials that may prevent or limit the use of our products. Should this occur, we may have to delay or discontinue development of the potential product that causes the problem. After a successful clinical trial, we cannot market products in the United States until we receive regulatory approval. Even if we are able to gain regulatory approval of our products after successful clinical trials and then commercialize and sell those products, we may be unable to manufacture enough products to maintain our business, which could have a negative impact on our financial condition.

**Our clinical trials may not yield results that will enable us to obtain regulatory approval for our products.**

We will only receive regulatory approval for a drug candidate if we can demonstrate in carefully designed and conducted clinical trials that the drug candidate is safe and effective. We do not know whether our pending or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or will result in marketable products. Clinical trials are lengthy, complex, and expensive processes with uncertain results. It will take us several years to complete our testing, and failure can occur at any stage of testing. Results attained in pre-clinical testing and early clinical studies, or trials, may not be predictive of results that are obtained in later studies. We may suffer significant setbacks in advanced clinical trials, even after promising results in earlier studies. Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue development of one or more of our drug candidates. If we fail to adequately demonstrate the safety and efficacy of our products under development, we will not be able to obtain the required regulatory approvals to commercialize our drug candidates, and our business, results of operations and financial condition will be materially adversely affected.

Clinical trials are subject to continuing oversight by governmental regulatory authorities and institutional review boards, or IRBs, and must meet the requirements of these authorities in the United States, including those for informed consent and good clinical practices. We may not be able to comply with these requirements and the FDA, an IRB or we may suspend or terminate clinical trials at any time.

16

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Administering our drug candidates to humans may produce undesirable side effects. These side effects could interrupt, delay or halt clinical trials of our drug candidates and could result in the FDA or other regulatory authorities denying approval of our drug candidates for any or all targeted indications.

We rely on third parties, including contract research organizations and outside consultants, to assist us in managing and monitoring clinical trials. Our reliance on these third parties may result in delays in completing, or in failing to complete, these trials if they fail to perform with the speed and competency we expect.

If clinical trials for a drug candidate are unsuccessful, we will be unable to commercialize the drug candidate. If one or more of our clinical trials are delayed, we will be unable to meet our anticipated development or commercialization timelines. Either circumstance could cause the price of our shares to decline.

**If we encounter difficulties enrolling patients in our clinical trials, our trials could be delayed or otherwise adversely affected.**

Clinical trials for our drug candidates require that we identify and enroll a large number of patients with the disorder under investigation. We may not be able to enroll a sufficient number of patients to complete our clinical trials in a timely manner.

Patient enrollment is affected by factors including

- design of the protocol;
- the size of the patient population;
- eligibility criteria for the study in question;
- perceived risks and benefits of the drug under study;
- availability of competing therapies;
- efforts to facilitate timely enrollment in clinical trials;
- patient referral practices of physicians; and
- availability of clinical trial sites.

If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay or terminate ongoing or planned clinical trials, either of which would have a negative effect on our business. Delays in enrolling patients in our clinical trials would also adversely affect our ability to generate product and royalty revenues and could impose significant additional costs on us or our collaborators. In addition, we have never conducted Phase 3 clinical trials, and we may be unable to successfully conduct multiple Phase 3 clinical trials involving the numbers of clinical sites and the numbers of patients planned for our alfimeprase Phase 3 clinical trials.

**We face heavy government regulation, and FDA regulatory approval of our products is uncertain.**

The research, testing, manufacturing and marketing of drug products such as those proposed to be developed by us or our collaboration partners are subject to extensive regulation by federal, state and local governmental authorities, including the FDA, and comparable agencies in other countries. To obtain regulatory approval of a drug product, we or our collaboration partners must demonstrate to the satisfaction of the applicable regulatory agency, among other things, that the product is safe and effective for its intended uses. In addition, we must show that the manufacturing facilities used to produce the products are in compliance with current Good Manufacturing Practices, or cGMP, requirements.

17

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

The process of obtaining FDA and other required regulatory approvals and clearances typically takes several years and will require us to expend substantial capital and resources. Despite the time and expense expended, regulatory approval is never guaranteed. The number of pre-clinical and clinical tests that will be required for FDA approval varies depending on the drug candidate, the disease or condition that the drug candidate is in development for, and the regulations applicable to that particular drug candidate. The FDA or comparable international regulatory authorities can delay, limit or deny approval of a drug candidate for many reasons, including:

- a drug candidate may not be safe or effective;

- FDA or comparable international regulatory authorities may interpret data from pre-clinical and clinical testing in different ways than we and our collaboration partners interpret them;

- the FDA or comparable international regulatory authorities may not approve our manufacturing processes or facilities or the processes or facilities of our collaboration partners; or

- the FDA or comparable international regulatory officials may change their approval policies or adopt new regulations.

Moreover, if and when our products do obtain such approval or clearances, the marketing, distribution and manufacture of such products would remain subject to extensive ongoing regulatory requirements. Failure to comply with applicable regulatory requirements could result in:

- warning letters;

- fines;

- civil penalties;

- injunctions;

- recall or seizure of products;

- total or partial suspension of production;

- refusal of the government to grant approvals; or

- withdrawal of approvals and criminal prosecution.

Any delay or failure by us or our collaboration partners to obtain regulatory approvals for our product candidates:

- would adversely affect our ability to generate product and royalty revenues;

- could impose significant additional costs on us or our collaboration partners;

- could diminish competitive advantages that we may attain;

- would adversely affect the marketing of our products; and

- could cause the price of our shares to decline.

Even if we do receive regulatory approval for our drug candidates, the FDA or international regulatory authorities may impose limitations on the indicated uses for which our products may be marketed, subsequently withdraw approval or clearances, or take other actions against us or our products that are adverse to our business. The FDA and comparable international regulatory authorities generally approve products for particular indications. An approval for a limited indication reduces the size of the potential market for the product. Product approvals, once granted, may be withdrawn if problems occur after initial marketing.

