# Exhibit R

Table of Contents

We currently have, or have in-licensed, issued patents and pending patent applications that cover portions of our in-licensed clinical products. ARC183 is covered both by a U.S. patent specifically claiming ARC183 and by U.S. patents covering aptamers generically. However, there are no equivalent international applications pending specifically claiming ARC183. International patent applications generically covering aptamers are pending but we cannot assure you that such patents will issue. We licensed the worldwide rights for all indications of rNAPc2 and all of the rNAPc molecules owned by Dendreon in February 2004. The United States government may claim a non-exclusive right to use rNAPc2 with respect to the treatment of hemorrhagic fever. We also currently have patents that cover some of our technological discoveries and patent applications that we expect to protect some of our gene, protein and technological discoveries. We will continue to apply for patents for our discoveries. We cannot assure you that any of our applications will issue as patents, or that any patent issued or licensed to us will not be challenged, invalidated, circumvented or held unenforceable by way of an interference proceeding or litigation.

The timing of the grant of a patent cannot be predicted. Patent applications describing and seeking patent protection of methods, compositions, or processes relating to proprietary inventions involving human therapeutics could require us to generate data, which may involve substantial costs. Our pending patent applications may lack priority over others' applications or may not result in the issuance of patents. Even if issued, our patents may not be sufficiently broad to provide protection against competitors with similar technologies and may be challenged, invalidated or circumvented.

In addition to patents, we rely on a combination of trade secrets, copyright and trademark laws, nondisclosure agreements, licenses and other contractual provisions and technical measures to maintain and develop our competitive position with respect to intellectual property. Nevertheless, these measures may not be adequate to safeguard the technology underlying our products. For example, employees, consultants and others who participate in the development of our products may breach their agreements with us regarding our intellectual property and we may not have adequate remedies for the breach. Our trade secrets could become known through other unforeseen means. We depend on our collaborators and other third parties that license intellectual property to us to protect our licensed intellectual property. These collaborators and other third parties could fail to take a necessary step to protect our licensed intellectual property, which could seriously harm our intellectual property position.

We also may not be able to effectively protect our intellectual property rights in some foreign countries, as many countries do not offer the same level of legal protection for intellectual property as the United States. Furthermore, certain of the patent applications describing our proprietary methods are filed only in the United States. Even where we have filed our patent applications internationally, for some cases and in certain countries, we have chosen not to maintain foreign patent protection by opting not to enter national phase or opting not to pay maintenance annuities.

Notwithstanding our efforts to protect our intellectual property, our competitors may independently develop similar or alternative technologies or products that are equal or superior to our technology. Our competitors may also develop similar products without infringing on any of our intellectual property rights or design around our proprietary technologies.

**If our products infringe on the intellectual property rights of others, we could face costly litigation, which could cause us to pay substantial damages and limit our ability to sell some or all of our products.**

Extensive litigation regarding patents and other intellectual property rights has been common in the biopharmaceutical industry. Litigation may be necessary to assert infringement claims, enforce patent rights, protect trade secrets or know-how and determine the enforceability, scope and validity of certain proprietary rights. The defense and prosecution of intellectual property lawsuits, United States Patent and Trademark Office interference proceedings, and related legal and administrative proceedings in the United States and internationally involve complex legal and factual questions. As a result, such proceedings are costly and time-consuming to pursue and their outcome is uncertain.

34

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Regardless of merit or outcome, our involvement in any litigation, interference or other administrative proceedings could cause us to incur substantial expense and could significantly divert the efforts of our technical and management personnel. An adverse determination may subject us to the loss of our proprietary position or to significant liabilities, or require us to seek licenses that may include substantial cost and ongoing royalties. Licenses may not be available from third parties, or may not be obtainable on satisfactory terms. An adverse determination or a failure to obtain necessary licenses may restrict or prevent us from manufacturing and selling our products, if any. These outcomes could materially harm our business, financial condition and results of operations.

Our market success depends in part on us neither infringing valid, enforceable patents or proprietary rights of third parties, nor breaching any licenses that may relate to our technologies and products. We are aware of third-party patents that may relate to our technology. We may be required to obtain licenses to patents or other proprietary rights of others in order to conduct research, development, or commercialization of some or all of our programs. We plan to seek licenses, as we deem appropriate, but it is possible that we may infringe upon these patents or proprietary rights of third parties. If we do not obtain these licenses, we may encounter delays in product market introductions, incur substantial costs while we attempt to design around existing patents or not be able to develop, manufacture or sell products. In response, third parties may assert infringement or other intellectual property claims against us. We may consequently be subjected to substantial damages for past infringement or be required to modify our products if it is ultimately determined that our products infringe a third party's proprietary rights. Further, we may be prohibited from selling our products before we obtain a license, which, if available at all, may require us to pay substantial royalties, which could adversely impact our product costs and have an impact on our business. Further, if we do obtain these licenses, the agreed terms may necessitate reevaluation of the potential commercialization of any one of our programs. Failing to obtain a license could result in litigation. Even if these claims are without merit, defending a lawsuit takes significant time, may be expensive and may divert management attention from other business concerns. Any public announcements related to litigation or interference proceedings initiated or threatened against us could cause our stock price to decline.

### We face product liability exposure and potential unavailability of insurance.

We risk financial exposure to product liability claims in the event that the use of products developed by us or our collaboration partners, if any, result in personal injury.

We may experience losses due to product liability claims in the future. We have obtained limited product liability insurance coverage. Such coverage, however, may not be adequate or may not continue to be available to us in sufficient amounts or at an acceptable cost, or at all. We may not be able to obtain commercially reasonable product liability insurance for any product approved for marketing. A product liability claim or other claim, product recalls, as well as any claims for uninsured liabilities or in excess of insured liabilities, may significantly harm our business, financial condition and results of operations.

### We use hazardous materials, chemicals and patient samples in our business and any disputes relating to improper handling, storage or disposal of these materials could be time consuming and costly.

Our research and development and production activities involve the controlled use of hazardous or radioactive materials, chemicals, including oxidizing and reducing reagents, patient tissue and blood samples. We, our collaborators and service providers are subject to federal, state and local laws and regulations governing the use, storage, handling and disposal of these materials and certain waste products. We could be liable for accidental contamination or discharge or any resultant injury from hazardous materials, and conveyance, processing, and storage of and data on patient samples. If we, our collaborators or service providers fail to comply with applicable laws or regulations, we could be required to pay penalties or be held liable for any damages that result and this liability could exceed our financial resources. Further, future changes to environmental health and safety laws could cause us to incur additional expense or restrict our operations. In

9

35

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

addition, our collaborators and service providers may be working with these types of hazardous materials, including viruses and hazardous chemicals, in connection with our collaborations. In the event of a lawsuit or investigation, we could be held responsible for any injury caused to persons or property by exposure to, or release of, patient samples that may contain viruses and hazardous materials. The cost of this liability could exceed our resources.

**Variagenics has been named as a defendant in a class action suit and defending this litigation could hurt our business.**

Variagenics has been named as a defendant in a securities class action lawsuit alleging the failure to disclose additional and excessive commissions purportedly solicited by and paid to underwriters who are also named defendants in the lawsuit. Plaintiffs in the suit allege that underwriters took these commissions and in exchange allocated shares of Variagenics' stock to their preferred customers through alleged agreements with these preferred customers that tied the allocation of initial public offering shares to agreements by the customers to make additional aftermarket purchases at pre-determined prices. As a result of our merger with Variagenics, we are obligated to continue to defend against this litigation. Currently we are in the process of approving a settlement by and between the issuers that are defendants in the lawsuit, the insurers of those issuers, and the plaintiffs. We believe that any loss or settlement amount will not be material to our financial position or results of operation, and that any settlement payment and attorneys' fees accrued with respect to the suit will be paid by our insurance provider. However, we cannot assure you that this will be the case until a final settlement is executed. Failure to finalize a settlement could require us to pay substantial damages.

**Item 2.    Properties**

We lease approximately 59,000 square feet of space at 675 Almanor Avenue, Sunnyvale, California, which is currently our primary headquarters. This lease expires on June 30, 2005, and has a five-year renewal option, which, if exercised, would extend the lease to June 30, 2010. On January 11, 2005, we entered into a five-year lease for approximately 55,000 square feet of space at 201 Industrial Road, San Carlos, California, which we intend to become our primary headquarters, and therefore we will likely forego the five-year renewal option on our existing headquarters. We also lease a 12,000 square foot facility at 670 Almanor Avenue, Sunnyvale, California, which is across the street from 675 Almanor, under a lease that expires June 30, 2005. This facility is currently being used by SBH Genomics, Inc., which purchased our Callida subsidiary in December 2004, and the related operations continue to be housed in this facility under terms of the purchase agreement for this subsidiary. We also lease approximately 140,000 square feet of space at 985 Almanor Avenue in Sunnyvale, California, which is adjacent to 675 Almanor, and is currently primarily being used for storage. The lease on this space extends through May 2011.

**Item 3.    Legal Proceeding**

On or about December 6, 2001, Variagenics was sued in a complaint filed in the United States District Court for the Southern District of New York naming it and certain of its officers and underwriters as defendants. The complaint purportedly is filed on behalf of persons purchasing the Company's stock between July 21, 2000 and December 6, 2000, and alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended, and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.

The complaint alleges that, in connection with Variagenics' July 21, 2000 initial public offering, or IPO, the defendants failed to disclose additional and excessive commissions purportedly solicited by and paid to the underwriter defendants in exchange for allocating shares of Variagenics' stock to preferred customers and alleged agreements among the underwriter defendants and preferred customers tying the allocation of IPO shares to agreements to make additional aftermarket purchases at predetermined prices. Plaintiffs claim that the failure to disclose these alleged arrangements made Variagenics' registration statement on Form S-1 filed with the SEC

36

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

in July 2000 and the prospectus, a part of the registration statement, materially false and misleading. Plaintiffs seek unspecified damages. On or about April 19, 2002, an amended complaint was filed which makes essentially the same allegations. On or about July 15, 2002, Variagenics and the individuals filed a motion to dismiss. We are involved in this litigation as a result of our merger with Variagenics in January 2003.

On July 16, 2003, Nuvelo's Board of Directors approved a settlement proposal initiated by the plaintiffs. The final terms of the settlement are still being negotiated. It is possible that the parties may not reach agreement on the final settlement documents or that the Federal District Court may not approve the settlement in whole or part. We believe we have meritorious defenses and intend to defend this action vigorously; however, we could be forced to incur material expenses in the litigation if the parties do not reach agreement of the final settlement documents, and in the event there is an adverse outcome, our business could be harmed.

**Item 4.**    *Submission of Matters to a Vote of Security Holders*

No matters were submitted to the vote of stockholders through the solicitation of proxies or otherwise during the fourth quarter of the year ended December 31, 2004.

