# Exhibit R

Table of Contents

venture capital investors, and will be granted the same rights and preferences as those provided to the venture capital investors. If SBH Genomics fails to raise at least $2.0 million in venture capital financing within this period, the notes will become due and payable. No interest or principal are payable on the notes for two years from the closing date. Simple interest of prime plus 1% per annum will be payable in years three and four on a quarterly basis. Prime will be set as of the second anniversary of the sale and adjusted on the third anniversary. The patents and patent applications owned by Callida are collateral for the notes. As additional consideration for the sale of Callida to SBH Genomics, SBH Genomics will make earn-out payments equal to 2.5% of its net annual revenues in excess of $5.0 million from the sale of, or license under, certain Callida patents for a period of 10 years. The earn-out will initially be paid to Affymetrix, until the $4.0 million promissory note owed by the Company to Affymetrix has been fully paid, and thereafter will be split in the same ratio as the original ownership of Callida by the two entities.

As part of this transaction, Affymetrix, Inc. has waived the acceleration of a $4.0 million promissory note owed by the Company to Affymetrix that would have become immediately payable as a result of the change in control of Callida. This convertible note arose from a loan made to the Company by Affymetrix in 2001 to fund the initial capital contribution to Callida. Additionally, as a part of this transaction, Affymetrix' option to buy out Callida's wholly-owned subsidiary, N-Mer Inc., was terminated.

The sale of Callida's net assets resulted in a net non-cash charge to earnings of approximately $1.1 million, representing the carrying value of Callida's assets and liabilities at the time of sale. The value of the $0.9 million convertible promissory note received from SBH Genomics was assessed to be zero, due to the improbability of any collection. This note serves as collateral for the $4.0 million promissory note owed by the Company to Affymetrix. Any interest income will be credited to income in the period received. In addition, various cash and non-cash charges of $0.5 million were associated with the sale. The sale of the Callida business segment meets the criteria for presentation as a discontinued operation under the provisions of SFAS 144, "*Accounting for the Impairment or Disposal of Long-Lived Assets*". Therefore, the historical results of operations of Callida for all periods presented and the charges related to the disposal are reported under discontinued operations.

**4.  Merger with Variagenics, Inc.**

On January 31, 2003, the Company completed its merger with Variagenics, Inc., a publicly traded company incorporated in Delaware. Variagenics developed molecular diagnostic tests by identifying genetic markers associated with response to cancer therapies, with the goal of optimizing patient care. Nuvelo and Variagenics merged because they believed the merger would benefit the stockholders of both companies by leveraging the companies' assets and management to develop biotherapeutic, pharmacogenomic and molecular diagnostic products and accelerate revenue generation. As a result of the merger, Variagenics' shareholders received approximately 13.2 million Company shares, at an approximate purchase price of $48.6 million, net of estimated transaction costs of $1.6 million.

Each employee stock option to purchase Variagenics' common stock outstanding at January 31, 2003 was assumed by Nuvelo and converted into an option to purchase Nuvelo common stock based on the terms specified in the merger agreement. As a result, approximately 1.6 million options to purchase Nuvelo common stock were assumed, on an as converted basis. In addition, each warrant to purchase Variagenics' common stock outstanding at January 31, 2003 was assumed by Nuvelo and converted into warrants to purchase Nuvelo common stock based on the terms specified in the merger agreement. As a result, warrants to purchase approximately 0.7 million shares of Nuvelo common stock were assumed, on an as converted basis.

68

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the date of acquisition. The allocation of the purchase price was based on the fair value of identifiable assets and liabilities:

|  | At January 31, 2003 |
|---|---|
|  | (In thousands) |
| Assets: |  |
| Cash, cash equivalents and short-term investments | $ 50,867 |
| Restricted cash | 750 |
| Other current assets | 846 |
| Property and equipment | 1,522 |
| Intangible assets | 300 |
| Total assets acquired | 54,285 |
| Liabilities: |  |
| Accounts payable and accrued liabilities | (5,586) |
| Capital lease obligations | (3,146) |
| Total liabilities assumed | (8,732) |
| Fair value of net assets acquired | $ 45,553 |

The purchase price of $50.2 million exceeded the fair value of net assets acquired of $45.5 million, resulting in goodwill of $4.7 million reported in the Company's balance sheet. The Company evaluates its goodwill for impairment on an annual basis under the guidance of SFAS No. 142, *"Goodwill and Other Intangible Assets"*. The Company has accounted for this merger under the purchase method of accounting for business combinations in accordance with the provisions of SFAS No. 141, *"Business Combinations"*. The accompanying financial statements include the results of operations of Variagenics commencing from February 1, 2003.

The following unaudited pro forma financial information presents the combined results of the operations of Variagenics and the Company as if the merger had occurred on January 1, 2003 and 2002.

|  | Year Ended December 31, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands, except per share data) | |
| Contract revenues | $ 1,063 | $ 26,984 |
| Net loss | (50,236) | (71,995) |
| Total basic and diluted net loss per share | (2.39) | (3.55) |

69

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

5.  **Available-For-Sale Investments**

The following is a summary of the Company's available-for-sale investments as of December 31, 2004 and 2003 (in thousands)

| | December 31, 2004 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $        11,940 | $        — | $        — | $        11,940 |
| U.S. government agencies | 4,141 | | — | 4,141 |
| Corporate debt securities | 29,712 | — | — | 29,531 |
| Asset-backed securities | 4,308 | — | (181) | 29,531 |
| | 4,308 | | (25) | 4,283 |
| | $        50,101 | $        — | $        (206) | $        49,895 |
| Reported as: | | | | |
| Cash equivalents | | | | $        16,081 |
| Short-term investments | | | | 33,814 |
| | | | | $        49,895 |

| | December 31, 2003 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $        12,378 | $        — | $        — | $        12,378 |
| Corporate debt securities | 21,063 | — | (15) | 21,048 |
| | $        33,441 | $        — | $        (15) | $        33,426 |
| Reported as: | | | | |
| Cash equivalents | | | | $        12,378 |
| Short-term investments | | | | 21,048 |
| | | | | $        33,426 |

The following is a summary of amortized cost and estimated fair value of available-for-sale investments by contract maturity (in thousands):

| | December 31, 2004 | |
| --- | --- | --- |
| | Amortized Cost | Estimated Fair Value |
| Due in less than one year | $        50,101 | $        49,895 |
| Due in one year or more | — | — |
| | $        50,101 | $        49,895 |

The following is a summary of available-for-sale investments with unrealized losses and their related fair value by the period of time each investment has been in an unrealized loss position (in thousands):

| | December 31, 2004 | |
| --- | --- | --- |
| | Unrealized | Estimated |

Source: NUVELO INC, 10-K, March 16, 2005

|  | Losses | Fair Value |
|---|---|---|
| Unrealized loss position for less than one year | $ 206 | $ 36,457 |
| Unrealized loss position for one year or more | --- | --- |
|  | $ 206 | $ 36,457 |

70

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Due to the short maturities of investments, the type and quality of security held, the relatively small size of unrealized losses compared to fair value, and the short duration of such unrealized losses, the Company believes these unrealized losses to be temporary in nature.

## 6. Accumulated Other Comprehensive Loss

Accumulated other comprehensive income or loss consists entirely of unrealized gains and losses on securities. The change in accumulated other comprehensive loss was $191,000, $15,000 and $0 in 2004, 2003 and 2002 respectively. These changes consisted entirely of unrealized losses on securities.

## 7. Equipment, Leasehold Improvements and Capitalized Software

Equipment, leasehold improvements and capitalized software, net, consist of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2004 | 2003 |
| Machinery, equipment and furniture | $ 7,513 | $ 9,391 |
| Computers and capitalized software | 7,295 | 9,207 |
| Leasehold improvements | 11,058 | 11,363 |
| | 25,866 | 29,961 |
| Less: accumulated depreciation | (19,818) | (20,006) |
| Equipment, leasehold improvements and capitalized software, net | $ 6,048 | $ 9,955 |

Depreciation expense, including expense from discontinued operations, totaled $3.7 million, $5.1 million and $5.8 million for the years ended December 31, 2004, 2003 and 2002, respectively. Equipment as of December 31, 2004 and 2003 both include items under capital leases in the amount of $0.2 million and related accumulated depreciation of $0.1 million. These leases are secured by the equipment leased thereunder.

## 8. Patents and Licenses

### Patent and License Assets

Patent and license costs are incurred in connection with obtaining or licensing certain patents and the filing of patent applications, and are capitalized and amortized on a straight-line basis over each patent's estimated useful life, which approximates 17 years. As of December 31, 2004 and 2003, the gross carrying amounts were $0.7 million and $2.2 million, respectively. Of the amount as of December 31, 2003, $1.7 million related to the Affymetrix Inc. patent licensed to Callida in 2003, which was subsequently disposed of by the Company in December 2004 as part of the sale of Callida (see Note 3). As of December 31, 2004 and 2003, accumulated amortization of patent costs was $0.4 million and $1.2 million, of which $0 and $0.9 million were related to the Affymetrix patent, respectively. Patent and license amortization expense, including expense from discontinued operations, was $0.4 million, $0.5 million and $0.5 million for the years ended December 31, 2004, 2003 and 2002, respectively. Additionally, impairment charges for patents of $0.2 million were recorded to loss on disposal of discontinued operations in the consolidated statement of operations for 2004, related to the disposal of Callida. Annual amortization expense for the next five years on existing balances as of December 31, 2004 is estimated to be $17,000 in each year.

### Patent License Agreement

In 1994, the Company entered into a patent license agreement with an affiliate of the University of Chicago for an exclusive license to use certain proprietary technology developed by the Company's former Chief Scientific Officer and to develop, use and sell licensed products or processes. The Company issued 15,244

71

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

shares of Series A preferred stock (which converted to common stock in connection with the Company's initial public offering in 1997). The Company began paying minimum royalties of $25,000 per annum beginning in 1997 and increasing to $100,000 per annum in 1999, and will continue to pay minimum royalties at the rate of $100,000 per annum over the term of the agreement, which terminates upon the later to occur of (a) fifteen years after the date of the agreement, or (b) the expiration of the last-to-expire patents of the licensed patent rights.

**9.    Financing Arrangements**

On August 31, 2004, the Company entered into a Loan and Security Agreement (Loan Agreement), with Silicon Valley Bank that provides a $6.0 million term loan facility through June 30, 2005 and a $4.0 million revolving credit line and grants Silicon Valley Bank a primary security interest over certain of our assets, excluding intellectual property. As a condition precedent to the Loan Agreement, the Company agreed, among other things, to certain financial and non-financial covenants, including a restriction on cash dividends, and certain reporting requirements. On December 15, 2004, the Company completed a planned $2.6 million initial draw-down on the term loan, the proceeds of which were used entirely to repay a note for the same amount that was owed to AMB Property, L.P. in relation to the termination of a lease agreement for facilities at Humboldt Court, Sunnyvale, California. Interest on the initial drawn-down is payable monthly through April 30, 2005 and both principal and accrued interest are payable in 30 equal monthly installments from May 1, 2005 to October 1, 2007. The Company has not used any of the funds available under the revolving credit line. The proceeds of all other term loan draw-downs and the revolving credit line may be used solely for working capital or other general business requirements. The term loan borrowings under the new loan facility shall bear interest at a fixed rate per annum equal to the 36-month Treasury Rate in effect on the funding date plus three and one-quarter percent (3.25%), and, in any event, shall not be less than 6.43% per annum. The revolving credit borrowings shall bear interest at Silicon Valley Bank's prime rate in effect from time to time. As of December 31, 2004, the Company had received waivers for any breaches of related covenants and reporting requirements, and the applicable interest rate for the outstanding amount under the term loan was 6.43%.

