# Exhibit R

## EXHIBIT A

### Defined Terms

A.1 **"Affiliate"** shall mean, except as provided below, an individual, a partnership, a joint venture, a corporation, a trust, an estate, an unincorporated organization, a government or any department or agency thereof, or any other entity or any combination of the aforementioned entities that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with Amgen or Nuvelo. For purposes of this definition, "control" shall mean the possession, direct or indirect, of the power to cause the direction of the management and policies of a Party, whether through ownership of more than fifty percent (50%) of the voting securities of such Party, by contract or otherwise.

A.2 **"Alfimeprase"** shall mean the polypeptide having the amino acid sequence which is set forth in Exhibit B.

A.3 **"Amgen Know-How"** shall mean all Information and Material Controlled by Amgen prior to or on the Effective Date necessary to Develop, manufacture or Commercialize Licensed Products, including but not limited to the following information: (1) information disclosed in the IND for Alfimeprase as of the Effective Date; (2) information disclosed as of the Effective Date in any IND supplements for Alfimeprase; (3) all Amgen-sponsored collaborator data and results (subject to any contractual confidentiality obligations of Amgen to Third Parties regarding such results), (4) any regulatory data which Amgen provides to Nuvelo; (5) sequence information of other Licensed Products and information regarding their activity; and (6) such information which Amgen expressly designates in writing it intends to include as Amgen Know-How under this License Agreement; provided however, that Amgen Know-How shall exclude Amgen Material and Manufacturing Information.

A.4 **"Amgen Material and Manufacturing Information"** shall mean the most current version of (i) the Materials (other than Licensed Products), and (ii) the Information pertaining to the manufacture of Licensed Products including, without limitation, Information contained in the CMC section of any applicable Regulatory Filings or Information regarding Amgen's manufacturing facility, and (iii) Information regarding the Materials.

A.5 **"Amgen Patent Rights"** shall mean Amgen's rights in (a) those Patent Rights Controlled by Amgen on the Effective Date with respect to the Licensed Products and listed in Exhibit C and (b) all Patent Rights Controlled by Amgen prior to or during the term of the License Agreement that claim Amgen Know-How.

A.6 **"Amgen Technology"** shall mean all Amgen Patent Rights and Amgen Know-How and Amgen's interest in the Joint Patent Rights and Joint Know-How.

A.7 **"Asian Countries"** shall mean one or more of the following: Bangladesh, Cambodia, India, Indonesia, Japan, Laos, Malaysia, Myanmar, Nepal, North Korea, Pakistan, Peoples Republic of China (including Hong Kong and Macao), Philippines, Singapore, South Korea, Sri Lanka, Taiwan, Thailand and Vietnam.

Amgen Contract #200200784                    35

Source: NUVELO INC, 10-K, March 16, 2005

A.8 **"Calendar Quarter"** shall mean the respective periods of three (3) consecutive calendar months ending on either March 31, June 30, September 30, or December 31 for so long as this License Agreement is in effect.

A.9 **"Calendar Year"** means each successive period of twelve (12) months commencing on January 1 and ending on December 31.

A.10 **"Commercialize" or "Commercialization"** shall mean all activities relating to the manufacturing, promotion, and other pre-launch and post-launch marketing and sale activities of Licensed Products and shall include without limitation, Phase IV clinical trials (as defined in the Collaboration Agreement) or equivalent clinical trials conducted following Regulatory Approval to market such Licensed Product.

A.11 **"Commercially Reasonable Efforts"** shall mean the level of efforts and resources required to Develop, manufacture or Commercialize a Licensed Product in a sustained manner consistent with the efforts a similarly situated biopharmaceutical company would typically devote to a product of similar market potential, profit potential or strategic value resulting from its own research efforts, based on conditions then prevailing. Commercially Reasonable Efforts shall be determined on a country-by-country (each country including its territories) basis for a particular Licensed Product, and it is anticipated that the level of effort will change over time reflecting changes in the status of the Licensed Product and the country (including its territories) involved.

A.12 **"Competitive Product"** shall mean any pharmaceutical product, other than a Licensed Product, that contains (a) Alfimeprase or (b) any fibrinolytic metalloproteinase product which has, incorporates or contains the following properties: (i) is directly fibrinolytic, (ii) does not require the involvement of the plasminogen system, and (iii) is complexed by alpha-2 macroglobulin.

A.13 **"Confidential Information"** shall mean all Information received by either Party from the other Party pursuant to this License Agreement, other than that portion of such Information which:

(a)    is publicly disclosed by the disclosing Party, either before or after it becomes known to the receiving Party;

(b)    was known to the receiving Party, without obligation to keep it confidential, prior to when it was received from the disclosing Party;

(c)    is subsequently disclosed to the receiving Party, by a Third Party lawfully in possession thereof without obligation to keep it confidential;

(d)    has been publicly disclosed other than by the disclosing Party and without breach of an obligation of confidentiality with respect thereto; or

(e)    has been independently developed by the receiving Party without the aid, application or use of Confidential Information, as demonstrated by competent written proof.

Amgen Contract #200200784                                        36

Source: NUVELO INC, 10-K, March 16, 2005

**A.14 "Control" or "Controlled"** shall mean possession of the ability to grant a license or sublicense as provided for herein under such intellectual property right without violating the terms of any agreement or other arrangement with any Third Party.

**A.15 "Development" or "Develop"** shall mean all research, pre-clinical, process development/manufacturing and clinical activities undertaken for a Licensed Product required to successfully complete Pivotal Trials in the Territory. For the avoidance of doubt, these activities shall include clinical drug development activities, including among other things, test method development and stability testing, toxicology, formulation, statistical analysis and report writing, product approval and registration, and regulatory affairs related to the foregoing. When used as a verb, "Develop" means to engage in Development.

**A.16 "Dollar"** shall mean a United States dollar, and "$" shall be interpreted accordingly.

**A.17 "Drug Approval Application"** shall mean an application for Regulatory Approval required before commercial sale or use of a Licensed Product as a drug or to treat a particular indication in a regulatory jurisdiction, including without limitation: (a) (i) a Biologics License Application (BLA) pursuant to 21 C.F.R. 601.2, submitted to the FDA; or any successor application or procedure and (ii) any counterpart of a U.S. BLA in another country in the Territory; and (b) all supplements and amendments, including supplemental BLAs (and any foreign counterparts), that may be filed (e.g., to expand the label) with respect to the foregoing.

**A.18 "FDA"** shall mean the United States Food and Drug Administration, or any successor thereto.

**A.19 "First Commercial Sale"** shall mean the initial transfer by Nuvelo or its Affiliates or Sublicensees under this License Agreement of a Licensed Product to a non-Sublicensee Third Party in exchange for cash or some equivalent to which value can be assigned for the purpose of determining Net Sales, following Regulatory Approval to market such Licensed Product.

**A.20 "Force Majeure"** shall mean any occurrence beyond the reasonable control of a Party that prevents or substantially interferes with the performance by such Party of any of its obligations hereunder, if such occurs by reason of any act of God, flood, fire, explosion, earthquake, breakdown of plant, shortage of critical equipment, loss or unavailability of manufacturing facilities or material, strike, lockout, labor dispute, casualty or accident, or war, revolution, civil commotion, acts of public enemies, blockage or embargo, or any injunction, law, order, proclamation, regulation, ordinance, demand or requirement of any government or of any subdivision, authority or representative of any such government, inability to produce or use materials, labor, equipment, transportation, or energy sufficient to meet manufacturing needs without the necessity of allocation, or any other cause whatsoever, whether similar or dissimilar to those above enumerated, beyond the reasonable control of such Party, if and only if the Party affected shall have used reasonable efforts to avoid such occurrence and to remedy it promptly if it shall have occurred.

**A.21 "GAAP"** shall mean United States generally accepted accounting principles.

Amgen Contract #200200784                                37

Source: NUVELO INC, 10-K, March 16, 2005

**A.22 "IND"** shall mean an Investigational New Drug application.

**A.23 "Information"** shall mean all tangible and intangible techniques, technology, practices, trade secrets, inventions (whether patentable or not), methods, knowledge, know-how, conclusions, skill, experience, test data and results (including pharmacological, toxicological and clinical test data and results), analytical and quality control data, results or descriptions, software and algorithms.

**A.24 "Joint Know-How"** shall mean Information and Materials characterized, conceived, developed, derived, generated or identified jointly by employees of or consultants to Nuvelo and employees of or consultants to Amgen from the Effective Date through the Term.

**A.25 "Joint Patent Rights"** shall mean all Patent Rights that claim or disclose Joint Know-How.

**A.26 "Licensed Product(s)"** shall mean (a) Alfimeprase or (b) any fibrinolytic metalloproteinase product which is owned or Controlled by Amgen and/or Nuvelo and which has, incorporates or contains the following properties: (i) is directly fibrinolytic, (ii) does not require the involvement of the plasminogen system, and (iii) is complexed by alpha-2 macroglobulin.

**A.27 "Losses"** shall mean liabilities, costs, fees, expenses and/or losses, including without limitation reasonable legal costs and expenses and attorneys' fees for outside counsel.

**A.28 "Materials"** shall mean certain biological materials including, but not limited to, Licensed Products, screens, animal models, cell lines, cells, nucleic acids, receptors and reagents.

**A.29 "Net Sales"** shall mean all revenues recognized in accordance with GAAP from the sale or other disposition of Licensed Products by Nuvelo or its Affiliates or Sublicensees to a non-Sublicensee Third Party after deducting returns and allowances (actually paid or allowed) including, but not limited to, prompt payment and volume discounts, price reductions, including Medicaid and similar types of rebates, chargebacks from wholesalers of Licensed Products (whether in cash or trade), freight, shipping, packing, insurance, rebates, and sales and other taxes based on sales prices when included in gross sales, but not including taxes when assessed on income derived from such sales. Amounts received by Nuvelo or its Affiliates for the sale of Licensed Products among Nuvelo or its Affiliates for resale or for transfer of Licensed Products to a Sublicensee for resale shall not be included in the computation of Net Sales hereunder.

**A.30 "Patent Rights"** shall mean (i) a pending application for a patent, including without limitation any provisional, converted provisional, continued prosecution application, continuation, divisional or continuation-in-part thereof; or (ii) an issued, unexpired patent (with the term "patent" being deemed to encompass, without limitation, an inventor's certificate) which has not been held invalid or unenforceable by a court of competent jurisdiction from which no appeal can be taken or has been taken within the required time period, including without limitation any substitution, extension, registration, confirmation, reissue, re-examination, renewal or any like filing thereof.

