# Exhibit R

**15. Amendments and Waivers.** Any term of this Warrant may be amended and the observance of any term of this Warrant may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of each of the parties hereto. Any waiver or amendment effected in accordance with this section shall be binding upon Holder and the Company.

**16. Governing Law.** This Warrant shall be governed by the laws of the State of California as applied to agreements among California residents made and to be performed entirely within the State of California.

**17. Entire Agreement.** This Warrant and the other documents delivered pursuant hereto or referred to herein, constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof.

**18. Severability.** In case any provision of this Warrant shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**19. Counterparts.** This Warrant may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**20. Survival.** Except as expressly set forth herein, the representations, warranties, covenants and agreements made herein shall survive the closing of the transactions contemplated hereby.

**21. Notices of Certain Transactions.**

In the event that:

**(a)** the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time deliverable upon the exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right, or

**(b)** of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the surviving entity), or any transfer of all or substantially all of the assets of the Company, or

**(c)** of the voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such case, the Company will mail or cause to be mailed to the Holder of this Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization.

7

Source: NUVELO INC, 10-K, March 16, 2005

reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is to take place, and the time, if any, to be fixed, as of which the holders of record of Common Stock (or such other stock or securities at the time deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up) are to be determined. Such notice shall be mailed at the earlier of (i) ten (10) days, or (ii) as soon as reasonably practicable, prior to the record date or effective date for the event specified in such notice.

**22. Piggyback Registration Rights.**

(a) If the Company decides to register any of its Common Stock under the Securities Act of 1933, as amended (the "Act") on a form that would be suitable for a registration involving the Shares, the Company shall so notify Holder (which shall include, if applicable, a list of the jurisdictions in which the Company intends to attempt to qualify such securities under the applicable Blue Sky or other state securities laws) and afford Holder an opportunity to include in such registration statement all or any part of the Shares issued or reserved for issuance to Holder upon exercise of this Warrant. If Holder desires to include in any such registration statement all or any part of such Shares, Holder shall, within (10) ten days after receipt of the above-described notice from the Company, so notify the Company in writing, and in such notice shall inform the Company of the number of Shares Holder wishes to include in such registration statement. In the event Holder elects to include its Shares in such registration statement (or any related qualification under Blue Sky laws or other compliance), subject to the terms and conditions of this Section 22, the Company shall include in such registration, and in any underwriting involved therein, the number of Shares specified by Holder. If Holder decides not to include all of the Shares issued or reserved for issuance to Holder upon the exercise of this Warrant in any registration statement thereafter filed by the Company, Holder shall nevertheless continue to have the right to include any such Shares in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

(b) In connection with any registration under this Section 22 involving an underwriting of shares of the Company's capital stock, the Company shall not be required under this Section 22 to include any of the Holder's Shares in such underwriting unless the Holder accepts the terms of the underwriting as agreed upon between the Company and the underwriters selected by the Company (or by other persons entitled to select the underwriters), and then only in such quantity as the underwriters determine in their sole discretion will not jeopardize the success of the offering by the Company. In connection with any other registration under this Section 22, the Company shall only be required under this Section 22 to include Holder's Shares in such registration only in such quantity as the Board of Directors in good faith determine in their sole discretion will not jeopardize the success of the offering. In connection with this subsection 22(b), the Company shall use its reasonable best efforts to insure that Holder will be treated in a similar manner as the other shareholders exercising piggyback registration rights in the same registration of shares of common stock. If, pursuant to its rights under this subsection 22(b), the Company elects not to include all or some of the Shares issued or reserved for issuance to Holder upon the exercise of this Warrant in any registration statement filed by the Company, Holder shall nevertheless continue to have the right to include any such Shares in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth in this Section 22.

8.

Source: NUVELO INC, 10-K, March 16, 2005

(c) To the extent permitted by law, the Company agrees to indemnify and hold harmless Holder and each person, if any, who controls such Holder within the meaning of the Act or the Securities Exchange Act of 1934, as amended (the "1934 Act") from and against any losses, claims, damages or liabilities to which they may become subject under the Act, the 1934 Act or other federal or state law, insofar as such losses, claims, damages or liabilities arise out of or are based upon any of the following statements, omissions or violations (collectively a "Violation") (i) any untrue or alleged untrue statement of material fact contained in any registration statement, or any amendment or supplement thereto, or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation of the Act or the 1934 Act in connection therewith, and will reimburse Holder and or controlling person for any legal or other expenses reasonably incurred in connection with investigating or defending any such action or claim as such expenses are incurred, *provided, however,* that the indemnity agreement contained in this subsection 22(c) shall not apply to amounts paid in settlement of any such losses, claims, damages or liabilities if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable in any such case of any such losses, claims, damages or liabilities to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with the written information furnished or expressly for use in connection with such registration by such Holder or controlling person

(d) To the extent permitted by law, Holder agrees to indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement and each person, if any, who controls the Company within the meaning of the Act or the 1934 Act, from and against any losses, claims, damages or liabilities to which they may become subject under the Act, the 1934 Act or other federal or state law, insofar as such losses, claims, damages or liabilities arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by Holder expressly for use in connection with such registration, and will reimburse Company or any such person intended to be indemnified by pursuant to this subsection 22(d), for any legal or other expenses reasonably incurred in connection with investigating or defending any such action or claim as such expenses are incurred, *provided, however,* that the indemnity agreement contained in this subsection 22(d) shall not apply to amounts paid in settlement of any such losses, claims, damages or liabilities if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld), provided, that, in no event shall any indemnity under this subsection 22(d) exceed the gross proceeds from the offering received by Holder.

(e) If any Shares are included in a registration statement relating to the direct issuance of common stock by the Company, all expenses incurred by the Company in complying with provision (a) above (expressly excluding Selling Expenses, as defined below), including, without limitation, all registration and filing fees (including all expenses incident to filing with the National Association of Securities Dealers, Inc.), fees and expenses of complying with securities and blue sky laws, expense allowances of the underwriters, printing expenses, fees and disbursements of counsel or other advisor to the Company, and of the accountants, are herein called "Registration Expenses." All fees and expenses of counsel for any Holder and all underwriting fees and commissions applicable to the Shares covered by any such registration are

9

Source: NUVELO INC, 10-K, March 16, 2005

herein called "Selling Expenses." The Company shall pay all Registration Expenses in connection with each registration pursuant to Section 22(a). All Selling Expenses in connection with each registration pursuant to Section 22(a) shall be borne by the Holder.

(f) If any Shares are included in a registration statement relating to the resale of common stock of the Company, Holder shall pay its pro rata portion of all reasonable registration expenses agreed to be paid by the other selling shareholders.

(g) The Holder shall not have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 22.

(h) No Holder shall be entitled to exercise any right provided in this Section 22 when all shares held by such Holder can be sold pursuant to Rule 144 of the Act within a ninety (90) day period.

23. **Counterparts.** This Warrant may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

*(Remainder of page intentionally left blank)*

10.

Source: NUVELO INC, 10-K, March 16, 2005

IN WITNESS WHEREOF, this Warrant is executed as of the 20th day of January 2005

COMPANY:

NUVELO, INC.

By: /s/ Lee Bendekgey

Name
Title


COMPANY:

HOLDER:

SAGAMORE HILL HUB FUND LTD.

/s/ Steven H. Bloom

*Signature*

Steven H. Bloom
Authorized Signatory

Address:            Ten Glenville Street
                      Greenwich, CT 06831

Facsimile           (203) 532-7673

11.

Source: NUVELO INC, 10-K, March 16, 2005

**EXERCISE NOTICE**

NUVELO, INC.

**Attention: Chief Financial Officer**

1. The undersigned hereby elects

    **(a)** to purchase, pursuant to the provisions of the Warrant to Purchase Shares of Common Stock issued by Nuvelo, Inc. and held by the undersigned, the original of which is attached hereto, _____ shares of Common Stock of Nuvelo, Inc. Payment of the exercise price per share required under such Warrant accompanies this Exercise Notice; or

    **(b)** to make a Net Issuance exercise as provided in Section 4 of the attached Warrant, to purchase _____ shares of Common Stock of Nuvelo, Inc., pursuant to the terms of the attached Warrant

    2. The undersigned hereby represents and warrants that the undersigned is acquiring such shares for its own account for investment purposes only and, unless such shares have been registered in compliance with applicable securities laws or an applicable exemption is available therefrom, not for resale or with a view to distribution of such shares or any part thereof.

