# Exhibit R

### Work Letter

THIS WORK LETTER (this "Work Letter") is made and entered into as of January 11, 2005 by and between BMR-201 INDUSTRIAL ROAD LLC, a Delaware limited liability company ("Landlord"), and NUVELO, INC., a Delaware corporation ("Tenant"), and is attached to and made a part of that certain Lease, dated as of January 11, 2005 (the "Lease"), by and between Landlord and Tenant, for the premises located at 201 Industrial Road, San Carlos, California. All capitalized terms used but not otherwise defined herein shall have the meanings given them in the Lease.

1. General Requirements.

    1.1 Tenant's Authorized Representative. Tenant designates Rob Middleton, Brian McPherson, Ron Malouf and Bryce Mason (each, a "Tenant's Authorized Representative"), or any one of them, as the person or persons authorized to approve and initial all plans, drawings, change orders and approvals on Tenant's behalf pursuant to this Work Letter. Tenant may change Tenant's Authorized Representative at any time upon not less than five (5) business days' advance written notice to Landlord. Landlord shall not be obligated to respond to or act upon any such item until such item has been initialed or approved in writing by one of Tenant's Authorized Representatives. The contact information for the Tenant's Authorized Representatives are as follows:

    Bryce Mason
    1770 Pacific Avenue, #103
    San Francisco, CA 94109
    Phone: (415) 317-2100
    Fax:    (415) 276-3065
    Email: bryce@kbmpartners.com
    Ron Malouf
    675 Almanor
    Sunnyvale, CA
    Phone: (408) 215-4322
    Email: rmalouf@nuvelo.com
    Rob Middleton
    153 Kearny Street, #409
    San Francisco, CA 94108
    Phone: (415) 393-8062
    Fax:    (415) 393-8008
    Email: rob@colepm.com
    Brian McPherson
    153 Kearny Street, #409
    San Francisco, CA 94108

Source: NUVELO INC, 10-K, March 16, 2005

Phone    (415)393-8062
Fax      (415)393-8008
Email:   brianm@colepm.com

1.2 Development Schedule. The schedule for design and development of Tenant's Work (as hereinafter defined), including without limitation the time periods for preparation and review of construction documents, approvals and performance, whether by Landlord or by Tenant, shall be in accordance with that certain Time and Responsibility Schedule prepared by Landlord and Tenant, and attached as Schedule D-1 to this Work Letter, subject to adjustment as mutually agreed to in writing by the parties or as provided in this Work Letter (the "Development Schedule").

1.3 Architects and Consultants. The architect, engineering consultants, design team, general contractor and all subcontractors responsible for the construction of Tenant's Work shall be selected by Tenant and approved by Landlord. Landlord's approval of the same shall not be unreasonably withheld, conditioned or delayed. Landlord hereby approves Dowler-Gruman Architects as Tenant's architect.

2.    Landlord's Work

2.1 Landlord shall provide to Tenant on or before Rent Commencement Date the following items in a finished condition (collectively, "Landlord's Work"):

(a) Base Building HVAC to support the fourth (4th) floor Common Areas.

(b) Building fire exit stairways. Stair wells are considered Common Areas of the Building. Tenant shall have the right to secure access to any of Tenant's space from the common areas.

(c) Fire alarm systems for the Building Common Areas in compliance with applicable codes and regulations.

(d) Demise the fourth (4th) floor into a multi-tenant floor, which shall include corridors.

(e) Utility and electrical installation for 4,000 amps in the Building and to the Premises, including PG&E submeters for the Premises.

(f) Elevator service operational, with all inspections and maintenance completed.

(g) Concrete slab with a floor load capacity that is comparable to other life science laboratories in the San Francisco mid-peninsula area.

(h) Exterior ramp and exterior alterations to the Building or Common Areas to accommodate a shipping and receiving area for Tenant's use. For the avoidance of doubt, any alterations to the interior of the Building or Common Areas related to such shipping and receiving area shall be included in Tenant's Work (defined below); and

Source: NUVELO INC, 10-K, March 16, 2005

Landlord's obligation to construct improvements under this Section 2.1(h) shall be subject to Approved Tenant Plans related to the interior portion of such shipping and receiving area.

2.2 Landlord's Work shall be substantially completed by September 1, 2005. Landlord shall perform Landlord's Work without any material interference to Tenant's construction of Tenant's Work, and shall have the right to perform Landlord's Work after tendering possession to Tenant.

2.3 To the extent Landlord's Work is not completed substantially by September 1, 2005 ("Delay in Landlord's Work"), then the Rent Commencement Date shall be extended one day for each day of Delay in Landlord's Work.

3. Tenant's Work.

3.1 Work Plans. All work to be performed by Tenant ("Tenant's Work") shall be performed by Tenant at Tenant's sole cost and expense and without cost to Landlord (except for the Tenant Improvement Allowance and, at Tenant's option, the Additional Allowance) and in accordance with the Approved Tenant Plans (as defined below). The quality of Tenant's Work shall be of a nature and character not less than the quality of other Class A life science tenants in the San Francisco mid-peninsula area ("Standard Improvements"). The design drawings, plans and specifications contained on Schedule D-2 to this Work Letter (the "Work Plans") are the initial list of plans which Tenant shall develop and submit to Landlord for approval. Tenant shall prepare and submit to Landlord for approval schematics covering Tenant's Work prepared in conformity with the applicable provisions of this Work Letter (the "Draft Plans"). The Draft Plans shall contain sufficient information to convey Tenant's proposed design to Landlord and such other information as Landlord may reasonably request. Tenant shall be solely responsible for ensuring that the Work Plans and the Draft Plans reflect Tenant's requirements for Tenant's Work.

3.2 Landlord Approval of Plans. Landlord shall notify Tenant, within five (5) business days after receipt of the Draft Plans whether Landlord approves or objects to the Draft Plans and of the manner, if any, in which the Draft Plans are unacceptable. Landlord shall not object to any Draft Plans that set forth Standard Improvements. If Landlord makes objections to the Draft Plans, and provided such objections are reasonable, Tenant shall revise the Draft Plans and cause such objections to be remedied in the revised Draft Plans. Tenant shall then resubmit the revised Draft Plans to Landlord for approval. Within two (2) business days after Landlord receives the revised Draft Plans, Landlord shall approve or reasonably disapprove such Draft Plans. If Landlord does not respond within said two (2) business day period, Landlord shall be deemed to have approved of the Draft Plans. This procedure shall be repeated until the Draft Plans are finally approved by Landlord and written approval has been delivered to and received by Tenant. Landlord's approval or reasonable objection to the revised Draft Plans and Tenant's correction of the same shall be in accordance with this Section 3.2. The iteration of the Draft Plans which are finally approved by Landlord without objection are referred to as the "Approved Tenant Plans." For the avoidance of doubt, Landlord acknowledges that Tenant will provide Draft Plans for the following, which following Landlord's approval in accordance with this Section 3.2 shall be included as part of the Approved Tenant Plans: (a) a designated area for

Source: NUVELO INC, 10-K, March 16, 2005

Tenant's storage purposes to be located adjacent to the new non-exclusive shipping and receiving area in the parking garage, subject to City of San Carlos' ("City") minimum parking requirements; (b) a designated area for Tenant's Hazardous Materials storage area, which area may be located in the parking garage or outside on the parking lot, all subject to City's approval and parking requirements; (c) a reasonable location for an outside generator pad; and (d) reasonable structural improvements to the Premises to increase the Building load for Tenant's additional storage purposes

3.3 <u>Completion of Tenant's Work</u>. Tenant will perform and cause to be completed Tenant's Work (a) in a good and workmanlike manner, (b) in compliance with the Lease and this Work Letter in strict conformance with the Approved Tenant Plans; (c) otherwise in compliance with the Lease and this Work Letter, and (d) in accordance with all Applicable Laws, Landlord's and Tenant's insurance carriers and the board of fire underwriters having jurisdiction Completion of all Tenant's Work shall be subject to Landlord's reasonable approval.

