1
COUGHLIN STOIA GELLER
2    RUDMAN & ROBBINS LLP
DENNIS J. HERMAN (220163)
3  ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
4  San Francisco, CA  94111
Telephone:  415/288-4545
5  415/288-4534 (fax)
dennish@csgrr.com
6  elig@csgrr.com

7  Liaison Counsel

8  BERGER & MONTAGUE, P.C.
SHERRIE R. SAVETT
9  CAROLE A. BRODERICK
BARBARA A. PODELL
10  PHYLLIS M. PARKER
JOSHUA C. SHUMACHER
11  1622 Locust Street
Philadelphia, PA  19103
12  Telephone:  215/875-3000
215/875-4604 (fax)
13  ssavett@bm.net
bpodell@bm.net
14  pparker@bm.net

SCHATZ NOBEL IZARD, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
NANCY A. KULESA
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT  06103
Telephone:  860/493-6292
860/493-6290 (fax)
aschatz@snilaw.com
jnobel@snilaw.com
nkulesa@snilaw.com

15  Co-Lead Counsel for Plaintiffs

16                      UNITED STATES DISTRICT COURT

17                      NORTHERN DISTRICT OF CALIFORNIA

18                      SAN FRANCISCO DIVISION

19

20  In re NUVELO, INC. SECURITIES       )   Master File No. 3:07-cv-04056-MJJ
    LITIGATION                          )
                                        )   CLASS ACTION
21  ─────────────────────────────────── )
                                        )
22  This Document Relates To:           )   PLAINTIFFS' OPPOSITION TO
                                        )   DEFENDANTS' MOTION TO DISMISS
            ALL ACTIONS.                )   CONSOLIDATED COMPLAINT FOR
23                                      )   VIOLATIONS OF THE FEDERAL
    ─────────────────────────────────── )   SECURITIES LAWS
24
                                            DATE:          March 25, 2008
25                                          TIME:          9:30 a.m.
                                            COURTROOM:     11
26                                          JUDGE:         Hon. Martin J. Jenkins

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. iii

II.   ARGUMENT ........................................................................................................3

    A.    Plaintiffs Rely on Defendants' Admissions as the Source of Their Allegations, Which Are Corroborated by Confidential Witness Information ............................................................................................5

    B.    Defendants Misled Investors About the Ongoing Clinical Trials of Alfimeprase for PAO and CO ...................................................................8

        1.    Defendants' Statements About the Phase 2 and 3 Trials for PAO Were Materially False and Misleading When Made .....................8

            a.    Defendants Knew but Concealed the Fact that the Insertion of the Drug Delivery Catheter Was Likely to Have Disrupted Clots in the Phase 2 Trial ...................................9

            b.    Defendants' Statements About The "Overwhelming Statistical Power" of the Phase 3 PAO Trial Were False ..............11

        2.    The Failure to Disclose the 0.00125 P-Value Rendered Defendants' Statements About the Phase 3 CO Trial Misleading ............13

            a.    Defendants Repeatedly Compared the Nuvelo CO Trials to the Genentech Cathflow Studies, Which Utilized the Traditional P-Value of 0.05 .........................................14

            b.    Defendants Stated that the Phase 3 CO Clinical Trials Would Include *Two* Pivotal Trials, Which Implied the Standard 0.05 P-Value Would Be Used .........................................14

            c.    The FDA Guidance Does Not Require a P-Value of 0.00125 Even if Only One Pivotal Trial Had Been Performed ...................................................................................16

            d.    Defendants Concealed that Alfimeprase Had to Meet a Difficult "Target Product Profile" Before Nuvelo Would Market the Drug for CO .........................................18

        3.    In Light of Their Material Omissions, Defendants' Statements that PAO and CO Presented a "Low Risk Path to Regulatory Approval" Were Misleading .........................................19

    C.    Plaintiffs Have Alleged Facts Giving Rise to a Strong Inference of Scienter as to Each Defendant ...................................................................20

        1.    The Individual Defendants' Active Involvement in the Alfimeprase Program, Admissions of Prior Knowledge, and Day-to-Day Management of Nuvelo Demonstrate They Acted with Scienter ..............21

**Page**

2.    Defendants Had the Motive and Opportunity to Commit Fraud ...............24

3.    Bayer's Investment in Nuvelo Does Not Negate the Inference of Scienter ......................................................................................................26

4.    The Group Publication Doctrine Supports the Inference that Each of the Individual Defendants "Made" Statements that Misled Investors ....................................................................................................27

D.    Defendants' False Statements Are Not Protected by the PSLRA Safe Harbor ...............................................................................................................28

E.    Defendants' Misleading Statements Were Not Puffery .........................................30

F.    Plaintiffs Have Sufficiently Pled Loss Causation ..................................................32

G.    The Complaint Sufficiently Pleads Control Person Liability ................................34

H.    Dismissal with Prejudice Would Be Improper .......................................................34

III.    CONCLUSION............................................................................................................35

1

# TABLE OF AUTHORITIES

2

Page

3

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ........................................................................30

4

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................12

5

*Brody v. Transitional Hosp. Corp.*,
    280 F.3d 997 (9th Cir. 2002) .........................................................................10

6

7

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) .........................................................................31

8

9

*Commc'n. Workers of Am. Plan for Employees'*
    *Pensions & Death Benefits v. CSK Auto Corp.*,
    No. CV06-1503-PHX-DGC, 2007 U.S. Dist. LEXIS 72424
    (D. Az. Sept. 27, 2007) ..................................................................................21

10

11

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .......................................................................34

12

13

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) .........................................................................31

14

15

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ...................................................................21, 27

16

*In re Amylin Pharm., Inc. Sec. Litig.*,
    No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667
    (S.D. Cal. May 1, 2003)..............................................................................4, 24

17

18

*In re Apple Computers Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .......................................................................17

19

20

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)..............................................................................7

21

*In re Convergent Tech. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ...........................................................10, 20, 30

22

23

*In re Converium Holding AG Sec. Litig.*,
    No. 04 Civ. 7897 (DLC), 2007 U.S. Dist. LEXIS 67660
    (S.D.N.Y. Sept. 14, 2007)..............................................................................21

24

25

*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................7, 26, 32, 34

26

27

*In re Dura Pharm., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006)....................................................31, 32

28

1

2                                                                          **Page**

3  *In re Entropin, Inc. Sec. Litig.*,
        487 F. Supp. 2d 114 (C.D. Ca. 2007) ............................................................11
4

5  *In re Genta, Inc. Sec. Litig.*,
        No. 04-2123 (JAG), 2005 U.S. Dist. LEXIS 22857
6      (D.N.J. Sept. 30, 2005) ..............................................................................24

7  *In re GlenFed, Inc. Sec. Litig.*,
        60 F.3d 591 (9th Cir. 1995) .......................................................................28
8

   *In re Immune Response Sec. Litig.*,
9      375 F. Supp. 2d 983 (S.D. Cal. 2005) .........................................................34

10 *In re InfoSonics Corp. Sec. Litig.*,
        No. 06cv1231 BTM(WMc), 2007 U.S. Dist. LEXIS
11     (S.D. Cal. Aug. 7, 2007) ....................................................................*passim*

12 *In re Merck & Co. Sec. Litig.*,
        432 F.3d 261 (3rd Cir. 2005) .......................................................................7

13 *In re NPS Pharm., Inc. Sec. Litig.*,
        No. 2:06-cv-00570, 2007 U.S. Dist. LEXIS 48713
14     (D. Utah July 3, 2007)................................................................................21

15 *In re NeoPharm, Inc. Sec. Litig.*,
        No. 02C2976, 2003 Dist. LEXIS 1862
16     (N.D. Ill. Feb. 7, 2003)..........................................................................4, 24

17 *In re PETsMART, Inc. Sec. Litig.*,
        61 F. Supp. 2d 982 (D. Ariz. 1999) .............................................................28
18

19 *In re Portal Software, Inc. Sec. Litig.*,
        No. C-03-5138, 2005 U.S. Dist. LEXIS 20214
20     (N.D. Cal. Aug. 10, 2005) ..........................................................................25

21 *In re Regeneron Pharm. Inc. Sec. Litig.*,
        No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
22     (S.D.N.Y. Feb. 3, 2005)..............................................................................23

23 *In re Retek Inc. Sec. Litig.*,
        No. 02-4209 (JRT/SRN), 2005 U.S. Dist. LEXIS 25986
        (D. Minn. Oct. 21, 2005)............................................................................34
24

25 *In re Scholastic Corp. Sec. Litig.*,
        252 F.3d 63 (2d Cir. 2001).............................................................................7

26 *In re Scientific-Atlantic, Inc. Sec. Litig.*,
        239 F. Supp. 2d 1351 (N.D. Ga. 2002) ........................................................26
27

28 *In re Secure Computing Corp. Sec. Litig.*,
        120 F. Supp. 2d 810 (N.D. Cal. 2000) .........................................................29

1

2                                                                                                    **Page**

3

4   *In re Seebeyond Tech. Corp. Sec. Litig.*,
        266 F. Supp. 2d 1150 (C.D. Cal. 2003) ......................................................26, 30

5   *In re Silicon Storage Tech., Inc.*,
        No. C 05-0295 PJH, 2006 WL 648683
6       (N.D. Cal. Mar. 10, 2006) ...............................................................................7

7   *In re Stratosphere Corp. Sec. Litig.*,
        1 F. Supp. 2d 1096 (D. Nev. 1998) ................................................................28
8
    *In re Synergen, Inc. Sec. Litig.*,
9       863 F. Supp. 1409 (D. Colo. 1994) ................................................10, 15, 17

10  *In re Syntex Corp. Sec. Litig.*,
        95 F.3d 922 (9th Cir. 1996) ...............................................................................5
11
    *In re Time Warner, Inc. Sec. Litig.*,
12      9 F.3d 259 (2d Cir. 1993) ...............................................................................15

13  *In re Vicuron Pharm., Inc. Sec. Litig.*,
        No. 04-2627, 2005 U.S. Dist. LEXIS 15613
14      (E.D. Pa. July 1, 2005).....................................................................................24

15  *In re Viropharma, Inc. Sec. Litig.*,
        No. 02-1627, 2003 U.S. Dist. LEXIS 5623
16      (E.D. Pa. Apr. 7, 2003) ..................................................................4, 11, 24

17  *In Re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
        286 F. Supp. 2d 1047 (D. Minn. 2003)............................................................4
18
    *Iyer v. NTN Commc'ns, Inc.*,
19      No. 97-cv-1116 TW(JAH), 1999 U.S. Dist. LEXIS 8968
        (S.D. Cal. May 21, 1999) ...............................................................................18
20
    *Lipton v. PathoGenesis Corp.*,
21      284 F.3d 1027 (9th Cir. 2002) ........................................................................25

22  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
        403 F.3d 1050 (9th Cir. 2005) ........................................................................30
23
    *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
24      No. 04-1687, 2008 U.S. App. LEXIS 975
        (7th Cir. Jan. 17, 2008) ............................................................................23, 24
25
    *Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
26      927 F. Supp. 1297 (C.D. Cal. 1996) ..............................................................18

27  *Middlesex Ret. Sys. v. Quest Software Inc.*,
        No. CV 06-6863 DOC (RNBx), 2007 U.S. Dist. LEXIS 84695
28      (C.D. Cal. Oct. 22, 2007)................................................................................23

Page

*Miller v. Thane Int'l, Inc.*,
    508 F.3d 910 (9th Cir. 2007) .......................................................................9, 20

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ..............................................................................23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
    *v. Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..............................................................................22

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
    No. CIVA-04CV-1030-RPM, 2005 WL 4161977
    (D.Colo. Oct. 20, 2005) ......................................................................................17

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................22

*Padnes v. Scios Nova Inc.*,
    No. C95-1693 MHP, 1996 WL 539711
    (N.D. Cal. Sept. 18, 1996) ...................................................................................9

*Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.*,
    38 F. Supp. 2d 1158 (C.D. Cal. 1998) ...............................................................28

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ..........................................................................26

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ............................................................................17

*Sloman v. Presstek, Inc.*,
    No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475
    (D.N.H. Sept. 18, 2007) ......................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)..................................................................5, 21, 26, 27

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991).........................................................................................18

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .................................................................................4

*Wool v. Tandem Computers, Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ......................................................................28, 34

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ............................................................29

1

2                                                                                   **Page**

3                          **STATUTES, RULES AND REGULATIONS**

4   Federal Rules of Civil Procedure
            Rule 8(a)(2)................................................................................................32
5           Rule 15(a)..................................................................................................34

6   15 U.S.C.
            §78t(a).................................................................................................3, 34
7           §78j(b).................................................................................................3, 34

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' OPPOSITION TO DEFS.' MOTION TO DISMISS CONSOLIDATED COMPLAINT          - vii -
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-04056-MJJ

I.      **INTRODUCTION**

Plaintiffs have asserted claims for securities fraud against Nuvelo, Inc., ("Nuvelo" or the "Company") and three of its four executive officers for making false and misleading statements between January 5, 2006 and December 8, 2006 (the "Class Period") about the on-going clinical trials of its lead drug candidate, alfimeprase, to treat two conditions: (i) peripheral arterial occlusion ("PAO"), also known as "leg attack"; and (ii) blockages in catheters used to administer intravenous drugs, also known as "catheter occlusion" ("CO").

