1  COOLEY GODWARD KRONISH LLP
   SCOTT D. DEVEREAUX (146050) (devereauxsd@cooley.com)
2  GRANT P. FONDO (181530) (gfondo@cooley.com)
   JEFFREY M. KABAN (235743) (jkaban@cooley.com)
3  Five Palo Alto Square
   3000 El Camino Real
4  Palo Alto, CA  94306-2155
   Telephone:    (650) 843-5000
5  Facsimile:    (650) 857-0663

6  Attorneys for Defendants
   NUVELO, INC., MICHAEL D. LEVY, TED W. LOVE,
7  and GARY S. TITUS

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  In re NUVELO, INC. SECURITIES          Master File No. 07-CV-04056-VRW
    LITIGATION
14                                          **CLASS ACTION**

15                                          **DEFENDANTS' REPLY MEMORANDUM IN
                                            SUPPORT OF MOTION TO DISMISS**
16                                          **CONSOLIDATED COMPLAINT FOR
                                            VIOLATIONS OF THE SECURITIES LAWS**
17
                                            Hearing Date:   May 29, 2008
18                                          Time:           2:30 p.m.
                                            Courtroom:      6
19                                          Judge:          Hon. Vaughn R. Walker

20                                          Trial Date:     Not yet set

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO            769028/PA                         **DEFENDANTS' REPLY MEMORANDUM
                                                       CASE NO. 07-CV-04056-VRW**

# Table of Contents

Page

I.   INTRODUCTION ................................................................................. 1

II.  ARGUMENT ....................................................................................... 2

    A.   Defendants' Alleged "Admissions" Were Nothing Of The Kind And Do Not Support Falsity Or Scienter.......................................................... 2

    B.   The Confidential Witness Allegations Do Not Corroborate That Any Statement Was Materially False When Made Or That Defendants Acted With Scienter...................................................................................... 3

    C.   Bayer's Investment in Nuvelo Negates Materiality, Falsity and Scienter ............. 4

    D.   Plaintiffs Fail To Allege With Particularity Any Statements Were Materially False Or Misleading When Made........................................ 5

        1.   Defendants' Disclosure Of The Results Of Phase II PAO Trial Was Not False And Misleading ........................................................ 5

        2.   Defendants' Statements Regarding The Power Calculations For The PAO Phase III Trial Were Not Materially False Or Misleading................. 7

        3.   Plaintiffs Fail To Allege With Particularity That Any Statements Regarding the CO Trials Were Materially False When Made ................... 7

            a.   Defendants Did Not Make Any Materially False And Misleading Statements Regarding The "P-Value" of the CO Phase III Trial.................................................................... 8

            b.   Plaintiffs' "Target Product Profile" Allegations Are Irrelevant And Do Not Render Any Statement Materially False And Misleading .................................................. 11

        4.   Defendants' Statements Concerning The PAO And CO Trials Representing A "Low Risk Path To Regulatory Approval" Were Not Materially False Or Misleading ......................................... 12

    E.   Plaintiffs Fail To Allege A Strong Inference Of Scienter As To Any Individual Defendant .......................................................................... 13

        1.   Plaintiffs Allegations Of "Admissions" Fail To Demonstrate A Strong Inference Of Deliberate Recklessness Or Conscious Misconduct......................................................................... 13

        2.   Plaintiffs' "Motive And Opportunity" Allegations Fail To Create A Strong Inference Of Scienter ................................................ 14

        3.   Plaintiffs' Concede That The Group Pleading Doctrine Does Not Apply to Scienter ...................................................................... 17

    F.   The Alleged Statements Are Protected By The PSLRA's "Safe Harbor."........... 17

    G.   Defendants' Statements Of Optimism Are Non-Actionable................................ 19

    H.   Plaintiffs Fail To Plead Loss Causation ............................................. 20

III. CONCLUSION .................................................................................... 20

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA

i.

DEFENDANTS' REPLY MEMORANDUM
CASE NO. 07-CV-04056-VRW

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4
*Gompper v. VISX, Inc.*,
   298 F. 3d 893 (9th Cir. 2002)............................................................................................. 5

5
*Harris v. IVAX Corp.*,
   182 F.3d 799 (11th Cir. 1999).................................................................................... 17, 18

6

7
*In re Apple Computers Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989)......................................................................................... 11

8
*In re Autodesk, Inc., Sec. Litig.*,
   132 F. Supp. 3d 833 (N.D. Cal. 2000)............................................................................ 15

9
*In re Bristol-Meyers Squibb Sec. Litig.*,
   2005 WL 2007004, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005)................... 19

10
*In re Bristol-Meyers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................................................................ 19

11

12
*In re Calpine Corp. Sec. Litig.*,
   288 F. Supp. 2d 1054 (N.D. Cal. 2003).......................................................................... 15

13
*In re Convergent Technologies Sec. Litig.*,
   948 F. 2d 507 (9th Cir. 1991).......................................................................................... 18

14
*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004)................................................................... 17, 18, 19

15
*In re Dauo Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005)......................................................................................... 20

16

17
*In re FVC.com Sec. Litig.*,
   136 F. Supp. 2d 1031 (N.D. Cal. 2000).......................................................................... 16

18
*In re ICN Pharms., Inc. Sec. Litig.*,
   299 F. Supp. 2d 1055 (C.D. Cal. 2004).......................................................................... 16

19
*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................................ 20

20
*In re Nextcard, Inc. Sec. Litig.*,
   2006 WL 708663, 2006 U.S. Dist. LEXIS 16156 (N.D. Cal. Mar. 20, 2006) ............... 17

21

22
*In re Portal Software Inc. Sec. Litig.*,
   2006 WL 2385250 2006 U.S. Dist. LEXIS 61589 (N.D. Cal. Aug. 16, 2006) ................ 4, 14, 15

23
*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .............................................................................................. 3

24
*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)................................................................................. 10, 13, 16

25
*In re Silicon Storage Tech., Inc.*,
   20006 WL 648683, 2006 U.S. Dist. LEXIS 14790 (N.D. Cal. Mar. 10, 2006) ............... 3

26

27
*In re Synergen, Inc. Sec. Litig.*,
   863 F. Supp. 1409 (D. Colo. 1994) .............................................................................. 6, 11

28
*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) .............................................................................................. 9

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA

ii.

**DEFENDANTS' REPLY MEMORANDUM
CASE NO. 07-CV-04056-VRW**

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *In re Thoratec Corp. Sec. Litig.,*
       2006 WL 1205226, 2006 U.S. Dist. LEXIS 30602 (N.D. Cal. May 11, 2006)........................ 14

4    *In re Tibco Software, Inc. Sec. Litig.,*
       2006 WL 1469654, 2006 U.S. Dist. LEXIS 36666 (N.D. Cal. May 25, 2006)......................... 17

5

6    *In re Vantive Corp. Sec. Litig.,*
       283 F.3d 1079 (9th Cir. 2002)................................................................................. 16

7    *In re Wetseal Inc. Sec. Litig.,*
       518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................................. 15

8    *Lipton v. Pathogenesis Corp.,*
       284 F.3d 1027 (9th Cir. 2002)........................................................................ 14, 15, 16

9

10   *Makor Issues & Rights, LTD. v. Tellabs, Inc.,*
       2008 U.S. App. LEXIS 975 (7th Cir. January 17, 2008).......................................... 15

11   *Nathenson v. Zonagen, Inc.,*
       267 F.3d 400 (5th Cir. 2001)................................................................................ 19

12   *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West
       Holding Corp.,*
13      320 F.3d 920 (9th Cir. 2003) ............................................................................. 14

14   *Noble Asset Mgmt. v. Allos Therapeutics, Inc.,*
       2005 WL 4161977, 2005 U.S. Dist. LEXIS 24452 (D. Colo. Oct. 20, 2005)............ 9, 10, 18, 19

