**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN re NUVELO, INC, SECURITIES
LITIGATION
_____/

This Document Relates to:
All Actions
_____/

Master File No

C 07-4056 VRW

Class Action

ORDER

       In this securities fraud putative class action,
defendants move to dismiss plaintiffs' 73-page consolidated
complaint (Doc #31).  Doc #34.  Plaintiffs seek to represent
investors who purchased securities of Nuvelo, Inc at prices
plaintiffs allege were inflated by misstatements and misleading
omissions defendants made between January 5, 2006 and December 8,
2006, inclusive (the "class period").  Plaintiffs invoke sections
10 and 20 of the Securities Exchange Act of 1934, naming as
defendants Nuvelo, its Chief Executive Officer Ted W Love, its

1   Chief Financial Officer Gary S Titus and Senior Vice President

2   Michael D Levy.

3       Nuvelo develops thrombolytic drugs, which are drugs

4   designed to dissolve blood clots.  Nuvelo's star candidate to treat

5   blood clots was a drug called alfimeprase.  The process of FDA

6   approval for alfimeprase included "phase 2" and "phase 3" clinical

7   trials.  Plaintiffs allege that although Nuvelo's phase 2 trials

8   for alfimeprase appeared successful, the trials suffered from a

9   number of flaws that made alfimeprase a very risky endeavor and

10  Nuvelo's stock a risky investment.  Plaintiffs allege that those

11  flaws eventually played out when the phase 3 trials failed.

12  Plaintiffs allege that when defendants trumpeted the results of

13  their phase 2 trials and expressed confidence in the phase 3

14  trials, defendants failed to disclose the risks and flaws that

15  defendants knew made the phase 2 trials unreliable and made

16  regulatory approval and successful commercialization of alfimeprase

17  unlikely.

18      Defendants claim their disclosures were sufficient as a

19  matter of law and that the alleged omissions did not render their

20  statements misleading and on this basis move to dismiss the

21  complaint.  The court concludes that in the present complaint

22  plaintiffs have failed to allege misstatements and omissions with

23  the required particularity and failed to link the misstatements and

24  omissions asserted to the causes of the plaintiffs' losses.

25  Because, however, it appears that there may be a set of facts from

26  which a claim under sections 10 and 20 of the Exchange Act could be

27  alleged, this dismissal shall be without prejudice to plaintiffs

28  filing a further amended complaint.

**United States District Court**
For the Northern District of California

**2**

I

Section 10(b) of the '34 Act and SEC Rule 10b-5 make it unlawful for any person, in connection with the purchase or sale of any security:  (1) to engage in fraud, (2) to make an untrue statement regarding a material fact or (3) to make a misleading statement by omitting a material fact.  15 USC § 78j(b); 17 CFR § 240.10b-5.  The elements of a Rule 10b-5 claim are: (1) material misrepresentation or omission of fact; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss and (6) loss causation.  <u>Dura Pharmaceuticals, Inc v Broudo</u>, 544 US 336, 341-42 (2005).  Claims brought under section 10(b) and Rule 10b-5 must first meet the particularity requirements of FRCP 9(b).  <u>In re Stac Electronics Securities Litigation</u>, 89 F3d 1399, 1404 (9th Cir 1996).  FRCP 9(b) requires a plaintiff alleging fraud to "set forth what is false or misleading about [the] statement, and why it is false."  <u>In re GlenFed Securities Litigation</u>, 42 F3d 1541, 1548 (9th Cir 1994) (superseded by the Private Securities Litigation Reform Act ("PSLRA") on other grounds).

Additionally, a complaint must satisfy the more stringent requirements imposed on securities fraud pleadings by the PSLRA. The PSLRA requires that a complaint: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (15 USC § 78u-4(b)(1)); (2) for any such allegations based on information and belief, "state with particularity all facts on which that belief is formed" (15 USC § 78u-4(b)(1)) and (3) "with respect to each act or omission * * * state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 USC §

78u-4(b)(2)).  The required state of mind —— scienter —— is met when the complaint alleges "that the defendants made the false or misleading statements either intentionally or with deliberate recklessness."  In re Daou Systems Inc, 411 F3d 1006, 1015 (9th Cir 2005), citing In re Silicon Graphics Securities Litigation, 183 F3d 970, 974 (9th Cir 1999).  In securities cases, falsity and scienter "are generally strongly inferred from the same set of facts and the two requirements may be combined into a unitary inquiry under the PSLRA."  In re Vantive Corp Securities Litigation, 283 F3d 1079, 1091 (9th Cir 2002) (internal citations omitted).

**A**

As an initial matter, defendants request judicial notice of 30 documents (Doc #35, Exhs A-DD) relating to their motion to dismiss.  Doc #36.  Exhibits A-Q are the full versions of documents referenced by plaintiffs in their consolidated complaint.  Exhibits R-DD include securities filings, press releases, conference call transcripts, journal articles and an FDA Guidance report appearing on the FDA website.  Id.  Federal Rule of Evidence 201 allows courts to take judicial notice of matters that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed R Evid 201(b).

Plaintiffs do not contest the authenticity of the documents mentioned in the defendant's request except for two (exhibits W and X are contested).  Plaintiffs' concern is that if the court takes judicial notice of the submitted documents, disputed factual statements within the documents will be taken as true.  Doc # 41.  Defendants do not request judicial notice for the

4

truth of the statements within the documents; defendants merely seek judicial notice that the documents are authentic and the information contained in them was available to the market during the class period.  Doc #53 at 3.

Courts hearing securities fraud cases routinely take judicial notice of documents with unquestioned authenticity that were referenced in the complaint or that demonstrate the information available to the market during the class period.  See Construction Laborers Pension Trust of Greater St Louis v Neurocrine Biosciences, Inc, 2008 US Dist LEXIS 38899, *5 (S D Cal May 12, 2008) (taking judicial notice of FDA guidelines because they were "publicly available to a reasonable investor"); In re Wet Seal, Inc Securities Litigation, 518 F Supp 2d 1148, 1157–58 (C D Cal 2007) (taking judicial notice of SEC filings and other documents to show "the availability of information to the market"). These documents may be considered "to establish 'whether and when certain information was provided to the market' not the truth of the matters asserted in the reports." In re Infonet Servs Corp Securities Litigation, 310 F Supp 2d 1106, 1116 (C D Cal 2003), quoting In re PetSmart, Inc Securities Litigation, 61 F Supp 2d 982, 987 n1 (D Ariz 1999).  Accordingly, the court takes judicial notice of exhibits A–Q (documents referenced in the complaint) and Y–DD (documents available to the market) not for the truth of the statements contained in those documents, but in order to consider the complete record of the defendants' alleged misstatements in light of the other information available to the market.  See In re Wet Seal, Inc Securities Litigation, 518 F Supp 2d 1148, 1157 (C D Cal 2007).