18

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

We also are subject to numerous federal, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals, the environment and the use and disposal of hazardous substances used in connection with our discovery, research and development work, including radioactive compounds and infectious disease agents. In addition, we cannot predict the extent of government regulations or the impact of new governmental regulations that might significantly harm the discovery, development, production and marketing of our products. We may be required to incur significant costs to comply with current or future laws or regulations, and we may be adversely affected by the cost of such compliance.

**If we fail to maintain existing third-party arrangements and collaborative agreements or fail to develop new collaborative arrangements, our business will be harmed.**

The success of our business is dependent, in significant part, upon our ability to enter into multiple collaboration agreements and to manage effectively the numerous issues that arise from such arrangements. Management of our relationships with these third parties has required and will require

- a significant amount of our management team's time and effort;

- effective allocation of our and third-party resources to multiple projects;

- agreements with third parties as to ownership of proprietary rights and development plans, including clinical trials or regulatory approval strategy; and

- an ability to obtain and retain management, scientific and other personnel.

In October 2004, Amgen Inc. exercised its rights under the collaboration agreement entered into by us and Amgen in January 2002 to convert the relationship from a collaboration into a licensing arrangement in accordance with terms agreed upon by us and Amgen. In November 2004, we and Amgen entered into a license agreement granting us worldwide rights to develop and commercialize alfimeprase in exchange for payment of previously negotiated development milestones and royalties. We are required to pay Amgen $5.0 million within 30 days of dosing of the first patient in the first Phase 3 clinical trial for alfimeprase. We expect this milestone to be achieved in the first quarter of 2005. Future milestone payments under the license agreement could total as much as $40.0 million. Under the terms of the license agreement, Amgen will transfer the technology necessary for the manufacture of alfimeprase to us or to Avecia Limited, our designated manufacturer. Amgen is required to continue to supply alfimeprase to us during the transition period. On January 21, 2005, we entered into an Interim Agreement with Avecia Limited for the manufacture of alfimeprase, and we are currently in negotiations with Avecia for a definitive agreement for the manufacture of commercial quantities of alfimeprase. Either party may terminate this agreement at any time. While we currently believe we have enough supplies of alfimeprase for phase 3 trials for the treatment of acute PAO and catheter occlusion, additional supplies may be necessary, and we do not yet have a definitive agreement for the manufacture of additional supplies of alfimeprase. We cannot be certain that we will be able to reach a definitive agreement with Avecia or any other manufacturer, upon commercially reasonable terms for alfimeprase's manufacture or that Avecia or any other manufacturer will be able to produce alfimeprase in the quantities and with the quality we need for our clinical trials. If we are unable to find a manufacturer, or manufacturers, to produce alfimeprase in the quantities and with the quality we need, at a commercially reasonable price, we may incur significant, additional expenses and our efforts to complete our clinical trials and obtain FDA approval to market alfimeprase could be significantly delayed.

In our collaboration with Archemix for the development and commercialization of ARC183, we will share equally all research and development costs and revenues after we fund the first $4.0 million in research and development costs, which occurred in the third quarter of 2004. We will make milestone payments of $10.0 million upon commencement of a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Nuvelo and Archemix for pre-clinical studies. We are obligated to make the Phase 2 milestone payment to Archemix even if Archemix terminates the collaboration or Archemix does not meet its obligations under the agreement and we terminate the collaboration for Archemix's default. We have the option to lead

19

Table of Contents

commercialization in which both parties may participate if we establish commercialization capabilities; however, if we do not establish such commercialization capabilities, Archemix, or a third party selected by the parties' joint steering committee, will have the option to lead commercialization. We do not currently have established commercialization experience or an internal trained sales force and we may not successfully develop such capabilities without incurring additional expenses. If we cannot develop an internal sales force, we will not be able to lead commercialization activities on our own. If we do not lead the commercialization efforts, we are dependent on Archemix or a third party's experience in commercialization and ability to perform and we may also incur additional expenses for a third party to undertake commercialization efforts.

We are subject to a number of additional risks associated with our collaboration with Archemix for ARC183, including the right of Archemix to terminate its collaboration with us on limited notice and for reasons outside our control, and to the loss of significant rights if the collaboration is terminated because we fail to meet our obligations under it. In particular, if Archemix terminates the collaboration for our breach, all of our rights to ARC183 and other collaboration products will become the property of Archemix, and we may not practice certain activities related to anti-thrombin compounds in the field of modifying blood-clotting times in therapeutic applications through the use of aptamers such as ARC183, including research and development, manufacturing and commercialization activities.

Pursuant to our licensing arrangement with Dendreon relating to rNAPc2, we are obligated to make milestone payments ranging from $2.0 million to $6.0 million upon the first dosing of the first patient in a Phase 3 clinical trial, upon submission of a new drug application, or NDA, and upon commercialization for the first and second indications. If all milestones are achieved, total milestone payments to Dendreon can reach as much as $23.5 million.

Our efforts to manage simultaneously a number of collaboration arrangements may not be successful, and our failure to manage effectively such collaborations would significantly harm our business, financial condition and results of operations.

Due to these factors and other possible disagreements with Amgen, Archemix, Dendreon and Kirin, we may be delayed or prevented from developing or commercializing alfimeprase, ARC183 and rNAPc2 or our pre-clinical product candidates or we may become involved in litigation or arbitration, which would be time-consuming or expensive and could have a material adverse effect on our stock price.

In addition to our existing collaborations, we will focus on effecting new collaborative arrangements where we would share costs of identifying, developing and marketing drug candidates. We cannot assure you that we will be able to negotiate new collaboration arrangements of this type on acceptable terms, or at all.

**We are currently dependent on third parties for a variety of functions and may enter into future arrangements for the manufacture and sale of our products. Our arrangements with these third parties may not provide us with the benefits we expect.**

We currently rely upon third parties to perform administrative functions and functions related to the research, development, pre-clinical testing and clinical trials of our drug candidates. In addition, because we do not have the resources, facilities or experience to manufacture our drug candidates on our own, we currently rely, and will continue to rely, on third parties to manufacture our drug candidates for clinical trials, and, if our products are approved, in quantities for commercial sales. We currently rely on a number of sole-source service providers and suppliers and do not have long-term supply agreements with our third-party manufacturers.