37

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

PART II

### Item 5.   *Market for Registrant's Common Equity and Related Stockholder Matters*

Our common stock began trading on the Nasdaq Stock Market on August 8, 1997 as Hyseq, Inc. (HYSQ), and has traded under the symbol "NUVO" since January 31, 2003, (except for the period between June 19, 2003 and March 19, 2004, where we temporarily traded under the symbol "NUVOD"). The following table sets forth, for the periods indicated, the high and low bid information for our common stock, as reported by the Nasdaq Stock Market under these symbols:

|  | High | Low |
|---|---|---|
| **Year ended December 31, 2003** | | |
| First quarter | $        4.47 | $     1.92 |
| Second quarter | 8.16 | 2.58 |
| Third quarter | 12.03 | 5.28 |
| Fourth quarter | 12.66 | 7.47 |
| **Year ended December 31, 2004** | | |
| First quarter | $      16.50 | $    10.36 |
| Second quarter | 13.20 | 7.57 |
| Third quarter | 10.44 | 6.77 |
| Fourth quarter | 11.23 | 8.36 |

As of February 28, 2005, there were approximately 263 stockholders of record of our common stock, and the last sale price reported on The Nasdaq National Market for our common stock was $7.77 per share.

The holders of our common stock are entitled to dividends in such amounts and at such times, if any, as may be declared by our board of directors out of legally available funds. We have not paid any dividends on our common stock and do not anticipate paying any cash dividends on our common stock in the foreseeable future. Under our August 31, 2004 Loan and Security Agreement with Silicon Valley Bank, we cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of our capital stock.

Information relating to compensation plans under which our equity securities are authorized for issuance is included in Item 12 of Part III of this Annual Report, which is incorporated by reference from our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

### Recent Sales of Unregistered Securities

On February 11, 2004 we issued an aggregate of 70,538 shares of common stock to Atlas Venture Fund III and Atlas Venture Entrepreneurs' Fund III, pursuant to the cashless exercise of a warrant, dated July 30, 1999. The warrant was exercisable for a total of 105,596 shares of common stock and had an exercise price of $4.98 per share. In connection with the cashless exercise, the number of shares issuable pursuant to the warrant was reduced by 35,058 shares pursuant to the operation of the cashless exercise provisions in the warrant. The issuance of the shares pursuant to this warrant was exempt from registration under the Securities Act of 1933 in reliance on Section 4(2) promulgated thereunder as a transaction not involving any public offering.

On February 19, 2004 we issued an aggregate of 16,380 shares of common stock to Comerica, Inc., pursuant to the cashless exercise of a warrant, dated June 24, 1999. The warrant was exercisable for a total of 24,084 shares of common stock and had an exercise price of $4.98 per share. In connection with the cashless exercise, the number of shares issuable pursuant to the warrant was reduced by 7,704 shares pursuant to the operation of the cashless exercise provisions in the warrant. The issuance of the shares pursuant to this warrant was exempt from registration under the Securities Act of 1933 in reliance on Section 4(2) promulgated thereunder as a transaction not involving any public offering.

38

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

On September 9, 2004, we issued an aggregate of 240,842 shares of common stock to Wells Fargo Bank Indiana, N.A., pursuant to the cash exercise of four warrants, each dated July 30, 1999. The warrants were exercisable for a total of 240,842 shares of common stock and each warrant had an exercise price of $4.98 per share. The issuances of the shares pursuant to these warrants were exempt from registration under the Securities Act of 1933 in reliance on Section 4(2) promulgated thereunder as a transaction not involving any public offering.

Item 6.  *Selected Consolidated Financial Data*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Statement of Operations Data:** | (In thousands, except per share amounts) | | | | |
| Contract revenues | $    195  | $    1,024  | $    25,554  | $    24,550  | 15,604 |
| Loss from continuing operations | (48,942) | (46,229) | (39,512) | (33,836) | (22,253) |
| Loss from discontinued operations, including loss on disposal | (3,547) | (3,958) | (5,466) | (2,636) | — |
| Net loss | $  (52,489) | $  (50,187) | (44,978) | (36,472) | (22,253) |
| Basic and diluted net loss per share: | | | | | |
| Continuing operations | (1.59) | (2.19) | (5.48) | (6.29) | (4.95) |
| Discontinued operations | (0.11) | (0.18) | (0.76) | (0.49) | — |
| Total basic and diluted net loss per share | $  (1.70) | $  (2.37) | (6.24) | (6.78) | (4.95) |
| Weighted average shares used in computing basic and diluted net loss per share | 30,874 | 21,054 | 7,220 | 5,386 | 4,483 |

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Balance Sheet Data:** | (In thousands) | | | | |
| Working capital | $  43,382  | $  25,772  | (20,728) | (1,717) | (2,577) |
| Total assets | 79,264 | 57,809 | 27,072 | 39,904 | 21,288 |
| Bank loan | 2,600 | | | | |
| Notes payable | 4,000 | 6,600 | 6,600 | 4,000 | |
| Capital lease obligations | 1,079 | 3,070 | 2,242 | 4,734 | 7,101 |
| Related party line of credit | 7,792 | 10,542 | 10,000 | | |
| Accumulated deficit | (256,048) | (203,559) | (153,372) | (108,394) | (71,922) |
| Total stockholders equity (deficit) | 45,589 | 22,701 | (4,564) | 15,421 | 8,362 |

A factor affecting the comparability of information between 2003 and 2004 was our public offering in March 2004, in which an aggregate of approximately 5.8 million shares of common stock were sold for net proceeds of approximately $69.5 million.

Two factors affecting the comparability of information between 2002 and 2003 was our merger with Variagenics, Inc. on January 31, 2003, in which approximately 13.3 million shares of common stock were issued to Variagenics shareholders for an approximate net purchase price of $48.6 million. In addition, in October 2003, an aggregate of approximately 3.8 million shares of common stock were sold in an underwritten public offering for net proceeds of approximately $26.3 million.

A factor affecting the comparability of information between 2001 and 2002 was our private placement offering in April 2002, in which an aggregate of approximately 1.2 million shares of common stock and warrants to purchase an aggregate of approximately 0.3 million shares of common stock were sold for net proceeds of approximately $14.3 million.

39

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

A factor affecting the comparability of information between 2000 and 2001 was our private placement offering in August 2001, in which an aggregate approximately of 1.0 million shares of common stock and warrants to purchase an aggregate of approximately 0.5 million shares of common stock were sold for net proceeds of approximately $20.7 million, and the conversion of our loan from our Chairman's first line of credit into approximately 0.75 million shares of common stock

40

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

We have included or incorporated by reference into this Management's Discussion and Analysis of Financial Condition and Results of Operations and elsewhere in this Annual Report on Form 10-K, and from time to time our management may make statements that constitute "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by words including "anticipate," "believe," "intends," "estimates," "expect," "should," "may," "potential" and similar expressions. Such statements are based on our management's current expectations and involve risks and uncertainties. Although we believe that the expectations reflected in the forward-looking statements are reasonable, our actual results and performance could differ materially from those projected in the forward-looking statements as a result of many factors discussed in this Annual Report, including those set forth in this Item 7 as well as under "Item 1. Business," including "Risk Factors." We do not intend to update any of the forward-looking statements after the date of this Annual Report to conform these statements to actual results unless required by law.

### Overview

We are engaged in the discovery, development and commercialization of life improving therapeutics for the treatment of human disease. Our lead product candidate, alfimeprase, has completed two Phase 2 trials in two indications, acute peripheral arterial occlusion (PAO) and catheter occlusion, and is expected to enter Phase 3 trials in 2005. Adding to our cardiovascular portfolio, we announced in the first quarter of 2004 a partnership with Archemix for the development and commercialization of ARC183, a novel thrombin inhibitor, and a license agreement with Dendreon for worldwide rights to rNAPc2, an anticoagulant that blocks tissue factor. ARC183 is currently in a Phase 1 program and rNAPc2 is in a Phase 2a trial. Both trials are expected to conclude in the first half of 2005.

In addition, we plan to leverage our proprietary gene collection and expertise in secreted proteins and antibody discovery to expand our pipeline and create partnering and licensing opportunities.

Alfimeprase, our lead development candidate, recently completed Phase 2 clinical trials in two distinct indications, acute PAO and catheter occlusion. Alfimeprase is a thrombolytic agent, or blood clot dissolver, with a novel mechanism of action, and was identified through a research program at Amgen Inc. In January 2002 we entered into a 50/50 cost/profit sharing arrangement with Amgen for the development and commercialization of alfimeprase. In October 2004, Amgen exercised its rights pursuant to the terms of this collaboration agreement to terminate its collaboration with us and enter instead into an exclusive license whereby we are granted the worldwide rights to develop and commercialize alfimeprase in exchange for the payment to Amgen of previously negotiated milestone payments and royalties. Under the terms of our license agreement, Amgen will transfer the technology necessary for the manufacture of alfimeprase to us or to Avecia Limited, our designated manufacturer. On January 21, 2005, we entered into an Interim Agreement with Avecia for the manufacture of alfimeprase, and we are currently in negotiations with Avecia for a definitive agreement for the manufacture of commercial quantities of alfimeprase. Amgen is required to continue to supply alfimeprase to us during the transition period. In connection with the termination of the collaboration agreement with Amgen, we also entered into an opt-out, termination, settlement and release agreement with Amgen in October 2004, whereby we made a payment of $8.5 million to Amgen, of which $8.3 million was related to the remaining reimbursement of its manufacturing costs incurred under the collaboration agreement. We believe the inventory to which these manufacturing costs relate is sufficient to supply the Phase 3 program for alfimeprase as currently contemplated. In addition, we are also required to pay Amgen $5.0 million within 30 days of dosing of the first patient in the first Phase 3 clinical trial for alfimeprase. We expect this milestone to be achieved in the first quarter of 2005. Future milestone payments under the license agreement could total as much as $40.0 million.

In February 2004, we entered into a licensing agreement with Dendreon Corporation for worldwide rights to all indications of rNAPc2 and all other rNAPc molecules owned by Dendreon. rNAPc2 is a recombinant version of a naturally occurring protein that has anticoagulant properties. Under the terms of the agreement, we paid

41

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock) and have expensed $5.6 million for this and related clinical trial costs in 2004. We are required to pay Dendreon milestone payments, ranging from $2.0 million to $6.0 million, for both rNAPc2's first and second indications upon dosing of the first patient in a Phase 3 clinical trial, upon submission of a New Drug Application, or NDA, and upon first commercial sale. If all development and commercialization milestones are achieved, total milestone payments to Dendreon can reach as much as $23.5 million. We believe that achieving these milestones is uncertain and we currently cannot predict when any may be achieved. Upon reaching commercialization, we are also responsible for paying future royalties to Dendreon depending on certain sales volume of rNAPc2. We are currently investigating rNAPc2 in a Phase 2a double-blind, placebo-controlled clinical trial for potential use in treating acute coronary syndromes, or ACS, including unstable angina, or UA, and non-ST segment elevation myocardial infarction, or NSTEMI. We plan to complete patient enrollment of this study in the first half of 2005.