Aggregate debt repayments for the next five years under long-term borrowings as of December 31, 2004 are as follows (in thousands):

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Bank loan | 693 | 1,040 | 867 | — | — |
| Note payable (Note 12) | — | 4,000 | — | — | — |
| Related party line of credit (Note 15) | 2,750 | 2,750 | 2,292 | — | — |
| Aggregate debt repayments | $    3,443 | $    7,790 | $    3,159 | $    — | $    — |

72

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**10.  Capital Lease Obligations**

The Company has financed equipment purchases through capital lease agreements. The capital lease obligations are to be repaid over terms of 36 to 60 months at interest rates ranging from 6.84% to 13.95% and are secured by the related equipment.

Minimum future payments under the capital lease agreements as of December 31, 2004 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---|
| 2005 | $ | |
| 2006 | | 1,010 |
| 2007 | | 105 |
| 2008 | | 14 |
| 2009 | | — |
| Total capital lease payments | | 1,129 |
| Less: Amount representing interest | | (50) |
| Present value of future capital lease payments | | 1,079 |
| Less: Current portion | | (966) |
| Noncurrent portion | $ | 113 |

**11.  Commitments and Contingencies**

*Operating Leases*

As of December 31, 2004, the Company had leases for three facilities under operating lease agreements, two that expire in June 2005 and one that expires in May 2011. The rent is being recognized as expense on a straight-line basis, except for the property at 670 Almanor Avenue, for which the remaining rent from January through June 2005 was expensed in the fourth quarter of 2004 due to the cessation of use of this property as a result of the sale of Callida (see Note 3). Rent expense, including expense from discontinued operations, was approximately $7.3 million, $8.0 million and $9.9 million in 2004, 2003 and 2002 respectively.

Minimum future rental commitments under non-cancelable operating leases as of December 31, 2004 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---|
| 2005 | $ | |
| 2006 | | 5,693 |
| 2007 | | 7,260 |
| 2008 | | 7,479 |
| 2009 | | 7,707 |
| 2010 and thereafter | | 6,906 |
| | | 12,004 |
| Minimum rental commitments | $ | 47,049 |

In August 2002, the lease on the property at 985 Almanor Avenue was amended to provide for a rent deferral of approximately $4.9 million over the subsequent three years, retroactive to June 1, 2002. The Company will be required to repay the deferred rent liability, plus interest, over a four-year period beginning June 1, 2005 in equal monthly installments of approximately $0.1 million. In October 2003, the lease was amended for a second time, to provide for an additional rent deferral. In order to receive this rent deferral, the Company pre-paid approximately $2.7 million of base rental payments in October 2003 to cover the 9 month period beginning

73

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

October 1, 2003 and ending June 30, 2004. The amendment provides that no base rent will be due for the period July 1, 2004 through March 30, 2005, resulting in a $2.9 million deferral and approximately $0.2 million of savings. The deferral amount will be repaid on May 30, 2011. Other terms of the agreement include the ability to repay the $2.9 million deferred rent in 36 monthly installments of approximately $0.1 million, commencing on June 1, 2011 if the lease term is extended for at least 36 months, and early reinstatement of the original rental rates if the Company successfully raises $75.0 million in a single public or private equity offering, with the remaining amount of rent deferred under both lease amendments up to that date coming due immediately.

### Letters of Credit

In accordance with the terms of a lease agreement signed in the fourth quarter of 1997, the Company was required to obtain an irrevocable standby letter of credit in the amount of $2.0 million as partial security for the Company's lease obligations. In connection with obtaining the letter of credit, the Company was required to place $2.1 million restricted cash on deposit with the Company's primary bank as security for the letter of credit. The letter of credit and the cash collateralizing it were reduced by $0.5 million in July 2001 and have been further reduced by $0.5 million each year thereafter to a minimum amount of $191,000 as of December 31, 2004, which is recorded as restricted cash on the Company's balance sheet.

## 12. Collaborative Agreements

### Amgen

Alfimeprase was identified through a research program at Amgen Inc. In January 2002, the Company entered into a 50/50 cost/profit sharing arrangement with Amgen for the development and commercialization of alfimeprase and recorded a $10.0 million non-cash license fee as research and development expense for the fair value of warrants granted to Amgen under the terms of the collaboration, (as determined using the Black-Scholes option pricing model). In October 2004, Amgen exercised its rights pursuant to the terms of this collaboration agreement to terminate the collaboration and enter instead into an exclusive license whereby the Company is granted the worldwide rights to develop and commercialize alfimeprase in exchange for the payment to Amgen of previously negotiated milestone payments and royalties. Under the terms of the license agreement, Amgen will transfer the technology necessary for the manufacture of alfimeprase to the Company or to Avecia Limited, the Company's designated manufacturer. On January 21, 2005, the Company entered into an Interim Agreement with Avecia for the manufacture of alfimeprase, and is currently in negotiations with Avecia for a definitive agreement for the manufacture of commercial quantities of alfimeprase. Amgen is required to continue to supply alfimeprase during the transition period. In connection with the termination of the collaboration agreement with Amgen, the Company also entered into an opt-out, termination, settlement and release agreement with Amgen in October 2004, whereby the Company made a payment of $8.5 million to Amgen, of which $8.3 million was related to the remaining reimbursement of its manufacturing costs incurred under the collaboration agreement. In addition, the Company is also required to pay Amgen $5.0 million within 30 days of dosing of the first patient in the first Phase 3 clinical trial for alfimeprase. Future milestone payments under the license agreement could total as much as $40.0 million. The Company recognizes clinical trial drug manufacturing expense when manufacturing is completed and the clinical trial drug material is shipped from the manufacturing or storage facility to the testing site. Prior to shipment of alfimeprase from the drug manufacturing or storage facility, the Company reflects the manufacturing work in process as Clinical Trial Supplies, a current asset on the balance sheet, which totaled $12.6 million as of December 31, 2004. Including the non-cash license fee above, in 2004, 2003 and 2002, the Company expensed $6.7 million, $7.5 million and $12.7 million, respectively, under these agreements.

### Dendreon

In February 2004, the Company entered into a licensing agreement with Dendreon Corporation for worldwide rights to all indications of rNAPc2, a recombinant version of a naturally occurring protein that has

74

Table of Contents

anticoagulant properties, and all other rNAPc molecules owned by Dendreon. Under the terms of the agreement, the Company paid Dendreon an upfront fee of $4.0 million ($0.5 million in cash and $3.5 million in Nuvelo common stock) and has expensed $5.6 million for this and related clinical trial costs in 2004. The Company is required to pay Dendreon milestone payments, ranging from $2.0 million to $6.0 million, for both rNAPc2's first and second indications upon dosing of the first patient in a Phase 3 clinical trial, upon submission of a New Drug Application (NDA), and upon first commercial sale. If all development and commercialization milestones are achieved, total milestone payments to Dendreon can reach as much as $23.5 million. Upon reaching commercialization, the Company is also responsible for paying future royalties to Dendreon depending on certain sales volume of rNAPc2. The Company is currently investigating rNAPc2 in a Phase 2a double-blind, placebo-controlled clinical trial for potential use in treating acute coronary syndromes (ACS), including unstable angina and non-ST segment elevation myocardial infarction.

### Archemix

In January 2004, the Company entered into a worldwide collaboration agreement with Archemix Corporation to develop and commercialize ARC183, a novel thrombin inhibitor, for use in acute cardiac surgical procedures, such as coronary artery bypass graft (CABG) surgery. Under the terms of the agreement, the Company paid Archemix an upfront fee of $3.0 million in cash, and has expensed $7.7 million for this and related clinical trial costs in 2004. Under the terms of the collaboration agreement, Archemix is initially responsible for leading development and for all clinical development activities. As part of the agreement, the Company and Archemix equally share all costs associated with the development and commercialization of ARC183 after the Company has funded the first $4.0 million in research and development costs, and will jointly share any revenues resulting from its commercialization. Since these joint research and development costs have already exceeded $4.0 million as of the third quarter of 2004, the Company and Archemix have begun the 50/50 cost sharing arrangement. Under the collaboration agreement, the Company has the option to lead commercialization efforts in which both the Company and Archemix may participate. An Investigational New Drug (IND) application for ARC183 was filed in June 2004, and the Company subsequently initiated a Phase 1 clinical trial in August 2004. The Company is required to pay Archemix total development milestone payments of up to $11.0 million, including $10.0 million upon commencement of a Phase 2 trial and $1.0 million upon the designation of any backup compound selected by both Nuvelo and Archemix for IND-enabling studies. The Company is obligated to make the Phase 2 milestone payment to Archemix even if the collaboration is terminated by Archemix, or if Archemix does not meet its obligations under the agreement and the Company terminates the collaboration for default by Archemix. Upon reaching commercialization, both companies are responsible for paying any related royalties to each other depending on product sales volume.

### Pharmaceutical Division of Kirin Brewery Company, Ltd.

In August 2001, the Company entered into a collaboration with Kirin Brewery Co., Ltd., in which Kirin will fund three years of collaborative research work, and both companies will conduct research directed toward discovering proteins and antibodies for a variety of diseases, including hematopoietic and inflammatory diseases. In September 2004, the Company extended and expanded the research and development collaboration with Kirin. The amended agreement extends the term of the current collaboration to December 31, 2005 and expands the scope of the collaboration to include additional secreted protein genes from Nuvelo's full-length gene portfolio. Discoveries during the collaboration will be jointly owned by Kirin and the Company, and will be jointly developed and marketed with costs, efforts and revenues shared by both companies. The Company will have marketing rights in North America on all products discovered and developed under the collaboration. Kirin will have marketing rights in Asia and Oceania. Marketing rights will be shared by both companies in Europe and the rest of the world. During 2004, 2003 and 2002, the Company recorded expenses of $3.0 million, $0.2 million and $0.1 million, respectively, in relation to this collaboration.

75

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

**BASF**

In December 1999, the Company entered into a collaboration with American Cyanamid Company in which the Company used its signature-by-hybridization technology to target agricultural products. During 2000, BASF Aktiengesellschaft acquired the crop protection business of American Cyanamid Company and subsequently assigned our collaboration with American Cyanamid to BASF Plant Sciences GmbH (BASF). The collaboration originally provided for funding of $60.0 million over its initial term of three and one half years. BASF had the exclusive right to commercialize any agricultural products resulting from the collaboration. In May 2002 the collaboration was amended to accelerate completion of the Company's gene discovery activities and BASF's payment schedule, resulting in a cost savings to both parties. Future royalties due the Company under the agreement were eliminated. Revenues recognized in 2004, 2003 and 2002 under the agreement were $0, $40,000 and $21.9 million, respectively. All activities under the collaboration were successfully completed in January 2003.

**Deltagen**

In October 2001, the Company entered into a collaboration with Deltagen, Inc. to undertake research and development activities on approximately 200 novel secreted protein genes. The Company provided gene sequences encoding for the secreted proteins, and Deltagen utilized its in vivo mammalian gene Knock-Out Technology to identify and validate potential commercially relevant biopharmaceutical drug targets. Deltagen and the Company each had certain joint development and commercialization rights around potential biopharmaceutical drug targets discovered through the collaboration. Deltagen and the Company were to share the collaboration's costs. The Company agreed to provide Deltagen with up to $10.0 million in research and development payments for approximately 200 project genes over the two years ending October 2003.