Amgen Contract #200200784                                         38

Source: NUVELO INC, 10-K, March 16, 2005

A.31 **"Pivotal Trial(s)"** shall mean those clinical trials on sufficient numbers of patients that, if the defined end-points are met, are designed (and agreed to by the FDA, or other Regulatory Authorities in the Territory based upon existing data in the same patient population) as of the start of the trial to definitively establish that a drug is safe and efficacious for its intended use, and to define warnings, precautions and adverse reactions that are associated with the drug in the dosage range to be prescribed, and provide pivotal data supporting Regulatory Approval of such drug or label expansion of such drug and that satisfy the requirements of 21 CFR 321.21(c) (or its successor regulation), or an equivalent foreign clinical trial.

A.32 **"Product Trademark"** shall mean any trademarks and trade names (and trademark applications (whether or not registered) together with all goodwill associated therewith, and any renewals, extensions or modifications thereto in the Territory), trade dress and packaging which (a) are owned by or Controlled by either Party and (b) are applied to or used with Licensed Products or any Promotional Materials. The Parties hereby acknowledge that as of the Effective Date no such Product Trademarks are owned or have been developed by Amgen.

A.33 **"Promotional Materials"** shall mean all sales representative training materials and all written, printed, graphic, electronic, audio or video matter including, but not limited to, journal advertisements, sales visual aids, direct mail, direct-to-consumer advertising, Internet postings, broadcast advertisements, and sales reminder aids (e.g., scratch pads, pens and other such items) intended for use or used by a Party in connection with any Promotion (as defined herein) or Detailing (as defined in the Collaboration Agreement) of a Licensed Product, except for (i) the Regulatory Authority-approved full prescribing information for a Licensed Product, including any required patient information and (ii) all labels and other written, printed or graphic matter upon any container, wrapper, or any package insert or outsert utilized with or for a Licensed Product.

A.34 **"Regulatory Approval"** shall mean any approvals (including supplements, amendments, pre- and post-approvals and price approvals), licenses, registrations or authorizations (including designations of a Licensed Product as an "Orphan Product" under the Orphan Drug Act) of any national, supra-national, regional, state or local regulatory agency, department, bureau, commission, council or other governmental entity, including the FDA or equivalent foreign Regulatory Authorities, necessary for the distribution, use or sale of a Licensed Product in a regulatory jurisdiction. Regulatory Approval shall not include any site license for an Amgen manufacturing facility.

A.35 **"Regulatory Authority"** shall mean the FDA or any counterpart of the FDA outside the United States.

A.36 **"Regulatory Filings"** shall mean collectively, INDs, BLAs, establishment license applications (ELAs) and drug master files (DMFs), applications for designation of a Licensed Product as an "Orphan Product" under the Orphan Drug Act, or any other similar filings (including any foreign equivalents and further including any related correspondence and discussions), and all data contained therein, as may be required by the FDA or equivalent foreign Regulatory Authorities for the Development, manufacture or Commercialization of a Licensed Product.

Amgen Contract #200200784                                    39

Source: NUVELO INC, 10-K, March 16, 2005

**A.37 "Royalty" or "Royalties"** shall mean those amounts payable as royalties by Nuvelo to Amgen pursuant to Section 5.2 of this License Agreement.

**A.38 "Sublicensee"** shall mean a Third Party to whom Nuvelo shall have granted a license or sublicense under Nuvelo's rights pursuant to Section 2.3 to make, have made, use, sell, offer for sale, or import a Licensed Product in one or more countries in the Territory. Solely for the purpose of any compensation payable to Amgen hereunder, "Sublicensee" shall include a Third Party to whom Nuvelo or another Sublicensee shall have granted the right to distribute one or more Licensed Product(s), wherein such distributor pays to Nuvelo or such another Sublicensee a royalty based upon the revenues received by the distributor for the sale of such Licensed Product(s), but shall not include (i) any Third Party who receives an implied license to use a unit of Licensed Product(s), arising by operation of law, as a consequence of the purchase of said unit of Licensed Product(s); or (ii) any Third Party where Nuvelo or such another Sublicensee merely sells such Licensed Product(s) at a fixed transfer price to such distributor for resale by such distributor and Nuvelo is not compensated based on the resale price of such Licensed Product by such distributor.

**A.39 "Term"** shall have the meaning set forth in Section 12.1.

**A.40 "Territory"** shall mean the world.

**A.41 "Third Party"** shall mean any individual, a partnership, a joint venture, a corporation, a trust, an estate, an unincorporated organization, a government or any department or agency thereof, or any other than Amgen or Nuvelo or an Affiliate of either of them.

**A.42 "Third Party Payment"** shall mean all upfront payments, milestone payments, license fees, royalties or other payments, payable to any Third Party under any Third Party license agreement deemed necessary or useful to make, have made, use, sell, offer to sell, and import, export or otherwise transfer physical possession of or otherwise transfer title in a Licensed Product.

**A.43 "Trademark"** shall mean any and all corporate names, trade names, service marks, logos or trademarks and trademark applications (whether or not registered) together with all good will associated therewith, and any renewals, extensions or modifications thereto either filed or used.

**A.44 "Valid Claim"** shall mean (i) an unexpired claim of an issued patent within the Amgen Patent Rights and Joint Patent Rights that has not been found to be unpatentable, invalid or unenforceable by a court or other authority in the country of the patent, from which decision no appeal is taken or can be taken; or (ii) a claim of a pending application within the Amgen Patent Rights and Joint Patent Rights, wherein such pending application claims a first priority no more than five (5) years prior to the date upon which pendency is determined.

Amgen Contract #200200784                                              40

Source: NUVELO INC, 10-K, March 16, 2005

## EXHIBIT B

### PROTEIN SEQUENCE OF ALFIMEPRASE

| | | |
|---|---|---|
| RN | 259074-76-5 | ZREGISTRY |
| CN | 3-203-Fibrolase  [3-serine]   (Agkistrodon contortrix contortrix recombinant) | |
| | (9CI)     (CA INDEX NAME) | |
| FS | PROTEIN SEQUENCE | |
| SQL | 201 | |
| NTE | | |

| type | location | | description |
|---|---|---|---|
| bridge | Cys-116 | - Cys-196 | disulfide bridge |
| bridge | Cys-156 | - Cys-180 | disulfide bridge |
| bridge | Cys-158 | - Cys-163 | disulfide bridge |

```
SEQ    1  SFPQRYVQLV   IV&DHRMNTK   YNGDSDKIRQ   WVHQIVNTIN   EIYRPLNIQF
      51  TLVGLEIWSN   QDLITVTSVS   HDTLASFGNW   RETDLLRRQR   HDNAQLLTAI
     101  DFDGDTVGLA   YVGGMCQLKH   STGVIQDHSA   INLLVALTMA   HELGHNLGMN
     151  HDGNQCHCGA   NSCVMAAMLS   DQPSKLFSDC   SKKDYQTFLT   VNNPQCILNK
     201  P
```

```
SEQ 3    1  Ser-Phe-Pro-Gln-Arg-Tyr-Val-Gln-Leu-Val-
        11  Ile-Val-Ala-Asp-His-Arg-Met-Asn-Thr-Lys-
        21  Tyr-Asn-Gly-Asp-Ser-Asp-Lys-Ile-Arg-Gln-
        31  Trp-Val-His-Gln-Ile-Val-Asn-Thr-Ile-Asn-
        41  Glu-Ile-Tyr-Arg-Pro-Leu-Asn-Ile-Gln-Phe-
        51  Thr-Leu-Val-Gly-Leu-Glu-Ile-Trp-Ser-Asn-
        61  Gln-Asp-Leu-Ile-Thr-Val-Thr-Ser-Val-Ser-
        71  His-Asp-Thr-Leu-Ala-Ser-Phe-Gly-Asn-Trp-
        81  Arg-Glu-Thr-Asp-Leu-Leu-Arg-Arg-Gln-Arg-
        91  His-Asp-Asn-Ala-Gln-Leu-Leu-Thr-Ala-Ile-
       101  Asp-Phe-Asp-Gly-Asp-Thr-Val-Gly-Leu-Ala-
       111  Tyr-Val-Gly-Gly-Met-Cys-Gln-Leu-Lys-His-
       121  Ser-Thr-Gly-Val-Ile-Gln-Asp-His-Ser-Ala-
       131  Ile-Asn-Leu-Leu-Val-Ala-Leu-Thr-Met-Ala-
       141  His-Glu-Leu-Gly-His-Asn-Leu-Gly-Met-Asn-
       151  His-Asp-Gly-Asn-Gln-Cys-His-Cys-Gly-Ala-
       161  Asn-Ser-Cys-Val-Met-Ala-Ala-Met-Leu-Ser-
       171  Asp-Gln-Pro-Ser-Lys-Leu-Phe-Ser-Asp-Cys-
       181  Ser-Lys-Lys-Asp-Tyr-Gln-Thr-Phe-Leu-Thr-
       191  Val-Asn-Asn-Pro-Gln-Cys-Ile-Leu-Asn-Lys-
       201  Pro
```

Amgen Contract #200200784                    41

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT C

AMGEN PATENT RIGHTS AS OF THE EFFECTIVE DATE

## PATENTS

| COUNTRY | TITLE | PATENT # |
|---|---|---|
| ALBANIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| AUSTRIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| BELGIUM | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| BULGARIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| CYPRUS | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| DENMARK | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| EURASIAN PATENT OFFICE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 4627 |
| EUROPEAN PATENT OFFICE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| FINLAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| FRANCE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| GERMANY | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| GREAT BRITAIN | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| GREECE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| IRELAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| ITALY | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| LATVIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| LITHUANIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| LUXEMBOURG | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| MACEDONIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| MONACO | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| NETHERLANDS | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| NEW ZEALAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 518007 |
| PORTUGAL | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| ROMANIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| SLOVENIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| SOUTH AFRICA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 02002/2400 |
| SPAIN | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| SWEDEN | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| SWITZERLAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 1220685 |
| UNITED STATES | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 6440414 |

Amgen Contract #200200784

Source: NUVELO INC, 10-K, March 16, 2005

## PATENTS

| COUNTRY | TITLE | PATENT # |
|---|---|---|
| UNITED STATES | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 6455269 |
| UNITED STATES | DNA MOLECULES ENCODING FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 6617145 |
| AUSTRALIA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 767827 |
| NEW ZEALAND | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 517951 |
| SINGAPORE | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 87654 |
| SOUTH AFRICA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 02002/2206 |
| UNITED STATES | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 6261820 |
| UNITED STATES | SIZE ENHANCED FIBRINOLYTIC ENZYMES; LIMITATIONS OF PLASMA INACTIVATION | 6214594 |