**HOLDER:**

_____

Name:
Title:

Date: _____

Address:

_____

_____

Name in which shares should be registered:

_____

12.

Source: NUVELO INC, 10-K, March 16, 2005

**EXHIBIT B**

**ASSIGNMENT**

(To be executed only upon assignment of attached Warrant (the "Warrant Certificate"))

For value received, _____ hereby sells, assigns and transfers unto _____ the within Warrant Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrant Certificate on the books of the within-named Company with respect to the number of Warrants set forth below, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address | # of Warrants |
| --- | --- | --- |
| | | |

And if said number of Warrants shall not be all the Warrants represented by the Warrant Certificate, a new Warrant Certificate is to be issued in the name of said undersigned for the balance remaining of the Warrants registered by said Warrant Certificate.

Dated:

Signature:

Notice: The signature to the foregoing Assignment must correspond to the name as written upon the face of this security in every particular, without alternation or any change whatsoever; signature(s) must be guaranteed by an eligible guarantor institution (banks, stock brokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program) pursuant to Securities and Exchange Commission Rule 17Ad-15.

13.

Source: NUVELO INC, 10-K, March 16, 2005

Exhibit 4.10

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THE WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE HEREOF MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. NOTWITHSTANDING THE FOREGOING, THIS WARRANT MAY BE TRANSFERRED AS PROVIDED IN SECTION 14 OF THIS WARRANT.**

Warrant No. D-1R

Date: January 20, 2005

## NUVELO, INC.

### · WARRANT TO PURCHASE SHARES OF COMMON STOCK

This Warrant is issued to SAGAMORE HILL HUB FUND LTD., a Delaware limited partnership ("Holder" or the "Partnership"), by NUVELO, INC., a Nevada corporation (the "Company"), as of the date set forth beside the Company's signature below, to replace lost warrant No. D-1, originally dated May 13, 2003 (the "Lost Warrant").

**1. Purchase of Shares**. Subject to the terms and conditions hereinafter set forth, Holder is entitled, upon surrender of this Warrant at the principal office of the Company (or at such other place as the Company shall notify Holder in writing), to purchase from the Company up to two hundred thousand (200,000) shares (the "Shares") of common stock of the Company (the "Common Stock"), at an exercise price of $1.35 per share (the "Exercise Price"). The Shares and the Exercise Price are as of the date of the Lost Warrant, and do not reflect the 3:1 reverse stock split effected by the Company on February 23, 2004 or any other adjustments occurring subsequent to the date of the Lost Warrant. The Shares and Exercise Price shall be subject to adjustments occurring since the date of the Lost Warrant, as set forth in Section 7 hereof. Notwithstanding anything to the contrary herein, this Warrant may not be exercised by the Partnership to the extent that, as a result of such exercise, it would result in a violation of the REIT Test (as defined in Section 24).

**2. Exercise Period**. This Warrant shall be fully vested in Holder as of the date hereof and shall be exercisable for a period of five (5) years from May 13, 2003 (the "Exercise Period").

**3. Method of Exercise**. While this Warrant remains outstanding and exercisable during the Exercise Period, Holder may exercise, in whole or in part, the purchase rights evidenced hereby. Such exercise shall be effected by: (i) the surrender of the Warrant, together with a duly executed copy of the form of Exercise Notice attached hereto as **Exhibit A**, to the Secretary of the Company at its principal offices; and (ii) the payment to the Company by cash, check or wire transfer of an amount equal to the aggregate Exercise Price for the number of Shares being purchased.

1.

Source: NUVELO INC, 10-K, March 16, 2005

**4. Net Issuance Provision.** In lieu of exercising pursuant to paragraph 3 above, at the Holder's option, while this Warrant remains outstanding and exercisable during the Exercise Period, Holder may exercise this Warrant by surrender of this Warrant as determined below ("Net Issuance"). If the Holder elects the Net Issuance method, the Company will issue Common Stock in accordance with the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where:

X =     the number of shares of Common Stock to be issued to the Holder.

Y =     the number of shares of Common Stock requested to be exercised under this Warrant.

A =     the fair market value of one (1) share of Common Stock.

B =     the Exercise Price.

For purposes of this Warrant, current fair market value of Common Stock shall mean with respect to each share of Common Stock:

**(a)** if the Common Stock is traded on a securities exchange, the fair market value shall be deemed to be the average of the closing prices over a twenty-one (21) day period ending three days before the day the current fair market value of the securities is being determined;

**(b)** if actively traded over-the-counter, the fair market value shall be deemed to be the average of the closing prices quoted on the Nasdaq system (or similar system) over the twenty-one (21) day period ending three days before the day the current fair market value of the securities is being determined; or

**(c)** if at any time the Common Stock is not listed on any securities exchange or quoted in the Nasdaq System or the over the counter market, the current fair market value of Common Stock shall be determined in good faith by the Company and Holder, provided that, if the parties are unable to reach agreement within a reasonable period of time, the fair market value of Common Stock shall be determined in good faith by an independent investment banking firm selected by the American Arbitration Association in accordance with its rules.

Upon partial exercise by either cash or Net Issuance, the Company shall promptly issue an amended Warrant representing the remaining number of shares purchasable thereunder. All other terms and conditions of such amended Warrant shall be identical to those contained herein, including, but not limited to, the Exercise Period.

2.

Source: NUVELO INC, 10-K, March 16, 2005

**5. Certificates for Shares**. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Shares so purchased shall be issued as soon as reasonably practicable thereafter. Upon any partial exercise of this Warrant, the Company will forthwith issue and deliver to Holder a new warrant or warrants of like tenor as this Warrant for the remaining portion of the Common Stock for which this Warrant may still be exercised.

**6. Issuance of Shares**. The Company covenants that (a) the Shares, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully-paid and non-assessable and free from all taxes, liens and charges with respect to the issuance thereof (except for any applicable transfer taxes, which shall be paid by Holder) and (b) during the Exercise Period, the Company will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of Common Stock upon the exercise of this Warrant.

**7. Adjustment of Exercise Price and Number of Shares**. The number of and kind of securities purchasable upon exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time as follows:

**(a) Subdivisions, Combinations and Other Issuances**. If the Company shall at any time prior to the expiration of this Warrant subdivide its Common Stock, by split or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend with respect to any shares of its Common Stock, the number of Shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination. Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of Shares purchasable under this Warrant (as adjusted) shall remain the same. Any adjustment under this Section 7(a) shall become effective as of the record date of such subdivision, combination or dividend, or in the event that no record date is fixed, upon the making of such subdivision, combination or dividend.

**(b) Reclassification, Reorganization and Consolidation**. In case of any reclassification, capital reorganization, or change in the Common Stock of the Company (other than as a result of a subdivision, combination, or stock dividend provided for in Section 7(a) above), then, as a condition of such reclassification, reorganization or change, lawful provision shall be made, and duly executed documents evidencing the same from the Company or its successor shall be delivered to Holder, so that Holder shall have the right at any time prior to the expiration of this Warrant to purchase, at a total price equal to that payable upon the exercise of this Warrant, the kind and amount of shares of stock and other securities and property receivable in connection with such reclassification, reorganization or change by a holder of the same number of shares of Common Stock as were purchasable by Holder immediately prior to such reclassification, reorganization or change. In any such case, appropriate provisions shall be made with respect to the rights and interest of Holder so that the provisions hereof shall thereafter be applicable with respect to any shares of stock or other securities and property deliverable upon exercise hereof, and appropriate adjustments shall be made to the purchase price per share payable hereunder, provided the aggregate purchase price shall remain the same.

3.