3.4 <u>Conditions to Performance of Tenant's Work</u>. Prior to the commencement of Tenant's Work, Tenant shall submit to Landlord, for Landlord's approval (which approval shall not be unreasonably withheld, conditioned or delayed), a list (the "<u>Contractor List</u>") of project managers and licensed contractors and/or subcontractors who will perform Tenant's Work Landlord shall give Tenant notice of its approval or disapproval of the Contractor List within five (5) business days after Landlord's receipt of the Contractor List. If Landlord does not respond within said five (5) business day period, Landlord shall be deemed to have approved of the Contractor List. If Landlord reasonably disapproves one or more parties on the Contractor List, Landlord shall state the reason for its disapproval and Tenant shall revise the Contractor List and resubmit the same to Landlord for Landlord's approval in accordance with the preceding two sentences Notwithstanding the foregoing, Landlord hereby approves BCCI Construction as Tenant's general contractor; <u>provided</u> that Landlord shall receive a credit of $25,000 against the Tenant Improvement Allowance to cover the fees of Landlord's construction manager

3.5 <u>Requests for Consent</u>. Landlord shall respond to all requests for consents, approvals, directions or the like made by Tenant pursuant to this Work Letter within five (5) business days following Landlord's receipt of such request. Requests need be sent only to Landlord's General Counsel at Landlord's San Diego office, either by fax (858-485-9843) or email (gkreitzer@biomedrealty com). Landlord's failure to respond within such five (5) business day period shall be deemed approval by Landlord

4. <u>Tenant's Construction Obligations Do Not Delay Rent Commencement Date</u>. Notwithstanding any Tenant Work to be performed by Tenant, the commencement of the Lease Term and Tenant's obligation to pay Rent shall not, under any circumstances, be extended or delayed beyond September 1, 2005, unless Landlord does not cause temporary power to be provided to the Building with an electricity load equal to approximately 50 amps on or prior to February 1, 2005 (in which case the Rent Commencement Date shall be extended by a day for each day that Landlord fails to complete such Landlord's work after February 1, 2005); <u>provided</u> that the Premises are delivered to Tenant on or before February 1, 2005 and there are no delays by Landlord in performing Landlord's Work pursuant to this Work Letter or the Lease. Tenant shall perform promptly such of its obligations contained in this Work Letter as are to be performed by it. Tenant shall also observe and perform all of its obligations under the Lease

Source: NUVELO INC, 10-K, March 16, 2005

from the Lease Commencement Date, while performing Tenant's Work, other than the payment of Rent.

5. Completion of Tenant's Construction Obligations. Tenant, at Tenant's sole cost and expense and without cost to Landlord (except for the Tenant Improvement Allowance and, at Tenant's option, the Additional Allowance), shall complete Tenant's Work described in this Work Letter in all respects in accordance with the provisions of the Lease, and not later than December 31, 2005, except for extensions due to Landlord delays or force majeure, after which date Landlord's obligation to fund the Tenant Improvement Allowance and the Additional Allowance shall expire. Tenant's Work shall be completed at such time as Tenant shall (1) furnish evidence reasonably satisfactory to Landlord that (i) all of Tenant's Work has been completed (which may be evidenced by the architect's certificate of completion and the general contractor's and subcontractor's final waivers and releases of liens), (ii) such work has been accepted by Landlord, which acceptance shall not be unreasonably withheld, (iii) any and all liens therefor that have been or might be filed have been discharged of record (by payment, bond, order of a court of competent jurisdiction or otherwise) or waived, and (iv) no security interests relating thereto are outstanding; (2) furnish to Landlord all certifications and approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriters or similar body for the use and occupancy of the Premises; (3) furnish to Landlord the insurance required by the Lease; and (4) furnish an affidavit from Tenant's architect certifying that all of Tenant's Work performed in the Premises is in substantial accordance with the Approved Plans.

6. Insurance. Tenant shall provide, or shall cause Tenant's contractors and subcontractors to provide, in addition to the insurance required of Tenant pursuant to the Lease, the following types of insurance:

6.1 Builders Risk Insurance. At all times during the period between the commencement of construction of Tenant's Work and completion of Tenant's Work, Tenant shall maintain, or cause to be maintained, casualty insurance in Builder's Risk Form, covering Landlord, Landlord's agents, Tenant and Tenant's contractors, as their interests may appear, against loss or damage by fire, vandalism, and malicious mischief and other such risks as are customarily covered by the so-called "broad form extended coverage endorsement" upon all Tenant's Work and builder's machinery, tools and equipment, all while forming a part of, or contained in, such improvements or temporary structures while on the Premises, or when adjacent thereto, all on a completed value basis for the full insurable value at all times. Said Builder's Risk Insurance shall contain an express waiver of any right of subrogation by the insurer against Landlord, its agents and employees.

6.2 Workers' Compensation. At all times during the period of construction of Tenant's Work, Tenant will itself, if necessary, and will require contractors and subcontractors to maintain statutory Workers' Compensation insurance.

7. Liability.

7.1 Tenant's Liability. Tenant assumes the responsibility and liability for any and all injuries or death of any persons, including Tenant's contractors and subcontractors, and their

Source: NUVELO INC, 10-K, March 16, 2005

respective employees and for any and all damages to property caused by, or resulting from or arising out of any act or omission on the part of Tenant, Tenant's contractors or subcontractors or their respective employees, in the prosecution of Tenant's Work and with respect to such work. Tenant agrees to indemnify, defend, protect and save free and harmless Landlord, from and against all losses and/or expenses, including reasonable legal fees and expenses, which Landlord may suffer or pay as the result of claims or lawsuits due to, because of, or arising out of any and all such injuries or death and/or damage, whether real or alleged and Tenant and Tenant's contractors and/or subcontractors or their respective insurance companies shall assume and defend at their own expense all such claims or lawsuits; provided, however, that nothing contained in this Work Letter shall be deemed to indemnify or otherwise hold Landlord harmless from or against the negligent or wrongful acts or omissions of Landlord, its agents, employees and contractors nor to affect or modify the terms of the Lease. Any approval or consent by Landlord shall in no way obligate Landlord in any manner whatsoever in respect of the finished product designed and/or constructed by Tenant or its contractors. Any deficiency in design or construction, although the same has prior approval of Landlord, shall be solely the responsibility of Tenant. All construction materials and equipment furnished by Tenant as Tenant Work, except for personal property, furniture and trade equipment, shall be new or "like-new" and all work shall be performed in a first-class workmanlike manner.

7.2 Landlord's Liability. Landlord assumes the responsibility and liability for any and all injuries or death of any persons, including Landlord's contractors and subcontractors, and their respective employees and for any and all damages to property caused by, or resulting from or arising out of any act or omission on the part of Landlord, Landlord's contractors or subcontractors or their respective employees, in the prosecution of Landlord's Work and with respect to such work. Landlord agrees to indemnify, defend, protect and save free and harmless Tenant, from and against all losses and/or expenses, including reasonable legal fees and expenses, which Tenant may suffer or pay as the result of claims or lawsuits due to, because of, or arising out of any and all such injuries or death and/or damage, whether real or alleged and Landlord and Landlord's contractors and/or subcontractors or their respective insurance companies shall assume and defend at their own expense all such claims or lawsuits; provided, however, that nothing contained in this Work Letter shall be deemed to indemnify or otherwise hold Tenant harmless from or against the negligent or wrongful acts or omissions of Tenant, its agents, employees and contractors nor to affect or modify the terms of the Lease.