Although this case is steeped in medical and statistical jargon regarding p-values, power calculations and direct-acting thrombolytic agents, the primary issues in this case are simple and straightforward.  In a nutshell, the question before this Court is whether defendants misled investors by repeatedly trumpeting prior clinical success in proclaiming that the ongoing PAO and CO trials represented a "***low risk** path to regulatory approval*" while simultaneously failing to disclose adverse facts creating heightened risks to those trials.  *E.g.*, ¶¶68-72.  For example:

- Defendants repeatedly claimed that alfimeprase had **cleared clotted arteries** and restored blood flow within four hours in more than 60% of the patients treated in the Phase 2 PAO trial, **without disclosing** that **they knew** that the arteries of patients in that trial could have been **cleared simply by shooting the drug solution through the clot**, rather than by any pharmacological action of alfimeprase.  In fact, absent a placebo control, there was **no way to reliably determine whether the disruption of the blood clots** shown in the Phase 2 trials was **due to the drug or** due to the insertion of the **catheter**.  ¶¶5-8, 61-63, 68-72.[1]

- In the Phase 3 CO trial, **defendants failed to disclose** that the U.S. Federal and Drug Administration ("FDA") had imposed an extraordinarily **stringent standard for statistical significance**, or "**p-value**," of **0.00125**, requiring Nuvelo to establish that only 1 in 2,500 positive results could have resulted from chance, versus the expected FDA-required p-value of 0.05, which would have permitted approval where as many as 1 in 40 positive results could simply have resulted from chance.  *Id.*; *see also*, ¶39.

As a result of these misrepresentations and omissions, Nuvelo's public securities traded at artificially inflated levels during the Class Period.  This inflation was suddenly and completely eliminated on December 11, 2006, when defendants announced that both the Phase 3 trials had failed

---

[1]      Unless otherwise noted, paragraph references ("¶__" or "¶¶__") are to the Consolidated Complaint for Violations of the Federal Securities Laws filed on November 9, 2007 (the "Complaint").

1   – alfimeprase had not performed any better than a placebo in treating PAO, and the drug had failed

2   to satisfy the FDA's stringent p-value for treating CO.  ¶¶10-11, 60-63, 84-88, 158-159.  As a result,

3   Nuvelo's stock collapsed, plunging from $19.55 to $4.05.  This staggering one-day drop of nearly

4   80% in value caused millions of dollars in damages to plaintiffs and other members of the proposed

5   Class who had purchased their securities in reliance on the accuracy and completeness of

6   defendants' Class Period statements about alfimeprase and the on-going drug trials:



18   ¶153.

19       In moving to dismiss the Complaint, defendants do *not* – and cannot – contend that the

20   evidence of mechanical clot busting by the catheter in the PAO 2 trials or the FDA-required p-value

21   of 0.00125 in the CO trial were *ever* disclosed to investors prior to the end of the Class Period.

22   Instead, defendants point to the disclosure of *other* facts and contend, in essence, that the disclosure

23   of such information demonstrates that investors "should have known" of the concealed facts.  As

24   discussed herein, none of these contentions has merit.

25       Defendants have *admitted* that, throughout the Class Period, they were aware of all the

26   concealed risks and undisclosed facts giving rise to plaintiffs' claims.  When Nuvelo announced on

27   December 11 2006 that the clinical trials had failed, defendants: (1) acknowledged that they had

28   "*always known*" that the drug delivery catheter disrupted clots and that "it did probably happen in

1  Phase 2"; and (2) revealed that, even though the CO trial had succeeded at the standard level of

2  significance (p-value of 0.05), it had failed to meet the undisclosed p-value of 0.00125. ¶¶37, 61-63;

3  *see also* Herman Decl., Exs. 1-2.

4        Given defendants' tacit acknowledgment that the adverse facts creating material risks to the

5  ongoing drug trials were never disclosed, and their admissions establishing that they had known of

6  these facts and risks throughout the Class Period, the primary question presented in this case is

7  whether a jury could reasonably conclude that defendants' failure to disclose those facts or describe

8  those risks rendered their public statements during the Class Period materially misleading to

9  investors.  At this stage of the proceedings, there is no doubt that question must be answered in the

10 affirmative.

11       Plaintiffs do ***not*** allege that defendants knew ahead of time that the CO study would not meet

12 the required p-value or that alfimeprase would fail to beat a placebo in the PAO study, nor are they

13 required to do so in order to sustain their claims.  Rather, plaintiffs have alleged that defendants

14 misled investors by: (1) failing to reveal that catheters like those used in the Phase 2 PAO trials were

15 known to break clots apart and restore blood flow, such that both the Phase 2 results and the Phase 3

16 power calculations could be misleading; and (2) failing to disclose that, for the CO trial to succeed,

17 alfimeprase had to satisfy the extremely low p-value of 0.00125 set by the FDA.  ¶¶95-97, 102-104,

18 111-113, 117, 121, 126-128, 135, 138, 141, 144.

19       Under the circumstances described above and explained in more detail below, there is simply

20 no question that plaintiffs plead each and every element of a §10(b) claim – falsity, scienter,

21 materiality, reliance and loss causation – as well as a claim for violation of §20(a) of the Securities

22 Exchange Act of 1934 ("Exchange Act"), and do so with sufficient strength and particularity to

23 satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995

24 ("PSLRA").  Defendants' motion to dismiss should therefore be denied in its entirety.

25 **II.    ARGUMENT**

26       It is well established that securities fraud liability may lie where a defendant knowingly or

27 recklessly makes false or misleading statements about ongoing drug studies, including failing to

28 disclose facts giving rise to increased risks relating to drug approval or commercialization. *E.g.*, *In*

1   *re Amylin Pharm., Inc. Sec. Litig.*, No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667, at *23

2   (S.D. Cal. May 1, 2003) ("If a defendant states that it believes or expects that the FDA will approve

3   its drug but has information tending to seriously undermine the accuracy of its statement, the

4   statement is actionable"); *In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS

5   5623 (E.D. Pa. Apr. 7, 2003); *In re NeoPharm, Inc. Sec. Litig.*, No. 02C2976, 2003 Dist. LEXIS

6   1862, at *43-*44 (N.D. Ill. Feb. 7, 2003).

7        In pressing for the immediate dismissal of the claims brought here, defendants have

8   mischaracterized the applicable legal standard pertaining to such claims by wrongly contending that

9   plaintiffs must establish ***both*** defendants' knowledge of the undisclosed risks ***and*** that they knew the

10  trials would fail because of those risks.  Defs.' Mem. at 2, 12, 18.[2]  Plaintiffs need not plead – or

11  prove – that defendants knew that the trials would fail.  Rather, plaintiffs need only plead facts

12  supporting the inference that defendants knew of the undisclosed facts and concealed risks, because

13  it was the material omission of this information that misled investors about the current prospects for

14  success of the alfimeprase trials:

15        Whether the Defendants had to predict the FDA's decision is irrelevant.  They are
          liable under 10b-5 if they made statements that a reasonable investor would consider
16        in deciding whether to buy stock.  All investing is based on investor's perceptions
          about the future. . . .  Accuracy in these types of factual statements lies at the heart of
17        what the securities laws are trying to protect.

18  *Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *17-*18; *see also Warshaw v. Xoma Corp.*, 74 F.3d

19  955 (9th Cir. 1996) (predictions of FDA approval made while discounting risks to ongoing clinical

20  trials are actionable statements); *In Re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 286 F.

21  Supp. 2d 1047, 1058 (D. Minn. 2003) (court rejected defendants' claim that they were not obligated

22  to disclose risky provisions in the company's credit facilities because they did not have a "crystal

23  ball" to foresee that the provisions would come into play; defendants' assertions did "not address

24  defendants' duty to give complete information on a subject once raised").

25

26  [2]      "Defs.' Mem." refers to Defendants' Notice of Motion and Motion to Dismiss Consolidated
    Complaint for Violations of the Federal Securities Laws; Memorandum of Points and Authorities,
27  filed on December 21, 2007.

28

1      Indeed, defendants agree that "investors evaluating clinical trial programs **are primarily**

2 **interested in the risk** that the trial will fail to meet its primary endpoints."[3] Defs.' Mem. at 19.  This

3 is precisely what plaintiffs alleged here – defendants concealed from investors significant facts

4 giving rise to material risks threatening the success of the alfimeprase trials.  Defendants' contention

5 that they "had every reason to believe that the phase III trial for CO would be successful" therefore

6 provides no ground for dismissal.  Defs.' Mem. at 18.  Even if defendants truly believed that the trial

7 would succeed, defendants were not permitted under the federal securities law to conceal the

8 extraordinary p-value imposed on that trial.  Similarly, defendants' contention that, based on the

9 Phase 2 results, they "had every reason to be confident that the NAPA-2 trial [for PAO] would be

10 successful" (Defs.' Mem at 16) does not mitigate their failure to tell investors that there was a strong

11 likelihood that some of the positive Phase 2 results had been caused by the catheter breaking the clot

12 apart, instead of alfimeprase dissolving it.[4]

13    **A.**    **Plaintiffs Rely on Defendants' Admissions as the Source of Their Allegations, Which Are Corroborated by Confidential Witness**

14 **Information**

15      Contrary to the assertion that confidential witnesses are the "primary source" of plaintiffs'

16 allegations (Defs.' Mem. at 12), the Complaint is based on defendants' public admissions that they

17 always **knew** the undisclosed facts that made their Class Period statements materially false and

18 misleading.  *E.g.*, ¶¶37, 58, 61-67.  The confidential sources pled in the Complaint merely

19 corroborate the facts admitted by defendants, providing additional circumstantial evidence of

20 defendants' contemporaneous knowledge of the undisclosed material risks to the alfimeprase trials.

21 Under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, (2007), this Court considers all

22 of these facts collectively, not in isolation.

23      With respect to the Phase 3 PAO trial, plaintiffs allege, *inter alia*, that defendants knew, but

24 concealed, the risk that the positive Phase 2 results were caused by the insertion of the catheter,

25

26 [3]    All emphasis is added and citations and quotations omitted unless otherwise noted.

27 [4]    *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996), on which defendants rely, is inapposite.  In that case, plaintiffs failed to allege that defendants' statements were false when made.

28

1    rather than by the action of alfimeprase.  ¶8, 37, 61-68.  Nuvelo's CEO, defendant Ted W. Love

2    ("Love"), confirmed this allegation when he admitted in the December 11, 2006 conference call with

3    analysts, that he had "always" known that clots could be disrupted simply by inserting the drug

4    delivery catheter:

>    So to be clear, *its always been known that mechanical devices can work* and
>    probably what mechanical devices do is increase the surface area of the clot which is
>    in contact with uncoagulated blood and that facilitates much like breaking an ice
>    cube apart would facilitate dissolution in water.

7    *See* Exhibit 1 to the Declaration of Dennis' J. Herman in Support of Plaintiffs' Opposition to

8    Defendants Motion to Dismiss Consolidated Complaint for Violations of the Federal Securities Laws

9    ("Herman Decl.") filed herewith.  Love further admitted that this risk, which had *never* been

10   previously disclosed to investors, was likely the primary cause of the misleading Phase 2 results:

>    Jim Birchenough:      So I'm trying to understand why that might not have happened
>                         in the Phase 2 experience where it seems you had higher
>                         thrombolysis rates?
>
>    Dr. Ted W. Love:     . . . *I actually think it did probably happen in Phase 2*.