15   *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
       380 F.3d 1226 (9th Cir. 2004)............................................................................. 14

16   *Oppenheim Pramerica Asset Mgmt. S.A.R.L v. Encysive Pharms., Inc.,*
       2007 WL 2720074, 2007 U.S. Dist. LEXIS 69121 (S.D. Tex. Sept. 18, 2007) ......................... 19

17   *Padnes v. Scios Nova, Inc.,*
       1996 WL 539711, 1996 U.S. Dist. LEXIS 22858 (N.D. Cal. Sept. 18, 1996).................... 6, 8, 9

18

19   *Ronconi v. Larkin,*
       253 F.3d 423 (9th Cir. 2001) ............................................................................. 16

20   *Securities and Exchange Commission v. Guenthner,*
       395 F. Supp. 3d 835 (D. Neb. 2005) .................................................................. 9

21   *Tellabs, Inc. v. Makor Issues & Rights, Ltd,*
       127 S. Ct. 2499, 2510 (2007)........................................................................ 4, 13

22   *Wietschner v. Moterey Pasta Co.,*
       294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................................................. 4

23

24   *Zucco Partners, LLC v. Digimarc Corp.,*
       445 F. Supp. 2d 1201 (D. Ore. 2006) ................................................................. 4

25

**STATUTES**

U.S.C. § 78u-5(i), et seq. .......................................................................................... 17

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                          iii.              DEFENDANTS' REPLY MEMORANDUM
                                                     CASE NO. 07-CV-04056-VRW

1

## I.     INTRODUCTION

Drug development is an inherently risky venture. Plaintiffs do not dispute that Defendants provided a lengthy 23 page exposition of the risks or that analysts were only predicting a 50% chance that the phase III trials would not meet its endpoints. Plaintiffs further concede that they allege no facts demonstrating that the Defendants knew in advance that the clinical trials would not succeed. Rather, plaintiffs assert that the Defendants committed fraud because they omitted two items from their lengthy disclosures that "creat[ed] heightened risks to" the phase III clinical trials. Securities laws are not meant as investment insurance. Nuvelo, while believing in the likely success of alfimeprase, made it abundantly clear that clinical trials are risky and that the trials might not succeed for numerous reasons. This Complaint is nothing more than an attempt to plead fraud by hindsight.

Plaintiffs, in attempting to support their claims, rely primarily on Defendants' "admissions" that it was possible that the insertion of a catheter could cause a disruption to a blood clot and that the p-value for the phase III CO trial was 0.00125. (Plaintiffs' Opposition ("Pltfs. Op.") 2:25-3:3.) From these "facts," plaintiffs assert that they have pled with particularity that Defendants issued materially false and misleading statements and did so with scienter. Plaintiffs are mistaken.

The purported "admissions" were nothing of the sort and, along with the other "facts" allegedly supporting falsity, fall far short of pleading facts with particularity that each alleged statement was materially false when made. Plaintiffs fail to plead any facts demonstrating who knew what when, or how the statements at issue were materially false when made. Plaintiffs also fail to point to even one well-pled allegation in the Complaint that the Defendants made any of the alleged misstatements with scienter. Plaintiffs' reliance on the stock sales of one defendant who sold his stock upon leaving the Company (while all other defendants held onto their stock), generic "motive and opportunity" allegations and reliance upon the group pleading doctrine to meet the stringent requirements of the PSLRA fall far short. Finally, plaintiffs' Opposition also fails to demonstrate that the alleged misstatements are not protected by the PSLRA's safe harbor and/or are not non-actionable statements of corporate optimism.

The phase III trials' failure to meet their endpoints was disappointing, but it was not fraud. Plaintiffs cannot meet the PSLRA's stringent pleading standards as to materiality, falsity or scienter,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA

1.

DEFENDANTS' REPLY MEMORANDUM
CASE NO. 07-CV-04056-VRW

1    not now, not ever.  Therefore, this Court should dismiss the Complaint with prejudice.

2    II.    ARGUMENT

3        A.    **Defendants' Alleged "Admissions" Were Nothing Of The Kind And Do Not Support Falsity Or Scienter.**

4

5    Plaintiffs contend that the Complaint is not "primarily" based on confidential witnesses

6    ("CWs") but rather on Dr. Love's December 11, 2006 "public admissions" about the phase III trial

7    results.  (Pltfs. Op. 5:15-7:3.)  While it is understandable why plaintiffs would not want to place the

8    viability of their complaint on their CWs, not one of the statements identified by plaintiffs is an

9    "admission" of anything, nor a well-pled fact.

10    Plaintiffs assert that the following three statements are defendants' "admissions" of fraud.

11    First, Dr. Love's statement that "it has always been known that mechanical devices can work."  When

12    Dr. Love's statement is reviewed in its entirety, it is indisputably not an admission, but rather a

13    statement of surprise about the apparent impact of the catheter:

14        So to be clear, it's always been known that mechanical devices can work and
        probably what mechanical devices do is increase the surface area of the clot which is

15        in contact with uncoagulated blood and that facilitates much like breaking an ice cube
        apart would facilitate dissolution in water.  And there was *surprisingly* a significant

16        amount of that at least based upon what we've seen with the simple introduction of a
        drug delivery catheter.

17        I think that mechanical thrombolysis does work.  I think it has been known to

18        work.  *I don't think people felt that this minimal amount of mechanical thrombolysis
        would work as well as it did.  I do think however though that adding a drug that*

19        *would work and stay at the site and dissolve the clot would be dramatically better*

20        *than mechanical thrombolysis.*

21    (Herman Decl., Ex. 1, p. 7 (emphasis added).)  The statement certainly does not show that Love or

22    any others knew that the insertion of the catheter would have a material effect on the results of the

23    phase III trial, plaintiffs' assertions notwithstanding.

24    Similarly, the second purported admission relied on by plaintiffs, Dr. Love's statement "I

25    actually think it did happen in Phase 2," in regards to the insertion of the catheter and the unblocked

26    arteries, is not an admission.  Rather, it merely shows his impression that, based on what he had

27    learned from the results of the phase III trial, the catheter may have impacted the phase II results as

28    well.  It certainly does not demonstrate that any statement during the class period was materially false

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                2.                DEFENDANTS' REPLY MEMORANDUM
                                           CASE NO. 07-CV-04056-VRW

1   or misleading when made, or that during the class period Dr. Love or anyone else believed that the

2   insertion of the catheter would have a material impact on the results.  Dr. Love's third purported

3   admission, that the phase III CO results "did not meet the high threshold established by the FDA for

4   regulatory approval based on only one control trial" is not an admission of anything; it is simply a

5   statement of the phase III results.  And, it certainly does not constitute a well-pled allegation of the

6   knowing failure to disclose a material risk.

7          **B.      The Confidential Witness Allegations Do Not Corroborate That Any Statement
              Was Materially False When Made Or That Defendants Acted With Scienter.**

8

9          Plaintiffs point to no facts sufficient to demonstrate that their confidential witnesses had

10  personal knowledge of what they claimed, or that the statements were anything more than merely

11  regurgitated gossip and innuendo.  CW 1, 3, and 4 each left Nuvelo before the completion of the

12  phase II trials and well before the class period.  (¶¶ 22, 24, 25.)  Plaintiffs cite to no legal authority

13  within the Ninth Circuit for the proposition that an employee who left a company before the class

14  period could be in a position to espouse on a defendant's knowledge during the class period.  Instead,

15  plaintiffs rely on Second Circuit law that does not even address confidential witnesses.  (Pltfs. Op.