5

United States District Court
For the Northern District of California

1   Judicial notice of stock sales contained in securities

2   filings with the SEC is appropriate, particularly where plaintiffs

3   rely on stock sales in their complaint.  See Construction Laborers

4   Pension Trust of Greater St Louis, 2008 US Dist LEXIS 38899 at *5.

5   Accordingly, the court takes judicial notice of exhibits R-V for

6   the information about the stock sales contained in those documents

7   as well as to demonstrate information available to the market.

8   Plaintiffs dispute the accuracy of two submitted

9   conference call transcripts (exhibits W and X) that were not

10  referenced in the complaint and contain disclaimers about their

11  accuracy.  Doc #41 at 7; Doc# 35-40, Exh W at 14, Doc# 35-41 at 15.

12  Because there is a dispute about the accuracy of these transcripts

13  and taking judicial notice of them is not necessary to the result

14  here, the court declines to do so at this time.

15

16                              B

17  In In re Cutera Securities Litigation, ___ F Supp 2d ___

18  (N D Cal 2008), the court had occasion to address some of the

19  problems that attend a long and evidentiary-laden complaint in a

20  securities fraud action, such as the complaint at bar.  That

21  discussion will not be reprised here although the difficulties that

22  the complaint in Cutera presented are present here.  Such a

23  complaint makes more, rather than less, difficult the task of

24  determining whether a complaint meets the heightened pleading

25  standards of the PSLRA.  Such a complaint also obscures whether

26  plaintiffs have adequately alleged loss causation, the topic to

27  which the court turns first.

28  As noted in Cutera, the class period in an open market

securities fraud case coincides with the period "during which defendants' fraud was allegedly alive in the market." <u>In re Clearly Canadian Securities Litigation</u>, 875 F Supp 1410, 1420 (N D Cal 1995)(Walker, J).  Thus it is "only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value who can possibly state a claim for damage resulting from the fraud." <u>Zelman v JDS Uniphase Corp</u>, 376 F Supp 2d 956, 966 (N D Cal 2005)(Schwarzer, J).

As the essence of an open market securities fraud claim is that true facts were withheld from the market or were misstated, a good place to begin analysis of a complaint alleging such a claim is what the complaint alleges the true facts were that revealed the prior misstatements or misleading omissions of the defendants.  In the complaint at bar, these alleged facts are set forth in paragraph 158 at page 66, needless to say deep into the pleading:

> The inflation in Nuvelo's securities prices was eliminated when the market learned that, contrary to defendants' statements during <u>and even prior to the Class Period</u>, alfimeprase had not worked as represented in the Phase 2 trials, that the Phase 3 trials had failed as a result of risks that had been concealed or downplayed by defendants in a manner that misled investors during the Class Period, that the drug did not meet the Company's target product profile necessary to market it for [catheter occlusion], and the FDA had imposed an extraordinary high standard for approval of the drug for [catheter occlusion]. <u>Most of this inflation</u> was eliminated when Nuvelo announced, on December 11, 2006 –– the last day of the Class Period –– that alfimeprase had failed the Phase 3 clinical trials, causing Nuvelo's stock price to plummet.  Nuvelo's share price fell from $19.55 to close at $4.05, a one day drop of nearly 80% on extraordinary trading volume of 90,150,600 shares –– more than 150 times its daily average, causing injury to investors who purchased at the fraud-inflated prices prevailing in the market during the Class Period.

Doc #31 at 69-70 (emphasis added).  The very next paragraph begins as follows:

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

4

> <u>The remaining inflation</u> **was eliminated on June 27, 2007, when Bayer pulled out of further efforts to develop alfimerprase and defendants revealed the full extent by which the risks of failure in the Phase 3 trials had been withheld from investors, causing additional injury to Class members who continued to hold their securities through the date of the announcement.**

5    Doc #31 at 70 (emphasis added).

6          The problem with this, as the underlined text highlights,

7    is obvious.  Plaintiffs do not seek to represent purchasers of

8    Nuvelo stock before the class period (January 5, 2006 to December

9    8, 2006) or afterwards.  In <u>Dura Pharmaceuticals</u>, the Supreme Court

10   held that a complaint must not merely allege stock price inflation

11   resulting from a misrepresentation, but must also allege, and

12   plaintiffs later must prove, that the misrepresentation

13   "proximately caused the plaintiff's loss."  544 US at 342-46.

14   Price inflation due to a misstatement or omission, the Supreme

15   Court in <u>Dura Pharmaceuticals</u> noted, may be "a necessary condition"

16   of market fraud, but is insufficient to prove economic loss.  Id at

17   343.  "Given the tangle of factors affecting [a security's] price"

18   (e g, "changed economic circumstances, changed investor

19   expectations, new industry-specific or firm-specific facts,

20   conditions, or other events"), Id, <u>Dura Pharmaceuticals</u> requires

21   that the facts that drive the security's price lower to inflict

22   investor losses must be the same facts whose earlier

23   misrepresentation or omission inflated the price.  Id at 345-46.[*]

24          Hence, if there remains unresolved inflation in the price

25

26

27   * The text of the Supreme Court's opinion in <u>Dura
     Pharmaceuticals</u> refers to a misrepresentation.  The logic of

28   the Court's holding applies equally to a misleading
     omission.