We do not currently have significant manufacturing facilities for clinical or commercial production of our drug candidates and depend on contract research and manufacturing organizations. We may not be able to finalize contractual arrangements, transfer technology or maintain relationships with such organizations in order to file an investigational new drug application, or IND, with the FDA, and proceed with clinical trials for any of

20

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

our drug candidates. We currently rely on Amgen to manufacture our clinical drug product, alfimeprase. We have entered into an Interim Agreement with Avecia and are in the process of transitioning manufacture of alfimeprase from Amgen to Avecia, but do not yet have a definitive agreement with Avecia for the manufacture of commercial quantities of alfimeprase. If our efforts are unsuccessful, we may not have adequate supplies of alfimeprase to complete our clinical trials or to commercialize alfimeprase on our anticipated schedule.

We are dependent on third-party contract research organizations to conduct certain research, including good laboratory practices toxicology studies, in order to gather the data necessary to file INDs with the FDA for any of our drug candidates. Our drug candidates have never been manufactured on a commercial scale. Third-party manufacturers may not be able to manufacture these drug candidates at a cost or in quantities necessary to make them commercially viable. In addition, if and when any of our other drug candidates enter the clinical trial phase, we will initially depend on third-party contract manufacturers to produce the volume of current good manufacturing practices materials needed to complete such trials. We will need to enter into contractual relationships with these or other organizations in order to (1) complete the Good Laboratory Practices, or GLP, toxicology and other studies necessary to file an IND with the FDA, and (2) produce a sufficient volume of current cGMP grade material in order to conduct clinical trials of ARC183 and our other drug candidates. We cannot be certain that we will be able to do so on a timely basis or that we will be able to obtain sufficient quantities of material on commercially reasonable terms. In addition, the failure of any of these relationships with third-party contract organizations may delay our filing for an IND or impede our progress through the clinical trial phase. Any significant delay or interruption would have a material adverse effect on our ability to file an IND with the FDA and/or proceed with the clinical trial phase for any of our drug candidates.

Moreover, contract manufacturers that we may use must continually adhere to current cGMP regulations enforced by the FDA through a facilities inspection program. If one of our contract manufacturers fails to maintain compliance, the production of our product candidates could be interrupted, resulting in delays, additional costs and potentially lost revenues. In addition, if the facilities of such manufacturers do not pass a pre-approval plant inspection, the FDA will not grant pre-market approval of our products.

Our reliance on these relationships poses a number of risks, including:

- disagreements with third parties that could disrupt our operation or delay or terminate the research, development or manufacturing of drug candidates, or result in litigation or arbitration;

- our inability to effectively control the resources devoted by our partners to our programs or products;

- inadequate contractual protection or difficulty in enforcing the contracts if one of our partners fails to perform;

- failure of these third parties to comply with regulatory requirements;

- conflicts of interest between third parties' work for us and their work for another entity, and the resulting loss of their services;

- failure to identify acceptable manufacturers or other suppliers or enter into favorable long-term agreements with them;

- inability of third parties to manufacture our drug candidates in a cost-effective or timely manner or in quantities needed for clinical trials or commercial sales;

- delays in, or failures to achieve, scale-up to commercial quantities, or changes to current raw material suppliers or product manufacturers (whether the change is attributable to us or the supplier or manufacturer), resulting in delayed clinical studies, regulatory submissions and commercialization of our drug candidates; and

- lack of all necessary intellectual property rights to manufacture and sell our drug candidates.

21

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Given these risks, our current and future collaborative efforts with third parties may not be successful. If these efforts fail, we would be required to devote additional internal resources to the activities currently performed, or to be performed, by third parties, to seek alternative third-party collaborators, or to delay our product development or commercialization.

**We may not achieve our projected development goals in the time frames we announce and expect.**

We set goals for and make public statements regarding the timing of certain accomplishments, such as the commencement and completion of clinical trials, anticipated regulatory approval dates and time of product launch, which we sometimes refer to as milestones. The actual timing of these events can vary dramatically due to a number of factors such as delays or failures in our clinical trials, the uncertainties inherent in the regulatory approval process and delays in achieving manufacturing or marketing arrangements sufficient to commercialize our products. There can be no assurance that our clinical trials will be completed, that we will make regulatory submissions or receive regulatory approvals as planned or that we will be able to adhere to our current schedule for the launch of any of our products. If we fail to achieve one or more of these milestones as planned, our business will be materially adversely affected and the price of our shares could decline.

**The success of our potential products in pre-clinical studies does not guarantee that these results will be replicated in humans.**

Although our clinical development-stage drug candidates have shown results in pre-clinical studies, these results may not be replicated in our clinical trials with humans. Consequently, there is no assurance that the results in our pre-clinical studies are predictive of the results that we will see in our clinical trials with humans or that they are predictive of whether the resulting products will be safe and effective in humans.

**We are dependent on key personnel and we must attract and retain qualified employees, collaborators and consultants.**

The success of our business is highly dependent on the principal members of our scientific and management staff, including our senior management team. The loss of the services of any such individual might seriously harm our product development and commercialization efforts. In addition, we will require additional skilled personnel in areas such as clinical development. Retaining and training personnel with the requisite skills is challenging, and, if general economic conditions improve, is likely to become extremely competitive, particularly in Northern California where we are located.

Our success will depend on our ability to attract and retain qualified employees to help develop our potential products and execute our research and development strategy. We have programs in place to retain personnel, including programs to create a positive work environment and competitive compensation packages. Because competition for employees in our field is intense, however, we may be unable to retain our existing personnel or attract additional qualified employees. Our success also depends on the continued availability of outside scientific collaborators, including collaborators at research institutions, to perform research and develop processes to advance and augment our internal research efforts. Competition for collaborators is intense. We also rely on services provided by outside consultants. Attracting and retaining qualified outside consultants is competitive, and, generally, outside consultants can terminate their relationship with us at will. If we do not attract and retain qualified personnel, outside consultants and scientific collaborators, or if we experience turnover or difficulties recruiting new employees or outside consultants, our research and development programs could be delayed and we could experience difficulties in generating sufficient revenue to maintain our business.