In January 2004, we announced a collaboration agreement with Archemix, a privately held biotechnology company located in Cambridge, Massachusetts, for the development and commercialization of ARC183. Our lead indication for ARC183 is as a thrombin inhibitor for use in CABG surgery. Under the terms of our agreement, we paid Archemix an upfront fee of $3.0 million in cash, and have expensed $7.7 million for this and related clinical trial costs in 2004. Under the terms of the collaboration agreement, Archemix is initially responsible for leading development and for all clinical development activities. As part of the agreement, we and Archemix equally share all costs associated with the development and commercialization of ARC183 after we have funded the first $4.0 million in research and development costs, and will jointly share any revenues resulting from its commercialization. Since these joint research and development costs have already exceeded $4.0 million as of the third quarter of 2004, we and Archemix have begun the 50/50 cost sharing arrangement. Under the collaboration agreement, we have the option to lead commercialization efforts in which both we and Archemix may participate. We are required to pay Archemix total development milestone payments of up to $11.0 million, including $10.0 million upon commencement of a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Nuvelo and Archemix for IND-enabling studies. We estimate that the milestone payment of $10.0 million could occur in the first half of 2006. We are obligated to make the Phase 2 milestone payment to Archemix even if the collaboration is terminated by Archemix, or if Archemix does not meet its obligations under the agreement and we terminate the collaboration for default by Archemix. Upon reaching commercialization, both companies are responsible for paying any related royalties to each other depending on product sales volume. In August 2004, we and our partner, Archemix, initiated a Phase 1 clinical program for ARC183 for use in CABG surgery. These studies are evaluating the safety, tolerability, anticoagulation activity and titratability of ARC183. We expect to complete enrollment of the Phase 1 clinical program of ARC183 in the first half of 2005.

In September 2004, we extended and expanded our research and development collaboration with Kirin. The amended agreement extends the term of the current collaboration to December 31, 2005 and expands the scope of the collaboration to include additional secreted protein genes from our full-length gene portfolio. Under the current contract, we will jointly own discoveries resulting from the collaboration, and we will jointly develop and market the resulting products while sharing costs, efforts and revenues. Under our Kirin collaboration, we have completed the initial analysis of 50 secreted protein genes in mouse models and will be testing additional candidates genes in 2005. We plan to announce a primary indication for our pre-clinical candidate, NU206, in the first half of 2005. NU206 was identified as a result of this collaboration.

Our efforts to manage simultaneously a number of collaboration and licensing arrangements may not be successful, and the failure to manage effectively such collaborations would significantly harm our business, financial condition and results of operations. Due to these factors and other possible disagreements with Amgen, Archemix, Dendreon and Kirin, we may be delayed or prevented from developing or commercializing alfimeprase, ARC183 and rNAPc2 or our pre-clinical product candidates or we may become involved in litigation or arbitration, which would be time-consuming or expensive and could have a material adverse effect on our stock price.

42

Table of Contents

In December 2004, we sold our subsidiary, Callida Genomics, Inc., or Callida, to SBH Genomics, Inc., a privately held Delaware corporation. This transaction is part of our strategy to monetize assets that are outside of our core business. Prior to the sale, we owned approximately 90% of Callida's issued and outstanding capital stock. Affymetrix, a minority stockholder in Callida, also sold its Callida shares as part of the same negotiated transaction. We and Affymetrix sold our stock in Callida in exchange for convertible promissory notes in the principal amount of $1.0 million, being $0.9 million for Nuvelo and $0.1 million for Affymetrix, and potential additional payments to us from SBH Genomics based on future revenues. The notes are convertible into preferred shares of SBH Genomics under certain circumstances. As part of this transaction, Affymetrix has waived the acceleration of a $4.0 million promissory note owed to us by Affymetrix that would have become immediately payable as a result of the change in control of Callida. This convertible note arose from a loan made to us by Affymetrix in 2001 to fund our initial capital contribution to Callida and is due in November 2006. The sale of our Callida stock results in a net non-cash charge to our earnings of approximately $1.1 million, representing the difference between the value of the convertible promissory notes received and the carrying value of Callida's assets and liabilities in our balance sheet. In addition, various cash and non-cash charges of approximately $0.5 million are associated with the sale of this subsidiary. The sale of the Callida business segment meets the criteria for presentation as a discontinued operation under the provisions of the Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets."* Therefore, the historical results of Callida are reported in our consolidated financial statements as a discontinued operation.

In January 2005, we entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for approximately 55,000 square feet of industrial space at 201 Industrial Road in San Carlos, California at $2.35 per square foot per month, subject to annual adjustments. The lease will commence on or around September 1, 2005 and contains an option to cancel the lease after five years, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), and rights of first refusal over all vacant space in the building during the first two years of the lease. The lease contains a tenant improvement allowance of $7.7 million, or $140 per square foot.

In March 2004, we raised approximately $69.5 million in a public offering, net of underwriters' fees and stock issuance costs of $5.3 million, from the sale of 5,750,000 shares of our common stock, including 750,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $13.00 per share.

In February 2005, we raised approximately $68.3 million in a public offering, net of underwriters' fees and stock issuance costs of approximately $5.0 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share. We intend to use the net proceeds from this offering for general corporate purposes, including capital expenditures, working capital needs, current and future clinical trials of our lead drug candidate, alfimeprase, as well as other research and drug development activities. The amounts and timing of the expenditures will depend on numerous factors, such as the timing and progress of our clinical trials and research and development efforts, technological advances and the competitive environment for our drug candidates. We expect from time to time to evaluate the acquisition of businesses, products and technologies for which a portion of the net proceeds may be used, although we currently are not planning or negotiating any such transactions.

## Results of Operations

Nuvelo's core business is to develop and market therapeutic drugs for the treatment of human diseases. The following results of operations include those of both Nuvelo and Callida Genomics, Inc. (Callida), through its disposal on December 3, 2004. The results of Callida have been reclassified to discontinued operations for all periods presented.

43

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### Contract Revenues

Contract revenues were $0.2 million in 2004, compared to $1.0 million in 2003 and $25.6 million in 2002. The $0.8 million decrease in 2004 from 2003 was primarily due to $0.5 million of deferred revenues recognized in 2003 from the $4.0 million license payment received from Affymetrix as part of the October 2001 settlement of all our outstanding litigation with Affymetrix, with no corresponding amount in 2004. The $24.6 million decrease in 2003 from 2002 was primarily due to completion of our gene screening services collaboration with BASF in January 2003 and from the $4.0 million Affymetrix license payment, for which we recognized revenues of $21.9 million and $2.7 million, respectively, in 2002.

Our revenues may vary significantly from quarter to quarter as a result of licensing or collaboration activities. In the future, we may not be able to maintain existing collaborations, obtain additional collaboration partners or obtain revenue from other sources, which could have a material adverse effect on our revenues, operating results and cash flows.

### Research and Development Expenses

| | Years Ended December 31, | | | % Change | % Change |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | in 2004 | in 2003 |
| | (Dollars in Thousands) | | | | |
| Research and development | $ 39,970 | $ 30,014 | $ 46,827 | 33% | (36)% |

Research and development (R&D) expenses, primarily consist of R&D personnel costs, clinical trial and drug manufacturing costs, license, collaboration and royalty fees, outside services, supplies, depreciation and amortization, and allocated facilities expenses.

The $10.0 million increase in R&D expense in 2004 as compared to 2003 was primarily due to $7.0 million in upfront fees related to our license and collaboration agreements signed with Dendreon and Archemix, respectively, in the first quarter of 2004, and an increase of $4.7 million in overall clinical trial and research-related costs to continue supporting development of our current drug candidates in 2004, partially offset by $2.7 million in R&D savings realized during 2004 from completion of the shut-down of our Variagenics research operations in Cambridge, Massachusetts in 2003.

The $16.8 million decrease in R&D expense in 2003 as compared to 2002 was primarily due to net savings of $15.0 million of research and personnel costs as a result of the early completion of our agricultural gene screening services agreement with BASF in January 2003, total rent savings of $3.5 million realized from our early lease termination of the Humboldt Court, Sunnyvale facility executed in November 2002, and a decrease of $1.5 million in depreciation expense due to significantly lower capital expenditures in 2003 and with fixed assets becoming fully depreciated in 2003. The decrease was partially offset by additional R&D expense of $2.7 million in 2003 from Variagenics' operations assumed in connection with the merger completed on January 31, 2003 and subsequently shut down at the end of the third quarter of 2003.

R&D expenses included in the statement of operations for 2004 and since inception for our significant programs are as follows (including license and collaboration fees):

| Program | 2004 | Since Inception |
|---|---|---|
| | (Dollars in Millions) | |
| alfimeprase | | |
| rNAPc2 | $ 6.7 | $ 26.8 |
| ARC183 | $ 5.6 | $ 5.6 |
| | $ 7.7 | $ 7.7 |

We expect to expense up to $12.6 million of drug manufacturing costs within the next twelve months as we start to advance alfimeprase into Phase 3 clinical trials in 2005. We also are required to pay Amgen $5.0 million

44

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

within 30 days of dosing of the first patient in the first phase 3 clinical trial for alfimeprase, resulting from the license agreement signed in November 2004. We expect this milestone to be achieved in the first quarter of 2005. We currently do not expect to incur any milestone expense for our rNAPc2 and ARC183 drug candidates in 2005. We expect other R&D expenses to increase during 2005 as we continue to dedicate our resources to advance ongoing alfimeprase clinical trials as well as work to enhance our pipeline by seeking attractive therapeutic candidates that complement our ongoing development programs, while prosecuting and enforcing our intellectual property rights.

The timing, cost of completing the clinical development of any product candidate, and any potential future product revenues will depend on a number of factors, including the disease or medical condition to be treated, clinical trial design and endpoints, availability of patients to participate in trials and the relative efficacy of the product versus treatments already approved. Due to these uncertainties, we are unable to estimate the length of time or the costs that will be required to complete the development of these product candidates. We do not expect to generate any product revenue until we reach the commercialization stage for any of our drug products, if this ever occurs.

### General and Administrative Expenses

| | Years Ended December 31, | | | % Change in 2004 | % Change in 2003 |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | | |
| | (Dollars in Thousands) | | | | |
| General and administrative | $   8,702 | $     15,069 | $     14,981 | (42)% | 1% |

General and administrative (G&A) expenses primarily consist of G&A personnel costs, consulting and professional fees, insurance, facilities and depreciation expenses, and various other administrative costs.

The $6.4 million decrease in G&A expense in 2004 as compared to 2003 was primarily due to a $4.6 million decrease from rent and option termination expenses in 2003 related to the Humboldt Court facility lease, and $3.6 million in G&A savings realized during 2004 from completion of the shut-down of our Variagenics' operations in 2003, offset by increases in consulting and professional fees associated with the internal controls documentation, testing and auditing required under the Sarbanes-Oxley Act of 2002.

The $0.1 million increase in G&A expense in 2003 as compared to 2002 was primarily due to an increase of $3.6 million from Variagenics' G&A costs before it was shut down in the third quarter of 2003, largely offset by cost savings in 2003 from decreased average headcount and decreased rent expense as a result of the Humboldt Court facility lease termination in November 2002.

We expect general and administrative expenses to increase during 2005 to support our growth in general operating activity.

### Loss on Sale of Assets

Losses on sales of assets were $0.2 million in 2004, compared to $1.2 million in 2003 and $36,000 in 2002. The $1.0 million decrease in 2004 and the $1.2 million increase in 2003 were both primarily due to the $1.2 million write-off in 2003 of Humboldt Court leasehold improvements in connection with our decision to not exercise a purchase option in April 2003 related to an early lease termination agreement executed in November 2002.