On June 27, 2003 Deltagen filed for Chapter 11 bankruptcy protection and on January 28, 2004 the Company entered into an amended agreement with Deltagen which, when effective, would grant certain rights to Deltagen's Knock-Out Technology. On March 8, 2004, the California Bankruptcy Court approved an amendment to the agreement with Deltagen. Under the amendment, the Company assigned to Deltagen its rights in 46 of the genes that entered the collaboration and granted Deltagen a non-exclusive license to certain technology arising out of the collaboration related to those 46 genes. In exchange, Deltagen relinquished any rights it had under the agreement to the other 115 genes that entered the collaboration and granted the Company certain rights to Deltagen's Knock-Out Technology related to those 115 genes. In addition, Nuvelo and Deltagen granted each other general releases under the amendment with respect to any obligations or activities under the collaboration. During 2004, 2003 and 2002, the Company recorded operating expenses of $0.8 million, $0.2 million and $0.2 million, respectively, for research and development under the collaboration, and as of December 31, 2004, there are no continuing financial obligations under this agreement.

**Affymetrix**

In October 2001, the Company and Affymetrix Inc. resolved all outstanding litigation and entered into a collaboration to accelerate development and commercialization of a high speed universal DNA sequencing chip. This collaboration with Affymetrix was through N-Mer, Inc., a wholly-owned subsidiary of Callida, which in turn was a majority-owned subsidiary of the Company until its sale on December 3, 2004. The Company contributed cash and certain assets consisting primarily of equipment, capitalized software, and intellectual property to Callida upon its formation in exchange for a 90% interest in Callida. Affymetrix received a 10% equity interest in Callida in exchange for a contribution of certain intellectual property. The Company accounted for the Affymetrix 10% ownership share as minority interest in Callida in the statement of operations until Affymetrix' initial minority interest investment was depleted. Beyond that point, which occurred in 2002, the Company absorbed 100% of Callida's net losses until December 3, 2004, when the Company and Affymetrix sold all Callida stock respectively owned (see Note 3).

76

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Affymetrix paid a total of $8.0 million in cash to the Company at the close of the settlement. The $8.0 million payment comprised of two pieces. Firstly, Affymetrix made a license payment of $4.0 million in return for a non-exclusive license, without the right to grant sublicenses, under 11 U.S. patents and 30 U.S. patent applications and counterpart foreign patents and applications to make, use, sell, and import products in the non-universal array field. The remaining deferred revenues of $0.5 million and $2.7 million from the original $4.0 million license payment were recognized in 2003 and 2002, respectively.

Secondly, Affymetrix made a loan to the Company of $4.0 million in the form of a 5-year promissory note bearing annual interest of 7.5%, for the Company's cash investment in Callida. Consequent to the sale of Callida, the note is collateralized by the $0.9 million promissory note issued by SBH Genomics to the Company, patents and patent applications transferred to SBH Genomics and any royalties payable by SBH Genomics related to them. Accrued interest will be paid with the final payment in November 2006. As of December 31, 2004, the remaining principal and accrued interest on the note totaled $4.9 million. In lieu of cash repayment, the Company has the right, at any time, to convert the outstanding principal and interest of the note, in whole or in part, into shares of its common stock based upon 90% of the average price of the Company's common stock over a 10-day period ending 2 days prior to conversion. As of December 31, 2004, 542,235 shares would be issuable to fully repay the principal and interest outstanding upon conversion.

### 13. Stockholders' Equity

#### *Preferred Stock*

Since reincorporation as a Delaware corporation on March 25, 2004, the Company is authorized to issue 5,000,000 shares of preferred stock. The Company's Board of Directors may set the rights and privileges of any preferred stock issued. As of December 31, 2004 and 2003, there were no issued and outstanding shares of preferred stock.

On June 5, 1998, the Company's Board of Directors adopted a rights plan and declared a dividend with respect to each share of common stock then outstanding. This dividend took the form of a right that entitles the holders to purchase one one-thousandth of a share of our Series A junior participating preferred stock at a purchase price of $175, subject to adjustment from time to time. These rights have also been issued in connection with each share of common stock issued after June 5, 1998. The rights are exercisable only if a person or entity or affiliated group of persons or entities acquires, or has announced its intention to acquire, 15% (27.5% in the case of certain approved stockholders) or more of the Company's outstanding common stock. The adoption of the rights plan makes it more difficult for a third party to acquire control of the Company without the approval of the Board of Directors. This rights agreement was amended on March 19, 2004, to reflect our reincorporation under Delaware law.

#### *Common Stock*

In March 2004, the Company raised approximately $69.5 million in a public offering, net of underwriters' fees and stock issuance costs of $5.3 million, from the sale of 5,750,000 shares of common stock, including 750,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $13.00 per share. Under the August 2004 Loan and Security Agreement with Silicon Valley Bank, the Company cannot pay dividends without Silicon Valley Bank's prior written consent, except for dividends paid in shares of its capital stock.

#### *Warrants*

As of December 31, 2004, warrants to purchase 1,516,792 shares of common stock were outstanding at exercise prices ranging from $4.05 to $25.53, with a weighted average exercise price per share of $20.88. These warrants, which were granted as part of various financing and business agreements, are held by certain investors,

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

businesses and an executive officer, and expire at various times between July 2005 and November 2009. Warrants are recorded at their estimated fair market value at the date of grant using the Black-Scholes option pricing model.

### Stock Option Plans

In May 2004, the Company adopted the 2004 Equity Incentive Plan, (2004 Plan), to authorize the grant of stock options (including indexed options), stock appreciation rights, restricted stock purchase rights, restricted stock bonuses, restricted stock units, performance shares, performance units and deferred stock units. Under the 2004 Plan, all awards may be granted to employees, directors and consultants of the Company, except for incentive stock options, which may be granted only to employees. The 2004 Plan replaces all prior option plans (detailed below), which were terminated upon its adoption, with no new awards to be granted thereunder. A total of 4,750,000 common shares were initially reserved for issuance under the 2004 Plan, including shares previously reserved for issuance under prior plans, and as of December 31, 2004 there were 3,760,298 shares reserved for future option grants. For stock options, the 2004 Plan requires that the exercise price of each option may not be less than the fair market value of a share of common stock on the date of grant, and in the case of incentive stock options granted to an owner of more than 10% of the total combined voting power of all classes of the Company's stock (10% Owners), must have an exercise price equal to at least 110% of the fair market value on the date of grant. Options granted to employees generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As of December 31, 2004, 2,611,774 options were outstanding under the 2004 Plan. The maximum term of any option granted under the 2004 Plan is ten years, provided that incentive stock options granted to 10% Owners must have a term not exceeding five years.

In 1995, the Company's stockholders adopted the 1995 Employee Stock Option Plan (Employee Plan). Options granted under the Employee Plan were either incentive stock options or nonstatutory stock options. Incentive stock options were granted to employees with exercise prices of not less than fair market value and nonstatutory options were granted to employees at exercise prices of not less than par value of the common stock on the date of grant as determined by the Board of Directors. Options vest as determined by the Board of Directors (generally in four equal annual installments commencing one year after the date of grant), and expire 10 years from the date of grant. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2004, options to purchase 556,811 shares were outstanding under the Employee Plan.

In 1997, the Company's stockholders adopted the Non-Employee Director Stock Option Plan (Directors Plan), providing for periodic stock option grants to non-employee directors of the Company. Under the Directors Plan, each new, non-employee director received a one-time grant of options to purchase 7,680 shares of common stock, of which options to purchase 3,840 shares vest immediately, with the balance vesting in two equal allotments on the first and second anniversaries of joining the Board. All non-employee directors automatically received options to purchase up to 1,920 shares each year (such that the amount received under the Directors Plan when added to all prior options granted to a director which vest in that year totaled 1,920) on the date of the annual meeting of the stockholders. Options under the Directors Plan were granted at the fair market value of the Company's common stock on the date of the grant. In 2000, the Company's stockholders approved an amendment to the Directors Plan that changed the method for determining the number of shares granted under the plan, and lengthened the vesting date for the new director's initial and first annual grants of options. Under the amendment, the number of shares granted were equal to the lesser of the number determined by dividing $200,000 by the fair market value of the Company's common stock on the date of grant, or 3,333 shares. The amendment also revised the vesting date for initial options that were granted when a new director joined the Company's Board such that 50% of a new director's option vest one year after the grant date and the other 50% vest two years after the grant date. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2004, options to purchase 94,046 shares were outstanding under the Directors Plan.

78

Table of Contents

In 1999, the Company adopted a Scientific Advisory Board/Consultants Stock Option Plan (SAB/Consultant Plan) that provided for periodic grants of non-qualified stock options to members of the Company's scientific advisory board and allowed the Board of Directors to approve grants of stock options to consultants. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. At December 31, 2004, options to purchase 9,331 shares were outstanding under the SAB/Consultant Plan.

In August 2002, the Company adopted the 2002 Equity Incentive Plan (2002 Plan), to grant stock options or make restricted stock awards to employees (including officers or employee directors) and consultants. The 2002 Plan authorized the grant of incentive stock options and of non-qualified stock options and restricted stock awards to employees and consultants. The 2002 Plan required that the exercise price of options be not less than the fair value of the common shares at the grant date for those options intended to qualify as performance-based compensation and be not less than 110% of the fair value in the case of incentive stock options granted to 10% Owners. Options generally vest over a four-year period and are exercisable in installments beginning one year after the grant date and expire after 10 years if not exercised. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2004, options to purchase 426,009 shares were outstanding under the 2002 Plan.

On January 31, 2003, in connection with the merger of Variagenics, Inc., the Company assumed Variagenics' existing stock option plan, the Amended 1997 Employee, Director and Consultant Stock Option Plan (1997 Plan), by reserving and registering an additional 2,269,666 shares of common stock. The 1997 Plan authorized the grant of incentive and non-qualified stock options to employees, directors and consultants of the Company. Options generally vest ratably over three- to five-year periods and expire after 10 years if not exercised. As a result of the adoption of the 2004 Plan, all shares previously reserved for issuance under this plan and remaining for grant are now reserved for issuance under the 2004 Plan. As of December 31, 2004, options to purchase 173,623 shares were outstanding under the 1997 Plan.

The Company granted options to purchase common stock to several key employees, directors, scientific advisory board members and scientists prior to adoption of the Employee Plan. Each option gives the holder the right to purchase common stock at prices between $2.34 and $5.46 per share. In 1998, the Company granted options outside of any of the Company's stock option plans to purchase a total of 3,806 shares of common stock to three non-employee directors and a scientific advisory board member at prices between $14.25 and $30.19 per share. The options vest over periods of up to four years. In February 2000, a director who was previously an officer of the Company was granted an option to purchase 333,333 shares of common stock at $95.06 per share, the closing price on the day prior to the grant, as an inducement to become an employee of the Company. This option became exercisable one-third upon the date of grant, one-third on the one-year anniversary and one third on the two-year anniversary of the date of grant. In 2001, the Company granted options outside of any of the Company's stock option plans to purchase a total of 422,720 shares to five employee officers at prices between $29.87 and $37.69 per share as inducements to become employees of the Company. In August 2001, a director of the Company was granted an option to purchase 333,333 shares of common stock at $25.91 per share, the closing price on the day prior to the grant. In June 2002, an officer of the Company was granted an option to purchase 58,333 shares of common stock at $5.67, the average of the high and low price on the day of the grant. In June 2003, a new high-level employee was granted an option to purchase 66,666 shares of common stock at $7.05, the average of the high and low price on the day of the grant. As of December 31, 2004, 895,075 options issued outside of any of the Company's stock option plans were outstanding.