## PATENT APPLICATIONS

| COUNTRY | TITLE | PATENT APPLICATIONS# |
|---|---|---|
| UNITED STATES | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 10/226408 |
| PCT | METHOD FOR TREATMENT OF INDWELLING CATHETER OCCULSION USING FIBRINOLYTIC | US03/19702 |
| UNITED STATES | METHOD FOR TREATMENT OF INDWELLING CATHETER OCCULSION USING FIBRINOLYTIC | 10/177916 |
| AUSTRALIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 77430/00 |
| BRAZIL | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | PI00014420-7 |
| CANADA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 2385966 |
| CHINA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 816379 |
| CZECH REPUBLIC | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 02002-1033 |
| HONG KONG | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 3100282 4 |
| HUNGARY | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 00P0202554 |
| ISRAEL | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 148842 |
| JAPAN | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 2001527816 |
| MEXICO | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 3197 |
| NORWAY | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 20021500 |
| PCT | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | US00/27022 |
| POLAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | P-355016 |
| SERBIA AND MONTENEGRO | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | P-233/02 |
| SINGAPORE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 2002017465 |
| SLOVAKIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 42402002 |

Amgen Contract #200200784

43

Source: NUVELO INC, 10-K, March 16, 2005

## PATENT APPLICATIONS

| COUNTRY | TITLE | PATENT APPLICATIONS# |
|---|---|---|
| SOUTH KOREA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 7004128/02 |
| AUSTRALIA | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 2004201694 |
| EUROPEAN PATENT OFFICE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 4007657 2 |
| NEW ZEALAND | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 530959 |
| SINGAPORE | PHARMACEUTICAL COMPOSITIONS OF FIBRINOLYTIC AGENT | 2004005427 |
| AUSTRALIA | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 0024346/01 |
| CANADA | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 2394613 |
| EUROPEAN PATENT OFFICE | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 988099 8 |
| HONG KONG | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 3101990.5 |
| JAPAN | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 2001544901 |
| MEXICO | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | 2002006024 |
| PCT | METHOD FOR LOCALIZED ADMINISTRATION OF FIBRINOLYTIC METALLOPROTEINASES | US00/34143 |
| UNITED STATES | METHODS FOR THE TREATMENT OF THROMBOSIS | 10/441667 |
| BRAZIL | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 00014414-2 |
| BULGARIA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 106578 |
| CANADA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 2386185 |
| CHINA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 816321 9 |
| CZECH REPUBLIC | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 02002-1034 |
| EURASIAN PATENT OFFICE | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 200200410 |
| EUROPEAN PATENT OFFICE | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 965554.9 |
| HONG KONG | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 3100667 9 |
| HUNGARY | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 00P0202650 |
| ISRAEL | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 148787 |
| JAPAN | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 2001528597 |
| MEXICO | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 2002003126 |
| NORWAY | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 20021501 |
| PCT | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | US00/27029 |
| POLAND | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 00P-355017 |
| SERBIA AND MONTENEGRO | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 00P-225/02 |

Amgen Contract #200200784

Source: NUVELO INC, 10-K, March 16, 2005

## PATENT APPLICATIONS

| COUNTRY | TITLE | PATENT APPLICATIONS# |
|---|---|---|
| SLOVAKIA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | PV4232002S |
| SOUTH KOREA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 7004225 |
| AUSTRALIA | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 2004200775 |
| EURASIAN PATENT OFFICE | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 1 |
| MEXICO | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 1 |
| NEW ZEALAND | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 530114 |
| SERBIA AND MONTENEGRO | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 00P-596/04 |
| SINGAPORE | FIBRINOLYTICALLY ACTIVE POLYPEPTIDE | 2473790 |
| PCT | SIZE ENHANCED FIBRINOLYTIC ENZYMES; LIMITATION OF PLASMA INACTIVATION | US99/10108 |

Amgen Contract #200200784                                     45

Source: NUVELO INC, 10-K, March 16, 2005

## EXHIBIT D

## MANUFACTURING TRANSFER OUTLINE

**Summary**

The Tech Transfer of the alfimeprase will occur on two fronts. First, the API process and fill/finish process will be transferred to Nuvelo and then Nuvelo will be responsible for transferring the process to the contract manufacturer, Avecia and the fill/finish contractor of Nuvelo's choice, which shall be either [*] or [*] Amgen will provide documentation currently in its possession necessary for the transfer of manufacturing and to support Nuvelo's BLA filing to the extent relating to Amgen's manufacturing prior of Licensed Product prior to the Effective Date of the License Agreement. Activities associated with transfers of analytical methods will be similar for both API and DP. All transfers would begin as soon as possible after entering into the License Agreement. Amgen would commit [*] [*] FTEs for a one-year period to performing the manufacturing technology transfer, one in Process Development, one in Drag Product Process Development and one in Quality/Analytics. Amgen's manufacturing technology transfer responsibilities will be complete upon Avecia's successful completion of the shakedown runs.

**Transfer of API Process:**

Time [*] LAUNCH ( [*] )

- Meeting with CMO
- Review and finalize process fit
- Review equipment specs and confirm for ordering
- Prepare activity plan (includes lab-scale, large-scale centrifugation runs, validation, etc.)
- Discuss analytical method transfer, and finalize assay validation responsibilities
- Outline timeline and activities for harvest development
- Discuss process characterization plan
- Discuss training plan for CMO operators
- Finalize communication process, points of contact, etc. (between CMO manufacturing operators, CMO tech transfer leads and ATO)
- Delivery of Technology Transfer Package

Time [*] EQUIPMENT and RAW MATERIALS ( [*] )

- Avecia/Nuvelo to order chromatography columns
- Avecia/Nuvelo to order depth filtration filter housings (6 housings)
- Avecia/Nuvelo to order delipid filtration filter housing (1 housings)
- Avecia/Nuvelo to order Stedim jacketed pallet tank for 1000-L bags, and confirm availability of sterile bags (possible custom bag design with 1" tubing – order)

[ * ] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

- Avecia/Nuvelo to order membrane holders for existing CMO ultrafiltration skids
- Avecia/Nuvelo to order trace heating elements for media filtration lines
- Check on availability of all raw materials, and Avecia/Nuvelo to begin ordering

EQUIPMENT MODIFICATION / COMMISSIONING ( [ * ] )

- Avecia/Nuvelo to test and evaluate ammonia gas system in fermentation suite
- Avecia/Nuvelo to modify bioreactor controls for mass-flow (for lab-scale and production scale)
- Discuss and Avecia/Nuvelo to complete various piping modifications to support process
- Discuss and Avecia/Nuvelo to prepare microfiltration skid as possible alternative to centrifugation

VALIDATION PLAN ( [ * ] )

- Avecia/Nuvelo to Create validation Master Plan for conformance lots

PROCESS CHARACTERIATION ( [ * ] )

- Avecia/Nuvelo to Plan for characterization studies

Time [*] LAB SCALE DEMONSTRATION RUNS ( [*] )

- Avecia to create batch records for lab scale runs (both upstream and downstream)
- Avecia to perform a minimum of two runs
- Avecia collect and review lab scale data
- Avecia to develop and test microfiltration strategy for harvest (as alternative to centrifugation)
- Avecia to test and finalize analytical assays for process

PROCESS CHARACTERIATION ( [ * ] )

- Avecia to perform characterization studies

CENTRIFUGE CHARACTERIZATION ( [ * ] )

- Avecia to write, review and finalize batch records
- Avecia to perform two large scale centrifugation runs
- Avecia to collect and review data
- Avecia to decide on final clarification strategy for harvest (microfiltration versus centrifugation)

[ * ] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Time [* ] WRITE MANUFACTURING PROCEDURES ( [ * ] )

- Avecia to create, review and finalize equipment validation procedures
- Avecia to create, review and finalize batch records/manufacturing procedures for "Shake-down" runs
- Avecia to create process validation protocols

Time [* ] EQUIPMENT ( [ * ] )

- Avecia to perform Factory Acceptance Tests (FAT)
- Avecia to receive all equipment
- Avecia to perform IQ/OQ/ PQ equipment validation

Time [* ] "SHAKE-DOWN" (ENGINEERING) RUNS ( [ * ] )

- Avecia to perform two runs at large scale to test equipment, process, analytical assays, etc.
- Avecia to collect and review data (compare to clinical GMP data)
- Avecia to troubleshoot issues, and finalize logistics and process for preparation of conformance lots (including revision of batch records and manufacturing procedures)
- Avecia to finalize acceptance criteria for conformance lots

Time [* ] CONFORMANCE LOTS ( [ * ] )

- Avecia to perform five successful consecutive conformance lots
- Avecia to perform "blank" run following the five conformance lots
- Avecia to collect and review data
- Avecia to complete process validation protocols

[ * ]

**Transfer of Drug Product (Fill/Finish)**

It was anticipated that a contract manufacturer would be selected [ * ]

- Tech Transfer items
    - Amgen to prepare technical package for CM site
    - Nuvelo to ID and procure equipment for CM site (tanks, change parts, raw materials, components, freezers if needed, etc)
    - CM to conduct tank characterization
    - CM/Nuvelo to Review Batch record/MP/SOP draft

[ * ] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended

- Nuvelo to Develop validation strategy with CM site

- Nuvelo to work with CM on validation support of vial wash and sterilization, stopper processing, etc

- CM to support WFI runs

- Nuvelo to support shakedown engineering runs

- CM to complete Lyo robustness studies (full scale at CM)

- CM to complete any scale-down work needed based on site parameters

- Nuvelo to support Validation runs

- Nuvelo to partner with Contract Mfg on site selection for secondary packaging (may be a post-conformance activity)

**Transfer of Analytical Methods:**

- Amgen to transfer documentation to contract manufacturer

- Amgen to review Method Transfer Protocols (MTP) with CM and Nuvelo

- Amgen to provide support for method troubleshooting

- Nuvelo and Amgen to review data from CM on MTP execution

- Nuvelo to review draft of Method Transfer Reports with CM and Amgen

- Amgen to transfer of stability samples to CM

- Amgen to transfer of stability database to CM

Amgen Contract #200200784                                          49

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT 10.50

## LEASE

This LEASE ("Lease") is made as of January 11, 2005 ("Effective Date") between BMR-201 INDUSTRIAL ROAD LLC, a Delaware limited liability company ("Landlord"), and NUVELO, INC., a Delaware corporation ("Tenant"), who agree as follows:

## RECITALS:

This Lease is executed by Landlord and Tenant in contemplation of the following facts and circumstances:

A. Landlord is the owner of certain real property located in the City of San Carlos, State of California, commonly known as 201 Industrial Road, San Carlos, California, and more particularly described on Exhibits A and B which are attached and made a part of this Lease. The land consists of approximately 4.701 acres (together with any easements and appurtenances thereto, the "Land") with two existing, connected buildings containing approximately 171,965 rentable square feet of space. The Land and the buildings are collectively referred to as the "Project."