Source: NUVELO INC, 10-K, March 16, 2005

**(c) Merger and Sale of Assets.** If at any time there shall be a capital reorganization of the shares of the Company's stock (other than a combination, reclassification, exchange or subdivision of shares otherwise provided for herein), or a merger or consolidation of the Company with or into another corporation, whether or not the Company is the surviving corporation, or the sale of all or substantially all of the Company's properties and assets to any other person (hereinafter referred to as a "Merger Event"), then, as a part of such Merger Event, lawful provision shall be made so that the Holder shall thereafter be entitled to receive, upon exercise of the Warrant, the number of shares of common stock or other securities of the successor corporation resulting from such Merger Event equivalent in value to that which would have been issuable if Holder had exercised this Warrant immediately prior to the Merger Event. In any such case, appropriate adjustment (as determined in good faith by the Company's Board of Directors) shall be made in the application of the provisions of this Warrant with respect to the rights and interest of the Holder after the Merger Event to the end that the provisions of this Warrant (including adjustments of the Exercise Price and number of shares of Common Stock purchasable) shall be applicable to the extent possible.

**(d) Certificate of Adjustment.** When any adjustment is required to be made in the number or kind of shares purchasable upon exercise of the Warrant or in the Exercise Price, an officer of the Company shall promptly compute such adjustment in accordance with the terms of this Warrant and prepare a certificate setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated and the Exercise Price and number of shares purchasable hereunder after giving effect to such adjustment, and shall cause a copy of such certificate to be mailed (by first class mail, postage prepaid) to Holder.

**8. Compliance with Securities Laws.** Holder hereby represents and warrants that:

**(a) Purchase Entirely for Own Account.** This Warrant and the Common Stock issuable upon exercise hereof (collectively, the "Securities") will be acquired for investment for Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Holder has no present intention of selling, granting any participation in or otherwise distributing the same. Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to any person with respect to any of the Securities. Holder represents that it has full power and authority to enter into this Warrant:

**(b) Investment Experience.** Holder acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant. Holder also represents it has not been organized for the purpose of acquiring this Warrant.

**(c) Accredited Investor.** Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

4

Source: NUVELO INC, 10-K, March 16, 2005

**(d) Restricted Securities.** Holder understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. In this connection, Holder represents that it is familiar with SEC Rule 144 promulgated under the Act, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

**9. Limitations on Disposition; Legends.**

**(a)** Without in any way limiting the representations set forth above, Holder further agrees not to make any disposition of all or any portion of the Securities unless and until (I) there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement, or (II) Holder shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act; provided, however, that an opinion of counsel will not be required for any disposition of Securities by the Holder to its affiliates or subsidiaries so long as such disposition otherwise complies with the securities laws.

**(b)** Each person (other than the Company) to whom this Warrant or the Shares are transferred, in whole or in part, by means of a permitted transfer must, as a condition precedent to the validity of such transfer, acknowledge in writing to the Company that such person is bound by the provision of this Warrant to the same extent this Warrant or the Shares would be so subject if retained by Holder.

**(c)** Certificates evidencing the Shares will bear the following legend(s):

**(i)** "SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT."

**(ii)** Any legend required by any applicable state securities laws.

The legend set forth above will be removed by the Company from any certificate evidencing Shares if the Shares are registered under the Act or upon delivery to the Company of an opinion by counsel, reasonably satisfactory to the Company, that such security can be freely transferred without such a registration statement being in effect.

5.

Source: NUVELO INC, 10-K, March 16, 2005

**(d)** Notwithstanding any provision of this Section 9 to the contrary, an opinion of counsel shall not be required in connection with any transfer in compliance with Rule 144 of the Act.

**10. No Fractional Shares or Scrip.** No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor on the basis of the fair market value of the Company's Common Stock.

**11. No Stockholder Rights.** Prior to exercise of this Warrant, Holder shall not be entitled to any rights of a stockholder with respect to the Shares, including (without limitation) the right to vote such Shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings, and Holder, as such, shall not be entitled to any notice or other communication concerning the business or affairs of the Company, except as expressly set forth herein.

**12. Replacement of Warrant.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Warrant, the Company at its expense shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

**13. Notices.** All notices or other communications hereunder shall be in writing and shall be deemed given when (i) personally delivered, (ii) three days after being sent by prepaid certified or registered U.S. mail, or one day after being sent, if sent by nationally recognized overnight courier, to the address of the party to be noticed as set forth herein or such other address as such party last provided to the other by written notice, or (iii) upon receipt of electronic confirmation, if by facsimile. All notices shall be sent to the addresses and facsimile numbers set forth below or such other address as may be given from time to time under the terms of this notice provision:

If to the Company:
Nuvelo, Inc.
675 Almanor Avenue
Sunnyvale, California 94085
Attention: President
Fax: (408) 215-4000
If to Holder:
At the address and facsimile number
indicated on the signature page hereof.

**14. Transfer of Warrant; Successors and Assigns.** Subject to compliance with the terms of Section 9 hereof, this Warrant and all rights hereunder are transferable in whole or in part by the Holder to any person or entity upon written notice to the Company enclosing a

6

Source: NUVELO INC, 10-K, March 16, 2005

properly executed assignment (in the form of **Exhibit B** hereto). In the event of a partial transfer, the Company shall issue to the holders one or more appropriate new warrants. The terms and provisions of this Warrant shall inure to the benefit of, and be binding upon, the Company and the Holder, and their respective successors and assigns. Except as permitted above, any purported transfer hereof shall be null and void and the Company is hereby expressly authorized to instruct its transfer agent (which may be the Company itself) to not honor any such purported transfer.

**15. Amendments and Waivers.** Any term of this Warrant may be amended and the observance of any term of this Warrant may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of each of the parties hereto. Any waiver or amendment effected in accordance with this section shall be binding upon Holder and the Company.

**16. Governing Law.** This Warrant shall be governed by the laws of the State of California as applied to agreements among California residents made and to be performed entirely within the State of California.

**17. Entire Agreement.** This Warrant and the other documents delivered pursuant hereto or referred to herein, constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof.

**18. Severability.** In case any provision of this Warrant shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**19. Counterparts.** This Warrant may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**20. Survival.** Except as expressly set forth herein, the representations, warranties, covenants and agreements made herein shall survive the closing of the transactions contemplated hereby.

**21. Notices of Certain Transactions.**

In the event that:

(a) the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time deliverable upon the exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right, or

(b) of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the surviving entity), or any transfer of all or substantially all of the assets of the Company, or

7

Source: NUVELO INC, 10-K, March 16, 2005

(c) of the voluntary or involuntary dissolution, liquidation or winding-up of the Company,

then, and in each such case, the Company will mail or cause to be mailed to the Holder of this Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is to take place, and the time, if any, to be fixed, as of which the holders of record of Common Stock (or such other stock or securities at the time deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up) are to be determined. Such notice shall be mailed at the earlier of (i) ten (10) days, or (ii) as soon as reasonably practicable, prior to the record date or effective date for the event specified in such notice

**22. Piggyback Registration Rights.**

   (a) If the Company decides to register any of its Common Stock under the Securities Act of 1933, as amended (the "Act") on a form that would be suitable for a registration involving the Shares, the Company shall so notify Holder (which shall include, if applicable, a list of the jurisdictions in which the Company intends to attempt to qualify such securities under the applicable Blue Sky or other state securities laws) and afford Holder an opportunity to include in such registration statement all or any part of the Shares issued or reserved for issuance to Holder upon exercise of this Warrant. If Holder desires to include in any such registration statement all or any part of such Shares, Holder shall, within ten (10) days after receipt of the above-described notice from the Company, so notify the Company in writing, and in such notice shall inform the Company of the number of Shares Holder wishes to include in such registration statement. In the event Holder elects to include its Shares in such registration statement (or any related qualification under Blue Sky laws or other compliance), subject to the terms and conditions of this Section 22, the Company shall include in such registration, and in any underwriting involved therein, the number of Shares specified by Holder. If Holder decides not to include all of the Shares issued or reserved for issuance to Holder upon the exercise of this Warrant in any registration statement thereafter filed by the Company, Holder shall nevertheless continue to have the right to include any such Shares in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

   (b) In connection with any registration under this Section 22 involving an underwriting of shares of the Company's capital stock, the Company shall not be required under this Section 22 to include any of the Holder's Shares in such underwriting unless the Holder accepts the terms of the underwriting as agreed upon between the Company and the underwriters selected by the Company (or by other persons entitled to select the underwriters), and then only in such quantity as the underwriters determine in their sole discretion will not jeopardize the success of the offering by the Company. In connection with any other registration under this Section 22, the Company shall only be required under this Section 22 to include Holder's Shares in such registration only in such quantity as the Board of Directors in good faith determine in their sole discretion will not jeopardize the success of the offering. In connection with this subsection 22(b), the Company shall use its reasonable best efforts to insure that Holder will be

8

Source: NUVELO INC, 10-K, March 16, 2005

treated in a similar manner as the other shareholders exercising piggyback registration rights in the same registration of shares of common stock. If, pursuant to its rights under this subsection 22(b), the Company elects not to include all or some of the Shares issued or reserved for issuance to Holder upon the exercise of this Warrant in any registration statement filed by the Company, Holder shall nevertheless continue to have the right to include any such Shares in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth in this Section 22.