8. Tenant Improvement Allowance.

8.1 Application of Tenant Improvement Allowance. Landlord shall contribute first the Tenant Improvement Allowance and second, at Tenant's option, the Additional Allowance toward the costs and expenses incurred in connection with the performance of Tenant's Work. If the entire Tenant Improvement Allowance is not applied toward or reserved for the costs of Tenant's Work, any unused portion of the Tenant Improvement Allowance shall be credited against Monthly Rent payments as such Monthly Rent payments become due.

8.2 Approval of Budget for Tenant's Work. Notwithstanding anything to the contrary set forth elsewhere in this Work Letter, Landlord shall not have any obligation to advance to Tenant any portion of the Tenant Improvement Allowance or Additional Allowance until Landlord shall have reasonably approved, in writing, the project budget for the Tenant's Work.

Source: NUVELO INC, 10-K, March 16, 2005

(an "Approved Budget"). Landlord shall respond to the proposed budget within five (5) business days of submittal by Tenant, and if Landlord does not respond within said five (5) business day period, such proposed budget shall be deemed approved. Landlord's consent to the proposed budget shall not be unreasonably withheld. If the Approved Budget exceeds the Tenant Improvement Allowance, then within five (5) business days of the day Landlord approves such budget, Tenant may request in writing that Landlord fund the Additional Allowance in accordance with Paragraph 4.5 of the Lease. In the event Tenant makes such election with respect to the Additional Allowance, the Combined Allowance shall be used to fund the Approved Budget, provided, however, that in the event Tenant does not request the Additional Allowance, or the Combined Allowance is still not sufficient to cover the Approved Budget (including any approved Tenant Changes), then Tenant shall deliver to Landlord within five (5) business days a letter of credit in favor of Landlord in an amount sufficient to cover such excess costs ("Tenant's Costs"). Once all funds in the Tenant Improvement Allowance and the Additional Allowance, if applicable, have been paid by Landlord, Tenant shall pay for the Tenant's Costs directly to the contractors, subcontractors or vendors, and in the event Tenant does not directly pay such Tenant's Costs within a reasonable period of time, Landlord shall be entitled to draw from the letter of credit described above. In the event Tenant pays for the Tenant's Costs directly to Tenant's contractors, subcontractors or vendors, Landlord shall return said letter of credit to Tenant upon Tenant's completion of Tenant's Work in accordance with Section 5 hereof.

8.3 Advance Requests. Upon submission by Tenant to Landlord of a statement (an "Advance Request") from Tenant's contractor, subcontractor or vendor setting forth the total amount requested therefrom and a reasonably detailed summary of the work performed (which shall be satisfied by a copy of an AIA standard form Application for Payment (G702) executed by the general contractor and by the architect) accompanied by unconditional partial lien releases from the general contractor and the relevant subcontractors in respect of the prior advance and conditional lien releases from the general contractor and the relevant subcontractors in respect of the current Advance Request, Landlord, within seven (7) business days following receipt by Landlord of an Advance Request and the accompanying materials, shall make such payment directly to Tenant's contractor, subcontractor or vendor, as applicable, provided, however, that Landlord shall not be responsible for payments for Tenant's Work once all funds in the Tenant Improvement Allowance and the Additional Allowance, if applicable, have been used.

8.4 Use of the Tenant Improvement Allowance. The Tenant Improvement Allowance may be used for the payment of Tenant's furniture, personal property, equipment (including non-building system equipment), and trade fixtures in accordance with Paragraph 4.5 of the Lease, including without limitation, data cabling, telephone and data equipment, security, audio/visual equipment, white noise and furniture systems ("FF&E"). As provided in Paragraph 4.5 of the Lease, in no event shall more than fifteen percent (15%) of the Tenant Improvement Allowance be used to purchase FF&E. The FF&E shall be part of the Approved Budget.

9. Existing Building Materials; Removal of Tenant's Property. Any existing building materials within the Premises that Tenant reuses (e.g., lights, doors, frames, hardware, etc.) shall be at no cost to Tenant and shall not be deducted from the Tenant Improvement Allowance or Additional Allowance.

Source: NUVELO INC, 10-K, March 16, 2005

10. Changes. Any major changes requested by Landlord or Tenant to Tenant's Work after Landlord signs the Approved Plans shall be requested and instituted in accordance with the provisions of this Section 10 and shall be subject to the reasonable written approval of the party not requesting the change.

### 10.1 Tenant Change Requests

10.1.1 If, after Landlord signs the Approved Plans, Tenant shall request changes to Tenant's Work or request major changes to the Tenant's Work already installed ("Tenant Changes"), Tenant shall request such Tenant Changes by notifying Landlord in writing in substantially the same form as the AIA standard change order form (a "Tenant Change Request"), which Tenant Change Request shall detail (i) the nature and extent of any such Tenant Change and (ii) an estimate of the additional cost or savings and the time savings or delay involved with respect to such Tenant Change. If the nature of such Tenant Change requires revisions to the Approved Plans in order to comply with Applicable Laws, then Tenant shall be solely responsible for the cost of such revisions. Such Tenant Change Request must be signed by one of Tenant's Authorized Representatives or Landlord shall not be required to process such Tenant Change Request. Landlord, before approving a Tenant Change to Tenant's Work, shall use its best efforts to respond to Tenant as soon as is reasonably possible with an estimate of the time it will take Landlord to analyze the Tenant Change Request. Landlord shall thereafter submit to Tenant in writing, within five (5) business days receipt of the Tenant Change Request (or such longer period of time as is reasonably required depending on the extent of the Tenant Change Request), Landlord's approval or disapproval of the Tenant Change Request. If Landlord fails to respond to the Tenant Change Request, then the Tenant Change Request shall be deemed accepted and Tenant shall be permitted to proceed with the Tenant's Work in accordance with the Tenant Change Request.

10.1.2 Landlord shall approve or reject the Tenant Change Request according to the guidelines established pursuant to Section 3 hereof. If Landlord does not approve in writing the Tenant Change Request, the Tenant Change Request shall be deemed rejected and Tenant shall not be permitted to construct Tenant's Work in accordance with the Tenant Change Request.

### 10.2 Landlord Change Requests

10.2.1 If, after Landlord signs the Approved Plans, Landlord shall request reasonable changes to Tenant's Work or request reasonable changes to the Tenant's Work already installed ("Landlord Changes"), Landlord shall request such Landlord Changes by notifying Tenant in writing in substantially the same form as the AIA standard change order form (a "Landlord Change Request"), which Landlord Change Request shall detail the nature and extent of any such Landlord Change. If the nature of such Landlord Change requires revisions to the Approved Plans, then Landlord shall be solely responsible for the cost of such revisions. Tenant shall, before proceeding with any Landlord Change to Tenant's Work, use its best efforts to respond to Landlord as soon as is reasonably possible within estimate of (i) the time it will take Tenant to analyze the Landlord Change Request, and (ii) the architectural and engineering fees and costs which will be incurred in order to analyze such Landlord Change Request and Tenant shall thereafter submit to Landlord in writing, within five (5) days receipt of

Source: NUVELO INC, 10-K, March 16, 2005

the Landlord Change Request (or such longer period of time as is reasonably required depending on the extent of the Landlord Change Request), an estimate of the additional cost or savings involved with respect to Tenant's Work.