14   Herman Decl., Ex. 1; ¶62.  The witnesses merely confirmed what Love already admitted – that the

15   Phase 2 PAO trial had been unable to reliably determine how much of the disruption of blood clots

16   was due to the action of alfimeprase, as opposed to the insertion of the drug delivery catheter

17   breaking up the clot.

18   With respect to the Phase 3 CO trial, plaintiffs alleged that defendants failed to disclose that

19   the FDA had imposed a p-value of less than 0.00125 – 40 times more stringent than its typical

20   standard (p-value of 0.05), which the market believed would apply.  Love admitted that he had

21   always known of this extraordinary hurdle to the success of the CO trial when he acknowledged,

22   during the December 11, 2006 conference call, that "*[w]e had an agreement with the FDA that the*

23   *p-value would be far lower than .05 which would be the traditional number*."  Herman Decl., Ex.

24   1; ¶63.  Nuvelo's senior vice president of research of development, defendant Michael Levy

25   ("Levy") subsequently admitted that the agreement was for an unusually low p-value of 0.00125.

26   ¶65.  Again, the confidential witnesses merely confirm that these defendants always knew about the

27   p-value of 0.00125 because:  (i) Love wrote the protocol for the Phase 3 CO trial; and (ii) both Love

1   and Levy were members of the "alfimeprase team" that lead the drug development efforts, and

2   whose members had previously expressed concern about alfimeprase's ability to meet the extremely

3   low p-value.  ¶40.

4          Recognizing that the witnesses bolster plaintiffs' claims of scienter, defendants seek to

5   discount their testimony through ill-considered attacks on the bases of the witnesses' knowledge.[5]

6   That some of the confidential witnesses left Nuvelo before the alfimeprase trials were completed

7   does not undermine the veracity of their statements.  To the contrary, it plainly establishes that the

8   adverse facts were known, and the risks recognized by defendants **before** the Phase 2 results were

9   reported, and well **before** defendants began using those results to suggest that there was a high

10  probability of success in the Phase 3 trials.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72

11  (2d Cir. 2001) (pre-class period data relevant to show knowledge at start of class period); *In re*

12  *Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3rd Cir. 2005).  Nor are the witnesses merely repeating

13  "gossip and innuendo," as defendants suggest.  To the contrary, they are describing events and

14  conversations that *they personally witnessed or participated in while working at Nuvelo*.  ¶¶37, 40.

15  This is a more than sufficient basis on which to credit the information they provide.  *Daou*, 411 F.3d

16  at 1015; *Cabletron*, 311 F.3d at 29-30; *see also In re InfoSonics Corp. Sec. Litig.*, No. 06cv1231

17  BTM(WMc), 2007 U.S. Dist. LEXIS, at *30-*31 (S.D. Cal. Aug. 7, 2007) ("Given the small size of

18  InfoSonics, the significance of the relationship with Centennial, and the disastrous sequence of

19  events that led to the end of the relationship, CW1's claim that the information was 'public

20  knowledge' within the Company is credible.").

21

22

23

24

25  [5]    Plaintiffs need not plead "all" facts upon which allegations of the witness' knowledge may be
    based, as defendants appear to contend.  Rather, only facts "sufficient" to support the allegations
26  need be pled giving additional weight to allegations that are corroborated by multiple sources.  *In re*
    *Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *see also In re Cabletron Sys., Inc.*,
27  311 F.3d 11, 29-30 (1st Cir. 2002); *In re Silicon Storage Tech., Inc.*, No. C 05-0295 PJH, 2006 WL
    648683, at *10 (N.D. Cal. Mar. 10, 2006).

28

**B.** **Defendants Misled Investors About the Ongoing Clinical Trials of Alfimeprase for PAO and CO**

    **1.** **Defendants' Statements About the Phase 2 and 3 Trials for PAO Were Materially False and Misleading When Made**

During the Class Period, defendants repeatedly claimed that alfimeprase had "demonstrated" its ability to dissolve clots in the Phase 2 clinical trials, and that, based on these results, Nuvelo had designed a Phase 3 clinical trial that, even with "conservative" assumptions about placebo rates, had "overwhelming" statistical power to succeed. ¶¶69, 92, 101, 116, 120, 125. For example, at the outset of the Class Period, Nuvelo issued a press release telling investors that "Alfimeprase . . . *has been shown* in clinical studies to provide rapid clot dissolution. . . ." ¶92. On April 10, 2006, the Company claimed (as it had repeatedly done in the past) that "announced results from the NAPA-1 trial, a Phase 2 dose-escalation study, *demonstrated that alfimeprase can restore arterial blood flow within four hours* of initiation of dosing. . . ." ¶116.

On May 5, 2006, defendant Love told investors that, in designing a Phase 3 study to replicate these results, the Company "took a *conservative* case scenario and allowed for a certain percentage of patients to be deemed to respond to placebo" and that, even so, "the statistical power is still overwhelming for this trial...." ¶120. On the same conference call, defendant Gary Titus ("Titus"), Nuvelo's Chief Financial Officer ("CFO"), further reassured investors that there was no question that alfimeprase worked as reflected in the Phase 2 results, because:

> really *the driver here is not the statistical power for approving efficacy*, because we believe that can be done with a relatively small patient sample; but we need to generate a reasonable size patient safety database to seek approval. . . . [¶] . . .We believe *we still have overwhelming statistical power to detect the difference between active therapy such as alfimeprase – which is indeed very active based on our Phase 2 studies to date – and placebo*.

*Id.*

Each of these statements was materially false and misleading to investors. Defendants knew, but did not disclose, that the mere insertion of the drug delivery catheter would have caused some of

1    the blood clots in patients enrolled in the PAO trials to be broken apart.  *E.g.*, ¶¶37, 69-70.

2    Defendants also knew that, because the Phase 2 trial had no placebo arm, they had no way to

3    quantify the extent to which the catheter, rather than alfimeprase, had been responsible for the

4    positive Phase 2 results.  ¶¶6-8, 37, 61-62.  Because these facts, which materially increased the risks

5    that the Phase 3 trials would not succeed, were not disclosed, defendants' statements regarding the

6    efficacy of the drug as shown in the Phase 2 trials and the conservative nature of Nuvelo's Phase 3

7    assumptions about placebo rates were misleading to investors.

8

9    Defendants' claims about the "overwhelming statistical power" of the Phase 3 trials were

10   also misleading because, in the absence of any reliable data regarding the rate at which the catheter

11   would clear the clot, the power calculations were unreliable.  *E.g.*, ¶¶69-70.  Again, because

12   defendants did not disclose the fact that there was no reliable data regarding catheter clearance rates

13   on which to base power calculations, investors were mislead about the statistical power of the Phase

14   3 PAO trials.  *Id*.

15                    **a.    Defendants Knew but Concealed the Fact that the
                              Insertion of the Drug Delivery Catheter Was Likely to
16                            Have Disrupted Clots in the Phase 2 Trial**

17   Defendants repeatedly contend that they should be absolved from liability because they claim

18   to have accurately reported and publicly disclosed the raw data from the Phase 2 PAO trial.  Defs.'

19   Mem. at 9, 15.  However, even a literally true statement can be misleading through its context and

20   manner of presentation if by "fair and reasonable implication an ordinary investor" would be misled.

21   *Miller v. Thane Int'l, Inc*., 508 F.3d 910, 917 (9th Cir. 2007).[6]  Literal truth is an insufficient defense

22

23

24   [6]    *Padnes v. Scios Nova Inc*., No. C95-1693 MHP, 1996 WL 539711 (N.D. Cal. Sept. 18,
      1996), upon which defendants rely, is inapposite.  In that case, the court held that "[r]easonable
25   minds could differ with respect to the value of the Colorado study in determining the therapeutic
      effects of Auriculin."  *Id*. at *5.  In this case, however, defendant Love admitted that he knew that
26   the insertion of the drug delivery catheter disrupted clots.  Therefore, he knew that there was no way
      to reliably determine whether the Phase 2 results could predict the results of the Phase 3 study,
27   which had a placebo arm.  Unlike *Padnes*, this is not a case where "reasonable minds" could differ
      about the value of the Phase 2 study or where there were legitimate differences in data interpretation.

28

1   because "an issuer's public statements cannot be analyzed in complete isolation," but must be read in

2   context.  *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

3         This is exactly what plaintiffs allege here.  Throughout the Class Period, defendants

4   repeatedly cited the results of the Phase 2 PAO trial when discussing the likely success of the Phase

5   3 PAO trials, ***without*** disclosing the risk that those results could be explained simply as clot busting

6   by the drug delivery catheter, such that there was no way to reliably determine how effective

7   alfimeprase had been during that trial.  ¶¶74, 79, 81, 82, 83.  As a result, the mere fact that raw data

8   from the Phase 2 PAO trial may have been accurately reported does not negate a securities fraud

9   claim.  *See In re Synergen, Inc. Sec. Litig.*, 863 F. Supp. 1409, 1418 (D. Colo. 1994) (even though

10  plaintiffs did not allege that the actual trial data was reported inaccurately, the court denied

11  defendants' motion for summary judgment on grounds that "having touted the Phase II results, the

12  defendants may have a duty to disclose known facts that would have placed the Phase II trial in a

13  different light").  "Incomplete statements are misleading if they 'affirmatively create an impression

14  of a state of affairs which differs in a material way from the one that actually exists.'"  *In re Syncor

15  Int'l Corp. Sec. Litig.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007) (quoting *Brody v. Transitional Hosp.

16  Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

17        Because the Phase 2 trial for PAO did not have a placebo arm, it was impossible for

18  defendants to determine how many of the clot disruptions in that trial had been caused by the

19  insertion of the catheter, or how many had been caused by the action of alfimeprase.  ¶¶69-70.

20  Although Nuvelo told investors there was no placebo control, it did ***not*** warn them of the specific

21  risk this created that the Phase 2 results were misleading because the drug-delivery catheter might

22  have simply broken through the clot.  That defendants were aware of this risk is evident from Love's

23  admission that Nuvelo had "always known" that the mere insertion of the catheter could disrupt the

24  clot.[7]  ¶¶61-62.

25

---

26  [7]     Additional evidence of defendants' knowledge that the risk of clot disruption by the catheter

27  was significant is found in the results of the NAPA-2 Phase 3 PAO study first published on Nuvelo's
    website on January 24, 2008, after the Complaint was filed.  Herman Decl., Ex. 4; *see* ¶64.  Those

28  results reveal that Nuvelo divided the placebo group into two subgroups – one of whom was

1   Because defendants knew that the Phase 2 PAO data which purported to show the efficacy of

2   alfimeprase in disrupting clots did not take into account the effect of catheter insertion and that this

3   risk had not been disclosed to investors, they had no basis for making any representations about the

4   success of alfimeprase in disrupting clots in the Phase 2 trial, or using these results to demonstrate

5   the likelihood of success in the Phase 3 PAO trials.  ¶¶68-70, 131-144.  As the court stated in

6   *Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *23, "it would be sad day when [a] court could

7   determine that misstatements about whether a company's primary product worked did not alter the

8   'total mix' of information available in the market."  Omissions and misrepresentations are material

9   and "'not trivial, as the efficacy and competitiveness of [the company's sole product] was essential

10  to the company's performance.'"  *In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 114, 1151 (C.D.