16  7:10-12); *see, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (addressing data

17  not the reliability of confidential witness statements).  Nor do plaintiffs explain how "concerns" or

18  "potential" alternative explanations expressed before the end of the phase II trials and before the

19  Defendants had a chance to fully analyze the phase II data show that during the class period

20  Defendants were withholding material information and did so with scienter.  (*See* ¶ 40.)  Because an

21  individual expressed a concern or alternative hypothesis years before the class period began does not

22  mean that the confidential witness was in a position to have personal knowledge of the Defendants'

23  thoughts and actions during the class period.  Quite simply, because CW 1, 3 and 4 were not

24  employed by Nuvelo during the class period, they were not in a position to know what information

25  Defendants possessed at the time of the alleged misstatements, or what the material risks to the phase

26  III trials were; thus, their allegations are probative of neither falsity or scienter.  *See In re Silicon*

27  *Storage Tech., Inc. Sec. Litig.*, No. C 05-0295 PJH, 2006 WL 648683 at *10, 2006 U.S. Dist. LEXIS

28  14790, at *31-32 (N.D. Cal. Mar. 10, 2006) (holding that confidential witnesses who were not

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                3.                          **DEFENDANTS' REPLY MEMORANDUM
                                                                      CASE NO. 07-CV-04056-VRW**

1    employed during the class period were not in a position to have personal knowledge of the defendants

2    alleged misstatements); *In re Portal Software Inc. Sec. Litig.*, No. C-03-5138 VRW, 2006 WL

3    2385250 at *8, 2006 U.S. Dist. LEXIS 61589, at *21-22 (N.D. Cal. Aug. 17, 2006) (Walker, C.J.)

4    (finding unreliable testimony of an employee terminated prior to the class period).

5    Plaintiffs' assertion that the CW allegations are based on more than gossip and innuendo is

6    also unpersuasive. (Pltfs. Op. at 7:12-14.) Allegations that "other employees had expressed similar

7    doubts" and that the p-value "was a topic of conversation" between Deitcher and Wang-Clow are

8    classic examples of hearsay and rumors. Accordingly, these allegations are not probative of falsity or

9    scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1207 (D. Or. 2006).

10    Further, CW 1 did not work on alfimeprase and plaintiffs have not demonstrated that he

11    would be in a position to know whether mechanical disruption of the clot would be a material risk to

12    the phase III trials. (¶ 22.) *Wietschner v. Moterey Pasta Co.*, 294 F. Supp. 2d 1102, 1112 (N.D. Cal.

13    2003). CW 2 only worked at one clinical site – plaintiffs have provided no facts from which the

14    Court can conclude that CW 2 would have any knowledge regarding enrollment at other clinical sites.

15    (¶ 23.) The same is true for CW 3 and CW 4, neither of whom are described with sufficient

16    particularity for the Court to conclude that their allegations are reliable. (*See* ¶¶ 24, 25.) Thus,

17    plaintiffs have failed to demonstrate that the confidential witnesses' allegations are sufficiently

18    particular or reliable to make them probative of either materiality, falsity or scienter.

19    **C.    Bayer's Investment in Nuvelo Negates Materiality, Falsity and Scienter.**

20    Plaintiffs assert that Bayer's $50 million cash payment to Nuvelo and agreement to pay $335

21    million in milestone payments and to pay 40% of the development costs for alfimeprase is a "small"

22    investment and is of no consequence. (Pltfs. Op. 26:19-27:13; ¶ 72; Fondo Decl., Ex. A.) Plaintiffs'

23    assertion is illogical. The agreement to pay $50 million up-front plus 40% of the expenses to develop

24    alfimeprase, Nuvelo's largest single expense, can hardly be characterized as small. (Fondo Decl.,

25    Ex. E, p. 49.) Moreover, the Court is not supposed to ignore undisputed facts, but rather it is to

26    evaluate a fact and weigh the reasonable inferences that can be drawn from it. *Tellabs, Inc. v. Makor

27    Issues & Rights, Ltd*, 127 S. Ct. 2499, 2510 (2007). The only reasonable inference to be drawn from

28    Bayer's investment is that Bayer investigated and reviewed the phase II data and phase III trials

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                4.                **DEFENDANTS' REPLY MEMORANDUM
CASE NO. 07-CV-04056-VRW**

1    methodology and made its significant investment because it believed in the likelihood of success of

2    the phase III trials. *Gompper v. VISX, Inc.*, 298 F. 3d 893, 897 (9th Cir. 2002). Consequently,

3    Bayer's investment negates plaintiffs' assertions of materiality, falsity and scienter.

4    **D.    Plaintiffs Fail To Allege With Particularity Any Statements Were Materially False Or Misleading When Made.**

5
6    **1.    Defendants' Disclosure Of The Results Of Phase II PAO Trial Was Not False And Misleading.**

7    Plaintiffs do not dispute that Nuvelo accurately disclosed the data and results of the PAO

8    phase II trials. (Pltfs. Op. 9:17-10:3.) Rather, plaintiffs claim that Nuvelo's truthful and accurate

9    descriptions of the phase II trial, when read in "context," were misleading because it failed to disclose

10   that the phase II results "could be explained simply as clot busting by the drug delivery catheter . . ."

11   (Pltfs. Op. 10:5-7.) In short, plaintiffs assert that Defendants failed to disclose every conceivable

12   reason why the results might not be as indicative of alfimeprase's efficacy as the data suggested.

13   Plaintiffs' argument fails for several reasons.

14   First, plaintiffs have alleged no facts to demonstrate that Defendants knew that the catheter

15   disruption was a risk to the success of the phase III trial, not to mention a material one. Instead,

16   plaintiffs rely on a classic fraud by hindsight tactic – stating that comments made by Dr. Love

17   regarding his interpretation of the phase III results demonstrate that Love and the other defendants

18   always knew that this was a material risk and that they failed to disclose it. (Pltfs. Op. 10:22-24;

19   ¶¶ 37, 61-62.) As demonstrated *supra* in section II.A., Dr. Love's statement makes no such

20   admission. Plaintiffs' only other "fact" is a purported statement by CW 1, who did not work on

21   alfimeprase. It is alleged that CW 1 stated in 2004 or 2005, before the completion of the phase II

22   trials, that at a company-wide meeting she discussed the possibility of the catheter disrupting the clots.

23   (¶ 37.) Plaintiffs provide no specific details regarding this one meeting. Plaintiffs do not state who

24   was in attendance, when the meeting took place or where, what was specifically "discussed," and who

25   heard CW. Plaintiffs also provide no particularized allegations that the Defendants possessed any

26   data demonstrating that the catheter would be a material risk to the success of the *phase III trials*.

27   Second, even if the Defendants had considered a catheter as having a possible impact on the

28   test results, Nuvelo made numerous disclosures about such risks, including that phase II results were

1    not necessarily determinative of success in phase III trials, and Defendants were under no obligation

2    to second guess the phase II results by disclosing every conceivable alternative hypothesis for the

3    phase II results. *Padnes v. Scios Nova, Inc.*, No. C 95-1693 MHP, 1996 WL 539711, at *5, 1996 U.S.

4    Dist. LEXIS 22858, at *17 (N.D. Cal. Sept. 18, 1996). In *Padnes*, the court concluded that where the

5    company had accurately reported the data of the study, the company's statements were not misleading

6    even though they failed to disclose design defects such as the study was not completely randomized,

7    was not double-blinded and different dosages were used. *Id.* The court stated that while reasonable

8    minds could dispute the value of the phase II study for determining the effects of the drug "reasonable

9    minds cannot conclude, however, that defendants failure to exhaustively catalogue those possibilities

10   was fraudulent." *Id.* The omitted information in *Padnes* was much more significant than what

11   plaintiffs are claiming was omitted in this case. In fact, plaintiffs do not even claim that Defendants

12   failed to disclose anything about the phase II trial. Instead, they are claiming that there was a risk that

13   something other than alfimeprase alone assisted the positive  results. This risk is present in any study.