United States District Court

For the Northern District of California

of the security due to a misstatement or omission, the class period should extend to the time the inflation is eliminated.  Of course, extending the class period in this manner would have the effect of increasing the number of claimants to any recovery plaintiffs obtain and presumably diminish by at least some amount the recovery of the claimants who purchased in the class period alleged. Extending the class period also may present the problem of differing levels of price inflation due to the different informational mix as the falsity of the defendants' representations is revealed.  This creates possible conflicts among the class claimants.  Plaintiffs can, of course, choose to represent a class of all or only some of those allegedly defrauded.  But the problem with the allegation that there remained some undigested fraud on the market until late June 2007 is that, if this is so, then there is a potential conflict between the class that plaintiffs seek to represent and the potential class that they do not seek to represent.

More importantly, and in addition, plaintiffs' suggestion that some misinformation remained in the market after the December 11 announcement is entirely at odds with the fraud-on-the-market presumption which underlies plaintiffs' theory of liability.  As Judge Easterbrook has explained, plaintiffs proceed on the assumption that the market for Nuvelo stock is "informationally efficient":

//

//

//

//

United States District Court

For the Northern District of California

> [O]nly if the market is inefficient is partial
> transmission [of information] likely, and if the
> market for [the company's] stock is inefficient then
> this suit collapses because a fraud-on-the-market
> claim won't fly.  An investor who invokes the fraud-
> on-the-market theory must acknowledge that all public
> information is reflected in the price, just as the
> Supreme Court said in Basic [Inc v Levinson, 485 US
> 224, 246 (1988)].

Asher v Baxter International, Inc, 377 F3d 727, 732 (7th Cir 2004).

Accordingly, the allegation about elimination of the "remaining inflation" on June 27, 2007 adds nothing to plaintiffs' claim unless plaintiffs are prepared to allege that the class period extends to June 27.  The period of the alleged price distortion and the class period in an open market securities fraud action must coincide.  As plaintiffs have not sought to extend the class period to June, 2007, the allegations about "remaining inflation" are beside the point of the claims plaintiffs seek to prosecute and are simply surplusage.

In the same way, plaintiffs' allegations of events prior to the class period are beside the point or, perhaps more accurately, merely background.  The recounting of pre-class period events consumes thirty paragraphs on at least eleven pages of the complaint — rather excessive space to devote to a mere windup before we get to the pitch.  See Doc #31 at 11-22.  To the extent that plaintiffs rely on alleged misstatements prior to the class period as distorting the price of Nuvelo stock, the period in which such statements were made should be included in the class period. Again, as it must be presumed under the efficient market hypothesis that the price of Nuvelo stock reflects the information available to the market, plaintiffs' unwillingness to extend the class period to before January 5, 2006 is tantamount to a concession that the

United States District Court
For the Northern District of California

defendants had not made misstatements or misleading omissions prior to this date.  This is significant because some of the defendants' alleged misstatements or omissions related to the reliability of the phase 2 trials, which were concluded over twelve months before the start of the class period.

An analysis of the price behavior of Nuvelo stock during the class period highlights other deficiencies in plaintiffs' pleading of loss causation.  Closing stock prices are public information "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and are the proper subject of judicial notice in a motion to dismiss.  See FRE 201(b); In re Finisar Corporation Derivative Litigation, 542 F Supp 2d 980, 990 n4 (N D Cal 2008)(Whyte, J)(taking judicial notice of public stock prices).  In analyzing plaintiffs' allegations of misleading omissions, the court can, therefore, look at the alleged misleading omissions against the backdrop of the price behavior of Nuvelo's stock.

//
//
//
//
//
//
//
//
//
//
//

1    The following figure depicts the price behavior of Nuvelo
2  stock along with the allegedly actionable misleading statements
3  that plaintiffs allege defendants made during the class period.
4  Doc #31 at 31-56.  Within the class period, the complaint recounts
5  but six information releases that allegedly are actionable; these
6  are information releases on January 5, February 27, March 15, April
7  10, May 5 and August 3.  Doc #31 at 31-56.



**Nuvelo Closing Stock Prices (2006)\***

23    The allegedly misleading statements fit into three
24  general categories: (1) statements about the effectiveness of
25  alfimeprase during the phase 2 trials, (2) statements that the two
26  alfimeprase indications chosen for trials represented a "low-risk
27  path to regulatory approval" and (3) statements that alfimeprase
28  had the potential to have "transformational" commercial success.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Doc #31 at 34-59.   The statements regarding regulatory approval and commercial success are "forward-looking statements" and fit into the PLSRA "safe harbor provision," see infra, but the plaintiffs argue that the alleged misstatements about the effectiveness of the phase 2 trials do not fall under that provision because those statements look back rather than forward.   Doc #40 at 36-37 n22.

Plaintiffs are correct about the direction of the phase 2 trial allegations.   But while some of the alleged misleading statements about the phase 2 trials avoid the safe harbor provision by looking backward, they pose additional loss causation issues associated with the selection of January 5, 2006 as the first day of the class period.   Plaintiffs' theory regarding statements touting the success of phase 2 trials is that they were misleading because "Nuvelo omitted to disclose" certain "known risks" about those trials that rendered replication of the results unlikely. Doc #31 at 36.   If that is true, then Nuvelo's stock price would have been inflated due to fraud beginning the moment the defendants were aware of those risks and did not disclose them.   Because all phase 2 trials for alfimeprase were completed and results reported by early December, 2004, this theory cannot be squared with the selection of January 5, 2006 as the first day of the class period. The complaint does not allege that defendants only became aware of the undisclosed risks thirteen months after the conclusion of the phase 2 trials, one possible explanation for a January 5, 2006 class period start date.   Another possible explanation plaintiffs might have alleged is that the affirmative statements on January 5, 2006 made the omission of the risks misleading for the first time. But the complaint presents similar statements about the phase 2

13

United States District Court
For the Northern District of California

studies as early as May 2, 2005.  Doc #31 at 26 (discussing a May 2, 2005 Nuvelo company statement that the company had "'power calculations' that clearly established the efficacy of alfimeprase as compared to a placebo").