In addition, we do not currently have a marketing and sales organization. As the potential commercialization of our products approaches, we intend to hire marketing and sales personnel to enable us to participate in the commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate qualifications and talent, our ability to generate product revenues would be adversely affected.

22

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Because we have not yet commercialized any of our drug candidates, our ability to develop and subsequently commercialize products is unproven.**

We have not yet commercialized any of our in-licensed therapeutic product candidates. Moreover, we have not developed any therapeutic products using proteins produced by the genes we have discovered in our internal research programs. Before we make any products available to the public from our internal research and development programs, we or our collaboration partners will need to conduct further research and development and complete laboratory testing and animal and human studies. We or our collaboration partners will need to obtain regulatory approval before releasing any drug products. We have spent, and expect to continue to spend, significant amounts of time and money in our internal research programs in determining the function of genes and the proteins they produce, using our own capabilities and those of our collaboration partners. Such a determination process constitutes the first step in developing commercial products from our internal research programs. We also have spent and will continue to spend significant amounts of time and money in developing processes for manufacturing of our recombinant proteins under pre-clinical development, yet we may not be able to produce sufficient proteins for pre-clinical studies. A commercially viable product may never be developed from our gene discoveries.

Our commercialization of products is subject to several risks, including but not limited to:

- the possibility that a product is toxic, ineffective or unreliable;

- failure to obtain regulatory approval for the product;

- difficulties in manufacturing the product on a large scale, or inability to market in an economically feasible manner;

- competition from superior products; or

- third-party patents that preclude us from marketing a product.

Our internally developed drug development programs are currently in the research stage or in pre-clinical development. None of our potential therapeutic protein candidates from our own portfolio has advanced to Phase 1 clinical trials. Our programs may not move beyond their current stages of development. Even if our internal research does advance, we will need to engage in certain additional pre-clinical development efforts to determine whether a product is sufficiently safe and effective to enter clinical trials. We have little experience with these activities and may not be successful in developing or commercializing products.

Under our Kirin collaboration arrangement, Kirin has primary responsibility for clinical development in its territory and we have primary responsibility in our territory. Under our collaboration with Archemix, Archemix leads development until Phase 2 clinical trials are reached, and thereafter, a joint steering committee will designate one party to lead development until commercialization. With respect to these arrangements, we run the risk that Kirin or Archemix may not pursue clinical development in a timely or effective manner.

Any regulatory approvals that we or our collaboration partners receive for our product candidates may be subject to limitations on the intended uses for which the product candidates may be marketed or contain requirements for potentially costly post-marketing follow-up studies. In addition, if the FDA approved of our or our collaboration partners' product candidates, the labeling, packaging, adverse event reporting, storage, advertising, promotion and record-keeping for the products will be subject to extensive regulatory requirements.

We, our collaborators and our suppliers may also not be able to produce any products in commercial quantities at a reasonable cost or may not be able to successfully market such products. If we do not develop a commercially viable product, then we will suffer significant harm to our business, financial condition and operating results.

23

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**We lack marketing and commercialization experience for biopharmaceutical products and we may have to rely on third parties for these capabilities.**

We currently have no sales, marketing or distribution capability. As the potential commercialization of our products approaches, we intend to hire marketing and sales personnel to enable us to participate in the commercialization of our products in the United States. If we are unsuccessful in hiring and retaining sales and marketing personnel with appropriate technical and sales expertise or in developing an adequate distribution capability to support them, our ability to generate product revenues would be adversely affected. To the extent we cannot or choose not to use internal resources for the marketing, sales or distribution of any potential products in the United States or elsewhere, we intend to rely on collaboration partners or licensees. We may not be able to establish or maintain such relationships. To the extent that we depend on collaboration partners or other third parties for marketing and distribution, any revenues we receive will depend upon their efforts. Such efforts may not be successful, and we will not be able to control the amount and timing of resources that collaboration partners or other third parties devote to our products

**Our products may not be accepted in the marketplace, and we may not be able to generate significant revenue, if any.**

Even if they are approved for marketing, our products, if any, may never achieve market acceptance among physicians, patients and the medical community. Our products, if successfully developed, will compete with a number of traditional drugs and therapies manufactured and marketed by major pharmaceutical and other biotechnology companies. Our products will also compete with new products currently under development by such companies and others. The degree of market acceptance of any products developed by us, alone, or in conjunction with our collaboration partners, will depend on a number of factors, including:

- the establishment and demonstration of the clinical efficacy and safety of the products;

- convenience and ease of administration;

- cost-effectiveness;

- our products' potential advantages over alternative treatment methods;

- marketing, sales and distribution support of our products; and

- reimbursement policies of government and third-party payers

Physicians, patients or the medical community in general may not accept and utilize any of the products that we alone, or in conjunction with our collaboration partners, develop. In practice, competitors may be more effective in marketing their drugs. The lack of such market acceptance would significantly harm our business, financial condition and results of operations

**We face intense competition.**

The biopharmaceutical industry is intensely competitive and is accentuated by the rapid pace of technological development. We expect to face increased competition in the future as new companies enter our markets. Research and discoveries by others may result in breakthroughs that render our potential products obsolete even before they begin to generate any revenue. Our competitors include major pharmaceutical and biotechnology firms, many of which have substantially greater research and product development capabilities and financial, scientific, marketing and human resources than we have. Our lead product candidate alfimeprase, if approved, will face competition in the catheter occlusion indication from alteplase, an approved Genentech, Inc. product, and will potentially face competition in the peripheral arterial occlusion, or PAO, indication from product candidates being developed and/or marketed by Abbot Laboratories, Centocor, Inc. and Genentech

Our competitors may obtain patents and regulatory approvals for their competing products more rapidly than we or our collaboration partners, or develop products that are more effective than those developed by us or

24

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

our collaboration partners. Any potential products based on genes we identify ultimately will face competition from other companies developing gene-based products as well as from companies developing other forms of treatment for diseases which may be caused by, or related to, the genes we identify. Similarly, our products will face competition from other companies developing similar products as well as from companies developing other forms of treatment for the same conditions.