### Restructuring Expenses

There were no restructuring expenses in 2004 or 2003, compared to restructuring costs of $2.1 million in 2002 related to headcount reductions in connection with the early completion of our BASF collaboration.

45

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents
*Interest Income and Expense, Net*

| | Years Ended December 31, | | | % Change in 2004 | % Change in 2003 |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | | |
| | (Dollars in Thousands) | | | | |
| Interest income | $        2,889 | $        747 | $        87 | 287% | 759% |
| Interest expense — related party | (481) | (557) | (252) | (14)% | 121% |
| Interest expense — other | (2,706) | (1,135) | (990) | 138% | 15% |
| Interest income and expense, net | $        (298) | $        (945) | $        (1,155) | (68)% | (18)% |

The $0.6 million decrease in net interest expense for 2004 as compared to 2003 was primarily due to the increase in interest income resulting from higher average cash and investment balances due to public offerings completed in October 2003 and March 2004, partially offset by increased amortization of premium/discount related to our investment balances.

The $0.2 million decrease in net interest expense for 2003 as compared to 2002 was primarily due to the increase in interest income resulting from higher average cash and investment balances due to our merger with Variagenics in January 2003 and the public offering completed in October 2003, partially offset by increased interest expense from the line of credit with our Chairman, increased amortization of premium/discount related to our investment balances and additional capital leases assumed from the merger with Variagenics.

*Loss from Continuing Operations*

Since our inception, we have incurred significant net losses, and as of December 31, 2004, our accumulated deficit was $256.0 million. During 2004, we incurred a net loss from continuing operations of $48.9 million as compared to $46.2 million in 2003 and $39.5 million in 2002.

We expect to continue to incur significant losses from continuing operations for the foreseeable future, which may increase substantially as we continue clinical development of our lead drug candidate, alfimeprase, continue clinical development of rNAPc2 and ARC183, further expand research and development of our potential biopharmaceutical product candidates, potentially in-license other drug candidates, and continue to prosecute and enforce our intellectual property rights.

*Loss from Discontinued Operations*

On December 3, 2004, we sold our subsidiary, Callida Genomics, Inc. (Callida). In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"*, the operating results of Callida have been reclassified to discontinued operations for all periods presented. The sale resulted in a net non-cash charge of approximately $1.1 million, representing the difference between the value of the convertible promissory notes received and the carrying value of Callida's assets and liabilities on our balance sheet. In addition, various cash and non-cash charges of approximately $0.5 million were associated with the sale. All of the charges related to the disposal have been classified within discontinued operations.

**Liquidity and Capital Resources**

Cash, cash equivalents and short-term investment balances at the end of 2004 and 2003 were as follows:

| | December 31, 2004 | December 31, 2003 |
|---|---|---|
| | (Dollars in Thousands) | |
| Cash and cash equivalents | $        16,811 | $        13,141 |
| Short-term investments | 33,814 | 21,048 |
| Cash, cash equivalents and short-term investments | $        50,625 | $        34,189 |

46

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Cash flows from operating, investing and financing activities in 2004, 2003 and 2002 were as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (Dollars in Thousands) | |
| Cash flows from operating activities | $ (50,112) | $ (45,066) | $ (30,908) |
| Cash flows from investing activities | (13,576) | 28,393 | (2,001) |
| Cash flows from financing activities | 67,358 | 27,589 | 22,805 |
| Net increase (decrease) in cash and cash equivalents | $ 3,670 | $ 10,916 | $ (10,104) |

### Cash, Cash Equivalents and Short-Term Investments

As of December 31, 2004, we had $50.6 million in cash, cash equivalents and short-term investments. These amounts reflect a net increase of $16.4 million from the $34.2 million total as of December 31, 2003. This increase resulted primarily from the net proceeds of approximately $69.5 million from a public offering in March 2004, partially offset by $50.1 million of cash used in operating activities in 2004.

In February 2005, we raised approximately $68.3 million in a public offering, net of underwriters' fees and stock issuance costs of approximately $5.0 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share.

As of December 31, 2004, all of our short-term investments in marketable securities have maturities of less than one year, and have been classified as available-for-sale securities, as defined by Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities"* (SFAS 115). These securities are recorded at their fair value and consist of corporate debt and asset-backed securities. We make our investments in accordance with our investment policy. The primary objectives of our investment policy are liquidity, safety of principal and diversity of investments.

### Sources and Uses of Capital

To date, our primary sources of liquidity have been cash from financing activities, collaboration receipts and our merger with Variagenics in January 2003. We plan to continue to raise funds through additional public and/or private offerings and collaboration activities in the future.

In March 2004, we raised approximately $69.5 million in a public offering, net of underwriters' fees and stock issuance costs of $5.3 million, from the sale of 5,750,000 shares of our common stock, including 750,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $13.00 per share.

In August 2004, we entered into a Loan and Security Agreement (Loan Agreement), with Silicon Valley Bank that provides us with a $6.0 million term loan facility and a $4.0 million revolving credit line and grants Silicon Valley Bank a security interest over certain of our assets, excluding intellectual property. As a condition precedent to the Loan Agreement, we agreed, among other things, to certain covenants and reporting requirements. On December 15, 2004, we completed a planned $2.6 million initial draw-down on the term loan, the proceeds of which were used entirely to repay a note for the same amount that was owed to AMB Property, LP in relation to the termination of a lease agreement for facilities at Humboldt Court, Sunnyvale, California. We have not used any of the funds available under the revolving credit line. The proceeds of all other term loan draw-downs and the revolving credit line may be used solely for our working capital or other general business requirements. Since September 2004, the revolving credit line has been used to collateralize a $4.0 million letter of credit issued to the Irvine Company related to the 985 Almanor facility lease that was previously guaranteed and collateralized by Dr. Rathmann. Our term loan borrowings under the new loan facility shall bear interest at a fixed rate per annum equal to the 36-month Treasury Rate in effect on the funding date plus three and one-quarter

47

Table of Contents

percent (3.25%), and, in any event, shall not be less than 6.43% per annum. Our revolving credit borrowings shall bear interest at Silicon Valley Bank's prime rate in effect from time to time. As of December 31, 2004, we had received waivers for any breaches of related covenants and reporting requirements, and the applicable interest rate for the outstanding amount under the term loan was 6.43%.

Dr. Rathmann, the chairman of our board of directors, provided us with a $20.0 million line of credit in August 2001, of which we have drawn down $11.0 million, with the remaining $9.0 million having expired. The related promissory note bears interest at the prime rate plus 1%. In November 2003, we began repaying the outstanding balance over 48 months with equal principal payments of approximately $0.2 million. Accrued interest will be paid with the final payment in October 2007. As of December 31, 2004, the remaining principal and accrued interest to date totaled $9.2 million. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of our common stock at a price based upon the average price of our common stock over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of December 31, 2004, 907,113 shares would be issuable to fully repay the principal and interest outstanding upon conversion. Dr. Rathmann's guarantee of our $2.6 million promissory note to AMB Property, LP was canceled upon repayment of this note in December 2004.

We issued Affymetrix a 5-year promissory note for $4.0 million in November 2001, bearing a fixed annual interest rate of 7.5%. Accrued interest will be paid with the final payment in November 2006. As of December 31, 2004, the remaining principal and accrued interest to date totaled $4.9 million. The outstanding principal and interest under the note may be repaid in whole or in part at any time, at our option, by conversion into shares of our common stock at a price based upon 90% of the average price of our common stock over a 10-day period ending 2 days prior to the conversion. As of December 31, 2004, 542,235 shares would be issuable to fully repay the principal and interest outstanding upon conversion. Affymetrix has the ability to declare all outstanding principal and interest under the note immediately due and payable if our market capitalization is under $50.0 million and Affymetrix reasonably determines that the loan evidenced by the note is impaired, and we have an obligation to prepay amounts owing under the note to the extent that the amounts outstanding exceed 10% of our market capitalization. Moreover, we have registered for resale a portion of these shares issuable to Affymetrix on a registration statement that has been declared effective by the SEC.

Our primary use of capital resources has been to fund operating activities, including license payments, to acquire capital equipment and to make leasehold improvements. We used cash of $50.1 million and $45.1 million for operating activities, and cash of $0.7 million and $0.3 million to acquire capital equipment and make leasehold improvements in 2004 and 2003, respectively.

In August 2002 we amended our lease on the property at 985 Almanor Ave. to provide for a rent deferral of approximately $4.9 million over the subsequent three years, retroactive to June 1, 2002. We will be required to repay the deferred rent liability, plus interest, over a four-year period beginning June 1, 2005 in equal monthly installments of approximately $0.1 million. In October 2003, we amended the lease for a second time, to provide for an additional rent deferral. In order to receive this rent deferral, we pre-paid approximately $2.7 million of base rental payments in October 2003 to cover the 9 month period beginning October 1, 2003 and ending June 30, 2004. The amendment provides that no base rent will be due for the period July 1, 2004 through March 30, 2005, resulting in a $2.9 million deferral and approximately $0.2 million of savings. The deferral amount will be repaid on May 30, 2011, the end of the lease term. Other terms of the agreement include the ability to repay the $2.9 million deferred rent in 36 monthly installments of approximately $0.1 million, commencing on June 1, 2011 if the lease term is extended for at least 36 months, and early reinstatement of the original rental rates if we successfully raise $75.0 million in a single public or private equity offering, with the remaining amount of rent deferred under both lease amendments up to that date coming due immediately.

### Cash Used in Operating Activities

Net cash used in operating activities increased by $5.0 million to $50.1 million in 2004, compared to $45.1 million in 2003. The increase in cash used was primarily due to payments to Amgen of $8.5 million in relation

48

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

to the termination of the collaboration agreement in October 2004, of which $8.3 million was related to the remaining reimbursement of its manufacturing costs incurred under the collaboration agreement, and of $0.4 million in related technology transfer fees, as well as total license and collaboration agreement fees of $3.5 million paid to Dendreon and Archemix, partially offset by the elimination of $6.3 million of expenses incurred in 2003 resulting from our merger with Variagenics in January 2003. Net cash used in operating activities increased by $14.2 million to $45.1 million in 2003, compared to $30.9 million in 2002, primarily due to an increase in net loss before non-cash license expenses.

We expect an increase in operating expenses in 2005, as we continue to incur increased clinical development and manufacturing costs related to our three drug candidates. In addition, we are required to pay Amgen $5.0 million within 30 days of dosing of the first patient in the first Phase 3 clinical trial for alfimeprase, as part of the license agreement signed on November 3, 2004. We expect this milestone to be achieved in the first quarter of 2005. If we are successful in reaching the commercialization stage, we will also be responsible for paying our collaboration and licensing partners certain product royalties, depending on product sales volumes. We do not foresee a significantly negative impact in our liquidity based on potential royalty payment obligations, as the majority of these payments are related to commercial sales, which provide us with offsetting cash inflows. Our future milestone payments under current agreements could total $74.5 million if all milestones are achieved, which would significantly affect our future cash flows. Only $5.0 million of this amount is expected to be paid in 2005, as noted above.