The Directors Plan, the Employee Plan, the 2002 Plan, the 2004 Plan and the options granted to a director to purchase 666,666 shares (as described above) provide for the acceleration of vesting of options upon certain specified events.

79

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

On December 14, 2004, the Company's Board of Directors approved an "Executive Change in Control and Severance Benefit Plan" for executive officers and other eligible employees. The purpose of the plan is to provide for the payment of severance benefits and/or change in control benefits to certain eligible employees, and the plan supersedes and replaces any change in control and/or severance plans adopted previously. The plan provides that, upon a change in control of the Company as defined under the plan, all Nuvelo stock options and stock awards held by a plan participant will become fully vested. Such shares held by a plan participant will also become fully vested if the participant is terminated without cause or constructively terminated within one month preceding a change in control. If a participant is terminated without cause or constructively terminated one month before or one year after a change in control, he or she will also be entitled to certain cash severance and medical benefits. In addition, if a participant is terminated without cause or constructively terminated outside the context of change in control, he or she will be entitled to certain cash severance and continued medical benefits and shall be credited with an additional year of vesting with respect to Nuvelo stock options and stock awards held. If a change in control occurs in the future, it is possible that material additional stock-based compensation expense could be incurred.

A summary of the Company's stock option activity, and related information follows:

| | Year Ended December 31, | | | | | |
| | 2004 | | 2003 | | 2002 | |
| | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|---|---|
| Options outstanding at beginning of period | 2,680,170 | $ 26.52 | 1,968,373 | $ 36.33 | 1,874,780 | $ 42.96 |
| Options assumed from Variagenics acquisition | — | $ — | 1,576,356 | $ 5.64 | — | $ — |
| Options granted | 2,773,980 | $ 9.76 | 755,873 | $ 4.89 | 700,970 | $ 8.40 |
| Options exercised | (234,534) | $ 3.79 | (641,918) | $ 2.07 | (16,664) | $ 10.71 |
| Options canceled | (452,947) | $ 17.23 | (978,514) | $ 12.00 | (590,713) | $ 24.87 |
| Options outstanding at end of period | 4,766,669 | $ 18.77 | 2,680,170 | $ 26.52 | 1,968,373 | $ 36.33 |

The following table summarizes information about stock options outstanding and exercisable as of December 31, 2004:

| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number of Shares | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| $ 0.03 – $ 6.45 | 601,651 | 7.41 | $ 4.66 | 343,880 | $ 4.56 |
| 6.62 – 8.41 | 557,537 | 8.23 | 7.34 | 193,640 | 6.70 |
| 8.46 – 9.21 | 455,877 | 9.48 | 9.10 | 45,294 | 9.12 |
| 9.28 – 9.67 | 488,666 | 9.54 | 9.65 | 203,987 | 9.67 |
| 9.75 – 9.91 | 294,240 | 9.79 | 9.85 | 9,310 | 9.83 |
| 10.02 – 10.18 | 950,897 | 8.91 | 10.17 | 159,085 | 10.18 |
| 10.19 – 25.91 | 691,982 | 7.24 | 19.94 | 451,344 | 22.48 |
| 26.01 – 95.06 | 716,753 | 5.69 | 64.02 | 659,196 | 66.63 |
| 97.13 – 285.56 | 8,066 | 5.53 | 140.03 | 8,066 | 140.03 |
| 304.31 – 304.31 | 1,000 | 5.16 | 304.31 | 1,000 | 304.31 |
| | 4,766,669 | 8.08 | $ 18.77 | 2,074,802 | $ 30.10 |

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

The weighted-average grant date fair values of options granted during the years ended December 31, 2004, 2003 and 2002 were $7.17, $3.69 and $6.93, respectively.

*Employee Stock Purchase Plan*

The Company's stockholders have approved an Employee Stock Purchase Plan, covering an aggregate of 250,000 shares of the Company's common stock. Each quarter, an eligible employee may elect to purchase shares of the Company's stock through payroll deductions at a price equal to the lower of 85% of the fair market value of the stock as of the first business day of the quarter or the last business day. In the year ended December 31, 2004, 31,959 shares of the Company's stock were sold under the Employee Stock Purchase Plan at a weighted-average price of $8.12 per share. The weighted-average grant date fair values of the purchase rights granted during the years ended December 31, 2004, 2003 and 2002 were $9.77, $1.71 and $2.25 per share, respectively.

**14. Income Taxes**

The Company had no current state or federal income taxes for the years ended December 31, 2004, 2003, and 2002. The reconciliations between the amounts computed by applying the U.S. federal statutory tax rate of 34% to loss from continuing operations and the actual provision for income taxes for the years ended December 31, 2004, 2003 and 2002 are as follows (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Loss from continuing operations | (48,942) | (46,229) | (39,512) |
| Federal tax benefit at statutory rate | (16,640) | (15,718) | (13,434) |
| Current year net operating losses and temporary differences, no tax benefit recognized | 16,655 | 15,978 | 14,748 |
| State taxes, net of federal benefit | 16 | 4 | 3 |
| Other permanent differences | (31) | (264) | (1,317) |
| Provision for income taxes | | | |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets for federal and state income taxes are as follows (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Deferred tax assets: | | | |
| Book depreciation in excess of tax depreciation | 3,843 | 2,535 | 870 |
| Accruals and reserves | 4,361 | 4,292 | 3,190 |
| Research and other credits | 18,065 | 16,158 | 13,540 |
| Capital loss carryforward discontinued operations | 3,152 | | |
| Stock-based compensation | 3,485 | 5,070 | |
| Net operating loss | 110,093 | 96,272 | 53,330 |
| Deferred revenue | 8 | 2 | 210 |
| State taxes | | | |
| Capitalized research costs | 6,858 | 5,250 | 3,100 |
| Gross deferred tax assets | 149,865 | 129,579 | 74,240 |
| Valuation allowance | (149,865) | (129,579) | (74,240) |

Source: NUVELO INC, 10-K, March 16, 2005

Net deferred tax
assets

81

Source: NUVELO INC, 10-K, March 16, 2005

<u>Table of Contents</u>

Deferred tax assets are reduced by a valuation allowance, as management believes that it is more likely than not that the deferred tax assets will not be realized. The net valuation allowance increased by $20.3 million, $55.3 million and $24.0 million for the years ended December 31, 2004, 2003 and 2002, respectively.

As of December 31, 2004, the Company had net operating loss carryforwards for federal and state income tax purposes of approximately $313.1 million and $62.7 million, respectively. The Company also had federal and California research and development tax credit carryforwards of approximately $9.7 million and $7.5 million, respectively. The federal net operating loss and credit carryforwards will expire at various dates beginning in the year 2008 through 2024, if not utilized. The State of California net operating losses will expire at various dates beginning in 2005 through 2014, if not utilized.

On December 3, 2004, the Company sold its subsidiaries, Callida Genomics and N-Mer. The related capital loss carryforward is $7.9 million. The federal and California capital loss carryforwards will expire in 2009.

Utilization of the Company's net operating loss carryforwards and credits may be subject to an annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state provisions. The annual limitation may result in the expiration of net operating losses and credits before utilization.

Approximately $13.2 million of the federal net operating losses and $7.1 million of the state net operating losses relate to deductions from stock-based compensation. No income statement benefit will result from the realization of these losses.

The tax benefit of approximately $5.0 million in deferred tax assets related to the merger with Variagenics will be treated as a reduction to goodwill and other intangible assets under the provisions of SFAS 109 when realized.

### 15. Transactions with Related Parties

Dr. Rathmann, the Company's Chairman, provided a $20.0 million line of credit in August 2001, of which $11.0 million was drawn down, with the remaining $9.0 million having expired. The related promissory note bears interest at the prime rate plus 1%. In November 2003, the Company began repaying the outstanding balance over 48 months with equal monthly principal payments of approximately $0.2 million. Accrued interest will be paid with the final payment in October 2007. The remaining principal and accrued interest to date totaled $9.2 million as of December 31, 2004, and the interest rate on the note was 6.25%. The outstanding principal and interest under the note may be repaid at any time upon mutual agreement, by conversion into shares of the Company's common stock at a price based upon the average stock price over a 20-day period ending 2 days prior to the conversion or, if in connection with an equity financing, at the offering price. As of December 31, 2004, 907,113 shares would be issuable to fully repay the principal and interest outstanding upon conversion. A $4.0 million letter of credit issued to the Irvine Company related to the 985 Almanor facility lease that was guaranteed and collateralized by Dr. Rathmann was canceled and replaced in September 2004 by a letter of credit collateralized by the Company's $4.0 million revolving credit line with Silicon Valley Bank. Dr. Rathmann's guarantee of the Company's $2.6 million promissory note to AMB Property, LP was canceled upon repayment of this note in December 2004.

### 16. Segment and Geographic Data

#### Segment data

The Company is engaged in the discovery, development and commercialization of life improving therapeutics for the treatment of human disease. Reportable segments reflect the Company's structure, reporting responsibilities to the chief executive officer and the nature of the products under development. The Company has only one reportable segment since the sale of its majority-owned subsidiary Callida Genomics, Inc. (Callida) in December 2004. Callida was created in October 2001 to develop and commercialize sequencing-by-

82

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

hybridization technology, and the Company had chosen to organize and manage Callida as a separate business segment through the time of its disposal. In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"*, the results of operations of Callida have been reclassified to discontinued operations for all periods presented

*Geographic data*

| | Year Ended December 31 | | |
| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (In thousands) | |
| Revenues | | | |
| Domestic | $        195 | $        984 | $        3,678 |
| Germany | — | 40 | 21,876 |
| Total revenues | $        195 | $        1,024 | $        25,554 |

### 17.  Legal Matters

On or about December 6, 2001, Variagenics was sued in a complaint filed in the United States District Court for the Southern District of New York naming it and certain of its officers and underwriters as defendants. The complaint purportedly is filed on behalf of persons purchasing the Company's stock between July 21, 2000 and December 6, 2000, and alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder

The complaint alleges that, in connection with Variagenics' July 21, 2000 initial public offering, or IPO, the defendants failed to disclose additional and excessive commissions purportedly solicited by and paid to the underwriter defendants in exchange for allocating shares of Variagenics' stock to preferred customers and alleged agreements among the underwriter defendants and preferred customers tying the allocation of IPO shares to agreements to make additional aftermarket purchases at predetermined prices. Plaintiffs claim that the failure to disclose these alleged arrangements made Variagenics' registration statement on Form S-1 filed with the SEC in July 2000 and the prospectus, a part of the registration statement, materially false and misleading. Plaintiffs seek unspecified damages. On or about April 19, 2002, an amended complaint was filed which makes essentially the same allegations. On or about July 15, 2002, Variagenics and the individuals filed a motion to dismiss. The Company is involved in this litigation as a result of the merger with Variagenics in January 2003.