B. Tenant desires to lease from Landlord, and Landlord is willing to lease to Tenant, that portion of the Project (hereinafter referred to as the "Premises") delineated on the floor plan attached hereto as Exhibit B-1 and made a part hereof, consisting of approximately 55,000 rentable square feet located on the third (3rd) floor and a portion of the fourth (4th) floor of the building known as "Building 2," which Building 2 consists of approximately 92,048 rentable square feet of space, upon the terms and conditions contained herein (Building 2 is hereinafter referred to as the "Building"). Landlord and Tenant agree that for all purposes of this Lease, the total rentable square feet for the third (3rd) floor shall be deemed to be 45,574 square feet (with 43,972 usable square feet) and the total rentable square feet for the fourth (4th) floor shall be deemed to be 46,474 square feet (with 44,840 usable square feet).

C. As consideration for Tenant entering into this Lease, Landlord shall provide Tenant with a tenant improvement allowance to construct certain improvements to the Premises. In addition, Landlord agrees to cooperate with Tenant to establish a shipping and receiving area on the ground floor of the Building and to rework the reception area on the second (2nd) floor of the Building to address Tenant's entry and aesthetic needs, the costs of which shall be paid from the Tenant Improvement Allowance (as defined in Section 4.5) except for those portions described as Landlord's Work in the Work Letter, which shall be at Landlord's sole cost and not as part of the Tenant Improvement Allowance.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. DEFINITIONS. The terms defined in this paragraph, for all purposes of this Lease, shall have the meanings herein specified. Terms defined elsewhere in this Lease shall have the meanings as defined thereunder.

1.1 "Applicable Law" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, permits, licenses, regulations, ordinances,

1

Source: NUVELO INC, 10-K, March 16, 2005

judgments, decrees, directions and injunctions affecting the Premises or any portion thereof or the use or occupancy thereof, whether now or hereafter enacted or in force, whether ordinary or extraordinary, foreseen or unforeseen.

1.2 "Claims" shall mean any and all liabilities (statutory or otherwise), obligations, claims, demands, damages, penalties, causes of action, costs, expenses (including attorneys' fees and expenses), losses and injuries arising from the subject matter of an indemnity granted herein.

1.3 "Common Areas" shall mean all portions of the Project which are for the non-exclusive use of tenants of the Project, including, without limitation, driveways, sidewalks, parking areas, landscaped areas, service corridors, stairways, elevators, public restrooms and building lobbies.

1.4 "Default Rate" shall mean the greater of (i) ten percent (10%) per annum, or (ii) five percent (5%) per annum plus the discount rate of the Federal Reserve Bank situated nearest the Premises; provided, however, in no event shall the Default Rate exceed the maximum interest rate permitted under applicable law.

1.5 "HVAC-Building" shall mean all heating, ventilation and air conditioning equipment and all equipment and fixtures related thereto that services the Building or the Project.

1.6 "Lease Commencement Date" shall be the Effective Date.

1.7 "Lease Term" shall mean the period commencing with the Lease Commencement Date and ending after the term described in Paragraph 4.1.

1.8 "Lender" shall mean any lender whose loan is secured by a deed of trust on any part of the Premises or this leasehold interest.

1.9 "Rent" shall include all Monthly Rent, Additional Rent and all other sums of any and every sort payable hereunder to Landlord by Tenant.

1.10 "Rent Commencement Date" shall be the earliest of (i) the date Tenant's Work (as defined in the Work Letter) is Substantially Completed, (ii) the date Tenant occupies substantially all of the Premises for the purpose of operating its business; (iii) such earlier date as provided in the Work Letter or as the parties hereto may agree; or (iv) September 1, 2005. Notwithstanding the foregoing, if Landlord does not cause temporary power to be provided to the Building with an electricity load equal to approximately 50 amps) on or prior to the February 1, 2005 (the "Outside Date"), then the Rent Commencement Date shall be extended by a day for each day that Landlord fails to complete such Landlord's work after the Outside Date. Landlord and Tenant shall each execute and deliver to the other written acknowledgement of the Rent Commencement Date and the expiration date of the Lease Term when such is established and shall attach the acknowledgement to this Lease as part of Exhibit C; provided, however, failure to execute and deliver such acknowledgement shall not affect Landlord or Tenant's rights or liabilities hereunder. Notwithstanding anything to the contrary in this Section 1.10, the Rent Commencement Date shall be delayed until Tenant shall have received a fully executed

2

Source: NUVELO INC, 10-K, March 16, 2005

non-disturbance and attornment agreement from any mortgagee or deed of trust beneficiary of record as of the date of the mutual execution of this Lease, if applicable.

1.11 "Security Deposit" shall be an amount equal to three (3) times the Initial Monthly Rent.

1.12 "Substantially Complete(d)" and "Substantial Completion" shall mean latest of (i) the date of issuance of a temporary certificate of occupancy subject only to such minor work as would not unreasonably interfere with Tenant's occupancy and use of the Premises for the purposes for which it is to be used, (ii) the date Tenant receive a Certificate of Substantial Completion in the form of the American Institute of Architects document G704 executed by the project architect and the general contractor, or (iii) the satisfaction of all requirements set forth in the Work Letter for project completion.

1.13 "Subtenant" shall mean any tenant, assignee, subtenant, licensee, concessionaire or other occupant of the Premises (other than Tenant), and the term "sublease" shall mean any lease, assignment, sublease, license or other agreement for the use or occupancy of any such space (other than this Lease).

1.14 "Taking" shall mean a taking or voluntary conveyance of title to or any interest in all or any part of the Premises, or the right to use all or any part thereof, pursuant to, as a result of, or in lieu or in anticipation of, the exercise of the right of condemnation, expropriation or eminent domain; and upon such a Taking the Premises, or such part thereof, shall be deemed to have been "taken."

1.15 "Taxes" shall mean all government impositions including, without limitation, property tax costs consisting of real and personal property taxes and assessments (including amounts due under any improvement bond upon the Building or the Project, including the parcel or parcels of real property upon which the Building and areas serving the Building are located or assessments levied in lieu thereof) imposed by any governmental authority or agency on the Project or improvements thereon, any tax on or measured by gross rentals received from the rental of space in the Project, or tax based on the square footage of the Premises, the Building or the Project as well as any parking charges, utilities surcharges, or any other costs levied, assessed or imposed by, or at the direction of, or resulting from statutes or regulations, or interpretations thereof, promulgated by any federal, state, regional, municipal or local government authority in connection with the use or occupancy of the Project or the parking facilities serving the Project, any tax on this transaction or any document to which Tenant is a party creating or transferring an interest in the Premises, any fee for a business license to operate an office building, and any expenses, including the reasonable cost of attorneys or experts, reasonably incurred by Landlord in seeking reduction by the taxing authority of the applicable taxes, less tax refunds obtained as a result of an application for review thereof; provided, however, that "Taxes" shall in no event include (i) any franchise or income tax or any tax based on net rentals received from the rental of space in the Project or taxes which are the personal obligation of Tenant or of another tenant of the Project, (ii) any Taxes that are fairly allocate to any period of time prior to the Lease Commencement Date or following the expiration or sooner termination of this Lease (except for Tenant's personal property taxes), and (iii) any Taxes that

3

are fairly allocable to any other tenant's personal property or payable as a result of a default by Landlord under this Lease or a default of any other tenant of the Project.

1.16 "Work Letter" shall mean the Work Letter attached hereto as Exhibit D.

2  FUNDAMENTAL LEASE PROVISIONS.

| | |
|---|---|
| Initial Lease Term: | Seven (7) years |
| Rentable Area: | 55,000 square feet, subject to adjustment pursuant to Paragraph 4.7 |
| Rentable Area of Project: | 171,965 square feet |
| Initial Annual Rent: | $28.20 per rentable square foot, subject to annual adjustments pursuant to Paragraph 5 |
| Initial Monthly Rent: | $2.35 per rentable square foot, subject to annual adjustments pursuant to Paragraph 5 |
| Security Deposit: | Three (3) times the Initial Monthly Rent |
| Target Rent Commencement Date: | |
| Tenant's Pro Rata Share of Operating Expenses: | 62% with respect to Operating Expenses for the Building, subject to adjustment pursuant to Paragraph 4.7 |
| | 32% with respect to Operating Expenses for the Project, subject to adjustment pursuant to Paragraph 4.7 |
| Address for Notices: | |
| To Landlord: | c/o BioMed Realty, L.P.<br>17140 Bernardo Center Drive, Suite 222<br>San Diego, California 92128<br>Attention: Gary A. Kreitzer |

4

Source: NUVELO INC, 10-K, March 16, 2005

| | |
|---|---|
| To Tenant: | Nuvelo, Inc.<br>201 Industrial Blvd. Bldg. #2<br>San Carlos, California 94070<br>Attention: Gary Titus |
| With a copy to: | Hopkins & Carley<br>P.O. Box 1469<br>San Jose, California 95109-1469<br>Attention: Garth E. Pickett |
| Exhibits: | A (Legal Description)<br>B (Site Plan)<br>    B-1 (Premises)<br>    B-2 (Roof Rights)<br>C (Acknowledgement of Rent Commencement Date)<br>D (Work Letter)<br>E (Rules and Regulations)<br>F (Estoppel Certificate)<br>G (Expansion Space) |

In the event of any conflict between any Fundamental Lease Provision and the balance of this Lease, the latter shall control.

3.  AGREEMENT TO LEASE   Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, under the terms and conditions of this Lease.