(c) To the extent permitted by law, the Company agrees to indemnify and hold harmless Holder and each person, if any, who controls such Holder within the meaning of the Act or the Securities Exchange Act of 1934, as amended (the "1934 Act") from and against any losses, claims, damages or liabilities to which they may become subject under the Act, the 1934 Act or other federal or state law, insofar as such losses, claims, damages or liabilities arise out of or are based upon any of the following statements, omissions or violations (collectively a "Violation"): (i) any untrue or alleged untrue statement of material fact contained in any registration statement, or any amendment or supplement thereto, or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation of the Act or the 1934 Act in connection therewith; and will reimburse Holder and or controlling person for any legal or other expenses reasonably incurred in connection with investigating or defending any such action or claim as such expenses are incurred; provided, however, that the indemnity agreement contained in this subsection 22(c) shall not apply to amounts paid in settlement of any such losses, claims, damages or liabilities if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable in any such case of any such losses, claims, damages or liabilities to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with the written information furnished or expressly for use in connection with such registration by such Holder or controlling person.

(d) To the extent permitted by law, Holder agrees to indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement and each person, if any, who controls the Company within the meaning of the Act or the 1934 Act, from and against any losses, claims, damages or liabilities to which they may become subject under the Act, the 1934 Act or other federal or state law, insofar as such losses, claims, damages or liabilities arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by Holder expressly for use in connection with such registration, and will reimburse Company or any such person intended to be indemnified by pursuant to this subsection 22(d), for any legal or other expenses reasonably incurred in connection with investigating or defending any such action or claim as such expenses are incurred; provided, however, that the indemnity agreement contained in this subsection 22(d) shall not apply to amounts paid in settlement of any such losses, claims, damages or liabilities if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld); provided, that, in no event shall any indemnity under this subsection 22(d) exceed the gross proceeds from the offering received by Holder.

9.

Source: NUVELO INC, 10-K, March 16, 2005

**(e)** If any Shares are included in a registration statement relating to the direct issuance of common stock by the Company, all expenses incurred by the Company in complying with provision (a) above (expressly excluding Selling Expenses, as defined below), including, without limitation, all registration and filing fees (including all expenses incident to filing with the National Association of Securities Dealers, Inc.), fees and expenses of complying with securities and blue sky laws, expense allowances of the underwriters, printing expenses, fees and disbursements of counsel or other advisor to the Company, and of the accountants, are herein called "Registration Expenses." All fees and expenses of counsel for any Holder and all underwriting fees and commissions applicable to the Shares covered by any such registration are herein called "Selling Expenses." The Company shall pay all Registration Expenses in connection with each registration pursuant to Section 22(a). All Selling Expenses in connection with each registration pursuant to Section 22(a) shall be borne by the Holder

**(f)** If any Shares are included in a registration statement relating to the resale of common stock of the Company, Holder shall pay its pro rata portion of all reasonable registration expenses agreed to be paid by the other selling shareholders.

**(g)** The Holder shall not have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 22.

**(h)** No Holder shall be entitled to exercise any right provided in this Section 22 when all shares held by such Holder can be sold pursuant to Rule 144 of the Act within a ninety (90) day period.

**(i) REIT Provisions**. Notwithstanding the foregoing provisions of this Section 22 or any other provision of this Warrant but nonetheless subject to the provisions of Section 8(d), there shall be no limitation on a Holder's sale or other disposition of this Warrant or any securities issued or to be issued pursuant to this Warrant if the Holder intends to qualify as a real estate investment trust for federal income tax purposes and believes (as determined in the holder's sole discretion) that continued ownership of such securities could have an adverse impact on its ability to qualify as a real estate investment trust.

**23. Counterparts**. This Warrant may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument

**24. Limitation to Preserve REIT Status**. Notwithstanding anything to the contrary contained herein, the Holder agrees that in no event shall the Holder of this Warrant be issued or own capital stock of the Company, or warrants which would entitle it to acquire, or otherwise be entitled to receive (including as a result of the exercise of this Warrant), shares of capital stock of the Company or other assets (including partnership interests and shares of capital stock of other companies), to the extent that the Holder would acquire or own actually or Constructively in excess of (i) 9.9% of the total number of then outstanding shares of capital stock of the Company, (ii) 9.9% of the then outstanding securities of the Company entitled to vote for the election of directors of the Company, (iii) 9.9% of the total value of all then outstanding shares of capital stock of the Company, or (iv) a number or value of shares of capital stock of the Company, or any other assets, the ownership of which could jeopardize the status of AMB

10.

Source: NUVELO INC, 10-K, March 16, 2005

Property Corporation, the general partner of the Partnership (the "General Partner"), as a Real Estate Investment Trust or the qualification as "rents from real property" as defined in Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code"), of amounts received by any partnership or limited liability company in which the General Partner directly or indirectly owns an interest, whichever of the four foregoing tests is the most restrictive (collectively, the "REIT Test") For purposes of applying the REIT Test, (i) the Holder shall be treated as simultaneously acquiring all capital stock of the Company or other assets distributed by the Company as a result of any previous exercise or exercises by any Holder of this Warrant, (ii) any capital stock of the Company or other assets then actually or Constructively owned by the Holder which were not issued by the Company as a result of an exercise of this Warrant shall be taken into account, (iii) to the extent the exercising Holder is not the Partnership, the limit described above shall be applied as if it were the Partnership (if such application would be more restrictive); and (iv) "Constructively" shall mean constructively through the application of Section 318 of the Code, as modified by Section 856(d)(5) of the Code. The Holder acknowledges that the foregoing definition, among other things, generally requires the parties to give effect to the issuance of the Shares but not to give effect to any other capital stock of the Company issuable to third parties upon the exercise of securities convertible into capital stock of the Company (including options, warrants or other convertible securities)

In the event that any adjustment under this Section 24 would result in a violation by the General Partner of the REIT Test, any such shares or other securities which the Partnership would be entitled to acquire, or otherwise be entitled to receive, shall only be issued to the extent that such shares or other securities would not cause the General Partner to violate the REIT Test.

*(Remainder of page intentionally left blank)*

11

Source: NUVELO INC, 10-K, March 16, 2005

IN WITNESS WHEREOF, this Warrant is executed as of the 20th day of January 2005.

COMPANY:

NUVELO, INC.

By        /s/ Lee Bendekgey

Name
Title

HOLDER:

SAGAMORE HILL HUB FUND LTD.

/s/ Steven H. Bloom

*Signature*

Steven H. Bloom
Authorized Signatory

Address    Ten Glenville Street
          Greenwich, CT 06831

Facsimile (203) 532-7673

12.

Source: NUVELO INC, 10-K, March 16, 2005

**EXERCISE NOTICE**

NUVELO, INC.