10.2.2 If the Landlord Change impacts on Tenant's Work, then if Landlord approves in writing the cost or savings, Tenant shall cause the approved Landlord Change to be instituted. If Tenant does not approve in writing the cost or savings and the extension in the time for completion of Tenant's Work, then the Landlord Change Request shall be deemed rejected and Tenant shall not be required to construct Tenant's Work in accordance with the Landlord Change Request. All additional costs and expenses payable by Tenant to complete Tenant's Work due to the Landlord Change Request shall be reimbursed by Landlord, but shall not result in any reduction in the Tenant Improvement Allowance or Additional Allowance. If as a result of the Landlord Change, Tenant's Work is not completed by September 1, 2005, the Rent Commencement Date shall be extended a day for each day that such Landlord Change delays completion of Tenant's Work.

11. Costs. Except as provided in Section 10.2, Landlord is under no obligation to bear any portion of the cost of any of Tenant's Work except to the extent of the Tenant Improvement Allowance, Landlord's contribution to a preliminary space planning "test-fit" as provided in Section 4.5 of the Lease, and, at Tenant's option, the Additional Allowance.

12. Miscellaneous.

12.1 Consents. Whenever consent or approval of either party is required under this Work Letter, that party shall not unreasonably withhold, condition or delay such consent or approval, except as may be expressly set forth herein to the contrary.

12.2 Modification. No modification, waiver or amendment of this Work Letter or of any of its conditions or provisions shall be binding upon Landlord or Tenant unless the same is in writing, signed by Landlord and Tenant.

12.3 Counterparts. This Work Letter may be executed in any number of counterparts, but all counterparts taken together shall constitute a single document.

12.4 Governing Law. This Work Letter shall be governed by, construed and enforced in accordance with the laws of the State of California.

12.5 Time of the Essence. Time is of the essence of this Work Letter and of each and all provisions thereof.

12.6 Delay. Tenant shall be excused for any delay in completion of any portion of Tenant's Work caused by acts of God, acts of Landlord, inclement weather, labor trouble, acts of public utilities, or changes requested by Landlord which are, in each case, beyond the reasonable control of Tenant.

12.7 Severability. If any term or provision of this Work Letter is declared invalid or unenforceable, the remainder of this Work Letter shall not be affected by such determination and shall continue to be valid and enforceable.

Source: NUVELO INC, 10-K, March 16, 2005

12.8 Merger. All understandings and agreements, oral or written, heretofore made between the parties hereto and relating to Tenant's Work are merged in this Work Letter, which alone (but inclusive of provisions of the Lease incorporated herein and the final Approved Plans prepared pursuant hereto) fully and completely expresses the agreement between Landlord and Tenant with regard to the matters set forth in this Work Letter.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Work Letter to be effective on the date first above written.

TENANT:

NUVELO, INC.,
a Delaware corporation

By:

Name:  Lee Bendekgey
Title:   CFO

LANDLORD:

BMR-201 INDUSTRIAL ROAD LLC,
a Delaware limited liability company

By:

Name:  Gary A. Kreitzer
Title:   Executive Vice President

Source: NUVELO INC, 10-K, March 16, 2005

**EXHIBIT E**

<u>**Rules and Regulations**</u>

Source: NUVELO INC, 10-K, March 16, 2005

**EXHIBIT F**

Estoppel Certificate

Source: NUVELO INC, 10-K, March 16, 2005

EXHIBIT 10 51



CONFIDENTIAL

**Avecia Limited**

PO Box 2 Belasis Avenue
Billingham Cleveland TS23 1YN

**Tel: +44 (0)1642 364499**
**Fax: +44 (0)1642 364463**
**www.avecia.com**

Luis Pena
Vice President - Product Development
Nuvelo Inc
675 Almanor Avenue
Sunnyvale
CA 94085
USA

| Our Ref: | Direct Line: | Direct Fax: | E-mail: | Date: |
|---|---|---|---|---|
| RJC/SCT | +44 1642 364001 | +44 1642 364463 | Stephen.taylor@avecia.com | |

Dear Sirs

**Interim Agreement: Alfimeprase Project**
*Background*

1.  Nuvelo Inc. (**"Nuvelo"**) wishes Avecia Limited (**"Avecia"**) to carry out a range of activities in relation to Alfimeprase (**"the API"**) which are referred to in this Interim Agreement as **"the Project"**, the details of which are more fully set out in the proposal attached hereto as Exhibit A (**"the Proposal"**), the terms of which are incorporated into this Interim Agreement.

2.  The parties are in negotiation for a definitive agreement anticipated to cover the activities under the Project, as well as Avecia's supply of commercial quantities of the API during the initial 1 year after Nuvelo receives regulatory approval in the United States for the API (**"the Definitive Agreement"**). It is recognised however that, in order to meet the desired overall timescale for the Project, it is necessary for the Project to be commenced prior to execution of the Definitive Agreement. This Interim Agreement therefore sets out the interim terms and conditions on which the following portions of the laboratory program set out in section 2 of the Proposal, consisting of (i) Assessment and Planning, (ii) Transfer of process and assays, (iii) purchase of capital equipment set forth in Exhibit B, [and] (iv) Replicate 15L fermentation and purification runs[, and (v) GMP consultancy preparatory to GMP manufacture (collectively **"the Initial Work"**), will be carried out prior to execution of the Definitive Agreement.

*Commencement and Conduct of the Initial Work*

3.  Following signature of this Interim Agreement, Avecia shall commence the Initial Work in accordance with the terms and conditions of this Interim Agreement and Section 2 of the Proposal. In order for Avecia to carry out the Initial Work, Nuvelo shall carry out communication of the existing process for production of the API and associated data and intellectual property to Avecia necessary for the Initial Work in accordance with the terms and conditions of this Interim Agreement and Section 2 of the Proposal.

- 1 -

Source: NUVELO INC, 10-K, March 16, 2005

4.     Avecia shall carry out the Interim Work in accordance with the terms and conditions of this Interim Agreement and the Proposal with reasonable skill and care and no less than the level of skill and care to be reasonably expected of a professional provider of such services. Avecia also shall perform the Initial Work in compliance with all relevant professional standards and all applicable supranational, national or local laws, rules and regulations, including without limitation: (i) the United States Federal Food, Drug and Cosmetic Act, the regulations promulgated pursuant thereto, any non-U.S. equivalents thereof, and any successor laws, rules or regulations thereto; and (ii) the Rules and Guidance for Pharmaceutical Manufacturers and Distributors (UK) 2002 Annex 18 and Good Manufacturing Practices for Active Pharmaceutical Ingredients (ICHQ7A) as incorporated in the Federal Register Vol. 66 No 186 in the USA.

*Consideration*

5.     Nuvelo shall pay to Avecia the following amounts at the following times:

| Amount (£) | Deliverables | Payment Event |
|---|---|---|
| i) **105,000** in consideration for Avecia carrying out technical consultancy in relation to assessment and planning. | Commitment to secure staff to carry out project. | On signature of this Interim Agreement |
| ii) **105,000** in consideration for Avecia carrying out technical consultancy in relation to transfer of process and assays. | Method transfer reports, gap analysis, action plan, process flow diagram, process description and time line. | Upon completion of transfer of process and assays |
| iii) **50,000** in consideration for Avecia carrying out technical consultancy preparatory to GMP manufacture. | Commitment to secure manufacturing facility and investigate purchasing equipment | On signature of this Interim Agreement |
| iv) **109,000** in consideration for Avecia carrying out technical consultancy in relation to the 15L fermentation and purification runs | Fermentation, purification and analytical comparability reports. | On completion of the replicate 15L fermentation and purification runs. |
| v) **300,000** in consideration for Avecia carrying out technical consultancy preparatory to GMP manufacture. | Weekly meetings updating on status of GMP preparation. Project plan with timings for centrifuge trials and GMP development batches | On 28th February 2005 |

5.1     Payments to be made in accordance with this Section 5 shall be made in United States dollars. The currency exchange rate for such payments shall be calculated based upon the exchange rate quoted in the Wall Street Journal for the purchase of pounds using United States dollars on the calendar date the payment is due in accordance with this Section 5, or if no calendar date is stated, upon the date after the applicable payment is triggered in accordance with Section 5, that Nuvelo receives an invoice for the applicable payment. For any payment due for which no calendar date for payment is set forth above in this Section 5, such payment is due within 10 business days after Nuvelo's receipt of the invoice for such payment.