11  Ca. 2007).

        **b.    Defendants' Statements About The "Overwhelming
                Statistical Power" of the Phase 3 PAO Trial Were False**

12
13          Defendants' statements about "power calculations" and "overwhelming statistical power" of

14  the Phase 3 PAO trial suffered from the same deception discussed above.  Defendants knew that the

15  insertion of the drug delivery catheter was disrupting clots in the Phase 2 PAO trial and the same

16  effect would occur in the Phase 3 PAO trial, causing the placebo arm to have a high rate of

17  avoidance of open surgery at 30 days.  ¶¶6-8, 37, 61-62.  In order to perform a power calculation, it

18  is necessary to have some basis to predict how many patients in the placebo arm will attain the

19  primary endpoint. Since defendants knew that insertion of a catheter disrupted clots but did not have

20  any way of quantifying the expected effect of catheter insertion in the Phase 3 PAO trial, they had no

21  factual basis to make ***any*** assumptions about the extent of success to be expected with a placebo or,

22  by extension, any basis to make a reliable power calculation.  ¶¶61-62, 69.  As a result, it was

23

24  administered the placebo via a catheter inserted ***through*** the clot (the intra-thrombus group), and
25  another who was administered the placebo via a catheter placed ***above*** the clot (the peri-thrombus
    group).  *See* Herman Decl., Ex. 4.  This is very clear evidence that defendants knew about the
26  substantial risk posed by the catheter effect and wanted to measure it.  While plaintiffs believe the
    Complaint is sufficient on its own to satisfy the PSLRA pleading requirements, if necessary, they
27  can expand upon the inferences flowing from these belatedly-published results in an amended
    complaint.

28

1  misleading, in the absence of any disclosure of this risk, to represent that Nuvelo had "overwhelming

2  statistical power" to detect the difference between alfimeprase and placebo.

3          Contrary to defendants' contentions (Defs.' Mem. at 16), the fact that Nuvelo disclosed the

4  placebo rate it was using is irrelevant.  Regardless of the disclosure of the assumed placebo rate,

5  investors did not have sufficient information to understand that the placebo rate, and hence the

6  power calculations, lacked a reliable basis.  Defendants' reliance on Levy's statement during the

7  November 1, 2005 conference call is telling.  There, Levy told investors that "***we're assuming a***

8  ***relatively low placebo rate***.  You know if you wanted to guesstimate something in the order of 10%

9  or so, you would be approximately right." *Id*. (citing Fondo Decl.,[8] Ex. X).  Far from disclosing that

10  the lack of a placebo arm together with the risk of catheter-caused clot busting rendered the Phase 2

11  results potentially misleading and the power calculations unreliable, this statement ***assured*** investors

12  that any placebo effect was known to be relatively minor, and would have little impact on trial

13  results.

14          The impact of this misstatement was magnified during the Class Period, when Love told

15  investors that the Company had taken a "conservative case scenario and allowed for a certain

16  percentage of patients to be deemed to respond to a placebo. . . ." ¶120.  This suggested, on its face,

17  that ***no*** placebo effect was anticipated and the Company was being extra cautious in designing its

18  trial by taking into account that some small number of patients receiving placebo might experience a

19  benefit.  Indeed, defendants' stated assumption of a low placebo rate was ***directly contrary*** to their

20  knowledge that the mere insertion of a catheter would disrupt clots in patients receiving placebo.  As

21  a result, given the total mix of information that was available to investors the statement was

22  misleading.  *See Basic, Inc. v. Levinson* 485 U.S. 224, 231-32 (1988)

23

24

25

26

---

27  [8]      "Fondo Decl.," refers to the Declaration of Grant P. Fondo in Support of Motion to Dismiss
Consolidated Complaint for Violations of the Federal Securities Laws filed on December 21, 2007.

28

1

2

**2.    The Failure to Disclose the 0.00125 P-Value Rendered Defendants' Statements About the Phase 3 CO Trial Misleading**

3       Prior to the Class Period, Nuvelo had announced the results of a Phase 2 clinical study in

4  which a 3.0 mg dose of alfimeprase was reported to have cleared blocked catheters much faster than

5  existing treatments.  ¶54.  In fact, defendants told investors, the results were so convincing that

6  Nuvelo had closed the study early in order to accelerate the clinical program.  ¶53.  Following the

7  infusion of operating cash from an investment made by Bayer Healthcare A.G. ("Bayer") and the

8  follow-on offering, *infra* §II(C)(2), Nuvelo had the funds it needed for further clinical studies and

9

10  announced commencement of the Phase 3 CO trial.  ¶100.  In a press release, Nuvelo told investors

11  that it "expect[s] the Phase 3 trial results to confirm the ability of alfimeprase to restore function to

12  occluded catheters in 15 minutes or less, as demonstrated in our Phase 2 trial."[9]  *Id*.  Thereafter,

13  defendants continued to assure investors that the Phase 3 CO program was progressing as planned.

14  ¶124.

15

16       These statements were materially misleading to investors because defendants failed to

17  disclose that, prior to the commencement of the Phase 3 trial, Nuvelo had agreed with the FDA to

18  impose a p-value of 0.00125 on the trial – a virtually unheard of standard that is 40 times more

19  difficult to meet than the FDA's typical p-value of 0.05 which the market anticipated would be

20  applied to the trial.  *E.g.*, ¶58.  Defendants do not, and cannot, contend that this p-value was ever

21  disclosed to investors.  Rather, defendants incorrectly contend that investors should have anticipated

22  the p-value of 0.00125.  Their contentions have no merit.

23

24  [9]       Genentech's competing product, alteplase, had achieved a 52% catheter clearance rate at 30 minutes of dosing in a trial that involved 955 patients.  In order to market a competitive product, alfimeprase had to replicate its Phase 2 results, showing a 50% clearance rate at 15 minutes, *i.e.*, twice as fast as the existing treatment.  However, because of the early closure of the trial the Phase 2 results were based on an extremely small sample size – only 10 patients had received the 3 mg. dose being tested in Phase 3, and only five of those had received the required benefit (*i.e.*, clearance of blockage at 15 minutes).

25

26

27

28

1          **a.    Defendants Repeatedly Compared the Nuvelo CO**
2               **Trials to the Genentech Cathflow Studies, Which**
               **Utilized the Traditional P-Value of 0.05**

3          Defendants repeatedly and illogically assert that their acknowledged failure to disclose the p-

4    value of 0.00125 for the Phase 3 CO trial was not misleading because Nuvelo repeatedly disclosed

5    that its trials were modeled after the successful Genentech Cathflo Activase trials.  Defs.' Mem. at 7,

6    17, 18.  If, however, the market believed that Nuvelo's Phase 3 CO trials were comparable to the

7    Genentech Cathflo trials, then defendants have proven plaintiffs' point.  The market would ***not*** have

8    known or expected the unusually stringent p-value of less than 0.00125 which the FDA imposed on

9    Nuvelo's CO alfimeprase trial, because ***Genentech's Cathflo trial had an FDA required p-value of***

10   ***0.05***, the traditional p-value for clinical trials.  ¶58; *see also* Fondo Decl., Ex. Y at 953 ("All

11   statistical tests were . . . conducted at the 0.05 level of significance.").

12         Defendants' related contention that the difference between a p-value of 0.05 and 0.00125 was

13   immaterial because the Genentech Cathflo study of alteplase achieved a p-value of less than 0.0001

14   is irrelevant, because that is simply the result of a ***different*** drug tested under ***different***

15   circumstances.[10]   That alteplase succeeded at p-value of 0.0001 says nothing about whether

16   alfimeprase could meet a p-value of 0.00125.  Because the risk of non-approval increases as the p-

17   value decreases, investors cared about the statistical showing ***alfimeprase*** would be required to meet

18   in order to be approved for the treatment of CO – ***not*** whether or the extent to which a competitive

19   product, alteplase, had been able to exceed that standard.

20         **b.    Defendants Stated that the Phase 3 CO Clinical Trials**
21              **Would Include *Two* Pivotal Trials, Which Implied the**
              **Standard 0.05 P-Value Would Be Used**

22         Defendants' contention that the "market could not have reasonably assumed that the

23   SONOMA-2 [Phase 3 CO] trial would have a p-value of two clinical trials, or 0.05" is similarly

24   _____

25   [10]    Even apart from the fact that they were testing different drugs, the Cathflo trial measured
     efficacy by checking to see whether catheters were cleared two hours after administration of the
26   drug, whereas the alfimeprase trial was attempting to show success just 15 minutes after dosing.
     Given the significant difference in endpoints, it would not have been "reasonable for Defendants to
27   believe that the phase III trial would be at least as statistically significant as the Genentech study"
     (Defs.' Mem. at 18) even if the ***same*** drug were being tested.

28

1  unfounded – and directly contrary to defendants' statements to investors during the Class Period.

2  Defendants contend that investors understood that alfimeprase would have a p-value lower than 0.05

3  because only *one* pivotal trial was being conducted, as opposed to the two pivotal trials used in the

4  Genentech program. Defs.' Mem. at 18. This argument directly contradicts Nuvelo's statements to

5  investors during the Class Period that the Nuvelo Phase 3 CO program, like Genentech's, consisted

6  of *two* pivotal trials: "Nuvelo . . . and Bayer . . . today announced that they have begun patient

7  enrollment in a ***second pivotal Phase 3 clinical trial*** of lead product candidate, alfimeprase, for the

8  treatment of . . . CO."[11] ¶100.

9      Hence, defendants' own Class Period statements prove plaintiffs' claim that investors

10  expected that Nuvelo's CO trial would also use a p-value of 0.05, and were necessarily misled by

11  defendants' deliberate failure to disclose that a p-value of 0.00125 or less was required. *See*

12  *Synergen*, 863 F. Supp. at 1418 ("I cannot conclude that the omissions [about the p-value analyses]

13  are so obviously unimportant to reasonable investors in deciding whether to purchase Synergen stock

14  that reasonable minds cannot differ on the question of materiality."); *In re Time Warner, Inc. Sec.*

15  *Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information

16  renders prior public statements materially misleading, not merely when information completely

17  negates the public statements.").

18      Contrary to defendants' brief, that "[no] analyst asked about the p-value" during the Class

19  Period would not establish that analysts knew that the p-value for the Phase 3 trial was 0.00125 or

20  less.[12] Rather, the analysts' purported failure to ask, if true, would more plausibly support plaintiffs'

21

---

22  [11]    The Genentech Cathflo Phase 3 trials consisted of a double-blind placebo controlled efficacy study and a single arm open label safety study. Defs.' Mem. at 7. Similarly, Nuvelo's Phase 3 trials

23  for CO consisted of a double-blind placebo controlled study and a single arm open-label safety study. ¶¶56, 57. A June 2004 article in the Journal of Vascular Interventional Radiology, titled,

24  "Dose-Ranging Trial with a Recombinant Urokinase (Urokinase Alfa) for Occluded Central Venous Catheters in Oncology Patients," authored by, among others, Dr. Steven Deitcher (who later became

25  Nuvelo's V.P. Medical Affairs), similarly states that the Genentech open label trial was the second trial in Genentech's Phase 3 catheter occlusion program – *i.e.*, it was one of "[t]wo pivotal trials."

26  Love worked at Genentech while it was testing Cathflo Activase. ¶¶17, 40.

27  [12]    Moreover, the extent to which analysts as investors asked, publicly or privately, about the p-value raises factual issues not susceptible to determination on a motion to dismiss.

28

1  allegation that analysts (and investors) reasonably understood and expected the traditional p-value of

2  0.05 to be used for the study.  *See* ¶58.  Indeed, during an August 1, 2007 analyst conference call in

3  which the Company announced that they would initiate a new CO trial at a higher dose (¶¶58, 65-

4  66), analysts pointedly asked: "***And what's the p-value this time?***"  This question strongly suggests

5  that analysts did not want to be misled again.

6           **c.      The FDA Guidance Does Not Require a P-Value of
                       0.00125 Even if Only One Pivotal Trial Had Been
7                      Performed**

8           Even if investors had reached the irrational conclusion pressed by defendants that the p-value

9  for SONOMA-2 would have been based on a single study, defendants incorrectly rely on an FDA

10  Guidance document to argue that the market would then have known that FDA had imposed a p-

11  value of 0.00125 or less.  Defs.' Mem. at 17-18; Fondo Decl., Ex. 2.  Contrary to defendants'

12  contentions, the FDA Guidance document gives ***no*** specific guidance about what p-value might be

13  imposed to establish evidence of effectiveness from a single well-controlled study.  Rather, the

14  document explicitly ***refuses*** to give specific guidance:

15           the Agency has not comprehensively described the situations in which a single
             adequate and well-controlled study might be considered adequate support for an
16           effectiveness claim, ***or the characteristics of a single study that could make it
             adequate support for an effectiveness claim***.