14   Nuvelo was under no obligation to disclose all possible countervailing hypotheses.

15          Third, when Nuvelo's statements are read in "context," as plaintiffs urge, it is clear they are

16   not misleading.[1]  Concurrent with their accurate statements regarding the results of the phase II trials,

17   Nuvelo had 23 pages of risk disclosures. (Fondo Decl., Exs. E, J, R.)  Nuvelo specifically warned,

18   among other things, that "early clinical trials may not be predictive of results in later studies" and that

19   "we may suffer significant set backs in advanced clinical trials, even after promising results in earlier

20   studies." (Fondo Decl., Exs. E, J, R; Appendices 1, 6, 7.)  Moreover, the market was aware of the

21   significant risk that the phase III trials would not succeed – analysts publicly predicted that there was

22   a *50% chance* the phase III trials would not meet its endpoints. (Fondo Decl., Ex. L, p. 5.)

---

[1] Plaintiffs' reliance on, *In re Synergen, Inc. Sec. Litig.*, 863 F. Supp. 1409 (D. Colo. 1994), is inapposite. (Pltfs. Op. 10:9-16.)  In *In re Synergen*,  the Defendants touted the phase II results even though they knew that, when the results were adjusted for "organ dysfunction imbalance" and types of infections amongst the test groups. the results were no longer statistically significant. *Id.* at 1418.  In short, Defendants knew, when touting the phase II results, that the tests showed the drug did not work.  In stark contrast, here plaintiffs admit they do not allege that Defendants knew the data demonstrated the drug had no efficacy.  Nor do they allege existence of any known information showing that the insertion of the catheter would have a material effect on the results of the phase III trial, or that Defendants knew this.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                    6.                          DEFENDANTS' REPLY MEMORANDUM
                                                                         CASE NO. 07-CV-04056-VRW

1    Fourth, plaintiffs' contention that the results of the phase II PAO trials "could be explained

2    simply as clot busting by the drug delivery catheter" is inaccurate and has no support in the

3    Complaint.  The phase II trial was a dose escalation study, meaning that the study examined the safety

4    and efficacy of alfimeprase at different dose levels. (¶ 44.)  In the phase II trial, the percentage of

5    patients who experienced a restoration of arterial blood flow increased as the dose of alfimeprase

6    increased. (Fondo Decl., Ex. P.)  These results cannot be explained by a catheter disrupting the clot.

7          **2.      Defendants' Statements Regarding The Power Calculations For The PAO Phase III Trial Were Not Materially False Or Misleading.**

8
9    Plaintiffs' allegations regarding the "power calculations" and lack of "overwhelming

10   statistical power" of the phase III PAO trial are also misleading and baseless.  As discussed in

11   Nuvelo's opening brief, a power calculation is an estimate of the likelihood of achieving the study's

12   primary endpoints with the pre-specified p-value.  (Def. Br. 5:27-6:5.)  As disclosed by Nuvelo, the

13   assumption was for a placebo effect of between five and ten percent, and alfimeprase to have an

14   effectiveness rate of around seventy percent.  (*See* Fondo Decl., Exs. H, L, X.)  Nevertheless, due to

15   the large size of the study, the results of the trial would be statistically significant even if the

16   difference in effectiveness between the placebo arm and the alfimeprase arm of the study was only

17   twenty-two percent.  As a result, the study did, in fact, have an overwhelming statistical power.  There

18   was nothing false or misleading about Nuvelo's statements.  Moreover, plaintiffs have pled no facts,

19   particularized or otherwise, demonstrating that any defendant had knowledge that the assumptions

20   built into the power calculations were inaccurate, or that there was a significant risk that the disruption

21   caused by the catheter would cause the phase III trial to fail.[2]

22          **3.      Plaintiffs Fail To Allege With Particularity That Any Statements Regarding the CO Trials Were Materially False When Made.**

23   Plaintiffs allege that Defendants' statements concerning the CO phase III trials were false and

24   misleading because they failed to disclose that the p-value for the trial was 0.00125 and that there was

25   ─────────────
     [2] Plaintiffs alleged that Defendants failed to disclose that the market for PAO was smaller than

26   predicted due to competition from off-label drugs.  (¶¶ 97, 104, 113, 117, 121.)  As demonstrated

     in Defendants' opening brief, these allegations have no merit.  (*See* Defendants' Opening Brief

27   ("Def. Br.") 16:15-28.)  Plaintiffs do not even address these allegations or Defendants' arguments

     in their opposition.  Accordingly, the Court should dismiss these claims.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                    7.                    **DEFENDANTS' REPLY MEMORANDUM
                                                   CASE NO. 07-CV-04056-VRW**

1   allegedly a "target product profile" that CO needed to meet before Nuvelo would develop it for the

2   market.  Plaintiffs point to no facts demonstrating that the 0.00125 p-value created a material risk that

3   the phase III trial would not meet its endpoints, that the Defendants knew that it created a material

4   risk, or that the market was misled.  Nor does the Complaint allege any facts demonstrating that the

5   "target product profile" was in existence at the time of the alleged false statements, was even

6   discussed on December 11, 2006, had anything to do with the CO clinical trial not meeting its end

7   points, or was in any way a "material omission."

8              a.      **Defendants Did Not Make Any Materially False And Misleading**
9                      **Statements Regarding The "P-Value" of the CO Phase III Trial.**

10         Plaintiffs distort and misrepresent what a p-value is in the context of a clinical trial and its

11  significance.  Plaintiffs contend that the "risk of non-approval increases as the p-value decreases" and

12  that is why investors cared about the statistical showing that alfimeprase would be required to meet

13  for approval for the treatment of CO.  (Pltfs. Op. 14:16-19.)  Plaintiffs are incorrect.  A trial can have

14  the same likelihood of success with a 0.00125 p-value as it would with a 0.05 p-value by merely

15  increasing the sample size.  What is significant to investors is the likelihood that a clinical trial will

16  meet its endpoints.  This is determined by the power calculation, not the p-value.  The industry

17  standard is to have a power calculation of 80-90 percent and plaintiffs have not asserted (or alleged

18  any facts demonstrating) that the phase III CO trial was not of a sufficient size or "power" to give it a

19  80-90 percent chance of meeting the primary endpoint with the pre-specified p-value of 0.00125.

20         Further, plaintiffs cite to no case law for the their assertion that a company must disclose

21  every aspect of a clinical trial, including information known and understood by those in the industry,

22  and that failure to do so constitutes securities fraud.  That is not, and cannot be, the law.  *Padnes*, 1996

23  WL 539711, at *5, 1996 U.S. Dist. LEXIS 22858, at *17 (holding that the failure to disclose that the

24  study was not randomized, double-blind, and that different doses were used did not constitute fraud)

25  Every single clinical trial that does not succeed is subject to hindsight review—that is good science—

26  it is not a basis for securities fraud.

27         Plaintiffs have provided no facts demonstrating that the 0.00125 p-value was a material risk to

28  the trial's success and that Defendants knew this at the time of any of the alleged false statements or

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

769028/PA                                    8.                    **Defendants' Reply Memorandum
                                                                    Case No. 07-CV-04056-VRW**

that the market did not understand what Nuvelo was doing.  In *Padnes*, the court held that "[m]edical researchers may well differ with respect to what constitutes acceptable testing procedures," and that failing to disclose all those differences does not constitute securities fraud.  1996 WL 539711, at *5, 1996 U.S. Dist. LEXIS 22858, at *17.  Without specific facts demonstrating that Defendants knew that the 0.00125 p-value posed a material risk to the success of the phase III trial, plaintiffs' allegations must be dismissed.  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) ("the fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made").  Plaintiffs' sole allegation is that CW 4 expressed "concern" about the low p-value and that it was a topic of discussion between Deitcher and Wang-Clow, neither of whom are defendants.  (¶ 40.) Plaintiffs' Opposition fails to even address how the "concern" of one low level employee who left before the trial was initiated establishes that the "concern" was scientifically indisputable, and that Defendants knew of and agreed that the 0.00125 p-value created a material risk to the phase III trial. The case law is clear that such weak conclusory allegations do not establish that the Defendants knowingly or recklessly omitted a material fact.  *See Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. CIVA-04CV-1030 RPM, 2005 WL 4161977, at *7, 2005 U.S. Dist. LEXIS 24452, at *21-22 (D. Colo. Oct. 20, 2005) (holding that defendants did not have a duty to disclose *concerns raised by the FDA* about the drugs efficacy); *In re Syntex*, 95 F.3d at 931 (holding that plaintiffs failed to allege any facts demonstrating that defendants had knowledge that their drug would not be approved by the date they predicted even though plaintiffs were able to show knowledge of deficiencies in the testing procedures); *Securities and Exchange Commission v. Guenthner*, 395 F. Supp. 2d 835, 848 (D. Neb. 2005) (holding that evidence of "disagreement, infighting, and differences in management styles between the managers and executives" does not infer securities fraud).