Although the particularity requirement of 15 USC § 78u-4(b)(1) ("if an allegation regarding the statement or omission is made on information and belief") and § 78u-4(b)(2) ("required state of mind") may not apply to the allegation of loss causation, Dura Pharmaceuticals, 544 US at 346 ("[W]e assume, at least for argument's sake, that neither the Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation * * * ."), the Supreme Court nonetheless observed that the complaint must at least provide "fair notice." Id at 346.  Fair notice can only reasonably be interpreted to require the complaint to spell out the connection between the alleged misstatement or omission and the plaintiffs' loss.  See the Supreme Court's discussion of Dura Pharmaceuticals in Bell Atlantic Corporation v Twombly, ___ US ___, 127 S Ct 1955, 1966 (2007) ("So, when allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." [quotation marks omitted]).  Because the complaint does not allege the relationship between the defendants' alleged misstatements about the phase 2 studies and the plaintiffs' loss it fails the test of Dura Pharmaceuticals.

The complaint attempts to resolve the lack of congruence between the start of the class period and the beginning of the

14

United States District Court
For the Northern District of California

alleged fraud-induced price inflation by alleging that the entire drop in the stock price at the close of the class period was caused by disclosure of the previously omitted known risks.  To plead such a claim, plaintiffs must allege that the omitted facts were unknown to the market and, had they been disclosed, would have lowered the trading prices of Nuvelo stock.  <u>Binder v. Gillespie</u>, 184 F3d 1059, 1065-66 (9th Cir 1999).

Plaintiffs do allege, and the price behavior of Nuvelo's stock substantiates, that the December 11 disclosures had a dramatic effect on Nuvelo's stock causing it to lose 80 percent of its value.  These disclosures were contained in two information releases: (1) a press release dated December 11, 2006 and (2) a conference call in which Nuvelo's CEO Love discussed the information in the press release with securities analysts.  Doc #42, Exhs 1-2.  The issue is whether plaintiffs have linked the facts disclosed on December 11 to false statements or misleading omissions during the class period.

The meat of the December 11 disclosures is contained in the first paragraph of the press release:

//
//
//
//
//
//
//
//
//

15

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

> Nuvelo, Inc (NASDAQ: NUVO) and Bayer HealthCare today announced top-line data demonstrating that the Phase 3 clinical trial of alfimeprase in acute peripheral arterial occlusion(PAO), known as NAPA-2 (Novel Arterial perfusion with Alfamiprase-2) did not meet its primary endpoint of avoidance of open vascular surgery within 30 days of treatment.  The companies also announced that the Phase 3 trial in catheter occlusion (CO), known as SONOMA-2 (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase-2), did not meet the endpoint of restoration of function at 15 minutes.  These trials did not meet key secondary endpoints.  In addition, the companies announced that they have temporarily suspended enrollment in the ongoing Phase-3 trials, NAPA-3 and SONOMA-3, until further analysis and discussions with outside experts and regulatory agencies are completed.

10

Doc# 42, Ex 2.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

As the figure above illustrates, the December 11 disclosures —— in addition to providing information on some of the specific risks in the phase 3 trials that Nuvelo had not previously disclosed —— revealed to the market that alfimeprase failed in phase 3 trials.  Because, as will be discussed presently, plaintiffs do not allege that defendants knew that the phase 3 trials had failed or would fail or made false statements during the class period about the probable success of the phase 3 trials, the complaint fails to link the truthful information released on December 11 with allegedly misleading information put into the market during the class period.  The complaint does not make clear, had the omitted known risks alleged in the complaint been disclosed previously, what the effect on the price of Nuvelo stock would have been without the accompanying news that the phase 3 trials indeed failed.  In other words, the failure of the phase 3 trials is as consistent with a scenario in which the information releases prior to December 11 were not misleading as an alternative scenario that these informational releases were misleading.  Accordingly, the

16

United States District Court
For the Northern District of California

complaint does not specify the cause of the plaintiffs' alleged loss as <u>Dura Pharmaceuticals</u> requires.

II

In addition to the complaint's failure to plead loss causation, the complaint fails to plead with the required particularity that the statements about alfimeprase's "path to regulatory approval" and potential for "transformative" commercial success were misleading.  Plaintiffs identify four risks to alfimeprase achieving regulatory approval and commercial success that were allegedly known by the defendants during the class period, but not to the market.  These risks included (1) a lack of reliability in one phase 2 trial result due to an "observer effect," (2) an unusually stringent target success rate for one phase 3 trial, (3) an internal target phase 3 trial success rate that was even more stringent and (4) a smaller potential market due to competition from off-label drugs and mechanical techniques.  The court addresses these alleged undisclosed risks in turn.

A

Plaintiffs allege that an observer effect biased phase 2 results related to one particular potential use for alfimeprase. That potential use was to dissolve blood clots of a type usually occurring in the leg.  Such clots are known as PAOs, which stands for peripheral arterial occlusions.  Doc #31 at 5.  In order to treat blood clots intravenously, alfimeprase must be delivered to the clot using a "drug delivery system."  The drug delivery system made use of a catheter to deliver alfimeprase to the clot area.

17

United States District Court

For the Northern District of California

Once the catheter delivered the drug, alfimeprase was supposed to break up the clot.

The project name for Nuvelo's clinical trials for PAOs was "NAPA." Doc #31 at 17. Nuvelo conducted its phase 2 trial of alfimeprase in 2003 and 2004. Doc #31 at 12–13. On September 30, 2004, Nuvelo presented the results of the phase 2 trial. Doc #31 at 12–13, 19. Nuvelo reported that leg clots were dissolved at rates of up to 76 percent and blood flow was restored at rates of up to 60 percent within four hours of administering alfimeprase. Doc #31 at 19. Sixty-one percent of the patients receiving 0.3 mg/kg of alfimeprase avoided surgery for thirty days. Id. Side effects such as bleeding were minimal, and none of the patients suffered a stroke or death. Id.

Plaintiffs allege those results were unreliable because of what scientists call "observer effects." The observer effect is related to but not the same as Heisenberg's uncertainty principle or Schrödinger's paradox. Observer effects occur when the very act of observing a phenomenon changes the properties of that phenomenon. The most commonplace example occurs when taking the body's temperature using an oral thermometer. The temperature underneath the tongue hovers around 98.6 degrees, but the glass and mercury in the thermometer will be slightly cooler. When the thermometer is inserted into the mouth, an endothermic process begins, and heat transfers from the mouth to the thermometer. This absorption of heat causes the mercury to expand into the hollow chamber inside the thermometer, allowing the observer to read the temperature as marked by the tick marks on the side of the thermometer. The thermometer reading will always be inaccurate,

United States District Court

For the Northern District of California

however, because the mouth was ever-so-slightly warmer before the thermometer was inserted and began absorbing heat.  The act of measuring the mouth's temperature lowers the mouth's temperature. The effect might be trivial in that instance, but the magnitude of the observer effect can be large depending on the circumstances.