Many of the companies developing competing products have significantly greater financial resources than we have. Many such companies also have greater expertise than we or our collaboration partners have in discovery, research and development, manufacturing, pre-clinical and clinical testing, obtaining regulatory approvals and marketing. Other smaller companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These companies and institutions compete with us in recruiting and retaining qualified scientific and management personnel as well as in acquiring technologies complementary to our programs. We will face competition with respect to:

- product efficacy and safety;

- the timing and scope of regulatory approvals;

- availability of resources;

- reimbursement coverage; and

- price and patent position, including the potentially dominant patent positions of others.

There can be no assurance that research and development by others will not render the products that we may develop obsolete or uneconomical, or result in treatments or cures superior to any therapy developed by us or that any therapy we develop will be preferred to any existing or newly developed alternative products.

**We face uncertainty with respect to coverage, pricing, third-party reimbursements and health care reform.**

Our ability to collect significant royalties from our products may depend on our ability, and the ability of our collaboration partners or customers, to obtain adequate levels of coverage for our products and reimbursement from third-party payers such as:

- government health administration authorities;

- private health insurers;

- health maintenance organizations;

- pharmacy benefit management companies; and

- other health care related organizations.

Third-party payers may deny coverage or offer inadequate levels of reimbursement if they determine that a prescribed product or device has not received appropriate clearances from the FDA or other government regulators, is not used in accordance with cost-effective treatment methods as determined by the third-party payer, or is experimental, unnecessary or inappropriate. If third-party payers deny coverage or offer inadequate levels of reimbursement, we may not be able to market our products effectively. We also face the risk that we will have to offer our products at prices lower than anticipated as a result of the current trend in the United States towards managed health care through health maintenance organizations. Currently, third-party payers are increasingly challenging the prices charged for medical products and services. Prices could be driven down by health maintenance organizations that control or significantly influence purchases of health care services and products. Existing U.S. laws, such as the Medicare Prescription Drug and Modernization Act of 2003, or future legislation to reform health care or reduce government insurance programs could also adversely affect prices of our approved products, if any. The cost containment measures that health care providers are instituting and the

25

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

results of potential health care reforms may prevent us from maintaining prices for our products that are sufficient for us to realize profits and may otherwise significantly harm our business, financial condition and operating results. In addition, to the extent that our products are marketed outside of the United States, foreign government pricing controls and other regulations may prevent us from maintaining prices for our products that are sufficient for us to realize profits and may otherwise significantly harm our business, financial condition and operating results.

**We may merge with or acquire other companies and our failure to receive the anticipated benefits in these transactions could harm our business.**

In January 2003, we merged with Variagenics, and we may merge with or acquire other companies in the future. The success of any merger or acquisition depends, in part, on our ability to realize the anticipated synergies, cost savings and growth opportunities from integrating the business of the merged or acquired company with our business. The integration of two independent companies is a complex, costly and time-consuming process. The difficulties of combining the operations of the companies and/or our subsidiary include, among others:

- consolidating research and development operations;

- retaining key employees;

- consolidating corporate and administrative infrastructures;

- preserving the research and development and other important relationships of the companies;

- integrating and managing the technology of two companies;

- using the merged or acquired company's liquid capital and other assets efficiently to develop the business of the combined company;

- minimizing the diversion of management's attention from ongoing business concerns; and

- coordinating geographically separate organizations.

Moreover, we have assumed the costs of defending against litigation claims asserted against Variagenics, and anytime we or our subsidiary merge with or acquire another company, we will be exposed to similar costs. In addition, we may be exposed to a number of other risks in connection with future transactions, including:

- we may experience unbudgeted expenses in attempting to complete the transaction and integration process and exposure to unknown liabilities of the merged or acquired business; and

- our stock price may suffer if the former stockholders of the merged or acquired entity dispose of significant numbers of shares of our common stock that they receive in the transaction within a short period of time.

We cannot assure you that we will receive all of the anticipated benefits of any mergers or acquisitions, or that any of the risks described above will not occur. Our failure to receive anticipated benefits of, and our exposure to inherent risks in, any such merger or acquisition transaction could significantly harm our business, financial condition and operating results.

**We may not receive any benefits from and we may have lost potential income as a result of the sale of our equity holdings in our former Callida subsidiary.**

On December 3, 2004, we entered into and consummated a Stock Purchase Agreement with SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac and Affymetrix, Inc., pursuant to which we sold all of the stock we held in our subsidiary, Callida Genomics, Inc., or Callida, to SBH Genomics, Inc., a privately held Delaware corporation. Prior to the sale, we owned approximately 90% of Callida's issued and outstanding capital stock.

26

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Affymetrix, a minority stockholder in Callida, also sold its Callida shares to SBH Genomics as part of the same negotiated transaction. We and Affymetrix sold our stock in Callida in exchange for convertible promissory notes in the principal amount of $1.0 million, being $0.9 million for Nuvelo and $0.1 million for Affymetrix, and potential additional payments to us from SBH Genomics based on future revenues. The notes are convertible into preferred shares of SBH Genomics under certain circumstances. The notes may prove uncollectible, and we cannot assure you that we will receive the anticipated benefits, if any, of our sale of Callida stock, and through this transaction we may have lost certain benefits that we would have otherwise received from the continued ownership of our Callida holdings.

### We are subject to the risk of natural disasters.

Our facilities are located in Northern California. If a fire or other natural disaster (such as an earthquake) disrupts our research or development efforts, our business, financial condition and operating results could be materially adversely affected. Some of our landlords maintain earthquake coverage for our facilities. Although we maintain personal property and business interruption coverage, we do not maintain earthquake coverage for personal property or resulting business interruption.

## RISKS RELATED TO OUR CAPITAL STRUCTURE AND FINANCIAL RESULTS

### We have not been profitable, anticipate continuing losses and may never become profitable.

We had net losses of $52.5 million in 2004, $50.2 million in 2003, and $45.0 million in 2002. As of December 31, 2004, we had an accumulated deficit of $256.0 million.

All of our product candidates are in various stages of product development, and some are still in research or in early development. None of them are approved for sale. The process of developing our drug products will require significant additional research and development, pre-clinical testing, clinical trials and regulatory approvals.