## Cash Used in / Provided by Investing Activities

Net cash used in investing activities was $13.6 million in 2004, compared to $28.4 million provided by investing activities in 2003 and $2.0 million used in investing activities in 2002. The increased use of cash in 2004 was primarily due to $25.7 million of cash used for the acquisition of Variagenics in 2003, and increased purchases of short-term investments as a result of cash raised from the public offering completed in March 2004, partially offset by an increase in proceeds from the subsequent sales or maturities of those investments. The increase in cash provided by investing activities in 2003 was primarily due to the cash received from the acquisition of Variagenics.

We expect capital expenditures to increase significantly during 2005 as compared to 2004, as we prepare our newly-leased facilities at 201 Industrial Road in San Carlos, California to be our primary headquarters.

## Cash Provided by Financing Activities

Net cash provided by financing activities increased by $39.8 million to $67.4 million in 2004, compared to $27.6 million in 2003. The cash provided in 2004 and 2003 primarily resulted from public offerings completed in March 2004 and October 2003, respectively. Net cash provided by financing activities increased by $4.8 million from 2002 to 2003, resulting from the increase in size of the public offering in 2003 from the private investment in 2002.

In February 2005, we raised approximately $68.3 million in a public offering, net of underwriters' fees and stock issuance costs of approximately $5.0 million, from the sale of 9,775,000 shares of our common stock, including 1,275,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share. We may also raise further funds through additional public or private financings in 2005.

Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth under "Risk Factors." We may not be able to secure additional financing to meet our funding requirements on acceptable terms, if at all. If we raise additional funds by issuing equity securities, substantial dilution to our existing stockholders may result. If we are unable to obtain additional funds, we will have to reduce our operating costs and delay our research and development programs. Including the $68.3 million of net

49

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

proceeds from the offering in February 2005, we believe that we have adequate cash reserves to fund our operations through 2006.

### Contractual Obligations

The following table summarizes our significant contractual obligations as of December 31, 2004, and the effect such obligations are expected to have on our liquidity and cash flow in future periods (in thousands)

| Contractual obligations: | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 and Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Operating lease obligations | $ 5,693 | $ 7,260 | $ 7,479 | $ 7,707 | $ 6,906 | $ 12,004 | $ 47,049 |
| Bank loan(a) | 844 | 1,133 | 893 | — | — | — | 2,870 |
| Note payable(b) | | 4,939 | | | | | 4,939 |
| Capital lease obligations(a) | 1,010 | 105 | 14 | — | — | — | 1,129 |
| Related party line of credit(c) | 2,750 | 2,750 | 3,694 | — | — | — | 9,194 |
| Total contractual obligations | $ 10,297 | $ 16,187 | $ 12,080 | $ 7,707 | $ 6,906 | $ 12,004 | $ 65,181 |

(a)  Includes interest payments at fixed rates of interest.
(b)  Fixed interest of 7.5% per annum is accrued and due with the final loan payment in November 2006. Includes $0.9 million interest accrued as of December 31, 2004.
(c)  Interest is accrued at a variable rate based on the current prime rate plus 1% and is due with the final line of credit payment in October 2007. Includes $1.4 million interest accrued as of December 31, 2004

The foregoing table does not include milestone payments potentially payable by us under our collaboration agreements and licenses. Such milestone payments are dependent upon the occurrence of specific milestones events and not the passage of time. We currently expect only one milestone to be achieved in 2005, being a payment to Amgen of $5.0 million within 30 days of dosing of the first patient in the first phase 3 clinical trial for alfimeprase. This milestone may or may not be achieved in this timeframe, if at all, and we cannot accurately estimate when any such milestone events will occur, if ever.

## Critical Accounting Policies and Estimates

Our discussion and analysis of our operating results and financial condition is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of the financial statements requires us to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent amounts. While we believe our estimates, judgments, and assumptions are reasonable, the inherent nature of estimates is that actual results will likely be different from the estimates made.

We believe the following critical accounting policies, among others, affect the more significant judgments and estimates used in the preparation of our consolidated financial statements.

### Clinical Trial Drug Manufacturing Expense and Clinical Trial Supplies Asset

We recognize clinical trial drug manufacturing expense when manufacturing is completed and the clinical trial drug material is shipped from the manufacturing or storage facility to the testing site. In accordance with Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs" (SFAS 2), we have accounted for this clinical trial drug material as Clinical Trial Supplies, a current asset on our balance sheet as there are alternative future uses for the supply in other indications not currently being studied, including deep vein thrombosis, stroke, acute myocardial infarction and pulmonary embolism. On a quarterly basis we evaluate if there continues to be alternative future use for the

50

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

alfimeprase clinical drug material, and if the material is obsolete or in excess of anticipated requirements. Any unconsumed Clinical Trial Supplies will be charged as research and development expense in the quarter in which there ceases to exist a future alternative use, or if the material is obsolete or in excess of anticipated requirements, which may result in a significant adverse impact on our financial condition and results of operations.

### Impairment or Disposal of Long-Lived Assets

Periodically, we determine whether any property and equipment or any other assets have been impaired based on the criteria established in Statement of Financial Accounting Standards No. 144, "*Accounting for the Impairment or Disposal of Long-Lived Assets*" (SFAS 144). SFAS 144 requires, among other things, that impairment losses be recognized whenever the carrying amount exceeds the fair value of the asset. Intangibles with determinable lives and other long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, and we perform an annual impairment review regardless of any such events or changes. Our judgments regarding the existence of impairment indicators are based on historical and projected future operating results, changes in the manner of our use of the acquired assets or our overall business strategy, and market and economic trends. Events may occur that could cause us to conclude that impairment indicators exist and that certain intangibles with determinable lives and other long-lived assets are impaired, which may result in a significant adverse impact on our financial condition and results of operations.

### Goodwill

We applied the provisions of Statement of Financial Accounting Standards No. 142, "*Goodwill and Other Intangible Assets*" (SFAS 142) upon the completion of the merger with Variagenics in January 2003. SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and reviewed for impairment in accordance with SFAS 144.

The SFAS 142 goodwill impairment model involves a two-step process. During the first step, we compare the fair value of the reporting unit with its carrying value, including goodwill. The estimated fair value of the reporting unit, in this case the Nuvelo business segment, is computed by multiplying the quoted market price of the company's common stock on the Nasdaq National Market by the outstanding common stock of the company at that time. Previously, we used the present value of expected cash flows for our Nuvelo business segment, discounted at a risk-adjusted weighted average cost of capital. However, due to the disposal of the Cailida business segment in the fourth quarter and its insignificant fair value and carrying value at the time of disposal, we now believe the market capitalization of Nuvelo as a whole to be a more reliable indicator of the fair value of the Nuvelo reporting unit, being our only remaining business segment.

If the fair value of the reporting unit is determined to be more than its carrying value, including goodwill, no goodwill impairment is recognized. If the fair value of the reporting unit is determined to be less than its carrying value, goodwill impairment, if any, is computed using the second step. The second step requires the fair value of the reporting unit to be allocated to all the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination at the date of the impairment test and the fair value of the reporting unit was the price paid to acquire it. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied value of goodwill, which is used to determine the impairment amount.

We have designated October 31 as the annual impairment testing date for our goodwill, although additional testing may be performed if circumstances warrant a re-evaluation. If it is determined that the carrying value of goodwill has been impaired, the value would be reduced by a charge to operations in the amount of the impairment, which may result in a significant adverse impact on our financial condition and results of operations. There was assessed to be no goodwill impairment based on the testing performed on October 31, 2004.

51

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### Capitalization of Software Developed for Internal Use

We account for software developed for internal use in accordance with Statement of Position 98-1, "*Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*" (SOP 98-1) which requires research and development costs associated with the development stage of the internal-use software application to be capitalized. Platform and software development costs incurred prior to the application development stage are charged to expense as incurred. Management is required to use professional judgment in determining whether development costs meet the criteria in SOP 98-1 for immediate expense or capitalization. Amortization of the capitalized costs begins when all substantial testing is completed and the software is ready for its intended use Management periodically reviews the carrying value of the projects that have been capitalized to determine if impairment may exist. If it is determined that the carrying value of the asset has been impaired, the value would be reduced by a charge to operations in the amount of the impairment, which may result in a significant adverse impact on our financial condition and results of operations

### Clinical Trial and Drug Manufacturing Accruals

We accrue costs for clinical trial and drug manufacturing activities based upon estimates of the services received and related expenses incurred that have yet to be invoiced by the contract research organizations (CROs), clinical study sites, drug manufacturers, collaboration partners, laboratories, consultants, or other clinical trial vendors that perform the activities. Related contracts vary significantly in length, and may be for a fixed amount, a variable amount based on actual costs incurred, capped at a certain limit, or for a combination of these elements. Activity levels are monitored through close communication with the CROs and other clinical trial vendors, including detailed invoice and task completion review, analysis of expenses against budgeted amounts, and pre-approval of any changes in scope of the services to be performed. Each CRO and significant clinical trial vendor provides an estimate of costs incurred but not invoiced at the end of each period for each individual trial. The estimates are reviewed and discussed with the CRO or vendor as necessary, and are included in research and development expenses for the related period. For clinical study sites, which are paid quarterly on a per-patient basis to the institutions performing the clinical study, we accrue an estimated amount based on patient enrollment in each quarter. All estimates may differ significantly from the actual amount subsequently invoiced. No adjustments for material changes in estimates have been recognized in any period presented.

### Revenue Recognition

We recognize revenue when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. We defer up-front refundable fees and recognize revenues upon the later of when they become nonrefundable or when performance obligations are completed. In situations where we have no continuing performance obligations, we recognize up-front nonrefundable fees as revenues when received. In situations where continuing performance obligations exist, we defer and amortize up-front nonrefundable fees over the performance period. Revenues related to collaborative research agreements and government grants are generally recognized over the related funding periods for each contract as the services are performed. The terms of such arrangements may cause our operating results to vary considerably from period to period

### Stock-Based Compensation

In accordance with the provisions of Statement of Financial Accounting Standards No. 123, "*Accounting for Stock-Based Compensation*" (SFAS 123), as amended by SFAS No. 148, "*Accounting for Stock-Based Compensation — Transition and Disclosure*" (SFAS 148) we have elected to account for stock-based compensation to employees under the provisions of Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees,*" and its related interpretations, and to adopt the "disclosure only" alternative described in SFAS 123, as amended by SFAS 148. Stock options granted to non-employees are accounted for in accordance with SFAS 123 and Emerging Issues Task Force No. 96-18, "*Accounting for Equity Instruments that*

52

Table of Contents

*Are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."* Effective from the beginning of our third fiscal quarter of 2005, we will be subject to Statement of Financial Accounting Standards No. 123(R), *"Share-Based Payment"*, which is expected to have a material adverse effect on our results of operations (see Recent Accounting Pronouncements below).