On July 16, 2003, the Company's Board of Directors approved a settlement proposal initiated by the plaintiffs. The final terms of the settlement are still being negotiated. It is possible that the parties may not reach agreement on the final settlement documents or that the Federal District Court may not approve the settlement in whole or part. The Company believes it has meritorious defenses and intends to defend this action vigorously; however, the Company could be forced to incur material expenses in the litigation if the parties do not reach agreement of the final settlement documents, and in the event there is an adverse outcome, the Company's business could be harmed

### 18.  Subsequent Events

On January 11, 2005, the Company entered into a seven-year facility lease agreement with BMR-201 Industrial Road LLC for approximately 55,000 square feet of industrial space at 201 Industrial Road in San Carlos, California at $2.35 per square foot per month, subject to annual increases of $0.07 per square foot per month. The lease will commence on or around September 1, 2005 and contains an option to cancel the lease after five years, two options to extend the lease for five additional years at 95% of the then-current fair market rental rate (but not less than the existing rental rate), and rights of first refusal over all vacant space in the building during the first two years of the lease. The lease contains a tenant improvement allowance of $7.7 million, or $140 per square foot. As a result of the entry into this lease, a review for impairment of leasehold improvements

83

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

at 985 Almanor Avenue will take place in the first quarter of 2005. The net book value of these leasehold improvements as of December 31, 2004 was $4.0 million.

On January 21, 2005, the Company entered into an Interim Agreement with Avecia Limited for initial work related to the manufacture by Avecia of alfimeprase. The initial work will include assessment and planning, transfer of processes and assays to Avecia, purchase of certain capital equipment, replicated fermentation and purification runs and consulting work in preparation for the manufacture of alfimeprase pursuant to Good Manufacturing Practices regulations. The Company will pay Avecia fees totaling £0.7 million (approximately equivalent to $1.3 million) and will also pay for the purchase of necessary items of equipment, together with certain related fees and expenses. The Interim Agreement will expire upon the first to occur of completion of the work under the agreement by Avecia, entry by Nuvelo and Avecia into a definitive agreement, or termination of the agreement by either party. Either party may terminate the agreement at any time, subject to certain cancellation fees, if applicable. The Interim Agreement requires negotiation in good faith towards the potential entry into a definitive agreement with Avecia that would cover activities under the Interim Agreement as well as other activities related to the manufacture of alfimeprase.

In February 2005, the Company raised approximately $68.3 million in a public offering, net of underwriters' fees and stock issuance costs of approximately $5.0 million, from the sale of 9,775,000 shares of common stock, including 1,275,000 shares related to the exercise of an over-allotment option granted to the underwriters, at a public offering price of $7.50 per share. The Company intends to use the net proceeds from this offering for general corporate purposes, including capital expenditures, working capital needs, current and future clinical trials of the lead drug candidate, alfimeprase, as well as other research and drug development activities.

## 19.    Selected Quarterly Financial Data (Unaudited)

Summarized selected quarterly financial data is as follows (in thousands, except per share amounts):

| | Quarter Ended | | | |
| | December 31, 2004 | September 30, 2004 | June 30, 2004 | March 31, 2004 |
|---|---|---|---|---|
| Contract revenues | $            43 | $            54 | $            20 | $            78 |
| Operating loss | (10,778) | (10,274) | (10,629) | (16,963) |
| Loss from continuing operations | (10,837) | (10,295) | (10,643) | (17,166) |
| Loss from discontinued operations | (2,145) | (574) | (317) | (512) |
| Net loss | (12,982) | (10,869) | (10,960) | (17,678) |
| Basic and diluted net loss per share from continuing operations* | (0.33) | (0.32) | (0.33) | (0.63) |
| Total basic and diluted net loss per share* | (0.40) | (0.34) | (0.34) | (0.65) |

| | Quarter Ended | | | |
| | December 31, 2003 | September 30, 2003 | June 30, 2003 | March 31, 2003 |
|---|---|---|---|---|
| Contract revenues | $            12 | $            55 | $            198 | $            759 |
| Operating loss | (8,658) | (9,841) | (15,085) | (11,699) |
| Loss from continuing operations | (8,882) | (10,151) | (15,324) | (11,871) |
| Loss from discontinued operations | (507) | (756) | (984) | (1,712) |
| Net loss | (9,389) | (10,907) | (16,308) | (13,583) |
| Basic and diluted net loss per share from continuing operations* | (0.35) | (0.48) | (0.73) | (0.72) |
| Total basic and diluted net loss per share* | (0.37) | (0.51) | (0.78) | (0.82) |

*    The sum of earnings per share for the four quarters may be different from the full year amount as a result of computing the quarterly and full year amounts based on the weighted average number of common shares outstanding in the respective periods.

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

Historically, the Company's revenues have varied considerably from period to period due to the nature of the Company's collaborative arrangements. As a consequence, the Company's results in any one quarter are not necessarily indicative of results to be expected for a full year.

**Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None

**Item 9A.     Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of management, including our Chief Executive Officer and our Chief Financial Officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures. Disclosure controls and procedures are controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the 1934 Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

**Changes in Internal Control over Financial Reporting**

We have recently completed our first annual company-wide review of our internal control over financial reporting as part of the process of preparing for compliance with Section 404 of the Sarbanes-Oxley Act of 2002, and as a complement to our existing overall internal control over financial reporting. As a result, we have continued to improve the design and effectiveness of our internal control over financial reporting. We anticipate that improvements and changes will continue to be made. However, there has been no change in the Company's internal controls over financial reporting during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on the Effectiveness of Controls**

Our management, including the Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our internal control system was designed to provide reasonable assurance to management and our board of directors regarding the preparation and fair presentation of published financial statements.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is a more than remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than

85

Table of Contents

inconsequential will not be prevented or detected. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we have assessed the effectiveness of our internal control over financial reporting as of December 31, 2004. In making our assessment of internal control over financial reporting, we used the criteria issued in the report Internal Control-Integrated Framework by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We have concluded that our internal control over financial reporting was effective as of December 31, 2004 based on these criteria.

Our independent registered public accounting firm, KPMG LLP, has issued an attestation report on management's assessment of our internal control over financial reporting, which is included hereunder.

86

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents
**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Nuvelo, Inc

We have audited management's assessment, included in Management's Annual Report on Internal Control over Financial Reporting, that Nuvelo, Inc and subsidiaries maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Nuvelo, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Nuvelo, Inc. and subsidiaries maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, Nuvelo, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Nuvelo, Inc. and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the three-year period ended December 31, 2004, and our report dated March 15, 2005 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

San Francisco, California
March 15, 2005

87

Table of Contents

PART III

**Item 10.**     *Directors and Executive Officers of the Registrant*

The information required by this item is incorporated by reference to "General Information" and "Section 16(a) Beneficial Ownership Reporting Compliance" under Proposal No. 1 in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

**Item 11.**     *Executive Compensation*

The response to this item is incorporated by reference to "Certain Information With Respect to Executive Officers" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

**Item 12.**     *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The response to this item is incorporated by reference to "Security Ownership of Certain Beneficial Owners and Management" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

**Item 13.**     *Certain Relationships and Related Transactions*

The response to this item is incorporated by reference to "Certain Relationships and Related Transactions" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

**Item 14.**     *Principal Accountant Fees and Services*

The response to this item is incorporated by reference to "Ratification of Selection of Independent Auditors" in our Definitive Proxy Statement to be filed pursuant to Regulation 14A under the Securities Exchange Act of 1934, relating to our 2005 Annual Meeting of Stockholders.

Consistent with Section 10A(i)(2) of the Securities Exchange Act of 1934, as added by Section 202 of the Sarbanes-Oxley Act of 2002, we are responsible for listing the non-audit services approved by our Audit Committee to be performed by KPMG LLP, our external auditor. Non-audit services are defined as services other than those provided in connection with an audit or a review of our financial statements. The Audit Committee approved the engagement of KPMG LLP in 2004 for the following non-audit services: the preparation of property tax returns, and tax advice in preparing for and in connection with the filing of such returns.

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

PART IV

Item 15.     *Exhibits and Financial Statement Schedules*

(a)   *The following documents are filed as part of this Report:*

1.   Consolidated financial statements filed as part of this Report are listed under Part II, Item 8, page 32 of this Form 10-K.

2.   No schedules are required because either the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements or the notes thereto.

(b)   *Exhibits*

The following documents are filed as part of this annual report on Form 10-K. The Company will furnish a copy of any exhibit listed to requesting stockholders upon payment of the Company's reasonable expenses in furnishing those materials.

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of November 9, 2002, among Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc.(1) |
| 2.2 | Agreement and Plan of Merger, dated March 19, 2004, between the Registrant and Nuvelo, Inc., a Nevada corporation and the Registrant's predecessor in interest (27) |
| 2.3 | Stock Purchase Agreement, dated December 3, 2004, entered into by and between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc.(28) |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant (27) |
| 3.2 | Amended and Restated By-Laws of the Registrant (29) |
| 3.3 | Certificate of Ownership and Merger of Variagenics, Inc. with and into Hyseq, Inc.(30) |
| 3.4 | Form of Certificate of Amendment to the Amended and Restated Articles of Incorporation, filed in connection with our 1-for-3 reverse stock split (26) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate (27) |
| 4.2 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998.(5) |
| 4.3 | Hyseq Promissory Note, dated as of November 13, 2001, in the principal amount of $4,000,000.(6) |
| 4.4 | Registration Rights Agreement, dated as of November 13, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 4.5 | Pledge and Security Agreement, dated as of November 13, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 4.6 | Amendment to Rights Agreement, dated as of November 9, 2002, between Hyseq, Inc. and U.S. Stock Transfer Corporation.(7) |
| 4.7 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc., entered into January 8, 2002 (36) |
| 4.8 | Form of Warrant, dated as of April 5, 2002 (3) |
| 4.9* | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc., dated as of January 20, 2005 |

89

Table of Contents

| Exhibit Number | Description |
|---|---|
| 4.10* | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc, dated as of January 20, 2005. |
| 4.11 | Amendment to Rights Agreement, dated as of March 19, 2004, between Nuvelo, Inc. and U.S. Stock Transfer Corporation (27) |
| 4.12 | Certificate of Designations of Series A Junior Participating Preferred Stock (27) |
| 4.13 | Reference is made to Exhibits 3.1 through 3.4. |
| 10.1 | Form of Indemnification Agreement between Hyseq, Inc. and each of its directors and officers.(2) |
| 10.2 | Patent License Agreement between Arch Development Corporation and Hyseq, Inc. dated June 7, 1994.(2) |
| 10.3 | Stock Purchase Agreement for Series B Convertible Preferred Stock dated May 28, 1997.(2) |
| 10.4† | Stock Option Plan, as amended (9) |
| 10.5*† | Employee Stock Purchase Plan, as amended and restated on December 14, 2004. |
| 10.6† | Non-Employee Director Stock Option Plan, as amended (10) |
| 10.7 | Collaboration and License Agreement between Hyseq, Inc. and American Cyanamid Company dated December 10, 1999.(11) |
| 10.8† | Non-Qualified Employee Stock Purchase Plan.(12) |
| 10.9† | Scientific Advisory Board/ Consultants Stock Option Plan.(12) |
| 10.10† | Employment and Confidential Information Agreement between Hyseq, Inc. and Dr. Ted W. Love dated January 11, 2001.(13) |
| 10.11 | Lease between The Irvine Company and Hyseq, Inc. dated as of April 30, 2001.(14) |
| 10.12 | Industrial Multi-Tenant Lease between AMB Property, L.P. and Hyseq, Inc. dated June 23, 2000, as amended.(13) |
| 10.13 | Form of Registration Rights Agreement, dated as of August 28, 2001, among Hyseq, Inc. and the investors party thereto.(4) |
| 10.14† | Stock Option Agreement, dated as of February 1, 2000, between Hyseq, Inc. and Dr. George B. Rathmann (6) |
| 10.15 | Line of Credit Agreement, dated as of August 6, 2001, between Hyseq, Inc. and Dr. George B. Rathmann (6) |
| 10.16† | Stock Option Agreement, dated as of August 21, 2001, between Hyseq, Inc. and Dr. George B. Rathmann.(6) |
| 10.17 | Interference Settlement Agreement, dated as of October 24, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 10.18† | Form of Non-Stockholder Approved Stock Option Agreement for Officers.(15) |
| 10.19 | Registration Rights Agreement, dated as of April 5, 2002, among Hyseq, Inc. and the investors party thereto (3) |
| 10.20 | Settlement Agreement, dated as of October 24, 2001, between Hyseq, Inc. and Affymetrix, Inc.(15) |
| 10.21 | Collaboration Agreement, dated of January 8, 2002, between Hyseq, Inc. and Amgen, Inc.(16) |