4.  TERM AND POSSESSION

    4.1 Lease Term   The initial Lease Term shall begin as of the Lease Commencement Date and shall continue until seven (7) years after the Rent Commencement Date unless sooner terminated or renewed as provided in this Lease, provided that, if the Rent Commencement Date is other than the first of a calendar month, the initial Lease Term shall continue until seven (7) years after the first day of the calendar month following the month in which the Rent Commencement Date occurs. Provided that no Default has occurred and is continuing at the time Tenant elects to extend the Lease Term, Tenant, at its sole option, may extend the Lease Term for two (2) additional periods of five (5) years each (individually, an "Extension Period"), subject to all the provisions of this Lease, except, however the Rent (as defined in Paragraph 5 below) shall be adjusted at the commencement of each Extension Period to an amount equal to ninety-five percent (95%) of the then current fair market rental rate as agreed to by Landlord and Tenant, but in no event shall the Rent be less than the Rent payable on the date immediately preceding the commencement of such Extension Period. "Fair market rental rate" of the Premises shall be determined with reference to the then prevailing market rental rates for properties in the San Francisco mid-peninsula area with improvements and common area improvements comparable to those then existing in the Premises and paid for by Landlord. If after thirty (30) days following delivery of the written extension notice described in

<div align="center">5</div>

Source: NUVELO INC, 10-K, March 16, 2005

Paragraph 4.2 below, Landlord and Tenant are unable to agree upon the fair market rental value of the Premises, Tenant shall obtain at its expense and deliver to Landlord an independent appraisal of the fair market rental value of the Premises as of the commencement of the Extension Period. Following its receipt of Tenant's appraisal, Landlord may elect to obtain at its expense and deliver to Tenant a second independent appraisal of the fair market rental value of the Premises as of the commencement of the Extension Period. If Landlord elects not to obtain a second appraisal, or if Landlord's appraisal is no more than five percent (5%) greater than Tenant's appraisal, Tenant's appraisal shall be conclusive. If Landlord's appraisal is more than five percent (5%) greater than Tenant's appraisal, the two appraisers shall appoint a third appraiser to appraise the fair market rental value of the Premises as of the commencement of the Extension Period, and the fair market rental value of the Premises shall be the arithmetical average of the two appraisals closest in their determination of fair market rental value. Landlord and Tenant shall bear equally the expense of the third appraiser. The Monthly Rent as so determined for each Extension Period shall be increased annually by $0.07 per rentable square foot above its then current amount as provided in Paragraph 5.1.4 below. All references in this Lease to "Lease Term" shall be considered to include both the initial term of this Lease and any properly executed Extension Period, and all references to termination or to the end of the Lease Term shall be considered to mean the termination or end of the initial term of this Lease or any exercised Extension Period, as the case may be.

4.2 <u>Procedure to Extend Term</u>. Tenant may exercise its option with respect to each Extension Period by complying with the following procedure: At least ten (10) months before the last day of the then applicable Lease Term (the "<u>Exercise Period</u>"), Tenant shall deliver written notice to Landlord setting forth Tenant's irrevocable election to exercise the option to extend. Extension Periods are personal to Tenant and not assignable separate and apart from this Lease, except for an assignment pursuant to a merger or consolidation, or an assignment to a parent, subsidiary or affiliate of Tenant.

4.3 <u>Tenant's Default</u>. Notwithstanding the foregoing, if a Default has occurred and is continuing at the time Tenant elects to extend the Lease Term (unless Tenant is diligently pursuing the cure of such Default), Tenant shall have no right to extend the Lease Term as herein provided, and Landlord shall be free to lease the Premises to any other party or parties. Furthermore, nothing in this Paragraph 4.3 shall increase or extend the Exercise Period.

4.4 <u>Possession</u>. Landlord shall endeavor to tender possession of the Premises to Tenant on or before January 5, 2005. Tenant may occupy any and all portions of the Premises, for the purpose of constructing Tenant's tenant improvements therein and installing its furniture, fixtures and equipment, prior to the Rent Commencement Date, with no obligation to pay Rent until the Rent Commencement Date. Landlord shall have the right to perform Landlord's Work after tendering possession, provided it does not materially interfere with Tenant's Work. Delivery of possession is conditioned upon receipt by Tenant of a fully executed non-disturbance and attornment agreement from any mortgagee or deed of trust beneficiary of record as of the date of the mutual execution of this Lease, if applicable. In the event Landlord does not tender possession of the Premises to Tenant on or prior to the Outside Date, the Rent Commencement Date shall be extended by a day for each day that Landlord fails to tender possession of the Premises to Tenant after the Outside Date.

6

Source: NUVELO INC, 10-K, March 16, 2005

4.5 Tenant Improvements. Tenant shall cause to be constructed the tenant improvements in the Building (the "Tenant Improvements") pursuant to the Work Letter at a cost to Landlord not to exceed **Seven Million Seven Hundred Thousand Dollars ($7,700,000.00)** (based upon One Hundred Forty Dollars ($140.00) per rentable square foot and subject to adjustment in Rentable Area as provided in Section 4.7 herein) (the "Tenant Improvement Allowance") which shall include the cost of construction, cost of space planning, architect, engineering and other related services, building permits, signage, consulting fees, equipment (including personal property and trade fixtures, which shall not exceed fifteen percent (15%) of the Tenant Improvement Allowance), relocation costs, furniture, cabling and other planning and inspection fees. Any costs incurred in performing the Tenant Improvements described in the Work Letter in excess of the Tenant Improvement Allowance shall be borne solely by Tenant, provided, however, at Tenant's option, Landlord shall fund such excess in an amount not to exceed Twenty-Five Dollars ($25.00) per rentable square foot (the "Additional Allowance," and together with the Tenant Improvement Allowance, the "Combined Allowance"). The Additional Allowance shall be repaid by Tenant monthly as Additional Rent beginning with Tenant's first Rent payment, in a monthly amount equal to the Additional Allowance fully amortized at an interest rate of twelve percent (12%) per annum over twelve (12) years. Tenant may prepay the remaining Additional Allowance at any time without penalty, and shall repay the remaining Additional Allowance in full upon expiration of the Lease Term. Any unused portion of the Tenant Improvement Allowance shall be credited against Monthly Rent payments as such Monthly Rent payments become due. In addition to the Tenant Improvement Allowance and Additional Allowance, Landlord will provide Tenant with an additional allowance of up to 15/100 Dollars ($0.15) per rentable square foot for purposes of Dowler-Gruman Architects preparing a preliminary space planning "test-fit," payable upon Landlord's receipt of such test-fit prior to construction of any tenant improvements.

4.6 Termination Option. Tenant shall have an option to terminate this Lease (the "Termination Option") for a period commencing on the Lease Commencement Date and ending on the fourth (4th) anniversary of the Rent Commencement Date (the "TerminationOption Period"). Tenant shall be entitled to exercise the Termination Option by giving notice to Landlord prior to the expiration of the Termination Option Period. If Tenant exercises the Termination Option, (a) the termination of the Lease shall be effective as of the fifth (5th) anniversary of the Rent Commencement Date (the "Termination Date"), (b) Tenant shall continue to meet all of its obligations under the Lease, including the payment of Rent, through the Termination Date and (c) on the Termination Date, Tenant will pay Landlord the remaining unamortized portion of the Tenant Improvement Allowance, the remaining Additional Allowance, if any, and leasing commissions (the "Termination Penalty"), based on an eighty-four (84) month amortization period for the Premises and the actual lease term of any Expansion Space (calculated using a flat average, with no interest). The Termination Penalty shall be pro rated based on the actual rentable square footage leased by Tenant under this Lease on the Termination Date. Tenant's right to exercise the Termination Option shall be subject to the conditions that (i) no voluntary or involuntary petition in bankruptcy naming Tenant as debtor has been filed, and no general assignment for the benefit of creditors has been made by Tenant prior to the termination of the Lease and (ii) Tenant shall not be in Default under the Lease beyond any applicable cure period provided in the Lease at the time Tenant exercises the Termination Option and through the Termination Date, and if Tenant is in Default beyond any

7

applicable cure period during such period, then any effort to exercise the Termination Option, whether occurring before or after any such Default by Tenant, shall be null and void. Notwithstanding the foregoing to the contrary, in the event Tenant is in Default but is diligently pursuing the cure of such default, Tenant may exercise the Termination Option provided that such Default is cured by Tenant within a reasonable time thereafter but in no event later than the Termination Date.

4.7 Rentable Square Footage. The term "Rentable Area" as set forth in Section 2 and as referenced within the Work Letter attached hereto as Exhibit "D" and as may otherwise be referenced within this Lease shall be adjusted after being calculated in accordance with the 1996 Standard Method for Measuring Floor Area in Office Buildings as adopted by the Building Owners and Managers Association. The calculation shall be based upon the Approved Tenant Plans, as defined in Section 3.2 of the Work Letter, and shall be made by Dowler-Gruman Architects as Tenant's architect. In addition to the Premises, the Rentable Area shall include any interior shipping and receiving area and storage area utilized by Tenant. After finalization of the calculation of the Rentable Area, Section 2 of the Lease shall be adjusted as to Rentable Area and Tenants Pro Rata Share of Operating Expenses, if necessary.

5. RENT, SECURITY DEPOSIT.

5.1 Monthly Rent.

5.1.1 Tenant shall pay the Rent to Landlord during the Lease Term, commencing as of the Rent Commencement Date, without deduction, setoff, prior notice or demand. Tenant shall pay the Rent in advance on the first day of each calendar month during the Lease Term. Rent for any partial months will be prorated based upon the number of days in the month, and will be paid in advance on the first day of each month.

5.1.2 Upon the Rent Commencement Date, Tenant shall pay to Landlord the Rent due and payable for the first full calendar month of the Lease Term. If the Rent Commencement Date is not on the first day of a calendar month, Tenant shall pay to Landlord the prorated Rent for the first partial month of the Lease Term.

5.1.3 All Rent payable hereunder shall be paid to Landlord in lawful money of the United States of America which shall be legal tender at the time of payment at Landlord's office or to such other person or at such other place as Landlord from time to time may designate in writing.

5.1.4 The Initial Annual Rent shall be the amount set forth in Paragraph 2. The Annual Rent will be payable in twelve (12) equal installments ("Monthly Rent"). The Landlord and Tenant shall attach an acknowledgement of the Initial Annual Rent to this Lease as part of Exhibit C; provided, however, failure to execute and deliver such acknowledgement shall not affect Landlord's or Tenant's rights or liabilities hereunder. Effective each year during the Lease Term (including any Extension Period) on the anniversary of the first day of the calendar

8

Source: NUVELO INC, 10-K, March 16, 2005

month following the month in which the Rent Commencement Date occurs, Monthly Rent shall be increased by $0.07 per rentable square foot above its then current amount.