Attention: Chief Financial Officer

1.  The undersigned hereby elects

    (a) to purchase, pursuant to the provisions of the Warrant to Purchase Shares of Common Stock issued by Nuvelo, Inc. and held by the undersigned, the original of which is attached hereto, _____ shares of Common Stock of Nuvelo, Inc. Payment of the exercise price per share required under such Warrant accompanies this Exercise Notice; or

    (b) to make a Net Issuance exercise as provided in Section 4 of the attached Warrant, to purchase _____ shares of Common Stock of Nuvelo, Inc., pursuant to the terms of the attached Warrant.

2.  The undersigned hereby represents and warrants that the undersigned is acquiring such shares for its own account for investment purposes only and, unless such shares have been registered in compliance with applicable securities laws or an applicable exemption is available therefrom, not for resale or with a view to distribution of such shares or any part thereof.

3.  The undersigned hereby represents and warrants that the exercise effected hereby will not result in a violation of the REIT Test based upon capitalization information provided by Nuvelo, Inc. (Nuvelo, Inc. must provide requested capitalization information within 24 hours of receipt of the written request from Holder or must accept this notice without the representation in this third section).

HOLDER:

_____

Name:
Title:

Date: _____

Address

_____

_____

Name in which shares should be registered:

_____

13

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT B

## ASSIGNMENT

(To be executed only upon assignment of attached Warrant (the "Warrant Certificate"))

For value received, _____ hereby sells, assigns and transfers unto _____ the within Warrant Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrant Certificate on the books of the within-named Company with respect to the number of Warrants set forth below, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address | # of Warrants |
| --- | --- | --- |

And if said number of Warrants shall not be all the Warrants represented by the Warrant Certificate, a new Warrant Certificate is to be issued in the name of said undersigned for the balance remaining of the Warrants registered by said Warrant Certificate.

Dated:

Signature:

Notice: The signature to the foregoing Assignment must correspond to the name as written upon the face of this security in every particular, without alteration or any change whatsoever; signature(s) must be guaranteed by an eligible guarantor institution (banks, stock brokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program) pursuant to Securities and Exchange Commission Rule 17Ad-15.

14

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT 10.5

**NUVELO, INC.**
**EMPLOYEE STOCK PURCHASE PLAN**

(As amended and restated on December 14, 2004)

1.  **PURPOSE**

The purpose of the Nuvelo, Inc. Employee Stock Purchase Plan is to provide eligible Employees of Nuvelo, Inc. and its Affiliates with an opportunity to acquire a proprietary interest in the Company through the purchase of Common Stock of the Company on a payroll deduction basis. It is believed that participation in the ownership of the Company will be to the mutual benefit of the eligible Employees and the Company. It is intended that this Plan shall constitute an "employee stock purchase plan" within the meaning of Section 423 of the Internal Revenue Code of 1986, as amended. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of Code Section 423.

2.  **DEFINITIONS**

Unless otherwise specified or unless the context otherwise requires, the following terms, as used in this Plan, have the following meanings. Wherever appropriate, words used in the singular shall be deemed to include the plural and vice versa, and the masculine gender shall be deemed to include the feminine gender.

(a) **Account** means the funds accumulated with respect to an Employee as a result of deductions from his paycheck for the purpose of purchasing Common Stock under the Plan. The funds allocated to an Employee's Account shall remain the property of the Employee at all times prior to the purchase of the Common Stock, but may be commingled with the assets of the Company and used for general corporate purposes. No interest shall be paid or accrued on any funds accumulated in the Accounts of Employees.

(b) **Affiliate** means a corporation, as defined in Section 424(f) of the Code, that is a parent or subsidiary of the Company, direct or indirect.

(c) **Board** means the Board of Directors of the Company.

(d) **Code** means the Internal Revenue Code of 1986, as amended.

(e) **Committee** means the committee to which the Board delegates the power to act under or pursuant to the provisions of the Plan, or the Board if no committee is selected.

(f) **Common Stock** means the shares of common stock of the Company, $.001 par value.

(g) **Company** means Nuvelo, Inc., a Delaware corporation, and any corporate successor to all or substantially all of the assets or voting stock of the Company.

Source: NUVELO INC, 10-K, March 16, 2005

(h) **Compensation** means the compensation paid to an Employee by the Company during a payroll period for federal income tax purposes, as reported on an Employee's Form W-2 (or comparable reporting form) for income tax withholding purposes.

(i) **Effective Date** means the date the Plan is adopted by, and made effective by, the Board, subject to the limitations of Section 16.

(j) **Employee** means any person who is employed by the Company or an Affiliate on a regular full-time basis. A person shall be considered employed on a regular full-time basis if he is customarily employed for more than twenty (20) hours per week.

(k) **Offering Date** means the date on which the Committee grants Employees the option to purchase shares of Common Stock.

(l) **Offering Period** means the period between the Offering Date and the Purchase Date.

(m) **Purchase Date** means the date on which the Committee purchases the shares of Common Stock, which date shall be the last day of an Offering Period.

(n) **Participant** means an Employee who elects to participate in the Plan.

(o) **Plan** means the Nuvelo, Inc. Employee Stock Purchase Plan.

3.    **ELIGIBILITY**

All Employees of the Company and, if designated by the Board, any Affiliate, who are employed by the Company and/or such designated Affiliate shall be eligible to participate in the Plan on the first Offering Date coincident with, or following the Employee's first day of employment.

4.    **ADMINISTRATION**

The Plan shall be administered by the Committee, which shall consist of not less than two (2) members of the Board. Subject to the provisions of the Plan, the Committee shall be vested with full authority to make, administer, and interpret such rules and regulations as it deems necessary to administer the Plan, and any determination, decision, or action of the Committee in connection with the construction, interpretation, administration, and application of the Plan shall be final, conclusive, and binding upon all Participants and any and all persons claiming under or through any Participant. Notwithstanding anything to the contrary in the Plan, the Committee shall have the discretion to modify the terms of the Plan with respect to Participants who reside outside of the United States or who are employed by a subsidiary of the Company that has been formed under the laws of any foreign country, if such modification is necessary in order to conform such terms to the requirements of local laws.

5.    **STOCK**

(a) The Common Stock to be sold to Participants under the Plan may, at the election of the Company, be either treasury shares, shares acquired on the open market, and/or

2

Source: NUVELO INC, 10-K, March 16, 2005

shares originally issued for such purpose. The aggregate number of shares of Common Stock that shall be made available for purchase under the Plan shall not exceed two hundred fifty thousand (250,000) shares, subject to adjustment upon changes in capitalization of the Company as provided in subparagraph (b) below. In the event any purchase right granted under the Plan expires or terminates for any reason without having been exercised in full or ceases for any reason to be exercisable in whole or in part, the unpurchased shares subject thereto will again be available for purchase by Employees upon the exercise of purchase rights. If the total number of shares that otherwise would have been acquired under the Plan on any Purchase Date exceeds the number of shares of Common Stock then available under the Plan, the Company shall make a pro rata allocation of the shares remaining available in as nearly a uniform manner as shall be practicable and as it shall determine to be equitable. In such event, the payroll deductions to be made pursuant to the Participants' authorizations shall be reduced accordingly, or refunded to the Participants, as the case may be, and the Company shall give written notice of such reduction or refund to each affected Participant

(b) Appropriate adjustments in the aggregate number of shares of Common Stock that shall be made available for purchase under the Plan shall be made to give effect to any mergers, consolidations, acquisitions, reorganizations, stock splits, stock dividends, or other relevant changes in the capitalization of the Company occurring after the Effective Date. The establishment of the Plan shall not affect in any way the right or power of the Company to make adjustments, reclassifications, reorganizations, or changes in its capital or business structure or to merge, consolidate, dissolve, liquidate, sell, or otherwise transfer all or any part of its business or assets. Adjustments under this Section 5 shall be made in the sole discretion of the Committee, and its decision shall be binding and conclusive

(c) A Participant shall not have any interest in shares covered by his authorized payroll deduction until shares of Common Stock are acquired for his Account

6.    **PARTICIPATION**

(a) Each Employee may become a Participant in the Plan by authorizing a payroll deduction on a form provided by the Committee. Such authorization shall become effective on the Offering Date coincident with, or the next Offering Date following the delivery of the authorization form to the Committee, provided that the Employee is eligible under Section 3 to participate in the Plan on such Offering Date

(b) At the time an Employee files his authorization for a payroll deduction, he shall elect to have deductions made from each paycheck that he receives, such deductions to continue until the Participant withdraws from the Plan or otherwise becomes ineligible to participate in the Plan. Authorized payroll deductions shall be for a minimum of one percent (1%) and a maximum of ten percent (10%) of the Participant's Compensation. The deduction rate so authorized shall continue in effect through the Offering Period and each succeeding Offering Period. A Participant may increase the rate of his payroll deduction effective as of any subsequent Offering Date by filing a new authorization form with the Company fifteen (15) or more days prior to the next Offering Date. A

3

Source: NUVELO INC, 10-K, March 16, 2005

Participant may, at any time during any Offering Period, reduce his rate of payroll deduction by filing a new authorization form with the Company, which shall become effective as soon as practicable after it is filed

(e) All Compensation deductions made for a Participant shall be credited to his Account. Except as may otherwise be provided by the Committee under Section 4, a Participant may not make any separate cash payment into his Account.