- 2 -

Source: NUVELO INC, 10-K, March 16, 2005

6.    Any payment under this Interim Agreement is stated exclusive of UK VAT. It is the understanding of both parties that the technical consultancy services being provided under this agreement are outside the scope of UK VAT. However in the unlikely event that UK VAT does become payable, this shall be for the account of Nuvelo and Avecia will give assistance to Nuvelo to seek recovery of such tax paid from the UK HM Customs and Excise.

*Purchase of Equipment*

7    In order for Avecia to provide technical consultancy services work under this Interim Agreement, it will be necessary for certain items of equipment (**"the Equipment"**) to be purchased by Avecia. Avecia will be authorised to proceed with the relevant services for which the Equipment is required on the following terms:

7.1    Avecia shall obtain, from an independent third party, at least 2 quotations for each item of Equipment and send a copy of the quotations by fax or email to Nuvelo and Nuvelo shall inform Avecia within 5 business days of receipt whether it authorises Avecia to proceed with the services for which the item of Equipment is required. In the absence of such approval, Avecia shall not proceed with the relevant services.

7.2    If Nuvelo gives its approval to the relevant quotation, Avecia shall be considered authorised to proceed with the relevant services and shall purchase the item of Equipment for such purpose. Any Equipment purchased by Avecia shall be dedicated to the Project, and shall not be used for any other use or purpose. Avecia shall keep the Equipment in good working order. The purchase price of the item of Equipment per the approved quotation shall thereupon form part of the consideration for the provision of the technical consultancy services by Avecia and Avecia shall invoice Nuvelo for (i) such amount; and (ii) a sum equivalent to 10% of the cost of the Equipment as a handling fee (the **"Handling Fee"**). Nuvelo shall pay such invoices within ten (10) days of receipt.

7.3    Following completion or termination of the Initial Work or Project, whichever occurs first, at any time within 12 months following such completion or termination, Nuvelo shall be entitled to purchase all or any of the Equipment from Avecia for £1.00 in its then current condition, subject to payment of any outstanding fees by Nuvelo to Avecia in respect of work carried out under this Interim Agreement in accordance with the terms and conditions of this Interim Agreement and the Proposal.

7.4    Nuvelo shall provide to Avecia reasonable prior written notice of its wish to purchase the Equipment so as to minimize any unplanned facility downtime and Nuvelo shall be responsible for all commercially reasonable removal costs and expenses. If the removal is performed by Nuvelo personnel, Nuvelo agrees to pay for the making good of any damage caused to Avecia's facility as a result of such removal. If the removal is performed by Avecia personnel, Avecia agrees to pay for the making good of any damage caused to the Equipment being removed as a result of such removal.

*Confidentiality and Intellectual Property*

8.    The provisions of the confidentiality agreement (**"the CDA"**) entered into, between the parties and dated 23rd September 2004 shall remain in full force and effect, except to the extent modified by the terms and conditions of this Interim Agreement. The obligations of confidentiality and non disclosure set forth in the CDA will continue for 7 years after the expiration or termination of this Interim Agreement, and the CDA shall not terminate or expire before the termination of this Interim Agreement. Avecia may use the Confidential Information solely for the purpose of the performance of the Initial Work. The CDA shall, with effect from the date hereof, be deemed to be extended to cover disclosures of information by either party pursuant to and subject to this Interim Agreement.

- 3 -

Source: NUVELO INC, 10-K, March 16, 2005

9.  Nothing in this Interim Agreement shall affect the ownership by either party of its Background IP or imply any licence to a party's Background IP unless granted expressly. "Background IP" means any intellectual property owned by or in the possession of a party (and to which that party has the necessary rights): (a) at the date of this Interim Agreement; or (b) after the date of this Interim Agreement and either (i) acquired independently of the Project or (ii) developed independently of the Project by any employee of that party without use or reference to any of the Confidential Information of the other party (as defined in the CDA, as amended by this Interim Agreement) disclosed by the other party.

10. Nuvelo shall own any and all intellectual property directly resulting from or arising out of the performance of the Initial Work ("**New IP**"), and Avecia shall assign all its rights in any such New IP to Nuvelo. Avecia represents and warrants that its employees and contractors are required to assign any inventions and discoveries resulting from or arising out of the performance of the Initial Work to Avecia, to enable Avecia to make the assignments set forth in this Section 10. Nuvelo hereby grants to Avecia a royalty-free, non-exclusive, world-wide licence, with power to sub-license, under New IP for use other than to make, have made, use, sell, offer for sale, import, keep and otherwise deal in the API.

*Licenses and Warranties*

11. Nuvelo shall grant to Avecia a royalty free, non-exclusive licence to use any of its Background IP and the New IP necessary for the performance of the Initial Work for the purposes of carrying out the Initial Work, and for no other use or purpose (save, in respect of the New IP, as permitted under Section 10 of this Interim Agreement).

12. Except as otherwise disclosed by Nuvelo to Avecia, Nuvelo represents and warrants that, to its knowledge as of the effective date of this Interim Agreement, Avecia's application of Nuvelo's Background IP or information provided to Avecia by Nuvelo for use in the performance of the Initial Work will not infringe the intellectual property of any third party.

13. Avecia represents and warrants that, to its knowledge as of the effective date of this Interim Agreement, Avecia's Background IP, to be used by Avecia in the performance of the Initial Work will not infringe the intellectual property of any third party.

14. Avecia represents and warrants that it has not been debarred under Section 306 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §335a(a) or (b). In the event that Avecia becomes debarred, Avecia shall notify Nuvelo immediately.

*Indemnification and Limitation of Liability*

15. Except as provided below in this Section 15, Nuvelo shall indemnify Avecia from and against any loss, claim, suit, liability, damages or expense, of whatsoever kind or nature ("**Loss**"), resulting from or arising out of: (i) actual or suspected infringement of the intellectual property of any third party arising from Avecia's application of Nuvelo's Background IP or information provided to Avecia by Nuvelo, in the performance of the Initial Work; (ii) Nuvelo's use of any results of the Initial Work performed by Avecia hereunder (including API or other materials manufactured); or (iii) the negligence, willful misconduct or breach of any applicable laws or regulations by Nuvelo or its affiliates. Nuvelo shall have no obligation to indemnify Avecia for any Loss to the extent resulting from or arising out of: (a) the actual or suspected infringement of the intellectual property of any third party arising from Avecia's application of Avecia's Background IP or information not provided to Avecia by Nuvelo, in the performance of the Initial Work; (b) the negligence or willful misconduct of Avecia or any of its affiliates; (c) any breach of this Interim Agreement by Avecia or any of its affiliates; (d) any failure by Avecia or any of its affiliates to comply with applicable laws or regulations.