17
   Fondo Decl., Ex. Z at 12.
18
           Since the FDA Guidance does not mandate, or even mention, that the p-value for one well-
19
   controlled trial should be 0.00125 or less, defendants' argument that investors would have expected
20
   such a stringent and unique requirement is groundless.[13]  Moreover, the passage quoted repeatedly in
21
   defendants' brief about a "very low p-value" is taken out of context, and comes from a section of the
22
   document describing five separate factors, ***any one*** or more of which could be sufficient to
23
   demonstrate the reliability of a single-arm study.  *Id*. at 17.  Nothing in the FDA Guidance ***requires*** a
24

25  _____

26  [13]      Moreover, the fact that a p-value of 0.00125 was not automatically required for the trial can
            also be demonstrated by the fact that ***the p-value for every one of the secondary endpoints in the
27  phase 3 CO trial was 0.05***.  Herman Decl., Ex. 3 ("The primary efficacy endpoint analysis was
   conducted at [p] = 0.00125.  ***All other statistical tests were conducted at [p=0.05]***").

28

1    "very low p-value" to be used, defines what constitutes a "very low" value, or otherwise establishes

2    that a p-value under 0.00125 is ***always*** to be expected in such a trial.[14]

3          Moreover, defendants' argument has no legal basis.  In *Noble Asset Mgmt. v. Allos*

4    *Therapeutics, Inc.*, No. CIVA-04CV-1030-RPM, 2005 WL 4161977 (D.Colo. Oct. 20, 2005), the

5    principal case relied upon by defendants, plaintiffs had alleged that defendants had failed to disclose

6    that the touted positive results observed in an undefined subgroup could only be considered

7    "exploratory" and could not form the basis for substantive conclusions about the effect of the drug

8    being tested.  *Id.* at *6-*7.  The court found that the FDA guidance cited by defendants in that case

9    sufficiently warned of the precise information that plaintiffs had alleged was omitted, because it

10   ***specifically*** warned that subgroup analyses are considered exploratory in "most cases" and that any

11   conclusions based solely on exploratory subgroup analyses were unlikely to be accepted.  *Id*.  In this

12   case, by contrast, the FDA Guidance is ***silent*** on the issue raised by defendants – *i.e.*, the required p-

13   value for a single trial.

14         Defendants' contentions regarding the FDA's guidance are akin to a "truth-on-the-market"

15   defense that should be rejected as inappropriate for resolution at this stage of the case.  Determining

16   whether investors understood, in the absence of any express disclosure by Nuvelo that the CO trial

17   was required to demonstrate statistical significance at p-value of 0.00125, involves a fact-intensive

18   inquiry inappropriate on a motion to dismiss.  *In re Apple Computers Sec. Litig.*, 886 F.2d 1109,

19   1116 (9th Cir. 1989) ("In order to avoid Rule 10b-5 liability, any material information which insiders

20   fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient

21   to effectively counter-balance any misleading impression created by the insiders' one-sided

22   representations."); *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996); *see also In re Synergen*

23   *Inc. Sec. Litig.*, 863 F. Supp. at 1419 (denying motion for summary judgment on grounds that a

24   reasonable fact finder could conclude that investors did not understand that the p-0.015 in

25

26   [14]    Defendants' repeated statement that (0.05 x 0.05) ÷ 2 = 0.00125 proves nothing.  There are
     no facts that suggest such a calculation was used or required in the specific context of the CO drug
27   trial in this case, nor are there any facts to suggest that investors or analysts would have performed
     such a calculation.

28

1   defendants' media advisory on Phase 2 results of its new drug referred to survival curves, not the 28-

2   day mortality rate).[15]

3               **d.     Defendants Concealed that Alfimeprase Had to Meet a**
                         **Difficult "Target Product Profile" Before Nuvelo Would**
4                        **Market the Drug for CO**

5               In addition to failing to disclose the p-value of 0.00125, defendants also failed to tell

6   investors that Nuvelo had developed an internal performance target to market alfimeprase, which

7   would require alfimeprase to clear blocked catheters significantly faster than competing drugs

8   already on the market.  ¶¶8, 65-66.  Defendants concealed the fact that failure to meet the target at

9   standard significance levels would preclude commercialization of the drug for CO.  Defendants

10  apparently knew, but did not disclose, that for alfimeprase to replicate the phase 2 results

11  demonstrating 50% catheter clearance at 15 minutes, the drug would have to succeed at a p-value of

12  0.001.[16]  Unless such an extraordinarily stringent standard could be achieved, defendants knew that

13  the drug would not be marketable for CO.

14              Nuvelo's inability to market the drug with results achieved at standard levels of significance

15  was first revealed in the December 11, 2006 conference call with analysts, when Love stated that

16  although Nuvelo "definitely did see thrombolytic effect" in CO at "what would traditionally be

17  considered a statistically significant rate in the SONOMA [CO] trial," the CO trial would be

18  _____

19  [15]     *See also Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1307 (C.D.

20  Cal. 1996) (release of "inconspicuous addendum" cannot cure a misleading statement, "especially
    where it is unclear that the contents of the addendum directly address the allegedly misleading
21  information in the statements"); *Iyer v. NTN Commc'ns, Inc.*, No. 97-cv-1116 TW(JAH), 1999 U.S.
    Dist. LEXIS 8968, at *19 n.4 (S.D. Cal. May 21, 1999) (truth-on-the-market defense imposes an
22  "extremely high burden" on defendants in order to successfully invoke the defense).

23  [16]     The recently-disclosed data from the phase 3 CO trial demonstrates that, if the results in the
    phase 3 CO trial had established that alfimeprase could clear blocked catheters at 15 minutes in 50%
24  of the patients being tested, the results would have necessarily been statistically significant to a p-
    value of 0.001 – *i.e.*, almost exactly what was required in the FDA-approved protocol for the drug
25  trial.  *See* Herman Decl., Ex. 3.  Even if this date had been available during the Class Period,
    however, investors would not have been required to conduct detailed statistical calculations in order
26  to discover the information defendants deliberately failed to disclose.  *See Marksman Partners*, 927
    F. Supp. at 1307-08 ("if it would take a financial analyst to spot the tension between the one and the
27  other, whatever is misleading will remain materially so…") (citing *Virginia Bankshares, Inc. v.
    Sandberg*, 501 U.S. 1083, 1097 (1991)).

28

1   *suspended* because the drug had not met the Company's "target product profile."  ¶¶10, 65-66.

2   Since the 3 mg. dose being tested in the Phase 3 trial achieved a p-value of 0.022 – well within the

3   traditional level of statistical significance of 0.05 or less for two pivotal trials (although not less than

4   the .00125 p-value required) – Nuvelo should have been able to obtain FDA approval of alfimeprase

5   for CO simply by conducting a second trial at the same dose.  Instead, based on the previously

6   undisclosed "target product profile," Nuvelo suspended the CO trial.

7           **3.     In Light of Their Material Omissions, Defendants' Statements
                       that PAO and CO Presented a "Low Risk Path to Regulatory
8                      Approval" Were Misleading**

9           During the Class Period, defendants repeatedly told investors that Nuvelo was starting its

10  clinical testing of alfimeprase with the PAO and CO indications because that provided a "low risk

11  path to regulatory approval" and a "rapid and low risk entry strategy" with a "high probability of

12  success."  ¶¶6, 71, 94, 95, 101, 102, 109.  Defendants made these statements to assure investors that

13  the PAO and CO indications – which combined had a total market of only $500 million – were just

14  the beginning for alfimeprase and that, once easy approval for these treatments was established,

15  Nuvelo would push forward into the much more lucrative market for treatment of ischemic stroke

16  and deep vein thrombosis.  *E.g.*, ¶71.

17          For example, in a conference call with analysts at the outset of the Class Period, Love

18  claimed that alfimeprase had "blockbuster" potential, explaining that:

19          It has been very clear to us from the very beginning that stroke and DVT are much
            larger market opportunities. ***But we did not start with those indications because of
20          the development strategy was really focused on going after indications which will
            be rapid to market, which would demonstrate the superior advantage of the
21          compound in terms of its fast speed of action and would provide a low-risk
            regulatory path for approval***.  Now that we've got those programs obviously well
22          underway, we plan to turn our attention to DVT, stroke, [and] other indications to
            really exploit the full commercial potential and the full medical benefit of the
23          product.

24  ¶94.  Throughout the Class Period, defendants reaffirmed the "low risk" nature of the pending PAO

25  and CO trials, including in a letter to shareholders accompanying Nuvelo's annual report, wherein

26  Love again explained that the Company:

27

28

1

2

3

4

chose our initial clinical programs for alfimeprase in acute peripheral arterial occlusion (PAO) and catheter occlusion (CO), to *permit more rapid and lower risk market entry*, with the expectation that we would later expand our efforts into additional indications. *We are well on our way to achieving this goal*.

¶109.

5

6

For the reasons described previously, these statements were materially false and misleading by reason of defendants' failure to disclose the extremely stringent p-value and target product

7

requirement for the Phase 3 CO trial, and the risk of catheter insertion effects on the PAO trials. By

8

telling investors, in exceedingly strong terms, that the PAO and CO trials provided a "rapid," and

9

"low-risk path to regulatory approval" with a "high probability of success," defendants had a duty to

10

disclose the concealed information giving rise to significant undisclosed risks directly affecting these

11

trials. *Miller*, 508 F.3d at 917; *Convergent*, 948 F.2d at 512. Because the failure to disclose these

12

adverse facts concealed material risks to the success of the Phase 3 trials in both the CO and PAO

13

indications from investors, defendants' repeated claims about the ease with which regulatory

14

approval could be obtained and the "low risk" nature of the ongoing trials were materially false and

15

misleading to investors.

16

Instead, Nuvelo provided only non-specific, generic risk warnings to investors. ¶¶131-44.

17

Defendants' failure to disclose the fact that the Phase 2 PAO results were impacted by the ability of

18

the catheter breaking apart the clot, and that the Phase 3 CO trials were subject to a heightened p-

19

value requirement and an internal marketing requirement, rendered the risk warnings issued by the

20

Company during the Class Period similarly misleading. *Id*. When considered together with

21

defendants' public statements touting the Phase 2 results for both indications and strongly suggesting

22

that the Phase 3 trials would succeed and the drug would be marketable, including the statements

23

pled at ¶¶93-94, 100-101, 107-110, 116, 120, and 124-125, the generic and incomplete risk warnings

24

contained in Nuvelo's public Securities Exchange Commission ("SEC") filings were materially

25

misleading to investors. ¶¶135, 138, 141, 144.

26

**C.    Plaintiffs Have Alleged Facts Giving Rise to a Strong Inference of Scienter as to Each Defendant**

27

In determining whether a plaintiff has adequately alleged scienter, "courts must consider the

28

complaint in its entirety. . . . The inquiry is whether *all* of the facts alleged, taken collectively, give

1    rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

2    meets that standard." *Tellabs*, 127 S. Ct. at 2509, 2511 (emphasis in original). A strong inference of

3    scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable

4    person would "deem the inference of scienter at least as strong as any opposing inference[.]" *Id.*

5        In holding that "[t]he inference that the defendant acted with scienter need not be irrefutable,

6    *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" *id.* at 2510,

7    the Supreme Court *lowered* the standard for pleading scienter in this Circuit. Where previously,

8    under *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002), inferences supporting scienter had to be

9    *more* plausible than non-culpable inferences, now the inferences need only be *equally* plausible.

10   Hence, under *Tellabs*, "a tie goes to the Plaintiff." *Commc'n. Workers of Am. Plan for Employees'*

11   *Pensions & Death Benefits v. CSK Auto Corp.*, No. CV06-1503-PHX-DGC, 2007 U.S. Dist. LEXIS

12   72424, at *9 (D. Az. Sept. 27, 2007); *Sloman v. Presstek, Inc.*, No. 06-cv-377-JD, 2007 U.S. Dist.