In addition, plaintiffs' own allegations demonstrate that there was no reason for the Defendants to know that the 0.00125 p-value was a material risk to the phase III trial.  (Pltfs. Op. 14:12-19, n. 10.)  In the phase II trial, alfimeprase had a 50% success rate at clearing catheters at 15 minutes compared to Genentech's Cathflo Activase, which had a 0% success rate at 15 minutes. (¶ 108.)  The phase III trial for Activase, which tested much fewer patients than Nuvelo's trial, established a p-value of 0.0001. (Fondo Decl., Ex. Y.)  Because Nuvelo's phase III trial was much

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                     9.                    **DEFENDANTS' REPLY MEMORANDUM**
                                                                     **CASE NO. 07-CV-04056-VRW**

1    larger than Genentech's trial and alfimeprase cleared 50% more catheters at 15 minutes than Cathflo

2    Activase in Nuvelo's phase II trial, it would not be unreasonable to assume that the trial would meet

3    its end points and the p-value of 0.00125 would not be a material risk to the trial's success.

4         Finally, plaintiffs' argument that the market was not aware that Nuvelo was not using the 0.05

5    p-value for its phase III CO trial, and that the market would assume that Nuvelo's two very different

6    phase III CO trials, one being placebo-controlled and the other not, could be evaluated together to

7    arrive at a 0.05 p-value, also fail.  "The regulatory environment is presumed to be known in an

8    efficient market."  *Noble Asset Mgmt.*, 2005 WL 4161977, at *7, 2005 U.S. Dist. LEXIS 24452, at

9    *20.  In *Noble Asset Management*, the court does not state that the FDA guidance has to specifically

10   state that for a single placebo-controlled study the p-value has to be 0.00125.  (Pltfs. Op. 17:8-13.)

11   Under the regulatory environment, it would be illogical for an investor to presume a 0.05 p-value if a

12   company is conducting only one placebo controlled study.  (Fondo Decl., Ex. Z.)  The regulatory

13   guidance provides that a "very-low p-value" is necessary for FDA approval, and that where there is

14   one placebo-controlled study the standard p-value is 0.00125.  (*See* Fondo Decl., Ex. Z; *see also*

15   Declaration of Grant P. Fondo In Support of Defendants' Reply Brief ("Fondo Reply Decl.") Ex. EE.)

16   Both publicly available journal articles and FDA presentations state that doing one placebo controlled

17   study with a 0.00125 p-value is the equivalent of doing two-studies with a p-value of 0.05, and for a

18   single placebo controlled study the 0.05 standard is insufficient.  *Id.*  (stating that a p-value of 0.001 in

19   a single study is "[e]quivalent to evidence from two studies, each with a one-sided p-value of 0.025;

20   ie, 0.025 x 0.025 = 0.000625 x 2 = 0.00125").  Moreover, the fact that you cannot use a placebo-

21   controlled trial together with an open-label trial to create a single p-value is obvious in the industry.

22   Nowhere in *Noble Asset Management* does the court state that the FDA guidance has to specifically

23   state that for a single placebo controlled study the p-value has to be 0.00125.  (Pltfs. Op. 17:8-13.)

24        Under the PSLRA, plaintiffs must plead with *specificity* that Defendants made materially false

25   and misleading statements.  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).

26   Given plaintiffs' failure to show that the p-value was a material risk and that the Defendants knew it

27   was a material risk, coupled with the fact that the market could not have logically assumed that the p-

28   value for a single placebo controlled study would be 0.05 or that a placebo-controlled trial and an

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                    10.                    **DEFENDANTS' REPLY MEMORANDUM**
                                                                    **CASE NO. 07-CV-04056-VRW**

1    open-label trial could be evaluated together to arrive at a 0.05 p-value, the Complaint falls far short of

2    pleading that Defendants made any materially false statements.[3]

3              **b.    Plaintiffs' "Target Product Profile" Allegations Are Irrelevant
                    And Do Not Render Any Statement Materially False And
4                    Misleading.**

5              Plaintiffs' incorrectly assert that on December 11, 2006 Nuvelo disclosed that it was

6    suspending its phase III CO trial because it did not meet its "target product profile." (Pltfs. Op. 18:14-

7    19:1.)  On December 11, 2006, Nuvelo disclosed that it suspended enrollment in the non-placebo

8    controlled phase III CO trial because the placebo controlled study failed to meet its primary endpoint.

9    Dr. Love stated "We have also temporarily suspended enrollment in the ongoing Phase III trials

10   NAPA-3 and SONOMA-3 until further analysis and discussion with outside experts and regulatory

11   agencies are completed."  (Herman Decl., Ex. 1, p. 2.)  Neither in the December 11, 2006 press

12   release nor in the conference call is there any mention of a "target product profile."

13             Six months after the December 11, 2006 announcement, and after analyzing the results of the

14   phase III data, Nuvelo concluded that while it could potentially support a registration of alfimeprase

15   for CO by doing a second placebo controlled study it did not believe a registration at that dose would

16   be a "commercial success in the marketplace." (¶ 65.)  Plaintiffs take the above statement and assert

17   that Nuvelo's decision not to conduct a second trial at the same dose for commercial reasons is

18   tantamount to securities fraud. (Pltfs. Op. 19:4-5.)  There are simply no facts alleged to support such

19   an inference.  Moreover, on August 22, 2007, Nuvelo re-initiated the phase III trial for CO using a

20   higher dose. (¶ 67.)  Plaintiffs fail to explain how an alleged "target product profile" makes any of the

21   statements concerning the phase II CO trials or the likelihood of success in the phase III trials false

22   and misleading or how they are connected to plaintiffs' loss.[4]  In fact, plaintiffs fail to allege any facts

23   ─────────────────────
     [3] Plaintiffs' reliance on *In re Apple Computers Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)
24   and *In re Synergen*, 863 F. Supp. at 1418, is misplaced.  (Pltfs. Op. 17:14-24 -18:1-2.)  In both
     *In re Apple* and *In re Synergen*, the Court was analyzing evidence for a motion for summary
25   judgment.   Neither case dealt with whether plaintiffs allegations were sufficient to meet the
     pleading standards of Rule 9(b) and the PSLRA.  In addition, neither case dealt with the omission
26   of items that were part of the regulatory environment.

27   [4] Moreover, Nuvelo disclosed the risk that even if a product was approved by the FDA it might
     not be successfully commercialized and that at any stage of the clinical trials Nuvelo could
28   "redesign or discontinue the development of a product." (Fondo Decl., Exs. E, J, R;

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                11.                    **DEFENDANTS' REPLY MEMORANDUM
                                                               CASE NO. 07-CV-04056-VRW**

1    demonstrating that the "target product profile" was even in existence during the class period.