Plaintiffs allege that the design of the PAO alfimeprase phase 2 trials contained serious risk of a powerful observer effect.  While a clinician administered alfimeprase via the insertion of a catheter in order to observe the impact of alfimeprase on a blood clot, there was a risk that the catheter itself would break up the clot before the alfimeprase arrived.  If many clots were dissolved by the catheter, this would have overestimated the effectiveness of alfimeprase.  Essentially, alfimeprase would have received credit for dissolving more clots than it actually dissolved due to "help" from the catheter itself. Accordingly, plaintiffs allege that there was a risk that the phase 2 trial results were unreliable.

Plaintiffs allege defendants "knew or recklessly disregarded" the risk that alfimeprase was subject to this problem. Doc #31 at 43.  "In fact, this precise risk had been discussed by [a confidential witness] prior to the class period with high-ranking officers of Nuvelo, including Love * * *. [The confidential witness] said that, in 2004 or 2005, s/he discussed the potential for the drug delivery system to disrupt the clot during quarterly company-wide meetings regularly held after each Board of Directors meeting."  Doc #31 at 15.

Plaintiffs allege that the failure to disclose this potential observer effect rendered a number of defendants'

United States District Court
For the Northern District of California

statements misleading.  Defendants, in promoting the encouraging results of the phase 2 trial, suggested that alfimeprase was the one and only cause of blood clot dissolution among the participants in the trial.  For example, on January 5, 2006, the first day of the class period, defendants stated that "[a]lfimeprase * * * has been shown in clinical studies to provide rapid clot dissolution." Doc #35-2, Exh A at 2.  On April 10, 2006, defendants stated that "the NAPA-1 trial, a Phase 2 dose escalation study, demonstrated that alfimeprase can restore arterial blood flow within four hours of initiation of dosing."  Doc #35-13, Exh G at 2.  On May 5, 2006, Titus stated that Nuvelo "believe[s it] still [has] overwhelming statistical power to detect the difference between an active therapy such as alfimeprase —— which is indeed very active based on our Phase 2 studies to date —— and placebo."  Doc #35-14, Exh H at 13.  And on August 3, 2006, Levy stated that Nuvelo was "very gratified in phase [2] to find that alfimeprase worked very well on big clots and on small clots * * * . [¶] And it's worked on what we thought were new clots and old clots * * *."  Doc #35, Exh I at 11. On December 11, 2006, Nuvelo informed the market that its phase 3 tests had failed, stating that the observer effect described above was "probably" responsible for the encouraging phase 2 results. Doc #31 at 24.  "Nuvelo's stock closed at $4.05 a share, down $15.50 a share in unusually heavy trading * * *."  Id at 32.

Plaintiffs allege that each of the positive statements above was misleading because defendants attributed the drug's success to the drug itself and did not disclose the known risk that the drug delivery system might be the true source of the results in the study.  According to the plaintiffs, "defendants knew, but did

United States District Court

For the Northern District of California

not disclose, that the mere insertion of the drug delivery catheter would have caused some of the blood clots in patients enrolled in the PAO trials to be broken apart." Doc #44 at 16–17.

Because there was "no placebo arm" in the phase 2 study (no control group to which clinicians administered a catheter but not alfimeprase), Nuvelo lacked the data needed to determine conclusively whether the drug or the drug delivery system was responsible for dissolving clots. Doc #31 at 18; Doc #44 at 16–17. Instead, Nuvelo relied on "placebo assumptions" to estimate the efficacy of alfimeprase independent of other variables. Doc #31 at 26. Nuvelo disclosed those assumptions to investors under a "conservative case scenario" that 5 to 10 percent of patients would respond to a placebo compared with 70 percent of patients responding to alfimeprase. Doc #31 at 52; Doc #35-18, Exh L at 4. Nuvelo stated it assumed that even if alfimeprase outperformed the placebo not by 60 to 65 percent but by only 22 percent, the study's sample size was sufficiently large that the drug would still be deemed effective. Doc #35-18, Exh L at 4.

Plaintiffs allege those statements were insufficient and had "no reasonable basis in fact because defendants did not know how many patients avoided open surgery for thirty days as a result of the catheter insertion breaking up the clot." Doc #31 at 26. Plaintiffs argue that defendants' disclosure of the assumed placebo rate is "irrelevant" because "investors did not have sufficient information to understand that the placebo rate, and hence the power calculations, lacked a reliable basis." Doc #44 at 12.

Plaintiffs argue that disclosing the assumption of a 5 to 10 percent placebo response was misleading because it conveyed a

sense of certainty in a situation where the observer effect permits none: "Far from disclosing that the lack of a placebo arm together with the risk of catheter-caused clot busting rendered the Phase 2 results potentially misleading and the power calculations unreliable, this statement assured investors that any placebo effect was known to be relatively minor and would have little impact on trial results."  Doc #44 at 12.

Plaintiffs' argument goes too far.  An assumption is merely an assumption.  By disclosing that the placebo rate was based on assumptions rather than on data, defendants disclosed that they were most definitely <u>not</u> certain whether alfimeprase alone was causing patients to avoid surgery in the phase 2 trials.  Defendants put reasonable investors "on notice" that some variable other than alfimeprase might account for the results in the trial.  See <u>Brody v Transitional Hospitals Corp</u>, 280 F3d 997, 1007 (9th Cir 2002).

Plaintiffs insist that providing any assumption at all was necessarily false and misleading in light of defendants' awareness of the observer effect:  "defendants' stated assumption of a low placebo rate was directly contrary to their knowledge that the mere insertion of a catheter would disrupt clots in patients receiving placebo."  Doc #44 at 12.  On its face, this argument is false.  Plaintiffs allege that defendants knew that some uncertain number of patients avoided surgery as a result of the drug delivery system rather than alfimeprase; plaintiffs do not allege that defendants knew this would occur in many patients or significantly more than 5 to 10 percent of patients.  Accordingly, defendants' disclosures are entirely consistent with what plaintiffs allege

they knew.