These activities, together with general administrative and other expenses, are expected to result in operating losses for the foreseeable future. To date, we have not generated any revenues from product sales. We do not expect to achieve significant product sales or royalty revenue for several years, and we may never do so. We expect to incur additional operating losses in the future, and these losses may increase significantly as we continue pre-clinical research and clinical trials, apply for regulatory approvals, develop our drug candidates, expand our operations and develop systems that support commercialization of our potential products. These losses, among other things, have caused and may cause our stockholders' equity and working capital to decrease. We may not be successful in developing our drug candidates, obtaining regulatory approvals and commercializing our products, and our operations may not be profitable even if any of our drug candidates are commercialized. We may never generate profits and, as a result, the trading price of our common stock could decline.

Moreover, utilization of our net operating loss carryforwards and credits may be subject to an annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state law provisions. It is possible that certain transactions that we have entered into, including our merger with Variagenics that occurred in January 2003, when considered in connection with other transactions, may result in a "change in ownership" for purposes of these provisions.

In January 2005, we entered into a lease agreement for approximately 55,000 square feet of industrial space in San Carlos, California. In connection with our lease of this new facility, we are examining the potential to sublease or otherwise exit our existing facility at 985 Almanor Avenue in Sunnyvale, California, which is currently primarily being used for storage and for which we have a lease through May 30, 2011. In accordance with Statement of Financial Accounting Standards No. 146, "Accounting for Costs Associated with Exit or

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

- future funding commitments to our collaborators;

- general conditions in the financial markets and in the biotech sector;

- the uncertain condition of the capital markets and in the biotech sector; and

- other factors not within our control.

**We may face fluctuations in operating results.**

Our operating results may rise or fall significantly as a result of many factors, including:

- the amount of research and development we engage in;

- the number of product candidates we have and their progress in research and pre-clinical studies;

- our ability to expand our facilities to support our operations;

- our ability to maintain existing and enter into new strategic relationships;

- the scope, duration and effectiveness of our collaborative arrangements;

- the costs involved in prosecuting, maintaining and enforcing patent claims;

- the possibility that others may have or obtain patent rights that are superior to ours;

- changes in government regulation; and

- release of successful products into the market by our competitors.

Excluding our three clinical stage drug candidates, our potential products currently are in research or pre-clinical development, and revenues from the sales of any products resulting from this research and development may not occur for several years, if at all. A high percentage of our expenses are fixed costs such as lease obligations. As a result, we may experience fluctuations in our operating results from quarter to quarter and continue to generate losses. Quarterly comparisons of our financial results may not necessarily be meaningful, and investors should not rely upon such results as an indication of our future performance. In addition, investors may react adversely if our reported operating results are less favorable than in a prior period or are less favorable than those anticipated by investors or the financial community, which may result in a drop of our stock price.

**Our stock price has historically been and is likely to remain highly volatile, and an investment in our stock could suffer a decline in value.**

Stock prices and trading volumes for many biopharmaceutical companies fluctuate widely for a number of reasons, including factors which may be unrelated to their businesses or results of operations such as media coverage, legislative and regulatory measures and the activities of various interest groups or organizations. This market volatility, as well as general domestic or international economic, market and political conditions, could materially and adversely affect the market price of our common stock and the return on your investment.

Historically, our stock price has been extremely volatile. Between January 1, 2004 and December 31, 2004, the price ranged between a high of $16.50 per share and a low of $6.77 per share. The significant market price fluctuations of our common stock are due to a variety of factors, including:

- the depth of the market for the common stock;

- the experimental nature of our potential products;

- actual or anticipated fluctuations in our operating results;

- sales of our common stock by existing holders, or sales of shares issuable upon exercise of outstanding options and warrants, upon repayment of our outstanding note to Affymetrix, or upon repayment of our line of credit with Dr. Rathmann;

29

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Disposal Activities," if we sublease or otherwise exit this facility, we could incur a potentially significant charge to our earnings based on the remaining lease rental expense as of December 31, 2004 of $36.1 million for our existing facility, reduced by the estimated income from sublease rental, if any. Our remaining lease obligations as of December 31, 2004 with respect to the facility at 985 Almanor Avenue total approximately $46.2 million, excluding deferred rent credits of $10.1 million. We are obligated to pay the full amount of such remaining lease rental obligation, net of any sublease payments we may receive, from time to time as it comes due under the terms of the lease for this facility.

**We will need to raise additional capital, and such capital may be unavailable to us when we need it or not available on acceptable terms.**

We will need to raise significant additional capital to finance the research and clinical development of our drug products. If future securities offerings are successful, they could dilute our current shareholders' equity interests and reduce the market price of our common stock. Financing may be unavailable when we need it or may not be available on acceptable terms. The unavailability of financing may require us to delay, scale back or eliminate expenditures for our research, development and marketing activities necessary to commercialize our potential biopharmaceutical products. We may also be required to raise capital by granting rights to third parties to develop and market drug candidates that we would prefer to develop and market on our own, potentially reducing the ultimate value that we could realize from these drug candidates.

If we are unable to obtain additional financing when we need it, the capital markets may perceive that we are not able to raise the amount of financing we desire, or on the terms that we desire. This perception, if it occurs, may negatively affect the trading price of our common stock. If sufficient capital is not available, we may be forced to delay, reduce the scope of, eliminate or divest one or more of our research or development programs. Any such action could significantly harm our business, financial condition and results of operations.