### Income Taxes

Income taxes are accounted for under the asset and liability method pursuant to Statement of Financial Accounting Standards No. 109, *"Accounting for Income Taxes"* (SFAS 109). Under SFAS 109, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

We record a valuation allowance to reduce deferred income tax assets to an amount that is more likely than not to be realized. Assessment of the realization of deferred income tax assets requires that estimates and assumptions be made as to the realization of deferred income tax assets is reduced to zero, as management believes that it is more likely than not that the deferred tax assets will not be realized. Our deferred tax assets are inherently difficult as it involves consideration of numerous factors such as our overall strategies and estimates of new product development and acceptance, product lifecycles, selling prices and volumes, responses by competitors, manufacturing costs and assumptions as to operating expenses and other industry specific and macro and micro economic factors. In addition, consideration is also given to ongoing and constantly evolving global tax laws and our own tax minimization strategies.

### Recent Accounting Pronouncements

In June 2004, the FASB ratified Emerging Issues Task Force Issue No. 03-1, *"The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments"* (EITF 03-1). EITF 03-1 includes new guidance for evaluating and recording impairment losses on debt and equity investments, as well as new disclosure requirements for investments that are deemed to be temporarily impaired. Adoption of the recognition and measurement guidance of EITF 03-1 has been temporarily deferred by the FASB, but the disclosure requirements of EITF 03-1 are effective for our 2004 consolidated financial statements. Accordingly, additional disclosures as required by EITF 03-1 are included in Note 5 of the Notes to the Consolidated Financial Statements.

On December 16, 2004, the FASB issued Statement of Financial Accounting Standards No. 123(R), *"Share-Based Payment"* (SFAS 123(R)), an amendment of Statements of Accounting Standards No. 123 and 95, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize as an expense the fair value of stock options and other stock-based compensation to employees. The statement eliminates the ability to account for share-based compensation transactions using APB Opinion No. 25, *"Accounting for Stock Issued to Employees,"* (APB 25), and generally requires instead that such transactions be accounted for using a fair-value-based method, such as Black-Scholes, to fairly value stock options and recognize that value as an expense. The standard will be effective for public companies as of the beginning of the first fiscal quarter after June 15, 2005. We currently account for our stock-based compensation plans in accordance with APB 25. SFAS 123(R) offers companies alternative methods of adopting this standard. At present, we have not yet determined which method we will adopt, but regardless of the method, adoption of this statement is expected to have a material adverse effect on our consolidated financial statements, specifically, the consolidated statements of operations and stockholders' equity (deficit).

53

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Off-Balance Sheet Arrangements**

We have not participated in any transactions with unconsolidated entities, such as special purpose entities (SPEs), which would have been established for the purpose of facilitating off-balance sheet arrangements.

**Indemnifications**

In the ordinary course of business, we enter into contractual arrangements under which we may agree to indemnify certain parties from any losses incurred relating to the services they perform on our behalf or for losses arising from certain events as defined within the particular contract. Such indemnification obligations may not be subject to maximum loss clauses. Historically, payments made related to these indemnifications have been immaterial. In addition, we have entered into indemnity agreements with each of our directors and executive officers. Such indemnity agreements contain provisions, which are in some respects broader than the specific indemnification provisions contained in Delaware law. We also maintain an insurance policy for our directors and executive officers insuring against certain liabilities arising in their capacities as such.

**Item 7A.  *Qualitative Quantitative Disclosures About Market Risk***

**Interest Rate Risk**

We have exposure to changes in interest rates on our cash equivalents, which are held primarily in money market funds and debt securities with original maturities of 90 days or less that earn interest at variable rates. We do not use derivative financial instruments in our investment portfolio. We place our investments with high quality issuers and, by policy, limit the amount of credit exposure with any one issuer. We are averse to principal loss, and ensure the safety and preservation of our invested funds by limiting default, market and reinvestment risk. The recorded carrying amounts of our cash equivalents approximate fair value due to their short-term maturities.

Changes in interest rates do not affect interest income on our short-term investments as they are maintained in corporate debt and asset-backed securities with fixed rates and original maturities of less than 24 months.

Changes in interest rates do not affect interest income on our restricted cash as it is maintained in commercial paper with fixed rates and original maturities of less than 90 days.

Changes in interest rates do not affect interest expense on our outstanding bank loan, note payable and capital leases, as they bear fixed rates of interest.

We have exposure to changes in interest rates on our revolving bank line of credit with Silicon Valley Bank, which bears interest at their prime rate. No draw-downs have been made on this line of credit to date.

We have exposure to changes in interest rates on our line of credit with our chairman, which bears interest at the prime rate plus 1%. Our interest rate exposure is mitigated by our ability to repay amounts outstanding under the line of credit with our common stock.

A hypothetical 10% change in market interest rates is not expected to have a material effect on our near-term financial condition or results of operations.

54

Table of Contents

The table below summarizes the carrying amounts as of December 31, 2004 and 2003 and related average annual interest rates of our various financial instruments:

| | 2004 Average Rate | | 2004 Carrying Amount | 2003 Average Rate | | 2003 Carrying Amount |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | (In thousands) |
| Cash equivalents | 0.97% | $ | 16,811 | 0.61% | $ | 13,141 |
| Short-term investments | 1.49% | $ | 13,814 | 1.66% | $ | 21,048 |
| Restricted cash | 1.37% | $ | 191 | 1.02% | $ | 501 |
| Bank loan | 6.43% | $ | 2,600 | —% | $ | — |
| Notes payable | 7.50% | $ | 4,000 | 7.67% | $ | 6,600 |
| Capital lease obligations | 10.18% | $ | 1,079 | 10.59% | $ | 3,070 |
| Related party line of credit | 5.38% | $ | 7,792 | 5.10% | $ | 10,542 |

55

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**Item 8.**     *Financial Statements and Supplementary Data*

Nuvelo, Inc.'s financial statements and notes thereto appear on pages 58 to 85 of this Annual Report on Form 10-K

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | |
| Consolidated Balance Sheets as of December 31, 2004 and 2003 | 57 |
| Consolidated Statements of Operations for the years ended December 31, 2004, 2003 and 2002 | 58 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the years ended December 31, 2004, 2003 and 2002 | 59 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2003 and 2002 | 60 |
| Notes to Consolidated Financial Statements | 61 |
| | 62 |

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders of Nuvelo, Inc.:

We have audited the accompanying consolidated balance sheets of Nuvelo, Inc. and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the three-year period ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Nuvelo, Inc. and subsidiaries as of December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Nuvelo, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2005 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/   KPMG LLP

San Francisco, California
March 15, 2005

57

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

## NUVELO, INC.
### CONSOLIDATED BALANCE SHEETS

|  | As of December 31, | |
|---|---|---|
|  | 2004 | 2003 |
|  | (In thousands, except share information) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 16,811 | $ 13,141 |
| Short-term investments | 33,814 | 21,048 |
| Accounts receivable | 271 | 341 |
| Clinical trial supplies | 12,637 | 4,026 |
| Other current assets | 2,462 | 1,301 |
| Total current assets | 65,995 | 39,857 |
| Restricted cash | 191 | 501 |
| Equipment, leasehold improvements and capitalized software, net | 6,048 | 9,955 |
| Goodwill | 4,671 | 4,671 |
| Patents, licenses and other assets, net | 2,359 | 2,825 |
| Total assets | $ 79,264 | $ 57,809 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Accounts payable | $ 3,107 | $ 2,110 |
| Accrued employee liabilities | 1,337 | 763 |
| Current portion of accrued clinical trial and drug manufacturing costs | 931 | 96 |
| Deferred rent | 10,138 | 4,597 |
| Accrued interest | 2,341 | 1,560 |
| Current portion of bank loan | 693 | 1,991 |
| Current portion of capital lease obligations | 966 | 2,750 |
| Current portion of related party line of credit | 2,750 | 218 |
| Other current liabilities | 350 | 14,085 |
| Total current liabilities | 22,613 | |
| Noncurrent portion of accrued clinical trial and drug manufacturing costs | 1,907 | 5,552 |
| Noncurrent portion of bank loan | — | |
| Noncurrent portion of notes payable | 4,000 | 6,600 |
| Noncurrent portion of capital lease obligations | 113 | 1,079 |
| Noncurrent portion of related party line of credit | 5,042 | 7,792 |
| Total liabilities | 33,675 | 35,108 |
| Commitments and contingencies (Note 11) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.001; 5,000,000 shares authorized, none issued and outstanding as of December 31, 2004 and 2003 | — | — |
| Common stock, par value $0.001; 100,000,000 shares authorized; 32,228,732 and 25,621,235 issued and outstanding as of December 31, 2004 and 2003, respectively | 32 | 26 |

Source: NUVELO INC, 10-K, March 16, 2005

| | | |
|---|---|---|
| Additional paid-in capital | 301,811 | 226,279 |
| Deferred stock compensation | — | (30) |
| Accumulated other comprehensive loss | (206) | (15) |
| Accumulated deficit | (256,048) | (203,559) |
| Total stockholders' equity | 45,589 | 22,701 |
| Total liabilities and stockholders' equity | $ 79,264 | $ 57,809 |

See accompanying Notes to Consolidated Financial Statements.

58

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**NUVELO, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (In thousands, except per share data) | | |
| Contract revenues | $ 195 | $ 1,024 | $ 25,554 |
| Operating expenses: | | | |
| Research and development | 39,970 | 30,014 | 46,827 |
| General and administrative | 8,702 | 15,069 | 14,981 |
| Restructuring | — | — | 2,067 |
| Loss on sale of assets | 167 | 1,225 | 36 |
| Total operating expenses | 48,839 | 46,308 | 63,911 |
| Operating loss | (48,644) | (45,284) | (38,357) |
| Interest income | 2,889 | 747 | 87 |
| Interest expense — related party | (481) | (557) | (252) |
| Interest expense — other | (2,706) | (1,135) | (990) |
| Loss from continuing operations | (48,942) | (46,229) | (39,512) |
| Discontinued operations: | | | |
| Loss from discontinued operations (including loss on disposal of $1,641 in 2004, net of tax of $0) | (3,547) | (3,958) | (5,466) |
| Net loss | $ (52,489) | $ (50,187) | $ (44,978) |
| Basic and diluted net loss per share: | | | |
| Continuing operations | $ (1.59) | $ (2.19) | $ (5.48) |
| Discontinued operations | $ (0.11) | $ (0.18) | $ (0.76) |
| Total basic and diluted net loss per share | $ (1.70) | $ (2.37) | $ (6.24) |
| Weighted average shares used in computing basic and diluted net loss per share | 30,874 | 21,054 | 7,220 |

See accompanying Notes to Consolidated Financial Statements

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### NUVELO, INC.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
#### For the Years Ended December 31, 2004, 2003 and 2002

| | Common Stock | | Additional Paid-in Capital | Deferred Compensation | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity (Deficit) | Comprehensive Loss |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| | | | | | (In thousands) | | | |
| Balance at December 31, 2001 | 6,435 | $ 7 | $ 123,861 | $ (53) | $ — | $ (108,394) | $ 15,421 | (36,472) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 73 | — | 511 | — | — | — | 511 | — |
| Warrants issued | | | 10,200 | | | | 10,200 | |
| Issuance of common stock through private placement in April 2002, net of issuance cost of $751 | 1,192 | 1 | 14,266 | — | — | — | 14,267 | — |
| Market value adjustment of deferred stock compensation | | | (32) | 32 | | | — | |
| Amortization of deferred stock compensation | | | | 15 | | | 15 | |
| Net loss | | | | | | (44,978) | (44,978) | (44,978) |
| Balance at December 31, 2002 | 7,700 | $ 8 | $ 148,806 | $ (6) | $ — | $ (153,372) | $ (4,564) | $ (44,978) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 700 | 1 | 1,524 | | | | 1,525 | — |
| Issuance of common stock in connection with Variagenics merger | 13,262 | 13 | 48,755 | | | | 48,768 | |
| Warrants issued | | | 192 | | | | 192 | |
| Issuance of common stock upon cashless exercise of warrants | 126 | | | | | | | |
| Issuance of common stock through a public offering in October 2003, net of issuance cost of $1,846 | 3,833 | 4 | 26,326 | | | | 26,330 | — |
| Deferred stock compensation in connection | | | 322 | (160) | | | 162 | |