90

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.22 | Amendment No. 1 to Lease Agreement, dated as of August 1, 2002, between Hyseq, Inc. and The Irvine Company (17) |
| 10.23† | Form of Severance Agreement (8) |
| 10.24 | Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc (18) |
| 10.25 | Equipment Schedules 3 and 4, dated July 27, 2001, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(19) |
| 10.26 | Equipment Schedule 5, dated November 28, 2001, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(20) |
| 10.27 | Equipment Schedules 6 and 7, dated March 18, 2002, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(21) |
| 10.28 | Securities Purchase Agreement, dated as of April 5, 2002, among Hyseq, Inc. and the investors party thereto.(3) |
| 10.29 | Form of Warrant Purchase Agreement, entered into January 8, 2002, between Hyseq, Inc. and Amgen, Inc.(2) |
| 10.30† | Variagenics, Inc. Amended 1997 Employee, Director and Consultant Stock Option Plan (22) |
| 10.31 | Guarantee by George Rathmann in favor of AMB Property, L.P., dated October 1, 2002 (23) |
| 10.32 | Amendment to Amended and Restated Line of Credit, dated as of November 9, 2002, between Hyseq, Inc. and Dr. George B. Rathmann.(23) |
| 10.33† | Nuvelo, Inc. 2002 Equity Incentive Plan.(24) |
| 10.34† | Form of Non-Stockholder Approved Option Agreement for Officers (24) |
| 10.35† | Stock Option Agreement, dated as of September 21, 2001, between Nuvelo, Inc. and Dr. George B. Rathmann.(24) |
| 10.36 | Second Amendment to Lease by and between the Irvine Company and Nuvelo, Inc. dated October 21, 2003 (25) |
| 10.37 | Assignment and Assumption of Lease by and between the Company and Idenix, Inc. dated October 28, 2003 (25) |
| 10.38 | Collaboration Agreement, dated as of January 12, 2004, between Nuvelo, Inc. and Archemix Corp.(26) |
| 10.39 | License Agreement, dated as of February 4, 2004, among Dendreon San Diego LLC, Dendreon Corporation and Nuvelo, Inc.(26) |
| 10.40 | Amended and Restated Secreted Protein Development and Collaboration Agreement, dated January 28, 2004, between Deltagen, Inc. and Nuvelo, Inc.(31) |
| 10.41† | Nuvelo, Inc. 2004 Equity Incentive Plan.(32) |
| 10.42† | Form of Notice of Grant of Stock Option under Nuvelo, Inc. 2004 Equity Incentive Plan (33) |
| 10.43† | Form of Nuvelo, Inc. Stock Option Agreement (Single Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(33) |
| 10.44† | Form of Nuvelo, Inc. Stock Option Agreement (Double Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(34) |
| 10.45 | Amendment No. 3 to Collaboration Agreement, dated as of September 10, 2004, between Nuvelo, Inc. and Kirin Brewery Co., Ltd.(34) |

91

Source: NUVELO INC, 10-K, March 16, 2005

| Exhibit Number | Description |
|---|---|
| 10.46 | Loan and Security Agreement, dated as of August 31, 2004, between Nuvelo, Inc., and Silicon Valley Bank.(34) |
| 10.47† | Nuvelo, Inc. Executive Change in Control and Severance Benefit Plan.(35) |
| 10.48*§ | Opt-Out, Termination, Settlement and Release Agreement, dated October 29, 2004, between Nuvelo, Inc. and Amgen, Inc. |
| 10.49*§ | License Agreement, dated November 3, 2004, between Nuvelo, Inc. and Amgen, Inc. |
| 10.50* | Lease Agreement, dated January 11, 2005, between Nuvelo, Inc. and BMR-201 Industrial Road LLC. |
| 10.51*§ | Interim Agreement, dated January 21, 2005, between Nuvelo, Inc. and Avecia Limited. |
| 21.1* | Subsidiaries of Nuvelo, Inc. as of December 31, 2004. |
| 23.1* | Consent of Independent Registered Public Accounting Firm. |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

\*    Filed herewith

†    Compensatory plan or agreement.

§    Confidential treatment requested

(1)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873

(2)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement filed on Form S-1, as amended, File No. 333-29091

(3)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form S-3, filed on June 14, 2002, File No. 333-90458.

(4)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-3, as amended, filed on September 25, 2001, File No. 333-70134.

(5)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No 00-22873

(6)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2001, filed on April 1, 2002, File No. 000-22873

(7)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-4, filed on November 27, 2002, File No. 333-101503

(8)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-4, filed on November 27, 2002, File No. 333-101503.

(9)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-8, filed on December 5, 1997, File No. 333-41663.

(10)    Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-8, filed on May 21, 1998, File No. 333-53089.

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

(11)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's report on Form 8-K/ A, filed on March 17, 2000, File No 00-22873.

(12)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's Annual Report on Form 10-K for the year ended December 31, 1999, filed on March 20, 2000, File No. 000-22873.

(13)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's Annual Report on Form 10-K for the year ended December 31, 2000, filed April 2, 2001, File No 000-22873

(14)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's report on Form 8-K, filed on May 21, 2001, File No 000-22873.

(15)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's report on Form 10-K/ A, for the year ended December 31, 2001, filed on May 9, 2002, File No. 000-22873.

(16)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's report on Form 10-Q/ A, for the quarterly period ended March 31, 2002, filed on July 22, 2002, File No. 000-22873

(17)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc 's report on Form 10Q, for the quarterly period ended September 30, 2002, filed on November 8, 2002, File No. 000-22873

(18)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics, Inc.'s report on Form 10-Q, for the quarterly period ended June 30, 2001, filed on August 14, 2001, File No. 000-31035.

(19)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics, Inc.'s report on Form 10-Q, for the quarterly period ended September 30, 2001, filed on November 14, 2001, File No. 000-31035.

(20)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics, Inc 's Annual Report on Form 10-K, for the year ended December 31, 2001, filed on April 1, 2002, File No 000-31035

(21)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics, Inc 's report on Form 10-Q, for the quarterly period ended March 31, 2002, filed on May 14, 2002, File No 000-31035

(22)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc 's Registration Statement on Form S-8, filed on February 7, 2003, File No 333-103055.

(23)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Annual Report on Form 10-K, filed on March 31, 2003, for the year ended December 31, 2002, File No 000-22873.

(24)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Registration Statement on Form S-8, filed on September 5, 2003, File No 333-108563.

(25)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s report on Form 10-Q, for the quarterly period ended September 30, 2003, filed on November 14, 2003, File No. 000-22873.

(26)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc 's report on Form 8-K, filed on February 19, 2004, File No. 000-22873.

(27)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc 's Form 8-K, filed March 26, 2004, File No. 000-22873

(28)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc 's Form 8-K, filed December 9, 2004, File No. 000-22873

(29)  Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc 's Form 10-Q, filed on August 9, 2004, File No. 000-22873

93

**Table of Contents**

(30)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 12, 2004, File No. 000-22873.

(31)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2004, File No. 000-22873.

(32)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Registration Statement on Form S-8, filed on May 21, 2004, File No. 333-115747.

(33)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2004, File No. 000-22873.

(34)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 9, 2004, File No. 000-22873.

(35)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 20, 2004, File No. 000-22873.

(36)     Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed September 25, 2000, File No. 333-70134.

94

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Sunnyvale, State of California, on March 15, 2005

NUVELO, INC

By   /s/   LEE BENDEKGEY
_____
**Lee Bendekgey**
*Senior Vice President,*
*Chief Financial Officer and General Counsel*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of Nuvelo, Inc., in the capacities indicated, on March 15, 2005

| Signature | Title |
|---|---|
| /s/   TED W. LOVE<br><br>**Ted W. Love** | President and Chief Executive Officer (Principal Executive Officer), Director |
| /s/   LEE BENDEKGEY<br><br>**Lee Bendekgey** | Senior Vice President, Chief Financial Officer and General Counsel (Principal Financial Officer) |
| /s/   GARY S. TITUS<br><br>**Gary S. Titus** | Vice President and Chief Accounting Officer (Principal Accounting Officer) |
| /s/   GEORGE B. RATHMANN<br><br>**George B. Rathmann** | Chairman of the Board |
| /s/   BURTON E. SOBEL<br><br>**Burton E. Sobel** | Director |
| /s/   MARK L. PERRY<br><br>**Mark L. Perry** | Director |
| /s/   MARY K. PENDERGAST<br><br>**Mary K. Pendergast** | Director |
| /s/   BARRY L. ZUBROW<br><br>**Barry L. Zubrow** | Director |

95

Source: NUVELO INC, 10-K, March 16, 2005

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of November 9, 2002, among Hyseq, Inc., Vertical Merger Corp. and Variagenics, Inc.(1) |
| 2.2 | Agreement and Plan of Merger, dated March 19, 2004, between the Registrant and Nuvelo, Inc., a Nevada corporation and the Registrant's predecessor in interest (27) |
| 2.3 | Stock Purchase Agreement, dated December 3, 2004, entered into by and between SBH Genomics, Inc., Radoje Drmanac, Snezana Drmanac, Nuvelo, Inc., and Affymetrix, Inc.(28) |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant (27) |
| 3.2 | Amended and Restated By-Laws of the Registrant (29) |
| 3.3 | Certificate of Ownership and Merger of Variagenics, Inc. with and into Hyseq, Inc.(30) |
| 3.4 | Form of Certificate of Amendment to the Amended and Restated Articles of Incorporation, filed in connection with our 1-for-3 reverse stock split (26) |
| 4.1 | Form of Nuvelo, Inc. Common Stock Certificate (27) |
| 4.2 | Rights Agreement between Hyseq, Inc. and U.S. Stock Transfer Corporation dated June 5, 1998 (5) |
| 4.3 | Hyseq Promissory Note, dated as of November 13, 2001, in the principal amount of $4,000,000.(6) |
| 4.4 | Registration Rights Agreement, dated as of November 13, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 4.5 | Pledge and Security Agreement, dated as of November 13, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 4.6 | Amendment to Rights Agreement, dated as of November 9, 2002, between Hyseq, Inc. and U.S. Stock Transfer Corporation.(7) |
| 4.7 | Form of Warrant to purchase 1,491,544 shares of Common Stock of Hyseq, Inc., entered into January 8, 2002.(36) |
| 4.8 | Form of Warrant, dated as of April 5, 2002.(3) |
| 4.9* | Replacement Warrant to purchase 195,130 shares of Common Stock of Nuvelo, Inc., dated as of January 20, 2005. |
| 4.10* | Replacement Warrant to purchase 200,000 shares of Common Stock of Nuvelo, Inc., dated as of January 20, 2005. |
| 4.11 | Amendment to Rights Agreement, dated as of March 19, 2004, between Nuvelo, Inc. and U.S. Stock Transfer Corporation (27) |
| 4.12 | Certificate of Designations of Series A Junior Participating Preferred Stock (27) |
| 4.13 | Reference is made to Exhibits 3.1 through 3.4 |
| 10.1 | Form of Indemnification Agreement between Hyseq, Inc. and each of its directors and officers.(2) |
| 10.2 | Patent License Agreement between Arch Development Corporation and Hyseq, Inc. dated June 7, 1994 (2) |
| 10.3 | Stock Purchase Agreement for Series B Convertible Preferred Stock dated May 28, 1997.(2) |
| 10.4† | Stock Option Plan, as amended.(9) |
| 10.5*† | Employee Stock Purchase Plan, as amended and restated on December 14, 2004 |