5.2 Additional Rent. Commencing upon the Rent Commencement Date Tenant shall pay to Landlord (unless otherwise expressly required hereunder to pay directly to a third party), as additional rent ("Additional Rent"), all sums of money of any and every sort required to be paid by Tenant under this Lease, whether or not the same are designated as Additional Rent. If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible as Additional Rent with the next installment of Monthly Rent thereafter falling due, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord.

5.3 Late Payment. If Tenant shall fail to pay, when the same is due and payable (after giving effect to any applicable notice and cure period), any Rent, such unpaid amounts shall bear interest at the Default Rate from the date which is two (2) business days after written notice from Landlord that such payment is due. Tenant further acknowledges that late payment of Monthly Rent will cause Landlord to incur certain costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to determine with certainty. For this reason, in addition to interest, if Tenant shall fail to pay (which for purposes of this paragraph, "pay" shall mean actual receipt of the payment by Landlord) any installment of Monthly Rent by the fifth (5th) day after receipt of written notice from Landlord of such late payment, a late charge equal to three and one-half percent (3.5%) of the overdue installment of Monthly Rent automatically shall be due without further notice, and shall be in addition to all other sums due. The Parties agree that this additional late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.

5.4 No Right to Setoff. Tenant shall pay to Landlord, throughout the Lease Term, the Rent and other sums payable hereunder, free of any charges, assessments, deductions or reductions of any kind, and without abatement, deduction or setoff except as otherwise expressly provided for herein.

5.5 Payment of Security Deposit. Landlord hereby acknowledges receipt of Tenant's Security Deposit unless this Lease is executed on or before January 3, 2005, in which event the Security Deposit shall be delivered to Landlord on January 5, 2005. This amount shall be deposited by Landlord into a non-segregated, interest-bearing bank account (with interest accruing for the benefit of Landlord) in a federally insured bank or savings institution, and shall be held for the faithful performance of all of the provisions and conditions of this Lease to be kept and performed by Tenant hereunder and under the Work Letter. Landlord's obligation with respect to the Security Deposit is that of a debtor and not of a trustee.

5.6 Use of Security Deposit. If Tenant defaults with respect to the payment of Rent or any other covenant contained herein or in the Work Letter, Landlord may use or retain all or any part of the Security Deposit for the payment of any Monthly Rent, Additional Rent or any other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's Default. Landlord also may apply the Security

9

Source: NUVELO INC, 10-K, March 16, 2005

Deposit toward costs incurred to repair damages to the Premises, other than ordinary wear and tear, and damage from casualty or condemnation, or to reasonably clean the Premises upon termination of this Lease. If any portion of the Security Deposit is so applied or used, Tenant shall, within five (5) business days after written notice thereof, deposit an additional amount with Landlord sufficient to restore the Security Deposit to the amount set forth in Paragraph 1.11, and Tenant's failure to do so shall constitute a material breach of this Lease. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by Tenant, the Security Deposit (including interest thereon), or the balance thereof, shall be returned to Tenant (or, at Landlord's option to the last assignee of Tenant's interest hereunder) within thirty (30) days after the expiration or earlier termination of the Lease, subject to the provisions of Paragraph 27. Landlord and/or the Lender may use, apply or retain all or any part of the Security Deposit for the payment of Tenant Improvement costs incurred by Landlord in excess of the Combined Allowance. If any portion of the Security Deposit is so applied, upon the Rent Commencement Date, Tenant shall deposit cash or a replacement letter of credit with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall constitute a material breach of this Lease. In the event of bankruptcy or other debtor-creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of Rent and other charges due Landlord for all periods prior to the filing of such proceedings.

5.7 Pledge of Security Deposit. Subject to Tenant's right, title and interest in the Security Deposit, the Security Deposit may be pledged by Landlord as additional collateral to the Lender.

5.8 Letter of Credit. The Security Deposit may be delivered either in cash or in the form of letter of credit reasonably acceptable to Landlord.

5.8.1 In lieu of depositing cash as the Security Deposit, Tenant shall have the right to deliver to Landlord an unconditional, irrevocable standby letter of credit in the amount of the cash Security Deposit otherwise required hereunder, which letter of credit (a) be in a form reasonably acceptable to Landlord, (b) be issued by a financial institution selected by Tenant and reasonably acceptable to Landlord, (c) be for the benefit of Landlord, but shall be assignable by Landlord to any subsequent purchaser or encumbrancer of the Building or the Project, (d) be automatically renewable from year to year throughout the Lease Term, (e) be payable by draft sight in a location reasonably acceptable to Landlord upon presentation of a certification signed by an officer of Landlord which states that a default under the Lease has occurred and has not been cured within any applicable cure period, and (f) be payable in the event such letter of credit is not renewed on or before the date which is thirty (30) days prior to its expiration. Any amounts of cash drawn on a letter of credit Security Deposit will thereafter be treated as a cash Security Deposit hereunder.

5.8.2 Tenant shall have the right at any time during the Lease Term upon thirty (30) days prior written notice to Landlord (i) to replace a cash Security Deposit with a letter of credit which complies with all the terms of Paragraph 5.8.1, or (ii) to replace a letter of credit Security Deposit with an applicable amount of cash

10

Source: NUVELO INC, 10-K, March 16, 2005

6  PERMITTED USE

6.1 Permitted Use. Tenant shall use the Premises for the purposes of laboratory research (including animal testing), administration, pharmaceutical and related health care research uses (and only for such purposes) (the "Permitted Use"). During the Lease Term, the Premises and every part thereof shall be kept by the Tenant in a clean and wholesome condition, free of any noises or activities, which constitute any nuisance. Tenant shall comply with all Applicable Law in all respects and at all times during the Lease Term.

6.2 No Violations. Tenant shall not use or occupy the Premises in violation of any federal, state and local laws and regulations, zoning ordinances, or the certificate of occupancy issued for the Building or the Project, and shall, upon five (5) days written notice from Landlord, discontinue any use of the Premises upon demand of any governmental authority having jurisdiction which declares or claims a violation of law, regulation or zoning ordinance or of such certificate of occupancy, or which in the reasonable opinion of Landlord violates law, regulation or zoning ordinance or the certificate of occupancy. Tenant shall comply with any direction of any governmental authority having jurisdiction which shall, by reason of the nature of Tenant's use or occupancy of the Premises, impose any duty upon Tenant or Landlord with respect to the Premises or with respect to the use or occupation thereof. Tenant shall not do or permit anything to be done in or about the Premises, except as is reasonably consistent with the Permitted Use, which shall in any way obstruct or interfere with the rights of other tenants or occupants of the Project, or injure or annoy them, or use or allow the Premises to be used for unlawful purpose, nor shall Tenant knowingly cause, maintain or permit any nuisance or waste in, on or about the Premises, the Building or the Project.

6.3 Additional Locks. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant nor shall any changes be made in existing locks or the mechanism thereof without the prior written consent of Landlord, provided, however Tenant shall be entitled to change existing office, storage and other ancillary door locks or the mechanism thereof without the prior written consent of Landlord so long as a copy of the new key is promptly provided to Landlord. Tenant must, upon termination of this Lease, return to Landlord all keys to offices and restrooms either furnished to or otherwise procured by Tenant. In the event any key so furnished is lost, Tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

6.4 Exterior Appearance. No awnings or other projection shall be attached to any outside wall of the building other than as expressly permitted under this Lease. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises other than Landlord's standard window coverings. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the express written consent of Landlord, nor shall any bottles, parcels, or other articles be placed on the windowsills. No equipment, furniture or other items of personal property shall be placed on any exterior balcony without the express written consent of Landlord.

11

Source: NUVELO INC, 10-K, March 16, 2005

6.5 <u>Signs</u>. No sign, advertisement, or notice shall be exhibited, painted or affixed by Tenant on any part of the Premises, the Building or the Project without the prior written consent of Landlord; <u>provided, however</u>, subject to the rights of Nektar Therapeutics to have a proportionate share of external and monument signage, in proportion to the ratio between the useable square footage in its premises and the total useable square footage on the Project, and to continue to display its corporate name and logo on the exterior of the buildings and the monument in the size and manner it is displayed as of the Effective Date, and in compliance with Applicable Laws relating to such signage, (a) Tenant shall have the right to ground monument signage at the entrance to the Project, and (b) during such time as the Premises encompasses the entire third (3rd) floor of the Building, Tenant (at its sole cost and expense) shall have the right to external, building-top signage on the southeastern side of the Building facing Highway 101, displaying Tenant's corporate logo, such external signage to be the maximum available signage permitted by Applicable Laws, but not greater than the external signage of Nektar Therapeutics as it is displayed as of the Effective Date subject to the foregoing. Landlord agrees to cooperate with Tenant, without any cost to itself, if Tenant chooses to seek a signage variance from the appropriate governmental agency in order to increase the size of its exterior signage. Common Area, Building ground monument and directory signs on doors and the directory tablet shall be inscribed, painted or affixed for Tenant by Landlord at the expense of Landlord (except ground monument signage, which shall be at the expense of Tenant), and shall be of a size, color and type typical of the Project. The directory tablet shall be provided exclusively for the display of the name and location of tenants only. In addition, Tenant may, at Tenant's sole cost and with Landlord's consent (which consent shall not be unreasonably withheld, delayed or conditioned), install signage in the reception area of the Building on the south wall abutting Tenant's Premises.

6.6 <u>Structural Integrity</u>. Landlord agrees and acknowledges that the Building load is one hundred (100) pounds per square foot for dead load and one hundred fifty (150) pounds per square foot for live load. Tenant shall cause any office equipment or machinery to be installed in the Premises so as to reasonably prevent sounds or vibrations therefrom from extending outside the Building. Further, no equipment or machinery weighing five hundred (500) pounds, or greater, shall be placed in the Premises without advance notice to and approval by Landlord. Such equipment or machinery, if approved by Landlord, shall be placed only at a location designed to carry the weight of such equipment.

6.7 <u>ADA</u>. Tenant shall be responsible for all liabilities, costs and expenses arising out of or in connection with the compliance of Tenant's particular use of the Premises with the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. (together with regulations promulgated pursuant thereto, "<u>ADA</u>") and Tenant shall indemnify, defend and hold Landlord harmless from and against any loss, cost, liability or expense (including reasonable attorneys' fees and disbursements) arising out of any failure of the Premises to comply with the ADA, <u>provided</u> that in no event shall Tenant be responsible for any alterations to the Premises that are part of Landlord's Work or any alterations to the Common Areas that are performed by Landlord. Notwithstanding the foregoing, Landlord represents and warrants to Tenant that, if based upon current interpretations of ADA as of the Commencement Date, the Premises (exclusive of furniture and equipment) fail, as of the Lease Commencement Date, to comply with ADA, Landlord will be solely responsible, at its cost and not as an Operating Expense, to correct such violation of ADA.