7.     **PURCHASE OF SHARES**

(a) On the Offering Date when a Participant's authorization form for a deduction becomes effective, and on each succeeding Offering Date thereafter, he shall be deemed to have been granted an option to purchase as many full shares of Common Stock as he will be able to purchase with the Compensation deductions credited to his Account during the payroll periods within the applicable Offering Period for which the Compensation deductions are made. In addition to the foregoing, any cash dividends paid on shares of Common Stock held in his Account shall be added to the Account, and used to purchase Common Stock as otherwise provided herein.

(b) The purchase price for the shares of Common Stock to be purchased with payroll deductions from the Participant shall be equal to the lesser of ninety-five percent (95%) (or such other amount as the Committee shall authorize, but in no event less than eighty- five percent (85%)) of (i) the "fair market value" of a share of Common Stock on the Offering Date or (ii) the "fair market value" of a share on the Purchase Date. Fair market value shall be defined as the closing bid price of the Common Stock on the largest national securities exchange on which such Common Stock is listed at the time the Common Stock is to be valued. If the Common Stock is not then listed on any such exchange, the fair market value shall be the closing sales price if such is reported or otherwise the mean between the closing "Bid" and the closing "Ask" prices, if any, as reported in the National Association of Securities Dealers Automated Quotation System (**"NASDAQ"**) for the date of valuation, or if none, on the most recent trade date thirty (30) days or less prior to the date of valuation for which such quotations are reported. If the Common Stock is not then listed on any such exchange or quoted in NASDAQ, the fair market value shall be the mean between the average of the "Bid" and the average of the "Ask" prices, if any, as reported in the National Daily Quotation Service for the date of valuation, or, if none, for the most recent trade date thirty (30) days or less prior to the date of valuation for which such quotations are reported. If the fair market value cannot be determined under the preceding three sentences, it shall be determined in good faith by the Committee.

8.     **TIME OF PURCHASE**

From time to time, the Committee shall grant to each Participant an option to purchase shares of Common Stock in an amount equal to the number of shares of Common Stock that the accumulated payroll deductions to be credited to his Account during the Offering Period may purchase at the applicable purchase price. Each Offering Period shall be for a specified period of time to be fixed by the Committee and shall be for no less than one month and no more than

4

Source: NUVELO INC, 10-K, March 16, 2005

twenty-seven (27) months' duration. Each Participant who elects to purchase shares of Common Stock hereunder shall be deemed to have exercised his option automatically on such date of purchase. Administrative and commission costs on purchases shall be paid by the Company. The Committee shall cause to be delivered periodically to each Participant a statement showing the aggregate number of shares of Common Stock in his Account, the number of shares of Common Stock purchased for him in the preceding Offering Period, his aggregate Compensation deductions for the preceding Offering Period, the price per share paid for the shares of Common Stock purchased for him during the preceding Offering Period, and the amount of cash, if any, remaining in his Account at the end of the preceding Offering Period.

A Participant may request delivery to him of the cash in his Account or of the shares of Common Stock held in his Account at any time (subject to any limitations imposed by Section 16(b) of the Securities Exchange Act of 1934), and the delivery thereof shall be made at such regular time as the Company or its transfer agent shall determine. If such delivery is required at a time other than the normal transfer date set by the Company or its transfer agent, the Participant requesting such transfer shall pay the costs thereof. All of the cash deposits in his Account shall be paid to him promptly after receipt of notice of withdrawal, without interest. Shares of Common Stock to be delivered to a Participant under the Plan shall be registered in the name of the Participant or, if the Participant so directs in writing to the Committee, in the name of the Participant and such person(s) as may be designated by the Participant, to the extent permitted by applicable law, and delivered to the Participant as soon as practicable after the request for a withdrawal. If a Participant wishes to sell the shares of Common Stock in his Account, he may notify the Committee to sell the same, in lieu of a distribution of such shares, in which event all commission costs incurred in connection with the sale of the shares of Common Stock shall be borne by the Participant. The Company shall pay administrative costs associated therewith other than costs arising from a sale occurring at a time different from the prearranged dates set by the Company or its transfer agent for making such sales.

## 9    CESSATION OF PARTICIPATION

A Participant may cease participation in the Plan at any time by notifying the Committee in writing of his intent to cease his participation. If such notice is received by the Committee the Company shall distribute to the Participant all of his accumulated payroll deductions, without interest. If any Participant ceases participation in the Plan, no further Compensation deductions shall be made on his behalf after the effective date of his cessation, except in accordance with a new authorization form filed with the Committee as provided in Section 6. Upon ceasing participation in the Plan, a Participant shall not be permitted to reenter the Plan until six (6) months have elapsed from the date his cessation becomes effective.

## 10.    INELIGIBILITY

An Employee must be employed by the Company or an Affiliate on the Purchase Date in order to participate in the purchase for that Offering Period. If an option expires without first having been exercised, all funds credited to the Participant's Account shall be refunded without interest. If a Participant becomes ineligible to participate in the Plan at any time, all Compensation deductions made on behalf of the Participant that have not been used to purchase shares of Common Stock

5

Source: NUVELO INC, 10-K, March 16, 2005

shall be paid to the Participant within sixty (60) days after the Committee determines that the Participant is not eligible to participate in the Plan.

11.   **DESIGNATION OF BENEFICIARY**

A Participant may file a written designation of a beneficiary who shall receive any shares of Common Stock (or remaining Compensation deductions) credited to the Participant's Account under the Plan in the event of such Participant's death prior to delivery to him of the certificates for such shares (or remaining Compensation deductions). The designation of a beneficiary may be changed by the Participant at any time by written notice given in accordance with rules and procedures established by the Committee. Upon the death of a Participant, and upon receipt by the Company of proof of the identity and existence, at the Participant's death, of a beneficiary validly designated by him under the Plan, the Company shall deliver such shares of Common Stock (or remaining Compensation deductions) to such beneficiary. In the event of the death of the Participant, and in the absence of a beneficiary validly designated under the Plan who is living at the time of such Participant's death, the Company shall deliver such shares (or remaining Compensation deductions) to the executor or administrator of the estate of the Participant, or if no such executor or administrator has been appointed, the Company, in its sole discretion, may deliver such shares (or remaining Compensation deductions) to the Participant's spouse or to any one or more dependents or relatives of the Participant, or to such other person or persons as the Company may designate on behalf of the estate of such deceased Participant.

12.   **TRANSFERABILITY**

Neither Compensation deductions nor Plan contributions credited to a Participant's Account nor any rights with regard to Plan participation or the right to purchase shares of Common Stock under the Plan may be assigned, transferred, pledged, or otherwise disposed of in any way by a Participant other than by will or the laws of descent and distribution; provided, however, that shares of Common Stock purchased on behalf of a Participant and left in his Account shall be subject to his absolute control. Any attempted assignment, transfer, pledge, or other disposition shall be void and without effect.

13.   **AMENDMENT OR TERMINATION**

The Board may, without further action on the part of the stockholders of the Company, at any time amend the Plan in any respect, or terminate the Plan, except that it may not

  (a) Permit the sale of more shares of Common Stock than are authorized under Section 5;
  (b) Change the class of Affiliates whose Employees are eligible to participate in the Plan; or
  (c) Effect a change inconsistent with Section 423 of the Code or the regulations issued thereunder.