- 4 -

Source: NUVELO INC, 10-K, March 16, 2005

16. Except as provided below in this Section 16, Avecia shall indemnify Nuvelo from and against any Loss resulting from or arising out of (i) actual or suspected infringement of the intellectual property of any third party arising from Avecia's application of Avecia's Background IP in the performance of the Initial Work; (ii) Nuvelo's use of any results of the Initial Work performed by Avecia hereunder (including API or other materials manufactured) to the extent Nuvelo's use results in the actual or suspected infringement of the intellectual property of any third party arising from Avecia's application of Avecia's Background IP, in the performance of the Initial Work, or (iii) the negligence, willful misconduct or breach of any applicable laws or regulations by Avecia or its affiliates. Avecia shall have no obligation to indemnify Nuvelo for any Loss to the extent resulting from or arising out of (a) the negligence or willful misconduct of Nuvelo or any of its affiliates; (b) any breach of this Interim Agreement by Nuvelo or any of its affiliates; (c) any failure by Nuvelo or any of its affiliates to comply with applicable laws or regulations.

17. EXCEPT WITH RESPECT TO INDEMNITY UNDER SECTIONS 15 and 16 ABOVE OR ANY BREACH OF CONFIDENTIALITY IN ACCORDANCE WITH SECTION 8, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES ARISING IN ANY WAY OUT OF OR RELATING TO THIS INTERIM AGREEMENT, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY. THIS LIMITATION WILL APPLY EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

18. NEITHER PARTY'S LIABILITY UNDER THIS INTERIM AGREEMENT WILL EXCEED THE TOTAL AMOUNT THAT WOULD BE DUE TO AVECIA UNDER THIS INTERIM AGREEMENT FOR THE INITIAL WORK.

*Duration and Termination/Cancellation*

19. The term of this Interim Agreement shall be from the date of signature by both parties until the first to occur of entry into the Definitive Agreement, completion of the Initial Work or earlier termination. The parties may agree to extend the duration and scope of the work carried out under this Interim Agreement by written agreement. Sections 8, 9, 10, 15, 16, 17, 18, 19, 21, 22, 23, 25 and 26 survive the termination or expiration of this Interim Agreement for the period set forth therein, or if no period is specified, perpetually or the maximum permitted by applicable law.

20. Nuvelo may terminate this Interim Agreement at any time with or without cause for its convenience, effective immediately upon written notice to Avecia. Avecia may terminate this Interim Agreement immediately upon written notice to Nuvelo if Nuvelo fails to pay an amount owed to Avecia under this Interim Agreement within 5 days of when it is due.

21. Upon termination of this Interim Agreement, other than for termination by Nuvelo in connection with a breach by Avecia, Nuvelo will pay Avecia:

   21.1 all sums due and payable up to the date of termination but not yet paid, but excluding any payments (other than the Handling Fee) due for Equipment: (i) that can be returned; or (ii) the ordering of which can be cancelled;

   21.2 all reasonable costs already incurred by Avecia at the date of termination in accordance with the terms and conditions of this Interim Agreement and the Proposal and uncancellable expenses incurred by Avecia after termination which could not reasonably be avoided after a reasonable attempt by Avecia to mitigate such costs, including cancellation charges payable by Avecia to the seller of Equipment in respect of Equipment (i) that has been returned to the seller, or (ii) the order of which has been cancelled; and

   21.3 if and only if the Agreement is terminated by Nuvelo other than for breach by Avecia, in consideration for technical consultancy services performed up to date of termination and

- 5 -

Source: NUVELO INC, 10-K, March 16, 2005

in winding down and cancelling the Project, the Cancellation Fee set out in paragraph 14 below.

22.    The Cancellation Fee shall be a proportion of the total £2,951,000 fee for technical consultancy associated with GMP manufacture of development batches referred to in more detail in Section 3.2 of the Proposal ("the GMP Fee"), less any sums paid by Nuvelo in consideration for Avecia carrying out technical consultancy preparatory to GMP manufacture already received under this Interim Agreement at the date on which notice is given. The proportion shall be dependent on the date on which notice of termination is given in relation to the anticipated date for commencement of the GMP manufacturing stage. At the date hereof, the anticipated commencement date of GMP manufacture is 1st October 2005. In the event that the parties agree to change this date, the table below shall be amended accordingly.

22.1    The Cancellation Fee shall be calculated as follows:

| If terminated between dates (2005) | Proportion of the GMP Fee (%) | Amount (£) |
|---|---|---|
| 1 Feb to 28 Feb | 10 | 295,100 |
| 1 Mar to 30 Mar | 20 | 590,200 |
| 1 Apr to 30 Apr | 30 | 885,300 |

22.2    Avecia shall make commercially reasonable efforts to raise revenue by utilising the production facility during the period during which the manufacturing stage was intended to take place but for early termination. Avecia shall refund to Nuvelo a sum equivalent to the revenue raised as a result of such alternative use up to a maximum of 80% of the Cancellation Fee paid.

22.3    Where the Cancellation Fee is less than the amount already paid to Avecia by Nuvelo under this Interim Agreement in consideration for technical consultancy preparatory to GMP manufacture, Avecia shall pay to Nuvelo the difference between the applicable Cancellation Fee and the amount already paid in consideration for technical consultancy preparatory to GMP manufacture.

23    If Nuvelo terminates for Avecia's unremedied breach or insolvency, Avecia shall refund to Nuvelo any monies paid to Avecia, less amounts paid for consultancy work done by Avecia in accordance with the terms and conditions of this Interim Agreement and the Proposal and not affected by the breach. In the event of a material error by Avecia in the performance of any portion of the Initial Work, Nuvelo is entitled to request Avecia to: (i) repeat the applicable portion at Avecia's own cost or (ii) reimburse Nuvelo for the price for that particular portion of the Initial Work. The preceding provision does not limit Nuvelo's rights under any provision of this Interim Agreement.

*Definitive Agreement*

24    Avecia and Nuvelo agree to commence negotiations in good faith for a Definitive Agreement, such Definitive Agreement to contain, amongst other things, the timing of the fees payable during the remainder of the Project, a detailed description of the work to be undertaken during the Project, including detailed stage start/end trigger points, together with provisions relating to termination, liability, compliance with applicable law and regulations, confidentiality, quality assurance, indemnity and intellectual property ownership and access.

*Governing Law & Miscellaneous*

25.    This Interim Agreement is, and is intended by the parties to be, legally binding. This Interim Agreement is governed by, and should be construed in accordance with the laws of the U.S.

- 6 -

Source: NUVELO INC, 10-K, March 16, 2005

State of Delaware and the parties expressly agree to submit to the exclusive jurisdiction and venue of the Courts of Delaware

26. A waiver of any provision or right under this Interim Agreement will be in writing and will not constitute a waiver of any subsequent similar or dissimilar occurrence. If any provision of this Interim Agreement is held to be illegal, invalid, or unenforceable, the applicable provision is severed from this Interim Agreement and the remaining provisions remain in full force and effect

27. Avecia shall not subcontract any work under this Interim Agreement without Nuvelo's prior written consent

The parties to this Interim Agreement, by the signature of their duly authorized representatives below, have executed this Interim Agreement as of the last date set forth below:

For Avecia Limited

Signature:

SC Taylor (Dr)
General Manager, Biologics Business

Date: 21 January 2005

For Nuvelo, Inc

Signature: /s/ Michael D. Levy

Name:    Michael Levy

Position:  SR VP R&D

Date:    1 20 2005

7

Source: NUVELO INC, 10-K, March 16, 2005

Confidential

Subject to contract



**PROPOSAL B2422.01 For Nuvelo Inc**

Program to carry out technology transfer of the Alfimeprase
process, Process Characterization and Validation of
in-process and bulk API assays by Avecia and manufacture of
three GMP development batches and five conformance
batches of Alfimeprase in Avecia's ABC 5000 facility

**Prepared by:**

**Avecia Biotechnology**

**22 November 2004**

| | | | |
|---|---|---|---|
| Avecia Biologics | Proposal B2422.01 | ALFIMEPRASE validation program | Page 1 of 9 |

## 1.    INTRODUCTION

This proposal incorporates information from discussions held at Amgen over 2003/2004 and the recent meeting at with the Nuvelo team on 17 November 2004.