13   LEXIS 69475, at *22 (D.N.H. Sept. 18, 2007).[17]

14       **1.    The Individual Defendants' Active Involvement in the**
             **Alfimeprase Program, Admissions of Prior Knowledge, and**
15           **Day-to-Day Management of Nuvelo Demonstrate They Acted**
             **with Scienter**

16       As an initial matter, the risks that were not disclosed to investors were neither insubstantial

17   nor remote. Rather, they represented significant risks giving rise to heightened uncertainty about

18   both the significance of the previously-reported Phase 2 trials and the likelihood of success in the

19   ongoing Phase 3 trials. Nor were these risks speculative; they arose from current or historical facts

20   and conditions that Nuvelo had never disclosed to its investors. Alfimeprase's utility as a treatment

21

22   _____

     [17]    At this stage of the litigation, a court may not "weigh the evidence that might be presented at
23   trial," but must simply determine "whether the complaint itself is legally sufficient." *In re
     Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897 (DLC), 2007 U.S. Dist. LEXIS 67660, at *8
24   (S.D.N.Y. Sept. 14, 2007); *see also In re NPS Pharm., Inc. Sec. Litig.*, No. 2:06-cv-00570, 2007 U.S.
     Dist. LEXIS 48713, at *10 (D. Utah July 3, 2007) ("NPS makes various claims in support of its
25   argument that the plaintiff has failed to plead particularized facts establishing the defendants'
     statements were false and misleading when made. The problem with all of NPS's claims is that they
26   require the court to weigh evidence. Therefore, they are inappropriate at the motion to dismiss
     stage."). As the Ninth Circuit observed with respect to motions to dismiss: "Our function is satisfied
27   when we identify issues sufficiently pled to raise triable questions. We need not consider the
     probability of success." *In re Syncor*, 239 Fed. Appx. at 321.

28

1    for PAO was directly dependent on its ability to dissolve clots in order to restore blood flow. Given

2    defendants' knowledge of the propensity of the catheters used in the PAO trials to accomplish the

3    same effect, there was a direct and substantial risk that the purportedly positive results of the Phase 2

4    trial were **not** due to the drug and would not be replicated in Phase 3. Similarly, given the fact that

5    statistical significance in drug trials typically was deemed established at a p-value of 0.05, the

6    imposition of the p-value of 0.00125 on the Phase 3 CO trial raised direct and substantial risks that

7    made it much more difficult for that trial to succeed.

8        Moreover, as stated above, defendants have ***admitted*** that they knew of both these conditions

9    from the outset of the Class Period, and knew further that neither of those facts – the propensity of

10   catheters to bust clots and the imposition of the p-value of 0.00125 – had never been disclosed to

11   Nuvelo's investors.    Under these circumstances, there is little question but that each of the

12   defendants – Nuvelo, Love, Levy and Titus – was at least deliberately reckless to the propensity of

13   their Class Period statements to mislead investors. *Nursing Home Pension Fund, Local 144 v.*

14   *Oracle Corp.*, 380 F.3d 1226, 1232, 1234 (9th Cir. 2004) (corporate executives admissions as to

15   what they knew and what information they had access to collectively sufficient to raise strong

16   inference of scienter); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*

17   *Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (rejecting as "patently incredible," that high-

18   ranking officers were unaware of major business events likely to have a significant impact on

19   company's financial condition).

20        Even apart from their express admissions of knowledge, there is ample evidence from which

21   to infer that defendants were aware of the facts giving rise to, and the significance of, the concealed

22   risks.   Love wrote the protocols for all of the clinical trials of alfimeprase and was a member,

23   together with Levy, of the "alfimeprase team" consisting of people primarily responsible for testing

24   and marketing the drug.   As such, both Love and Levy undoubtedly knew about the target product

25   profile of alfimeprase for CO, and the required p-value for the Phase 3 CO trial.   ¶¶17-19, 37, 40.

26   Love admitted on December 11, 2006 that there was a formal "agreement with the FDA that the p-

27   value would be far lower than .05 which would be the traditional number."   ¶63.   Moreover, as

28   explained previously, defendants knew that the undisclosed target market profile for the drug could

1   not be hit **unless** the extraordinarily low p-value was achieved.  *Supra* §II(B)(2)(d)  Further, Love

2   knew, from his experience at Genentech with alteplase, that the results in a small CO trial could

3   diverge greatly from the results in a large trial.  *See* ¶¶17, 40.  The difficulties encountered by

4   Nuvelo in the design of the Phase 3 trials, including the concerns raised by a Company statistician

5   over the ability to meet that p-value, lend additional credibility to these allegations of scienter.  ¶40,

6   55, 59.

7          Defendants Love and Levy also knew that the insertion of the drug delivery catheter

8   disrupted clots in patients with PAO because defendant Love admitted on December 11, 2006

9   conference call that they had "always known" of that fact, and acknowledged that it had probably

10  happened during the Phase 2 PAO trial.  ¶¶37, 61, 62.  As the Vice President of Research and

11  Development and due to his involvement on the "alfimeprase team," it can be inferred that Levy –

12  who silently acquiesced as Love made those admissions during the December 11, 2006 conference

13  call – understood the risks as well.  ¶¶37, 60-63.

14         The scienter of the individual defendants can be further inferred from the fact that Love,

15  Levy and Titus were three of only four executive officers at Nuvelo, a small 103-person Company,

16  where alfimeprase was the lead drug in development during the Class Period, and all three regularly

17  communicated with investors during the Class Period about the progress of the alfimeprase trials.

18  ¶¶2, 20, 98; *see Makor Issues & Rights, Ltd. v. Tellabs Inc*., No. 04-1687, 2008 U.S. App. LEXIS

19  975, at *24 (7th Cir. Jan. 17, 2008) ("it is exceedingly unlikely" that the CEO who sat "at the top of

20  the corporate pyramid," was merely repeating lies fed to him by other company executives when the

21  company's key products were involved and almost all of the false statements emanated directly from

22  him.); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425-26 (5th Cir. 2001) (finding strong evidence of

23  scienter with respect to the company officer where Zonagen was essentially a one-product company,

24  company's prospects were substantially dependent on one product and the company was small).[18]

25  _____

26  [18]     *Accord Middlesex Ret. Sys. v. Quest Software Inc*., No. CV 06-6863 DOC (RNBx), 2007

27  U.S. Dist. LEXIS 84695, at *48 n.2 (C.D. Cal. Oct. 22, 2007) (defendants' key positions with the
    company, combined with other particularized facts "may allow the Court to find that scienter has

28  been adequately pled"); *InfoSonics*, 2007 U.S. Dist. LEXIS, at *30-*31 (strong inference of scienter

1    Considering these allegations collectively and interpreting the Complaint holistically, as *Tellabs*

2    requires, leads to the inescapable conclusion that a strong inference of scienter has been pled here.

3                    **2.    Defendants Had the Motive and Opportunity to Commit
                            Fraud**

4

5            Defendants repeatedly contend that they had no motive to commit fraud because they had

6    every reason to believe that the alfimeprase trials would succeed.  Defs.' Mem. at 16, 18, 20-21.

7    This precise argument was recently rejected by the Seventh Circuit in *Makor*, 2008 U.S. App.

8    LEXIS 975, at *21, where defendants had argued that they had no motive to paint the prospects for

9    the company's two key products in "rosy hues" because neither the CEO nor anyone else profited

10   financially from that deception.  The Court easily rejected this argument:

11           The argument confuses expected benefits with realized benefits.  Notebaert [the
             CEO] may have thought that there was a chance that the situation regarding the two
12           key products would right itself.  If so, the benefits of concealment might exceed the
             costs. . . . ***It is like embezzling in the hope that winning at the track will enable the
13           embezzled funds to be replaced before they are discovered to be missing***.

14   *Id.* at *21-*22.

15           Here, defendants had a strong motivation to conceal the true facts about alfimeprase because

16   Nuvelo was desperately in need of cash and returned to the market time and again for financing in

17   order to survive.  Nuvelo repeatedly relied upon the purported success of the alfimeprase trials to

18   alleged where individual defendants were a "select group of officers" in "high-level positions"); *see
     also In re Regeneron Pharm. Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350,
19   at *69 (S.D.N.Y. Feb. 3, 2005) (because drug underdevelopment was a "make" or "break" product
     for the company, this supported inference of scienter of Chairman and CEO of negative information
20   from clinical trials); *In re Genta, Inc. Sec. Litig.*, No. 04-2123 (JAG), 2005 U.S. Dist. LEXIS 22857,
     at *20-21 (D.N.J. Sept. 30, 2005) (comprehensive knowledge of the clinical trials involved in the
21   development of Genta's lead pharmaceutical product may be reasonably imputed to Warrell, who
     was President, Chairman and CEO of the company); *e.g., In re Vicuron Pharm., Inc. Sec. Litig.*, No.
22   04-2627, 2005 U.S. Dist. LEXIS 15613, at  *28 (E.D. Pa. July 1, 2005) (the importance to the
     company of the lead drug under development warranted an inference of recklessness, at the least, of
23   its officers and directors as to misstatements related to Phase 3 clinical trials of the drug);
     *NeoPharm*, 2003 U.S. Dist. LEXIS 1862, at *35 (plaintiff pled sufficient facts to infer that chairman
24   and CEO of drug company knew results of Phase 2 clinical trials); *Viropharma*, 2003 U.S. Dist.
     LEXIS 5623, at *31 (because drug under development was company's leading product, it can be
25   assumed that Chairman and CEO knew results of Phase 2 clinical trials); *In re Amylin Pharm., Inc.*,
     No. 01cv1455 BTM (NLS), 2002 U.S. Dist. LEXIS 19481, at *22 (S.D. Cal. Oct. 10, 2002) (because
26   SYMLIN was Amylin's primary drug candidate and Amylin is a small biotech company, defendants
     Cook and Greene are properly charged with knowledge of the misstatements regarding severe
27   hypoglycemia).

28

1    obtain much needed cash to continue in operation, test alfimeprase, and highly compensate its

2    executives, including defendants Love, Levy and Titus.  ¶¶4, 28-31.  Each of the individual

3    defendants obtained substantial bonuses as a result of their success in leveraging the reported

4    positive results of alfimeprase into increased capital for Nuvelo. ¶¶145-147.  Indeed, even before the

5    Class Period, Nuvelo had fallen into a pattern of announcing positive news about alfimeprase as the

6    need to sell additional shares to investors arose.  ¶31.

7         This pattern continued during the Class Period.  For example, Nuvelo obtained an immediate

8    concrete benefit from the January 5, 2006 announcement that the alfimeprase trials would proceed.

9    Barely three weeks later, on January 30, 2006, Nuvelo sold 7.475 million newly-issued shares at $16

10    per share in a Follow-on Offering, netting proceeds of approximately $119.6 million.  ¶¶147, 149.

11    Without these funds, the alfimeprase Phase 3 testing program could not have been accomplished.

12    ¶¶47, 49, 56; *see In re Portal Software, Inc. Sec. Litig*., No. C-03-5138 VRW, 2005 U.S. Dist.

13    LEXIS 20214, at *36 (N.D. Cal. Aug. 10, 2005) (contention that "defendants were motivated to

14    inflate artificially Portal's stock price in the short term in order to conduct a successful secondary

15    public offering and obtain much-needed operating capital' does allege facts of a palpable motive for

16    fraud").  In light of these allegations, defendants' reliance on *Lipton v. PathoGenesis Corp*., 284

17    F.3d 1027, 1037 (9th Cir. 2002), is misplaced.  *Lipton* addressed the inferences of scienter arising

18    from defendants' need to secure a line of credit, a routine business matter.  By contrast, plaintiffs

19    here ask the Court to infer scienter from Nuvelo's need to raise capital from public investors to keep

20    the Company afloat and support the testing of its lead product.  Unlike the facts in *Lipton*, tapping

21    the public markets was essential for Nuvelo to survive.  The facts of this case are far different than

22    the routine action taken in the ordinary course of business in *Lipton*, and from which inferences of

23    scienter were found to be less strong.

24         Defendants also argue that even though defendant Titus sold his Nuvelo stock, the fact that

25    defendants Love and Levy did not sell stock negates an inference of scienter.[19]  Defs.' Mem. at 21-

26

_____

27    [19]    Defendants do not dispute that Titus sold his stock at times when Nuvelo's stock price was

28    alleged to be inflated by fraud, or that he was aware of the adverse facts and concealed risks that had

22.  Defendants' argument is again contrary to the law.  *Am. West*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.  In other words, the lack of stock sales by a defendant is not dispositive of scienter."); *Tellabs*, 127 S. Ct. at 2511 ("the absence of a motive allegation is not fatal."); *In re Daou*, 411 F.3d at 1022 (the PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter . . ."); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) (declining to negate scienter or infer lack of motive to defraud from fact defendants did not sell their stock); *In re Seebeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (scienter was adequately alleged when only one defendant sold a small percentage of his stock and another defendant purchased stock).  Moreover, where plaintiff has alleged defendants' actual knowledge of the falsity of their statements, as plaintiffs have here with respect to each of the three defendants, the lack of stock sales by defendants Love and Levy is irrelevant.