2          **4.    Defendants' Statements Concerning The PAO And CO Trials Representing A "Low Risk Path To Regulatory Approval" Were Not Materially False Or Misleading.**

3

4          On the one hand plaintiffs argue that Defendants' accurate descriptions of the phase II trials

5    were misleading when read in "context", yet on the other hand plaintiffs want Defendants' statements

6    that PAO and CO provided a "low risk path to regulatory approval" and a "rapid and low risk entry

7    strategy" with a "high probability of success" read completely out of context.  (Pltfs. Op. 20:5-15;

8    ¶¶ 6, 71, 94, 95, 101, 102, 109.)  The context of each of these statements is that PAO and CO would

9    provide a lower risk and quicker path to approval than initially trying to obtain approval for use of

10   alfimeprase for deep vein thrombosis ("DVT") or strokes.  (*See e.g.* ¶ 94.)  And, of course, plaintiffs

11   do not even claim these statements are false given that undeniable context.  Nowhere do plaintiffs

12   make the assertion that seeking regulatory approval for use of alfimeprase for DVT or strokes would

13   have been less risky or quicker than seeking approval for PAO and CO.

14         Moreover, any statement by Nuvelo that the PAO and CO trials provided a "low risk path to

15   regulatory approval" must also be read in context of its 23 pages of risk disclosures.   When

16   considered in the context of the numerous detailed risk disclosures, these statements are not false and

17   misleading:  "early clinical studies may not be predictive of results in later studies;" "[c]linical trials

18   are lengthy, complex, and expensive processes with uncertain results. It will take us several years to

19   complete our testing, and failure can occur at any stage of testing;" "[t]he actual timing of these events

20   can vary dramatically due to a number of factors such as delays or failure in our clinical trials, the

21   uncertainties inherent in the regulatory approval process and delays in achieving manufacturing or

22   marketing arrangements sufficient to commercialize our products."  (Fondo Decl., Exs. E, J, R;

23   Appendices 1, 6, 7.)  This is born out by the fact that the analysts who covered Nuvelo were

24   predicting that there was a 50% chance the phase III trials would fail.  (Fondo Decl., Ex. L, p. 5.)

25

26   _____

27   Appendices 1, 6, 7.)  This is exactly what happened here.  After the completion of one phase III trial, Nuvelo decided to re-design the study so that alfimeprase had a better likelihood of being approved at a dosage that would have a greater likelihood of commercial success.  This risk was fully disclosed.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                    12.                    DEFENDANTS' REPLY MEMORANDUM
                                                    CASE NO. 07-CV-04056-VRW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E.       **Plaintiffs Fail To Allege A Strong Inference Of Scienter As To Any Individual Defendant.**

Plaintiffs' mistakenly contend that the Supreme Court lowered the pleading standard in the Ninth Circuit.  To establish scienter in the Ninth Circuit plaintiffs must still plead with "particularity facts giving rise to a strong inference" that defendants acted "deliberately reckless or [with] conscious misconduct."  *Silicon Graphics*, 183 F.3d at 973-74.  To establish deliberate recklessness or conscious misconduct plaintiffs "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."  *Id.* at 974.  Plaintiffs do not even come close to making such a showing.

The "change" plaintiffs refer to, simply whether the tie goes to the plaintiff or the defendant, is of little practical difference because, as both concurring Justices in *Tellabs* noted, it is highly unlikely for the inferences in any case to be exactly balanced.  *See Tellabs*, 127 S. Ct. at 2514 (Scalia, J., concurring) ("How often is it that inferences are precisely in equipoise?"); *id.* at 2516 (Alito, J., concurring) (stating that the tie going to the plaintiff "is unlikely to make any practical difference").  This is the case here too, as the inferences are overwhelmingly against scienter.  *Id.* at 2510 ("To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for defendants conduct, as well as inferences favoring the plaintiff.")

1.       **Plaintiffs Allegations Of "Admissions" Fail To Demonstrate A Strong Inference Of Deliberate Recklessness Or Conscious Misconduct.**

Plaintiffs concede that they do not assert that Defendants knew or should have known that the CO and PAO phase III trials would not meet their primary endpoints.  (Pltfs. Op. 3:11-12.)  Rather, plaintiffs allege only that the Defendants failed to disclose material risks and that these risks made their statements false and misleading.  To plead scienter, plaintiffs must plead facts that establish not only that the Defendants knew the facts alleged at the time of the misstatements, but also that Defendants knew that these facts posed a material risk to the phase III trials and that failing to disclose them would render their other statements false and misleading.  Plaintiffs have not even come close to making such a showing.  Plaintiffs fail to point to any memorandums, documents, test results, letters, statements by Bayer or the like to support their allegations.  Instead, plaintiffs rely on a few out of context "admissions," which, as discussed in section II.A., *supra*, are of no assistance to plaintiffs.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                                13.                    **DEFENDANTS' REPLY MEMORANDUM**
                                                                               **CASE NO. 07-CV-04056-VRW**

1    Plaintiffs reliance on *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226

2    (9th Cir. 2004), and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West*

3    *Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), is similarly misplaced.    In contrast to *Oracle* and

4    *American West*, plaintiffs have not alleged knowledge of improper revenue recognition or of material

5    negative information which directly contradicted Defendants' statements.    Rather, plaintiffs have

6    alleged only that Defendants knew that mechanical disruption by the catheter was a "possibility" and

7    that Nuvelo fashioned its CO trial with a p-value of 0.00125.    This knowledge in no way equates to

8    the fraud alleged in *Oracle* and *American West*.    Further, plaintiffs here have not alleged any

9    suspicious stock sales by the defendants.    Accordingly, *Oracle* and *American West* provide no support

10    for plaintiffs contention that Defendants acted with deliberate recklessness or conscious misconduct.[5]

11    ### 2.    Plaintiffs' "Motive And Opportunity" Allegations Fail To Create A Strong Inference Of Scienter.

12    Plaintiffs have alleged no facts demonstrating that any defendant had the motive and

13    opportunity to deceive.    First, plaintiffs have pled no materially false statements or omissions, or that

14    Defendants knew that omitting the risk of the catheter disrupting the clot or the p-value rendered any

15    statements false when made.    Accordingly, plaintiffs have pled no facts from which the Court can

16    conclude that any defendant would have a motive to conceal these risks.    Similarly, plaintiffs have

17    pled no facts demonstrating scienter, and instead rely upon routinely rejected allegations.

18    First, plaintiffs' allegations that Defendants were motivated to commit fraud to raise capital

19    are boilerplate allegations that are routinely rejected by courts.    *Lipton v. Pathogenesis Corp.*, 284

20    F.3d 1027, 1038 (9th Cir. 2002); *In re Thoratec Corp. Sec. Litig.*, No C-04-03168 RMW, 2006 WL

21    1305226, at *10, 2006 U.S. Dist. LEXIS 30602, at *36 (N.D. Cal. May 11, 2006).    Plaintiffs' attempt

22    to distinguish *Lipton* and rely on *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005

23    U.S. Dist. LEXIS 20214, at *36, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005), is unavailing.

24    (Pltfs. Op. 25:7-23.)    In *In re Portal*, plaintiffs had alleged that "Portal's finances were such that the

25

26    ---
    [5] Similarly, plaintiffs' cases suggesting that knowledge can be imputed to defendants because of

27    their positions are inapposite.    (Pltfs. Op. 23:22-24, n. 18.)    In each of those cases, plaintiffs had adequately alleged the existence of facts that could be imputed.    There are no such facts in this

28    case.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                14.                DEFENDANTS' REPLY MEMORANDUM
CASE NO. 07-CV-04056-VRW

1   $60 million was absolutely necessary to keep Portal a 'going concern.'" 2005 U.S. Dist. LEXIS

2   20214, at *36, 2005 WL 1910923, at *12.[6]  In this case, plaintiffs have not alleged any specific facts

3   demonstrating that the secondary offering was necessary to keep Nuvelo afloat.