         In essence, plaintiffs complain that defendants failed to disclose a risk whose magnitude was uncertain —— the risk that the catheter, rather than the alfimeprase, broke up the clot.  But defendants need not go into all the details behind their placebo assumptions.  The securities laws do not "require that companies who report information from imperfect studies include exhaustive disclosures of procedures used, including alternatives that were not utilized and various opinions with respect to the effects of these choices on the interpretation of the outcome data."  <u>Padnes v Scios Nova, Inc</u>, 1996 WL 539711 (N D Cal Sept 18, 1996) (Patel, J).  In <u>Padnes</u>, the defendant did not disclose that its phase 2 trials were not double-blinded and were not fully randomized, among other defects.  See <u>Padnes</u> at *5.  The failure to double-blind the study is analogous to the problem at issue here because single-blinded tests allow for a type of observer bias to distort the results.  <u>Padnes</u> held that only with the benefit of hindsight was it possible to determine that the failure to double-blind the study made the phase 2 tests unreliable.  See <u>Padnes</u> at *5, citing <u>In re MedImmune, Inc Sec Litig</u>, 873 F Supp 953, 966-67 (D Md 1995).  The same is true here.  Defendants allegedly knew that some patients had responded to the catheter rather than alfimeprase.  Defendants disclosed that they assumed 5 to 10 percent of patients would respond to some variable other than alfimeprase.  Only hindsight reveals that the effect of the catheter was significantly larger than that assumption.

         Accordingly, plaintiffs have not alleged with particularity that defendants' statements regarding the phase 2

trials for alfimeprase in PAO patients were misleading.

**B**

Plaintiffs allege a second undisclosed risk relating to another potential use for alfimeprase.  This second use was the treatment of blood clots that develop inside or around catheters that are permanently implanted in patients' veins.  "An estimated 5 million catheters are placed in patients in the United States each year to deliver chemotherapy, nutritional support, antibiotics and blood products."  Doc #31 at 20.  Blood clots in catheters are known as catheter occlusions, or COs.  Id at 5.

The alleged omissions regarding CO are related to phase 3 testing.  Nuvelo began enrollment in its first phase 3 trial for CO — codenamed SONOMA-2 — in September 2005.  Id at 22.  Nuvelo began enrollment in its second phase 3 trial for CO — codenamed SONOMA-3 — in February 2006.  Id.  On December 11, 2006, Nuvelo announced that SONOMA-2 had failed and that it was suspending enrollment in SONOMA-3.  Id at 32–33.  The share price dropped from $19.55 to $4.05.  Id at 32.

Plaintiffs do not allege any observer effects in the use of alfimeprase to treat CO.  Instead, plaintiffs allege that defendants secretly imposed extraordinarily strict efficacy requirements in the phase 3 testing.  Plaintiffs allege that defendants had agreed with the FDA to impose "a much more stringent p-value requirement on Nuvelo to demonstrate success at a statistical significance level that was forty times more stringent than what the market believed."  Doc #31 at 6.

Plaintiffs allege that the phase 3 trial failed because

United States District Court

For the Northern District of California

the results were not statistically significant.  As plaintiffs
allege, statistical significance is expressed in terms of a "p-
value," which is a statistical measure of the probability that a
difference between groups in a clinical trial happened by chance.
Statistical significance consisting of a p-value of less than 0.05
has traditionally been considered convincing evidence by the FDA."
Doc #31 at 16.  The lower the p-value of a study, the more likely
it is that the results of the study are meaningful and not a fluke.

Plaintiffs allege that the phase 3 trial failed to meet
the p-value imposed by the FDA.  Doc #31 at 24.  Plaintiffs allege
that the target p-value for alfimeprase was not the traditional FDA
0.05 number but rather a much lower (which is to say stricter)
number and that the failure to meet this atypically low number was
responsible for the drug's failure.  In particular, plaintiffs
allege defendants eventually disclosed that although the study had
a p-value of 0.022 ⸺ within the FDA's normal approval range ⸺
Nuvelo and the FDA had previously agreed to a p-value target of
0.00125.  Id at 23–24.  Because SONOMA-2 did not meet that more
demanding p-value, Nuvelo shut down the remaining phase 3 trials.

Plaintiffs do not allege that defendants made any
specific misleading statements regarding the p-value for the CO
alfimeprase testing.  Instead, plaintiffs allege that the failure
to disclose the ultra-low p-value requirement of 0.00125 was
misleading.  Plaintiffs argue that had investors known that the p-
value requirement for alfimeprase was forty times more stringent
than normal (because 0.00125 x 40 = 0.05), investors would have
been more doubtful that alfimeprase could succeed in the phase 3
trials and gain FDA approval.  Id at 22.

United States District Court
For the Northern District of California

But the complaint does not account for a crucial exception to the FDA's normal p-value requirements.  The FDA usually requires two phase 3 trials, each with a p-value of 0.05. If an applicant desires approval based on only one trial, the FDA will require assurance that the single trial is not a fluke.  See Doc 35-43, Exh Z at 16.  Accordingly, the FDA might impose a very low p-value.  Id.  In that instance, the lower p-value would not be "more stringent" than the traditional p-value; the FDA would be offering two equivalent paths to approval: either a single study at a low p-value or two studies at a higher p-value.  A drug company might wish to avoid the risk or expense of a second trial by seeking regulatory approval based on a single study at phase 3, but in order to past muster that single study must prove the drug's efficacy with greater certainty.

Plaintiffs ignore this relationship between p-values and the number of phase 3 studies conducted.  Had Nuvelo been holding alfimeprase to a p-value of 0.00125 across each of two studies, then plaintiffs would be correct that the standard was far more stringent than normal and that the failure to disclose the abnormal p-value would be misleading.  But had Nuvelo been holding alfimeprase to a p-value of 0.00125 for a single phase 3 study, then the omission of the p-value would not be misleading because the FDA would accept those study results just as eagerly.  This relationship between the number of studies conducted and the required p-level was not a mystery to the market, as it appeared in the FDA's guidelines.  Id.