Our future capital requirements and the adequacy of our currently available funds will depend on many factors, including, among others, the following:

- our ability to maintain, and the financial commitments involved in, our existing collaborative and licensing arrangements;

- our ability to establish new collaborative relationships with other companies to share costs and expertise of identifying and developing drug candidates;

- the magnitude and scope of our research and development programs, including development of product candidates;

- continued scientific progress in our research and development programs, including progress in our research and pre-clinical studies;

- the cost involved in any facilities expansion to support research and development of our product candidates;

- the cost of manufacturing our material for pre-clinical, clinical and commercial purposes;

- progress in clinical studies of our products, including alfimeprase, rNAPc2 and ARC 183;

- the cost of prosecuting and enforcing our intellectual property rights;

- the time and cost involved in obtaining regulatory approvals;

- our need to develop, acquire or license new technologies or products;

- competing technological and market developments;

- our ability to use our common stock to repay the outstanding note to Affymetrix and our line of credit from our Chairman, Dr. George B. Rathmann;

28

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

- market conditions relating to the biopharmaceutical and pharmaceutical industries;

- any announcements of technological innovations, new commercial products, or clinical progress or lack thereof by us, our collaborative partners or our competitors;

- announcements concerning regulatory developments, developments with respect to proprietary rights and our collaborations;

- changes in or our failure to meet market or, to the extent securities analysts follow our common stock, securities analysts' expectations;

- loss of key personnel;

- changes in accounting principles;

- general market conditions; or

- public concern with respect to our products.

In addition, the stock market in general, and the market for biotechnology and other life science stocks in particular, has historically been subject to extreme price and volume fluctuations. This volatility has had a significant effect on the market prices of securities issued by many companies for reasons unrelated to the operating performance of these companies. In the past, following periods of volatility in the market price of a company's securities, class action securities litigation has often been instituted against such a company. Any such litigation instigated against us could result in substantial costs and a diversion of management's attention and resources, which could significantly harm our business, financial condition and operating results.

**Future sales of our common stock may depress the market price of our common stock.**

Sales in the public market of substantial amounts of our common stock could depress prevailing market prices of our common stock. As of February 28, 2005, we had 42,003,840 shares of our common stock outstanding, including 9,775,000 shares sold in an offering in February 2005. All of these shares are freely transferable without restriction or further registration under the Securities Act of 1933, as amended, or the Securities Act, except for shares held by our directors, officers and greater than five percent stockholders and unregistered shares held by non-affiliates. As of February 28, 2005, our directors, officers and greater than five percent stockholders held 3,566,900 shares of our common stock, which are transferable pursuant to Rule 144 or in some cases Rule 145, each as promulgated under the Securities Act, or pursuant to effective registration statements. Although we do not believe that our directors, officers and greater than five percent stockholders have any present intentions to dispose of any shares of common stock owned by them, there can be no assurance that such intentions will not change in the future. The sale of these additional shares could depress the market price of our common stock.

We have granted registration rights in connection with the issuance of our securities to a number of our stockholders and warrant holders. In the aggregate, as of February 28, 2005, these registration rights covered approximately 1,516,792 shares of our common stock which were then outstanding or which may become outstanding upon the exercise of warrants that were then outstanding. If these registration rights, or similar registration rights that may apply to securities we may issue in the future, are exercised, it could result in additional sales of our common stock in the market, which may have an adverse effect on our stock price.

In addition, under registration statements on Form S-8 under the Securities Act, as of February 28, 2005 we have registered approximately 5,239,537 shares of our common stock for sale upon the exercise of outstanding options under our 2004 Equity Incentive Plan, 2002 Equity Incentive Plan, 1995 Stock Option Plan, Non-Employee Director Stock Option Plan, Scientific Advisory Board/Consultants Stock Option Plan, the Variagenics, Inc. Amended 1997 Employee Director and Consultant Stock Option Plan and stock option agreements entered into outside of any of our stock option plans. Included in the 5,239,537 shares, options to

30

Table of Contents

exercise 4,344,462 shares of our common stock were outstanding under the specified plans, and shares of our common stock acquired pursuant to these plans and agreements are available for sale in the open market. Additionally, included in the 5,239,537 shares, we have reserved approximately 895,075 shares of our common stock for issuance upon the exercise of outstanding options under stock option agreements entered into outside of any of our stock option plans. As of February 28, 2005, 3,705,285 shares of the total 6,756,329 shares related to these warrants and options were exercisable. In addition, as of February 28, 2005, we had 3,287,321 shares of our common stock remaining for future option grants under our 2004 Equity Incentive Plan. Under our Employee Stock Purchase Plan, we have approximately 47,242 shares of our common stock reserved for future issuance as of February 28, 2005. The existence of the currently outstanding warrants and options to purchase our common stock may negatively affect our ability to complete future equity financings at acceptable prices and on acceptable terms. The exercise of those options or warrants, and the prompt resale of shares of our common stock received, may result in downward pressure on the price of our common stock.

As of February 28, 2005, 725,306 shares of our common stock were issuable, at our option, to repay a note in the principal amount of $4.0 million held by Affymetrix. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable in the event that our market capitalization is under $50.0 million and Affymetrix reasonably determines that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed 10% of our market capitalization. Moreover, we have registered for resale a portion of these shares on a registration statement that has been declared effective by the Securities and Exchange Commission. If we decide to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock by Affymetrix may also result in significant downward pressure on the price of our common stock. In addition, as of February 28, 2005, 1,117,315 shares of common stock were issuable, upon mutual agreement, to convert the promissory note that we have issued under a line of credit with George Rathmann. If we agree to repay this note with our common stock, whether pursuant to acceleration of the note or otherwise, the resale of shares of our common stock received by George Rathmann may also result in significant downward pressure on the price of our common stock.

We will need to raise significant additional capital to finance the research and clinical development of our drug products. If future securities offerings are successful, they could dilute our current shareholders' equity interests and reduce the market price of our common stock.

**We do not intend to pay cash dividends on our common stock in the foreseeable future.**

We do not anticipate paying cash dividends on our common stock in the foreseeable future. Any payment of cash dividends will depend upon our financial condition, results of operations, capital requirements and other factors and will be at the discretion of the Board of Directors. Under our August 31, 2004 Loan and Security Agreement with Silicon Valley Bank, we cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of our capital stock. Furthermore, we may incur additional indebtedness that may severely restrict or prohibit the payment of dividends.