Source: NUVELO INC, 10-K, March 16, 2005

| | Shares | Amount | | | | | | |
|---|---|---|---|---|---|---|---|---|
| with Varragenics merger | | | | | | | | |
| Compensation expense related to stock option modifications | | | 415 | | | | 415 | |
| Amortization of deferred stock compensation | | | | 75 | | | 75 | |
| Market value adjustment of deferred stock compensation | | | (61) | 61 | | | | |
| Unrealized loss on short-term investments | | | | | (15) | | | (15) |
| Net loss | | | | | | (50,187) | (50,187) | (50,187) |
| **Balance at December 31, 2003** | 25,621 | $ 26 | $ 226,279 | $ (30) | $ (15) | $ (203,559) | $ 22,701 | $ (50,202) |
| Issuance of common stock upon exercise of stock options and under employee stock purchase plan | 267 | | 1,148 | | | | 1,148 | |
| Issuance of common stock upon exercise of warrants | 241 | | 1,199 | | | | 1,199 | |
| Issuance of common stock upon cashless exercise of warrants | 87 | | — | | | | | |
| Issuance of common stock through a public offering in March 2004, net of issuance cost of $5,308 | 5,750 | 6 | 69,436 | | | | 69,442 | |
| Issuance of common stock in connection with Dendreon license agreement | 263 | | 3,500 | | | | 3,500 | |
| Compensation expense related to stock option modification | | | 152 | | | | 152 | |
| Consultant stock compensation expense | | | 127 | | | | 127 | |
| Market value adjustment of deferred stock compensation | | | (30) | 30 | | | | |
| Unrealized loss on short-term investments | | | | | (191) | | | (191) |
| Net loss | | | | | | (52,489) | (52,489) | (52,489) |
| **Balance at December 31, 2004** | 32,229 | $ 32 | $ 301,811 | $ | $ (206) | $ (256,048) | $ 45,589 | $ (52,680) |

See accompanying Notes to Consolidated Financial Statements.

60

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

### NUVELO, INC.
### CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| Cash flows from operating activities: | | | |
| Net loss | $ (52,489) | $ (50,187) | $ (44,978) |
| Adjustments to reconcile net loss to net cash used in operating activities | | | |
| Depreciation and amortization | 4,117 | 5,529 | 6,247 |
| Loss on disposal of assets | 167 | 1,225 | 36 |
| Non-cash stock compensation expense | 279 | 490 | 15 |
| Non-cash change in deferred revenue | — | (565) | (25,054) |
| Non-cash license expense | 3,500 | — | 10,000 |
| Other non-cash items | — | 192 | (112) |
| Loss on disposal of discontinued operations | 1,641 | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 70 | 2,210 | — |
| Clinical trial supplies | (8,611) | (4,026) | 303 |
| Other current assets | (1,161) | 650 | 213 |
| Other non-current assets | (559) | — | — |
| Accounts payable | 997 | 2,010 | (2,389) |
| Accrued employee liabilities | 574 | (1,976) | (2,585) |
| Current portion of accrued clinical trial and drug manufacturing costs | 835 | (1,542) | (465) |
| Deferred revenue | 5,391 | 94 | 2 |
| Deferred rent | 781 | 40 | 21,877 |
| Accrued interest | — | 759 | 2,230 |
| Accrued license fee | — | 856 | 552 |
| Other current liabilities | (92) | (1,775) | (725) |
| Noncurrent portion of accrued clinical trial and drug manufacturing costs | (5,552) | (4,602) | 4,050 |
| Other non-current liabilities | — | 5,552 | (125) |
| Net cash used in operating activities | (50,112) | (45,066) | (30,908) |
| Cash flows from investing activities: | | | |
| Sales or maturities of short-term investments | 50,866 | 22,480 | — |
| Purchases of short-term investments | (63,823) | (20,227) | — |
| Purchases of property and equipment | (664) | (320) | (2,063) |
| Proceeds from sale of assets | 45 | 745 | 62 |
| Cash received in conjunction with the acquisition of | | 25,715 | |

Source: NUVELO INC, 10-K, March 16, 2005

| | | | |
|---|---:|---:|---:|
| Variagenics, net of merger costs | | | |
| Net cash (used in) provided by investing activities | (13,576) | 28,393 | (2,001) |
| Cash flows from financing activities: | | | |
| Proceeds from release of cash on deposit | 310 | 1,355 | — |
| Payment of promissory note | (2,600) | — | 500 |
| Proceeds from bank loan | 2,600 | — | — |
| Payments on capital lease obligations | (1,991) | (2,318) | (2,491) |
| Payments on line of credit | (2,750) | (458) | — |
| Proceeds from line of credit | — | 1,000 | 10,000 |
| Proceeds from issuance of common stock (public offerings), net | 69,442 | 26,485 | — |
| Proceeds from issuance of common stock (PIPE), net | — | — | 14,263 |
| Proceeds from issuance of common stock upon the exercise of options, warrants and employee stock purchase plan | 2,347 | 1,525 | 533 |
| Net cash provided by financing activities | 67,358 | 27,589 | 22,805 |
| Net increase (decrease) in cash and cash equivalents | 3,670 | 10,916 | (10,104) |
| Cash and cash equivalents at beginning of year | 13,141 | 2,225 | 12,329 |
| Cash and cash equivalents at end of year | $ 16,811 | $ 13,141 | $ 2,225 |
| Supplemental disclosures of cash flow information: Interest paid | $ 436 | $ 535 | $ 691 |
| Non-cash investing and financing activities: Cashless exercise of warrants | $ 646 | $ 1,208 | $ 6 |
| Fair value of common stock, stock options and warrants issued and exchanged in connection with the acquisition of Variagenics | $ — | $ 48,768 | $ — |

See accompanying Notes to Consolidated Financial Statements

61

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

NUVELO, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. **Organization and Summary of Significant Accounting Policies**

*Organization*

The Company was established in August 1992 as an Illinois corporation, reincorporated as a Nevada corporation in November 1993 and subsequently reincorporated as a Delaware corporation on March 25, 2004. On October 24, 2001 the Company began doing business as Hyseq Pharmaceuticals, Inc., previously having done business as Hyseq, Inc. The Company's wholly owned subsidiary, Hyseq Diagnostics, Inc. is inactive. The Company's prior wholly owned subsidiary, GeneSolutions Inc. was merged into the Company on January 8, 2002. The Company's majority-owned subsidiary, Callida Genomics, Inc. (Callida), which was formed to carry out the Company's business relating to sequencing-by-hybridization (SBH) technology, and its wholly owned subsidiary, N-Mer, Inc., which was formed to collaborate with Affymetrix, Inc (See Note 12), were sold by the Company on December 3, 2004 (see Note 3). The Company changed its name to Nuvelo, Inc. on January 31, 2003 upon the closing of a merger with Variagenics, Inc.

The Company is engaged in the discovery, development and commercialization of life improving therapeutics for the treatment of human disease. The Company's lead product candidate, alfimeprase, has completed two Phase 2 trials in two indications, peripheral arterial occlusion (PAO) and catheter occlusion, and is expected to enter Phase 3 trials in 2005. Adding to its emerging cardiovascular portfolio, the Company announced in the first quarter of 2004 a partnership with Archemix for the development and commercialization of a novel thrombin inhibitor, ARC183, and a license agreement with Dendreon for worldwide rights to rNAPc2, an anticoagulant that blocks tissue factor. ARC183 is currently in a Phase 1 program and rNAPc2 is in a Phase 2a trial, both of which are expected to conclude in the first half of 2005.

*Basis of Presentation and Principles of Consolidation*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP). Certain prior period items have been reclassified to conform to the current year presentation, including reclassifications related to prepaid clinical trial costs, (which have been renamed as clinical trial supplies), and certain other assets and liabilities. Conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and on assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for the judgments made about the carrying values of assets and liabilities that are not readily apparent from other sources. Future results may differ from these estimates. The Company believes significant judgment is involved in evaluating if there continues to be alternative future use for alfimeprase clinical drug material, estimating goodwill and long-lived asset impairment, estimating clinical trial accruals, stock-based compensation and losses on disposals of assets.

The consolidated financial statements include the accounts of Nuvelo, Inc., Hyseq Diagnostics, Inc. and Callida, through its disposal on December 3, 2004. The results of operations of Callida have been reclassified to discontinued operations for all periods presented. All significant intercompany transactions and accounts have been eliminated in consolidation.

*Liquidity*

To date, the Company's primary sources of liquidity have been cash from financing activities, collaboration receipts and the merger with Variagenics in January 2003. The Company plans to continue to raise funds through

62

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

additional public and/or private offerings and collaboration activities in the future. The primary use of capital resources has been to fund operating activities, including license payments, to acquire capital equipment and to make leasehold improvements. In the event that the Company is unable to raise additional funds through financing activities, the Company will have to reduce its operating costs and delay its research and development programs.

### Cash Equivalents and Short-term Investments

Cash equivalents consist of money market funds and debt securities with original maturities of 90 days or less. Short-term investments consist of corporate debt and asset-backed securities with maturities of less than one year from the balance sheet date. The Company invests its excess cash in securities with strong ratings and has established guidelines relative to diversification and their maturity with the objective of maintaining safety of principal and liquidity. These guidelines are periodically reviewed and modified to take advantage of trends in yields and interest rates.

The Company classifies all cash equivalents and short-term investments as available-for-sale securities, as defined by Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities."* Unrealized holding gains and losses, net of the related tax effect, if any, on available-for-sale securities are excluded from earnings and are reported in accumulated other comprehensive income (loss), a separate component of stockholders' equity, until realized. The specific identification basis is utilized to calculate the cost to determine realized gains and losses from the sale of available-for-sale securities. Realized gains and losses and declines in value judged to be other than temporary are included in interest income or expense in the statements of operations. Gross realized losses on available-for-sale investments were $4,000, $0 and $0, and gross realized gains were $0, $40,000 and $0, in 2004, 2003 and 2002, respectively.