1

Source: NUVELO INC, 10-K, March 16, 2005

| Exhibit Number | Description |
|---|---|
| 10.6† | Non-Employee Director Stock Option Plan, as amended.(10) |
| 10.7 | Collaboration and License Agreement between Hyseq, Inc. and American Cyanamid Company dated December 10, 1999.(11) |
| 10.8† | Non-Qualified Employee Stock Purchase Plan.(12) |
| 10.9† | Scientific Advisory Board/ Consultants Stock Option Plan.(12) |
| 10.10† | Employment and Confidential Information Agreement between Hyseq, Inc. and Dr. Ted W. Love dated January 11, 2001.(13) |
| 10.11 | Lease between The Irvine Company and Hyseq, Inc. dated as of April 30, 2001.(14) |
| 10.12 | Industrial Multi-Tenant Lease between AMB Property, L.P. and Hyseq, Inc. dated June 23, 2000, as amended.(13) |
| 10.13 | Form of Registration Rights Agreement, dated as of August 28, 2001, among Hyseq, Inc. and the investors party thereto.(4) |
| 10.14† | Stock Option Agreement, dated as of February 1, 2000, between Hyseq, Inc. and Dr. George B. Rathmann.(6) |
| 10.15 | Line of Credit Agreement, dated as of August 6, 2001, between Hyseq, Inc. and Dr. George B. Rathmann.(6) |
| 10.16† | Stock Option Agreement, dated as of August 21, 2001, between Hyseq, Inc. and Dr. George B. Rathmann.(6) |
| 10.17 | Interference Settlement Agreement, dated as of October 24, 2001, between Hyseq, Inc. and Affymetrix, Inc.(6) |
| 10.18† | Form of Non-Stockholder Approved Stock Option Agreement for Officers.(15) |
| 10.19 | Registration Rights Agreement, dated as of April 5, 2002, among Hyseq, Inc. and the investors party thereto.(3) |
| 10.20 | Settlement Agreement, dated as of October 24, 2001, between Hyseq, Inc. and Affymetrix, Inc.(15) |
| 10.21 | Collaboration Agreement, dated of January 8, 2002, between Hyseq, Inc. and Amgen, Inc.(16) |
| 10.22 | Amendment No. 1 to Lease Agreement, dated as of August 1, 2002, between Hyseq, Inc. and The Irvine Company.(17) |
| 10.23† | Form of Severance Agreement.(8) |
| 10.24 | Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(18) |
| 10.25 | Equipment Schedules 3 and 4, dated July 27, 2001, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(19) |
| 10.26 | Equipment Schedule 5, dated November 28, 2001, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(20) |
| 10.27 | Equipment Schedules 6 and 7, dated March 18, 2002, to the Master Lease Agreement, dated as of May 10, 2001 between General Electric Capital Corporation and Variagenics, Inc.(21) |
| 10.28 | Securities Purchase Agreement, dated as of April 5, 2002, among Hyseq, Inc. and the investors party thereto.(3) |

2

Source: NUVELO INC, 10-K, March 16, 2005

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.29 | Form of Warrant Purchase Agreement, entered into January 8, 2002, between Hyseq, Inc. and Amgen, Inc. (2) |
| 10.30† | Variagenics, Inc. Amended 1997 Employee, Director and Consultant Stock Option Plan (22) |
| 10.31 | Guarantee by George Rathmann in favor of AMB Property, L.P., dated October 1, 2002.(23) |
| 10.32 | Amendment to Amended and Restated Line of Credit, dated as of November 9, 2002, between Hyseq, Inc. and Dr. George B. Rathmann.(23) |
| 10.33† | Nuvelo, Inc. 2002 Equity Incentive Plan (24) |
| 10.34† | Form of Non-Stockholder Approved Option Agreement for Officers.(24) |
| 10.35† | Stock Option Agreement, dated as of September 21, 2001, between Nuvelo, Inc. and Dr. George B. Rathmann. (24) |
| 10.36 | Second Amendment to Lease by and between the Irvine Company and Nuvelo, Inc. dated October 21, 2003 (25) |
| 10.37 | Assignment and Assumption of Lease by and between the Company and Idenix, Inc. dated October 28, 2003.(25) |
| 10.38 | Collaboration Agreement, dated as of January 12, 2004, between Nuvelo, Inc. and Archemix Corp.(26) |
| 10.39 | License Agreement, dated as of February 4, 2004, among Dendreon San Diego LLC, Dendreon Corporation and Nuvelo, Inc.(26) |
| 10.40 | Amended and Restated Secreted Protein Development and Collaboration Agreement, dated January 28, 2004, between Deltagen, Inc. and Nuvelo, Inc.(31) |
| 10.41† | Nuvelo, Inc. 2004 Equity Incentive Plan.(32) |
| 10.42† | Form of Notice of Grant of Stock Option under Nuvelo, Inc. 2004 Equity Incentive Plan.(33) |
| 10.43† | Form of Nuvelo, Inc. Stock Option Agreement (Single Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(33) |
| 10.44† | Form of Nuvelo, Inc. Stock Option Agreement (Double Trigger Acceleration) under Nuvelo, Inc. 2004 Equity Incentive Plan.(34) |
| 10.45 | Amendment No. 3 to Collaboration Agreement, dated as of September 10, 2004, between Nuvelo, Inc. and Kirin Brewery Co., Ltd.(34) |
| 10.46 | Loan and Security Agreement, dated as of August 31, 2004, between Nuvelo, Inc., and Silicon Valley Bank. (34) |
| 10.47† | Nuvelo, Inc. Executive Change in Control and Severance Benefit Plan (35) |
| 10.48*§ | Opt-Out, Termination, Settlement and Release Agreement, dated October 29, 2004, between Nuvelo, Inc. and Amgen, Inc. |
| 10.49*§ | License Agreement, dated November 3, 2004, between Nuvelo, Inc. and Amgen, Inc. |
| 10.50* | Lease Agreement, dated January 11, 2005, between Nuvelo, Inc. and BMR-201 Industrial Road LLC |
| 10.51*§ | Interim Agreement, dated January 21, 2005, between Nuvelo, Inc. and Avecia Limited. |
| 21.1* | Subsidiaries of Nuvelo, Inc. as of December 31, 2004. |
| 23.1* | Consent of Independent Registered Public Accounting Firm |

3

Table of Contents

| Exhibit Number | Description |
| --- | --- |
| 31.1* | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

---

\*    Filed herewith
†    Compensatory plan or agreement
§    Confidential treatment requested

(1) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on November 12, 2002, File No. 000-22873.

(2) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement filed on Form S-1, as amended, File No. 333-29091.

(3) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form S-3, filed on June 14, 2002, File No. 333-90458.

(4) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-3, as amended, filed on September 25, 2001, File No. 333-70134.

(5) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Form 8-K, filed on July 31, 1998, File No 00-22873.

(6) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2001, filed on April 1, 2002, File No. 000-22873.

(7) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-4, filed on November 27, 2002, File No. 333-101503.

(8) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-4, filed on November 27, 2002, File No. 333-101503.

(9) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-8, filed on December 5, 1997, File No. 333-41663.

(10) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Registration Statement on Form S-8, filed on May 21, 1998, File No. 333-53089.

(11) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form 8-K/A, filed on March 17, 2000, File No. 00-22873.

(12) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Annual Report on Form 10-K for the year ended December 31, 1999, filed on March 20, 2000, File No. 000-22873.

(13) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2000, filed April 2, 2001, File No. 000-22873.

(14) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form 8-K, filed on May 21, 2001, File No. 000-22873.

(15) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form 10-K/A, for the year ended December 31, 2001, filed on May 9, 2002, File No. 000-22873.

(16) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form 10-Q/A, for the quarterly period ended March 31, 2002, filed on July 22, 2002, File No. 000-22873.

(17) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Hyseq, Inc.'s report on Form 10-Q, for the quarterly period ended September 30, 2002, filed on November 8, 2002, File No. 000-22873.

4

Source: NUVELO INC, 10-K, March 16, 2005

<u>Table of Contents</u>

(18) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics Inc.'s report on Form 10-Q, for the quarterly period ended June 30, 2001, filed on August 14, 2001, File No. 000-31035.

(19) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics Inc.'s report on Form 10-Q, for the quarterly period ended September 30, 2001, filed on November 14, 2001, File No. 000-31035.

(20) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2001, filed on April 1, 2002, File No. 000-31035.

(21) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Variagenics Inc.'s report on Form 10-Q, for the quarterly period ended March 31, 2002, filed on May 14, 2002, File No. 000-31035.

(22) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Registration Statement on Form S-8, filed on February 7, 2003, File No. 333-103055.

(23) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Annual Report on Form 10-K, filed on March 31, 2003, for the year ended December 31, 2002, File No. 000-22873.

(24) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Registration Statement on Form S-8, filed on September 5, 2003, File No. 333-108563.

(25) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s report on Form 10-Q, for the quarterly period ended September 30, 2003, filed on November 14, 2003, File No. 000-22873.

(26) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s report on Form 8-K, filed on February 19, 2004, File No. 000-22873.

(27) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed March 26, 2004, File No. 000-22873.

(28) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 9, 2004, File No. 000-22873.

(29) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on August 9, 2004, File No. 000-22873.

(30) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-K, filed on March 12, 2004, File No. 000-22873.

(31) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on May 10, 2004, File No. 000-22873.

(32) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Registration Statement on Form S-8, filed on May 21, 2004, File No. 333-115747.

(33) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed September 20, 2004, File No. 000-22873.

(34) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 10-Q, filed on November 9, 2004, File No. 000-22873.

(35) Previously filed with the SEC as an Exhibit to and incorporated herein by reference from Nuvelo, Inc.'s Form 8-K, filed December 20, 2004, File No. 000-22873.

(36) Previously filed with the SEC as an Exhibit to and Incorporated herein by reference from Hyseq, Inc.'s Form S-3, filed September 25, 2000, File No. 333-70134.

5

Exhibit 4.9

THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THE WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE HEREOF MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. NOTWITHSTANDING THE FOREGOING, THIS WARRANT MAY BE TRANSFERRED AS PROVIDED IN SECTION 14 OF THIS WARRANT.