12

Source: NUVELO INC, 10-K, March 16, 2005

6.8 <u>Roof Rights</u>. During the Lease Term, Tenant shall have access to the roof of the Building for the purpose of installing and operating satellite or wireless communication equipment, which installation and operation shall be subject to Landlord's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned). Any such equipment shall be installed on the roof of the Building, in the permitted locations shown on <u>Exhibit B-2</u> hereto, by means of a roof mount so that (1) no part of the equipment or mount can be seen from Industrial Road or any Common Area; (2) no penetration of the roof of the Building results from the installation of the equipment and (3) no alteration or damage is caused to the roof of the Building as a result of such installation. Tenant shall bear all costs related to any such equipment, including, but not limited to, installation, maintenance, repairs, operation, permitting and other governmental approvals, and any roofing damage, leaks, loss of warranty coverage by Landlord or other roofing issues, and returning the roof and installation site to its original condition at the end of the Lease Term (if so requested by Landlord). Notwithstanding the foregoing, Tenant shall not be required to restore any roof equipment or installation that are part of the initial Tenant Improvements. The presence or operation of such equipment shall not interfere in any way with or violate the rights of any other person or entity, including the rights of existing tenants and rooftop users and uses. Tenant shall indemnify Landlord and its officers, directors, employees, agents and affiliates from any loss, damage or claim (including reasonable attorneys' fees) made by any third party due to or arising out of Tenant's possession or operation of such equipment. Only licensed contractors with valid liability and worker's compensation insurance in place shall perform any work related to any such equipment, and Landlord, any ground lessor and any Lender (or its successors and assigns) shall be named as additional insureds.

7. <u>TAXES; OPERATING EXPENSES</u>.

7.1 <u>Payment of Real Property Taxes</u>. Commencing with the Rent Commencement Date and continuing for each calendar year, or tax year at Landlord's option (such "tax year" being a period of twelve (12) consecutive calendar months for which the applicable taxing authority levies or assesses Taxes), for the balance of the Lease Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of all Taxes, pursuant to Paragraph 7.5 below. Such sum for any partial year of the Lease Term shall be prorated on the basis of the number of days of such partial year. At Tenant's request, Landlord shall provide Tenant with a copy of the applicable Tax bill or Tax statement from the taxing authority. In addition to any other amounts due from Tenant to Landlord, if Tenant fails to pay the Taxes to Landlord as herein required, Tenant shall pay to Landlord the amount of any interest, penalties or late charges caused by Tenant's late payment.

7.1.1 If the Premises are separately assessed, Tenant shall have the right, by appropriate proceedings, to protest or contest in good faith any assessment or reassessment of Taxes, any special assessment, or the validity of any Taxes or of any change in assessment or tax rate; <u>provided, however</u>, that prior to any such challenge Tenant must either (a) pay the taxes alleged to be due in their entirety and seek a refund from the appropriate authority, or (b) post bond in an amount sufficient to insure full payment of the Taxes. In any event, upon a final determination with respect to such contest or protest, Tenant shall promptly pay all sums found to be due with respect thereto. In any such protest or contest, Tenant may act in its own name.

13

Source: NUVELO INC, 10-K, March 16, 2005

and at the request of Tenant, Landlord shall cooperate with Tenant in any way Tenant may reasonably require in connection with such contest or protest, including signing such documents as Tenant reasonably shall request, provided that such cooperation shall be at no expense to Landlord and shall not require Landlord to attend any appeal or other hearing. Any such contest or protest shall be at Tenant's sole expense, and if any penalties, interest or late charges become payable with respect to the Taxes as a result of such contest or protest, Tenant shall pay the same.

    7.1.2 If Tenant obtains a refund as the result of Tenant's protest or contest and subject to Tenant's obligation to pay Landlord's costs (if any) associated therewith, Tenant shall be entitled to such refund to the extent it relates to the Premises during the Lease Term.

    7.2 Personal Property Taxes. Tenant shall be solely responsible for the payment of any and all taxes levied upon personal property and trade fixtures located upon the Premises and shall pay the same at least ten (10) days prior to delinquency. If any such taxes on Tenant's personal property or trade fixtures are levied against Landlord or Landlord's property or, if the assessed valuation of the Building or the Project is increased by the inclusion therein of a value attributable to Tenant's personal property or trade fixtures, and if Landlord after written notice to Tenant pays the taxes based upon such increase in the assessed value, then Tenant shall upon demand repay to Landlord the taxes so levied against Landlord.

    7.3 Other Taxes. If at any time during the Lease Term under the laws of the United States Government, state, county or city, or any political subdivision thereof in which the Premises are situated, a tax or excise on rent or any other tax, however described, is levied or assessed by any such political body against Landlord on account of rentals payable to Landlord hereunder, such tax or excise shall be considered "Taxes" for the purposes of this Article 7, excluding, however, from such tax or excise any amount assessed against Landlord as state or federal income tax.

    7.4 Intentionally Omitted.

    7.5 Payment of Operating Expenses

        7.5.1 As used herein, the term "Operating Expenses" shall include:

            (a) Taxes as defined in Paragraph 1.15 above.

            (b) All other reasonable costs paid or incurred by Landlord in connection with the operation and maintenance of the Building and the Project including, by way of examples and not as a limitation upon the generality of the foregoing, costs of repairs and replacements to improvements (other than capital improvements described in Paragraph 7.5.1(d)) within the Project as appropriate to maintain the Project as required hereunder; costs of utilities furnished to any Common Areas; sewer fees; cable TV, when applicable; trash collection; cleaning, including windows; costs of maintaining HVAC-Building; maintenance of landscape and grounds, drives and parking areas; security services and devices; building supplies; maintenance and replacement to equipment utilized for operation and maintenance of the Project

14

Source: NUVELO INC, 10-K, March 16, 2005

that are not included in the capital improvements described in Paragraph 7.5.1(d); license, permit and inspection fees, sales, use and excise taxes on goods and services purchased by Landlord in connection with the operation, maintenance or repair of the Project and Building systems and equipment; the cost of furniture, draperies, carpeting, landscaping and other customary and ordinary items of personal property provided by Landlord for use in the Common Areas; capital expenditures costing Fifty Thousand Dollars ($50,000) or less, provided that the cost of all other capital expenditures shall be amortized over the useful life of any such capital expenditure (calculated in accordance with GAAP) and included in Operating Expenses, and further provided that Tenant shall not be responsible for any amortized capital expenditures attributed to any period after the Lease Term; costs of complying with any applicable laws, hazard waste remediation, rules or regulations; insurance premiums including premiums for public liability, property casualty, earthquake and environmental coverages; portions of insured losses paid by Landlord as part of deductible portion of loss by reason of insurance policy terms not to exceed $100,000 per occurrence, with such amount to be amortized over the remainder of the Lease Term (provided, Tenant shall not be required to pay any such deductibles for events occurring in the last year of the Lease Term); service contracts; costs of services of independent contractors retained to do work of nature before referenced; and costs of compensation not to exceed market rate (including employment taxes and fringe benefits) of all persons who perform regular and recurring duties connected with the day-to-day operation and maintenance of the Project, its equipment, the adjacent walks, landscaped areas, drives and parking areas, including without limitation, janitors, floor waxers, window-washers, watchmen, gardeners, sweepers and handymen; and costs of management services, which costs of management services shall not exceed two percent (2%) of the Monthly Rent due from Tenant, whether or not Landlord incurs fees payable to any third party to provide such services and without regard to the actual costs incurred by Landlord for such services.

(c) Notwithstanding the foregoing, Operating Expenses shall not include any leasing commissions, including any legal fees, advertising costs, or other related expenses incurred by Landlord in connection with the leasing of space to individual tenants of the Project; expenses which relate to preparation of rental space for a tenant; expenses of initial development and construction, including but not limited to, grading, paving, landscaping and decorating (as distinguished from maintenance repair and replacement of the foregoing); repairs and maintenance of the structural and exterior portions and Common Areas of the Building and Project described in Paragraph 7.5.1(d); legal expenses relating to other tenants; costs of repair to the extent reimbursed by payment received by Landlord of insurance proceeds or from funds provided by Tenant or any other tenant; interest upon loans to Landlord or secured by mortgage or deed of trust covering the Project or a portion thereof (provided interest upon a government assessment or improvement bond payable in installments is an Operating Expense under subparagraph (b) above); salaries of executive officers of Landlord; depreciation claimed by Landlord for tax purposes (provided this exclusion of "depreciation" is not intended to delete from Operating Expenses actual costs of repairs and replacements in regard thereto which are provided for in subparagraph (b) above); and taxes of the types that are excluded from "Taxes" in Paragraph 1.15 above. In addition, Operating Expenses shall also not include the following: (i) the cost of constructing tenant improvements for any other tenant of the Project; (ii) the cost of special services, goods, or materials provided to any other tenant of the Project; (iii) repairs, alterations, additions, improvements, or replacements needed to rectify or correct any defects in

15

Source: NUVELO INC, 10-K, March 16, 2005

the original design, materials, or workmanship of the base building structural systems of the Building and Project, including the foundations, roof structure and exterior walls, Landlord's Work or any latent defects in the Building or Project; (iv) damage and repairs necessitated by the gross negligence or willful misconduct of Landlord, Landlord's employees, contractors, or agents; (v) Landlord's general overhead expenses not related to the Project; (vi) legal fees, accountants' fees, and other expenses incurred in connection with disputes of tenants or other occupants of the Project or associated with the enforcement of the terms of any leases with tenants or the defense of Landlord's title to or interest in the Project or any part thereof; (vii) costs incurred due to a violation by Landlord or any other tenant of the Project of the terms and conditions of a lease; (viii) costs of any service provided to Tenant or other occupants of the Project for which Landlord is reimbursed, and (ix) any cost of investigation, testing or cleanup relating to Hazardous Materials not related to Tenant's use or occupancy of the Premises.

(d) Notwithstanding anything to the contrary in this Paragraph 7.5, Landlord agrees to perform, at its sole cost and expense and not as part of the Operating Expenses during the Lease Term, including any renewal terms, all necessary and customary capital repairs and capital replacements involving the base building structural systems of the Building and Project, including the foundations, roof structure and exterior walls.