<center>6</center>

Source: NUVELO INC, 10-K, March 16, 2005

14  **NOTICES**

All notices or other communications by a Participant under or in connection with the Plan shall be deemed to have been duly given when received in writing by the Chief Financial Officer of the Company or when received in the form specified by the Committee at the location and by the person designated by the Committee for the receipt thereof.

15  **LIMITATIONS**

Notwithstanding any other provisions of the Plan:

(a) The Company intends that this Plan shall constitute an employee stock purchase plan within the meaning of Section 423 of the Code. Any provisions required to be included in the Plan under said Section, and under regulations issued thereunder, are hereby included as though set forth in the Plan at length.

(b) No Employee shall be entitled to participate in the Plan if, immediately after the grant of an option hereunder, the Employee would own stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or an Affiliate. For purposes of this Section 15, stock ownership shall be determined under the rules of Section 424(d) of the Code and stock that the Employee may purchase under outstanding options shall be treated as stock owned by the Employee.

(c) No Employee shall be permitted to purchase Common Stock hereunder if his right and option to purchase Common Stock under this Plan and under all other employee stock purchase plans (as defined in Section 423 of the Code) of the Company or any Affiliates would result in an entitlement to purchase Common Stock in any one (1) calendar year in excess of a fair market value of $25,000 (determined at the time of grant).

(d) All Employees shall have the same rights and privileges under the Plan, except that the amount of Common Stock that may be purchased pursuant to the Plan shall bear a uniform relationship to an Employee's Compensation. All rules and determinations of the Committee shall be uniformly and consistently applied to all persons in similar circumstances.

(e) Nothing in the Plan shall confer upon any Employee the right to continue in the employment of the Company or any Affiliate or affect the right that the Company or any Affiliate may have to terminate the employment of such Employee.

(f) No Participant shall have any right as a stockholder unless and until certificates for shares of Common Stock are issued to him or allocated to his Account.

(g) If under any provision of the Plan that requires a computation of the number of shares of Common Stock to be purchased, the number so computed is not a whole number of shares of Common Stock, such number of shares of Common Stock shall be rounded down to the next whole number.

7

Source: NUVELO INC, 10-K, March 16, 2005

(h) The Plan is intended to provide shares of Common Stock for investment and not for resale. The Company does not, however, intend to restrict or influence any Participant in the conduct of his own affairs. A Participant, therefore, may sell shares of Common Stock purchased under the Plan at any time he chooses, subject to compliance with any applicable federal or state securities laws or any applicable Company restriction or blackout periods; provided, however, that because of certain federal tax requirements, each Participant shall agree, by entering the Plan:

(i) promptly to give the Company notice of any shares of Common Stock disposed of within two (2) years after the date of grant of the applicable option, or within one (1) year of the Purchase Date, and the number of such shares disposed of (a "disqualifying disposition");

(ii) that the Company may withhold, pursuant to Code §§ 3102, 3301, and 3402, from his wages and other cash compensation paid to him in all payroll periods following in the same calendar year, any additional taxes the Company may become liable for in respect of amounts includable in his income as additional compensation as a result of a disqualifying disposition of Common Stock acquired under the Plan, or as a result of the acquisition of Common Stock under the Plan; and

(iii) that he shall repay the Company any amount of additional taxes the Company may become liable for in respect of amounts includable in his income as additional compensation as a result of a disqualifying disposition of Common Stock acquired under the Plan, or as a result of the acquisition of Common Stock under the Plan, that cannot be satisfied by withholding from the wages and other cash compensation paid to him by the Company.

(i) This Plan is intended to comply in all respects with applicable law and regulations, including with respect to Participants who are officers or directors for purposes of Section 16 of the Securities Exchange Act of 1934, as amended from time to time, Rule 16b-3 of the Securities and Exchange Commission. In case any one or more provisions of this Plan shall be held invalid, illegal, or unenforceable in any respect under applicable law and regulation (including Rule 16b-3), the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and the invalid, illegal, or unenforceable provision shall be deemed null and void; however, to the extent permitted by law, any provision that could be deemed null and void shall first be construed, interpreted, or revised retroactively to permit this Plan to be construed in compliance with all applicable law (including Rule 16b-3), so as to further the intent of this Plan. Notwithstanding anything herein to the contrary, with respect to Participants who are officers and directors for purposes of Section 16(b) of the Securities Exchange Act of 1934, as amended from time to time, and if required to comply with the rules promulgated thereunder, such Participants shall not be permitted to direct the sale of any Common Stock purchased hereunder until at least six (6) months have elapsed from the date of a purchase, unless the Committee determines that the sale of the Common Stock otherwise satisfies the then current Rule 16b-3 requirements.

<div align="center">8</div>

Source: NUVELO INC, 10-K, March 16, 2005

16.    **EFFECTIVE DATE AND APPROVALS**

The Plan shall become effective at a time when:

    (a) the Plan has been adopted by the Board; and

    (b) a registration statement on Form S-8 under the Securities Act of 1933, as amended, has become effective with respect to the Plan; and

    (c) the Committee has notified the eligible Employees that they may commence participation in the Plan; and

    (d) the Plan is approved by the holders of a majority of the outstanding shares of Common Stock of the Company, which approval must occur within the period ending twelve (12) months after the date the Plan is adopted by the Board. In the event such stockholder approval is not obtained, the Plan shall terminate and have no further force or effect, and all amounts collected from the Participants during any initial Offering Period(s) hereunder shall be refunded.

Unless sooner terminated by the Board, or as set forth above, the Plan shall terminate upon the earlier of (i) the tenth (10th) anniversary of the adoption of the Plan by the Board, or (ii) the date on which all shares available for issuance under the Plan shall have been sold under the Plan.

17.    **APPLICABLE LAW**

All questions pertaining to the validity, construction, and administration of the Plan shall be determined in conformity with the laws of Delaware, to the extent not inconsistent with Section 423 of the Code and the regulations thereunder.

Adopted the 16th day of March, 1998, amended on May 23, 2000, and amended and restated on December 14, 2004.

9

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT 10 48

# OPT-OUT, TERMINATION, SETTLEMENT AND RELEASE AGREEMENT

THIS OPT-OUT, TERMINATION SETTLEMENTAND RELEASE AGREEMENT (the "Opt-Out Agreement") is made effective as of October 29, 2004 (the "Effective Date") by and between **AMGEN INC.**, a Delaware corporation having its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1799 ("Amgen") and **NUVELO, INC.**, a Nevada corporation having its principal place of business at 670 Almanor Avenue, Sunnyvale, California 94085-1710 and formerly known as Hyseq, Inc. ("Nuvelo") Amgen and Nuvelo are sometimes referred to herein individually as a "Party" and collectively as the "Parties"

## RECITALS

**WHEREAS,** Amgen and Nuvelo have been collaborating in the joint development and commercialization of a protein known as Alfimeprase (and other variants of Alfimeprase) under the terms and conditions of that certain Collaboration Agreement between the Parties, dated January 8, 2002 ("Collaboration Agreement");

**WHEREAS,** pursuant to Article 15 of the Collaboration Agreement, Amgen has elected to exercise its right to convert its right to jointly develop and commercialize Alfimeprase (and other variants of Alfimeprase) into the grant to Nuvelo of an exclusive license under certain Amgen rights to Develop, manufacture and Commercialize Alfimeprase (and other variants of Alfimeprase);

**WHEREAS,** Nuvelo wishes to exclusively license such Amgen rights from Amgen in connection with the Development, manufacture and Commercialization of the Licensed Product(s) (as hereinafter defined), on the terms and conditions set forth in the form of License Agreement attached hereto as Attachment A (the "License Agreement");

**WHEREAS,** the Parties have engaged in an on-going discussion regarding the amounts each Party owed the other in respect of expenses incurred pursuant to the Collaboration Agreement and now desire to finally settle those discussions and all accounts relating to the Operating Profit or Loss up to and including the third Calendar Quarter of 2004;

**NOW THEREFORE,** based on the foregoing premises and the mutual covenants and obligations set forth below, the Parties agree as follows:

1. Definitions. Capitalized terms used but not otherwise defined herein have the meanings provided in the Collaboration Agreement.