The proposal includes the activities listed below. It is unclear at this point what the exact scope of the program will need to be since data from Amgen has not been evaluated and assessed. However it is Avecia's belief that most of the process characterisation and all the assay validation remains to be done.

- •    Data assessment and planning activity

- •    Transfer to Avecia of process and assays

- •    Validation of in-process and bulk API assays by Avecia, 24 assays in total

- •    Replicate 15L fermentation and purification runs to establish the process at Avecia

- •    Laboratory scale process characterisation (content to be defined)

- •    Two x 3000L fermentation batches to scale up the process and define centrifugation conditions

- •    Purification of product (non-GMP) from the 3000L batch supernatant but at 15L scale

- •    Three full scale GMP development batches – product to be supplied from one to two of them for clinical purposes.

- •    Process confirmation using process intermediates from Engineering runs

- •    Five conformance batches

This proposal is subject to agreement of formal contractual terms.

## QUALITY ASSURANCE

Avecia operates its Quality System according to the Quality Policy as described in its Quality Manual. Avecia manufactures non-sterile bulk biologic Active Pharmaceutical Ingredients (API) in compliance with the Rules and Guidance for Pharmaceutical Manufacturers and Distributors (UK) 2002 Annex 18 and Good Manufacturing Practices for Active Pharmaceutical Ingredients (ICHQ7A) as incorporated in the Federal Register Vol 66 No 186 in the USA.

Avecia and Nuvelo will jointly approve a Quality Agreement which defines the roles and responsibilities and interaction of Avecia and Nuvelo when dealing with quality related issues during the manufacture of the API. The QA agreement shall be incorporated with, constitute a part of and be read in conjunction with the Contract between the two companies.

The content of the Quality Agreement will include:

- •    Supplier management

- •    Change control

- •    Document management

- •    Nonconformance system

- •    Training

- •    Internal audits

| Avecia Biologics | Proposal B2422.01 | ALFIMEPRASE validation program | Page 2 of 9 |

Source: NUVELO INC, 10-K, March 16, 2005

This list is illustrative only

## 2.   WORK PROGRAM

**Assessment and Planning.** Data from Amgen will be reviewed and evaluated and the scope and extent of the work required to complete the laboratory process characterisation package will be determined. This activity should be completed as soon as possible and will lead to definition of a detailed work program.

**Transfer of process and assays.** The process and assays will be transferred to and operated by Avecia.

**Validation of in process and bulk API assays.** Avecia has a list of assays that were to be used by Avecia and Amgen for in process and API analysis. The list is attached as Appendix 1. Following assessment of the Amgen data and in discussion with Nuvelo a final list of assays will be derived. A validation program can then be defined. **In arriving at the costings below an assumption has been that all the current assays will be used and will need to be validated.**

The features typically included in a validation by Avecia are given below.
**specificity**
**precision (repeatability)**
**precision (intermediate)**
**linearity**
**range**
**accuracy**
**limit of quantitation**
**limit of detection**
**robustness**
**system suitability test**

**Replicate 15L fermentation and purification runs.** It is our preference to carry out a number of replicate runs at 15L scale to establish data on the robustness and reproducibility of the process. These data will also be valuable in establishing a baseline for the process characterisation work.

It was felt that the effort and resource that would need to be devoted to 100L runs of the process would not be cost effective for the following reasons.

- Scale up to 100L is only a small step towards 3000L and is unlikely to indicate performance at that scale.

- It has been Avecia experience that 15L, 100L and 1000L runs have all given closely similar results.

- Nuvelo already have data concerning performance of the process at 300L and Avecia 15L data can be compared with this and other laboratory scale fermentations carried out at Amgen.

In addition supernatant from the 3000L fermentation carried out to establish centrifuge conditions will be processed through the purification process at 15L scale to gain experience with plant produced material.

Avecia Biologics          Proposal B2422.01          ALFIMEPRASE validation program          Page 3 of 9

Source: NUVELO INC, 10-K, March 16, 2005

**Fermentation scale up and Centrifuge trials.** This was increasing felt to be a prudent step to take since it would,

- provide the first data on fermentation performance at 3000L scale

- provide early definition of centrifuge operating conditions which can only be determined empirically

- give time for batch record modification and writing

- allow greater chance that the first engineering batch would make useful product and de-risk that stage of the program

Laboratory scale purification of Alfimeprase from the supernatant produced will be carried out as mentioned above to confirm that product from the larger scale fermentation was comparable to that from laboratory fermentations and previously manufactured material

**Process characterisation.** This work will be carried out concurrently with assay validation, the 3000L trial fermentation and GMP preparation. Analytical methods used for the process characterisation will be considered qualified. The program content will be agreed with Nuvelo once the Amgen data has been acquired and progress has been assessed. A process characterisation plan will be established and will be documented.

The purpose of the process characterization is to establish the operating parameters for the alfimeprase Process B. The studies will include fermentation operating parameters, harvest operating parameters, operation parameters for each chromatographic, dead end filtration and ultrafiltration and diafiltration step.

**NOTE No definite figure has been included in the costings since the extent of the program required is not known.**

**Validation Documentation**

Documentation to support successful validation will be produced according to the Table below. Ahead of the Validation Campaign further changes may be made by agreement of Nuvelo and Avecia Quality Groups and the associated payment amended accordingly.

| Document | Purpose | Accountable Function | Approving Functions (Final formal release by QA) |
|---|---|---|---|
| **Validation Master Plan** | Defines overview Validation strategy for Product | QA | QA,QC, M, R&D |
| **Validation Sub Plans** | Defines specific Validation plans for Project relating to Equipment Qualification Cleaning Validation Analytical Validation Process Validation Electronic systems Training | Various | QA,QC, M, R&D |
| **Process Validation Sub Plan** | Defines specific activities to be undertaken in Process Validation programme And links these to relevant technical reports and the Development Report | R&D | QA,QC, M, R&D |

| Avecia Biologies | Proposal B2422.01 | ALFIMEPRASE validation program | Page 4 of 9 |
|---|---|---|---|

Source: NUVELO INC, 10-K, March 16, 2005

| | | | |
|---|---|---|---|
| **Process Validation Protocol** | Document listing: Runs to be undertaken in the manufacturing campaign, the expected specification of material produced (and the acceptances ranges for this). Critical process control parameters and acceptance ranges.<br>The results derived from the process validation campaign shall be recorded in this document. | R&D | QA,QC, M, R&D |
| **Process Validation Sub Plan Report** | Report detailing and analysing the outcome and data derived from the process validation campaign | R&D<br>Note Please. QA will make very strong input into this document | QA,QC, M, R&D |
| **Validation Summary Report** | Document Summarising and reviewing output from Validation Programme and formally closing it. | QA | QA,QC, M, R&D |

**Confirmation of Small Scale Process Characterisation**

Intermediate samples will be taken at appropriate scale to allow for the confirmation of Process B at the 15 L scale. From DOE experiments performed during the initial process characterisation runs will be used to determine process extremes or failure points. The process extremes or failure points will be tested using the collected intermediates at small scale. The selection of the steps and ranges to be tested will be determined by risk analysis.