Finally, Nuvelo's actions in attempting to interfere with witnesses desiring to communicate or cooperate with plaintiffs in their investigation in this case provides additional evidence of a motive to conceal information about the conduct of its clinical trials, thereby further supporting an inference of scienter.  ¶64; *see In re Scientific-Atlantic, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1366 (N.D. Ga. 2002).

### 3.  Bayer's Investment in Nuvelo Does Not Negate the Inference of Scienter

Defendants' contention that pharmaceutical giant Bayer's financial partnership with Nuvelo for the development of alfimeprase raises an inference that ***Bayer*** was convinced about the likelihood of success of the Phase 3 trials, is both baseless and irrelevant.  Defs.' Mem. at 19-20.  This assertion must initially be rejected because it relies entirely on supposition and purported extrinsic facts which are not pled in the Complaint, such as the extent of due diligence by Bayer, if

not been disclosed to investors at the time of his sale.  This provides additional evidence in support of his scienter.  Defendants' attempt to attribute a different motive to Titus' sales cannot appropriately be resolved in connection with the pending motion.  *See* Plaintiffs' Response to Defendants' Request for Judicial Notice, filed herewith.

1   any, and Bayer's state of mind and motivation for making the investment in alfimeprase.  This issue

2   must, of necessity, await discovery, and it is plain that given Bayer's size, its $50 million investment

3   in Nuvelo, was insignificant.[20]  Even if Bayer's interest could properly be considered at this stage,

4   the most plausible inference from Bayer's investment is that it had relatively little to lose and much

5   potentially to gain – not that it did "extensive due diligence" and was "convinced" of the success of

6   the Phase 3 trials.[21]

7        More importantly, **Bayer**'s investment says absolutely nothing about **defendants'** scienter,

8   nor does it negate falsity or materiality.  Defendants simply posit a purely speculative inference

9   about Bayer's scienter that is wholly irrelevant to the issue before the Court.  Defs.' Mem. at 20.

10  Even if Bayer **had** been "convinced" about the success of the Phase 3 trials, that would not establish

11  that Bayer, which had access to internal Company documents, was relying on the same information

12  as, or valued Nuvelo in the same manner as, public investors, who were **unaware** of the material

13  risks that defendants may – or may not have – disclosed to Bayer.

### 4.    The Group Publication Doctrine Supports the Inference that Each of the Individual Defendants "Made" Statements that Misled Investors

16       Contrary to defendants' assertion (Defs.' Mem. at 20), plaintiffs do not rely on the group

17  publication doctrine to establish scienter.  Plaintiffs do, however, rely on the doctrine as **additional**

18  support for attributing the challenged misrepresentations to defendants Love, Levy and Titus.  In

19  particular, Love, Levy and Titus, three of only four executive officers in the small company, were

20  intimately involved in day-to-day management, and each regularly communicated with investors

21  about the ongoing alfimeprase trials.  ¶¶61-64, 68, 71-72, 93-94, 101, 109, 120, 124-125, 161-165.

22  As a result, it can be reasonably inferred that they were involved in drafting, reviewing, approving or

---

[20]    For example, according to Bayer's FY06 Report on Form 10-K, Bayer's Health Care Division had net sales of €11.7 billion, and invested €1.4 billion ($2.07 billion) in research and development efforts.

[21]    *Gompper*, 298 F.3d at 893, lends no support to defendants' position because as discussed above, the inference defendants assert here with respect to Bayer is neither reasonable, plausible, nor supported by any facts.  Moreover, the *Gompper* "most compelling" standard has been relaxed by *Tellabs'* "equally compelling" requirement.  *Tellabs*, 127 S. Ct. at 2510.

1   "making" the false statements in this case.  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440

2   (9th Cir. 1987); *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).  Because the Ninth

3   Circuit has not overturned *Wool* or *GlenFed* in this respect, the group publication doctrine continues

4   to survive in this Circuit following the enactment of the PSLRA.  *In re PETsMART, Inc. Sec. Litig.*,

5   61 F. Supp. 2d 982, 997 (D. Ariz. 1999) ("the doctrine survives the PSLRA"); *Pegasus Holdings v.*

6   *Veterinary Ctrs. of Am., Inc.* 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998) ("non-speaking defendants

7   may be held liable on a 'group pleading' theory"); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d

8   1096, 1108 (D. Nev. 1998) ("[d]efendants offer no case authority for their ***proposition that group***

9   ***pleading has been sub silentio*** abolished by the PSLRA) (emphasis in original).

10      **D.      Defendants' False Statements Are Not Protected by the PSLRA Safe**
        **Harbor**

11          Defendants assert, in conclusory fashion, that "all the alleged misstatements" in the

12   Complaint are forward-looking, were accompanied by meaningful cautionary language, and thus are

13   protected by the PSLRA's safe harbor.  Defs.' Mem. at 22-24.  Defendants undertake no analysis of

14   the statements or even specify the statements they contend are so protected.  Rather, defendants

15   make the blanket assertion that ***all*** the statements complained of are protected as forward looking,

16   citing 11 paragraphs of the Complaint.  *Id*. at 22.  In fact, the vast majority of the cited false

17   statements are ***not*** forward-looking at all, but instead are statements of present or historical fact that

18   do not meet the threshold requirement for establishing safe harbor protection.[22]  *Amylin*, 2003 U.S.

19

20   _____

21   [22]      ¶92 (Alfimeprase "***has been shown*** in clinical studies to provide rapid clot dissolution."); ¶93
     (The alfimeprase testing data "***suggest[ed]*** a dramatic feat of action."); ¶100 ("We . . . expect the
22   Phase 3 trial results to confirm the ability of alfimeprase to restore function to occluded catheters in
     15 minutes or less, ***as demonstrated*** in our Phase 2 trial."); ¶101 ("We ***have always known*** that
23   alfimeprase holds the potential to treat a wide range of clot disorders and that acute PAO and
     catheter occlusion ***represented*** the most rapid and low risk market entry strategy for us."); ¶108
24   ("The Phase 2 results ***indicate*** that alfimeprase has the potential to offer significant advances in the
     rapid resolution of a blood clot. . . .  Analysis of the Phase 2 results ***showed*** that alfimeprase has the
25   potential to partially or completely break up blood clots within four hours."); ¶116 (The Phase 2
     results "***demonstrated*** that alfimeprase can restore arterial blood flow within four hours of initiation
26   of dosing."); ¶120 ("[W]e ***took*** a very conservative case when we prepared the [Phase 3 NAPA]
     trial.") ("[T]he statistical power ***is*** still overwhelming for this [Phase 3 NAPA] trial."); *Id*. ("[T]he
27   driver here ***is not*** the statistical power for approving efficacy."); *Id*. "[A]lfimeprase . . . ***is indeed***
     ***very active*** based on our Phase 2 studies to date."); *Id*. (Nuvelo's "collaboration with Bayer
28   HealthCare to develop and commercialize alfimeprase ***continues to go very well***, and [that Nuvelo

1  Dist. LEXIS 7667, at *16 ("observed facts about [drug] trial results and data" are not forward-

2  looking statements); *see also Am. West*, 320 F.3d at 937 (holding that if statements of past facts and

3  their present effects upon the company were found to be forward-looking, "any corporation could

4  shield itself from future exposure for past misconduct by making present-tense statements regarding

5  the misconduct and its effects on the corporation," thereby eviscerating the Exchange Act); *In re*

6  *Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (statement that

7  company was on track to meet expectations not forward-looking).

8      Moreover, none of the statements was accompanied by the required "cautionary language

9  [that] adequately disclose[d] both the risks involved and the assumptions upon which the optimistic,

10  forward-looking language [was] based." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1122

11  (C.D. Cal. 2005). Defendants do not and cannot identify specific cautionary statements

12  "'substantive and tailored to the specific future projections, estimates or opinions . . . which the

13  plaintiffs challenge.'" *Amylin*, 2003 U.S. Dist. LEXIS 7667, at *20. None of the statements cited by

14  defendants warned of the risk that the positive Phase 2 results were caused by the insertion of the

15  catheter, rather than by the action of alfimeprase. ¶¶131-144. Nor did the statements warn that the

16  FDA had imposed an extraordinarily stringent p-value requirement on the Phase 3 CO trial or that

17  Nuvelo had an undisclosed "marketing profile" for CO that depended upon meeting the stringent p-

18  value imposed by the FDA in the CO trial. *Id.* These facts, which existed at the time the statements

19  were made and gave rise to risks that likewise existed *at that time*, are not forward looking. Indeed,

20  plaintiffs have alleged that, because these facts were omitted, the risk warnings themselves were

21  misleading to investors. *Id.*

22      Instead, defendants merely cite to generalized boilerplate cautionary language in their SEC

23  filings with respect to clinical trials and FDA approval, contending that this was sufficient to qualify

24  ───────────────────────────────────

25  *was] tracking* to [its] goals and milestones laid out for the program."); ¶124 ("[W]e were very
gratified . . . to find that alfimeprase *worked very well* on big clots and on small clots, and . . . we've
26  had some examples of very large clots, clots up to 60 centimeters in length, that *we've dissolved
rapidly*."); ¶125 (Alfimeprase "*worked* on what we thought were new clots and old clots."); *Id.*
27  ("[W]e *were gratified* that in 40% of those patients as well we *could see improvements* on the
angiogram and *restoration* of blood flow.")  *Id.*

28

1   "[a]ll forward-looking statements regarding the future potential success of alfimeprase" for safe

2   harbor protection.  *See* Defs.' Mem. at 23 and Defs.' Appendix.  This language – which plaintiffs

3   allege is misleading in and of itself – is far too general to meaningfully address the risks to the

4   "future potential success of alfimeprase," including those relating to the Phase 2 trial results, the

5   design of the Phase 3 trials, and Nuvelo's undisclosed "target product profile" for alfimeprase.  *See*

6   ¶¶ 131-44.  Rather, these generic warnings could apply to any issuer performing clinical drug trials

7   subject to FDA approval.  *Staar Surgical*, 388 F. Supp. 2d at 1123; *see also Amylin*, 2003 U.S. Dist.

8   LEXIS 7667, at *21 ("The warnings were not tailored to Defendants' statement regarding the

9   sufficiency of the trial results . . . ."); *Seebeyond*, 266 F. Supp. 2d at 1167 (cautionary language is not

10  meaningful where "it does not sufficiently identify those facts that the plaintiff alleges made the

11  press release false or misleading"); *Convergent Tech.*, 948 F.2d at 515 ("'[t]o warn that the

12  untoward may occur when the event is contingent is prudent; to caution that it is only possible for

13  the unfavorable events to happen when they have already occurred is deceit.'"); *InfoSonics*, 2007

14  U.S. Dist. LEXIS 57784, at *31 (language did not contain "'meaningful cautionary statements'"

15  because it did not reveal that "[d]efendants already knew that Infosonics had lost its biggest U.S.

16  customer. . . .").

17        Accordingly, defendants have failed to meet their burden to establish that there was enough

18  cautionary language so that "'reasonable minds could not disagree that the challenged statements

19  were not misleading.'"  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056 (9th

20  Cir. 2005); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("[t]here is . . . no reason

21  that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the

22  items mentioned in [defendant's] cautionary language were those that at the time were the (or any of

23  the) 'important' sources of variance"); *id.* at 734-35 (even specific cautionary statements are

24  inadequate if they do not reflect the knowledge of the corporation as to what risks are actually likely

25  to affect future results).