4       In fact, the Complaint shows just the opposite.  On January 5, 2006, Nuvelo announced that it

5   had closed a deal with Bayer whereby Bayer would pay $50 million up-front to Nuvelo, $335 million

6   in milestone payments and 40% of the development costs for the right to license alfimeprase outside

7   of the United States.  (¶ 72; Fondo Decl., Ex. A.)  Thus, in the weeks leading up to the secondary

8   offering Nuvelo had roughly $88 million in cash ($50 million from Bayer and the $38 million cash in

9   hand from the end of December 2005, (¶ 35)) as well as a commitment that Bayer would pay 40% of

10  the expenses related to alfimeprase – by far Nuvelo's biggest expense in 2006.  This is hardly the

11  picture of a company on the verge of insolvency.  Accordingly, as in *Lipton* and numerous other cases

12  within the Ninth Circuit, plaintiffs' allegation is nothing more than the generic "desire to raise capital"

13  that has been rejected as creating an inference of scienter.  *See In re Calpine Corp. Sec. Litig.*, 288 F.

14  Supp. 2d 1054, 1087 (N.D. Cal. 2003) (holding that "allegations of a motive to present better financial

15  statements to secure credit" insufficient to establish a strong inference of scienter.); *In re Wetseal Inc.*

16  *Sec. Litig.,* 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) (holding that "[b]ecause the motive to secure

17  financing is a normal business objective, . . . it cannot by itself establish scienter").

18      Second, a defendant's compensation being tied to the company's performance does not create

19  an inference of scienter.  *In re Calpine Corp.*, 288 F. Supp. 2d at 1087; *In re Autodesk*, *Inc., Sec.*

20  *Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).  If this were the case, a plaintiff could plead

21  scienter as to nearly every executive.

22      Similarly, plaintiffs' reliance on *Makor Issues & Rights, LTD. v. Tellabs, Inc.*, 513 F.3d 702

23  (7th Cir. 2008), is misplaced. (Pltfs. Op. 24:4-14.)  In *Makor*, plaintiffs alleged that the defendants

24  were aware that sales for their two main products were precipitously falling and that they were

25

---

26  [6] In addition, the court in *In re Portal* also recognized that in the Ninth Circuit "motive pleading
    must be combined with allegations of other "red flags" to be probative."  2005 U.S. Dist. LEXIS

27  at *37, 2006 WL 1910923, at *12.  As in *In re Portal*, there are no other "red flags" in this case,
    therefore, even if the Court countenances plaintiffs' allegation of motive the Complaint must still

28  be dismissed for failing to allege a strong inference of scienter.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                              15.                    **DEFENDANTS' REPLY MEMORANDUM**
                                                              **CASE NO. 07-CV-04056-VRW**

1    engaged in "channel stuffing" while at the same time they publicly stated that sales were still strong

2    and demand was growing. *Id.* at 708-09. Thus, the court concluded that defendants had a motive to

3    conceal the declining demand to prevent the stock price from falling, with the hope that the demand

4    would increase before the truth was revealed. *Id.* at 710.

5          The situation in *Makor* is very different than Nuvelo's situation. In *Makor*, defendants were

6    in possession of facts that they knew contradicted their statements and that would cause their stock

7    price to fall. Essentially, this is akin to if Nuvelo had failed to disclose the results of its phase III trials

8    and then continued to tout the likely success of the phase III trials. However, that is not this case.

9          Third, plaintiffs' stock sale allegations as to Titus do not raise an inference of scienter.

10   Plaintiffs allege only that he sold $1.5 million worth of stock. (¶ 91.) Plaintiffs fail to identify any

11   specific facts demonstrating that these sales were suspicious. *Silicon Graphics*, 183 F.3d at 986. An

12   examination of Titus' sales demonstrates that his sales were not suspicious—Titus' sales were made

13   in late August following his resignation on August 10, 2006. (Fondo Decl., Exs. S, T.) Stock sales in

14   the context of an officer's resignation do not raise an inference of scienter. *In re ICN Pharms., Inc.*

15   *Sec. Litig.*, 299 F. Supp. 2d 1055, 1067 (C.D. Cal. 2004).

16         Further, the fact that the insiders "most in the know" did not sell any stock during the entire

17   class period and *one director purchased stock* during the class period strongly supports an inference

18   that the Defendants did not have scienter. Plaintiffs assert that cases like *American West* and others

19   stand for the unremarkable proposition that stock sales are not *dispositive* of scienter. *See Am. West*,

20   320 F.3d at 944 (emphasis added). While correct, this Circuit has repeatedly held that the lack of

21   stock sales is an important factor to be weighed against a finding of a strong inference of scienter. In

22   fact, courts routinely hold that there is no inference of scienter where, as here, the majority of insiders

23   hold their shares. *Lipton*, 284 F.3d at 1037 (no inference of scienter where "only [one insider] and not

24   other insiders sold during the class period); *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001)

25   (same); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002); *In re FVC.com Sec.*

26   *Litig.*, 136 F. Supp. 2d 1031, 1039-1040 (N.D. Cal. 2000) (holding that "the fact that [the Company's]

27   President and CEO . . . did not sell any of his stock" negates scienter). The absence of sales and the

28   actual *purchase* of stock clearly negates scienter.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                           16.                    DEFENDANTS' REPLY MEMORANDUM
                                                           CASE NO. 07-CV-04056-VRW

1

2

3       **3.      Plaintiffs' Concede That The Group Pleading Doctrine Does Not Apply to Scienter.**

Plaintiffs correctly concede that the group pleading doctrine does not assist them in pleading scienter.  (Pltfs. Op. 27:16-18); *see In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 871-872 (N.D. Cal. 2004) (Walker, C.J.) (agreeing with other courts which have found that the core business presumption "reduces pleading scienter to boilerplate assertions, which would defeat the PSLRA's requirement that scienter be pled with particularity").  This doctrine is equally inapplicable to satisfy the PSLRA's requirement that plaintiffs plead facts with particularity as to which defendants made false statements.  *In re Nextcard, Inc. Sec. Litig.*, 2006 WL 708663 at *3, 2006 U.S. Dist. LEXIS 16156, at *11-12 (N.D. Cal. Mar. 20, 2006) ("This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine no longer is viable after the PSLRA."); *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654 at *27-28, 2006 U.S. Dist. LEXIS 36666, at *83 (N.D. Cal. May 25, 2006) ("[M]ore recent [Northern District] authorities expressly support Defendants' assertion that Plaintiffs cannot state a claim against Mashruwala by relying on the group pleading doctrine.").  Accordingly, plaintiffs' reliance on the group pleading doctrine fails.

**F.      The Alleged Statements Are Protected By The PSLRA's "Safe Harbor."**

Plaintiffs erroneously contend that many of the alleged misstatements are not forward-looking.[7]  The alleged misstatements all fall into the category of plans and objectives of management for future operations or "any statement of the assumptions underlying or relating to" the same.  15 U.S.C. § 78u-5(i)(1)(A)-(D).  This is because Plaintiffs' allegations are all predicated on the Defendants failure to properly disclose the risks associated with the phase III trials.  (¶ 7.)  Thus, plaintiffs are alleging that Defendants failed to accurately predict the likely success of the phase III trials.  Consequently, no matter how plaintiffs couch their allegations, the alleged statements went to the likelihood of future events and, therefore, were forward-looking.  *Harris v. IVAX Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (holding that present tense statements can qualify as forward-looking if the truth or falsity of the statement cannot be discerned until some point in the future).  Similarly, certain

---

[7] Plaintiffs thus concede that, at a minimum, some of the alleged false statements were forward-looking.

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

769028/PA                                        17.                          **Defendants' Reply Memorandum
Case No. 07-CV-04056-VRW**

1    statements that specifically reference the expected results of the phase III trials or that the PAO and

2    CO indications represent a "low-risk path to regulatory approval" are indisputably forward-looking. [8]

3        In addition, the cautionary language did not need to specifically identify that there was a risk

4    that the insertion of the catheter could disrupt the clots, that the p-value for the CO phase III trials was

5    0.00125, and that there was a target product profile for CO for it to provide protection.  (Pltfs. Op.