Plaintiffs allege no facts that support an inference that investors believed Nuvelo was conducting two phase 3 trials, each

United States District Court
For the Northern District of California

at a p-value of 0.00125.  And plaintiffs allege no facts suggesting that defendants actually planned to perform two trials at 0.00125. The complaint and the statements cited therein suggest the opposite — that Nuvelo wanted to conduct either two trials with the normal p-value or a single trial with the stricter p-value.  The complaint quotes Levy as stating that Nuvelo was considering two phase 3 trials, each with a p-value requirement of 0.05.  Doc #31 at 24–25. Love's statement that Nuvelo "had an agreement with the FDA" regarding "the more stringent p-value required for a single pivotal trial" (Id at 22, 24) suggests only that if the first trial (SONOMA-2) could hit an ultra-low p-value, then Nuvelo could go to the FDA with its impressive results and argue that a second phase 3 trial would be unnecessary.  When SONOMA-2 came in at 0.022, Nuvelo lost its chance to win approval with only one phase 3 trial, even though it could have pushed on in hopes that SONOMA-3 would also achieve a p-value of less than 0.05, thereby meeting the FDA's threshold.  Id at 24–25.  No reading of defendants' statements suggests Nuvelo intended all along to abandon SONOMA-3 and pin its hopes on SONOMA-2 hitting the ultra-low p-value, and plaintiffs allege no facts supporting that claim.  And none of the market analysts cited in the complaint voiced any outrage or shock that the p-value in the phase 3 tests was supposedly forty times more stringent than normal.  The silence on that score undermines plaintiffs' contention that the failure to disclose the p-value up front was misleading.

Accordingly, plaintiffs have not pled with particularity that the omission of the p-value was misleading.  Plaintiffs have not alleged with particularity that a p-value of 0.05 for two

27

United States District Court
For the Northern District of California

trials "differs in a material way from" the p-value and number of trials that Nuvelo actually used.  See <u>Whiting v Applied Signal Technology</u>, No 06-15454, slip op at 6394 (9th Cir June 5, 2008), quoting <u>Brody</u>, 280 F3d at 1006.  Plaintiffs have not alleged with particularity that the difference between using a p-value of 0.05 for two trials and using a p-value of 0.00125 for one trial is material.  And plaintiffs have not alleged with particularity that Nuvelo used any combination of p-value and number of trials other than one of those two options.

C

Plaintiffs third alleged misleading omission also relates to CO phase 2 trial p-values.  Plaintiffs allege that Nuvelo's business team imposed an even stricter efficacy requirement whereby Nuvelo would market alfimeprase to treat CO only if alfimeprase substantially outperformed competition from off-label thrombolytic drugs, "even if the drug was otherwise qualified for FDA approval." Doc #31 at 6.  Plaintiffs allege that "Nuvelo had an undisclosed 'target product profile' which would be necessary to meet in order for [Nuvelo] to market alfimeprase for CO, such that [Nuvelo] would not proceed to market alfimeprase for that indication if the trial results did not meet that profile, <u>even if the drug was otherwise qualified for FDA approval</u>."  Id.

Acknowledging that alfimeprase might receive FDA approval if SONOMA-3 replicated the results of SONOMA-2, plaintiffs allege that defendants terminated SONOMA-3 because, as Levy disclosed at the end of the class period, defendants believed alfimeprase "likely would not meet the target product profile [they] believe[d]

necessary for commercial success in the marketplace."  Id at 24–25.
Levy further stated, "Clearly, the marketplace today is only around
$100 million and to be successful, you really have to have a very
good product profile."  Id at 25.  Plaintiffs allege that
alfimeprase would need to be an especially effective treatment in
order to beat competition from off-label drugs.  Id at 6.
Accordingly, plaintiffs claim that defendants harbored secret
criteria for judging the marketability of alfimeprase, criteria
which were exceptionally high and which made investment in Nuvelo
more risky than investors were led to believe.

        The first flaw in plaintiffs' theory is the lack of
particularized allegations in the complaint.  Plaintiffs allege no
details of the supposed "target product profile."  Accordingly
there is no factual basis from which to infer that the differences
between the "target" product profile and the product profile
necessary for FDA approval were material.

        Plaintiffs state in their opposition to defendants'
motion to dismiss that the "target product profile" was simply a p-
value requirement of 0.001.  Doc #44 at 26 & n16.  To begin, that
allegation of fact does not appear in the complaint, and plaintiffs
may not plead new facts via motion practice.  Moreover, the details
of the "target product profile" were disclosed after the end of the
class period, raising loss-causation issues —— the end of the class
period should coincide with the revelation of the fraud to the
market.  But even if details regarding the target product profile
had been disclosed earlier and alleged in the complaint, plaintiffs
allege no facts from which to infer that a p-value of 0.001 differs
in a material way from a p-value of 0.00125.  The court can

calculate that the difference is 0.00025, but the court has no context in which to interpret that number.  Plaintiffs do not state with particularity why that difference is meaningful rather than trivial.  There are no facts alleged sufficient to prove that earlier disclosure of this internal target product profile would have affected the stock price materially.

Perhaps more fundamentally, the risk that a product may receive federal approval but not the marketplace's acceptance should be obvious.  Plaintiffs do not explain how defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  Brody, 280 F3d at 1006.  Nowhere did defendants suggest that successful commercialization would be a likely or automatic result of FDA approval.

D

Finally, plaintiffs allege that defendants failed to disclose the risk that competition from off-label use of other drugs and mechanical clot-busting techniques would render the market for alfimeprase smaller than they led the market to believe.  Doc #31 at 36-37, 42, 46, 50, 53, 57.  According to plaintiffs, this undisclosed risk rendered misleading defendants' statements about the potential market share for alfimeprase if it were to win regulatory approval.