**We have implemented anti-takeover provisions that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

The existence of our stockholder rights plan and provisions of our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, even if doing so would benefit our stockholders. These provisions:

- establish a classified board of directors so that not all members of our board may be elected at one time;

- authorize the issuance of up to 5,000,000 shares of preferred stock that could be issued by our board of directors to increase the number of outstanding shares and hinder a takeover attempt;

- limit who may call a special meeting of stockholders;

31

Source: NUVELO INC, 10-K, March 16, 2005

**Table of Contents**

- prohibit stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders, and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon at a stockholder meeting

Specifically, our certificate of incorporation provides that all stockholder action must be effected at a duly called meeting and not by a consent in writing. The by-laws provide, however, that our stockholders may call a special meeting of stockholders only upon a request of stockholders owning at least 50% of our common stock. These provisions of our certificate of incorporation and our by-laws could discourage potential acquisition proposals and could delay or prevent a change in control. We designed these provisions to reduce our vulnerability to unsolicited acquisition proposals and to discourage certain tactics that may be used in proxy fights. These provisions, however, could also have the effect of discouraging others from making tender offers for our shares. As a consequence, they also may inhibit fluctuations in the market price of our shares that could result from actual or rumored takeover attempts. Such provisions also may have the effect of preventing changes in our management.

We are permitted to issue shares of our preferred stock without stockholder approval upon such terms as our board of directors determines. Therefore, the rights of the holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of our preferred stock that may be issued in the future. In addition, the issuance of preferred stock could have a dilutive effect on the holdings of our current stockholders.

On June 5, 1998, our board of directors adopted a rights plan and declared a dividend with respect to each share of our common stock then outstanding. This dividend took the form of a right, which entitles the holders to purchase one one-thousandth of a share of our Series A junior participating preferred stock at a purchase price that is subject to adjustment from time to time. These rights have also been issued in connection with each share of our common stock issued after June 15, 1998. The rights are exercisable only if a person or entity or affiliated group of persons or entities acquires, or has announced its intention to acquire, 15% (27.5% in the case of certain approved stockholders) or more of our outstanding common stock. The adoption of the rights plan makes it more difficult for a third party to acquire control of us without the approval of our board of directors. This rights agreement was amended on March 19, 2004, to reflect our reincorporation under Delaware law.

We are subject to the Delaware anti-takeover laws regulating corporate takeovers. These anti-takeover laws prevent a Delaware corporation from engaging in a merger or sale of more than 10 percent of its assets with any stockholder, including all affiliates and associates of the stockholder, who owns 15 percent or more of the corporation's outstanding voting stock, for three years following the date that the stockholder acquired 15 percent or more of the corporation's stock unless:

- the board of directors approved the transaction where the stockholder acquired 15 percent or more of the corporation's stock;

- after the transaction in which the stockholder acquired 15 percent or more of the corporation's stock, the stockholder owned at least 85 percent of the corporation's outstanding voting stock, excluding shares owned by directors, officers and employee stock plans in which employee participants do not have the right to determine confidentially whether shares held under the plan will be tendered in a tender or exchange offer; or

- on or after this date, the merger or sale is approved by the board of directors and the holders of at least two-thirds of the outstanding voting stock that is not owned by the stockholder.

The provisions of our governing documents, stockholder rights plan and current Delaware law may, collectively:

- lengthen the time required for a person or entity to acquire control of us through a proxy contest for the election of a majority of our board of directors;

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

- discourage bids for our common stock at a premium over market price; and

- generally deter efforts to obtain control of us

**Recent Accounting Pronouncements May Impact Our Future Financial Position and Results of Operations**

There may be potential new accounting pronouncements or regulatory rulings, which may have an impact on our future financial position and results of operations. On December 16, 2004, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 123(R), "*Share-Based Payment*" (SFAS 123(R)), an amendment of Statements of Accounting Standards No. 123 and 95, that addresses the accounting for share-based awards to employees. The statement requires companies to recognize as an expense the fair value of stock options and other stock-based compensation to employees. The statement eliminates the ability to account for share-based compensation transactions using APB Opinion No. 25, "*Accounting for Stock Issued to Employees,*" (APB 25), and generally requires instead that such transactions be accounted for using a fair-value-based method, such as Black-Scholes, to fairly value stock options and recognize that value as an expense. The standard will be effective for public companies as of the beginning of the first fiscal quarter after June 15, 2005. We currently account for our stock-based compensation plans in accordance with APB 25. We will be required to implement SFAS 123(R) effective from the beginning of our third fiscal quarter of 2005, and we expect that its adoption will have a material adverse impact on our consolidated results of operations and financial position.

**We have adopted an Executive Change in Control and Severance Benefit Plan that could discourage, prevent or delay a takeover, even if the acquisition would be beneficial to our stockholders.**

On December 14, 2004, our Board of Directors approved an "Executive Change in Control and Severance Benefit Plan" for our executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain of our eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted by us previously. All of our executive employees at the level of Vice President or above are expected to be eligible to participate in the plan and our Board of Directors may designate certain other individuals as eligible to participate. The plan provides that, upon a change in control of the company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause or constructively terminated within one month preceding our change in control. If a participant is terminated without cause or constructively terminated one month before or one year after our change in control, he or she will also be entitled to certain cash severance and continued medical benefits and shall be credited with an additional year of vesting with respect to Nuvelo stock options and stock awards held by such participant. The change in control and severance benefits for certain of our employees provided for under this plan could make it more difficult and expensive, or less desirable, for a third party to acquire us, even if doing so would benefit our stockholders.

## RISKS RELATED TO INTELLECTUAL PROPERTY AND OTHER LEGAL MATTERS

**The commercial success of our products will be dependent upon our ability to protect the intellectual property rights associated with our products and drug candidates.**

Our competitive success will depend in part on our ability to obtain and maintain patent protection for our inventions, technologies and discoveries, including intellectual property that we license. The patent positions of biotechnology companies involve complex legal and factual questions, and we cannot assure you that our patents and licenses will successfully preclude others from using our technology. We could incur substantial costs in seeking enforcement of our proprietary rights against infringement. In addition, to obtain a patent on a novel gene or the protein it encodes, we need to identify a utility for the novel gene or the encoded protein we seek to protect under patent law. Identifying a utility may require significant research and development with respect to which we may incur a substantial expense and invest a significant amount of time.

33

Source: NUVELO INC, 10-K, March 16, 2005