### Clinical Trial Drug Manufacturing Expense and Clinical Trial Supplies Asset

The Company recognizes clinical trial drug manufacturing expense for alfimeprase when manufacturing is completed and the clinical trial drug material is shipped from the manufacturing or storage facility to the testing site. In accordance with Statement of Financial Accounting Standards No. 2, *"Accounting for Research and Development Costs"* (SFAS 2), the Company accounts for this clinical trial drug material as Clinical Trial Supplies, a current asset on the balance sheet, as there are alternative future uses for the supply in other indications not currently being studied, including deep vein thrombosis, stroke, acute myocardial infarction and pulmonary embolism. On a quarterly basis, the Company evaluates if there continues to be alternative future use for this clinical drug material, and if the material is obsolete or in excess of anticipated requirements. Any unconsumed clinical trial supplies will be charged as research and development expense in the quarter in which there ceases to exist a future alternative use, or if the material is obsolete or in excess of anticipated requirements.

### Equipment, Leasehold Improvements and Capitalized Software

Equipment, leasehold improvements and capitalized software are recorded at cost. Equipment under capital leases is recorded at the lower of the net present value of the minimum lease payments required over the term of the lease or the fair value of the assets at the inception of the lease. Additions, renewals and betterments that significantly extend the life of an asset are capitalized. Minor replacements, maintenance, and repairs are charged to operations as incurred. Equipment is depreciated over the estimated useful lives of the related assets, ranging from three to five years, using the straight-line method. Equipment under capital leases and leasehold improvements are amortized over the shorter of their estimated useful life or the term of the lease, using the straight-line method. Capitalized software is amortized over the shorter of the estimated useful life or two years, using the straight-line method. When assets are retired or otherwise disposed of, the assets and related accumulated depreciation or amortization are eliminated from the accounts and any resulting gain or loss is reflected in the statements of operations.

63

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

*Impairment or Disposal of Long-Lived Assets*

Periodically, management determines whether any property and equipment or any other assets have been impaired based on the criteria established in Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"* (SFAS 144). SFAS 144 requires, among other things, that impairment losses be recognized whenever the carrying amount exceeds the fair value of the asset. Intangibles with determinable lives and other long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, and an annual impairment review is performed regardless of any such events or changes.

The results of operations of components of the Company that have been sold or otherwise disposed are reclassified to discontinued operations for all periods presented, and any loss or gain related to the disposal of the component is included in discontinued operations in the period of the disposal.

*Goodwill*

The Company applied the provisions of Statement of Financial Accounting Standards No. 142, *"Goodwill and Other Intangible Assets"* (SFAS 142) upon the completion of the merger with Variagenics in January 2003. SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and reviewed for impairment in accordance with SFAS 144.

The SFAS 142 goodwill impairment model involves a two-step process. During the first step, the fair value of the reporting unit is compared to its carrying value, including goodwill. The estimated fair value of the reporting unit, in this case the Nuvelo business segment, is computed by multiplying the quoted market price of the Company's common stock on the Nasdaq National Market by the outstanding common stock of the Company at that time. Previously, the Company used the present value of expected cash flows for its Nuvelo business segment, discounted at a risk-adjusted weighted average cost of capital. However, due to the disposal of the Callida business segment in the fourth quarter of 2004 and its insignificant fair value and carrying value at the time of disposal, the Company now believes the market capitalization of Nuvelo as a whole to be a more reliable indicator of the fair value of the Nuvelo reporting unit, being the only remaining business segment in the Company.

If the fair value of the reporting unit is determined to be more than its carrying value, including goodwill, no goodwill impairment is recognized. If the fair value of the reporting unit is determined to be less than its carrying value, goodwill impairment, if any, is computed using the second step. The second step requires the fair value of the reporting unit to be allocated to all the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination at the date of the impairment test and the fair value of the reporting unit was the price paid to acquire it. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied value of goodwill, which is used to determine the impairment amount.

The Company has designated October 31 as the annual impairment testing date for goodwill, although additional testing may be performed if circumstances warrant a re-evaluation. If it is determined that the carrying value of goodwill has been impaired, the value would be reduced by a charge to operations in the amount of the impairment. There was assessed to be no goodwill impairment based on the testing performed on October 31, 2004.

*Fair Value of Financial Instruments*

The carrying amount of certain of the Company's financial instruments, including accounts receivable, accounts payable, and accrued liabilities, approximates fair value due to the relatively short maturity of such

64

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

instruments. The carrying amount of the Company's debt instruments also approximate fair value as their fixed interest rates approximate current market lending rates offered for similar debt instruments proposed by the Company's current banking institution as of December 31, 2004.

### Revenue Recognition

Revenues are recognized when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed and determinable, and (iv) collectibility is reasonably assured. Up-front refundable fees are deferred and recognized as revenue upon the later of when they become nonrefundable or when performance obligations are completed. In situations where there are no continuing performance obligations, up-front nonrefundable fees are recognized as revenues when received. In situations where continuing performance obligations exist, up-front nonrefundable fees are deferred and amortized over the performance period. Revenues related to collaborative research agreements and government grants are generally recognized over the related funding periods for each contract as the services are performed.

Revenues from collaborative agreements or other sources representing 10% or more of total revenues are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| Source: | 2004 | 2003 | 2002 |
| MTHFR license | 100 % | 18 % | * |
| Affymetrix | * | 51 % | 11 % |
| Celera Diagnostics | * | 24 % | * |
| BASF Plant Sciences GmbH | * | * | 86 % |

* less than 10%

### Stock-Based Compensation

In accordance with the provisions of Statement of Financial Accounting Standards No. 123, "*Accounting for Stock-Based Compensation*" (SFAS 123), as amended by SFAS No. 148, "*Accounting for Stock-Based Compensation — Transition and Disclosure*" (SFAS 148) the Company has elected to account for stock-based compensation to employees under the provisions of Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees,*" and its related interpretations, and to adopt the "disclosure only" alternative described in SFAS 123, as amended by SFAS 148. Stock options granted to non-employees are accounted for in accordance with SFAS 123 and Emerging Issues Task Force No. 96-18, "*Accounting for Equity Instruments that Are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services.*"

65

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

The Company's pro forma information for employee stock options is as follows (in thousands, except for per share data):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| Net loss, as reported | $ (52,489) | $ (50,187) | $ (44,978) |
| Add: Stock-based employee compensation expense included in reported net loss, net of related tax effects | 152 | 440 | |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (7,843) | (4,353) | (7,940) |
| Pro forma net loss | $ (60,180) | $ (54,100) | $ (52,918) |
| Total basic and diluted net loss per share, as reported | $ (1.70) | $ (2.37) | $ (6.24) |
| Pro forma basic and diluted net loss per share | $ (1.95) | $ (2.58) | $ (7.32) |

The fair value of employee stock options was estimated at the date of grant using the Black-Scholes option pricing model with the following weighted-average assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| Volatility | 0.94 | 0.95 | 0.93 |
| Risk-free interest rate | 3.68% | 2.53% | 3.56% |
| Dividend yield | | | |
| Expected life of option | 5.4 years | 5.7 years | 5.3 years |

The fair value of employee purchase rights under the Company's Employee Stock Purchase Plan was estimated using the Black-Scholes model with the following assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| Volatility | 0.53 | 0.79 | 0.78 |
| Risk-free interest rate | 2.75% | 1.31% | 4.38% |
| Dividend yield | | | |
| Expected life of option | 1.0 years | 1.0 years | 1.0 years |

### Income Taxes

Income taxes are accounted for under the asset and liability method pursuant to Statement of Financial Accounting Standards No. 109, "*Accounting for Income Taxes*" (SFAS 109). Under SFAS 109, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recorded to reduce deferred income tax assets to an amount that is more likely than not to be realized.

*Net Loss per Share*

Source: NUVELO INC, 10-K, March 16, 2005

Basic and diluted net loss per share a... ...esented in conformity with Statement of Financial Accounting Standards No. 128, *"Earnings Per Share"* (SFAS 128) for all periods presented. In accordance with SFAS 128, basic and diluted net loss per share has been computed using the weighted average number of shares of common

66

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

stock outstanding during the period. In 2004, 2003 and 2002, outstanding options and warrants for 6,283,461, 4,567,501 and 3,338,880 shares of common stock, respectively, as determined using the treasury stock method, were not included in weighted average shares outstanding, as they were antidilutive.

### Recent Accounting Pronouncements

In June 2004, the FASB ratified Emerging Issues Task Force Issue No. 03-1, *"The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments"* (EITF 03-1). EITF 03-1 includes new guidance for evaluating and recording impairment losses on debt and equity investments, as well as new disclosure requirements for investments that are deemed to be temporarily impaired. Adoption of the recognition and measurement guidance of EITF 03-1 has been temporarily deferred by the FASB, but the disclosure requirements of EITF 03-1 are effective for the Company's 2004 consolidated financial statements. Accordingly, additional disclosures as required by EITF 03-1 are included in Note 5.

On December 16, 2004, the FASB issued Statement of Financial Accounting Standards No. 123(R), *"Share-Based Payment"* (SFAS 123(R)), an amendment of Statements of Accounting Standards No. 123 and 95, that addresses the accounting for share-based awards to employees. The standard requires companies to recognize as an expense the fair value of stock options and other stock-based compensation to employees. The statement eliminates the ability to account for share-based compensation transactions using APB Opinion No. 25, *"Accounting for Stock Issued to Employees,"* (APB 25), and generally requires instead that such transactions be accounted for using a fair value based method, such as Black-Scholes, to fairly value stock options and recognize that value as an expense. The standard will be effective for public companies as of the beginning of the first fiscal quarter after June 15, 2005. The Company currently accounts for stock-based compensation plans in accordance with APB 25. SFAS 123(R) offers companies alternative methods of adopting this standard. At present, the Company has not yet determined which method to adopt, but regardless of the method, adoption of this statement is expected to have a material adverse effect on the Company's consolidated financial statements, specifically, the consolidated statements of operations and stockholders' equity (deficit).

### 2. Stock Split

On February 23, 2004, the Company implemented a one-for-three reverse stock split and reduced the number of outstanding shares of common stock accordingly. On the effective date of February 23, 2004, each holder of record was deemed to hold one share of common stock for every three shares held immediately prior to the effective date, with cash payments being made for fractional shares. All share and per-share amounts, with the exception of par value, have been retroactively adjusted for all periods presented. The number of common shares authorized for issuance remained at 100,000,000 shares.

### 3. Sale of Callida Segment

On December 3, 2004, the Company sold its subsidiary, Callida Genomics, Inc. (Callida), to SBH Genomics, Inc., a privately held Delaware corporation. This transaction is part of the Company's strategy to monetize assets outside of its core business. Prior to the sale, the Company owned approximately 90% of Callida's issued and outstanding capital stock. Affymetrix, Inc., a minority stockholder in Callida, also sold its Callida shares to SBH Genomics as part of the same negotiated transaction. SBH Genomics is controlled by Radoje and Snezana Drmanac, who were employees of Callida prior to the sale. Radoje Drmanac was also an officer and director of Callida.

The Company and Affymetrix sold the Callida stock in exchange for convertible promissory notes in the principal amount of $1.0 million, being $0.9 million for the Company, and $0.1 million for Affymetrix, and potential additional earn-out payments as described below. The notes are convertible into SBH Genomics' preferred shares if SBH Genomics raises at least $2.0 million in venture capital financing within 4 years after the date of the closing. This preferred stock will be converted at the same price per share at which it is sold to the

67

Source: NUVELO INC, 10-K, March 16, 2005