Warrant No. C-1R
Date: January 20, 2005

## NUVELO, INC.
## WARRANT TO PURCHASE SHARES OF COMMON STOCK

This Warrant is issued to SAGAMORE HILL HUB FUND LTD., a Delaware limited partnership ("Holder"), by NUVELO, INC., a Nevada corporation (the "Company"), as of the date set forth beside the Company's signature below, to replace lost warrant No. C-1, originally dated November 1, 2002 (the "Lost Warrant")

**1. Purchase of Shares.** Subject to the terms and conditions hereinafter set forth, Holder is entitled, upon surrender of this Warrant at the principal office of the Company (or at such other place as the Company shall notify Holder in writing), to purchase from the Company up to one hundred ninety-five thousand one hundred thirty (195,130) shares (the "Shares") of common stock of the Company (the "Common Stock"), at an exercise price of $2.68 per share (the "Exercise Price"). The Shares and the Exercise Price are as of the date of the Lost Warrant, and do not reflect the 3:1 reverse stock split effected by the Company on February 23, 2004 or any other adjustments occurring subsequent to the date of the Lost Warrant. The Shares and Exercise Price shall be subject to adjustments occurring since the date of the Lost Warrant, as set forth in Section 7 hereof.

**2. Exercise Period.** This Warrant shall be fully vested in Holder as of the date hereof and shall be exercisable for a period of five (5) years from November 1, 2002 (the "Exercise Period").

**3. Method of Exercise.** While this Warrant remains outstanding and exercisable during the Exercise Period, Holder may exercise, in whole or in part, the purchase rights evidenced hereby  Such exercise shall be effected by: (i) the surrender of the Warrant, together with a duly executed copy of the form of Exercise Notice attached hereto as **Exhibit A**, to the Secretary of the Company at its principal offices; and (ii) the payment to the Company by cash, check or wire transfer of an amount equal to the aggregate Exercise Price for the number of Shares being purchased

**4. Net Issuance Provision.** In lieu of exercising pursuant to paragraph 3 above, at the Holder's option, while this Warrant remains outstanding and exercisable during the Exercise

1

Source: NUVELO INC, 10-K, March 16, 2005

Period, Holder may exercise this Warrant by surrender of this Warrant as determined below ("Net Issuance"). If the Holder elects the Net Issuance method, the Company will issue Common Stock in accordance with the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where:

X =    the number of shares of Common Stock to be issued to the Holder;

Y =    the number of shares of Common Stock requested to be exercised under this Warrant

A =    the fair market value of one (1) share of Common Stock;

B =    the Exercise Price

For purposes of this Warrant, current fair market value of Common Stock shall mean with respect to each share of Common Stock:

(a) if the Common Stock is traded on a securities exchange, the fair market value shall be deemed to be the average of the closing prices over a twenty-one (21) day period ending three days before the day the current fair market value of the securities is being determined;

(b) if actively traded over-the-counter, the fair market value shall be deemed to be the average of the closing prices quoted on the Nasdaq system (or similar system) over the twenty-one (21) day period ending three days before the day the current fair market value of the securities is being determined; or

(c) if at any time the Common Stock is not listed on any securities exchange or quoted in the Nasdaq System or the over the counter market, the current fair market value of Common Stock shall be determined in good faith by the Company and Holder, provided that, if the parties are unable to reach agreement within a reasonable period of time, the fair market value of Common Stock shall be determined in good faith by an independent investment banking firm selected by the American Arbitration Association in accordance with its rules.

Upon partial exercise by either cash or Net Issuance, the Company shall promptly issue an amended Warrant representing the remaining number of shares purchasable thereunder. All other terms and conditions of such amended Warrant shall be identical to those contained herein, including, but not limited to, the Exercise Period.

**5. Certificates for Shares.** Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Shares so purchased shall be issued as soon as reasonably practicable thereafter. Upon any partial exercise of this Warrant, the Company will forthwith issue and deliver to Holder a new warrant or warrants of like tenor as this Warrant for the remaining portion of the Common Stock for which this Warrant may still be exercised.

2

Source: NUVELO INC, 10-K, March 16, 2005

**6. Issuance of Shares.** The Company covenants that (a) the Shares, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully-paid and non-assessable and free from all taxes, liens and charges with respect to the issuance thereof (except for any applicable transfer taxes, which shall be paid by Holder) and (b) during the Exercise Period, the Company will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of Common Stock upon the exercise of this Warrant.

**7. Adjustment of Exercise Price and Number of Shares.** The number of and kind of securities purchasable upon exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time as follows:

(a) **Subdivisions, Combinations and Other Issuances.** If the Company shall at any time prior to the expiration of this Warrant subdivide its Common Stock, by split or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend with respect to any shares of its Common Stock, the number of Shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination. Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of Shares purchasable under this Warrant (as adjusted) shall remain the same. Any adjustment under this Section 7(a) shall become effective as of the record date of such subdivision, combination or dividend, or in the event that no record date is fixed, upon the making of such subdivision, combination or dividend.

(b) **Reclassification, Reorganization and Consolidation.** In case of any reclassification, capital reorganization, or change in the Common Stock of the Company (other than as a result of a subdivision, combination, or stock dividend provided for in Section 7(a) above), then, as a condition of such reclassification, reorganization or change, lawful provision shall be made, and duly executed documents evidencing the same from the Company or its successor shall be delivered to Holder, so that Holder shall have the right at any time prior to the expiration of this Warrant to purchase, at a total price equal to that payable upon the exercise of this Warrant, the kind and amount of shares of stock and other securities and property receivable in connection with such reclassification, reorganization or change by a holder of the same number of shares of Common Stock as were purchasable by Holder immediately prior to such reclassification, reorganization or change. In any such case, appropriate provisions shall be made with respect to the rights and interest of Holder so that the provisions hereof shall thereafter be applicable with respect to any shares of stock or other securities and property deliverable upon exercise hereof, and appropriate adjustments shall be made to the purchase price per share payable hereunder, provided the aggregate purchase price shall remain the same.

(c) **Merger and Sale of Assets.** If at any time there shall be a capital reorganization of the shares of the Company's stock (other than a combination, reclassification, exchange or subdivision of shares otherwise provided for herein), or a merger or consolidation of the Company with or into another corporation, whether or not the Company is the surviving

3

Source: NUVELO INC, 10-K, March 16, 2005

corporation, or the sale of all or substantially all of the Company's properties and assets to any other person (hereinafter referred to as a "Merger Event"), then, as a part of such Merger Event, lawful provision shall be made so that the Holder shall thereafter be entitled to receive, upon exercise of the Warrant, the number of shares of common stock or other securities of the successor corporation resulting from such Merger Event equivalent in value to that which would have been issuable if Holder had exercised this Warrant immediately prior to the Merger Event. In any such case, appropriate adjustment (as determined in good faith by the Company's Board of Directors) shall be made in the application of the provisions of this Warrant with respect to the rights and interest of the Holder after the Merger Event to the end that the provisions of this Warrant (including adjustments of the Exercise Price and number of shares of Common Stock purchasable) shall be applicable to the extent possible.

　　　　(d) **Certificate of Adjustment.** When any adjustment is required to be made in the number or kind of shares purchasable upon exercise of the Warrant or in the Exercise Price, an officer of the Company shall promptly compute such adjustment in accordance with the terms of this Warrant and prepare a certificate setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated and the Exercise Price and number of shares purchasable hereunder after giving effect to such adjustment, and shall cause a copy of such certificate to be mailed (by first class mail, postage prepaid) to Holder.

　　8. **Compliance with Securities Laws.** Holder hereby represents and warrants that:

　　　　(a) **Purchase Entirely for Own Account.** This Warrant and the Common Stock issuable upon exercise hereof (collectively, the "Securities") will be acquired for investment for Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Holder has no present intention of selling, granting any participation in or otherwise distributing the same. Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to any person with respect to any of the Securities. Holder represents that it has full power and authority to enter into this Warrant.

　　　　(b) **Investment Experience.** Holder acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant. Holder also represents it has not been organized for the purpose of acquiring this Warrant.

　　　　(c) **Accredited Investor.** Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

　　　　(d) **Restricted Securities.** Holder understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. In this connection, Holder represents that it is familiar with SEC Rule 144 promulgated under the Act, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

4

Source: NUVELO INC, 10-K, March 16, 2005

**9. Limitations on Disposition; Legends.**

(a) Without in any way limiting the representations set forth above, Holder further agrees not to make any disposition of all or any portion of the Securities unless and until (I) there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement, or (II) Holder shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act, *provided, however,* that an opinion of counsel will not be required for any disposition of Securities by the Holder to its affiliates or subsidiaries.

(b) Each person (other than the Company) to whom this Warrant or the Shares are transferred, in whole or in part, by means of a permitted transfer must, as a condition precedent to the validity of such transfer, acknowledge in writing to the Company that such person is bound by the provision of this Warrant to the same extent this Warrant or the Shares would be so subject if retained by Holder.

(c) Certificates evidencing the Shares will bear the following legend(s):

(i) "SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT."

(ii) Any legend required by any applicable state securities laws.

The legend set forth above will be removed by the Company from any certificate evidencing Shares if the Shares are registered under the Securities Act or upon delivery to the Company of an opinion by counsel, reasonably satisfactory to the Company, that such security can be freely transferred without such a registration statement being in effect.

(d) Notwithstanding any provision of this Section 9 to the contrary, an opinion of counsel shall not be required in connection with any transfer in compliance with Rule 144 of the Securities Act.

**10. No Fractional Shares or Scrip.** No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor on the basis of the fair market value of the Company's Common Stock.

5.

Source: NUVELO INC, 10-K, March 16, 2005

**11. No Stockholder Rights.** Prior to exercise of this Warrant, Holder shall not be entitled to any rights of a stockholder with respect to the Shares, including (without limitation) the right to vote such Shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings, and Holder, as such, shall not be entitled to any notice or other communication concerning the business or affairs of the Company, except as expressly set forth herein.

**12. Replacement of Warrant.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Warrant, the Company at its expense shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

**13. Notices.** All notices or other communications hereunder shall be in writing and shall be deemed given when (i) personally delivered, (ii) three days after being sent by prepaid certified or registered U.S. mail, or one day after being sent, if sent by nationally recognized overnight courier, to the address of the party to be noticed as set forth herein or such other address as such party last provided to the other by written notice, or (iii) upon receipt of electronic confirmation, if by facsimile. All notices shall be sent to the addresses and facsimile numbers set forth below or such other address as may be given from time to time under the terms of this notice provision:

 If to the Company:

 Nuvelo, Inc.
 675 Almanor Avenue
 Sunnyvale, California 94085
 Attention: President
 Fax: (408) 524-8141

 If to Holder:

 At the address and facsimile number
 indicated on the signature page hereof.

**14. Transfer of Warrant; Successors and Assigns.** Subject to compliance with the terms of Section 9 hereof, this Warrant and all rights hereunder are transferable in whole or in part by the Holder to any person or entity upon written notice to the Company enclosing a properly executed assignment (in the form of **Exhibit B** hereto). In the event of a partial transfer, the Company shall issue to the holders one or more appropriate new warrants. The terms and provisions of this Warrant shall inure to the benefit of, and be binding upon, the Company and the Holder, and their respective successors and assigns. Except as permitted above, any purported transfer hereof shall be null and void and the Company is hereby expressly authorized to instruct its transfer agent (which may be the Company itself) to not honor any such purported transfer.

6.

Source: NUVELO INC, 10-K, March 16, 2005