7.5.2 Tenant shall pay to Landlord on the first day of each calendar month of the Lease Term, as Additional Rent, Landlord's estimate of Tenant's Pro Rata Share of Operating Expenses for such month. Tenant's Pro Rata Share shall be as set forth in Paragraph 2 above and shall be separately calculated with respect to Operating Expenses of the Building, which shall include Operating Expenses relating solely to the Building, and Operating Expenses of the Project, which shall include Operating Expenses relating to the Project excluding Operating Expenses relating solely to the Building. The rentable square footage of the Premises, the Building and the Project referred to in the Recitals of this Lease shall be deemed the actual rentable square feet in the Premises, the Building and the Project.

(a) Within ninety (90) days after the conclusion of each calendar year (or such longer period as may be reasonably required), Landlord shall furnish to Tenant a statement showing in reasonable detail the actual Operating Expenses and Tenant's Pro Rata Share of Operating Expenses for the previous calendar year. Any additional sum due from Tenant to Landlord shall be due and payable within thirty (30) days of Landlord's written demand. If the amounts paid by Tenant pursuant to Paragraph 7.5.2 exceeds Tenant's Pro Rata Share of Operating Expenses for the previous calendar year, the difference shall be credited by Landlord against the Rent next due and owing from Tenant; provided that, if the Lease Term has expired, Landlord shall accompany said statement with payment for the amount of such difference.

(b) Any amount due under this Paragraph 7.5.2 for any period which is less than a full month shall be prorated (based on a 30-day month) for such fractional month.

7.5.3 Landlord's annual statement shall be final and binding upon Tenant unless Tenant, within one hundred and twenty (120) days after Tenant's receipt thereof,

16

Source: NUVELO INC, 10-K, March 16, 2005

shall contest any item therein by giving written notice to Landlord, specifying each item contested and the reason therefor. If, during such one hundred and twenty (120) day period, Tenant reasonably and in good faith questions or contests the correctness of Landlord's statement of Tenant's Pro Rata Share of Operating Expenses, Landlord will provide Tenant with access to Landlord's books and records and such information as Landlord reasonably determines to be responsive to Tenant's questions. In the event that after Tenant's review of such information, Landlord and Tenant cannot agree upon the amount of Tenant's Pro Rata Share of Operating Expenses, then Tenant shall have the right to have an independent public accounting firm hired by Tenant (at Tenant's sole cost and expense) and approved by Landlord (which approval shall not be unreasonably withheld or delayed) audit and/or review such Landlord's books and records for the year in question (the "Independent Review"). The results of any such Independent Review shall be binding on Landlord and Tenant. If the Independent Review shows that Tenant's Pro Rata Share of Operating Expenses actually paid for the calendar year in question exceeded Tenant's obligations for such calendar year, Landlord shall, at Tenant's option, either (1) credit the excess to the next succeeding installments of estimated Additional Rent or (2) pay the excess to Tenant within thirty (30) days after delivery of such statement. If the Independent Review shows that Tenant's payments of Tenant's Pro Rata Share of Operating Expenses for such calendar year were less than Tenant's obligation for the calendar year, Tenant shall pay the deficiency to the Landlord within thirty (30) days after delivery of such statement

7.5.4 Tenant shall not be responsible for Operating Expenses attributable to the time period prior to the Rent Commencement Date, except to the extent owing under any prior lease with Landlord or, if Landlord shall permit Tenant occupancy of the Premises prior to the Rent Commencement Date for purposes of conducting Tenant's business therein, Tenant shall be responsible for Operating Expenses from such earlier date of occupancy pursuant to Paragraph 4.4. The responsibility of Tenant for Tenant's Pro Rata Share of Operating Expenses shall continue to the latest of (i) the date of termination of the Lease, (ii) the date Tenant has fully vacated the Premises, or (iii) if termination of the Lease is due to the default of Tenant, the date of rental commencement of a replacement tenant.

7.5.5 Operating Expenses for the calendar year in which Tenant's obligation to share therein commences and in the calendar year in which such obligation ceases, shall be prorated on a basis reasonably determined by Landlord. Expenses such as taxes, assessments and insurance premiums which are incurred for an extended time period shall be prorated based upon time periods to which applicable so that the amounts attributed to the Premises relate in a reasonable manner to the time period wherein Tenant has an obligation to share in Operating Expenses.

8. CONDITION OF PREMISES.

8.1 Condition of Premises. Tenant has determined to lease the Premises after a full and complete investigation and examination thereof. Subject to latent defects in Landlord's Work, Tenant accepts the Premises and all other rights under this Lease "as is." Except as is expressly provided herein or under the Work Letter, Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Premises throughout the Lease Term.

17

Source: NUVELO INC, 10-K, March 16, 2005

8.2 Landlord's Warranties. Landlord represents and warrants that, to its knowledge as of the date Landlord delivers possession of the Premises to Tenant, the Building and the Project, other than the Premises and Tenant's Work, are in compliance with all applicable building codes, permits, laws and regulations, including without limitation, ADA and Title 24. Landlord further represents and warrants that it shall deliver possession of the Premises with all structural elements and building systems, including, but not limited to, HVAC-Building (which shall be building standard), mechanical, electrical, and plumbing systems, in good operating order and repair and the roof watertight. Excluding the foregoing representations and warranties in this Paragraph 8.2, Landlord has not made and makes no representations or warranties to Tenant of any kind regarding the Premises, the Building or the Project, including, without limitation, any representation or warranty regarding the physical condition of the Premises, its suitability for Tenant's intended use, or the availability or capacity of sewer to the Premises.

9. ALTERATIONS AND IMPROVEMENTS.

9.1 Construction Requirements. Any alterations or improvements to the Premises of any kind by Tenant (other than those constructed pursuant to the Work Letter which will be subject to the terms thereof), the cost of which exceeds One Hundred Thousand Dollars ($100,000) or which alters, affects, or modifies Building or Project systems (including, without limitation, mechanical, electrical, plumbing, or HVAC-Building systems), structural components, or the exterior of the Building or Project shall be subject to satisfaction of each of the following conditions:

9.1.1 Architectural Review. Prior to commencement of any work, Tenant shall submit its proposed final plans and specifications to Landlord for Landlord's consent, which consent shall not be unreasonably withheld, delayed or conditioned. Landlord agrees to respond to Tenant's proposed final plans and specifications within ten (10) days after its receipt of such final plans and specifications. Landlord's failure to approve or disapprove within said ten (10) days shall be deemed approval.

9.1.2 Code Compliance. Tenant shall comply with all Applicable Law, and Tenant shall obtain all required permits and approvals, including, but not limited to, any grading permits, building permits, zoning and planning requirements and approvals from any and all necessary governmental agencies and bodies.

9.1.3 Insurance. Tenant shall deliver to Landlord certificates of insurance evidencing that Tenant or the general contractor has obtained builder's all-risk risk insurance in an amount not less than Two Million Dollars ($2,000,000), or in the alternative, a cost of construction endorsement to Tenant's or such general contractor's general liability insurance. Tenant also shall deliver to Landlord evidence of worker's compensation insurance coverage for all persons employed in connection with the construction and with respect to whom death or personal injury claims could be asserted against Landlord or the Premises. Tenant also shall deliver to Landlord evidence that Tenant has paid or caused to be paid all premiums for the

18

Source: NUVELO INC, 10-K, March 16, 2005

insurance described in this paragraph. Tenant shall maintain or cause to be paid all premiums required to maintain and keep in force all insurance described in this paragraph at all times during which the construction is in progress.

9.1.4 <u>Construction Requirements</u>. Once any work of construction has begun, Tenant shall prosecute with reasonable diligence the same to conclusion. All construction shall be performed in a good and workmanlike manner, shall comply with all Applicable Law and shall be completed in conformance with the plans and specifications approved by Landlord.

9.1.5 <u>Notice of Construction; Mechanics' Liens</u>. Landlord and its representatives shall have the right to go upon and inspect the Premises at all reasonable times upon reasonable prior notice and shall have the right to post and keep posted thereon notices of non-responsibility, or such other notices which Landlord may deem to be proper for the protection of Landlord's interest in the Premises; provided, however, that such rights shall not unreasonably interfere with Tenant's use or possession of the Premises. Before the commencement of any work, which might result in any lien, Tenant shall give to Landlord written notice of its intention to do so in sufficient time to enable the posting of such notices. Subject to Tenant's right to contest any Claim or lien, Tenant shall keep the Premises, the Building and the Project free and clear of any and all liens and encumbrances which may arise at any time in connection with the improvement of the Premises by Tenant or its agents and contractors. Subject to Tenant's right to contest any Claim or lien, Tenant shall pay and discharge all expenses incurred by Tenant for the services of mechanics and for the cost of goods and materials supplied by materialmen, and Tenant shall defend, indemnify and hold harmless Landlord and the Premises from and against any Claims by such mechanics or materialmen for labor or services performed or goods supplied at the request of Tenant. Furthermore, subject to Tenant's right to contest any Claim or lien, Tenant shall, at its cost and expense, remove all such mechanics' liens by bond or otherwise within ten (10) working days after the filing thereof. If Tenant desires to contest any Claim or lien, it shall be entitled to do so on the condition that Tenant first shall either (1) furnish Landlord a bond of a responsible corporate surety approved by Landlord in such amount as is sufficient to cause discharge of the lien of record, and conditioned on the discharge of the lien, or (2) furnish Landlord with other assurances satisfactory to Landlord that Landlord will be protected from the effect of such Claim or lien. If a final judgment establishing the validity or existence of a lien for any amount is entered, Tenant shall pay and satisfy the same at once. If Tenant shall not have paid, as and when required by this Paragraph 9.1.5, any charge for which a mechanics' lien claim and suit to foreclose the lien have been filed, or if Tenant shall not have given Landlord security to protect the Premises and Landlord against such Claim or lien as required by this Paragraph 9.1.5, Landlord, upon five (5) days notice to Tenant, may (but shall not be required to) pay said lien or Claim including any costs, in which event the amount so paid, together with reasonable attorneys' fees incurred in connection therewith, shall be immediately due and owing from Tenant to Landlord. Tenant shall pay the same to Landlord together with interest on the full amount thereof at the Default Rate from the date of Landlord's payment until paid. If any Claims or liens are filed against the Premises or, if any action affecting title to the Premises is commenced, the party receiving notice of such lien or action shall forthwith give the other party written notice thereof.

19

Source: NUVELO INC, 10-K, March 16, 2005