2. Opt-Out Pursuant to the terms and conditions of Article 15 of the Collaboration Agreement, Amgen hereby exercises its opt-out right, and the Collaboration is hereby terminated pursuant to Section 16.8 of the Collaboration Agreement.

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Amgen Contract #200200784

3. Settlement and Release Effective upon the receipt by Amgen of the payment described in Section 4 of this Opt-Out Agreement:

A. Amgen, on behalf of itself and its officers, directors, employees, agents and Affiliates and each of their respective successors and assigns, hereby irrevocably and unconditionally releases and forever discharges Nuvelo, and its officers, directors, employees, agents and Affiliates and each of their respective successors and assigns, from all claims, liabilities, indemnifications, obligations, causes of action and demands, solely to the extent relating to the calculation of costs and expenses charged to the Operating Profit or Loss under the Collaboration Agreement prior to the end of the third Calendar Quarter of 2004 Amgen hereby waives its right to audit any books and records of Nuvelo pursuant to Section 10 2 of the Collaboration Agreement with respect to costs and expenses incurred prior to the end of the third Calendar Quarter of 2004

B. Nuvelo, on behalf of itself and its officers, directors, employees, agents and Affiliates and each of their respective successors and assigns, hereby irrevocably and unconditionally releases and forever discharges Amgen, and its officers, directors, employees, agents and Affiliates and each of their respective successors and assigns, from all claims, liabilities, indemnifications, obligations, causes of action and demands, solely to the extent relating to the calculation of costs and expenses charged to the Operating Profit or Loss under the Collaboration Agreement prior to the end of the third Calendar Quarter of 2004. Nuvelo hereby waives its right to audit any books and records of Amgen pursuant to Section 10 2 of the Collaboration Agreement with respect to costs and expenses incurred prior to the end of the third Calendar Quarter of 2004.

4. Payment. On or before November 5, 2004 Nuvelo shall pay to Amgen Eight Million Five Hundred Thousand Dollars ($8,500,000 U.S ), representing mutually agreed reimbursement of Amgen costs Such payment shall be made via wire transfer in currently available U.S funds to Amgen's account according to the following instructions:

| | |
|---|---|
| **Beneficiary Name:** | **Amgen Inc.** |
| **Beneficiary Account #:** | |
| **Bank Name:** | [ * ] |
| **ABA #:** | |

5. License Agreement. Notwithstanding any other term or condition of the Collaboration Agreement, Amgen shall have no obligation to enter into any license agreement, including, without limitation, the License Agreement unless Nuvelo timely meets its payment obligations set forth in Section 4 of this Opt-Out Agreement. In the event that Nuvelo does timely meet its payment obligations set forth in Section 4 of this Opt-Out Agreement then the Parties shall, within two (2) business days, execute the License Agreement.

6. General.

6.1 *No Strict Construction.* This Opt-Out Agreement has been prepared jointly and shall not be strictly construed against either Party

6.2 *Assignment.* Neither Party may assign or transfer this Opt-Out Agreement or any rights or obligations hereunder without the prior written consent of the other., except that a Party may

[*] Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended

make such an assignment without the other Party's consent to Affiliates or to an entity that acquires all or substantially all of the business of such Party, whether in a merger, consolidation, reorganization, acquisition, sale or otherwise. This Opt-Out Agreement shall be binding on the successors and assigns of the assigning Party, and the name of a Party appearing herein shall be deemed to include the name(s) of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this Opt-Out Agreement. Any assignment or attempted assignment by either Party in violation of the terms of this Section 6.2 shall be null and void and of no legal effect. The assigning Party shall forward to the other Party a copy of those portions of each fully executed assignment agreement which relate to the assumption of the rights and responsibilities of the assigning Party, within sixty (60) days of the execution of such assignment agreement.

6.3 *Counterparts.* This Opt-Out Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

6.4 *Severability.* If any one or more of the provisions of this Opt-Out Agreement are held to be invalid or unenforceable by any court of competent jurisdiction from which no appeal can be or is taken, such provisions shall be considered severed from this Opt-Out Agreement and shall not serve to invalidate any remaining provisions hereof.

6.5 *Independent Contractors.* The relationship between Nuvelo and Amgen created by this Opt-Out Agreement is one of independent contractors. This Opt-Out Agreement does not create any agency, distributorship, employee-employer, partnership, joint venture or similar business relationship between the parties. Neither Party is a legal representative of the other Party, and neither Party can assume or create any obligation, representation, warranty or guarantee (express or implied) on behalf of the other Party for any purpose whatsoever. Each Party shall use its own discretion and shall have complete and authoritative control over its employees and the details of performing its obligations under this License Agreement.

6.6 *No Benefit of Third Parties.* The representations, warranties, covenants and agreements set forth in this Opt-Out Agreement are for the sole benefit of the Parties hereto and their successors and permitted assigns, and they shall not be construed as conferring any rights on any Third Parties.

6.7 *Use of Name.* Except as expressly provided in this Opt-Out Agreement, no Party hereto shall use, and no rights are granted in or to, the names or Trademarks (including the names "Amgen" and "Nuvelo"), physical likeness, employee names or owner symbol of the other Party for any purpose (including, without limitation, private or public securities placements) without the prior written consent of the affected Party, such consent not to be unreasonably withheld or delayed so long as such use of name is limited to an objective statement of fact rather than for endorsement purposes, provided, further that in the event that such use is legally required the required Party shall provide the affected Party with a reasonable opportunity to comment on such use and the required Party shall reasonably consider the comments timely provided by such affected Party. Neither Party shall use any Trademark which either substantially resembles or is

Amgen Contract #200200784-004

Source: NUVELO INC, 10-K, March 16, 2005

confusingly similar to, misleading or deceptive with respect to, or which dilutes any of the other Party's Trademarks in connection with the subject matter of this Opt-Out Agreement.

6.8 *No Waiver.* Any delay in enforcing a Party's rights under this Opt-Out Agreement or any waiver as to a particular default or other matter shall not constitute a waiver of such Party's rights to the future enforcement of its rights under this Opt-Out Agreement, except with respect to an express written and signed waiver relating to a particular matter for a particular period of time.

6.9 *Entire Agreement; Amendment.* This Opt-Out Agreement (including all Exhibits), that certain Warrant Purchase Agreement, dated January 8, 2002, and any rights and obligations surviving, by its terms, termination of that certain Collaboration Agreement (as defined herein on Page 1) set forth the complete, final and exclusive agreement and all the covenants, promises, agreements, warranties, representations, conditions and understandings between the Parties hereto and supersedes and terminates all prior agreements and understandings between the Parties. There are no covenants, promises, agreements, warranties, representations, conditions or understandings (either oral or written) between the Parties other than as are set forth herein and therein. This Opt-Out Agreement may only be modified or supplemented in a writing expressly stated for such purpose and signed by an authorized officer of each Party (i.e., it may not be modified by any purchase order, change order, acknowledgment, order acceptance, standard terms of sale, invoice or the like). The license agreement attached to the Collaboration Agreement as Schedule IV is hereby deleted in its entirety and replaced with the License Agreement attached hereto as Attachment A. Section 15.3 of the Collaboration Agreement is hereby deleted in its entirety.

**IN WITNESS WHEREOF,** the Parties have executed this License Agreement in duplicate originals by their duly authorized representatives as of the Effective Date.



AMGEN INC.

By:

Print Name:  Roger Perlmutter, M.D., Ph.D.

Title:      Executive Vice President,
            Research and Development

NUVELO, INC.

By:

Print Name:  Ted W. Love

Title:      President & CEO

Amgen Contract #200200783-004

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT 10 49

**LICENSE AGREEMENT**

**BY AND BETWEEN**

**AMGEN INC.**

**AND**

**NUVELO, INC.**

Amgen Contract #200200784                               1

Source: NUVELO INC, 10-K, March 16, 2005