**GMP development batches and conformance batches.** Two to three overlapping GMP development batches are scheduled followed by an extended gap Avecia and Nuvelo will continue to discuss the optimum period for this hold such that it will allow the data required for successful operation of the conformance batches to be obtained, final GMP documentation to be put in place and Avecia to make practical use of the time with another process.

The third GMP Development batch will be carried out immediately prior to the conformance batches. Since a long gap is planned after the end of GMP development batches it was felt more appropriate to and run one of the batches before the validation campaign rather than start up the process and immediately run a validation batch.

Five overlapping conformance batches will be run.

| | | | |
|---|---|---|---|
| Avecia Biologics | Proposal B2422.01 | ALFIMEPRASE validation program | Page 5 of 9 |

Source: NUVELO INC, 10-K, March 16, 2005

3.   COST SUMMARY

3.1.   Laboratory Program

| Activity | Price £000's |
|---|---|
| Data acquisition and assessment | 105 |
| Process transfer into Avecia | 105 |
| Replicate 15L runs | 109 |
| Process characterisation Fermentation and downstream process | Up to 1000 depending on the work program required |
| Assay validation | 1067 |
| Total | 1492 (+ process characterisation) |

3.2.   Manufacturing

The freeze step at the DCCB stage has been retained since this allows fermenter purity checks to be carried out and results developed before loading the broth onto the first column

| Activity | Price £000s |
|---|---|
| Process transfer and preparation for large scale manufacture | 260 |
| Laboratory based cleaning studies | 10 |
| 2 x 3000L batches for centrifuge trials including small scale purification and PD support | 1114 |
| 2 x GMP Development batches includes blank run and PD support note 2 | 2951 |
| Review period | 200 |
| 1 X GMP Development batch 5 x Conformance batches Overlapping batches, includes blank run and PD support | 5397 |
| Validation Master Plan/Protocols note 3 | 50 |
| Execution of validation plan including validation reports | TBA |
| PAI Preparation and Inspection Quality and Regulatory Support FTE rate | £11K per month |

NOTES

1.   Laboratory based cleaning studies will be required to establish the "cleanability" of Alfimeprase in relation to the protein used in cleaning validation studies. This work is costed at £10K. Further cleaning validation at a cost of £10K per item may be required if Alfimeprase proves more difficult to clean than this protein.

Source: NUVELO INC, 10-K, March 16, 2005

2. The extended review period following the GMP Development batches will be a period of intense activity when product is analysed to ensure that the process is delivering product with the required specification, batch record logistics are reviewed to ensure smooth operation, any equipment modifications are implemented and documentation changes carried out.

3. No costs have been attributed to this activity at this point since the content of the validation plan has not been defined. The Validation Master Plan will be drafted by Avecia and agreed with Nuvelo. Validation reports will be written at the end of the conformance batch campaign.

Compendial testing of raw materials can be carried out at a cost of £500 to £1000 per raw material depending on the tests required.

Raw materials, consumables, chromatography resins and UF membranes are not included in the above costs for the ABC5000 campaigns and will be charged on a pass through basis plus 10% for administration and handling.

In addition pre-agreed expenses associated with visits of Avecia technical personnel to Amgen or Nuvelo facilities will be charged back to Nuvelo.

## 3.3  Capital

Work with Amgen on process fit established that a number of items of process specific equipment would be required to operate the Alfimeprase process. In addition Avecia would need to make certain plant modifications and provide items of a generic nature.

### 3.3.1  Process specific equipment.

| Equipment | Estimated cost £000s |
|---|---|
| Lenticular depth filtration skid | 200 |
| Delipid filter skid | 20 |
| Columns (2 x 900mm) | 200 |
| UF cassette holder | 25 |
| **Total** | **445** |

Qualification costs will be in addition to this sum. Amgen were investigating whether the equipment can be purchased at a lower price by them in the US and shipped to Avecia. The status of these enquiries is not known.

### 3.3.2  Generic modifications and equipment

Modification to fermenter control software
Trace heating on glucose line
Ammonia feed tank
Various tankage
0.2u filtration skid
Small UF rib (Sartorious Beta)

| | | | |
|---|---|---|---|
| Avecia Biologics | Proposal B2422 01 | ALFIMEPRASE validation program | Page 7 of 9 |

Source: NUVELO INC, 10-K, March 16, 2005

**4. ESTIMATED OVERALL TIMELINES**

[ * ]

**NOTE**

The review period in Nov-05 to Jan 06 is illustrative only. Avecia and Nuvelo will continue to discuss the optimum period for this gap such that it will allow the data required for successful operation of the conformance batches to be obtained and Avecia to make practical use of the time

**5. DRAFT MANUFACTURING SCHEDULE**

[ * ]

DCCB frozen and stored before further processing

Set up time

[ * ] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

**APPENDIX 1. ASSAY LIST**

[ * ]

[ * ]   = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended

**Exhibit B**

**Capital Equipment List**

[ * ]

* Nuvelo desires that Avecia provide input with respect to these issues.

[ * ] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934, as amended.

Exhibit 21.1

**LIST OF SUBSIDIARIES**
**AS OF DECEMBER 31, 2004**

1.    Hyseq Diagnostics, Inc., a Nevada corporation.

Source: NUVELO INC, 10-K, March 16, 2005

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Nuvelo, Inc.

We consent to the incorporation by reference in the registration statements on Form S-3 (Nos. 333-112209, 333-90458, 333-103257, 333-106873, and 333-118821) and the registration statements on Form S-8 (Nos. 333-68170, 333-68172, 333-101276, 333-103055, 333-108563, 333-115747 and 333-96313) of Nuvelo, Inc. of our reports dated March 15, 2005, with respect to the consolidated balance sheets of Nuvelo, Inc. and subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for each of the years in the three-year period ended December 31, 2004, management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004, and the effectiveness of internal control over financial reporting as of December 31, 2004, which reports appear in the December 31, 2004 annual report on Form 10-K of Nuvelo, Inc.

/s/ KPMG LLP

San Francisco, California
March 15, 2005

Source: NUVELO INC, 10-K, March 16, 2005

Exhibit 31.1

## CERTIFICATION

I, Ted W. Love, certify that:

1.  I have reviewed this annual report on Form 10-K of Nuvelo, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation;

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2005

/s/   TED W. LOVE
Ted W. Love
**President, Chief Executive Officer and Director**

Source: NUVELO INC, 10-K, March 16, 2005

Exhibit 31.2

## CERTIFICATION

I, Lee Bendekgey, certify that:

1.  I have reviewed this annual report on Form 10-K of Nuvelo, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation;

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2005

/s/   LEE BENDEKGEY
Lee Bendekgey
Senior Vice President,
Chief Financial Officer and General Counsel

Source: NUVELO INC, 10-K, March 16, 2005

Exhibit 32.1

**NUVELO, INC.**
**CERTIFICATION PURSUANT TO**
**18 U.S.C. SEC. 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Ted W. Love, Chief Executive Officer of Nuvelo, Inc. (the "Company"), and Lee Bendekgey, Chief Financial Officer of the Company, each hereby certifies that, to the best of his or her knowledge

(1)     The Company's Annual Report on Form 10-K for the period ended December 31, 2004, to which this Certification is attached as Exhibit 32.1 (the "Annual Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

(2)     The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned have set their hands hereto as of the 15th day of March, 2005

| /s/  Ted W. Love | /s/  Lee Bendekgey |
|---|---|
| Ted W. Love | Lee Bendekgey |
| President, Chief Executive Officer and Director | Senior Vice President, |
| | Chief Financial Officer and General Counsel |

"This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Nuvelo, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing."

Date: March 15, 2005

Created by 10KWizard     www.10KWizard.com