26        **E.    Defendants' Misleading Statements Were Not Puffery**

27        Defendants' "puffery" challenge fails for similar reasons.  As with their safe harbor

28  argument, defendants do not adequately identify the specific statements which they contend are

1    "corporate optimism" or "mere puffery," much less explain **why** the challenged statements are

2    puffery. Defs.' Mem. at 24. In fact, none of the statements in the Complaint constitutes the kind of

3    "generalized, vague and unspecific assertions" that Courts regard as inactionable puffery. *Glen*

4    *Holly Entm't, Inc. v. Tektronix Inc*., 352 F.3d 367, 379 (9th Cir. 2003); *In re Dura Pharm., Inc. Sec.*

5    *Litig*., 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) ("'Statements that fall within the [puffery] rule

6    tend to use terms that are not measurable and not tethered to facts that a reasonable person would

7    deem important to a securities investment decision.'"); *see also InfoSonics*, 2007 U.S. Dist. LEXIS

8    57784, at *18-*19 (statement that company's products were "well received" was not puffery because

9    "it would not be unreasonable for an investor to rely on this information regarding past performance

10    of the VK products in making investment decisions").

11        Here, defendants misled investors about the Company's key drug – alfimeprase – to which

12    the market attributed the majority of the Company's value and which the Company touted as its path

13    to profitability. ¶¶2-4, 26-37. The paragraphs cited by defendants (¶¶92, 108, 124) include **specific**

14    assertions of fact about alfimeprase that investors considered important, including representations

15    that the drug "has been shown in clinical studies to provide rapid clot dissolution" (¶92) and

16    purported analyses of the results of the Phase 2 trials (¶¶108, 124). This is not puffery. *See Casella*

17    *v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement

18    of opinion standing alone may be actionable as an integral part of a representation of material fact

19    when used to emphasize and induce reliance upon such a representation.").

20        Moreover, "the [puffery] rule has its limitations; a projection of optimism becomes

21    actionable 'when (1) the statement is not actually believed, (2) there is no reasonable basis for the

22    belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's

23    accuracy.'" *Dura Pharm.*, 452 F. Supp. 2d at 1033. As demonstrated above, the statements in ¶¶92,

24    108, 124 were materially misleading because defendants had no reasonable basis for the power

25    calculations or other statements about alfimeprase's purported efficacy in the Phase 2 trials and,

26    were aware of undisclosed risks and other facts tending to seriously undermine the statements'

27    accuracy. *Supra* §II(B, C). Accordingly, defendants' puffery argument should be rejected.

28

1        **F.        Plaintiffs Have Sufficiently Pled Loss Causation**

2        Defendants relegate their argument for dismissal on loss causation grounds to three sentences

3   at the end of their brief.  Defs.' Mem. at 25.  Defendants' sole argument is that plaintiffs have failed

4   to allege loss causation with respect to the misrepresentations "regarding the market size for PAO

5   and the target product profile for CO, [because those allegations] even if true, could not have caused

6   the phase III trials to fail to meet their endpoints."  Defs.' Mem. at 25.  By limiting their motion in

7   this manner, defendants concede that loss causation ***has*** been adequately pled as to all other alleged

8   misrepresentations, including those relating to defendants' failure to disclose the p-value for the CO

9   trial or the limitations of the Phase 2 PAO study resulting from the drug catheter's ability to break

10  clots apart on its own.  Even so limited, defendants' contention misconceives the law and the facts,

11  and provides no ground for dismissal of the Complaint.

12       To adequately plead loss causation, the complaint must provide a "short and plain statement"

13  under Fed. R. Civ. P. 8(a)(2) that "provides the defendants with notice of what the relevant economic

14  loss might be or of what the causal connection might be between that loss and the misrepresentation .

15  . . ."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Complying with this standard is "not

16  meant to impose a great burden upon a plaintiff."  *Id*. at 347.  To do so, plaintiffs must:

17          'demonstrate a causal connection between the deceptive acts that form the basis for
            the claim of securities fraud and the injury suffered by plaintiff[s]' . . . ***There does***
18          ***not seem to be a requirement that the specific reasons why the statements at issue***
            ***were false or misleading come to light, only that the 'facts . . . become generally***
19          ***known*.'

20  *InfoSonics*, 2007 U.S. Dist. LEXIS 57784, at *37.

21       In *Daou*, 411 F.3d at 1026, the Ninth Circuit held that loss causation is adequately pled

22  where the plaintiff gave "some indication" that the drop in the company's stock price was "causally

23  related" to the company's concealment of its true financial condition.  The Ninth Circuit also stated

24  that a "plaintiff is not required to show 'that a misrepresentation was the ***sole*** reason for the

25  investment's decline in value' in order to establish loss causation."  *Id*. at 1025 (emphasis in

26  original).  This is a "simple test."  *Dura*, 544 U.S. at 345.

27       The Complaint here satisfies *Dura* by specifically alleging that Nuvelo's stock traded at

28  artificially inflated prices during the Class Period (¶¶92-94, 100, 101, 108, 116, 120, 124, 125), and

1  that this fraud-related inflation was eliminated when the price of Nuvelo's securities collapsed on

2  December 11, 2006, upon the disclosure of facts revealing both the hidden risks to the success of

3  alfimeprase and their manifestation.  ¶¶60, 85, 158.  The Complaint alleges, for example, that on

4  December 11, 2006, the market learned that alfimeprase had not worked as represented in the Phase

5  2 PAO trial, that the Phase 3 PAO trial had failed as a result of the effect of catheter insertion that

6  had been concealed by defendants, that there was a target product profile necessary to market the

7  drug for CO, and that the FDA had imposed an extraordinary stringent statistical  standard for

8  approval of the drug for CO, which was far more difficult to achieve than the traditional standard

9  which defendants led investors to expect.  ¶¶37, 38, 60-63, 158.  These allegations far exceed the

10  pleading requirement to provide defendants "with some indication of the loss and the causal

11  connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347.

12       Plaintiffs have ***not*** alleged that defendants' misrepresentations about alfimeprase's market

13  potential caused the failure of the Phase 3 trials.  Rather, plaintiffs have alleged that the disclosure of

14  the target product profile for CO, and the suspension of the Phase 3 CO trials based on the drug's

15  failure to meet that target, played a role in causing Nuvelo's stock price to fall when the failure of

16  that trial was announced.  When the CO trial was abruptly suspended due to alfimeprase's inability

17  to hit the previously-undisclosed target profile, the market learned that there was far more

18  uncertainty in the potential application of the drug to CO than investors had previously been led to

19  believe, and that CO was ***not*** the low-risk market entry point defendants had represented.  Hence, the

20  stock drop following the December 11, 2006 announcement was due, in part, to the revelation that

21  there were additional risks to the drug's success – *i.e.*, the undisclosed product profile which they

22  had determined was necessary to market the drug (as well as the undiscovered p-value, which

23  defendants conceded is adequate to support loss causation).  As defendant Levy explained during the

24  August 1, 2007 conference call: "it didn't hit the target product profile that we were looking for to be

25  successful in this marketplace.  Clearly, the marketplace today is only around $100 million and to be

26  successful, you really have to have a very good product profile.  And we feel that by raising the

27  concentration of the dose that we will have a good chance of hitting that product profile."

28

1    Plaintiffs' allegations therefore are sufficient to demonstrate that these misrepresentations are

2    inextricably linked to the subject of the "corrective disclosure". *In re Retek Inc. Sec. Litig*., No. 02-

3    4209 (JRT/SRN), 2005 U.S. Dist. LEXIS 25986, at *11 (D. Minn. Oct. 21, 2005) (finding plaintiffs

4    met their burden of pleading loss causation); *see also In re Immune Response Sec. Litig*., 375 F.

5    Supp. 2d 983, 1025 (S.D. Cal. 2005)  ("Whether the alleged omissions and misstatements actually

6    were the cause-in-fact of the price of [Nuvelo] stock raises an issue of fact and, as such, is a question

7    properly reserved for a motion for summary judgment or for the trier of fact. . . ."). As such,

8    defendants' loss causation theory should be rejected.

9        **G.    The Complaint Sufficiently Pleads Control Person Liability**

10    Defendants contend that plaintiffs' claim for control person liability under §20(a) of the

11    Exchange Act should be dismissed because (i) no primary violation has been pled; and (ii) plaintiffs

12    failed to plead specific facts demonstrating the individual defendants' control of Nuvelo. Defs.'

13    Mem. at 25. Neither of these arguments has any merit. First, plaintiffs have successfully pled a

14    §10(b) violation. *Am. West*, 320 F.3d at 945. Second, plaintiffs have adequately alleged the

15    individual defendants' control of Nuvelo. ¶¶17-20, 178; *See Wool*, 818 F.2d at 1441 ("where . . . the

16    corporate officers are a narrowly defined group charged with the day-to-day operations of a public

17    corporation, it is reasonable to presume that these officers had the power to control or influence the

18    particular transactions giving rise to the securities violation"). For both of these reasons, defendants'

19    motion to dismiss the control person claim should be denied.

20        **H.    Dismissal with Prejudice Would Be Improper**

21    If the Court were to agree with defendants in any respect, that would not provide grounds for

22    dismissal of the Complaint with prejudice, as defendants contend. Defs.' Mem. at 25. Defendants'

23    two-sentence argument appended to the end of their brief fails to demonstrate that, even if

24    defendants' arguments for dismissal were credited, amendment would be futile. *See* Fed. R. Civ. P.

25    15(a). Hence, if the Court grants defendants' motion in any respect, leave to amend should be given.

26    *Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend

27    should be liberally granted, particularly in securities cases); *Daou*, 397 F.3d at 710 ("[d]ismissal

28

1   without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could

2   not be saved by any amendment").

3   **III.     CONCLUSION**

4          For the reasons set forth herein, plaintiffs respectfully request that defendants' motion to

5   dismiss be denied in its entirety.

6   DATED: February 4, 2008                    COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
7                                             DENNIS J. HERMAN
                                              ELI R. GREENSTEIN
8

9
                                              _____s/ Dennis J. Herman_____
10                                                   DENNIS J. HERMAN

11                                            100 Pine Street, Suite 2600
                                              San Francisco, CA 94111
12                                            Telephone: 415/288-4545
                                              415/288-4534 (fax)
13
                                              Liaison Counsel
14
                                              BERGER & MONTAGUE, P.C.
15                                            SHERRIE R. SAVETT
                                              CAROLE A. BRODERICK
16                                            BARBARA A. PODELL
                                              PHYLLIS M. PARKER
17                                            JOSHUA C. SHUMACHER
                                              1622 Locust Street
18                                            Philadelphia, PA 19103
                                              Telephone: 215/875-3000
19                                            215/875-4604 (fax)

20                                            SCHATZ NOBEL IZARD, P.C.
                                              ANDREW M. SCHATZ
21                                            JEFFREY S. NOBEL
                                              NANCY A. KULESA
22                                            One Corporate Center
                                              20 Church Street, Suite 1700
23                                            Hartford, CT 06103
                                              Telephone: 860/493-6292
24                                            860/493-6290 (fax)

25                                            Co-Lead Counsel for Plaintiffs

26   T:\CasesSF\Nuvelo\BRF00048652.doc

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 4, 2008.

<u>s/ Dennis J. Herman</u>
DENNIS J. HERMAN

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

E-mail:Dennish@csgrr.com

# Mailing Information for a Case 3:07-cv-04056-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Scott Devereaux**
  devereauxsd@cooley.com

- **Grant P. Fondo**
  gfondo@cooley.com,mcintoshjc@cooley.com

- **Dennis J. Herman**
  dennish@csgrr.com,jdecena@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Christopher J. Keller**
  ckeller@labaton.com,cchan@labaton.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **Phyllis Maza Parker**
  pparker@bm.net

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Barbara A Podell**
  bpodell@bm.net

- **David Avi Rosenfeld , Esq**
  drosenfeld@geller-rudman.com

- **Sherrie R. Savett**
  ssavett@bm.net

- **Monique C. Winkler**
  e_file_sd@csgrr.com,shawnw@csgrr.com,travisd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mario Alba
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road
Suite 200
Melville, NY 11747

Samuel Howard Rudman
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road
Suite 200
New York, NY 11747
```

**Marisa Megur Seifan**
Cooley Godward Kronish LLP
1114 Avenue of Americas
New York, NY 10036

**Evan J. Smith**
Brodsky & Smith L.L.C.
240 Mineola Blvd.
Mineola, NY 11501

**Nicolette Tropiano**
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA 19087