6    29:8-21.)  It is settled law that a company need not identify the precise risk that led to the business

7    reversal for the cautionary language to be sufficient.  *Harris*, 182 F.3d at 807; *Copper Mountain*, 311

8    F. Supp. 2d at 882 ("But the PSLRA does not require a listing of *all* factors that might make the

9    results different from those forecasted.  Instead, the warning must only mention *important* factors of

10   similar significance to those actually realized.").   To hold otherwise would result in disclosure

11   statements so long and detailed that they would be worthless to investors.  *In re Convergent*

12   *Technologies Sec. Litig.*, 948 F. 2d 507, 516 (9th Cir. 1991) ("The securities laws do not require

13   management 'bury the shareholders in an avalanche of trivial information--a result that is hardly

14   conducive to informed decisionmaking.'").  Nuvelo provided detailed risk disclosures that were more

15   than adequate, covering among other things, the specific risks that the phase II trials might not be

16   predictive of the phase III results and that alfimeprase might never be approved or prove

17   commercially successful.  (Fondo Decl., Exs. E, J, R; Appendices 1, 6, 7.)

18       In *Noble Asset Management*, the court held that "[p]rojections about the likelihood of FDA

19   approval are forward-looking statements," and were protected under the safe harbor provision because

20   the company's cautionary statements sufficiently disclosed that the "test data could be subject to

21   varying interpretations, that the Company might not be able to demonstrate efficacy, that a second

22   Phase 3 trial might be necessary, and that FDA approval might be delayed or not obtained at all."

23

---

24   [8] *See e.g.* ¶ 93 ("'the confidence that that profile *will be demonstrated in Phase III*'"); ¶ 94
25   ("rapid to market . . . low-risk regulatory path for approval"); ¶ 100 ("*expect* the Phase 3 trial
     results to confirm the ability of alfimeprase to restore function to occluded catheters"); ¶ 101
26   ("[alfimeprase] has a real potential to transform the treatment of this condition . . . " and PAO and
     CO provide the "most rapid and low risk market entry strategy for us"); ¶ 108 ("alfimeprase has
27   the potential to offer significant advances in the rapid resolution of a blood clot"); ¶ 109
     ("[alfimeprase] has the potential to fundamentally change the treatment of a wide range of clot
28   related disorders"); ¶ 124 ("phase III program in this indication is progressing well").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                                    18.                    DEFENDANTS' REPLY MEMORANDUM
                                                                    CASE NO. 07-CV-04056-VRW

1   2005 WL 4161977 at *9, 2005 U.S. Dist. LEXIS 24452, at *26-27; *see Oppenheim Pramerica Asset*

2   *Mgmt. S.A.R.L v. Encysive Pharms., Inc.*, 2007 WL 2720074 at *3, 2007 U.S. Dist. LEXIS 69121, at

3   *11 (S.D. Tex. Sept. 18, 2007) (holding that the defendant's "statements of its expectations regarding

4   the FDA approval process" were protected by the safe harbor provision); *In re Bristol-Meyers Squibb*

5   *Sec. Litig.*, 2005 WL 2007004 at *53-54, 2005 U.S. Dist. LEXIS 18448, at *153 (D.N.J. Aug. 17,

6   2005) (holding that cautionary language stating that "'there can be no guarantees that products will

7   receive regulatory approvals,'" and that "'products that may appear promising in development may

8   fail to reach market for numerous reasons'" was sufficient to protect the company's statements

9   regarding FDA approval). Nuvelo's disclosures were even more comprehensive, and thus, fall within

10  the protections of the PSLRA's safe harbor.

11  ### G.  Defendants' Statements Of Optimism Are Non-Actionable.

12      Plaintiffs allege that the statements that alfimeprase "has blockbuster potential," that it

13  could be a "transformational therapy," that it "has the potential to offer significant advances in the

14  rapid resolution of a blood clot," and that the "collaboration with Bayer HealthCare to develop

15  and commercialize alfimeprase continues to go very well" are false and misleading. (¶¶ 93, 10,

16  124.) Not only have plaintiffs failed to plead that these statements are false, but these statements

17  are also classic non-actionable puffery. In *In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp.

18  2d 549, 559 (S.D.N.Y. 2004), the court held that defendants' statements that Erbitux was "'a first-

19  in-class novel blockbuster drug for treating cancer'" and "'*potentially* represents one of the most

20  important advances in cancer medicine'" were non-actionable because they were merely

21  statements of corporate optimism. Similarly, Nuvelo's optimistic statements concerning

22  alfimeprase's potential are non-actionable corporate puffery. *Id.*; *see also Copper Mountain*, 311

23  F. Supp. 2d at 868; *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (holding that

24  statements that "Vasomax was a 'fast-acting,' 'improved formulation' for delivering

25  phentolamine" was inactionable puffery); *Noble Asset Mgmt.*, 2005 WL 4161977 at *11-12, 2005

26  U.S. Dist. LEXIS 24452, at *32 (holding that statements describing phase III trial result as

27  "compelling," "consistent," "impressive," "significant," and "strong," was mere puffing).

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

769028/PA                    19.                    DEFENDANTS' REPLY MEMORANDUM
                                                    CASE NO. 07-CV-04056-VRW

1

### H.     Plaintiffs Fail To Plead Loss Causation.

2     Defendants, in their opening brief, pointed out that Nuvelo's December 11, 2006 disclosures

3 did not contain any discussion regarding the market size for PAO or the target product profile for CO,

4 and that consequently, the Complaint, to the extent it relied upon those "falsehoods," failed to plead

5 loss causation.  (Def. Br. 19:20-24).  Plaintiffs incorrectly assert otherwise.[9]  (Pltfs. Op. 33:13-16.)

6 Nuvelo never announced on December 11, 2006 that the CO trial was suspended because of its failure

7 to hit the target product profile.  (Pltfs. Op. 33:16-19.)  Rather the trial was suspended to allow further

8 analysis of the data and to have discussions with outside experts and regulatory agencies.  (Herman

9 Decl., Exs. 1, 2.)  Not only have plaintiffs provided no connection between the alleged loss that

10 occurred on December 11, 2006 and the alleged misrepresentations concerning the market size for

11 PAO and the target product profile for CO, but by asserting these as additional causes of the stock

12 drop, conceded that the "truth" coming out about the other alleged "omissions" was not the only cause

13 of the drop in stock price.[10]  This is fatal, as plaintiffs must plead facts demonstrating that the alleged

14 false statements were a substantial cause of the drop in stock price.  *In re Dauo Sys., Inc. Sec. Litig.*,

15 411 F.3d 1006, 1025 (9th Cir. 2005); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 326 (D.N.J.

16 2007)  (plaintiffs failed to plead loss causation where there were three disclosures in the press release

17 but only one was related to the alleged fraud, which plaintiffs did not demonstrate was the substantial

18 cause of the stock drop).

19 **III.     CONCLUSION**

20     In conclusion, Defendants request that the Court dismiss the Complaint with prejudice.

21 Dated:   March 12, 2008                    COOLEY GODWARD KRONISH LLP

22                                                            /s/
                                                     _____

23                                                     /Grant P. Fondo (181530)
                                                     Attorneys for Defendants

24 [9] Plaintiffs, for example, refer to an August 1, 2007 statement to support their argument, but this

25 demonstrates Defendants' point, that to the extent the market learned about such "omissions," it
was not until after December 11, 2006.  (Pltfs. Op. 33:23-27.)

26 [10] Plaintiffs state that "*the disclosure of the target product profile for CO, and the suspension of

27 the Phase 3 CO trials based on the drug's failure to meet that target, played a role* in causing
Nuvelo's stock price to fall when the failure of the trial was announced."  Thus, fatally, they do

28 not allege all the factors that played a role or what factor was a substantial cause of the stock price
falling.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**DEFENDANTS' REPLY MEMORANDUM**
**CASE NO. 07-CV-04056-VRW**