There are significant problems with this final contention.  First, plaintiffs do not specify to which statements these concerns apply.  See Doc #31 at 34-59.  Putting that aside, there are three statements presented in the complaint that are

**United States District Court**
For the Northern District of California

candidates.   On January 5, 2006, the first day of the class period,
defendant Love stated during a conference call with investors, "So
I think people really do see this as a transformational therapy,
much like serotonin reuptake inhibitors were in Depression * * * ."
Doc #35-3, Exh B at 7.   In a February 27, 2006 conference call,
defendant Levy stated, "In the case of acute PAO, there is no
currently available FDA approved drug making it an unmet medical
need and the Phase 2 data for alfimeprase has demonstrated that it
has a real potential to transform the treatment of this condition."
Doc #35-4, Exh D at 6.   And in the same February 27 conference
call, defendant Love stated, "Our partnership with Bayer is
predicated on a belief that alfimeprase has the potential to
transform treatment for the more than 10 million people in the
western world who suffer from blood clot related conditions each
year * * * ."   Id at 8.

None of these three statements is specifically alleged to
be false.   The complaint does not allege that the people to which
Love referred did not see alfimeprase as transformational, that
there were other FDA approved drugs for acute PAO to compete with
alfimeprase or that the partnership with Bayer was predicated on
something different.   Instead, the complaint seems to allege that
these statements together create the impression that alfimeprase
will have no market competition, which is allegedly false because
of competition from off-label use of other drugs and mechanical
clot busting techniques.

Moreover, plaintiffs have not alleged sufficient facts to
indicate that these statements are misleading.   First, off-label
use is "commonplace in modern medical practice and ubiquitous in

United States District Court
For the Northern District of California

certain specialties." <u>Washington Legal Foundation v Henney</u>, 202 F3d 331, 333 (D C Cir 2000).  Absent an allegation that defendants fraudulently stated that there would be <u>no</u> competition from off-label uses of other drugs, defendants cannot be said to have misled the market by failing to disclose information that is generally understood.  Second, in its March 15, 2006 Form 10-K, Nuvelo disclosed that off-label drugs <u>were</u> being used to treat PAO.  Doc #35-6, Exh E at 10.  Based on that disclosure, plaintiffs have not alleged facts sufficient to demonstrate that defendants made misleading or inaccurate statements about the potential market size of alfimeprase or potential competition from off-label uses of other drugs.

III

Additionally, defendants' alleged misstatements about the "path to regulatory approval" and potential for "transformative" commercial success are shielded by the PLSRA safe harbor provision. The alleged misstatements about the likelihood of future success at phase 3 trials, regulatory approval, or commercialization of alfimeprase all fit the definition of forward-looking statements under the PLSRA.  15 USC § 78u-5(i)(1)(A)-(D) (defining forward-looking statements as including "a projection of revenues," "plans and objectives of management" and "assumptions underlying or relating to" the above); <u>Noble Asset Management v Allos Therapeutics, Inc</u>, 2005 WL 4161977, at *9 (D Col 2005) ("Projections about the likelihood of FDA approval are forward-looking statements" because they are predictions of the "Company's plans for its product * * * .").

United States District Court

For the Northern District of California

As such, these forward-looking statements are not actionable because they meet the requirements for protection under the PLSRA safe harbor provision.  Under that provision, a defendant "shall not be liable" with respect to any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 USC § 78-u-5(c)(1).  Defendants identified their statements about phase 3 trials, regulatory approval and commercial success as "forward-looking."  See, e g, Doc #35-2, Exh A at 3.  Additionally, the statements at issue contained the usual cautionary statements.  See, e g, Doc #35-2, Exh A at 3.  While plaintiffs label such language "boiler-plate risk warnings," Doc #40 at 37, language of this sort generally suffices to invoke the safe harbor of section 21E as long as it is "precise and relate[s] directly to the forward-looking statements at issue."  In re Copper Mountain Securities Litigation, 311 F Supp 2d 857, 882 (ND Cal 2004).  Statements in recent SEC filings, incorporated by reference in defendants' projections, included among the risk factors possibly affecting forward-looking projections:  "Clinical trials are lengthy, complex, and expensive processes with uncertain results. * * * Results attained in pre-clinical testing and early clinical studies, or trials, may not be predictive of results that are obtained in later studies. * * * If the clinical trials for a drug candidate are unsuccessful, we will be unable to commercialize the drug candidate."  Doc #35-26, Exh R at 20-21.  See Employers Teamsters Local Nos 175 & 505 Pension Trust Fund v Clorox Co, 353

33

**United States District Court**
For the Northern District of California

F3d 1125, 1133 (9th Cir 2004) (relying on similar language in SEC filing for cautionary language rendering the safe harbor applicable).  Plaintiffs argue that none of these risk factors included the precise problem that went wrong and caused Nuvelo to fail to replicate its phase 2 trial results at phase 3 (Doc #40 at 37), but the law does not require specification of the particular factor that ultimately renders the forward-looking statement incorrect.  See Harris v IVAX Corp, 182 F3d 799, 807 (11th Cir 1999); Noble Asset Management, 2005 WL 4161977, at *9 (holding that general warnings about phase 3 trial failures were sufficient to put investors on notice about uncertainties surrounding FDA approval).  Accordingly, the alleged misstatements relating to future success in phase 3 trials, regulatory approval and commercialization are not actionable for the additional reason that they are shielded by the safe harbor provision.

IV

Because plaintiffs have failed to: (1) link defendants' alleged misstatements and omissions with the cause of plaintiffs' alleged loss as required by Dura Pharmaceuticals, (2) allege that defendants' statements were misleading or (3) demonstrate that defendants' statements were not shielded by the safe harbor for forward-looking statements, the court GRANTS defendants' motion to dismiss.  Plaintiffs are granted leave to file an amended consolidated complaint not later than December 31, 2008.  Because of the possibility that plaintiffs may be able to allege defendants had knowledge of problems with the phase 2 trials that, although insufficient to put defendants to a duty to disclose these problems

prior to the class period, made one or more statements during the
class period actionable, this dismissal is without prejudice.
Should plaintiffs amend the complaint, the court strongly urges
that they heed the directive of Rule 8 to plead "a short and plain
statement" of their claim without the distended evidentiary detail
that characterizes the pleading this order dismisses, but instead a
pleading which directly (and one hopes succinctly) addresses the
causation and other difficulties discussed in this order.

          IT IS SO ORDERED.

          _____
          VAUGHN R WALKER
          United States District Chief Judge

**United States District Court**
For the Northern District of California